**CRAVATH, SWAINE & MOORE LLP**
J. Wesley Earnhardt (*pro hac vice*)
Helam Gebremariam (*pro hac vice*)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
wearnhardt@cravath.com
hgebremariam@cravath.com
Attorneys for Defendants

*(additional counsel on signature page)*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

| | |
|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, CENTRAL PENNSYLVANIA TEAMSTERS PENSION FUND, CENTRAL PENNSYLVANIA TEAMSTERS PENSION FUND – RETIREMENT INCOME PLAN 1987, CENTRAL PENNSYLVANIA TEAMSTERS HEALTH AND WELFARE FUND AND JOHN P. TALBOT, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY, ROBERT IGER, ROBERT CHAPEK, CHRISTINE M. MCCARTHY AND KAREEM DANIEL,<br><br>Defendants. | Case No. 2:23-cv-03661<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' CONSOLIDATED MOTION TO DISMISS CONSOLIDATED COMPLAINT**<br><br>Filed concurrently:<br>- Notice of Motion & Motion to Dismiss<br>- Request for Judicial Notice and Consideration of Documents Incorporated by Reference<br>- Declaration of Lauren Barnett<br>- [Proposed] Order<br><br>Date:     March 26, 2024<br>Time:    10:00 a.m.<br>Ctrm:   8D<br><br>Judge Consuelo B. Marshall |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. ii

I.    FACTUAL BACKGROUND ........................................................3

    A.    Disney Extensively Warns Investors About the Risks of
Disney+. ...............................................................................3

    B.    Confronted with COVID, Disney Aggressively Invests in DTC
and Disney+..........................................................................4

    C.    Disney Discloses Disney+ Subscriber Counts and ARPU Each
and Every Quarter. ...............................................................6

    D.    Disney Discloses DTC Operating Losses Each and Every
Quarter. ................................................................................8

    E.    The DMED Reorganization Has No Impact on Disney's
Transparency. .......................................................................8

    F.    Mr. Iger Returns as Disney's CEO and Changes the Business
Strategy. ...............................................................................9

    G.    Plaintiffs' Claims Are Premised on Disney's Fully Disclosed
DTC Strategy.......................................................................10

II.   LEGAL STANDARD ...............................................................11

III.  ARGUMENT ...........................................................................11

    A.    Plaintiffs' 10(b) Claim (Count I) Fails As A Matter of Law. .............11

        1.    Disney Disclosed the Information Plaintiffs Assert Was
Concealed............................................................................11

        2.    Plaintiffs' Alleged Misstatements Are Non-Actionable...........18

        3.    Plaintiffs' Claims Against Mr. Iger Are Particularly
Deficient..............................................................................26

        4.    Plaintiffs Fail to Plead Scienter.............................................26

        5.    Plaintiffs Fail to Plead Loss Causation. .................................36

    B.    Plaintiffs' § 20A Contemporaneous Trading Claim (Count II)
Fails As A Matter of Law.....................................................39

    C.    Plaintiffs' Control Person Liability Claim (Count III) Fails As
A Matter of Law. .................................................................40

IV.   Conclusion ..............................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................11

*Barnes v. Edison Int'l*,
   2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir.
   Mar. 18, 2022)......................................................................................20

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..................................................................................37

*Brody v. Transitional Hosp. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ...................................................................19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ..............................................................25, 27, 29

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
   963 F. Supp. 2d 1092 (E.D. Wash. 2013).................................................27

*Costabile v. Natus Medical Inc.*,
   293 F. Supp. 3d 994 (N.D. Cal. 2018).............................................32, 35

*Gammel v. Hewlett-Packard Co.*,
   905 F. Supp. 2d 1052 (C.D. Cal. Aug. 29, 2012) ...............................22

*Gregory Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) .......................................................22, 23, 38, 39

*In re Accuray, Inc. Sec. Litig.*,
   757 F. Supp. 2d 936 (N.D. Cal. 2010)......................................................29

*In re Arrowhead*,
   2016 WL 6562066 (C.D. Cal Mar. 29, 2016).........................................40

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
   355 F. Supp. 2d 1069 (9th Cir. 2005).................................................22, 32

*In re Countrywide Financial Corp. Securities Litigation*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008).............................................39, 40

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ...........................................................19, 20, 24, 25

*In re Edward D. Jones & Co. L.P. Sec. Litig.*,
   2019 WL 5887209 (E.D. Cal. Nov. 12, 2019), *rev'd on other grounds*, 990 F.3d
   692 (9th Cir. 2021)
   ...............................................................................................................11

*In re Hansen Natural Corp. Securities Litigation*,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) .........................................................2, 26

*In re Herbalife, Ltd. Sec. Litig.*,
   2015 WL 1245191 (C.D. Cal. Mar. 16, 2015)...................................................37

*In re Hertz Glob. Holdings Inc. Sheet Metal Workers Local Union 80 Pension Tr.
   Fund*,
   905 F.3d 106 (3d Cir. 2018) .............................................................................32

*In re ICN Pharms., Inc., Sec. Litig.*,
   299 F. Supp. 2d 1055 (C.D. Cal. 2004) ............................................................14

*In re Leapfrog Enter., Inc. Sec. Litig.*,
   200 F. Supp. 3d 987 (N.D. Cal. 2016)...............................................................12

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ..................................................................36, 37, 38

*In re Nimble Storage, Inc. Sec. Litig.*,
   252 F. Supp. 3d 848 (N.D. Cal. 2017)...............................................................13

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ..................................................................18, 28, 32

*In re Silicon Graphics Inc. Securities Litigation*,
   183 F.3d 970 (9th Cir. 1999) .............................................................................2

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   2000 WL 1727377 (N.D. Cal. Sept. 29, 2000)..................................................35

*In re Vantive Corp. Sec. Litig.*,
   110 F. Supp. 2d 1209 (N.D. Cal. 2000), *aff'd,* 283 F.3d 1079 (9th Cir. 2002)..33

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   2 F.4th 1199 (9th Cir. 2021) ............................................................................12

*In re Wet Seal*,
518 F. Supp. 2d 1148, 1174 (C.D. Cal. 2007) ...........................................32, 40

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ......................................................................13

*Janus Capital Group Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)......................................................................................26

*Lefter v. Yirendai Ltd.*,
2017 WL 2017 WL 2857535 (C.D. Cal. 2017)....................................19

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ...............................................................28, 39

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ..................................................................36, 37

*Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022) ...................................................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).................................................................................18, 19

*McCasland v. FormFactor, Inc.*,
2008 WL 2951275 (N.D. Cal.) ...............................................................28, 29

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...............................................................passim

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ..................................................................passim

*Phillips v. LCI International, Inc.*,
190 F.3d 609 (4th Cir. 1999) .......................................................................33

*Police Ret. Sys. of St. Louis v. Intuitive Surgical*,
759 F.3d 1051 (9th Cir. 2014) ................................................................passim

*Prodanova v. H.C. Wainwright Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) ...............................................................27, 30

*Rigel Pharms., Inc. Sec. Litig. v. Deleage*,
697 F.3d 869 (9th Cir. 2012) .......................................................................32

MOTION TO DISMISS CONSOLIDATED COMPLAINT

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...............................................................34

*Scheller v. Nutanix, Inc.*,
   450 F. Supp. 3d 1024 (N.D. Cal. 2020)...............................................22

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...............................................................27

*Scripsamerica, Inc. v. Ironridge Global LLC*,
   56 F. Supp. 3d 1121 (C.D. Cal. 2014) .................................................27

*Simpson v. Homestore.com, Inc.*,
   519 F.3d 1041 (9th Cir. 2008) .............................................................11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).............................................................................27

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) .............................................31, 32, 36

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) .............................................18, 19, 29

*Wozniak v. Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012)...............................................22

*Yourish v. California Amplifier*,
   191 F.3d 983 (9th Cir. 1999) ...............................................................28

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .......................................................passim

**Statutes & Rules**

15 U.S.C. § 78u-4...................................................................................26

15 U.S.C. § 78u-5.................................................................22, 23, 24

Fed. R. Civ. P. 9(b) ...............................................................................11

Fed. R. Civ. P. 12(b)(6).........................................................................11

Private Securities Litigation Reform Act (PSLRA) .............................11, 13, 22, 23

Rule 10b-5........................................................................................passim

-v-

The Consolidated Complaint spends nearly 200 pages criticizing various business decisions at Disney, asserting—with the benefit of hindsight—that Defendants should have run Disney's streaming service, Disney+, differently than they did.  But the securities laws provide remedies for fraud, not unpopular business decisions.  A plaintiff cannot "skirt[] dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful".  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).  Plaintiffs do not adequately plead securities fraud.

**First**, there can be no securities fraud under any theory—not one framed as misstatements nor one dramatized as a scheme—unless Plaintiffs adequately plead that Defendants did something to deceive investors.  Here, Plaintiffs cannot plead that bedrock element of deception because the purported fraud—sacrificing short-term profits to grow Disney+ subscribers—was fully and repeatedly disclosed to investors.

Whether or not that was a good plan, it cannot be securities fraud because Defendants consistently disclosed the very information that Plaintiffs allege was concealed, including that (i) launching Direct-to-Consumer ("DTC") and investing in Disney+ had caused—and would continue to cause—large operating losses for years; (ii) Disney would spend significant money on Disney+ content; (iii) certain subscribers (wholesale subscribers and those in international markets) were less financially beneficial than others; (iv) Disney would forgo revenue from other sources to attract subscribers to Disney+; (v) Disney reorganized the company to have a Disney Media and Entertainment Distribution ("DMED") division to focus on DTC distribution; and (vi) Disney's plans for DTC were risky and might fail.  Whether alternatively characterized as "nine artifices" related to an alleged scheme or as eight categories of alleged misstatements, Plaintiffs' 10b-5 claim fails for the same reason:  Plaintiffs cannot show that Defendants concealed material information and thereby misled investors.  (*Infra* § III.A.1.)

**Second**, Plaintiffs identify no actionable misstatement or omission.  Plaintiffs do not even attempt to allege that Defendants misstated DTC's financial performance,

conceding, as they must, that Defendants accurately disclosed Disney+'s subscriber count and average revenue per user ("ARPU"), and DTC's operating losses and content spend every quarter.  Having accurately disclosed those "hard metrics" to investors, Defendants had no duty to disclose more, which is fatal to Plaintiffs' claims.  Plaintiffs' alleged misstatements fail for separate, independent reasons.  Many are non-actionable because they merely express general corporate optimism (or puffery).  Others are non-actionable opinion statements, which Plaintiffs do not plead were disbelieved when made.  Others still are forward-looking statements accompanied by meaningful cautionary language, which are non-actionable under the PSLRA's "safe harbor".  (*Infra* § III.A.2.)

*Third*, the Ninth Circuit has emphasized that plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct".  *In re Hansen Natural Corp. Securities Litigation*, 527 F. Supp. 2d 1142, 1154 (C.D. Cal. 2007) (citing *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 974 (9th Cir. 1999)).  Plaintiffs do not come close to satisfying that exacting standard.  Plaintiffs allege no facts to show that any Defendant intentionally or with deliberate recklessness hid any material information from investors.  Plaintiffs assert that Defendants had access to internal data, but they do not identify any mismatch between what Defendants knew and what they disclosed.  The confidential witnesses (CWs) that Plaintiffs offer are long on hindsight critique of the DTC strategy but allege little or no interaction with the Defendants and identify neither concealed nor contradictory information to which any Defendant was privy.  And Disney's compensation structure, Mr. Chapek's management style, and the departures of Messrs. Chapek and Daniel and Ms. McCarthy are run-of-the-mill corporate occurrences, with some all the more common after a disappointing business downturn.  None are strong circumstantial evidence of scienter.  (*Infra* § III.A.4.)

