ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIEL S. DROSMAN (200643)
RYAN A. LLORENS (225196)
JESSICA T. SHINNEFIELD (234432)
JEFFREY J. STEIN (265268)
NICOLE Q. GILLILAND (335132)
JESSICA E. ROBERTSON (352207)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
ryanl@rgrdlaw.com
jshinnefield@rgrdlaw.com
jstein@rgrdlaw.com
ngilliland@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, on Behalf of Itself and All Others Similarly Situated, | Case No. 2:23-cv-03661-CBM (ASx) |
| Plaintiff, | CLASS ACTION |
| vs. | PLAINTIFFS' OPPOSITION TO DEFENDANTS' CONSOLIDATED MOTION TO DISMISS CONSOLIDATED COMPLAINT |
| THE WALT DISNEY COMPANY, et al., | DATE: March 26, 2024 |
| Defendants. | TIME: 10:00 a.m. |
| | CTRM: 8D |
| | JUDGE: Hon. Consuelo B. Marshall |

4864-1456-8866.v1

1
2

# TABLE OF CONTENTS

**Page**

3
4
5
6

I.      INTRODUCTION ................................................................................ 1

II.     LEGAL STANDARD ......................................................................... 2

III.    PLAINTIFFS ALLEGE A SCHEME CLAIM UNDER RULE 10b-5(a) AND (c) ............................................................................................... 3

7       A.      Plaintiffs Plead the Nature, Purpose and Effect of the Scheme ................ 4

8       B.      Plaintiffs Plead Defendants' Conduct Furthered the Scheme ................. 4

9       C.      Defendants' Attacks on the Scheme Allegations Are Meritless ............... 8

10              1.      Defendants Never Disclosed Their Fraudulent Scheme ................ 9

11              2.      Defendants' Fraudulent Scheme Was Not a "Business Strategy" ................................................................................ 13

12
13

IV.     PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS AND OMISSIONS UNDER RULE 10b-5(b) ........................................... 14

14      A.      The Complaint Alleges False and Misleading Statements ..................... 15

15      B.      Defendants' Challenges to the Misstatements Are Meritless ................. 21

16              1.      Defendants Incorrectly Claim that They "Did Not Conceal Anything from Investors" ...................................................... 21

17
18              2.      Defendants' "Hard Data" Argument Lacks Merit ...................... 22

                3.      The Alleged Misstatements Are Not Mere Puffery .................... 22

19              4.      The PSLRA's Safe Harbor Does Not Apply .............................. 24

20              5.      Defendants' Statements Were Not Inactionable Opinions ........... 26

21

V.      PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER ............. 27

22      A.      Internal Data Belied Defendants' Public Statements .............................. 27

23      B.      Temporal Proximity Supports Scienter .................................................... 29

24      C.      Inappropriate Tone at Top Supports Scienter .......................................... 30

25      D.      Terminations and Resignation Support Scienter ..................................... 30

26      E.      The Fraud Involved Disney's Core Operations ....................................... 31

27      F.      Confidential Witnesses and Media Sources Support Scienter ................. 32

28

- i -

**Page**

G. Defendants' Compensation Was Tied to the Fraud ................................ 33

H. Suspicious Stock Sales Support Scienter ................................ 34

VI. PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION .................... 35

VII. PLAINTIFFS ALLEGE A §20A CLAIM AGAINST IGER AND MCCARTHY ................................ 38

A. Predicate Exchange Act Violations ................................ 38

B. Contemporaneous Trading ................................ 40

VIII. CONCLUSION ................................ 40

4864-1456-8866.v1

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 3

5

6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ................................................................ 4

7

8

*Azar v. Yelp, Inc.*,
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ................................. 35

9

10

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ............................................................ 15

11

12

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ............................................................ 29

13

14

*Cmtys. Actively Living Indep. & Free v. City of L.A.*,
    2009 WL 10676002 (C.D. Cal. June 1, 2009) ................................... 9

15

16

*Costabile v. Natus Med. Inc.*,
    293 F. Supp. 3d 994 (N.D. Cal. 2018) ............................................. 30

17

18

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2013) ............................................................ 32

19

20

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ......................................................... 27

21

22

*Evanston Police Pension Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ....................................... 34, 40

23

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................. 13

24

25

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) ..................................................... 15, 39

26

27

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ....................................................... 26, 33

28

- iii -

1

2                                                                          **Page**

3

*Guevoura Fund v. Sillerman*,
4      2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016) ...................................................... 4

5

*In re Allergan PLC Sec. Litig.*,
6      2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ...................................................... 23

7
*In re Alphabet, Inc. Sec. Litig.*,
8      1 F.4th 687 (9th Cir. 2021), *cert. denied*,
       ___ U.S. ___, 142 S. Ct. 1227 (2022) ..................................................... 3, 26, 35
9

10     *In re Apple Inc. Sec. Litig.*,
       2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .................................................. 29
11

12     *In re BofI Holding, Inc. Sec. Litig.*,
       977 F.3d 781 (9th Cir. 2020) ............................................................................ 35
13

14     *In re CommVault Sys., Inc. Sec. Litig.*,
       2016 WL 5745100 (D.N.J. Sept. 30, 2016) .................................................... 35
15

16     *In re Countrywide Fin. Corp. Derivative Litig.*,
       554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................... 33
17

18     *In re CV Therapeutics, Inc.*,
       2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ................................................. 25
19

20     *In re Daou Sys., Inc.*,
       411 F.3d 1006 (9th Cir. 2005) .................................................................... 34, 37
21

22     *In re Edward D. Jones & Co., L.P. Sec. Litig.*,
       2019 WL 5887209 (E.D. Cal. Nov. 12, 2019) .................................................. 4
23

24     *In re Facebook, Inc. Sec. Litig.*,
       87 F.4th 934 (9th Cir. 2023) ............................................................................ 35
25

26     *In re Fibrogen, Inc.*,
       2022 WL 2793032 (N.D. Cal. July 15, 2022) ................................................. 31
27

28     *In re Galena Biopharma, Inc. Sec. Litig.*,
       117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................. 3, 4

- iv -

1

2                                                                              **Page**

3

*In re Gilead Scis. Sec. Litig.*,
4        536 F.3d 1049 (9th Cir. 2008)..................................................................3, 38

5

*In re Hertz Glob. Holdings Inc.*,
6        905 F.3d 106 (3d Cir. 2018)........................................................................31

7
*In re ICN Pharms., Inc., Sec. Litig.*,
8        299 F. Supp. 2d 1055 (C.D. Cal. 2004)......................................................39

9  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
10       554 F. Supp. 2d 1083 (C.D. Cal. 2008)......................................................22

11 *In re LDK Solar Sec. Litig.*,
         584 F. Supp. 2d 1230 (N.D. Cal. 2008) ......................................................32
12

13 *In re NVIDIA Corp. Sec. Litig.*,
         768 F.3d 1046 (9th Cir. 2014).....................................................................30
14

15 *In re Petco Animal Supplies Inc. Sec. Litig.*,
         2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) .............................................40
16

17 *In re Plantronics, Inc. Sec. Litig.*,
         2022 WL 3653333 (N.D. Cal. Aug. 17, 2022).............................................24
18

19 *In re Quality Sys., Inc. Sec. Litig.*,
         865 F.3d 1130 (9th Cir. 2017)..............................................................*passim*

20 *In re Questcor Sec. Litig.*,
21       2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ..............................................35

22 *In re Sipex Corp. Sec. Litig.*,
         2005 WL 3096178 (N.D. Cal. Nov. 17, 2005).............................................29
23

24 *In re Splunk Inc. Sec. Litig.*,
         592 F. Supp. 3d 919 (N.D. Cal. 2022).................................................36, 38
25

26 *In re UTStarcom, Inc. Sec. Litig.*,
         617 F. Supp. 2d 964 (N.D. Cal. 2009)........................................................31

27

28

1

2                                                                                    **Page**

3
*In re VeriFone Holdings, Inc. Sec. Litig.*,
4     704 F.3d 694 (9th Cir. 2012) ................................................................... 15

5
*In re WageWorks, Inc., Sec. Litig.*,
6     2020 WL 2896547 (N.D. Cal. June 1, 2020) .......................................... 31

7
*In re Wet Seal, Inc. Sec. Litig.*,
8     518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................... 30

9  *Johnson v. Aljian*,
      394 F. Supp. 2d 1184 (C.D. Cal. 2004),
10     *aff'd*, 490 F.3d 778 (9th Cir. 2007) ........................................................ 39

11
*Johnson v. Aljian*,
12     490 F.3d 778 (9th Cir. 2007) ................................................................... 38

13
*Karinski v. Stamps.com, Inc.*,
14     2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ........................................... 37

15
*Khoja v. Orexigen Therapeutics, Inc.*,
16     899 F.3d 988 (9th Cir. 2018) ................................................................... 26

17 *Knox v. Yingli Green Energy Holding Co. Ltd.*,
      2016 WL 6609210 (C.D. Cal. May 10, 2016) ........................................ 33
18

19 *Lamartina v. VMware, Inc.*,
      2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ........................................ 40
20

21 *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
      416 F.3d 940 (9th Cir. 2005) ................................................................... 25
22

23 *Lloyd v. CVB Fin. Corp.*,
      811 F.3d 1200 (9th Cir. 2016) ................................................................. 35

24
*Loos v. Immersion Corp.*,
25     762 F.3d 880 (9th Cir. 2014) ................................................................... 36

26
*Lorenzo v. SEC*,
27     587 U.S. ___, 139 S. Ct. 1094 (2019) .......................................... 3, 4, 8

28

4864-1456-8866.v1

1

2                                                                                   **Page**

3
4     *Luna v. Marvell Tech. Grp.*,
         2017 WL 2171273 (N.D. Cal. May 17, 2017) ...................................................... 30

5
6     *Maverick Fund, L.D.C. v. First Solar, Inc.*,
         2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ........................................... 5, 27, 33

7
8     *McCasland v. FormFactor Inc.*,
         2008 WL 2951275 (N.D. Cal. July 25, 2008) ...................................................... 33

9
10    *Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
         540 F.3d 1049 (9th Cir. 2008) .............................................................................. 35

11
12    *Mineworkers' Pension Scheme v. First Solar Inc.*,
         881 F.3d 750 (9th Cir. 2018) ................................................................... 35, 36, 37

13
14    *Mulderrig v. Amyris, Inc.*,
         492 F. Supp. 3d 999 (N.D. Cal. 2020) ................................................................. 34

15    *Mulligan v. Impax Lab'ys, Inc.*,
         36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................... 22, 26

16
17    *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
         320 F.3d 920 (9th Cir. 2003) ......................................................................... 34, 38

18
19    *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
         380 F.3d 1226 (9th Cir. 2004) .............................................................. 27, 28, 34

20
21    *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
         780 F. App'x 480 (9th Cir. 2019) ........................................................................ 28

22
23    *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
         575 U.S. 175 (2015) ............................................................................... 16, 17, 26

24    *Patel v. Axesstel, Inc.*,
         2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ...................................................... 30

25
26    *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
         759 F.3d 1051 (9th Cir. 2014) ....................................................................... 29, 33

27

28

4864-1456-8866.v1

1

2                                                                                    **Page**

3

*Provenz v. Miller*,
4      102 F.3d 1478 (9th Cir. 1996) ................................................................... 25

5

*Rabkin v. Lion Biotechnologies, Inc.*,
6      2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ............................................... 8

7

*Reese v. Malone*,
8      747 F.3d 557 (9th Cir. 2014) ......................................... 27, 28, 29, 31

9

*Roberti v. OSI Sys., Inc.*,
10     2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ........................................... 32

11

*Schueneman v. Arena Pharms., Inc.*,
12     840 F.3d 698 (9th Cir. 2016) ................................................................. 15, 27

13

*SEC v. Hui Feng*,
       935 F.3d 721 (9th Cir. 2019) .................................................................... 9

14

*SEC v. Richman*,
15     2021 WL 5113168 (N.D. Cal. Nov. 3, 2021) ........................................... 12

16

*SEC v. Todd*,
17     642 F.3d 1207 (9th Cir. 2011) ..................................................... 18, 19, 20

18

*Shenwick v. Twitter, Inc.*,
19     282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................... 20, 22, 31

20

*Starr v. Baca*,
21     652 F.3d 1202 (9th Cir. 2011) ............................................................. 3, 14

22

*Sudunagunta v. NantKwest, Inc.*,
       2017 WL 8810760 (C.D. Cal. Sept. 20, 2017) ......................................... 35

