**CRAVATH, SWAINE & MOORE LLP**
J. Wesley Earnhardt (*pro hac vice*)
Helam Gebremariam (*pro hac vice*)
Lauren Rosenberg (*pro hac vice*)
2 Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
wearnhardt@cravath.com
hgebremariam@cravath.com
lrosenberg@cravath.com
Attorneys for Defendants

*(additional counsel on signature page)*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, CENTRAL PENNSYLVANIA TEAMSTERS PENSION FUND, CENTRAL PENNSYLVANIA TEAMSTERS PENSION FUND – RETIREMENT INCOME PLAN 1987, CENTRAL PENNSYLVANIA TEAMSTERS HEALTH AND WELFARE FUND AND JOHN P. TALBOT, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE WALT DISNEY COMPANY, ROBERT IGER, ROBERT CHAPEK, CHRISTINE M. MCCARTHY AND KAREEM DANIEL, <br><br> Defendants. | Case No. 2:23-cv-03661 <br><br> **NOTICE OF SUPPLEMENTAL AUTHORITY RELATED TO DEFENDANTS' CONSOLIDATED MOTION TO DISMISS CONSOLIDATED COMPLAINT** <br><br> Date:    June 11, 2024 <br> Time:    10:00 a.m. <br> Ctrm:    8D <br><br> Judge Consuelo B. Marshall |

Case No. 2:23-cv-03661

NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants The Walt Disney Company, Robert Iger, Robert Chapek, Christine M. McCarthy and Kareem Daniel respectfully file this notice of supplemental authority to bring to the Court's attention a relevant case decided after the close of briefing.

Attached as Exhibit A is a true and correct copy of the April 19, 2024 decision of the U.S. Court of Appeals for the Ninth Circuit, *Espy v. J2 Glob., Inc.*, 99 F.4th 527 (9th Cir. 2024). *Espy* held: "Dissatisfaction with a company's strategy, management, and approach to accounting, coupled with a stock drop, make for interesting reading but not an actionable securities fraud claim". *Id.* at 533. It held that confidential-witness allegations that "fail to establish reliability or personal knowledge, or simply amount to criticisms of [] management practices", are "not statements which are themselves . . . indicative of scienter". *Id.* at 537 (internal quotations and citations omitted).

NOTICE OF SUPPLEMENTAL AUTHORITY

Dated:  May 20, 2024

*/s/ John W. Spiegel*
**CRAVATH, SWAINE & MOORE LLP**
J. Wesley Earnhardt (*pro hac vice*)
Helam Gebremariam (*pro hac vice*)
Lauren Rosenberg (*pro hac vice*)
2 Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
wearnhardt@cravath.com
hgebremariam@cravath.com
lrosenberg@cravath.com


**MUNGER, TOLLES & OLSON LLP**
John W. Spiegel (Bar No. 78935)
John M. Gildersleeve (Bar No. 284618)
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100
Facsimile:  (213) 687-3702
john.spiegel@mto.com
john.gildersleeve@mto.com

*Counsel for Defendants The Walt Disney Company, Robert Iger, Robert Chapek, Christine M. McCarthy and Kareem Daniel*

NOTICE OF SUPPLEMENTAL AUTHORITY

# EXHIBIT A

99 F.4th 527
United States Court of Appeals, Ninth Circuit.

Jonathan ESPY, himself and all others
similarly situated, Plaintiff-Appellant,
v.
J2 GLOBAL, INC.; Vivek Shah; Nehemia
Zucker; R. Scott Turicchi, Defendants-Appellees.

No. 22-55829
|
Argued and Submitted October
3, 2023 San Francisco, California
|
Filed April 19, 2024

**Synopsis**
**Background:** Investor filed putative class action against international information services corporation, former chief executive officers (CEOs) and former president, claiming securities fraud in violation of § 10(b) and Rule 10b-5 and control person liability for allegedly making materially misleading statements by omitting key facts regarding acquisition of consulting business registered to personal residence of corporation's vice president of corporate development, who was also director of corporation's subsidiary, and regarding investment in fund whose manager had multiple ties to corporation's leadership, lower-level employees, and other members of Board of Directors, as well as allegedly hiding underperforming acquisitions from investor scrutiny through consolidated accounting practices, which investors learned about from two short-seller reports, not from corporation's disclosures, and which allegedly artificially inflated corporation's stock price. After granting motion to dismiss with leave to amend, 2021 WL 1558331, and investor's filing of amended complaint, the United States District Court for the Central District of California, Fernando L. Aenlle-Rocha, J., 2022 WL 22717936, granted motion to dismiss for failure to state claim and denied investor further leave to amend complaint. Investor appealed.