*Fourth*, Plaintiffs have not adequately pleaded loss causation.  Plaintiffs allege that the supposed fraud was "corrected" on three dates:  November 10, 2021; November 8, 2022; and May 10, 2023, when Disney reported quarterly results.  But Plaintiffs ignore

that the supposedly revelatory information Plaintiffs identify on these three dates already had been disclosed by Disney months earlier and was therefore neither new nor corrective, which defeats loss causation as a matter of law.  (*Infra* § III.A.5.)

Because Plaintiffs fail to plead a predicate violation of § 10(b), their § 20A (Count II) and 20(a) (Count III) claims also should be dismissed.  (*Infra* §§ III.B, III.C.)

# I.   FACTUAL BACKGROUND

The below facts are those pleaded by Plaintiffs, including from documents the Consolidated Complaint incorporates by reference, or that are subject to judicial notice. Plaintiffs' well-pleaded facts are accepted as true only for purposes of this motion.

## A. Disney Extensively Warns Investors About the Risks of Disney+.

On August 8, 2017, Bob Iger, then-CEO of Disney, announced that the Company would pivot towards distributing its content via its own DTC streaming services, including Disney+.  (Consolidated Complaint ("CC") ¶ 105.)  Even before its launch and continuing ever since, Disney warned investors that its DTC strategy came with significant risk, including that:

- Disney+ would not achieve profitability until five years after its launch and, in the interim, would cause Disney to suffer billions of dollars in operating losses;
- "There can be no assurance that [its] DTC offerings and other efforts will successfully respond to" "shifting patterns of content consumption";
- Disney "expect[ed] to forgo revenue from traditional sources" in the short term;
- Disney "anticipate[d] an increase in programming and production investments to create exclusive content for Disney+";
- There was "no assurance that the DTC model and other business models [it] may develop will ultimately be as profitable as [its] existing business models";
- "Changes in [Disney's] business strategy or restructuring of [its] businesses may increase [its] costs or otherwise affect the profitability of [its] businesses"; and
- "[I]nvestments related to direct-to-consumer offerings" "may have short-term returns that are negative or low and the ultimate business prospects may be uncertain".  (Ex. 10, 2019 Form 10-K (11/20/19) at 147-50, 179 ("DTC Risk Factors").)

Disney further warned that the success of DTC distribution (i) "depend[ed] on acceptance of [its] offerings and products by consumers outside the U.S., and their success therefore depends on [its] ability to successfully predict and adapt to changing consumer tastes and preferences outside as well as inside the U.S."; (ii) Disney "must often invest substantial amounts in film production, television programming, [and] other content production" "before [it] know[s] the extent to which these products will earn consumer acceptance"; and (iii) "[i]f [its] entertainment offerings and products do not achieve sufficient consumer acceptance", Disney's "subscription fees" "may decline or fail to grow to the extent [it] anticipate[d] when making investment decisions and thereby adversely affect the profitability of one or more of [its] businesses". (*E.g.*, Ex. 10, 2019 Form 10-K ("10-K") at 147 (hereafter "Consumer Risk Factors").)

Defendants were upfront with investors about the costs and risks associated with its DTC strategy. Disney reiterated its DTC Risk Factors and Consumer Risk Factors ***in each and every annual and quarterly report*** issued during the Class Period.[1]

**B. Confronted with COVID, Disney Aggressively Invests in DTC and Disney+.**

On November 12, 2019, Disney launched Disney+. (CC ¶ 108.) While Mr. Iger had set an initial target of 60-90 million subscribers and profitability in five years (*i.e.*, by the end of 2024) (*id.* ¶ 110), Disney+ reached 26.5 million subscribers in only three months. (CC ¶ 106-10.) In February 2020, Mr. Iger disclosed that 20% of the subscribers had signed up through a wholesale deal with Verizon, which offered a "free" year to its customers at no additional cost to them, but for which Disney would receive a fee from Verizon. (Ex. 13, Q1 FY20 Earnings Call (2/4/2020) at 356, 369; Ex. 9, Q4 FY19 Earnings Call (11/7/2019) at 102, 116.) Mr. Iger warned that it expected "near

---

[1] (*See* Ex. 12, Q1 FY20 Form 10-Q ("10-Q") (2/4/2020) at 335; Ex. 14, Q2 FY20 10-Q (5/5/2020) at 458-461; Ex. 15, Q3 FY20 10-Q (8/4/2020) at 554-57; Ex. 20, 2020 10-K (11/25/2020) at 679-684; Ex. 27, Q1 FY21 10-Q (2/11/2021) at 1072-75; Ex. 29, Q2 FY21 10-Q (5/13/2021) at 1218-21; Ex. 32, Q3 FY21 10-Q (8/12/2021) at 1360-63; Ex. 35, 2021 10-K (11/24/2021) at 1520-25; Ex. 39, Q1 FY22 10-Q (2/9/2022) at 1692; Ex. 43, Q2 FY22 10-Q (5/11/2022) at 1969; Ex. 45, Q3 FY22 10-Q (8/10/2022) at 2082; Ex. 50, 2022 10-K (11/29/2022) at 2291-94, 2298; Ex. 52, Q1 FY23 10-Q (2/8/2023) at 2502; Ex. 54, Q2 FY23 10-Q (5/10/2023) at 2630.)

term . . . subscriber growth to come primarily from outside the U.S." (Ex. 13, Q1 FY20 Earnings Call, at 363), where it would be "more of a challenge" (*id.* at 372). Finally, Mr. Iger explained that the DTC transition, including investments in Disney+, would "drive an adverse impact on the year-over-year change in segment operating income of our DTC businesses", generating "about $900 million in operating losses for the second quarter" of 2020 alone. (*Id.* at 363.)

On February 25, 2020, Mr. Iger stepped down as CEO of Disney and transitioned the role to Mr. Chapek. (CC ¶ 111.) Weeks later, COVID-19 struck. The pandemic closed Disney's theme parks and cruise lines, interrupted its sports programming and other content, and prevented theaters from playing movies. (*Id.* ¶ 115.) Disney's common stock hit a low of $79 per share. (*Id.* ¶¶ 118-19.) With new stay-at-home orders and Disney's other businesses closed, DTC became a focal point. (*Id.* ¶ 119.) Yet, just as Mr. Iger had done before, Mr. Chapek continued to disclose DTC and Disney+'s costs, risks and challenges each and every quarter. (*See supra* § I.A.)

On December 10, 2020—the start of the Class Period—Disney held an Investor Day. (CC ¶ 6.) On that date, Disney+ had 86 million subscribers, achieving four years early the 60-90 million subscriber target that Mr. Iger had set the year before. (Ex. 21, 2020 Investor Day Tr. (12/10/2020) at 805.) A senior Disney employee announced that "[d]ue to [Disney's] exceptional performance out of the gate", its "aspirations" had "grown". (*Id.* at 813.) Ms. McCarthy announced that Disney "now expect[ed] that by the end of fiscal 2024, we will have between 230 and 260 million total paid Disney+ subscribers globally, compared to the 60 to 90 million we shared last year", with profitability still expected in 2024. (*Id.* at 880, 882.) She projected that 30-40% of the subscribers would come from Hotstar, a streaming service based in India, adding that, "ARPU, as we all know, is lower in India than in the other markets that we have launched Disney+". (*Id.* at 880, 890.) Ms. McCarthy explained that "this incredible trajectory of our subscriber growth will be fueled by our continued and increased investment in high-quality content", explaining that "Disney+ content amortization expense" would grow to

***"between \$8 or \$9 billion" by 2024***, more than four times earlier spending levels.  (*Id.* at 881.)  She also explained that Disney expected  "reach its peak year of [operating] losses between fiscal 2020 and fiscal 2022", with losses possibly peaking in fiscal 2021, and would "reinvest revenue generated from [its] better-than-expected subscriber growth back into content investment".  (*Id.* at 882.)

### C. Disney Discloses Disney+ Subscriber Counts and ARPU Each and Every Quarter.

Disney publicly disclosed Disney+'s subscribers and the average revenue per user (ARPU) each and every quarter, which, as depicted below, clearly demonstrated lower ARPU over time as Disney tried to attract additional subscribers:

| Quarter Ending | Disney+ Paid Subscribers | Average Revenue Per User (ARPU) |
| --- | --- | --- |
| March 28, 2020 (Ex. 14, 5/5/2020 10-Q at 436) | 33.5 Million | \$5.63 |
| June 27, 2020 (Ex. 15, 8/4/2020 10-Q at 531) | 57.5 Million | \$4.62 |
| October 3, 2020 (Ex. 20, 11/25/2020 10-K at 705-06) | 73.7 Million | \$4.80 |
| January 2, 2021 (Ex. 27, 2/11/2021 10-Q at 1056) | 94.9 Million | \$4.03 |
| April 3, 2021 (Ex. 29, 5/13/2021 10-Q at 1193) | 103.6 Million | \$3.99 |
| July 3, 2021 (Ex. 32, 8/12/2021 10-Q at 1335) | 116.0 Million | \$4.16 |
| October 2, 2021 (Ex. 35, 2021 10-K at 1539) | 118.1 Million | \$4.08 |
| January 1, 2022 (Ex. 39, 2/9/2022 10-Q at 1673-74) | 129.8 Million | \$4.41 |
| April 2, 2022 (Ex. 43, 5/11/2022 10-Q at 1943) | 137.7 Million | \$4.35 |
| July 2, 2022 (Ex. 45, 8/10/22 10-Q at 2056-57) | 152.1 Million | \$4.35 |
| October 1, 2022 (Ex. 50, 2022 10-K at 2311) | 164.2 Million | \$4.24 |
| December 31, 2022 (Ex. 52, 2/8/2023 10-Q at 2486-87) | 161.8 Million | \$3.93 |

| Quarter Ending | Disney+ Paid Subscribers | Average Revenue Per User (ARPU) |
|---|---|---|
| April 1, 2023 (Ex. 54, 5/10/2023 10-Q at 2606) | 157.8 Million | $4.44 |

As shown in the chart, Disney disclosed that Disney+'s ARPU had declined from $5.63 as of March 2020 to $3.99 as of April 2021—a year later.  Moreover, every quarter during the Class Period, Disney specifically explained that a "paid subscriber" included "those who receive the service through wholesale arrangements in which we receive a fee for the distribution of Disney+ to each subscriber to an existing content distribution tier" and "whether acquired individually, through a wholesale arrangement or via the bundle, we refer to them as paid subscriptions".  (Ex. 15, Q3 FY20 10-Q at 531).[2]  Disney further disclosed that "wholesale arrangements have a lower average monthly revenue per paid subscriber than subscribers that we acquire directly or through third party platforms" and that, sometimes, as part of a wholesale deal, Disney would be paid a fee while the subscriber received the service at no additional cost, including with an early promotion with Verizon.  (Ex. 14, Q2 FY20 10-Q at 422)[3]  Disney also disclosed revenue impacts based on pricing differentials in certain countries, explaining that "[t]he average monthly revenue per paid subscriber for Disney+ Hotstar is significantly lower than the average monthly revenue per paid subscriber in North America and Europe".  (Ex. 15, Q3 FY20 10-Q at 531; *see* similar Ex. 27, Q1 FY21 10-Q at 1056; Ex. 29, Q2 FY21 10-Q at 1193; Ex. 43, Q2 FY22 10-Q at 1944.)  Starting in February 2020, Disney disaggregated its ARPU figures into domestic (U.S. and Canada), International (non-Hotstar) and Hotstar markets.  (Compare Ex. 35, 2021 10-K at 1539 to Ex. 39, Q1 FY22 10-Q at 1673.)