23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
24     551 U.S. 308 (2007) ........................................................................... 2, 27

25

*Universal Health Servs., Inc. v. United States*,
26     579 U.S. 176 (2016) ................................................................................ 15

27

28

4864-1456-8866.v1

1

2                                                                              **Page**

3
*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
4       57 F. Supp. 3d 950 (D. Minn. 2014) ............................................................. 4

5
*Warshaw v. Xoma Corp.*,
6       74 F.3d 955 (9th Cir. 1996) ...................................................................... 23

7
*Webb v. Solarcity Corp.*,
8       884 F.3d 844 (9th Cir. 2018) .................................................................... 31

9   *Weston Fam. P'ship LLLP v. Twitter, Inc.*,
        29 F.4th 611 (9th Cir. 2022) .................................................................... 29
10

11  *Wochos v. Tesla, Inc.*,
        985 F.3d 1180 (9th Cir. 2021) ........................................................... 12, 25
12

13  *Xiaojiao Lu v. Align Tech., Inc.*,
        417 F. Supp. 3d 1266 (N.D. Cal. 2019) ................................................... 38
14

15  *Zaghian v. Farrell*,
        675 F. App'x 718 (9th Cir. 2017) ............................................................. 25
16

17  *Zucco Partners, LLC v. Digimarc Corp.*,
        552 F.3d 981 (9th Cir. 2009) ............................................................. 30, 34

18  **STATUTES, RULES, AND REGULATIONS**

19
20  15 U.S.C.
        §78u-5(c) ............................................................................................ 9, 11
21      §78u-5(c)(1) ............................................................................................ 24

22  Federal Rules of Civil Procedure
        Rule 9(b) ................................................................................................ 35
23      Rule 12(b)(6) ..................................................................................... 35, 38

24  17 C.F.R.
25      §240.10b-5 ....................................................................................... *passim*
        §240.10b-5(a) ................................................................................... *passim*
26      §240.10b-5(b) ................................................................................... *passim*
        §240.10b-5(c) ................................................................................... *passim*
27

28
4864-1456-8866.v1

## I.    INTRODUCTION

Plaintiffs allege two distinct Rule 10b-5 claims: (i) a scheme claim under Rule 10b-5(a) and (c); and (ii) a misstatement claim under Rule 10b-5(b).  For each claim, Defendants misapply the law and ignore the bulk of Plaintiffs' allegations.  For a scheme, Plaintiffs need plead only the "nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."  Indeed, Plaintiffs "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."  Plaintiffs easily meet this standard.  Plaintiffs allege the *nature* of the scheme by thoroughly detailing how Robert Chapek, Christine McCarthy and Kareem Daniel employed nine "artifices" to create the false "illusion of robust, sustainable, and profitable subscriber growth" at Disney+.  The scheme's *purpose* was to drive The Walt Disney Company's ("Disney" or the "Company") stock price up to ensure renewal of Chapek's lucrative CEO contract, and to enable McCarthy to sell over $17 million of her stock.  The scheme had its intended *effect*: duping investors into believing that Disney+ was achieving sustainable, profitable subscriber growth, which drove Disney's stock price to historic heights.

Defendants do not contest that Plaintiffs have satisfied this standard.  Instead, they largely ignore Plaintiffs' scheme claim and conflate it with Plaintiffs' misstatement claim, despite the fact that the consolidated complaint's (ECF 68) ("Complaint") detailed scheme allegations span more than 60 pages.  Defendants' lone argument is that the scheme was simply a business strategy they had fully disclosed.  But Defendants' deceptive conduct alleged in the Complaint was concealed from investors and cannot be glossed over as a "business strategy."

Separately, Plaintiffs state a misrepresentation claim by alleging that Defendants "tout[ed] positive information to the market," while failing to "disclos[e] adverse information that cut against the positive information."  Defendants fail to acknowledge this legal framework, much less address the adverse, undisclosed information that rendered their statements misleading.  Instead, Defendants build a strawman and attack statements Plaintiffs never allege were false and misleading under Rule 10b-5(b).  As a

- 1 -

1  result, Defendants erroneously attack these imaginary statements as puffery, opinion and

2  forward-looking.  Because Defendants fail to address Plaintiffs' actual misstatements,

3  their argument that they disclosed the adverse information fails.

4      Viewed holistically, Plaintiffs' allegations support a compelling inference of

5  scienter for their scheme and misstatement claims.  Numerous confidential witnesses

6  ("CWs"), including two senior executives who interacted with Defendants, revealed that

7  undisclosed internal data cut against Defendants' positive statements.  CW-2, for

8  example, observed Defendants' growth-at-any-cost scheme, describing Defendants'

9  "single-minded focus" on subscriber growth without regard to profitability.  Additional

10  sources detail how Chapek and Daniel intentionally masked Disney+'s ballooning

11  content costs.  Indeed, CWs recalled that Disney's **"entire focus was on streaming"** and

12  industry analysts noted streaming was "the most important part of the narrative" and the

13  **"main driver of future stock performance."**  As the house of cards collapsed, Chapek

14  and Daniel were fired and McCarthy "resigned," but not before she capitalized on the

15  fraud by selling millions of dollars of her stock.

16      Plaintiffs also satisfy their low burden for pleading loss causation: for each

17  corrective disclosure, Plaintiffs allege a causal connection between the fraud and the loss.

18  Plaintiffs identify three separate corrective disclosures, which were each followed by an

19  immediate and precipitous stock decline that Plaintiffs trace back to the fraud.

20      Plaintiffs easily state a §20A claim against Robert Iger.  While in possession of

21  material non-public information ("MNPI"), Iger capitalized on the fraud by selling over

22  $375 million of his stock contemporaneously with Plaintiffs' purchases.

23  **II.    LEGAL STANDARD**

24      The Court must "accept all factual allegations in the complaint as true" and "assess

25  all the allegations holistically."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308,

26  322, 326 (2007).  A complaint need only contain sufficient facts to state a claim that is

27

28

- 2 -

"'plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[1]  In deciding

plausibility, the Court may "draw the reasonable inference that the defendant is liable for

the misconduct alleged."  *Id.* at 678.  Dismissal is warranted only when defendants'

alternative explanation is so convincing that plaintiff's claim is implausible.  *Starr v.*

*Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011); *see also In re Gilead Scis. Sec. Litig.*, 536

F.3d 1049, 1057 (9th Cir. 2008) (so long as the complaint's theory is "not facially

implausible, the court's skepticism is best reserved for later stages").

### III. PLAINTIFFS ALLEGE A SCHEME CLAIM UNDER RULE 10b-5(a) AND (c)

Scheme claims are distinct from claims under Rule 10b-5(b) because they are

based on deceptive conduct rather than deceptive statements.  *See, e.g.*, *In re Galena*

*Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015).  Yet, as the

Supreme Court recognized in *Lorenzo v. SEC*, 587 U.S. ___, 139 S. Ct. 1094 (2019),

"considerable overlap" exists among the subsections of Rule 10b-5, and a defendant's

actions can, as here, violate Rule 10b-5(a) and (c), as well as Rule 10b-5(b).  *Id.* at 1100-

03; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (the "argument that

Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims

is foreclosed by *Lorenzo*"), *cert. denied*, ___ U.S. ___, 142 S. Ct. 1227 (2022).

Here, Plaintiffs allege that Chapek, McCarthy and Daniel violated Rule 10b-5(a)

and (c) of the Securities Exchange Act of 1934 ("1934 Act") by engaging in a scheme to

defraud investors.  ¶¶119-253.  The Complaint also alleges that these same Defendants

violated Rule 10b-5(b) by making materially false and misleading statements.  ¶¶266-

317.  Defendants ignore this carefully pled distinction, instead conflating the scheme and

misstatement allegations and attacking them together in an effort to hide the frailty of

their argument.  To correct this fallacy, Plaintiffs discuss their scheme allegations below

and separately address Defendants' misstatements *infra* at §IV.

---

[1] Unless otherwise noted, citations are omitted, emphasis is added, and all "¶_" or "¶¶_" references
are to the Complaint.

### A.    Plaintiffs Plead the Nature, Purpose and Effect of the Scheme

Rule 10b-5(a) prohibits "any device, scheme, or artifice to defraud," and Rule 10b-5(c) prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. §240.10b-5(a), (c).  "These provisions capture a wide range of conduct."  *Lorenzo*, 139 S. Ct. at 1101.  For scheme claims, Plaintiffs "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981 (D. Minn. 2014) (the Private Securities Litigation Reform Act of 1995's ("PSLRA") heightened pleading requirements do not apply to scheme liability claims).  Rather, "[b]ecause 'the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient'" (*Galena*, 117 F. Supp. 3d at 1193), and can be done "'in broad strokes'" at the motion to dismiss stage.  *Guevoura Fund v. Sillerman*, 2016 WL 4939372, at *8 (S.D.N.Y. Sept. 12, 2016).

The Complaint alleges the ***nature*** of the scheme by thoroughly detailing how Defendants employed nine "artifices" to create the false "illusion of robust, sustainable, and profitable subscriber growth" at Disney+.  ¶¶6-7, 119-228.  The ***purpose*** of their scheme was to drive Disney's stock price up so that Disney's Board of Directors (the "Board") would renew Chapek's lucrative CEO contract and McCarthy could cash in by selling over $17 million of stock.  ¶9.  The ***effect*** of the scheme was that investors were deceived into believing, "quarter after quarter, that Disney+ was achieving sustainable subscriber growth that would lead to profitability," which, in turn, drove "Disney's stock price . . . to a Class Period high of more than $200."  *Id.*

### B.    Plaintiffs Plead Defendants' Conduct Furthered the Scheme

Defendants concede that to be liable for a scheme, they need only have engaged in conduct that had "'the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.'"  ECF 69-1 ("MTD") at 11 (quoting *In re Edward D.*

1  *Jones & Co., L.P. Sec. Litig.*, 2019 WL 5887209, at *7 (E.D. Cal. Nov. 12, 2019)).  The
2  Complaint easily satisfies this standard by pleading nine artifices, each of which
3  advanced the scheme.

4      ***First, "Chapek, Daniel and McCarthy launched the scheme by intentionally***
5  ***setting an unattainably high Disney+ subscriber target"*** at Disney's 2020 Investor Day.
6  ¶¶122, 147-154.  By the start of the Class Period, Defendants knew that Disney+'s
7  success was the lone reason Disney's stock price continued to climb, despite the
8  devastation the Covid-19 pandemic had inflicted on the Company's financial health.
9  ¶¶147-149.  "Chapek, whose compensation and contract renewal were tied directly to
10  Disney's stock price, knew he needed to stoke the market's fervor by setting into motion
11  a scheme to maintain, at any cost, the illusion of meteoric, sustainable and profitable
12  Disney+ subscriber growth."  ¶149.  So, at Disney's 2020 Investor Day, Chapek and
13  McCarthy "wow[ed] Wall Street by announcing that the Company was ***quadrupling***
14  [the] Disney+ subscriber targets that Iger had set just twelve months prior" to "between
15  230 million and 260 million total paid Disney+ subscribers." ¶150.  CW-2, an executive
16  in Global Product at Disney Streaming, recounted that these new subscriber targets had
17  no basis and were "batshit crazy."  ¶153.  Setting these sky-high targets had the intended
18  effect, launching Disney's stock price to an all-time high of $180 per share by the end
19  December 2020.  ¶¶150-152.  Chapek knew that his bold new "subscriber target would
20  create a floor under Disney's stock so long as he could convince investors that his plan
21  to accelerate Disney+ subscriber growth was on track at each quarterly milepost when
22  Disney reported its results."  ¶124.

23      ***Second***, "simultaneously with the announcement of the new astronomical
24  subscriber targets," ***"Chapek reorganized the Company, creating DMED and***
25  ***appointing Daniel as President, to consolidate complete control over Disney+,"***
26  including "key decision-making authority over content budgets, content distribution,
27  marketing, pricing, and international markets."  ¶¶125, 155-163.  Defendants then
28  "utilized this new DMED structure to employ countless deceptive, unsustainable tactics

- 5 -

1    to inflate subscriber growth, and keep investors convinced the Netflix-like 230-260

2    million target was on track." ¶125.

3       ***Third***, with DMED in place, ***Chapek and Daniel used their newly acquired***

4    ***control to steer feature films to Disney+ to achieve a temporary subscriber bump***.