**Holdings:** The Court of Appeals, McKeown, Circuit Judge, held that:

scienter was not sufficiently alleged regarding acquisition;

scienter was not sufficiently alleged regarding investment;

scienter was not sufficiently alleged regarding consolidated accounting;

scienter was not sufficiently alleged viewed holistically;

loss causation was not sufficiently alleged; and

denial of further leave to amend complaint was not abuse of discretion.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim; Motion to Amend the Complaint.

 ***533**  Appeal from the United States District Court for the Central District of California, Fernando L. Aenlle-Rocha, District Judge, Presiding, D.C. No. 2:20-cv-06096-FLA-MAA

**Attorneys and Law Firms**

Ivy T. Ngo (argued), Velvel Devin Freedman, and Constantine P. Economides, Freedman Normand Friedland LLP, Miami, Florida; Michael P. Canty, Thomas G. Hoffman, Jr., and David J. Schwartz, Labaton Sucharow LLP, New York, New York; Brian Schall, The Schall Law Firm, Los Angeles, California; for Plaintiff-Appellant.

Matthew W. Close (argued), Aaron D. Henson, and Elizabeth A. Arias, O'Melveny & Myers LLP, Los Angeles, California; Abby F. Rudzin, O'Melveny & Myers LLP, New York, New York; for Defendants-Appellees.

Before: M. Margaret McKeown, Consuelo M. Callahan, and Kenneth K. Lee, Circuit Judges.

**OPINION**

McKEOWN, Circuit Judge:

This is a case in which neither individual allegations of securities fraud nor various acts of alleged corporate misfeasance over many years satisfies the heightened and demanding standard required in a securities case. Dissatisfaction with a company's strategy, management, and approach to accounting, coupled with a stock drop, make

for interesting reading but not an actionable securities fraud claim.

Jonathan Espy, who purchased shares of common stock in an international information services company, J2 Global ("J2"), between 2015 and 2020, appeals the dismissal of his securities fraud action for failure to plead scienter. Espy contends that J2 made materially misleading statements by omitting key facts regarding a 2015 acquisition and a 2017 investment, and hid underperforming acquisitions from investor scrutiny through consolidated accounting practices. Espy also alleges that investors learned of J2's corporate mismanagement and deception not from J2's disclosures, but from two short-seller reports. The district court twice dismissed Espy's complaint.

Because Espy failed to sufficiently plead either scienter or loss causation, and because failure to plead either of these elements dooms his appeal, we affirm.

## I. BACKGROUND [1]

[1]     This background is based on the allegations in Espy's Second Amended Complaint.

J2 uses an acquisition model to grow its business. Since its founding in 1995, J2 has acquired 186 businesses for a total of $3 billion. In the ordinary course, J2 would purchase a company in the media, technology, or internet space and integrate that company into one of its two existing divisions—Digital Media and Cloud Services—allowing J2 to cut costs while maintaining those businesses' existing revenue streams. Once these businesses are integrated into J2's divisions, J2 reports only the performance of those divisions, and not the performance of the individual acquisitions, a practice known as "consolidated accounting."

Espy alleges that since 2015, J2 has shrouded underperforming acquisitions and investments in questionable ventures, enriching J2's executives and members of its board of directors ("Board") while misleading **\*534** its investors through key omissions in press releases, earnings calls, proxy statements, and SEC disclosures. This appeal focuses on three general categories of alleged corporate malfeasance: (1) the 2015 VDW acquisition; (2) the 2017 Orchard investment; and (3) J2's practice of consolidated accounting.