---

[2] (*See* similar at Ex. 27, Q1 FY21 10-Q at 1056; Ex. 29, Q2 FY21 10-Q at 1193; Ex. 32, Q3 FY21 at 1335; Ex. 39, Q1 FY22 10-Q at 1674; Ex. 43, Q2 FY22 10-Q at 1944; Ex. 45, Q3 FY22 10-Q at 2057; Ex. 52, Q1 FY23 10-Q at 2487; Ex. 54, Q2 FY23 10-Q at 2606-07.)

[3] (*See* similar at Ex. 27, Q1 FY21 10-Q at 1056; Ex. 29, Q2 FY21 10-Q at 1193; Ex. 43, Q2 FY22 10-Q at 1944; *see also* Ex. 13, Q1 FY20 Earnings Call at 356, 370 (referring to subscribers with "free" year for no added cost).)

**D. Disney Discloses DTC Operating Losses Each and Every Quarter.**

Disney also disclosed its quarterly operating losses for its DTC business, which revealed it was recording hundreds of millions, cumulatively ***billions***, of dollars in losses:

| Quarter Ending | DTC Operating Loss ($ Millions) |
|---|---|
| March 28, 2020 (Ex. 26, 2/1/2021 8-K at 1019) | $805 Million[4] |
| June 27, 2020 (Ex. 26, 2/1/2021 8-K at 1019) | $624 Million |
| October 3, 2020 (Ex. 26, 2/1/2021 8-K at 1019) | $374 Million |
| January 2, 2021 (Ex. 27, 2/11/2021 10-Q at 1055) | $466 Million |
| April 3, 2021 (Ex. 29, 5/13/2021 10-Q at 1193) | $290 Million |
| July 3, 2021 (Ex. 32, 8/12/2021 10-Q at 1335) | $293 Million |
| October 2, 2021 (Ex. 34A, 11/10/2021 8-K at 1480) | $630 Million |
| January 1, 2022 (Ex. 39, 2/9/2022 10-Q at 1673) | $593 Million |
| April 2, 2022 (Ex. 43, 5/11/2022 10-Q at 1942) | $887 Million |
| July 2, 2022 (Ex. 45, 8/10/2022 10-Q at 2056) | $1,061 Million |
| October 1, 2022 (Ex. 48, 11/8/2022 8-K at 2218) | $1,474 Million |
| December 31, 2022 (Ex. 52, 2/8/2023 10-Q at 2486) | $1,053 Million |
| April 1, 2023 (Ex. 54, 5/10/2023 10-Q at 2605) | $659 Million |

**E. The DMED Reorganization Has No Impact on Disney's Transparency.**

---

[4] Operating losses for the quarters ending March 28, 2020, June 27, 2020 and October 3, 2020 are from a Form 8-K issued on February 1, 2021, that explained the DMED reorganization and provided recast metrics to allow for apples-to-apples comparison to future reporting.  Under the prior segment organization, the operating losses were $812 million (Ex. 14, Q2 FY20 10-Q at 435); $706 million (Ex. 15, Q3 FY20 10-Q at 530; Ex. 16, 8-K (8/4/2020) at 578); and $580 million (Ex. 18, 8-K (11/12/2020) at 607, 610).

Prior to the Class Period, on October 12, 2020, Disney announced a strategic reorganization of its media and entertainment businesses to support its DTC transition. (Ex. 17, Press Release (10/12/2020).)  Under the new structure, "distribution and commercialization activities [would] be centralized into a single, global Media and Entertainment Distribution organization" ("DMED") that would be "responsible for all monetization of content—both distribution and ad sales—and will oversee operations of the Company's streaming services".  (*Id.* at 594.)  Kareem Daniel, a 14-year veteran of Disney, was announced as the head of DMED.  (CC ¶¶ 25, 157.)

As the charts above show, Disney continued to disclose the same hard data. Disney also disclosed the impact the DMED reorganization would have on its financial reporting.  On February 1, 2021, prior to its first report under the DMED reorganization, Disney disclosed that by contrast to its "previous segment structure", where it sometimes happened that "production and distribution activities were in different segments" requiring "the producer segment [to] recognize revenue based on an intersegment transfer price", under the DMED reorganization, "the operating results of the production and distribution activities are reported in the same segment, and the fully loaded production cost will be allocated across the distribution platforms which are utilizing the content". (Ex. 26, 8-K at 1014.)  Disney described the significant operations and major revenue and expense categories for the new segments and, to allow for comparison, disclosed key metrics for 2020 (revenue and segment operating loss) as if DMED had been in place. (*Id.* at 1015-1020.)  In doing so, Disney updated its DTC segment operating losses for 2020 to allow for appropriate comparison, as indicated in the table above.

## F.  Mr. Iger Returns as Disney's CEO and Changes the Business Strategy.

On August 11, 2022, Disney issued its third quarter 2022 results, including a quarterly DTC operating loss of $1.1 billion (a year-over-year increase of about $800 million from Q3 2021 losses).  (Ex. 46, 8-K (8/10/2022) at 2160-63.)  Ms. McCarthy explained that "peak losses" would be "in this current fiscal year '22", and that DTC operating losses in the fourth quarter would have a "similar increase year-over-year that

you saw this quarter". (Ex. 47, Q3 FY22 Earnings Call (8/11/2022) at 2207.)  On November 8, 2022, Disney issued its fourth quarter 2022 and annual results, detailing Disney+ paid subscribers and ARPU, and DTC operating loss (Ex. 48, Q4 FY22 8-K (11/8/22) at 2218-22), as it had done every quarter since launch.  The announced operating loss of $1.47 billion (a year-over-year increase of ~ $800 million from Q4 2021 losses) (CC ¶ 390) was consistent with the prior guidance.

On November 20, 2022, Mr. Chapek was terminated and Mr. Iger took the role of CEO.  (CC ¶ 11.)  Mr. Daniel was terminated the next day.  (*Id*.)  Disney disclosed that "with the recent change in leadership, there may be additional adjustments to [its] business strategies" and it "may write-down other assets as [its] strategy evolves to account for the current business environment".  (Ex. 50, 2022 10-K at 2294.)  In February 2023, Mr. Iger announced a new business strategy to "aggressively curate our general entertainment content", "reassess all markets we have launched in and also determine the right balance between global and local content", "adjust [Disney+] pricing strategy", and "leverag[e Disney's] legacy distribution platforms for marketing and programming", including "use of legacy distribution opportunities to increase revenue and more effectively amortize content investment" and a "new organizational structure [to] re-establish the direct link between content decisions and financial performance".  (Ex. 53, Q1 FY23 Earnings Call (2/8/2023) at 2539.)  Mr. Iger predicted that DTC still would reach profitability in fiscal 2024, consistent with the prior plan.  (*Id*.)  On May 10, 2023, Mr. Iger reiterated his new strategies.  (CC ¶ 394.)

**G. Plaintiffs' Claims Are Premised on Disney's Fully Disclosed DTC Strategy.**

Notwithstanding Disney's extensive disclosures of the risk of its DTC strategy, its massive investment in the DTC strategy, and the hard data and commentary to show the losses of DTC and Disney+, Plaintiffs contend that Defendants defrauded investors by enacting a deceptive scheme and making misleading statements about the Company's DTC strategy.  Plaintiffs assert that the scheme was revealed to investors on three dates on which Disney's share price declined:  November 11, 2021 (-7.1%); November 9, 2022

(-13.2%); and May 11, 2023 (-8.7%).  (CC ¶¶ 383-97.)  But all Plaintiffs have alleged is a business strategy that did not succeed.  At the end of the Class Period, the industry shifted away from a focus on subscriber growth and, as a result, Disney's previous strategy no longer was favored by Wall Street.  That is not fraud.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face".  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Securities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).  Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud".  Fed. R. Civ. P. 9(b).

## III.    ARGUMENT

### A. Plaintiffs' 10(b) Claim (Count I) Fails As A Matter of Law.

"To plead a claim under section 10(b) and Rule 10b-5, the Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation".  *Apollo Grp.*, 774 F.3d at 603.  Here, Plaintiffs also try to repackage their run-of-the-mill misstatement theory as a "scheme".  Scheme liability requires a defendant to have "the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme".  *In re Edward D. Jones & Co. L.P. Sec. Litig.*, 2019 WL 5887209, at *7 (E.D. Cal. Nov. 12, 2019), *rev'd on other grounds*, 990 F.3d 692 (9th Cir. 2021) (citing *Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008)).  Both theories fail because Defendants did not conceal anything from investors.[5]

### 1.  Disney Disclosed the Information Plaintiffs Assert Was Concealed.

The gist of the Consolidated Complaint is that Disney engaged in business

---

[5] The alleged misstatements are listed in Index A and referenced herein by their accompanying statement number in that Index.

practices—*e.g.*, steering content to Disney+, spending too much on content for Disney+, expanding Disney+ into unprofitable international markets, setting high targets for Disney+ metrics—to increase Disney+ subscribers even at the expense of short-term profits. (*E.g.*, CC ¶¶ 7-12, 43-52, 169-180.)  But Disney repeatedly and publicly disclosed that very plan to investors.  As a result, Plaintiffs' claims must fail—"[a]ny fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself".  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2 F.4th 1199, 1205 (9th Cir. 2021).

**Disney+ Subscriber Targets.**  Plaintiffs claim that Disney's Investor Day target of 230 to 260 million global subscribers by 2024 was "unattainable".  (CC ¶¶ 122, 147.)  But Plaintiffs identify no facts suggesting that the target in fact was not attainable or that any Individual Defendant believed it was not, as must be pleaded to state a claim for securities fraud.  *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1009 (N.D. Cal. 2016).  In fact, Plaintiff's own confidential witness, CW-1, who apparently assisted in preparing for the Investor Day, **confirms** that the targets announced at the December 2020 Investor Day were taken from Disney's **actual** five-year plan.  (CC ¶ 35.)  Accurately disclosing the current plan to investors is the opposite of securities fraud.  CW-1 claims that several months **after** the Investor Day presentation—in April 2021— the five-year plan **changed** to show that "Hulu would be profitable one year earlier and Disney+ one year later".  (CC ¶ 37.)  But a change in plans in April 2021 cannot render statements made in December 2020 false or misleading, and there is no allegation that Defendants did not believe the statements **when made**.  *Metzler*, 540 F.3d at 1066 (to plead securities fraud plaintiff must show statements were false or misleading "when made").  Defendants then did not repeat the subscriber predictions until November 2021 (CC ¶ 207), long after CW-1 had left the company (CC ¶ 30).  CW-1 does not possess knowledge as to the state of the five-year plan when those later statements were made.

In all events, Disney disclosed its progress (or lack thereof) in reaching the target every quarter, as well as the risks and obstacles that might cause it to miss the target.

1  (*Supra* § I.A.)  Thus, Disney gave investors adequate information to determine for

2  themselves whether the goal was attainable (*infra* § III.A.1.a); that is all the law requires.

3  *See In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 853 (N.D. Cal.

4  2017) (with accurate hard data, "investors can assess for themselves defendants'

5  statements regarding [market] penetration").  In addition, as described below, subscriber

6  targets are forward-looking statements rendered non-actionable by the PSLRA safe

7  harbor.  (*Infra* § III.A.2.c.)

8      ***Organization of DMED.***  Plaintiffs allege that the DMED reorganization was a

9  fraudulent scheme because "the reorganization was actually designed to shift power to

10  Chapek and Daniel", who used this power to "inflate[] subscriptions at the expense of

11  profitability".  (CC ¶ 307.)  That makes no sense.  Mr. Chapek was the CEO of Disney

12  and did not need a reorganization to increase his power.  Nor was it fraud to appoint

13  Mr. Daniel to head DMED, especially if he was, as Plaintiffs allege, Mr. Chapek's "most

14  trusted lieutenant".  (CC ¶ 157.)  That other people might have made a different choice is

15  not fraud, particularly given Disney's ***public disclosure*** that DMED's plan was to grow

16  subscriptions at the expense of short-term profitability.  (*See supra* § I.B.)