5    ¶¶128, 164-168. Unbeknownst to investors, "these decisions were made solely to boost

6    subscriber growth and were at the detriment to overall Company profitability." ¶128. In

7    certain instances, Chapek and Daniel overrode studio executives to "send Pixar's big-

8    budget animated films directly to Disney+ rather than the traditional distribution window

9    for those films" – movie theaters. *Id.* And in "instances where films were initially

10    launched in theaters, Chapek and Daniel ensured that they did not remain there long" –

11    shortening the "'theatrical window' to 45 days rather than the customary 90 days" and

12    then "completely bypass[ing] the lucrative home video pay-per-view window to get films

13    to Disney+ quicker." *Id.*

14       ***Fourth, "Chapek and Daniel embarked on a massive and unsustainable content***

15    ***spending spree in an attempt to 'buy[] subscribers.'"*** ¶¶131,169-180. Chapek and

16    Daniel set out "to flood the so-called digital shelves with as much content as possible to

17    achieve . . . as much sub growth as possible." ¶131. Then, "[t]o mask the impact of the

18    runaway content spend, the Executive Defendants employed Disney's cost accounting

19    model to delay the recognition of content expenses, which were amortized or spread out

20    over several years." ¶132. Defendants "hid from investors the impending avalanche of

21    delayed content costs." *Id.*

22       ***Fifth***, to artificially boost subscriber growth, ***"Chapek ramped up the use of steep***

23    ***discounts and promotions to chase 'low quality' subscriber[s]"*** without regard for

24    profitability. ¶¶135, 181-190. Unbeknownst to investors, these low-quality subscriber

25    additions were likely to quit, or "churn" off, Disney+ after the promotion ended. ¶181.

26    As "the Class Period progressed and Disney's ability to sell full-price subscriptions

27    diminished, the Company increasingly turned toward these promotions to maintain the

28    auspices of robust subscription growth." *Id.*

4864-1456-8866.v1

***Sixth, "Chapek launched Disney+ in unprofitable international markets to
chase subscriber growth."*** ¶¶137, 191-203.  "From November 2019 through 2020,
Disney+ launched in over 50 countries and territories." ¶137.  "[When] the international
rollout wound down in 2021, [and] Disney+ subscriber growth began to slow,"
Defendants decided "to ***double*** Disney+'s international presence, even though it had
already launched in its most lucrative markets." *Id.*  "Unknown to investors, the
Executive Defendants' prolific spending to chase subscribers in international markets
came at the expense of Disney+'s profitability." ¶202.

***Seventh, "Chapek and McCarthy assured investors that Disney+ growth was on
track."*** ¶¶139, 204-213, 231-238.  "With analysts' and investors' attention directly on
Disney+, the Executive Defendants needed to convince investors that the impressive
growth targets were achievable." ¶139.  "To succeed at this part of the scheme, the
Executive Defendants needed to not only generate some subscriber growth, even if
modest, each quarter by utilizing the artifices and unsustainable growth tactics described
herein, but also to reassure investors each quarter that the growth story, and subscriber
and profitability targets, were squarely on track." *Id.*  So they did.  On each quarterly
call, Defendants reaffirmed that their unrealistic Disney+ subscriber targets were "on
track," despite internal evidence indicating otherwise. ¶¶204-210.

***Eighth, "Chapek, Daniel, and McCarthy employed accounting manipulations
to conceal runaway Disney+ content costs."*** ¶¶141, 214-223.  By the start of the Class
Period, Defendants' massive content spend was triggering significant losses in the
streaming division, which were getting harder to justify to investors. ¶215.  Disney's
DTC business was on track to report a $1.2 billion operating loss in Q1 2021, which
could have led investors to question the sustainability and viability of Chapek's Disney+
growth plan. *Id.*  To keep investors in the dark, Defendants masked these runaway
content costs using at least two types of accounting manipulations. ¶214.

First, Defendants used the DMED reorganization to "significantly alter[] the way
the Company calculated and reported its content costs in order to further mask the costs

- 7 -

1   and hide the operating losses of Disney+."    ¶142.   This "illusory jump toward

2   profitability" had the intended effect of "delight[ing]" investors and analysts throughout

3   2021.  *Id.*  Second, Defendants "artificially shifted costs" from Disney+ to Disney's cable

4   TV division to mask runaway content costs and minimize Disney+'s operating losses.

5   ¶141.  To remove costs from Disney+, Chapek and Daniel would briefly debut certain

6   Disney+ content on Disney's cable TV networks before making the shows available on

7   Disney+ shortly thereafter.   ¶222.   Unbeknownst to investors, this sequence allowed

8   Defendants to artificially shift significant content and marketing costs from the Disney+

9   division to Disney's cable TV division, thus masking Disney+'s true content costs.  *Id.*

10        ***Ninth***, to keep the scheme hidden, ***Defendants concealed "Disney+'s problem***

11   ***with churn*** (*i.e.*, subscriber cancellations)."  ¶¶143, 224-228.  Unbeknownst to investors,

12   Defendants' efforts to chase subscriber growth with steeply discounted promotions came

13   at a high cost: it resulted in lower quality subscribers who were more likely to cancel their

14   subscriptions when the promotion ended.  ¶143.  In order to keep the scheme going and

15   make the growth appear sustainable, "Chapek denied any ill-effects related to churn,"

16   and falsely assured investors that Disney+'s churn had declined.  *Id.*

17        **C.    Defendants' Attacks on the Scheme Allegations Are Meritless**

18        As a threshold matter, Defendants' accusation that Plaintiffs are trying "to

19   repackage their run-of-the-mill misstatement theory as a 'scheme'" is false.  MTD at 11.

20   As discussed above, the Complaint pleads distinct scheme and misstatement claims.

21   *Compare* ¶¶119-253, *with* ¶¶266-317.  That some of the "alleged acts are closely

22   connected to the alleged misrepresentations and omissions . . . does not mean that

23   Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim."

24   *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *17 (N.D. Cal. Feb. 15, 2018);

25   *Lorenzo*, 139 S. Ct. at 1100.  Defendants' ***lone*** substantive argument is that the scheme

26   was simply a business strategy that they fully disclosed to investors.  For the reasons

27   explained below, Defendants' argument fails.

28

- 8 -

1      **1.    Defendants Never Disclosed Their Fraudulent Scheme**

2          For *each and every* deceptive act alleged, Plaintiffs explain not only how that act

3   advanced the scheme, but also how it deceived investors.  *See* ¶¶147-228.

4          ***Investor Day Subscriber Targets***.  Defendants do not dispute that they announced

5   new, stratospheric Disney+ subscriber targets at Investor Day 2020 to further their

6   scheme.  They merely claim that the subscriber targets were attainable.  MTD at 13.  But

7   the Ninth Circuit has made clear that "deceptive conduct that is not 'inherently unlawful'

8   may form the basis of a scheme to defraud."  *SEC v. Hui Feng*, 935 F.3d 721, 737 (9th

9   Cir. 2019).  Defendants further contend that the new subscriber targets announced at

10  Investor Day are not actionable because they were forward-looking.[2]  This argument

11  misses the mark because the PSLRA's safe harbor affords protection to misstatements

12  alleged under Rule 10b-5(b), and Plaintiffs do not allege that Defendants' statements

13  about subscriber targets violate that provision.  15 U.S.C. §78u-5(c) (safe harbor protects

14  "an untrue statement of a material fact or omission of a material fact necessary to make

15  the statement not misleading" that is "forward-looking"); *see infra* §IV.A.

16         ***DMED Reorganization***.  Defendants assert that Plaintiffs' DMED allegations

17  "make[] no sense" because Chapek was Disney's CEO "and did not need a

18  reorganization to increase his power."  MTD at 13.  But Defendants ignore that, before

19  the DMED reorganization, Chapek ***did not*** have budgetary or distribution control over

20  Disney+ content.  ¶156.  That control resided with the heads of Disney's content groups.

21  *Id.*  As Plaintiffs allege, Chapek implemented DMED specifically to wrest this control

22  ***away*** from the heads of the content groups.  ¶162.  Defendants also contend that it was

23  not "fraud to appoint Mr. Daniel to head DMED."  MTD at 13.  But they ignore that

24  Chapek appointed Daniel for the purpose of ***advancing*** Defendants' scheme.  When

25

26  ---
    [2] Plaintiffs do not oppose Defendants' request for judicial notice (ECF 70) ("RJN") of the specific
    adjudicative fact Defendants requested – "that statements in [Exhibits 1-57] were conveyed to the
27  market on the respective dates."  RJN at 7-8.  The Court should not, however, judicially notice the
    truth of the matters asserted in Exhibits 1-57.  *See Cmtys. Actively Living Indep. & Free v. City of*
28  *L.A.*, 2009 WL 10676002, at *8 (C.D. Cal. June 1, 2009) (Marshall, J.).

4864-1456-8866.v1

Chapek tapped Daniel to head DMED, he gave Daniel "arguably the greatest power vested in one executive in Hollywood." ¶157.  Although Daniel "didn't understand the [streaming] business," Chapek nonetheless appointed him to run DMED because of his willingness to "d[o] exactly what he was told to do by Chapek," to further the scheme. ¶158.  Finally, though Defendants disclosed the *existence* of the DMED reorganization, they concealed from investors its true *purpose*.  Defendants told investors "that the move was designed to help Disney make better platform distribution decisions, . . . and to better monetize Disney's original content to maximize profitability." ¶162.  In reality, Chapek and Daniel implemented DMED to gain control over Disney+ content distribution and budget to further their growth-at-any-cost scheme.

*Steering Films to Disney+*.  Defendants contend that because Disney disclosed that certain feature films would bypass theaters and go directly to Disney+, this change could not be part of a fraudulent scheme.  MTD at 13.  Not so.  While Disney disclosed these distribution changes for certain feature films, Defendants never disclosed that their true purpose in doing so was to boost subscriber growth – to the detriment of overall Company profits.  ¶164.

*Buying Subscribers*.  Defendants' argument that they disclosed certain content costs ignores that, when Chapek and McCarthy occasionally acknowledged that content costs were expected to increase, they "always put a positive spin on the ever-increasing content costs, falsely implying that more content costs would inevitably equal more and more subscribers." ¶178.  It also overlooks that Defendants "conceal[ed] the devastating near-term financial consequences" of their prolific spending on content.  ¶¶171-172; *see also* ¶177.  Tellingly, investors were blindsided when, shortly after Chapek was fired, Disney admitted that it "made a lot of content that is not necessarily driving sub growth," "cut over 50 of the same shows and films that Chapek had touted just quarters earlier" and slashed Disney+'s content budget by billions of dollars.  ¶¶173, 180.

*Discounts and Promotions*.  Defendants' contention that they disclosed the steep discounts and aggressive pricing promotions fails for a host of reasons.  First, Defendants

- 10 -

concealed these discounts and promotions impeded Disney+'s profitability.  As CW-4 explained, Disney counted everyone *entitled* to a Disney+ subscription through these promotions as a "paid subscriber," even if they never used or activated the service.  ¶182. But these subscribers were illusory: they would never spend money on a subscription and would churn off the subscription as soon as the promotion ended.  ¶¶181-182.  Further, Defendants never disclosed the number of "subscribers" who did not actually use the service or warned investors that the promotions would lead to elevated churn.  Instead, they assured investors that they were "very selective" with their third-party promotion arrangements, and touted the inflated number of "paid subscribers" in every conference call.  ¶¶190, 267-276.  As the Complaint alleges, "Disney's opacity about its deeply discounted promotional subscriber growth allowed the Company to misleadingly convey steady, on-target subscription growth to the market, without disclosing the concurrent deterioration in the quality and sustainability of that growth."  ¶190.

Second, the boilerplate disclosures in Disney's SEC filings did not "disclose[] exactly what Plaintiffs say was hidden."  MTD at 15.  Defendants point to: (i) a footnote in their Forms 10-Q defining the term "'paid subscribers'" to include subscribers obtained "'through a wholesale agreement or via the bundle'"; and (ii) disclosures about the *average* price per unit across all subscribers.  *Id.*  Yet, Defendants concede that Disney never quantified the number of "paid subscribers" obtained via promotion, the number who did not actually pay or the number who did not actually use the service.  Nor, of course, did they disclose that the subscribers added through these promotions were low-quality and would churn off Disney+.