### 1. The VDW Acquisition

On October 5, 2015, J2 announced that it had completed nine acquisitions in the third quarter of 2015, and that those acquisitions would "grow the Company's global customer base, provide access to new markets and expand J2's product lineup." Among the acquisitions listed was VDW (Netherlands) ("VDW"), which J2 described as an "Intellectual Property" acquisition.

VDW was in fact an 11-month-old consulting business registered to the personal residence of Jeroen van der Weijden, who in 2015 was Vice President of Corporate Development at J2 and a director of a J2 subsidiary, J2 UK. J2 paid $900,000 for VDW, which had no employees other than van der Weijden and his girlfriend. Espy alleges that van der Weijden pressured J2 to acquire VDW as a "bonus" to him.

### 2. The Orchard Capital Investment

In September 2017, the Board authorized J2 to invest $200 million in a fund run by Orchard Capital Ventures ("Orchard"). Orchard's ties to J2's leadership are legion: Richard Ressler, who served as J2's CEO from 1997 to 2000 and has been Board Chairman and a director of J2 since 1997, is the majority equity holder of Orchard's fund and its manager, OCV Management, LLC. Nehemia Zucker, who served as J2's CEO from 2008 to 2017, held significant equity in Orchard. Three days after J2 authorized the Orchard investment, J2 announced that Zucker would be stepping down as J2's CEO and joining Orchard as a co-managing principal.

Lower-level employees and other members of the Board had ties to Orchard as well. Zohar Loshitzer, J2's Executive Vice President of Corporate Strategy since 2001, has also been a principal at Orchard since 2005. Brian Kretzmer, elected to the J2 Board in 2007, consulted for Orchard between 2016 and 2017. Stephen Ross, also elected to the J2 Board in 2007, had significant prior business ties with Ressler, Loshitzer, and Kretzmer.

In addition to its significant capital investment in Orchard's fund, J2 paid Orchard millions in management fees pursuant to its investment agreement with Orchard. Espy contends that because Orchard essentially does the same thing as J2—invests in and acquires companies—the deal had no business justification, and instead served to provide an untraceable "slush fund" for J2 insiders to enrich themselves, friends, and family members.

Unlike VDW, where details of the acquisition went undisclosed, J2 did disclose significant detail about the Orchard investment, including the amount of the investment, how the management fees would be calculated, and that Ressler and Zucker had ongoing relationships with Orchard and J2. However, J2 did not disclose Kretzmer, Loshitzer, and Ross's close ties to Orchard and Ressler, or the precise amount of management fees that J2 would pay to Orchard.

### 3. Consolidated Accounting

Espy alleges that J2's practice of consolidated accounting has allowed it to hide underperforming or overvalued acquisitions within its two divisions. Espy alleges that, by producing two sets of consolidated financial data (instead of financial data for **\*535** each of hundreds of acquired businesses), J2 has "misrepresented [its] true health as a business and, in turn, artificially inflated its stock price." Espy alleges that two J2 acquisitions and subsidiaries in particular—J2 Ireland and Everyday Health—failed to perform and showed declines in revenue that were not reflected in J2's consolidated accounting.

### 4. Procedural History

Espy acquired J2 stock between October 5, 2015 and June 29, 2020, and filed claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 of the Act's implementing regulations. On J2's first motion to dismiss, the district court held that while Espy had adequately pleaded loss causation and that certain categories of statements were materially misleading, Espy failed to adequately plead scienter. The court dismissed Espy's first amended complaint with leave to amend. Espy filed a second amended complaint with additional allegations of scienter, primarily from four anonymous J2 employees. The district court held that the second amended complaint still failed to plead scienter and dismissed the action without leave to amend.

## II. ANALYSIS

Section 10(b) of the Securities Exchange Act ("Exchange Act") prohibits a party from engaging in "manipulative or deceptive practices in connection with the purchase or sale of a security." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023) (cleaned up). Rule 10b-5 of the Exchange Act's implementing regulations is coextensive with Section 10(b). *Id.* To survive a motion to dismiss under this regime, Espy

must plead: "(1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (quoting *Glazer Cap. Mgmt., L.P. v. Forescout Techs. Inc.*, 63 F.4th 747, 764 (9th Cir. 2023)).