17      ***Feature Films.***  Plaintiffs allege that Disney schemed by "utiliz[ing] DMED to

18  steer feature films to Disney+, bypassing the lucrative theatrical release and pay-per-view

19  windows".  (CC ¶ 128.)  But this was no fraudulent scheme; it was an openly disclosed

20  business strategy to invest in DTC and adjust to post-COVID user habits, with Disney

21  expressly telling investors that it would forgo revenue from traditional sources in the

22  short term.  (*See supra* § I.A.)  Because the distribution plan was publicly disclosed,

23  Plaintiffs' allegations that Messrs. Chapek and Daniel "over[ro]de studio executives" at

24  Pixar in reaching that distribution decision (CC ¶ 128), and that Mr. Iger later disagreed

25  with the strategy, simply are not relevant to a fraud claim—"Plaintiffs cannot use the

26  benefit of 20-20 hindsight to turn management's business judgment into securities fraud".

27  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994).

28      ***"Buying" Subscribers.***  Plaintiffs assert that Chapek and Daniel spent

-13-

"unsustainably . . . to buy[] subscribers'". (CC ¶ 131.) But Defendants repeatedly told investors about Disney's aggressive content spend, calling it "a lot of money" (CC ¶ 279; *see id.* ¶¶ 278, 281-82, 284-86; Ex. 28, Q1 FY21 Earnings Call (2/11/21) at 1136), and disclosing the actual amount spent each quarter (Ex. 21, 2020 Investor Day at 881; Ex. 35, 2021 10-K at 1503, 1535, 1541 (disclosing and explaining "programming and production costs"); Ex. 50, 2022 10-K at 2275, 2306, 2312 (same)). Indeed, on the first day of the Class Period, Defendants told investors that their previous estimate of content spend for fiscal 2024 (of about $2 billion) would roughly quadruple (to between $8 and $9 billion) due to investments in Disney+. (Ex. 21, 2020 Investor Day at 881.) Defendants continued to warn about content costs throughout the Class Period, stating "we are increasing our overall long-term content expense for Disney+", particularly "towards the second half of fiscal '22" (CC ¶¶ 283-84), and that "it's all about content, content, content" (CC ¶ 285). The disclosures were clear, and Plaintiffs do not allege that the reported figures were inaccurate. (*See* CC ¶ 195.) The gist of Plaintiffs' claim is that Defendants took a "content-at-all-costs" approach. (CC ¶¶ 171-180, 307.) Plaintiffs might disagree with that decision, but it is not fraud. *In re ICN Pharms., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) ("a bad business decision" alone does not state a claim for securities fraud).

Plaintiffs further allege that Disney underrepresented its spending by means of a cost accounting model under which it amortized content expense over many years. (CC ¶ 132.) Yet Disney fully disclosed its accounting practices, including amortization—which are standard in the industry. (*See, e.g.*, Ex. 8, 2019 Investor Day (4/11/2019) at 82 (stating "roughly 80% to 90% of the content investment [would be] amortized within the first 4 years"); Ex. 35, 2021 10-K at 1538, 1541 (describing amortization practices); Ex. 50, 2022 10-K at 2306, 2310, 2313 (similar).)

***Discounts and Promotions.*** Plaintiffs assert that "costly promotions that handed consumers heavily discounted subscriptions" were part of a deceptive scheme. (CC ¶ 135.) Plaintiffs also claim that Disney misleadingly used the term "paid subscriber" to

count subscribers who received the service through a discount or promotion.  (CC ¶¶ 182, 276.)  Yet again, Disney repeatedly disclosed exactly what Plaintiffs say was hidden—that it had a mix of subscribers, some who purchased Disney+ directly, some who purchased it through a bundle, and some who obtained it via wholesale arrangements with third parties.  (*See* Ex. 27, Q1 FY21 10-Q at 1056 ("[w]hen we aggregate the total number of paid subscribers across our DTC services, whether acquired individually, through a wholesale arrangement or via the bundle, we refer to them as paid subscriptions"); *see supra* § I.C.)  Disney also disclosed that bundle and wholesale subscribers had a lower ARPU and that, sometimes, subscribers would receive Disney+ from third parties for no additional charge from a third-party.  (*See id.*)  But what Plaintiffs describe as a "gift" of free Disney+ from the Company to Hulu+ Live TV subscribers (CC ¶ 136) was actually a new bundle created by Disney, with a concomitant price increase.  (*See* Ex. 40, 8-K (2/9/2022) at 1834-35.)

***International Markets.***  Each challenge that Plaintiffs reference with the Disney+ international expansion—(i) lower ARPU, (ii) increased marketing costs, (iii) content bans and (iv) higher costs (CC ¶¶ 197-200)—was disclosed to investors.  (*E.g.*, Ex. 14, Q2 FY20 10-Q at 422; Ex. 32, Q3 FY21 10-Q at 1336; Ex. 55, Q2 FY23 Earnings Call (5/10/2023) at 2697-99.)  Disney reported that Disney+ Hotstar subscriptions brought in around $1 revenue per subscriber while others brought in over $6 per subscriber.  (*See* Ex. 43, Q2 FY22 10-Q at 1943.)  Plaintiffs also allege that Defendants concealed that subscriber growth "had stalled", and that "further international subscriber growth" would be an "unprofitable" way to grow subscribers.  (CC ¶ 302.)  Yet again, Defendants disclosed ***exactly*** what Plaintiffs contend was concealed.  Disney reported its Disney+ subscriber numbers each and every quarter, including disaggregated domestic and international subscribers (the accuracy of which Plaintiffs do not dispute), such that investors could determine subscribers and associated revenue in each market.  (*See supra* § I.C.)  "Plaintiffs' omissions theory fails to state a claim because the Defendants clearly disclosed material information".  *Apollo Grp.*, 774 F.3d at 607 (dismissing claim

regarding recruitment of flawed students when "[p]ublic filings" showed marketing spending, target students, enrollment numbers and withdrawal rates.)

*Disney+ "On Track".*  Plaintiffs cite allegedly "artificial assurances" regarding both subscriber growth and profitability targets for 2024.  (CC ¶¶ 209-212.)  But these were not assurances—they were statements of corporate optimism offered in connection with the explicitly disclosed metrics of quarterly subscriber growth.  (*Infra* § III.A.2.b.)  Plaintiffs fail to allege how these supposed assurances could mislead because they plead no facts that could show them to be false.  (*Infra* § III.A.2.a.)  Nor do Plaintiffs allege any facts suggesting Defendants did not believe these targets would be met.  (*Id.*)  In fact, Disney never issued a different Disney+ profitability target and predicts, *even now*, that DTC will be profitable in 2024.  (Ex. 57, Q4 FY23 Earnings Call (11/8/23) at 2801.)

*"Accounting Manipulations".*  Despite Disney's consistent disclosure of massive DTC operating losses, Plaintiffs assert that Disney used "accounting manipulations" to conceal Disney+ costs.  Plaintiffs *do not* allege any GAAP violations or accounting errors, and the assertions they do make fail.

*First*, Plaintiffs criticize Defendants for failing to "disclose any further details" or "break out the exact financial impact of the DMED reporting change".  (CC ¶ 218.)  But Disney fully explained the reporting change in a February 1, 2021 8-K—*prior to* implementing it.  (*Supra* § I.D, E.)  Disney even recast its key 2020 DTC metrics as if DMED had been in place to allow for appropriate comparison.  (*Id.*)  Disney also explained the impact of the change on Disney's operating metrics—"*the majority of the variance relates to the elimination of intersegment pricing markups under our new financial reporting structure*"—which is what Plaintiffs themselves now rely upon to demonstrate the impact of the change.  (CC ¶ 216 & n.14-17; *id.* ¶¶ 218, 289.)  Nothing was hidden from investors and, thus, there can be no fraud.

*Second*, Plaintiffs assert that Defendants should have disclosed "the impact of the reporting change on the operating results or content costs at the Disney+ level".  (CC ¶ 218.)  Plaintiffs provide no support for that assertion, failing to allege that Disney's

disclosures violated any reporting requirement or GAAP principle, and failing to show how the change could have misled investors.  Nor could they, in light of Disney's thorough disclosure regarding the impact of the reorganization.  (*Supra* § I.D, E.)

**Third**, Plaintiffs allege that Defendants concealed the content production costs by amortizing those costs over several years.  (CC ¶ 287(d).)  But that amortization practice, too, was disclosed.  (*See supra* § III.A.1 at 15-16.)  Plaintiffs "must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position".  *Apollo Grp.*, 774 F.3d at 609.  They do not, and thereby fail to allege fraud.

**Fourth**, Plaintiffs assert that Defendants "artificially shifte[d] content and marketing costs from Disney+ to other divisions" by airing content on legacy channels first.  (CC ¶ 222.)  Not only is that assertion contrary to Plaintiffs' other allegations—where, for example, they fault Defendants for being "too eager to send films directly to streaming" (CC ¶ 166)—Plaintiffs do not explain what was "artificial" or how this practice misled investors.  Rather, consistent with Plaintiffs' account of Disney's "internal" policy (CC ¶ 223 n.20), Disney publicly disclosed that, under DMED, "the fully loaded production cost will be allocated across the distribution platforms which are utilizing the content".  (Ex. 26, 8-K at 1014.)  Where to debut content (and for what reason) is a business decision, and Plaintiffs do not explain why choosing one platform over another to achieve Disney's overall objectives is wrongful, or how it possibly could be fraudulent.  Plaintiffs' contradictory, conclusory—and, frankly, confused—allegations fail.  *Apollo Grp.*, 774 F.3d at 602 (accounting not misleading without showing that "numbers were incorrect or misstated").

**Churn.**  Disney did not conceal that it experienced churn—which is monitored and reported by third parties.  (CC ¶¶ 224, 226, 312(a).)  Plaintiffs challenge two main statements concerning Disney+ churn, namely that (i) as of June 14, 2021, churn was not "significantly higher" following a price increase (Stmt. 78), and (ii) as of August 12, 2021, "churn ha[d] declined" (Stmt. 79).  Plaintiffs plead no facts suggesting those

statements were false.  Plaintiffs cite a *Wall Street Journal* article **from August 2022** reporting that Disney's churn rate was higher **in June 2022** (Q2 2022) than it had been in June 2021 (Q2 2021) (CC ¶ 312(a)), which tends to (i) confirm (rather than undermine) Disney's disclosure that, **as of June 2021**, churn had not significantly increased; and (ii) says nothing about whether churn had declined **as of August 2021**.  Similarly, Plaintiffs' unsourced statement that monthly churn increased from 3.75% to 4.25% between 2021 and 2022 (CC ¶ 312(a)) does not undermine Disney's statements about its churn **as of 2021**.  Plaintiffs' real gripe seems to be that Disney did not publicly disclose its specific churn rates each quarter.  (CC ¶ 143-44.)  But Defendants had no obligation to do so.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014) (Securities laws do not "create[] an affirmative duty to disclose any and all material information") (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)).

* * *

Whether labeled as a scheme or series of misstatements, Plaintiffs' fraud claim relies entirely on allegedly concealed information that Defendants repeatedly and consistently disclosed to investors, which causes the claim to fail as a matter of law.

### 2.  Plaintiffs' Alleged Misstatements Are Non-Actionable.

Plaintiffs litter their 200-page Complaint with blocks of bolded and italicized text, which purportedly form the basis of their claims.  But, as shown in the previous section, Plaintiffs fail to allege with particularity that any public statement was false or misleading.  That alone is dispositive.  In addition, each of the statements is non-actionable for independent reasons—Defendants had no duty to disclose more than they did; the statements are puffery; the statements are forward-looking statements protected by the PSLRA's safe harbor; and the statements are opinions.

a.  Having Accurately Disclosed "Hard Data", Defendants Had No Duty To Disclose Additional Information.