***International Expansion***.  Defendants claim they "disclosed *exactly* what Plaintiffs contend was concealed" regarding Disney+'s international expansion.  But Defendants never disclosed that they chased subscribers in unprofitable international markets.  Nor did they disclose that they expanded into unprofitable markets to maintain the illusion of sustainable subscriber growth.  ¶191.  Further, while Defendants point to

- 11 -

1    Disney's disclosures of metrics from the international sector ***as a whole***, they never
2    disclosed subscriber numbers or revenue on a country-by-country basis.

3        ***Growth on Track***.  Defendants do not contest that their repeated assurances that
4    Disney+'s growth and profitability targets were "on track" were made to further their
5    scheme.  Nor could they.  In similar circumstances, courts within this Circuit have upheld
6    scheme claims where defendants allegedly "created false appearances of fact by
7    misleading . . . investors about the strength and sustainability of the company's business
8    model when they allegedly knew that the walls were closing in around them."  *SEC v.*
9    *Richman*, 2021 WL 5113168, at *8 (N.D. Cal. Nov. 3, 2021).  Defendants also contend
10    that their "on track" statements are not false and misleading under Rule 10b-5(b), citing
11    *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021).  Plaintiffs, however, do not
12    allege these statements violated Rule 10b-5(b); rather, Plaintiffs allege that Defendants
13    made these statements in perpetuation of their scheme pursuant to Rule 10b5-(a) and (c),
14    which *Tesla* does not address.

15        ***Accounting Manipulations***.  Defendants' assertion that their accounting
16    manipulations were fully disclosed is also incorrect.  Defendants first point to Disney's
17    February 1, 2021 Form 8-K, claiming that it "fully explained the reporting."  MTD at 16.
18    But the technical accounting description contained in the Form 8-K failed to disclose: (i)
19    the intent of the accounting change, which was to conceal runaway Disney+ content
20    costs; (ii) the impact of the change on Disney+'s content costs, rather than on the much
21    broader DTC division as a whole; and (iii) the material impact the accounting change
22    would have on Disney+'s content costs going forward.  Indeed, unlike the Form 8-K,
23    which provided ***historical DTC division-level*** results, the Complaint details how the
24    accounting manipulation materially distorted ***Disney+*** content costs ***during*** the Class
25    Period by shaving off over 30% of the content costs that Disney would have reported
26    under the prior accounting model.  ¶216.  Defendants never disclosed these calculations.
27    Defendants also rely on a vague statement by McCarthy in Q1 2021, but McCarthy's
28    remarks actually had the effect of misleading – rather than informing – investors about

- 12 -

the impact of the DMED change on Disney+'s content costs.  ¶¶218-219.  Indeed, analysts were deceived, mistakenly attributing reductions in DTC losses to improved operating results, rather than to the reporting change, and noting that Disney's "opaque" disclosures "limit[ed] comparability."  ¶219.

Regarding artificially shifting costs, Defendants also point to a disclosure stating that, under DMED, "'the fully loaded production cost will be allocated across the distribution platforms which are utilizing the content.'"  MTD at 17.  But stating that Disney could allocate production costs across distribution platforms did not reveal the truth to investors, which was that the Defendants were intentionally debuting shows that had been made for Disney+ on other platforms (*e.g.*, Disney's cable TV networks) for a single day in order to artificially shift marketing and content costs away from Disney+ to Disney's cable TV division.  ¶223.  Finally, it defies logic that McCarthy would be "concerned" about this cost-shifting manipulation if, as Defendants falsely claim, it had actually been fully disclosed to investors.  *Id.*

***Concealing Churn***.  Defendants' contention that they did not attempt to conceal churn at Disney+ is false.  MTD at 17.  The Complaint alleges that Defendants closely monitored and watched as churn at Disney+ rose to alarming levels that exceeded Netflix's by ***88%***.  ¶¶225-226.  Despite this knowledge, and in order to maintain the illusion of sustained subscriber growth, Defendants falsely and repeatedly reassured investors that Disney+ was experiencing "low" churn.  ¶¶226-227.  While Defendants claim that they were not required to disclose churn, which Plaintiffs contest *infra* at §IV.A., they have failed to show that their statements regarding churn were not made in furtherance of their scheme.

### 2.    Defendants' Fraudulent Scheme Was Not a "Business Strategy"

Defendants' fraudulent scheme cannot be glossed over as a "business strategy." Plaintiffs plausibly allege, based on first-hand accounts from Disney insiders, that Defendants knowingly engaged in securities fraud.  *Freudenberg v. E*Trade Fin. Corp.*,

712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) (refusing to dismiss §10b claims because the "conduct" and "practices" alleged were "not merely 'bad business decisions' but [were] alleged to establish the falsity of Defendants' assurances to the market"). Defendants' unsupported, alternate narrative that their scheme was merely a business strategy is not credible, much less, "so convincing" that it renders Plaintiffs' competing explanation "implausible," as is required for dismissal. *Starr*, 652 F.3d at 1216-17. Equally unconvincing is Defendants' contention that the numerous and drastic remedial measures Iger implemented upon returning as CEO, merely reflected Iger's "***new*** business strategy." MTD at 9-10. As Iger has admitted, he acted urgently to unwind and mitigate the damage caused by Defendants' growth-at-any cost scheme. ¶¶12, 136, 252 (withdrawing Chapek's subscriber targets, and vowing to "stop 'chasing' subscribers and 'to start chasing profitability'"); ¶12 (cutting "aggressive promotion[s]" and promising to "start focusing on 'grow[ing] quality subs'"); *id.* ("Disney+ would abandon unprofitable international markets"); *id.* (slashing "Chapek's unsustainable annual content budget by ***billions***, promising to undo Chapek's years of excess and start 'spending less on what we make, and making less'"); ¶160 (dismantling the DMED reorganization, admitting that it was a "mistake" that "was not 'healthy for [the] Company'"). Defendants cannot evade liability for their deceptive scheme by mischaracterizing it as a business strategy.

Defendants' motion to dismiss Plaintiffs' scheme claims should be denied.

## IV.  PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS AND OMISSIONS UNDER RULE 10b-5(b)

Chapek, McCarthy and Daniel are also liable under Rule 10b-5(b) for their materially false and misleading statements.[3] Under Rule 10b-5(b), it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the true circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). A complaint alleges falsity when

---

[3] The statements Plaintiffs allege to be false and misleading under Rule 10b-5(b) are listed in Exhibit A attached hereto.

- 14 -

it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  The Supreme Court has made clear "the rule that half-truths – representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 & n.3 (2016).  As the Ninth Circuit has explained, "'once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wo[n't] mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016); *see Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

As described below, Defendants chose to tout positive information about subscriber growth, Disney+ content, DTC operating results, international expansion, the DMED reorganization, churn, Chapek's contract renewal and Disney+ profitability, while concealing adverse information that cut against this positive information.  In almost every instance, Defendants simply fail to address the fact that adverse, undisclosed information rendered their statements misleading.  Those arguments are now waived. *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

### A.    The Complaint Alleges False and Misleading Statements

***Paid Subscribers and Subscriber Growth*** (¶¶267-276).  Throughout the Class Period, Defendants chose to tout positive facts about Disney+ paid subscribers and quarterly subscriber growth, but repeatedly concealed material, adverse information that undercut those positive disclosures.  For example, on Disney's Q4 2021 earnings call, Chapek wowed investors with an update on Disney+ paid subscribers, explaining: ***"To put this growth in perspective, in the past fiscal year alone, we have grown the total number of subscriptions across our DTC portfolio by 48% and Disney+ subs, in particular, by 60%."*** ¶271.  During Disney's Q1 2022 earnings call, McCarthy also

- 15 -

1  stated "[w]e ended the quarter with nearly 130 million global paid Disney+ subscribers,

2  reflecting over 11 million net additions from Q4." ¶272.

3     These statements were misleading because Defendants concealed from investors

4  that: (i) the subscriber growth was the result of unsustainable growth tactics that targeted

5  low-quality subscribers who were more likely to churn; (ii) an increasing number of those

6  subscribers received the service for free or never actually subscribed; (iii) Disney was

7  pursuing subscriber growth to the detriment of profitability; and (iv) Disney launched

8  Disney+ in unprofitable international markets to generate subscriber growth.  ¶276.

9  Indeed, CW-1 described the pressure to "hit subscriber numbers and revenue targets" and

10 revealed that if Disney's internal goal was lower than analysts' consensus, "[CW-1] had

11 to find ways to be in range."  ¶276(a).  CW-4 and CW-6 corroborated CW-1's statement

12 that Disney would pull different "levers," using promotions to "juice subscription

13 numbers and tell the market they're doing well" even when subscribers from promotions

14 would likely churn.  ¶276(c).

15    Defendants fail to address that the above adverse, undisclosed information

16 rendered their statements misleading.  Instead, Defendants obliquely claim they "gave

17 investors adequate information to determine for themselves whether the [subscriber] goal

18 was attainable." MTD at 13.  Defendants miss the point.  Plaintiffs do not allege that the

19 subscriber guidance of 230-260 million was false and misleading under Rule 10b-5(b).

20 Rather, Plaintiffs allege the statements regarding reported subscriber growth was

21 rendered false and misleading by Defendants' failure to disclose the adverse information

22 set forth above.  Defendants also claim that the quarterly subscriber numbers were

23 literally true.  But "literal accuracy is not enough: An issuer must as well desist from

24 misleading investors by saying one [true] thing and holding back another." *Omnicare,*

25 *Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).

26    ***Disney+ Content*** (¶¶277-287).  Defendants misled investors about Disney+'s

27 content, stating it was "fuel[ing] growth" at Disney+ and assuring investors that

28 Defendants were carefully watching content cost growth.  But Defendants failed to tell

- 16 -

the market that, as CW-1 confirmed, much of the content produced for Disney+ was "not driving subscriber growth" (¶287(a)) and content cost growth was snowballing, ultimately forcing Defendants to write off billions of dollars in impairment charges.  For example, during Disney's Q3 2021 earnings call, Chapek told investors that Disney's *"robust pipeline of content continues to fuel growth."* ¶281.  During Disney's Q1 2022 earnings call, Chapek reiterated: *"[W]e are bullish about our future content going forward, not only in terms of quality, but also in terms of quantity."*  ¶285.  During Disney's Q2 2022 earnings call, Chapek stated: *"So as you know, we're very carefully watching our content growth – content cost growth."*  ¶286.

These statements misled investors because Defendants concealed the following: (i) Disney pursued quantity over quality regarding content and, accordingly, "a lot of content [was] not necessarily driving sub growth"; (ii) Disney was "chasing [subscribers] with . . . aggressive spend on content" to the detriment of profitability; (iii) Defendants artificially shifted content costs between divisions to mask the growth in Disney+ content costs; (iv) Defendants used Disney's cost-accounting model to delay the recognition of content costs; and (v) Disney spent billions of dollars on underperforming shows and films that would need to be written off.  *See* ¶287.  As CW-1 explained, "they just spent too much money making too much content."  ¶287(b).  Iger later acknowledged that "it's critical we rationalize the volume of content we're creating and what we're spending to produce our content."  *Id.*  Iger was forced to slash the content budget by more than 35%, and the Company ultimately removed content from Disney+ and took an impairment charge of $1.5 billion to $1.8 billion.  *Id.*

Once again, Defendants fail to address the fact that adverse, undisclosed information rendered their statements misleading.  Defendants claim they made "clear" disclosures regarding runaway costs, but again identify only vague statements such as

- 17 -

1    "'we are increasing our overall long-term content expense'" and "'it's all about content,

2    content, content.'"  MTD at 14.[4]

3       ***DTC Operating Losses*** (¶¶288-295).  Defendants also hyped Disney's improved

4    DTC operating results while concealing that accounting manipulations contributed to the

5    purported improvement.  For example, Disney's Q1 2021 Form 10-Q stated: "The

6    operating loss from Direct-to-Consumer decreased $644 million, to $466 million from

7    $1,110 million . . . ."  ¶290.  Likewise, three months later, McCarthy told investors:

8    ***"[L]ook, the biggest drivers for direct-to-consumer were coming out of Hulu and***

9    ***Disney+."***  ¶291.