We review de novo the dismissal of a complaint for failure to state a claim and accept the well-pleaded allegations in the complaint as true. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022). To survive a motion to dismiss, plaintiffs "must plead 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The factual allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). These allegations are subject to heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Id.* (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)).

We address only two of the Section 10(b) factors, either of which requires dismissal here: scienter and loss causation.

### A. Scienter

To plead scienter, a complaint "must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (quoting 15 U.S.C. § 78u–4(b)(2)). The "strong inference" "must be cogent and compelling, thus strong in light of other [countervailing] explanations," not merely "reasonable" or "permissible." **\*536** *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (alteration in original) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). "Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud." *Glazer*, 63 F.4th at 765. Instead, deliberate recklessness represents "an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991 (quoting

Espy v. J2 Global, Inc., 99 F.4th 527 (2024)
2024 Daily Journal D.A.R. 3383

*In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999)).

### 1. The VDW Acquisition

Espy endeavors to plead scienter as to the omitted disclosures regarding the VDW acquisition by reference to statements of two confidential former employees: FE1 and FE2. In doing so, Espy must satisfy two hurdles imposed by the PSLRA: "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* at 995 (internal citations omitted).

FE1, who was Managing Director of J2's Australia and New Zealand division between 2015 and 2017, worked with van der Weijden when he came to Australia for meetings, and understood that van der Weijden, as Vice President of Corporate Development, oversaw the acquisitions aspect of J2's business. In 2015, FE1's then-boss told him that van der Weijden's incentive package was based on the number of deals he brought in that closed, rather than the quality of those deals. FE1 thought that incentive structure led to shoddy due diligence, overpayment for acquisitions, and failure to integrate those acquisitions into J2's divisions.

FE2 was J2's Global Head of Human Resources between July 2006 and December 2016. As with FE1, FE2 recalled that van der Weijden was compensated based on the number of acquisitions he brought in, rather than their quality, and that FE2 "constantly pressured" van der Weijden to conduct more rigorous due diligence on potential acquisitions, but he never did so. FE2 understood that van der Weijden reported directly to Zucker, Turicchi, and Ressler who signed off on every acquisition and were aware that van der Weijden performed limited due diligence on the acquisitions he brought in. FE2 states that because the Board wanted van der Weijden to bring in six acquisitions per quarter, he "had a great deal of sway at J2" and his "demands were always met because otherwise he threatened to 'turn off the spigot.' "

FE2 was present at meetings during which van der Weijden, Turicchi, and Zucker discussed van der Weijden's compensation structure and his girlfriend's visa status. FE2 understood that van der Weijden wanted to bring his longtime girlfriend with him from the Netherlands to the United States by making her an employee of VDW, which he wanted J2 to acquire. At the meeting with Zucker and Turicchi, "van der Weijden threatened to leave J2 unless Turicchi and Zucker accommodated his demand to bring his girlfriend to the United States." FE2 was not present for the rest of the conversation.

The majority of FE1 and FE2's statements fail to establish reliability or personal knowledge, or simply amount to criticisms of J2's management practices and compensation structures. While FE1's understanding **\*537** of van der Weijden's job responsibilities can be credited as reliable due to FE1's direct observations of van der Weijden, his criticisms of van der Weijden's incentives—even if that information is reliable, given that it came secondhand from FE1's boss—are simply negative opinions of J2's business practices or compensation structures, not statements which are "themselves ... indicative of scienter." *Zucco*, 552 F.3d at 995. FE2's similar critique of van der Weijden's incentives fails for the same reasons. FE2's assessment is further undermined by her prior position as Global Head of Human Resources, which indicates that FE2 relies on secondhand information about the extent of van der Weijden's due diligence, and how closely those acquisitions were scrutinized by Zucker, Turicchi, and Ressler. *See id.* at 996–97 (holding that a human resources employee "had no firsthand knowledge of the workings of the finance or corporate departments"). FE2's general allegations regarding van der Weijden's conduct thus lack reliability and personal knowledge.