"Section 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information'".  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611,

620 (9th Cir. 2022) (quoting *Matrixx*, 563 U.S. at 44). Companies have no obligation to "disclose a negative internal development [unless] its omission would make other statements materially misleading". *Id.* In other words, "[t]here is no rule [] that 'once a disclosure is made, there is a duty to make it complete and accurate'". *Lefter v. Yirendai Ltd.*, 2017 WL 2017 WL 2857535, at *6 (C.D. Cal. 2017) (quoting *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Such "a completeness rule would sweep too broadly, as 'no matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not'". *Id.* If a company provides accurate information to investors that does not mislead, it has no duty to provide anything more. *Id.*

Here, Plaintiffs do not contest the accuracy of Defendants' disclosures concerning DTC's financial performance. Nor could they. Each and every quarter since its launch, Disney accurately disclosed Disney+'s paid subscriber numbers and ARPU, as well as the DTC segment's revenues, operating expenses and operating losses. (*Supra* § I.C, B.) Because those disclosures are extensive, accurate and not misleading—and because Defendants have maintained their prediction of DTC profitability by fiscal 2024— Defendants had no duty to disclose the litany of peripheral information in the Consolidated Complaint. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) ("Rule 10b-5 [prohibits] only misleading and untrue statements, not statements that are incomplete").

### b.  Plaintiffs' Challenged Statements Are Non-Actionable Puffery.

"[V]ague statements of optimism like good, well-regarded, or other feel good monikers" cannot form the basis for securities liability because investors "know how to devalue the optimism of corporate executives". *Police Ret. Sys. of St. Louis v. Intuitive Surgical*, 759 F.3d 1051, 1060 (9th Cir. 2014). Plaintiffs challenge numerous vague expressions of optimism, including that Defendants were "pleased" or "happy" with Disney+, that Disney's DTC business had "robust" or "solid" performance, and that the Company was "confident" in its strategy, including its "exceptional" leadership. Such

"optimistic, subjective assessment[s] hardly amount[] to a securities violation". *In re Cutera*, 610 F.3d at 1109; *see also Barnes v. Edison Int'l*, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir. Mar. 18, 2022) (holding language that "vaguely refer[ed] to . . . prioritization, improvement, and funding of safety procedures" was nonactionable puffery).)  Examples of obvious puffery include:

**Optimism Regarding Subscribers (*See* Stmts. 1, 2, 3, 6, 12-14, 16-18, 24-25, 27, 31, 36-39, 55):**

"Disney+ . . . ha[s] *performed incredibly well*, with 116 million . . . subscribers";

"[S]ubscriber growth was also solid at our core Disney+ markets";

"[W]e are extremely pleased with the success of our portfolio of streaming services [that] continue to perform incredibly well";

"Overall, *we are pleased* with Disney+ subscriber growth in the quarter";

"The growth of the platform since its launch *reinforces its unique nature*";

"And *significant subscriber growth* at our streaming services, which added 15.5 million subscriptions in the quarter";

"*Strong Disney+ core net subscriber* additions 6 million reflect growth";

"It has taken just 3 short years for Disney+ to transform from a nascent business to an industry leader".

**Optimism Regarding the Quality of Disney+ Content (*See* Stmts. 17, 44, 48, 52-53):**

"Disney+ subscribers around the world enthusiastically embraced Pixar's Academy Award-winning 'Soul' and the critically-acclaimed 'Luca'";

"And taking a wonderful family film like Luca in the middle of summer and putting that direct on the service will have sort of a similar impact like we saw when we did Soul back at the holiday time, and that was a huge boost to Disney+";

"Encanto *became a phenomenon* within days of its arrival on Disney+";

"And that's the thing that pleases me the most out of everything that came out of Disney+ Day is *the quality and the resonance of everything* across all of our different brand platforms, how great it is".

**Optimism Regarding Content (*See* Stmts. 12, 14, 38, 17, 41-43, 46-50, 54-56):**

"[C]onsumer behavior really does drive our decision-making" and "the rapid growth of our portfolio of D2C services provides us with an even greater opportunity to understand their preferences . . . to help determine how to optimally engage with our audiences";

"[T]he actual content that's pouring out and the amount of content that's pouring out, we think that *we're tremendously positioned* for the future of DTC services";

"First of all is our content slate. As you know, we're spending a lot of money across our variety of franchises in order to create the content that's going to keep consumers coming back and *keep not only our sub number growing but also our engagement growing* across all of our platforms";

"[W]e really tailor our content in terms of the number of active hours that are needed to maintain healthy engagement";

"Our robust *pipeline of content* continues to fuel growth, and we have an incredible line-up of new programming for Disney+".

**<u>Optimism Regarding International Expansion (*See* Stmts. 18, 65, 68-70):</u>**

"We also saw *strong additions* to our subscriber base from our November launch";

"So our *retention is very healthy* across the globe. We're really, really pleased".

**<u>Optimism Regarding Churn (*See* Stmts. 65, 77-80):</u>**

"[I]n terms of the health of Disney+, we feel really great about our sub trajectory";

"So the fact that our *churn is so low, our engagement is so high, our retention is so high* amongst the local quarters where we're taking price increases, I think, says everything about it";

"So in regard to the specific churn related to the anniversary of the Verizon launch promotion from last November 2020, *we're really happy* with the conversion numbers that we have seen there going from the promotion to become paid subscribers";

"We're *really pleased* with churn";

"[W]e're *extraordinarily pleased* with the low churn that we see".

**<u>Optimism Regarding DMED (*See* Stmts. 41, 58, 72-76):</u>**

"While we have always valued the data gained through our numerous consumer touch points, the *rapid growth* of our portfolio of D2C services provides us with an even *greater opportunity to understand their preferences* . . . . In fact, our team uses all of the information available to us when determining how best to allocate our creative content budgets across all platforms";

"I'm *100% confident* that this is going to play out exactly as we had intended. *It's going extremely well*. And despite the disruption in everyone's roles, I think we have *100% buy-in*".

**<u>Optimism Regarding Executive Leadership (*See* Stmts. 72, 81):</u>**

"Kareem is an exceptionally talented, innovative and forward-looking leader, with a strong track record";

"I can think of *no one better suited* to lead this effort than Kareem";

"Disney was dealt a tough hand by the pandemic, yet with Bob at the helm, our businesses—from parks to streaming—*not only weathered the storm, but emerged in a position of strength*".

Courts have routinely dismissed challenged statements with almost identical general and optimistic wording.  In *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, the Ninth Circuit held that "vague, generically positive terms, describing China as 'a great growth market,' 'a huge market opportunity,' 'a market that's growing significantly for us,' and possessing 'really good dynamics,' and describing Align's performance there as 'tremendous' and 'great'" were inactionable puffery.  39 F.4th 1092, 1098 (9th Cir. 2022); *see also In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (9th Cir. 2005) (holding that "excellent results", a "blowout winner" product, "significant sales gains", and "10% to 30% growth rate over the next several years" were puffery); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (finding statements that "[w]e are very pleased with the learning from our pilot launch", "we are very pleased with our progress" and "everything is clicking" were puffery).  Courts have likewise found that statements about a focus on consumers or the fit of leaders to be non-actionable puffery.  *See Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1038 (N.D. Cal. 2020) (statements that company had "a relentless focus on our customers" and "[d]emand for our solutions remains strong" were puffery); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1071 (C.D. Cal. Aug. 29, 2012) (statements regarding company's "position[ing] the right leaders in the right roles to accelerate the long-term growth of webOS" were puffery).

  c. <u>Plaintiffs' Challenged Statements Are Forward-Looking Statements Accompanied by Meaningful Cautionary Language</u>

Even if a statement would otherwise be actionable, the PSLRA provides a safe harbor for forward-looking statements.  15 U.S. Code § 78u–5.  It "is designed to protect companies and their officials when they merely fall short of their optimistic projections".  *Gregory Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021).  "[A] defendant will

not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading". *Id.* at 1190. Forward-looking statements include "(A) a statement containing a projection of revenues, income" "or other financial items; (B) a statement of the plans and objectives of management for future operations"; "(C) a statement of future economic performance"; and "(D) any statement of the assumptions underlying or relating to [the above]". 15 U.S.C. § 78u-5(i)(1)(A-D).

Future Disney+ Subscribers & Profitability:  Plaintiffs challenge nearly a dozen forward-looking statements indicating that Disney is "on track", "on the right trajectory", "well suited" to or "expects" to meet its 230-260 million subscriber and profitability goals by 2024.  (Stmts. 1, 4, 5, 7-17, 37, 49, 55.)  The Ninth Circuit recently held that statements that a company "was 'on track' to achieve [such] goals, and that 'there are no issues' that 'would prevent' [the company] from achieving the goal[s] are likewise forward-looking statements".  *Tesla*, 985 F.3d at 1192.  So, too, here.

Future Content Expansion:  Plaintiffs challenge statements that Disney was "looking forward to new market launches and a strong content slate later this year"; "expect[s] Disney+ core net additions in the fourth quarter to accelerate modestly"; has a "goal [of] something new every week"; and expects that Luca—"a wonderful family film"—will get "a lot of people enjoying it as we put it on the service for free this summer".  (Stmts. 12, 14, 17, 43-45, 48-52, 54-56.)  Those statements are "plans and objectives of management for future operations" protected by the PSLRA.  15 U.S.C. § 78u-5(i)(1).

Future International Expansion:  Plaintiffs also challenge forward-looking statements of future plans and objectives for Disney+'s expansion in international markets, including that it "plan[s] to bring Disney+ to consumers in 50-plus additional countries"; that the "number of markets that we're going to add will essentially double to more than 160 by FY'23"; and that "we are equally enthusiastic about our growth potential in international markets".  (Stmts. 10, 66-70, 72, 73.)  Those statements are non-

actionable forward-looking plans and objectives for future operations.

<u>Meaningful Cautionary Language</u>:  Each of those forward-looking statements was accompanied by specific and meaningful cautionary language.  During each earnings call, Disney disclosed that "expected results, growth, profitability", "statements regarding the future of our offerings (including our direct-to-consumer offerings) including content, launch dates and timing", and "expectations about general markets, markets we may serve and our potential customers or subscribers" constitute forward-looking statements, which "are subject to risks and uncertainties and actual results might differ materially from those discussed in, or implied by, the forward-looking statements".  (*See, e.g.*, Ex. 13, Q1 FY20 Earnings Call at 380 ("[l]et me also remind you, certain statements on this call, including financial estimates may constitute forward-looking statements under the securities laws").)  Disney also directed investors to its SEC filings containing detailed cautionary language that "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]".  (15 U.S.C. § 78u-5(c)(1)(A)(i); *see* Ex. 13, Q1 FY20 Earnings Call at 380.[6])  Those warnings are meaningfully cautionary because they convey the substantive information about factors that could realistically cause results to differ materially from those projected in the forward-looking statements.  *See In re Cutera,* 610 F.3d at 1112.