10      Defendants misleadingly failed to disclose that they had engaged in accounting

11   manipulations to minimize DTC operating losses: (i) Defendants artificially shifted costs

12   between divisions, hiding increasing Disney+ content costs and DTC operating losses;

13   and (ii) Defendants used DMED to lower the recorded cost of Disney+ content, which

14   also hid increasing content costs and DTC operating losses.  ¶295.  Although Defendants

15   say they disclosed this information, as described *supra* §III.C., this contention is

16   incorrect.  Further, Defendants' argument that Plaintiffs have not pled a Generally

17   Accepted Accounting Principles ("GAAP") violation fails because the undisclosed

18   accounting manipulations rendered Defendants' statements misleading.  *See SEC v.*

19   *Todd*, 642 F.3d 1207, 1217 (9th Cir. 2011) ("technical compliance with GAAP does not

20   preclude a finding that an accounting treatment was a material misrepresentation").

21      ***International Growth*** (¶¶296-303).  Defendants touted Disney+'s second round

22   of international launches but concealed that these launches, while providing a temporary

23   subscriber increase, came at the expense of profitability.  For example, Chapek stated

24

25   ───────────────

26   [4] Defendants also claim that "on the first day of the Class Period, Defendants told investors that
     their previous estimate of content spend for fiscal 2024 (of about $2 billion) would roughly
     ***quadruple*** (to between $8 and $9 billion)."  MTD at 14.  Defendants are simply wrong.  In fact,

27   Defendants told investors that their estimate for 2024 Disney+ content expense had increased from
     the "mid-$4 billion range" to "between $8 billion and $9 billion in that year [2024]" – ***a less than***

28   ***two-fold increase***.  ¶195.

- 18 -

during the Company's Q2 2022 earnings call: "[W]e are equally enthusiastic about our growth potential in international markets. . . .  We believe these premium local originals . . . *will attract new subscribers and drive engagement*."  ¶300.  The following quarter, McCarthy stated, "strong Disney+ core net subscriber additions of 6 million reflect growth in existing markets *as well as launches in over 50 new markets during the quarter*."  ¶301.

These statements were misleading.  Unbeknownst to investors, the international launches generated subscribers at the expense of Disney+'s profitability.  ¶302.  The launches occurred in markets that were highly discounted and where Disney spent prolifically to create and market local content.  *Id.*  Iger belatedly revealed what Chapek and McCarthy should have disclosed during the Class Period.  *See* §VI.A.  Although Defendants claim they "disclosed *exactly* what Plaintiffs contend was concealed," Defendants never disclosed international subscriber numbers or revenue on a country-by-country basis.  *See* MTD at 15 & §I.C.  Nor did Defendants disclose they were launching in unprofitable markets to inflate subscriber growth, which is "*exactly*" what Plaintiffs allege they concealed.

***DMED Reorganization*** (¶¶304-307).  After the DMED reorganization, Chapek repeatedly assured investors that DMED had "***very strong buy-in***" within Disney.  ¶¶304, 306.  These statements were false. As Iger belatedly revealed, the reorganization "created a ***huge divide*** between the creative side of the company . . . and the monetization, distribution side of the company."  ¶307.  CW-2 similarly recalled that the reorganization was "not favorably received internally" and stated: "I didn't talk to anyone who thought it was a good idea."  *Id.*  CW-3 corroborated this account, stating the reorganization "ruffled the feathers of the majority of the creative engine."  *Id.*  In addition, Chapek lied about the purpose of the DMED reorganization.  In reality, he and Daniel used DMED to wrest control away from studio executives in order to: (i) push content directly to Disney+, even if it was the less profitable option; (ii) hide Disney+ content costs; and (iii) spend prolifically on content to drive subscribers and amortize the costs without regard

- 19 -

1    for downstream profitability.  Defendants' sole response is that Plaintiffs' allegations

2    "make[] no sense" because Chapek "was the CEO of Disney and did not need a

3    reorganization to increase his power," which is factually incorrect.  *See supra* §III.C.

4         ***Churn at Disney+*** (¶¶308-313).  Churn was an important metric for streaming

5    companies like Disney+, as a high churn rate indicated that users were leaving Disney+.

6    ¶312.  Defendants were well-aware of the market's hyper-focus on churn, and so they

7    spoke favorably about Disney+ churn, when in reality, internally it was a "constant

8    problem."  For example, on Disney's Q3 2021 earnings call, Chapek stated: "We're

9    really pleased with churn. . . .  And what you're seeing is that our churn has declined."

10    ¶310.  He further assured investors: "[O]ur churn is low . . . [and] our retention is so

11    high."  *Id.*  And on Disney's Q2 2022 earnings call, Chapek told investors: "[W]e're

12    extraordinarily pleased with the low churn that we see."  ¶311.  According to Disney

13    insiders, churn at Disney+ was a "constant problem," and was referred to as "the leaky

14    bucket."  ¶312.  Disney+ had a "four or five percent monthly churn" rate, which was 88%

15    higher than Netflix's churn rate in 2021.  *Id.*

16         Defendants do not contest that the undisclosed, adverse information regarding

17    churn rendered their statements misleading.  Defendants merely emphasize that they "had

18    no obligation" to "publicly disclose [Disney's] specific churn rates each quarter."  MTD

19    at 18.  But even when there is "no duty to disclose in the abstract," the "omission of . . .

20    data is actionable if it was misleading."  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115,

21    1135, 1139 (N.D. Cal. 2017) (withholding a metric misleading when, without it,

22    "investors interpreted Defendants' statements as reassurances that the Company had

23    experienced and would continue to experience positive growth and engagement trends").

24         ***Chapek's Contract Renewal*** (¶¶314-315).  Tellingly, Defendants do not address

25    the misstatements concerning Chapek's contract renewal.  On June 28, 2022, Disney

26    claimed that the Board had unanimously voted to extend Chapek's contract and that

27    Chapek had its "full confidence."  *Id.*  In reality, Chapek did not have the Board's full

28    confidence, and the Board's contentious decision rendered the "unanimous" statement

1    misleading.  *See* ¶315.  According to *The Wall Street Journal* ("*WSJ*") "[t]wo directors

2    . . . had been reluctant to go along."    ¶315(b).  Another article provided "discontent

3    among some board members had been building" and that there were "discussion[s] about

4    replacing Chapek as far back as the directors' late June meeting."  *Id.*

5        ***Disney+ Profitability*** (¶¶316-317).  On November 8, 2022, Chapek assured

6    investors that Disney+ was "***well situated*** to leverage our position for long-term

7    profitability and success," and stated: "[W]e still expect Disney+ to achieve profitability

8    in fiscal 2024." ¶316.  Chapek's statements flatly contradicted reality.  Even other senior

9    executives were alarmed.  According to the *WSJ*, "McCarthy told board members that

10   she wasn't happy with the way Mr. Chapek had communicated with investors during the

11   [November 8] conference call." ¶316(c).  Indeed, Chapek had been repeatedly warned

12   about the true financial state of Disney+.  On September 22, 2022, McCarthy told Chapek

13   and the Board that the Q4 2022 financials "were on pace to be very bad." ¶317(b)(i).

14   And, on the morning of the November 2022 earnings call, "the finance team advised

15   Chapek to deliver a sober message acknowledging that the streaming division's net

16   operating losses were more than double that of the same period the previous year."

17   ¶317(b)(iii).  Instead, Chapek ignored that Disney+ was in dire straits due to his growth-

18   at-any-cost scheme and falsely assured investors that Disney+ was "well situated" for

19   "long term profitability and success." ¶316.  Notably, Defendants do not dispute that

20   Chapek's statements were inaccurate.

21        **B.    Defendants' Challenges to the Misstatements Are Meritless**

22            **1.    Defendants Incorrectly Claim that They "Did Not
                    Conceal Anything from Investors"**

23        The bulk of Defendants' argument is that they "did not conceal anything from

24   investors." MTD at 11.  In the 6.5 pages that Defendants devote to this argument, they

25   focus almost exclusively on Plaintiffs' scheme allegations, while making only passing

26   references to Plaintiffs' false statements under 10b-5(b).  *Id.* at 11-18.  As a result,

27   Defendants fail to address whether the undisclosed, adverse facts alleged in the

28

- 21 -

1    Complaint rendered their statements misleading in violation of 10b-5(b).  To the extent
2    Defendants' argument applies to Plaintiffs' misstatements, it lacks merit.  *See* §III.C.

3    **2.    Defendants' "Hard Data" Argument Lacks Merit**

4    Defendants contend all the information they withheld was "peripheral," and that
5    they disclosed "Disney+ paid subscriber numbers and ARPU, as well as the DTC
6    segment's revenues, operating expenses and operating losses."  MTD at 19.  ***But none***
7    ***of these metrics helped investors understand that the subscriber growth was***
8    ***unsustainable and unprofitable***.  For example, Defendants concealed the growing churn
9    rate, which Chapek, Daniel and McCarthy tracked closely and was a "constant problem"
10   at Disney.  Increased churn contradicted Disney's touted subscriber growth.  Under
11   analogous facts, the court in *Shenwick* found falsity adequately pled because "Twitter
12   reported positive MAU growth, [but withheld] that Twitter was simultaneously
13   experiencing adverse DAU trends, and that those DAU trends made MAU growth
14   implausible."  *Shenwick*, 282 F. Supp. 3d at 1137.

15   **3.    The Alleged Misstatements Are Not Mere Puffery**

16   A statement is puffery only if it is "'not capable of objective verification'" and
17   "'so "exaggerated" or "vague" that no reasonable investor would rely on it when
18   considering the total mix of available information.'"  *In re Impac Mortg. Holdings, Inc.*
19   *Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).  Because such a determination
20   is fact-intensive, "'courts must exercise great caution'" in determining puffery at the
21   motion to dismiss stage.  *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D.
22   Cal. 2014).  The "Court may not assess the statements . . . in a vacuum, 'plucking the
23   statements out of their context to determine whether the words, taken *per se*, are
24   sufficiently "vague" so as to constitute puffery,' but rather will examine the entire
25   statement and its circumstances to determine if it is actionable."  *Id.*

26   In place of the requisite individualized analysis, Defendants attack statements of
27   their own creation, rather than Plaintiffs' actual claims.  Indeed, ***of the 29 fragments***
28   ***Defendants challenge, 10 were never alleged as false or misleading under Rule 10b-***

- 22 -

*5(b)*.  *See* MTD at 20:18-28, 21:10, 21:12, 21:24-28, 22:1.  For example, Defendants challenge the statements that "Encanto became a phenomenon within days of its arrival on Disney+" and that viewers "enthusiastically embraced" the films Soul and Luca.  *Id.* at 20:18-22.  Plaintiffs ***never*** alleged these statements as false or misleading under Rule 10b-5(b).  *See* ¶165.  For additional statements, Defendants completely change the allegations and their context before attacking them.  MTD at 21:9, 21:20-23, 22:2-3.  For example, Plaintiffs alleged the following statement:

> While we have always valued the data gained through our numerous consumer touch points, the rapid growth of our portfolio of D2C services provides us with an even greater opportunity to understand their preferences.  And we are using these insights to help determine how to optimally engage with our audiences.  ***In fact, our team uses all of the information available to us when determining how best to allocate our creative content budgets across all platforms, with the goal to maximize both audience engagement and commercial impact***.

¶277.  In their argument, Defendants drop the crucial underlined clause, ***remove the emphasis*** from the allegedly false portion, ***add their own emphasis*** to the phrase "greater opportunity to understand their preferences" which is not alleged as false, and then re-categorize the entire statement as addressing the DMED restructure, rather than content.  By attacking statements that Plaintiffs never alleged as false or misleading under Rule 10b-5(b), Defendants are "essentially straw-manning an argument that [Plaintiff] does not make.  This alone, is sufficient to defeat [Defendants'] argument . . . ." *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *13 (S.D.N.Y. Sept. 8, 2021).

To the extent Defendants challenge statements Plaintiffs actually allege to be false, they are not puffery.  Even "'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).  Regarding subscribers, Defendants' puffery arguments fail because whether Disney+ had, for example, "perform[ed] incredibly well" by adding "118.1 million" subscribers (¶271) is a verifiable, factual representation about its subscriber growth.  *See, e.g., Warshaw v. Xoma*

- 23 -

1  *Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (statement that "'everything [was] going fine'"
2  was not puffery when defendants knew everything was not fine). As discussed *supra* at
3  §IV.A., "Defendants' omission of . . . adverse facts from the challenged statements [also]
4  gave investors an inaccurate impression." *See In re Plantronics, Inc. Sec. Litig.*, 2022
5  WL 3653333, at *16 (N.D. Cal. Aug. 17, 2022).