Espy comes closest to alleging scienter through FE2's description of the meeting in which van der Weijden, Turicchi, and Zucker discussed "van der Weijden's compensation structure and his girlfriend's visa status," and where "van der Weijden threatened to leave J2 unless Turicchi and Zucker accommodated his demand to bring his girlfriend to the United States." While FE2 makes broader statements regarding the VDW acquisition—namely, that J2 "acquiesced to van der Weijden's demands and acquired VDW for $900,000, which J2 considered to be a bonus to van der Weijden"—it is unclear whether those statements come from general knowledge, gossip, or the meeting where FE2 was present. But as alleged, the meeting FE2 attended did not directly discuss the VDW acquisition itself. The relationship between van der Weijden's "demands" and the VDW acquisition was apparently discussed, if at all, *after* "the discussions became private and FE2 no longer participated." Thus, FE2's incomplete report of the meeting in question cannot serve to impute to Turicchi and Zucker knowledge of

the details of the VDW acquisition—that it was effectively a "bonus" to van der Weijden and a vehicle acquired in part to allow van der Weijden's girlfriend to come to the United States.

Even if knowledge of the claimed nature of the VDW arrangement could be imputed to Turicchi and Zucker, that alone would not indicate a strong inference of scienter in J2's failure to disclose those details. The press release announcing the VDW acquisition also reported eight other acquisitions in the third quarter of 2015. Turicchi is quoted in the press release as saying that since the beginning of 2015, J2 had "completed twenty acquisitions deploying approximately $265 million of capital." The press release included no further discussion of any of the other eight acquisitions that quarter. While it is theoretically possible that J2 lumped VDW into a press release with other, more legitimate acquisitions to call as little attention to it as possible, that inference of scienter is not "strong in light of other explanations," such as mere negligence. *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499. After all, compared to the $265 million in capital J2 had spent to acquire other businesses in 2015, it seems less likely that J2 failed to fully describe a $900,000 acquisition because it was trying to hide it, as the overall value of J2 transactions that year dwarfed this particular acquisition. It is more plausible that the details of the VDW acquisition were equally unimportant to the press release as the details of the eight other acquisitions announced in that same disclosure.

 **\*538**  Espy's remaining allegations—that van der Weijden was on the board of a foreign J2 subsidiary and that VDW was a shell start-up—fare no better. Such disclosures were not required in view of the law and their minor value as compared to J2's $265 million in total acquisitions that year. What is missing are credible allegations of an intent to defraud investors.

### 2. The Orchard Capital Investment

Espy also fails to adequately plead scienter as to the Orchard investment disclosure. J2 disclosed significant detail in its 2017 proxy statement—including the amount of the investment ($200 million), the calculation of annual management fees that would be owed (two percent of J2's capital commitment), that Ressler was a majority equity holder in Orchard, and that Zucker was stepping down from his position as CEO to help manage the fund. Espy does not explain why the information that was left out—the precise amount of management fees that would be paid to Orchard

and the ties between Kretzmer, Loshitzer, and Ross and Orchard—compels a strong inference of scienter.

As to the management fees, Espy appears to mistake management fees for payment of capital commitments. The underlying documents cited in the complaint indicate that J2 paid management fees of between $3 and $4.5 million between 2018 and 2019, or approximately two percent of the $200 million capital commitment, as disclosed. [2]

[2] Espy alleges that "J2 paid [Orchard] over $36 million in 2018 and $29 million in 2019," citing J2's 2020 10-K and the partnership agreement between J2 and Orchard. While Espy does not explain whether those payments are management fees or something else, in his reply brief, he characterizes those payments as *entirely* management fees: "But Plaintiff alleges that J2 paid management fees 'over $36 million in 2018 and $29 million in 2019'—as revealed by Hindenburg—so J2's disclosure was false and misleading." Espy appears to misunderstand his sources. J2's disclosures describe *capital call notices* from Orchard for $36.8 million in 2018 and $29.6 million in 2019, "inclusive of certain management fees." J2's 2020 10-K further discloses the actual management fees J2 paid Orchard: $3.0 million in 2019, $4.5 million in 2018, and zero in 2017, almost precisely the yearly two percent of $200 million disclosed in the 2017 proxy statement announcing the deal.