> d. <u>Plaintiffs' Challenged Statements Are Non-Actionable Opinion.</u>

Many of Plaintiffs' challenged statements express opinions, which are not actionable unless the plaintiff alleges—and these Plaintiffs have not—"both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue", or, in the case of a purported omission from the opinion, that "there is no reasonable basis

---

[6] (*See* similar cautionary language, Ex. 13, Q1 FY20 Earnings Call (2/4/2020) at 380; Ex. 21, Disney Investor Day Presentation (12/10/2020) at 805, 900; Ex. 30, Q2 FY21 Earnings Call (5/13/2021) at 1263-65; Ex. 31, JPM Conference Call, 5/24/2021 at 1289; Ex. 33, Goldman Sachs Communacopia Conference (9/21/2021) at 1441; Ex. 34, Q4 FY21 Earnings Call (11/10/2021) at 1472-73; Ex. 41, Q1 FY22 Earnings Call (2/9/2022) at 1876-78; Ex. 42, Morgan Stanley Technology, Media and Telecom Conference (3/7/2022) at 1881; Ex. 44, Q2 FY22 Earnings Call (5/11/2022) at 2012-2013; Ex. 47, Q3 FY22 Earnings Call (8/11/2022) at 2201; Ex. 49, Q4 FY22 Earnings Call (11/8/2022) at 2266-68.)

for the belief". *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). Many of Plaintiffs' challenged statements are "vague" assurances reflecting the Defendants' "subjective assessments", which "hardly amount[] to a securities violation". *In re Cutera*, 610 F.3d at 1111.

**Opinions of Optimism on Disney+ (*See* Stmts. 27, 42, 48):**

"*We are extremely pleased* with the success of our portfolio of streaming";

"We think that we're tremendously positioned for the future of DTC services";

"*[W]e're confident* about delivering in the long term".

**Opinions on Subscriber and Profitability Targets (*See* Stmts. 1, 6-8, 10, 11-12, 14-17, 19, 27, 31, 38, 49, 55-56):**

"*We're incredibly confident* that we will achieve the long-term guidance";

"*[W]e feel really great* about our sub[scriber] trajectory";

"*[W]e're confident* we are on the right trajectory to achieve the guidance";

"*We're very confident* that even if we were not to go ahead and win that auction that we would still be able to achieve our 230 to 260" target;

"*[W]e believe we are well suited to achieve* the subscriber guidance as well as the profitability guidance";

"*Overall, we are pleased* with Disney+ subscriber growth in the quarter";

"*[W]e believe we are well positioned* to achieve the subscriber target of 230 to 260 million by fiscal 2024 that we laid out at last year's Investor Day";

"*[W]e still expect* Disney+ to achieve profitability in fiscal 2024, as losses begin to shrink in the first quarter of fiscal 2023".

**Opinions on Disney+ Content & Growth (*See* Stmts. 12, 14, 17, 38, 42, 48-50, 54-56, 65, 66, 70):**

"*[W]e're pretty confident* that the increase in content flow towards the second half of fiscal '22 will actually lead to the types of results that we're anticipating";

"*I think* that will give us the impetus to increase that price value relationship even higher. . . . And we are bullish about our future content going forward";

"*We are particularly pleased* with growth in the fourth quarter";

"*[W]e believe* that great content is going to drive our sub[scribers], and those sub[scribers] then in scale will drive our profitability";

"*[W]e are equally enthusiastic* about our growth potential in international markets".

**Opinions on Disney+ Churn (*See* Stmts. 65, 77, 79-80):**

"We're really, really pleased with" our retention;

"*We're really happy* with the conversion numbers that we have seen *there* going from the [Verizon] promotion to become paid subscriber";

"We're really pleased with churn";

"*We're extraordinarily pleased* with the low churn that we see".

**Opinions on DMED and Appointment of Mr. Daniel (*See* Stmts. 72-74, 76):**

"*Kareem is an exceptionally talented*, innovative and forward-looking leader, with a strong track record for developing and implementing successful global content distribution and commercialization strategies";

"*I can think of no one better suited* to lead this effort than Kareem";

"*I'm 100% confident* that this is going to play out exactly as we had intended"; "*[W]e're seeing the advantages* in this dynamic fast-moving world that we're *competing* in".

### 3. Plaintiffs' Claims Against Mr. Iger Are Particularly Deficient.

Plaintiffs' claims against Mr. Iger are particularly lacking. Plaintiffs make no attempt to allege that Mr. Iger participated in any alleged scheme. (*See, e.g.*, CC ¶¶ 6, 27, 147-228 (limiting scheme allegations to Mr. Chapek, Mr. Daniel and Ms. McCarthy).) Plaintiffs have not pleaded that Mr. Iger made any misleading statement. (*See* CC ¶¶ 266-316.) Nor have they pleaded that Mr. Iger controlled the content of any of the alleged misstatements, which means he cannot be liable for them. *Janus Capital Group Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("the maker of a statement is the person or entity with ultimate authority over the statement"). Plaintiffs plead ***nothing*** as to Mr. Iger, which makes the claims against him particularly deficient. *See In re Hansen*, 527 F. Supp. 2d at 1153 (rejecting "group pleading" with "no specific allegations that [individual defendants] played any role whatsoever in the preparation or dissemination of any allegedly false statements").

### 4. Plaintiffs Fail to Plead Scienter.

The complaint must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind". 15 U.S.C. § 78u-4(b)(2)(A). "Where, as here, the Plaintiffs seek to hold individuals and a company liable on a

securities fraud theory, [courts] require that the Plaintiffs allege scienter with respect to each of the individual defendants". *Apollo Grp.*, 774 F.3d at 607. "Mere negligence—even head-scratching mistakes—does not amount to fraud". *Prodanova v. H.C. Wainwright Co., LLC*, 993 F.3d 1097, 1103 (9th Cir. 2021). To support a strong inference of scienter, a complaint must allege an "intent to deceive, manipulate, or defraud", or "deliberate recklessness". *City of Dearborn*, 856 F.3d at 619. "Deliberate recklessness is not *mere* recklessness". *Prodanova*, 993 F.3d at 1106. Rather, it is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it". *Id.* (emphases in original). This "present[s] no small hurdle for the securities fraud plaintiff". *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). "[A] securities fraud complaint will survive a motion to dismiss 'only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference'". *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007)).

Plaintiffs fail that high bar; indeed, as explained above, Plaintiffs fail to plead any actionable misstatement or omission at all. Disney's "[r]obust disclosure of risks and problems further negates an inference that the company acted with intent to defraud". *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1142 (E.D. Wash. 2013); *Scripsamerica, Inc. v. Ironridge Global LLC*, 56 F. Supp. 3d 1121, 1165 (C.D. Cal. 2014). None of Plaintiffs' alleged bases for scienter, taken either alone or together, satisfies the PSLRA's stringent standards.

**Internal Data.** Plaintiffs allege that Defendants had access to "internal data" on key topics like "profitability, user engagement, and churn". (CC ¶ 318; ¶¶ 26-27.) But "mere access to reports . . . is insufficient to establish a strong inference of scienter". *Intuitive Surgical*, 759 F.3d at 1063. Pleading scienter based on "the existence of internal reports" requires "at least some specifics from those reports as well as such facts as may

indicate their reliability". *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002). Plaintiffs do not allege any specific information provided to any Individual Defendant and do "not detail the actual contents of the reports the executives purportedly referenced or had access to". *Intuitive Surgical*, 759 F.3d at 1062-63. Plaintiffs do not even allege facts suggesting that Defendants made public statements that differed from the internal reports they might have received, which is a dispositive failing. *See, e.g., In re NVIDIA*, 768 F.3d at 1059 (scienter established only if contemporaneous internal data contradict the allegedly misleading statements).

Plaintiffs' allegations about Disney's five-year plan for Disney+ are particularly dispositive of their claims. According to Plaintiffs, Disney's initial five-year-plan *confirmed* that Disney+ was expected to achieve profitability in 2024, which is what Defendants reported to the market in December 2020, and is in line with what Disney predicts today for DTC. (CC ¶ 36; Ex. 57, Q4 FY23 Earnings Call at 2801.) The only confidential witness Plaintiffs allege to have had any personal knowledge of the five-year plan (CW-1) left the Company mid-2021—before any of the alleged misstatements regarding the Disney+ 2024 profitability prediction. (CC ¶ 30.) Such allegations are insufficient to plead a strong inference of scienter. *See Digimarc*, 552 F.3d at 997-98.

**Temporal Proximity.** Plaintiffs seek to infer scienter based on " dramatic streaming losses, subscriber miss, firing of top executives, and decision to scrap Mr. Chapek's growth-at-any-cost model" that "occurred just months after Defendants reiterated their subscriber and profitability targets". (*See* CC § 338.) But "[m]ere temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance, without more, do[es] not create an inference that the earlier statements were fraudulent". *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999). That is particularly true, where, as here, the operating losses and subscriber figures were fully disclosed each quarter and the only change was a business decision to pivot away from the subscriber-growth-as-the-priority business plan, which occurred across the industry. (*See* Ex. 53, Q1 FY23 Earnings Call at 2538 (Iger:

"***Like many of our peers***, we will no longer be providing long-term subscriber guidance in order to move beyond an emphasis on short-term quarterly metrics – although we will provide color on relevant drivers") (emphasis added).)  Each event is at least as consistent with changed business circumstances as it is with fraud, which defeats Plaintiffs' scienter theory.  *See City of Dearborn*, 856 F.3d at 622 (holding scienter not as compelling as "opposing inference that Defendants exhibited poor business judgment" on write-down); *see also Twitter*, 29 F.4th at 622.

***Core Operations.***  Plaintiffs also ask the Court to infer scienter through the core operations theory, which "relies on the principle that corporate officers have knowledge of the critical core operation of their companies".  *Intuitive Surgical,* 759 F.3d at 1062.  "Proof under this theory is not easy".  *Id.*  "[A] plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports".  *Id.*  The Consolidated Complaint does not contain any of those things.  Indeed, Plaintiffs fail to identify any mismatch at all between Defendants' public disclosures and internal information concerning Disney+.

***Confidential Witnesses***.  Plaintiffs seek to infer scienter based on certain information provided by former Disney employees.  But "a complaint relying on statements from confidential witnesses must pass two hurdles".  *Digimarc*, 552 F.3d at 995.  First, the witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge".  *Id.*  "Second, those statements . . . must themselves be indicative of scienter".  *Id.*  Plaintiffs' allegations fail on both counts.

*First*, the CWs lack "reliable personal knowledge of the defendants' mental state".  *Digimarc*, 552 F.3d at 998; *see Intuitive Surgical*, 759 F.3d at 1062 (rejecting "impressions of witnesses who lacked direct access to the executives"); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948-49 (N.D. Cal. 2010) (holding that absent "personal interactions" the "opinions and observations of the CWs" cannot show "what these individual Defendants knew or did not know"); *McCasland v. FormFactor, Inc.*,

2008 WL 2951275, at *8 (N.D. Cal.) (not crediting testimony of CW who does not allege "any interaction or communication with any of the defendants, or to have provided any defendant with information or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period"). Five of Plaintiffs' seven confidential witnesses had **no** interactions with any Individual Defendants whatsoever, and therefore lack reliable personal knowledge.  (*See* Index. B, Confidential Witness Chart.)  The remaining two similarly fail.  CW-1 left Disney just months after the start of the Class Period, and therefore has no personal knowledge of defendants' mental state thereafter.  (*Supra* § III.A.1 at 12-13.)  And while CW-2 allegedly had "weekly meetings with the 'entire executive team' at Disney Streaming", "met with Chapek" twice, and "attended several meetings with Daniel and interacted with McCarthy" (CC ¶ 56), there are no allegations about any specific information discussed, let alone that any of it was misstated to investors.