6          Nor were Defendants' statements about content puffery. Defendants lauded their
7  content because it "continues to fuel growth" and made them "tremendously positioned
8  for the future," while concealing that Defendants spent aggressively on content to the
9  detriment of profitability. They provided a concrete description of a "'state of affairs that
10  differ[ed] in a material way from one that actually exist[ed].'" *See Quality Sys.*, 865 F.3d
11  at 1144. Furthermore, Defendants withheld actual data about churn, which was
12  increasingly negative, while they misleadingly boasted about it. Chapek told investors
13  he was "extraordinarily pleased with the low churn rate" even though churn had increased
14  a whopping 30% year-over-year. This is exactly the type of misleading statement that
15  courts find actionable. *See, e.g.*, *id.* at 1137-38, 1143-44 (statements that a pipeline was
16  "'very robust,'" and "'deep,'" at "'record levels,'" not puffery because they "address[ed]
17  specific aspects of a company's operation that the speaker [knew] to be performing
18  poorly").

19          **4.      The PSLRA's Safe Harbor Does Not Apply**

20          The PSLRA's safe harbor applies only if a forward-looking statement is
21  "'identified as a forward-looking statement, and is accompanied by meaningful
22  cautionary statements identifying important factors that could cause actual results to
23  differ materially from those in the forward-looking statement.'" *Id.* at 1141 (quoting 15
24  U.S.C. §78u-5(c)(1)). It does not apply if the statement "was made 'with actual
25  knowledge . . . that the statement was false or misleading.'" *Id.*

26          **"*Future Disney+ Subscribers & Profitability.*"** Erecting another strawman,
27  Defendants challenge nearly a dozen forward-looking statements indicating, *e.g.*, that
28  Disney+ was "'on track'" or "'expects'" to achieve Defendants' subscriber and

- 24 -

1  profitability targets.  MTD at 23.  Plaintiffs do not allege that any of these statements are

2  false and misleading under Rule 10b-5(b).  Thus, Defendants' argument that they are

3  forward-looking, and the case law they cite in support thereof (*Tesla*, 985 F.3d at 1189),

4  is irrelevant.  *See supra* §III.C.

5        ***"Future Content Expansion."***  Defendants identify as forward-looking only one

6  false statement regarding "Future Content Expansion": "***[o]verall, we are pleased with***

7  ***Disney+ subscriber growth in the quarter and*** are looking forward to new market

8  launches and a strong content slate later this year."  MTD at 23 (citing ¶272).  But

9  Defendants misleadingly excised the emphasized language, which describes present or

10  historical facts and is not forward-looking.  *Id*.  Under Ninth Circuit law, "mixed

11  statements" such as this – that is, statements that contain both forward-looking parts and

12  non-forward looking parts – are actionable.  *Quality Sys.*, 865 F.3d at 1142.

13        ***International Expansion***.  Defendants assert that misstatements concerning their

14  plans to launch Disney+ into new foreign markets are protected by the safe harbor.  But

15  in these misstatements, Defendants tout their plans to enter new markets, while omitting

16  material information about the unprofitability of those new regions.  Under these

17  circumstances, misstatements are not shielded as forward-looking.  *See, e.g.*, *In re CV*

18  *Therapeutics, Inc.*, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) ("The fact that

19  defendants used those inadequately disclosed historical facts to support unsound

20  projections does not shield their alleged misrepresentations as forward-looking

21  statements.").  Further, Defendants failed to give sufficiently detailed warnings for the

22  safe harbor to apply.  The Ninth Circuit employs a "stringent" standard for cautionary

23  language.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th

24  Cir. 2005).  The language must be "'precise,'" and "'directly address'" the

25  misrepresentation such that "the risk of real deception drops to nil."  *Provenz v. Miller*,

26  102 F.3d 1478, 1493 (9th Cir. 1996).  Boilerplate risk disclosures are not enough.  *See*

27  *Zaghian v. Farrell*, 675 F. App'x 718, 719-20 (9th Cir. 2017).

28

- 25 -

4864-1456-8866.v1

Here, the boilerplate "cautionary language" fails. For example, Defendants point to the preamble before Disney's conference calls, generically warning that "certain statements . . . may constitute forward-looking statements" and a general list of "important factors" from Disney's SEC filings, without identifying which factors apply to Plaintiffs' allegations. But, "language is not 'meaningful' [when] it amounts to only a boilerplate listing of generic risks and does not mention the specific risk." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 780 (9th Cir. 2023).[5]

### 5. Defendants' Statements Were Not Inactionable Opinions

Defendants' disingenuous argument that their statements were inactionable opinions fails primarily because ***half*** of the statements Defendants attack are not alleged to be false or misleading under Rule 10b-5(b). MTD at 25:6, 25:10-15, 25:26, 26:2, 26:7-11. For five other statements, Defendants ignore the part of the statement actually alleged as false or misleading and claim other, peripheral parts of the statement are opinion statements. *Id.* at 25:7-8, 25:16-17, 25:28. Defendants also provide a long list of purported opinions without analysis, but "the Court may not assess the statements listed in the FAC in a vacuum." *Impax*, 36 F. Supp. 3d at 966.

The remaining statements are actionable because Defendants did not honestly believe the stated opinions at the time they were made. *See Omnicare*, 575 U.S. at 184-86. For example, on November 8, 2022, Chapek told investors "we still expect Disney+ to achieve profitability in fiscal 2024." ¶316. But, he was "repeatedly advised" about

---

[5] Although Defendants list a number of purported risk disclosures in their brief, Defendants never contend that those risk disclosures immunize them from liability. Nor could they. First, the risk warnings are boilerplate, generalized warnings that do not address the misstatements. *See, e.g.*, MTD at 3 ("'[t]here can be no assurance that . . . DTC offerings and other efforts will successfully respond to' 'shifting patterns of content consumption'"). Second, Defendants' warnings that risks "***may***" result were misleading because those risks had already come to fruition. *Compare id.* ("'[c]hanges in [Disney's] business strategy or restructuring of [its] businesses ***may*** increase [its] costs or otherwise affect the profitability of its businesses'"), *with* ¶307 (Chapek and Daniel used the DMED reorganization to "inflate subscriptions at the expense of profitability"). Where, as here, "[r]isk disclosures . . . 'speak[] entirely of as-yet unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors.'" *Alphabet*, 1 F.4th at 703; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09, 1016 (9th Cir. 2018).

- 26 -

1   Disney's declining financial condition, and was told he needed to "deliver a sober
2   message" regarding the Company's finances on the earnings call.  ¶317(b).  Similarly,
3   although churn was a "constant problem," Defendants said they were "extraordinarily
4   pleased" with churn.  ¶¶308-312.

5   ## V.    PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER

6       Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or
7   defraud' . . . but also 'deliberate recklessness.'"  *Schueneman*, 840 F.3d at 705.  A
8   defendant is deliberately "'reckless if he [or she] had reasonable grounds to believe
9   material facts existed that were misstated or omitted, but nonetheless failed to obtain and
10  disclose such facts although he [or she] could have done so without extraordinary effort.'"
11  *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014).  "The inquiry . . . is whether all of
12  the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether
13  any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S.
14  at 322-23.  "The inference that the defendant acted with scienter need not be irrefutable,
15  *i.e.*, of the 'smoking-gun' genre."  *Id*.  "[I]f two possible inferences – one fraudulent and
16  the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong
17  inference of scienter."  *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir.
18  2016).

19  ### A.    Internal Data Belied Defendants' Public Statements

20      "The most direct way to show . . . that the party making the statement knew that it
21  was false is [through allegations of] contemporaneous reports or data, available to the
22  party, which contradict the statement."  *Nursing Home Pension Fund, Loc. 144 v. Oracle
23  Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

24      ***First***, Iger revealed Disney was producing content that was "not necessarily
25  driving sub growth" and many programs were "not driving any subs at all."  ¶¶133, 324.
26  CW-1 described the data on whether content was driving subscriber growth and reiterated
27  that Disney was producing content that was "not driving subscriber growth."  ¶325.  CW-
28  1 presented this data to Daniel and other executives at regular meetings.  *See id.*  Chapek

- 27 -

also publically discussed the data.   ¶321.   For example, he stated: "[W]e have a tremendous amount of data that we get on our [DTC] platforms, things like the first view . . . which is a pretty good proxy for . . . why they signed up." ¶¶321, 331.

*Second*, Defendants closely tracked Disney+'s ballooning content costs, which showed streaming losses were rapidly accumulating.   Chapek himself publicly admitted that "we're very carefully watching our content growth – content cost growth."   ¶329; *see Reese*, 747 F.3d at 572.   Further, Disney spread the costs out over many quarters, which CW-1 confirmed "provided good visibility for costs upcoming." ¶329.[6]

*Finally*, internal data showed churn was a "constant problem" for Disney+. ¶333. CW-1 stated Disney "tracked churn very closely" and that it was "the most important thing." ¶361.   CW-1 also provided "hard numbers" regarding Disney+ churn, stating that Disney+ suffered from a 4%-5% churn rate. ¶333; *Oracle*, 380 F.3d at 1231.   CW-1 also revealed Chapek, McCarthy and others in the C-suite "got presentations of versions of this [churn] data on an ongoing basis" and were presented with "slides on churn reduction."  ¶334.   CW-1 also prepared a presentation on churn, which was presented to Chapek – a scenario that the Ninth Circuit found established scienter.   *Id.*; *see Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019). CW-2 corroborated CW-1's account: s/he attended weekly meetings where "slowing churn" was discussed.   Chapek also publicly stated: "[W]e have a tremendous amount of data . . . the churn, information."   ¶¶321, 331, 334.   Defendants offer only conclusory assertions that Plaintiffs did not allege the content of the reports or that specific information was provided to Defendants.   But Defendants ignore Plaintiffs' allegations. They also misstate the law; Plaintiffs need only provide "some specifics" regarding the reports – a standard that Plaintiffs far exceed.   *Oracle*, 380 F.3d at 1230-31.[7]

---

[6]   Defendants make much of the fact that the five-year plan projected in December 2020 that Disney+ would be profitable by 2024.   But Defendants' argument misses the point because Plaintiffs do not allege the December 2020 statements were false and misleading under Rule 10b-5(b).

[7]   Contrary to Defendants' baseless assertion, the accounts of Disney insiders establish Daniel's

**B.    Temporal Proximity Supports Scienter**

The "'temporal proximity' of the misstatements and the subsequent disclosures indicates "that defendants knew about the [problem] when they made the statement." *Berson*, 527 F.3d at 988 n.5.  Defendants fail to address the temporal proximity between the Board's June 28, 2022 statements that Chapek's contract renewal was "unanimous[]" and that Chapek had the Board's "full confidence" and the November 20, 2022 decision to fire him.   ¶339; *see Reese*, 747 F.3d at 575 ("three to six months" between "the statements and the contradictory disclosures" supports scienter).    Further, on November 8, 2022, Defendants reaffirmed Disney+ subscriber and profitability targets. Only *weeks* later, Disney fired Chapek and Daniel, unwound DMED and revealed that it would need to *"reset the whole business"* to put the Company *on the path* to profitability. ¶336.  The next quarter, Disney announced a $5.5 billion cost cutting plan, abandoned the subscriber target and began reporting *negative* subscriber growth. *Id.*  The stark contrast between Defendants' November 8 statements and the reality that unfolded shortly after supports scienter, especially given that Defendants do not identify any "intervening events" causing the "sudden and extreme change of fortune." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10-*11 (N.D. Cal. Nov. 4, 2020).  Defendants also misconstrue the later disclosure as "a business decision to pivot away from the subscriber-growth-as-the-priority business plan."  MTD at 28.   The magnitude and breadth of the disclosures suggest more than a mere change in business decision: "Such house-cleaning and reforms do not follow innocent mistakes." *See In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005); *see also* §III.C.2.[8]

---

scienter with respect to both his participation in the scheme and his misleading statement at Investor Day.  *See, e.g.*, ¶¶31, 33, 42, 62, 64, 66-69, 79, 124-133, 143, 152, 157-172, 176-230, 234-240, 247-250, 254, 263, 279, 289, 323-329, 331-335, 342-353, 357, 363.

[8] Defendants' cases are inapposite.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1056 (9th Cir. 2014) (rather than alleging merely "'business operations and business goals'" generally, Plaintiffs here allege the specific information included in the reports, including the hard numbers, metrics used and the names of the reports); *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 (9th Cir. 2022) (holding that "nothing" other than temporal proximity supported the inference that Defendants knew the truth when their made their misstatements); *City*

- 29 -

1    **C.    Inappropriate Tone at Top Supports Scienter**

2         Multiple CWs recounted that Defendants created a "toxic" corporate culture

3    where they were under "extraordinary" pressure to meet "unreasonable" Disney+ targets.