As for the additional ties between Kretzmer, Loshitzer, and Ross, Espy does not allege that any of the individual defendants knew that Loshitzer was a principal at Orchard, that Kretzmer had done M&A consulting for Orchard, or that Ross had previously approved deals that benefitted Orchard and Ressler. And even assuming that Zucker—who was about to become a co-managing principal at Orchard—was aware of the additional relationships between J2 and Orchard, Espy does not explain why the omission of Kretzmer, Loshitzer, and Ross compels a strong inference of scienter when Ressler and Zucker's (arguably more important) relationships with Orchard were disclosed.

### 3. Consolidated Accounting

Finally, Espy fails to plead scienter as to J2's consolidated accounting practices because inconsistent statements from former employees do not demonstrate that the individual defendants actually knew the underlying data of each of their

acquisitions with the requisite accuracy to report detailed financials for each.

Espy points to various former employees who contend that Zucker and Turicchi were deeply involved with the day-to-day workings of J2, such as receiving reports and signing off on every new acquisition. While "allegations regarding management's role in a company may be **\*539** relevant and help to satisfy the PSLRA scienter requirement," allegations of "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784–85 (9th Cir. 2008) (quoting *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 534 F.3d 1068, 1087 (9th Cir. 2008)). The former employees attest only to such a "general awareness" of J2's finances: FE1 provided Zucker with weekly reports of performance results for businesses he oversaw in Australia and New Zealand; FE2 understood that Zucker and Turicchi signed off on every acquisition; FE2 reported that Zucker was "obsessed with numbers" and that "budgets ruled J2;" FE4 stated that Turicchi and Zucker received a daily report on J2's financial condition, and that they would often respond to the report with questions.

The only allegation that suggests that company management might have been attempting to keep financial information about individual acquisitions away from public scrutiny was FE1's instruction from his direct boss, Harmeet Singh—who reported to Zucker—that FE1 should not talk publicly about new acquisitions. Singh informed FE1 that that policy "was intentional and deliberate by the Board because, then, analysts could not track individual entities and would have to track the consolidated entity." Even if such a hearsay-within-hearsay statement can be credited as reliable, *see Zucco*, 552 F.3d at 997, it does not compel a strong inference that J2 management was trying to keep its employees quiet to limit public disclosure regarding underperforming acquisitions. The competing innocuous inferences—that a company might want to keep a lid on lower-level employees speaking publicly about inside information or that the company did not want to invite unfounded speculation on individual acquisitions—are much more compelling. Indeed, "[t]here is nothing so necessarily nefarious about" this policy "to suggest that an inference of deliberate recklessness in such a situation is equally as cogent and as compelling as an innocent explanation." *Id.* at 998.

Further, a strong inference of scienter is particularly implausible because even analysts within J2 had difficulty assessing how well individual acquisitions were performing. As FE3, a senior financial analyst at J2, noted, because there were "hundreds of companies" with different accounting systems incorporated into J2, it was difficult even for financial analysts within J2 to "line up the numbers." It is implausible that Turicchi and Zucker had better financial data about underperforming acquisitions than their own financial analysts (who were preparing the reports they allegedly pored over).

Espy's allegations also fall short of those that might establish scienter under a "core operations" theory. Cases where this theory has supported a strong inference of scienter typically involve "specific admissions from top executives that they are involved in every detail of the company," or "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," *S. Ferry*, 542 F.3d at 785–86 (first quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005), then quoting *Berson*, 527 F.3d at 988). Allegations that Turicchi and Zucker signed off on every acquisition, received detailed reports, or were "obsessed with numbers," do not compel a strong inference that they had knowledge of the alleged omitted information about particular underperforming acquisitions under J2's umbrella and used consolidated accounting to cover them up. *See Zucco*, 552 F.3d at 1000 (noting that **\*540** "allegations that senior management ... closely reviewed [quarterly] accounting numbers ... and that top executives had several meetings in which they discussed quarterly inventory numbers" are insufficient to establish scienter).