*Second*, none of the confidential witness allegations supports a strong inference of scienter.  *Digimarc*, 552 F.3d at 996.  At best, the confidential witnesses offer their own personal business opinions, such as that they did not understand "the purpose of the DMED reorganization", that they believed the subscriber targets were "crazy", and that they felt pressured by a request for "higher subscriptions and revenues and fewer losses". (CC ¶¶ 52, 61, 63.)  But that says nothing about the mindset of the Individual Defendants. Witness declarations "must provide specific facts showing a connection between the [misrepresentation] and the mindset of the person who made it".  *Prodanova*, 993 F.3d at 1110.  The only specific interactions with the Individual Defendants come from CW-1, and those allegations actually negate scienter.  "CW-1 was 'heavily involved in providing the data and writing the script' for the Investor Day presentation in December 2020 in which defendants Chapek and McCarthy forecast aggressive subscriber growth for Disney+" and "walked [Chapek] through the five-year plan financials before the big meeting' at Investor Day".  (CC ¶¶ 35, 36.)  CW-1 does not say that any of the statements at Investor Day were false—let alone fraudulent.  To the contrary, CW-1 **confirms** that

the "plan projected" Disney+ would be cash flow positive in 2024.  (CC ¶ 35.)

Plaintiffs attempt to turn CW-1's confirmation of the Investor Day projections on its head by claiming that in April 2021—several months later—the five-year plan shifted and suddenly showed that Hulu would be profitable one year earlier, and Disney+ one year later.  (CC ¶¶ 35-37, 319-20.)  But, as discussed above, CW-1 left the Company very shortly thereafter—in mid-2021—and does not claim that any of the public statements during CW-1's tenure were false (let alone that the Individual Defendants had an intent to defraud).  (CC ¶ 30; *supra* § III.A.1.)  CW-1 has no personal knowledge of the five-year plan after departing Disney in mid-2021, and no personal knowledge of the Individual Defendants' knowledge or awareness after that time.  Plaintiffs' attempt to imply scienter during a time when CW-1 was not even employed at Disney fails.

a.  <u>Plaintiffs Fail To Plead Scienter as to Mr. Chapek.</u>

In addition to the boilerplate allegations above, which add nothing, Plaintiffs advance a host of allegations against Mr. Chapek that could apply to any executive.  Each of Plaintiffs' arguments fails to "state with *particularity* facts giving rise to a *strong inference* that [Mr. Chapek] acted with the required state of mind".  *Intuitive Surgical,* 759 F.3d at 1058 (emphasis added).  And each is better suited to precisely the opposite non-fraud explanation:  Mr. Chapek fully believed in his growth strategy for Disney+, and the Board ultimately opted to change directions and return Mr. Iger as CEO.

***Leadership Style.***  Plaintiffs ask the Court to infer scienter based on allegations about "inappropriate management style".  But allegations of mismanagement will only support a securities fraud claim if they are coupled with allegations that the defendants were aware, or recklessly disregarded, that their mismanagement created an environment in which fraud was occurring.  *See Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018).  Plaintiffs come nowhere close to that standard.  Allegations that Mr. Chapek created pressure to achieve "aggressive" and "unreasonable" streaming goals (CC ¶¶ 341-343) are consistent with legitimate business objectives, not an intent to defraud.  *See In re Wet Seal Inc. Securities Litigation*, 518 F. Supp. 2d 1148, 1174 (C.D. Cal. 2007)

("allegations of a motive to present better financials . . . are insufficient to establish a strong inference of scienter").  Similarly, allegations that Mr. Chapek "wanted to keep data close", without any specific allegations of what that data contained or that it in any way differed from public statements, are insufficient.  (CC ¶ 346.)  Moreover, Plaintiffs' second-hand allegations that Mr. Chapek "did not want to hear that his decisions were wrong", that it was his "way or the highway", or that someone supposedly believed that the subscriber targets were "crazy" or supposedly "told him to be upfront with investors" (*see, e.g.*, ¶¶ 348-349, 364) are entitled to no weight as there is neither any alleged personal knowledge, nor any indication that Mr. Chapek himself believed the targets were unattainable.  *See In re NVIDIA*, 768 F.3d at 1059, 1061 (holding allegations of a "mentality" to not "say anything to muck the waters" were too vague to raise an inference of scienter); *Costabile v. Natus Medical Inc.*, 293 F. Supp. 3d 994, 1018-19 (N.D. Cal. 2018) (no scienter where competing inference existed that statements "were intended to be nothing more than [defendant's] then-held belief").  At best, the allegations "paint a picture of a mismanaged organization" that was in need of a leadership change, not fraud. *Webb*, 884 F.3d at 856.

 *Termination.*  "Notable departures are not in and of themselves evidence of scienter".  *In re Cornerstone,* 355 F. Supp. 2d at 1093.  "Changes in leadership are only to be expected when leadership fails.  That is not, in itself, a symbol of fraud".  *In re Hertz Glob. Holdings Inc. Sheet Metal Workers Local Union 80 Pension Tr. Fund*, 905 F.3d 106, 119 (3d Cir. 2018).  Plaintiffs do not overcome the "reasonable assumption" that "corporate reshuffling" was due just to disappointing results.  *Webb*, 884 F.3d at 857.

 *Compensation.*  Plaintiffs allege that Mr. Chapek was "highly motivated to increase Disney+ subscriber numbers because [his] compensation largely depended on it".  (CC ¶ 372.)  But "[i]t is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals".  *Rigel Pharms., Inc. Sec. Litig. v. Deleage*, 697 F.3d 869, 884 (9th Cir. 2012).  Courts "will not conclude that there is fraudulent intent merely because a

defendant's compensation was based in part on such successes". *Id.* Such an inference is even weaker here, where a large portion of compensation was awarded in long-term equity, which did not vest (and therefore could not be sold) for years. (*See* CC ¶ 372; *see* Ex. 23, Disney 2020 Proxy (1/17/2021) at 933.) Accordingly, Plaintiffs' unsupported "allegations of pecuniary motive" are insufficient; holding otherwise would result in "virtually every company in the United States that experiences a downturn in stock price [] be[ing] forced to defend securities fraud actions". *Digimarc*, 552 F.3d at 1005.

**Contract Renewal.** "[A]llowing a plaintiff to prove a motive to defraud by simply alleging a corporate defendant's desire to retain his position with its attendant salary . . . would force the directors of virtually every company to defend securities fraud actions". *Phillips v. LCI International, Inc.*, 190 F.3d 609, 623 (4th Cir. 1999). That is all that Plaintiffs allege. It strains credulity to suggest that Mr. Chapek "intentionally placed the subscriber target far enough out into the future" to trick the market into believing the target was attainable (CC ¶ 124), to remain CEO so that he then would need to deliver on that same target. Plaintiffs plead no facts to support that conjecture.

**Reorganization of DMED.** Plaintiffs do not plead any facts suggesting that Mr. Chapek created DMED to obscure a fraud. Nor could they. Both before and after the creation of DMED, Disney disclosed the same "hard data" to investors, including Disney+'s subscriber numbers and ARPU, and DTC's revenue, operating loss and more. (*See supra* § I.C-E.) Indeed, in advance of the DMED financial reporting in 2021, Disney provided 2020 financials as if they were organized within DMED for appropriate comparison. (*Id.*) And, starting in February 2022, Disney even broke out a Disney+ programming and production costs with its DTC operating expenses. (Ex. 50, 2022 Form 10-K at 2310-12.) DMED did not obscure the performance of Disney+.

**Accounting.** Plaintiffs' accounting allegations (CC ¶¶ 163, 214-23) cannot show scienter. Scienter is not established even "by the mere publication of inaccurate accounting figures, or failure to follow generally accepted accounting procedures ('GAAP'), without more". *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1216

(N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002). Here, Plaintiffs do not allege even accounting errors (let alone intentional ones), instead conceding, as they must, that Disney's financial reporting was accurately disclosed. (*See, e.g.*, CC ¶¶ 132, 141-142.)

### b. Plaintiffs Fail To Plead Scienter as to Ms. McCarthy.

The few specific allegations about Ms. McCarthy demonstrate that Plaintiffs have failed to allege a strong inference of scienter. ***First,*** "absent allegations that the resignation at issue was . . . accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned . . . for unrelated personal or business reasons". *Digimarc*, 552 F.3d at 1002. Plaintiffs plead no suspicious circumstances that compel an inference that McCarthy's departure related to fraud. ***Second***, according to Plaintiffs, Ms. McCarthy is alleged to have "veer[ed] wildly off script" at a meeting with Disney's Board and provided "blunt assessments" of Disney+, allegedly causing the Board "to pepper Chapek" with questions. (CC ¶¶ 317, 364, 392-92.) That is entirely ***inconsistent*** with an alleged scheme to defraud or an intent to conceal information. ***Third***, Plaintiffs must plead that Ms. McCarthy's trades were "dramatically out of line with prior trading practices" and occurred "at times calculated to maximize the personal benefit from undisclosed inside information". *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). They cannot. Each of Ms. McCarthy's trades during the putative Class Period was a continuation of a pre-class pattern of exercising options that were near expiration and selling the shares pursuant to a Rule 10b5-1 trading plan.[7]

---

[7] (*See, e.g.*, Ex. 3, Form-4 (1/7/2015) at 8 (showing sale of shares from redeemed options, set to expire in four days, pursuant to trading plan); Ex. 5, Form-4 (12/21/2015) at 14 (same, with expiration same day); Ex. 6, Form-4 (1/15/16) at 17 (same with options expiring in one day); Ex. 11, Form-4 (12/20/2019) at 277 (same, with expiration same day); Ex. 22, Form-4 (1/15/2021) at 902 (same, with expiration in 11 days); Ex. 24, Form-4, 1/22/2021 at 1006 (same, with expiration in six days); Ex. 25, Form-4 (1/27/2021) at 1009 (same, with expiration in one day); Ex. 37, Form-4 (1/14/2022) at 1634 (same, with expiration in four to six days); Ex. 38, Form-4 (1/18/2022) at 1637 (same, with expiration same day); Ex. 51, Form-4 (1/13/2023) at 2451 (same, with expiration in four days.)

There is no strong inference of scienter under these circumstances. *Metzler*, 540 F.3d at 1067, n.11 (holding no scienter where person "regularly sold as their options vested" pursuant to "pre-determined plans [that] may rebut [] an inference of scienter").

### c. Plaintiffs Fail To Plead Scienter as to Mr. Daniel.

Plaintiffs plead no facts suggesting that Mr. Daniel did not believe the only two statements he is alleged to have made (CC ¶¶ 164-66, 277), which means Plaintiffs cannot establish scienter as to Mr. Daniel as a matter of law. *See Costabile*, 293 F. Supp. 3d at 1018-19. There are no facts pleaded that would support a strong inference of scienter as to Mr. Daniel on any topic, and merely labeling him as Mr. Chapek's "right-hand-man", without more, is insufficient. (CC ¶ 8.)