4    ¶¶340-342.  The pressure was so severe that CW-1's physician advised him/her to leave

5    the Company to preserve his/her health.  ¶¶341-342.  This supports scienter.  *See Luna v.*

6    *Marvell Tech. Grp.*, 2017 WL 2171273, at \*3-\*5 (N.D. Cal. May 17, 2017) (scienter

7    supported where "senior management employed an inappropriate 'tone at the top' that

8    applied pressure . . . not only on sales personnel . . . but also on finance personnel").[9]

9    Further, as discussed *supra* at §IV.A., Chapek ignored repeated warnings from other

10   Disney executives, including McCarthy, about Disney's "devastating" financial

11   condition before the November 8, 2022 earnings call.  ¶365.[10]  Contrary to Defendants'

12   suggestions, McCarthy's decision to warn the Board about the unavoidable loss

13   announcement before the November 8, 2022 call does not minimize her scienter.  *See*

14   *Patel v. Axesstel, Inc.*, 2015 WL 631525, at \*13 (S.D. Cal. Feb. 13, 2015) ("That

15   Defendants came clean when [company's] cash position was so poor that they likely had

16   no other choice" does not negate the inference of scienter.).

17   **D.    Terminations and Resignation Support Scienter**

18        Executive departures support scienter when they are "accompanied by suspicious

19   circumstances," which is what the Complaint alleges.  *Zucco Partners, LLC v. Digimarc*

20

21

---

22   *of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th
     Cir. 2017) (concerning "poor business judgment in overpaying for [an acquired company] and
23   determining that no impairment was necessary" whereas Plaintiffs here allege sudden and dramatic
     losses in a business segment, a complete restructuring, and a multi-billion dollar cost-cutting
     initiative – all made within a week or months after profitability targets were reaffirmed).

24   [9] Defendants cite only *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007), to
25   support their argument that Chapek's pressure tactics were legitimate.  But *Wet Seal* does not
     discuss pressure at all.  *See id.* at 1174.

26   [10] Defendants' citation to *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014), is inapt
     because the "mentality" at issue in *NVIDIA* was not connected to any individual defendant.  *See*
27   *id.* at 1061.  Similarly, *Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994 (N.D. Cal. 2018), is
     beside the point because it discussed whether a defendant's misstatements themselves could
28   support scienter; it did not discuss issues with tone at the top.  *See id.* at 1018-19.

4864-1456-8866.v1

1  *Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009).  Disney fired Chapek days after the

2  Company's November 2022 earnings announcement partially revealed the fraud and

3  shortly after McCarthy "told board members that she ***wasn't happy with the way Mr.***

4  ***Chapek had communicated with investors*** during the [November 2022] conference

5  call." ¶354.  The Board fired Chapek only months after offering him a new, three-year

6  contract and publicly declaring it had "full confidence" in Chapek.  ¶339.  Disney fired

7  Daniel the day after it fired Chapek.  ¶355.  McCarthy abruptly resigned after 23 years at

8  Disney and shortly after the fraud was fully revealed.  ¶357.  Courts routinely hold that

9  similar circumstances support scienter.  *See In re Fibrogen, Inc.*, 2022 WL 2793032, at

10  *25 (N.D. Cal. July 15, 2022) ("abrupt resignation tends to support scienter"); *In re*

11  *WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020)

12  (resignations in "close temporal proximity to the initial revelations" supported scienter).[11]

13  **E.    The Fraud Involved Disney's Core Operations**

14  Scienter may be imputed to Defendants "based on the inference that [they] have

15  knowledge of the 'core operations' of the company."  *Reese*, 747 F.3d at 575-76 (scienter

16  established where "'defendants had actual access to the disputed information'" ***or*** where

17  "it would be 'absurd' to suggest that management was without knowledge of the

18  matter").  Here, Defendants publicly defined streaming, *i.e.*, Disney+, as Disney's "top

19  priority" and ***"key to the future growth of our company."***  ¶358.  CWs recalled that

20  Disney's ***"entire focus was on streaming"*** and industry analysts noted streaming was

21  "the most important part of the narrative" and the ***"main driver of future stock***

22  ***performance."***  ¶¶361, 363.  These facts support scienter.  *See Reese*, 747 F.3d at 575-

23  76; *Shenwick*, 282 F. Supp. 3d at 1145-46 (core operations supported scienter for metric

24

25  [11] Defendants' authority is unhelpful.  *Cf. In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (rejecting argument that it was "possible to infer" defendants "were removed

26  for mismanagement unrelated to wrongdoing").  *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118-19 (3d Cir. 2018), is inapposite because there the company explicitly attributed the departures

27  to non-fraudulent factors.  Likewise, the departures in *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018), unlike the departures here, were not close in time to disclosures that suggested

28  fraud.

1   company described "as one of its five 'major growth drivers'" and which confidential

2   witnesses described as "'the most important metric'").   Chapek and McCarthy also

3   repeatedly discussed Disney+ subscriber growth and profitability during the Class

4   Period, which further supports scienter. *See Roberti v. OSI Sys., Inc.*, 2015 WL 1985562,

5   at *12 (C.D. Cal. Feb. 27, 2015) ("scienter can be established by the fact that the

6   Defendants touched on the specific issue . . . in their public statements").

7   **F.    Confidential Witnesses and Media Sources Support Scienter**

8          CWs need only be "described with sufficient particularity to establish their

9   reliability and personal knowledge." *Quality Sys.*, 865 F.3d at 1144-45.   "[I]t is not

10  necessary that the source have personal firsthand knowledge in a strict evidentiary sense.

11  Rather, the source must be . . . reasonably reliable . . . ." *In re LDK Solar Sec. Litig.*, 584

12  F. Supp. 2d 1230, 1243 (N.D. Cal. 2008).   To determine reliability, courts consider "'the

13  level of detail provided . . ., the corroborative nature of the other facts alleged . . ., the

14  coherence and plausibility of the allegations, the number of sources, the reliability of the

15  sources, and similar indicia.'"   *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th

16  918, 938 (9th Cir. 2013).

17         The CWs are described by job description and responsibility and duration of

18  employment, which establishes their reliability.   *See* ¶¶29-94.   For example, CW-1, a

19  senior executive at Disney who attended monthly meetings with Daniel and drafted the

20  earning's call script for Chapek, recounted that Disney+'s strategy was essentially

21  "buying subscribers," that Disney "let Wall Street run the show for them," there was a

22  directive by Chapek to the studios to "produce as much content as you can," but the

23  content that was produced for Disney+ was "not driving subscriber growth," and

24  executives "tracked churn very closely." *See* ¶¶30-55.[12]   CW-2, an executive in Global

25

26  ─────────────────────

27  [12]   The Ninth Circuit has rejected Defendants' argument that CW-1's account cannot support
    scienter for the time period after s/he left Disney.   *C.f. Quality Sys.*, 865 F.3d at 1145 ("Although
28  CW6 was not at [the company] during the Class Period, as COO CW6 had personal knowledge of
    executive-level management's real-time access to Salesforce reports forecasting quarterly sales.").

4864-1456-8866.v1

Product at Disney Streaming who met with Chapek, Daniel and McCarthy, recounted that "a launch in individual markets would create a short-term bump" in new subscribers, and Chapek "disregard[ed] things he didn't want to hear," which created a "toxic culture." *See* ¶¶56-67. The remaining CWs provide similarly detailed evidence of scienter. *See* ¶¶68-94. The CWs also corroborate each other. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008) ("Corroboration from multiple sources also supports an inference of scienter."). Finally, Plaintiffs quote media sources that reflect interviews and firsthand accounts by Disney executives, which Defendants ignore. ¶¶29, 95-96. These sources, too, support scienter. *See Knox v. Yingli Green Energy Holding Co. Ltd.*, 2016 WL 6609210, at *9 (C.D. Cal. May 10, 2016).

Defendants' attacks fail: the CWs need not have personally interacted with Defendants for their accounts to be credited. *See Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *10 (D. Ariz. Nov. 27, 2018) (rejecting identical argument). The Ninth Circuit routinely credits CWs even when the CWs do not interact with a defendant. *See, e.g.*, *Glazer*, 63 F.4th at 772 (crediting accounts of low-level CWs who had no direct contact with defendants); *Quality Sys.*, 865 F.3d at 1144 (same).[13] Further, CW-1 and CW-2 did interact with and provide information to Defendants. *See* ¶¶31, 56. Defendants misleadingly argue that the CW allegations concern "personal business opinions" only. But the three quotations on which Defendants rely are not even mentioned among the Complaint's scienter allegations. Defendants simply ignore the CW allegations that, as discussed above, support scienter.

## G.    Defendants' Compensation Was Tied to the Fraud

Chapek's and McCarthy's compensation "relied principally" on performance

---

[13] None of Defendants' cases stands for the proposition that CWs can support scienter only if they had direct access to Defendants. *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1062 (holding limited to a defendant's knowledge of day-to-day operations); *McCasland v. FormFactor Inc.*, 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008) (witnesses could not support scienter without "corroborating details").

- 33 -

metrics that were tied to the fraud, which supports scienter. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). During the Class Period, only 10% of Chapek's and 15% of McCarthy's compensation was guaranteed. *See* ¶¶373-374. The other **90%** and **85%**, respectively, was based on a cash bonus/equity award, which depended on certain performance indicators, including Disney's stock price and streaming success. *See id.* The Company attributed Chapek's and McCarthy's compensation to Disney+. This compensation supports scienter. ¶375; *see Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019) (compensation supported scienter where defendants' "stock and cash awards far outstripped their base salaries").[14]

## H.    Suspicious Stock Sales Support Scienter

"'Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.'" *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005). "To evaluate suspiciousness of stock sales, [the Ninth Circuit] consider[s], *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Oracle*, 380 F.3d at 1232. Here, before the Class Period, McCarthy had not sold *any* Disney stock for *over a year*. ¶381. But when the Class Period began, she accelerated her selling. *Id.* Indeed, the difference between McCarthy's pre-Class Period and Class Period selling is stark: she sold over *$17 million* of her stock during the 2.5 year Class Period – *300%* more than she sold in the 2.5 years before the Class Period. *Id.* "[T]he significant uptick compared with . . . prior sales history [is] supportive of scienter." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1030 (N.D. Cal. 2020).

"To the extent that Defendants contend that this [insider selling] was merely an exercise of options that were set to expire, this is a factual question outside the

---

[14] Defendants' authority is not to the contrary. *See Digimarc*, 552 F.3d at 1004 ("In *America West*, we found it significant that the individual defendants' compensation was based '*principally*' on the defendant company's financial performance.").

- 34 -

1   Complaint." *In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at \*8 (D.N.J.
2   Sept. 30, 2016).  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th
3   Cir. 2008), is distinguishable because there, unlike here, scienter was lacking in part
4   because there was "nothing suspicious" about the timing of the defendants' sales.  Nor
5   does McCarthy's trading plan negate scienter.  *See In re Questcor Sec. Litig.*, 2013 WL
6   5486762, at \*16 (C.D. Cal. Oct. 1, 2013) ("[T]he fact of the 10b5-1 trading plan, without
7   more, is insufficient to negate the effect of otherwise suspicious sales.").  Moreover, a
8   "'10b5-1 trading plan does not provide an absolute defense to a claim of insider trading.
9   Rather, it requires an additional factual finding of good faith,' which a court cannot make
10  [on] a motion to dismiss." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*4 (N.D. Cal. Nov.
11  27, 2018).[15]

12  # VI.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

13          A plaintiff need only allege "a 'causal connection' between the fraud and the loss,
14  by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers'*
15  *Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *see also Lloyd v.*
16  *CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) ("'[T]o establish proximate
17  causation, the plaintiff must prove that when the relevant truth about the fraud began to
18  leak out, it caused the price of stock to depreciate and thereby proximately cause the
19  plaintiff's economic loss.'").  "'So long as the complaint alleges facts that, if taken as
20  true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate.'" *In*
21  *re Facebook*, *Inc. Sec. Litig.*, 87 F.4th 934, 954 (9th Cir. 2023).  Pleading loss causation
22  "'should not prove burdensome,' for even under Rule 9(b) the plaintiff's allegations will
23  suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and
24  provide the court 'some assurance that the theory has a basis in fact.'" *See In re BofI*

25

26  ---
    [15] Defendants argue that Chapek's lack of stock sales detracts from scienter, but "'[s]cienter can
    be established even if the officers who made the misleading statements did not sell stock during
27  the class period.'" *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8810760, at \*12 (C.D. Cal. Sept.
    20, 2017); *see also Alphabet*, 1 F.4th at 707 ("Although such allegations may support an inference
28  of scienter, they are not a sine qua non for raising such an inference.").