### 4. Holistic Analysis

Viewing the allegations holistically, as *Tellabs* instructs, does not alter our conclusion. *See* 551 U.S. at 326, 127 S.Ct. 2499. Espy paints a picture of a company that acquired many far-flung businesses and integrated them into a large conglomerate with mixed results. Where Espy points out details of transactions that were not disclosed, other, more relevant details *were* disclosed (as with the Orchard investment), or Espy did not supply sufficient evidence of knowledge (as with VDW). In both transactions, the omitted information and the context of the disclosure does not compel a strong inference of scienter. Even taken together, these allegations are insufficient to plead scienter under the PSLRA.

This conclusion could be the end of the inquiry. However, in the interest of completeness, we also address loss causation,

another factor Espy has failed to plead sufficiently. While the district court did not reach loss causation in dismissing Espy's second amended complaint, we may "affirm the district court's dismissal on any ground that is supported by the record," and exercise our discretion to do so here. *Silk v. Bond*, 65 F.4th 445, 456 (9th Cir. 2023) (quoting *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1121 (9th Cir. 2013)). Failure to sufficiently plead either scienter or loss causation is fatal to Espy's complaint.

## B. Loss Causation

The loss causation prong "is simply a variant of proximate cause." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Espy must show that "[J2's] misstatement, as opposed to some other fact, foreseeably caused [Espy's] loss." *Id.* This proof is often made by identifying one or more corrective disclosures, which occur when "information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (quoting 15 U.S.C. § 78u-4(e)(1)). Espy must allege with particularity facts "plausibly suggesting" that "a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements," and that disclosure "caused the company's stock price to decline." *Id.* at 791; *see also Lloyd*, 811 F.3d at 1210 ("To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009))).

Espy identifies two proposed corrective disclosures: a 2016 report from Citron Research detailing the failures of J2's acquisition model, and a 2020 Hindenburg Research report arguing that J2's "opaque acquisition approach has opened the door to egregious insider self-enrichment." Both Citron and Hindenburg are short-sellers that produce reports on companies they perceive to be underperforming the company's stock price. Because Citron and Hindenburg rely on public information to compile their reports, whether those reports "revealed ... the truth concealed by the defendant's misstatements" is an open question. *In re BofI*, 977 F.3d at 791. While "[a] disclosure based on publicly available information can, in certain circumstances, constitute a corrective **\*541** disclosure," the inquiry is whether, "[b]ased on [Espy's] particularized allegations, can we plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price?" *Id.* at 795. To allege that a disclosure

provided "new information," Espy must allege "particular facts plausibly suggesting that other market participants had not done the same analysis" as that done in the proposed corrective disclosure. *Id.* (emphasis omitted). In determining whether a disclosure provided "new information to the market," we consider a number of factors, including whether "the underlying data was publicly available," "the complexity of the data and its relationship to the alleged misstatements," and "the great effort needed to locate and analyze" that information. *Id.*; *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1208 (9th Cir. 2020) (holding that an article derived from publicly available information did not qualify as a corrective disclosure in part because its analysis "did not require any expertise or specialized skills beyond what a typical market participant would possess").

We considered the plausibility of relying on short-seller reports to plead loss causation in *BofI*, which dealt with anonymous blog posts from the crowdsourced financial news website *Seeking Alpha*. Although it was "plausible that the posts provided new information to the market," we concluded that the posts did not qualify as corrective disclosures because the posts were "authored by anonymous short-sellers who had a financial incentive to convince others to sell," and included a disclaimer that the anonymous authors made "no representation as to the accuracy or completeness of the information set forth" in their blog posts. *In re BofI*, 977 F.3d at 797. As a consequence, "[a] reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt." *Id.* We have applied this reasoning not only to other anonymous posts on *Seeking Alpha, see Grigsby*, 979 F.3d at 1208–09, but also to anonymous reports ostensibly from short-seller firms, *see In re Nektar*, 34 F.4th at 839–40 (holding that a report from an anonymous author at Plainview LLC did not establish loss causation).