### d. Plaintiffs Fail To Plead Scienter as to Mr. Iger.

Plaintiffs cannot plead scienter as to Mr. Iger. Mr. Iger stepped down as CEO on February 25, 2020 and transitioned the role to Mr. Chapek. (CC ¶¶ 22-23.) Plaintiffs acknowledge that Mr. Iger openly disagreed with Mr. Chapek's strategy when he returned as CEO—which itself negates any inference of scienter. (CC ¶ 127.) Plaintiffs try to save their scienter argument by alleging that Mr. Iger made significant sales of Disney common stock from January to June 2021. But any trades by Mr. Iger are irrelevant in the absence of any challenged statements or conduct. *See In re ICN,* 299 F. Supp. 2d at 1068 (concluding scienter not pleaded in part where "Plaintiffs make no allegations connecting [two defendants] with the allegedly misleading statements"). Regardless, "stock sales alone cannot provide a strong basis for scienter". *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. C 99-00109 SBA, 2000 WL 1727377 (N.D. Cal. Sept. 29, 2000). Plaintiffs fail to plead that Mr. Iger's trades are suspicious. Plaintiffs arbitrarily compare Mr. Iger's trades in the first half of 2021 to the two years prior to the putative Class Period. (CC ¶ 264.) But Mr. Iger became CEO of Disney in 2005 and his trading history shows a pattern of large trades like those Plaintiffs identify. (*See* Ex. 1, Form-4 (5/16/2013) at 2 (sale of 1,000,000 shares); Ex. 2, Form-4 (2/13/2014) at 5 (sale of 480,000 shares); Ex. 4, Form-4 (5/13/2015) at 11 (sale of 200,000 shares); Ex. 7,

Form-4, (6/9/2017) at 20 (sale of 797,578 shares).)

        e. <u>Plaintiffs Scienter Allegations Fail Under Holistic Analysis.</u>

Plaintiffs' scienter allegations are weaker in the aggregate than apart. Plaintiffs ignore Disney's extensive disclosures—about the risks of its DTC strategy, its goals and tactics, and its massive losses—that contradict any intent to mislead. Plaintiffs allege a profit motive for Mr. Chapek, yet he is not alleged to have sold stock during periods of alleged inflation. *Webb*, 884 F.3d at 856 ("a lack of stock sales can detract from a scienter finding"). Plaintiffs identify nothing Mr. Daniel stood to gain. And Plaintiffs allege, yet ignore, that Ms. McCarthy and Mr. Iger were critics of the DTC strategy. "Although the allegations in this case are legion, even together they are not as cogent or compelling as a plausible alternative inference"—Mr. Chapek pursued an aggressive, transparent strategy to grow DTC and, when results faltered, Mr. Iger returned and pursued a different strategy. *Digimarc,* 552 F.3d and 1007.

## 5. Plaintiffs Fail to Plead Loss Causation.

Plaintiffs also fail to adequately plead loss causation. Loss causation is shorthand for the requirement that investors must demonstrate that the defendant's deceptive conduct, "as opposed to some other fact, foreseeably caused the plaintiff's loss". *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022). A plaintiff can satisfy the loss causation pleading burden by alleging that "the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money'". *Id*. However, to adequately plead a corrective disclosure, a plaintiff must "plausibly allege that the defendant's fraud was '*revealed* to the market and *caused* the resulting losses'". *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (quoting *Metzler*, 540 F.3d at 1062).

Plaintiffs do not identify a specific increase in the price of Disney common stock as a result of the alleged fraud. Instead, Plaintiffs allege generally that "Disney common stock traded at artificially inflated prices" "throughout the Class Period". (CC ¶ 383.) They assert that "the artificial inflation was removed" when "Defendants'

misrepresentations and fraudulent conduct became apparent to the market through three separate disclosures": (1) November 11, 2021—Disney's earnings for its fourth quarter and fiscal year ending October 2, 2021; (2) November 8, 2022—Disney's earnings for its fourth quarter and fiscal year ending October 1, 2022; and (3) May 10, 2023—Disney's earnings for its second quarter 2023. (CC ¶¶ 384, 390, 394.) Each of Plaintiffs' alleged corrective disclosures coincides with general earnings results for the Company, as opposed to a specific news report or revelation. And Plaintiffs merely cherry-pick certain information within those earnings reports related to Disney+ and assert that Disney's stock price decline thereafter was "in response to this news". (CC ¶¶ 386, 391, 395.) But Ninth Circuit "precedent requires a securities fraud plaintiff to allege that the market 'learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally'". *Loos*, 762 F.3d at 889 (quoting *Metzler*, 540 F.3d at 1063). Plaintiffs have not done so. None of the alleged corrective disclosures reveals the existence of any fraud, restates any of Disney's financials, modifies the Disney+ targets (including the profitability or subscriber targets), or reveals any information about subscriber churn. Indeed, these earnings results merely reported up-to-date quarterly metrics about DTC operating losses and Disney+ subscriber count as Disney had done each and every other quarter. That is insufficient as a matter of law. *Id.*

Plaintiffs' alleged corrective disclosures fail for an additional, independent reason. The supposedly revelatory information Plaintiffs identify on these three dates already had been disclosed by Disney months earlier and was therefore neither new nor corrective. To be corrective, a disclosure must by definition reveal "new information to the market that was not yet reflected in the company's stock price". *Nektar,* 34 F.4th at 839. That is because "the market price of shares traded on well-developed markets reflects all publicly available information", *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988); the "disclosure of confirmatory information—or information already known by the market—will not cause a change in stock price". *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *4 (C.D. Cal. Mar. 16, 2015). Accordingly, to be corrective a disclosure "must by definition

reveal new information to the market that has not yet been incorporated into the [stock] price". *Nektar*, 34 F.4th at 839.

*First*, on November 10, 2021, Plaintiffs claim that "Disney disclosed a slowdown in Disney+ subscriber growth" in its 4Q 2021 earnings call. (CC ¶ 385.) But Disney actually reported that it "ended the fourth quarter and the fiscal year with over 118 million global paid Disney+ subscribers, reflecting over 2 million net additions from Q3, *in line with the subscriber guidance we gave in September*". (Ex. 34, Q4 FY21 Earnings Call (11/10/21) at 1456 (emphasis added).) In other words, Disney publicly disclosed the same expectations two months earlier: "In Q4, I think what you can expect to see is that our global paid sub[scribers] will increase by low single-digit millions of subscribers versus Q3" as a result of "some headwinds". (Ex. 33, Goldman Sachs Conference (9/21/2021) at 1425.) Because Disney disclosed its subscriber slowdown in September, and merely confirmed that information in November, the November disclosure cannot establish loss causation. Indeed, Plaintiffs do not allege—nor could they—that Disney's stock price experienced an enduring decline when the information was first disclosed in September, which "refutes the inference that the alleged concealment of th[ese] particular fact[s] caused any material drop in the stock price". *Tesla,* 985 F.3d at 1198.

*Second*, on November 8, 2022, Plaintiffs allege that Disney "shocked investors" when it "reported a monumental quarter-end operating loss of $1.47 billion" for DTC in Q4 2022. (CC ¶ 390.) But that was neither new, nor corrective. On August 10, 2022, Disney disclosed DTC operating losses for Q3 2022 of $1.1 billion—a nearly $800 million year-over-year increase from its Q3 2021 operating losses. (Ex. 46, Q3 FY22 8-K at 2161, 2163.) On the earnings call on August 11, Disney specifically indicated what to expect for the fourth quarter in relation to DTC operating losses. (Ex. 47, Q3 FY22 Earnings Call (8/11/2022) at 2207.) Ms. McCarthy explained that in "the next quarter", investors "will see a similar increase year-over-year that you saw this quarter". (*Id*.) In other words, Disney told investors in August that they should expect Q4 2022 operating losses for DTC to be approximately $800 million more than the DTC operating losses

from Q4 2021 ($630 million): approximately $1.4 billion.  That is what they then disclosed in November.  Thus, Disney explicitly notified investors in August exactly what to expect for fourth quarter operating losses, which was then reported in November. And, again, Plaintiffs do not (and cannot) allege that Disney's stock price declined after the August 11, 2022 earnings call—refuting any inference that the concealment of this information caused a stock decline.  *See Tesla*, 985 F.3d at 1198.

*Third*, on May 10, 2023, Plaintiffs assert that Mr. Iger "leveled with investors and acknowledged that Disney would be forced to radically alter the Disney+ business model".  (CC ¶ 394.)  Yet Plaintiffs ignore that Mr. Iger—who had returned as CEO on November 20, 2022—had already announced this strategic reversal during a February 8, 2023 earnings call, and there was no stock decline.  (Ex. 53, Q1 FY23 Earnings Call (2/8/2023) at 2536-39 (announcing a "transformation" to "rationalize" the streaming business to "put[] it on a path to sustained growth and profitability . . . while also reducing expenses to improve margins and returns", a re-reorganization to unwind DMED, cuts on content spending, and a reconsideration of international markets and pricing).  The lack of stock reaction on the prior days when the same information was revealed refutes any inference that this caused the investors' loss.

## B. Plaintiffs' § 20A Contemporaneous Trading Claim (Count II) Fails As A Matter of Law.

Plaintiffs' § 20A contemporaneous trading claim fails because Plaintiffs do not adequately allege that either Mr. Iger or Ms. McCarthy violated Rule 10b-5—a predicate to any § 20A claim—nor do they allege that either traded with material non-public information.  *Lipton*, 284 F.3d at 1035 n.15 ("[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must [] allege a violation of § 10(b) or Rule 10b 5.");  *Apollo Grp.*, 774 F.3d at 610 (dismissing § 20A claim where "the alleged material, non-public information is the same information at issue in the [deficient] Exchange Act claims").  For Mr. Iger, who stepped down as CEO, Plaintiffs do not allege any material non-public information that he received at this time.  *In re Wet Seal,* 518 F. Supp. 2d at

1181 (dismissing insider trading claim for lack of material, non-public information).

Moreover, in an "actively traded market" like the one in which Disney common stock is traded, a Plaintiff must show that it traded "on the same trading day, or one trading day after, the insider's transaction". *In re Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132, 1025 (C.D. Cal. 2008). Here, Plaintiffs do not even try to allege contemporaneous trades for six of Mr. Iger's 14 trades and six of Ms. McCarthy's eight trades. (Compare CC ¶¶ 263 (Mr. Iger), 380 (Ms. McCarthy) and CC ¶ 423.) Plaintiffs allege to have traded within one day only of Mr. Iger's February 2, 2021 trades. (*See* CC ¶ 423.) Plaintiffs' trades are too remote in time to be contemporaneous with any of Mr. Iger's other trades and any of Ms. McCarthy's trades because they occur two or more days later. (*See* CC ¶ 423.) On that basis, Plaintiffs' § 20A claim as to all but Mr. Iger's February 2, 2021 trades must be dismissed. *See In re Arrowhead*, 2016 WL 6562066, at *11 (C.D. Cal Mar. 29, 2016).

## C. Plaintiffs' Control Person Liability Claim (Count III) Fails As A Matter of Law.

Because Plaintiffs fail to allege a § 10(b) violation, Plaintiffs' § 20(a) control person claim fails. *Digimarc*, 552 F.3d at 990 (to state a § 20(a) claim plaintiff must demonstrate "a primary violation of federal securities law").

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' Consolidated Complaint should be dismissed in its entirety and with prejudice.

1    Dated:  December 21, 2023          */s/ John W. Spiegel*
2                                       **CRAVATH, SWAINE & MOORE LLP**
3                                       J. Wesley Earnhardt (*pro hac vice*)
                                        Helam Gebremariam (*pro hac vice*)
4                                       Worldwide Plaza
                                        825 Eighth Avenue
5                                       New York, NY 10019
                                        Telephone:  (212) 474-1000
6                                       Facsimile:  (212) 474-3700
7                                       wearnhardt@cravath.com
                                        hgebremariam@cravath.com
8
9
                                        **MUNGER, TOLLES & OLSON LLP**
10                                      John W. Spiegel (Bar No. 78935)
11                                      John M. Gildersleeve (Bar No. 284618)
                                        350 South Grand Avenue, Fiftieth Floor
12                                      Los Angeles, California 90071
                                        Telephone:  (213) 683-9100
13                                      Facsimile:  (213) 687-3702
14                                      john.spiegel@mto.com
                                        john.gildersleeve@mto.com
15
16                                      *Counsel for Defendants The Walt Disney*
17                                      *Company, Robert Iger, Robert Chapek, Christine*
                                        *M. McCarthy and Kareem Daniel*
18
19
20
21
22
23
24
25
26
27
28

-41-

## L.R. 11-6.2 Certificate of Compliance

The undersigned, counsel of record for Defendants, certifies that this brief contains 40 pages, which complies with the page limit set by court order dated November 22, 2023.

Dated:  December 21, 2023                    */s/ John W. Spiegel*

MOTION TO DISMISS CONSOLIDATED COMPLAINT