1 | *Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).

2 |       Defendants attempt to apply a more stringent standard than the Ninth Circuit
3 | requires, claiming *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), dictates that
4 | "plaintiff must 'plausibly allege that the defendant's fraud was "revealed to the
5 | market.""'" MTD at 36. But the Ninth Circuit has resoundingly rejected Defendants'
6 | reading of *Loos*, making clear that "[d]isclosure of the fraud is not a sine qua non of loss
7 | causation," but rather "one of the '***infinite variety***' of causation theories a plaintiff might
8 | allege to satisfy proximate cause." *First Solar*, 881 F.3d at 753-54 (rejecting the
9 | argument that *Loos* requires "a more restrictive test"); *see also In re Splunk Inc. Sec.*
10 | *Litig.*, 592 F. Supp. 3d 919, 952 (N.D. Cal. 2022) ("Plaintiff need not allege facts
11 | consistent with a revelation-of-the-fraud theory to plausibly allege loss causation, where,
12 | as here, it has plausibly alleged loss causation under a cognizable alternative theory.").
13 | Defendants' failure to apply the appropriate test is fatal.

14 |       By alleging a causal connection between the revelation of fraud-related
15 | information and a drop in Disney's stock price, Plaintiffs satisfy their burden. *See First*
16 | *Solar*, 881 F.3d at 753.

17 |       ***November 10, 2021***. Defendants disclosed a disappointing slowdown in
18 | subscriber numbers, which fell "1.5 million short of consensus estimates." ¶385.
19 | McCarthy disclosed that losses would mount for longer than previously disclosed: "[W]e
20 | now expect that Disney+ will reach its peak year of losses in fiscal 2022 instead of fiscal
21 | 2021." *Id.* This information was revealed to the market after market close, and, on the
22 | next trading day, the stock price fell 7.1% on abnormally high trading volumes. ¶396.

23 |       ***November 8, 2022***. Defendants disclosed a $1.47 billion operating loss, which
24 | caused analysts to doubt the attainability of Disney's misleading profitability targets.
25 | ¶392. A Barclays analyst said: "[W]e believe Disney may face a choice between its
26 | subscriber growth guidance and its streaming breakeven guidance as we believe it may
27 | be tough to meet both." *Id.* The disclosure came after market close, and on the next

28 |

1    trading day, Disney's stock price declined 13.2% on abnormally high trading volumes.

2    ¶391.

3         **May 10, 2023**.  Iger revealed that "Disney needed to completely change course

4    and unwind nearly every aspect of Chapek's growth-at-any-cost plan."  ¶394.  Further,

5    Disney planned to cut content spend, curb its unprofitable international expansion,

6    remove a trove of existing content and take a massive impairment charge.  *Id.*  This

7    disclosure occurred after market close, and, on the next trading day, Disney's stock price

8    dropped 8.7% on abnormally high trading volumes.  *Id.*  Analysts connected the stock

9    price decline to the corporate "reset," stating "[g]rowth narrative heavy on cost cuts and

10   light on a revenue may not justify current valuation."  ¶396.

11        Defendants argue that these corrective disclosures were merely generic earnings

12   misses.  But as described above, they were specific to the fraud.  In *Karinski v.*

13   *Stamps.com, Inc.*, 2020 WL 281716 (C.D. Cal. Jan. 17, 2020), this Court upheld

14   plaintiffs' loss causation allegations because they demonstrated that "both earnings

15   reduction[s] were clearly related to the allegedly fraudulent conduct."  *Id.* at *17; *see also*

16   *Daou Sys.*, 411 F.3d at 1026 (complaint adequately alleged loss causation by explaining

17   how stock price fell after revelations of "company's true financial condition").

18        Defendants recycle their argument that the "revelatory information Plaintiffs

19   identify on these three dates already had been disclosed."  MTD at 37.  But, as discussed

20   *supra* at §III.C.1, Defendants' mantra fails because this information was not disclosed.

21   For the November 10, 2021 disclosure, Defendants point to a prior message that "'paid

22   sub[cribers] will increase by low single-digit millions of subscribers versus Q3.'"  MTD

23   at 38.  Nothing from that "disclosure" divulged that Disney's losses would continue to

24   increase for another year.  Nor were investors told that Disney would miss consensus

25   estimates by 1.5 million.  For the November 8, 2022 disclosure, Defendants highlight

26   their statement that "investors 'will see a similar increase year-over-year that you saw

27   this quarter.'"  *Id.*  But nothing from that vague statement prepared investors for the

28

- 37 -

November 8, 2022 disclosure of *$1.47 billion in operating losses*.[16]  Finally, for the May 10, 2023 disclosure, Defendants highlight the previously announced "'transformation'" for Disney that would "'put[] it on a path to sustained growth and profitability.'"  MTD at 39.  But that earlier disclosure said *nothing* about profitability being unattainable under the prior plan, *nothing* about cutting international expansion and *nothing* about the upcoming *impairment charge of up to $1.8 billion*.  Defendants' argument also fails because "reasonable minds could differ as to whether the disclosures Defendants point to sufficiently revealed the matters that Defendants allegedly concealed from investors." *Splunk*, 592 F. Supp. 3d at 953-54).  Moreover, proof of loss causation is not appropriately addressed on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss.  *See Gilead*, 536 F.3d at 1055, 1058.[17]

## VII.  PLAINTIFFS ALLEGE A §20A CLAIM AGAINST IGER AND MCCARTHY

Section 20A imposes liability on defendants who: (1) commit a predicate 1934 Act violation by trading while in possession of MNPI; and (2) trade contemporaneously with the plaintiffs.  *See Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007).  Plaintiffs easily satisfy both requirements.

### A.    Predicate Exchange Act Violations

*Iger*.  Iger violated the 1934 Act by selling his stock while possessing MNPI, in violation of Rule 10b-5.  While Defendants assert that Plaintiffs' claims against Iger are deficient because he is not alleged as a misstatement or scheme defendant, the "Ninth Circuit has acknowledged that insider trading in violation of §10(b) and Rule 10b-5 may serve as the predicate violation for a private section 20A claim." *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1282 (N.D. Cal. 2019); *see also Am. W.*, 320 F.3d at

---

[16] Defendants contend that the $763 million increase in year-over-year losses for Q3 2022 should have prepared investors for an $844 million increase in Q4 2022, but that is a question of fact for the jury.  *Gilead*, 536 F.3d at 1055, 1058.

[17] Because Plaintiffs sufficiently allege a primary violation of §10(b), and Defendants do not dispute each Defendant's control, the Complaint properly pleads §20(a) control person liability.

4864-1456-8866.v1

1  937 ("the fact that neither [defendant] made any of the allegedly misleading statements

2  does not shield them from liability").[18]  Section 10(b) imposes liability when a defendant:

3  (1) sells stock; (2) while in possession of MNPI.  *See Johnson v. Aljian*, 394 F. Supp. 2d

4  1184, 1196 (C.D. Cal. 2004), *aff'd*, 490 F.3d 778 (9th Cir. 2007).[19]

5       Plaintiffs thoroughly detail the MNPI that Iger possessed when he sold over ***$375***

6  ***million*** of his stock to unknowing investors.  ¶263.  During his selling spree, Iger was

7  Disney's Executive Chairman, which allowed him to "keep a heavy hand on operations"

8  and act "almost as a ***shadow CEO***."  ¶254.  Indeed, as Executive Chairman, Iger

9  continued to lead the Board, headed the Company's creative engine, and was ***Chapek's***

10 ***boss***.  *Id.*  When Chapek announced the 230-260 million subscriber target, Iger

11 "[p]rivately . . . questioned the eye-popping prediction" and thought the "projections

12 went too far."  ¶259.  Regarding DMED, Iger "told people close to him that he didn't

13 think the new regime made sense."  *Id.*

14      Only ***after*** he sold his stock did Iger admit what he knew all along.  For example,

15 in February 2023, Iger told CNBC it was "very, very apparent . . . that [the DMED

16 reorganization] was a mistake" and not "healthy for this company."  ¶262.  Iger also

17 admitted on November 28, 2022 that the Company had been "chasing (subscribers) with

18 . . . aggressive spend on content."  *Id.*  During the Company's Q1 2023 earnings call, Iger

19 indicated that the Company was only just beginning to head towards profitability, stating:

20 "as we rationalize this business and we head in the direction of profitability, clearly, we're

21 looking at opportunities to reduce expenses in those markets where the revenue potential

22 just isn't there."  *Id.*  Iger left no doubt that he possessed MNPI throughout the Class

23

24

---

25 [18] For the same reason, Defendants' argument that "any trades by Mr. Iger are irrelevant in the

26 absence of any challenged statements or conduct" fails.  MTD at 35.  And *In re ICN Pharms., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055 (C.D. Cal. 2004), is unhelpful because it does not involve a §20A

27 insider trading claim.

[19] Because Defendants failed to address Iger's 10b-5 insider trading as a predicate 1934 Act

28 violation in their MTD, they may not do so in their reply.  *See Kempthorne*, 520 F.3d at 1033.

1  Period when he told CNBC: *"I was aware of some of the issues that the Company was*

2  *dealing with. . . .  I would say it was as expected. . . .  There were no surprises."*  ¶261.

3      *McCarthy*.  McCarthy violated the 1934 Act both by issuing false and misleading

4  statements and by engaging in the scheme.  *See McKesson*, 411 F. Supp. 3d at 605

5  ("[Plaintiff] has successfully pled a 'predicate insider trading violation' for the same

6  reasons it has adequately alleged its Section 10(b) claim.").  "The allegations giving rise

7  to a strong inference of scienter also support an inference that [McCarthy's] sales of

8  [Disney] stock . . . were made 'while in possession of [MNPI].'"  *See id.*

9      **B.  Contemporaneous Trading**

10      Although the "Ninth Circuit has not delineated the boundaries of

11  contemporaneity," most courts hold that trading between one to ten days suffices.

12  *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18-*19 (N.D. Cal. Mar. 31, 2023)

13  ("the Court finds ample precedent in this circuit for a finding that a four-day trading gap

14  may be considered contemporaneous"); *see also McKesson*, 411 F. Supp. 3d at 591 (six

15  and nine days contemporaneous); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL

16  6829623, at *37 (S.D. Cal. Aug. 1, 2006) (eight days sufficient).  The "Ninth Circuit has

17  not endorsed [Defendants'] preferred standard for contemporaneousness (trading 'on the

18  same day . . . or at most the day after')."  *McKesson*, 411 F. Supp. 3d at 606.  Here,

19  Defendants concede that Plaintiffs satisfy contemporaneity for Iger's February 2, 2021

20  trades.[20]  Contemporaneity is satisfied for the remaining trades because each occurred

21  within ten days of Plaintiffs' purchases.  ¶423.

22  **VIII.  CONCLUSION**

23      For the reasons set forth above, Defendants' motion to dismiss the Complaint

24  should be denied.

25

26  _____

27  [20] Defendants incorrectly state that "Plaintiffs allege to have traded within one day only of Mr.
Iger's February 2, 2021 trades."  MTD at 40.  But Plaintiffs also traded within one day of Iger's
February 8, 2021 trades.  ¶423.  Accordingly, even under Defendants' cramped reading of the law,

28  contemporaneity is also satisfied for Iger's February 8, 2021 trades.

- 40 -

DATED:  February 5, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN
RYAN A. LLORENS
JESSICA T. SHINNEFIELD
JEFFREY J. STEIN
NICOLE Q. GILLILAND
JESSICA E. ROBERTSON


                    s/ Daniel S. Drosman
                  DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
ryanl@rgrdlaw.com
jshinnefield@rgrdlaw.com
jstein@rgrdlaw.com
ngilliland@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 41 -

4864-1456-8866.v1

**L.R. 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 40 pages, which complies with the page limit set by court order dated November 22, 2023.

DATED:  February 5, 2024

                                        s/ Daniel S. Drosman
                                        DANIEL S. DROSMAN