The Citron and Hindenburg reports differ from the blog posts and reports held to be insufficient in *BofI, Grigsby*, and *Nektar*. Most notably, Citron and Hindenburg are well-known short-seller firms whose reports are not "anonymous," unlike the blog posts in *BofI* and *Grigsby* or the Plainview report in *Nektar*, which had no associated contact information that would allow investors to verify the report's reliability. Still, despite these differences, the Citron and Hindenburg reports do not qualify as corrective disclosures.

We begin with the Citron report. Espy alleges that the report revealed that J2 "needs acquisitions," "us[ed] money generated from its legacy eFax business to prop the

2024 Daily Journal D.A.R. 3383

financials" of its other assets, and the market was not "paying any attention to the bottom line or the quality of businesses J2 Global is aggregating." While these allegations suggest that Citron may have disclosed "negative information about [J2]," that information did not "relate back" to the alleged misrepresentations in Espy's complaint. *Lloyd, 811 F.3d at 1210.* For starters, the Citron report predates the Orchard investment and makes no mention of the VDW acquisition. And while the report accuses J2 of using consolidated accounting, this generalized criticism is untethered from Espy's allegations in the second amended complaint. For example, Espy alleges that J2 concealed the underperformance of two acquired assets **\*542** in particular —J2 Ireland and Everyday Health—but Citron does not identify either of these assets, so could not have revealed "information correcting the ... omission that is the basis for [Espy's] action." 15 U.S.C. § 78u-4(e)(1); *In re BofI*, 977 F.3d at 794 n.6 (holding that some alleged corrective disclosures were "not tethered to any actionable misstatements").

While the Hindenburg report may be more tethered to J2's alleged misrepresentations and omissions than the Citron report, because its analysis was based entirely on public information and required no "expertise or specialized skills beyond what a typical market participant would possess," it too fails to qualify as a corrective disclosure. *Grigsby*, 979 F.3d at 1208. Espy alleges that the Hindenburg report revealed how J2's "opaque acquisition approach opened the door to insider self-enrichment"—specifically the enrichment of van der Weijden through the VDW acquisition. Espy further alleges that the report disclosed how J2 "masked" the underperformance of acquisitions by utilizing "tricky accounting," especially relating to J2 Ireland and Everyday Health, and failed to disclose "decades of intertwined financial interests between board members and executives," as reflected in the Orchard investment. The Hindenburg report is undoubtedly more relevant to J2's alleged misrepresentations than the Citron report. But Hindenburg's analysis was based only on a careful reading of public documents, including J2's investor presentations, press releases, employees' LinkedIn profiles, board members' resumes, public corporate records, and SEC filings. Espy alleges no facts plausibly explaining why this information —already publicly available, requiring no "expertise or specialized skills beyond what a typical market participant would possess" to uncover and disseminate, *Grigsby*, 979 F.3d at 1208—was not yet reflected in J2's stock price. *In re BofI*, 977 F.3d at 794. By failing to plead any such facts with particularity, Espy has failed to plausibly allege that the Hindenburg report qualifies as a corrective disclosure.

In light of the foregoing, we hold that Espy also fails to plead loss causation.

**C. Leave to Amend**

Finally, the district court did not err in dismissing the second amended complaint without leave to amend. Because Espy had previously been granted two chances to amend but still failed to state a claim, "the district court's discretion to deny leave to amend is particularly broad." *Zucco*, 552 F.3d at 1007 (quoting *In re Read-Rite Corp.*, 335 F.3d 843, 845 (9th Cir. 2003)). Espy points to two potential sources of new information: "additional information from the former employees" of J2, and a settlement agreement resolving a Delaware action brought against J2 and Orchard leadership for breach of fiduciary duties related to the Orchard deal. Espy's vague promise of "additional information" cannot cure the deficiencies in the complaint. Even assuming the Delaware settlement does represent *new* facts—as the settlement was filed in July 2021 and only brought to the district court's attention in January 2022—Espy fails to demonstrate how a settlement of a different claim in a different jurisdiction rescues his claims here. The district court did not abuse its discretion in denying further leave to amend "since it was clear that the plaintiffs had made their best case and had been found wanting." *Zucco*, 552 F.3d at 1007.

**AFFIRMED.**

**All Citations**

99 F.4th 527, 2024 Daily Journal D.A.R. 3383

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.