```
 1                    UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3            HONORABLE CONSUELO B. MARSHALL, U.S. DISTRICT JUDGE

 4

 5

    LOCAL 272 LABOR-MANAGEMENT        )
 6  PENSION FUND, et al.,             )
                                      )
 7          Plaintiffs,               )
                                      )
 8             vs.                    )  2:23-CV-3661-CBM
                                      )
 9  THE WALT DISNEY COMPANY, et al., )
                                      )
10          Defendants.               )
    _____)

11

12

13                 REPORTER'S TRANSCRIPT OF HEARING

14                     Los Angeles, California

15                  Friday, September 27, 2024

16

17

18            _____

19

20

21

22

23                  AMY DIAZ, RPR, CRR, FCRR
                    Federal Official Reporter
                    350 West 1st Street, #4455
24                  Los Angeles, CA 90012

25
          Please order court transcripts here:  www.amydiazfedreporter.com
```

```
 1          APPEARANCES OF COUNSEL:

 2
            For the Plaintiffs:
 3

 4                          ROBBINS GELLER RUDMAN & DOWD LLP
                            By:  Jessica Shinnefield, Attorney at Law
 5                               Nicole Gilliland, Attorney at Law
                                 Jessica Robertson, Attorney at Law
 6                               Daniel Drosman, Attorney at Law
                            655 West Broadway, Suite 1900
 7                          San Diego, California 92101

 8

 9

10
            For the Defendants:
11
                            CRAVATH SWAINE & MOORE LLP
12                          By:  J. Wesley Earnhardt, Attorney at Law
                                 Ming-Toy A. Taylor, Attorney at Law
13                          2 Manhattan West
                            375 9th Avenue
14                          New York, New York 10001

15                          MUNGER TOLLES & OLSON LLP
                            By:  John Spiegel, Attorney at Law
16                          350 South Grand Avenue, 50th Floor
                            Los Angeles, California 90071
17

18

19

20

21

22

23

24

25
```

13:55:52          THE CLERK:  Calling item number 6, civil case

13:55:55    23-3661, Local 272 vs. The Walt Disney Company.

13:56:00          Counsel, state your appearance at the lectern.

13:56:08          MS. SHINNEFIELD:  Jessica Shinnefield for the

13:56:09    plaintiffs in the class, and I have my colleagues with me,

13:56:12    Nicole Gilliland, Daniel Drosman, and Jessica Robertson.

13:56:19          THE COURT:  You may be seated.  Good afternoon.

13:56:23          MR. EARNHARDT:  Good afternoon, Your Honor.  Wes

13:56:25    Earnhardt for the defendants, and I have with me Ming-Toy

13:56:29    Taylor and John Spiegel.

13:56:31          THE COURT:  Good afternoon.  Welcome.

13:56:35          So just a few questions.  So this is a Motion to

13:56:43    Dismiss, Defendants' Motion to Dismiss, and then Plaintiffs'

13:56:48    Motion to Strike the Notice of Supplemental Authority.

13:56:52          So let me let plaintiff address the Motion to Strike

13:56:58    the Notice of Supplemental Authority.  What's the basis for

13:57:02    that?

13:57:03          MS. SHINNEFIELD:  Your Honor, the basis for that

13:57:07    motion was simply that it contained argument regarding the

13:57:13    submission of the Supreme Court's opinion in the *Macquarie*

13:57:17    case.  And it mischaracterized the Court's ruling in that

13:57:23    case, saying that it was relevant to the issues in our case,

13:57:27    which it was not, and then also quoted select snippets from

13:57:32    the opinion that were in their opinion supportive of the

13:57:39    motion that they had submitted.

1 13:57:40          And our Motion to Strike was simply that it was

2 13:57:43   inappropriate to insert that sort of argumentative comments

3 13:57:47   into a notice of recent authority.

4 13:57:49          THE COURT:  So if counsel had just simply listed the

5 13:57:52   cases, directed the Court to the cites where the cases could

6 13:57:59   be found, you feel that that would be appropriate, but the

7 13:58:02   argument about the cases is what you are concerned about?

8 13:58:07          MS. SHINNEFIELD:  Right.  And especially including,

9 13:58:09   you know, quotes that they felt were beneficial to the

10 13:58:12   arguments that they had made on their brief.  It was almost a

11 13:58:15   supplemental brief, which is not allowed without permission

12 13:58:18   of the Court.

13 13:58:19          THE COURT:  All right.  Some additional questions.

14 13:58:28          So for plaintiff, are you alleging a 10b claim

15 13:58:34   against Iger, I-g-e-r, based on your scheme liability theory?

16 13:58:42          MS. SHINNEFIELD:  We are not, Your Honor.  He is not

17 13:58:45   alleged to be a scheme defendant under Rule 10b-5(a) or (c).

18 13:58:49          THE COURT:  And so the Complaint doesn't allege that

19 13:58:52   he made any false or misleading statements?

20 13:58:55          MS. SHINNEFIELD:  He is not alleged to have made any

21 13:58:57   false or misleading statements under 10b-5(b), as well.  The

22 13:59:01   only claim against Mr. Iger is for insider trading under Rule

23 13:59:06   20A.

24 13:59:09          THE COURT:  Okay.  The SEC filings and earnings call

25 13:59:16   transcripts indicate that defendants disclosed on multiple

1 13:59:21  occasions that it was using promotional subscriptions,

2 13:59:27  international market expansion, and content expansion to

3 13:59:35  drive subscriber growth.

4 13:59:41         The statements that you allege about the subscriber

5 13:59:43  growth, Disney+ content, and international expansions do not

6 13:59:49  appear to make any representations about the sustainability

7 13:59:55  of these strategies, and are only focused on subscriber

8 14:00:04  growth.

9 14:00:04         How are these statements false?

10 14:00:06        MS. SHINNEFIELD:  So our subscriber growth and

11 14:00:10  subscriber number claims are, while perhaps literally true,

12 14:00:15  the numbers that are being reported to the public, although

13 14:00:19  the number of subscribers they are reporting, for example,

14 14:00:22  155 million, we don't contest that that is a literally true

15 14:00:27  number.  But under the Ninth Circuit's rulings in *Schueneman*,

16 14:00:31  there is a very clear line of case law that says once a

17 14:00:35  company chooses to speak on a topic, it needs to speak

18 14:00:38  truthfully on it.  And you can't talk glowingly about a

19 14:00:43  particular aspect of your business, and not also disclose

20 14:00:48  adverse facts that would undercut that statement.

21 14:00:50         So while literally true, their statements about the

22 14:00:54  subscriber numbers and subscriber growth were literally true,

23 14:00:59  but they were misleading in that they failed to disclose

24 14:01:04  these various mechanisms that defendants were using to

25 14:01:11  inflate those subscriber numbers.

1  14:01:14          And a couple of them you referenced, Your Honor.

2  14:01:16   You mentioned expansion into international markets.

3  14:01:20   Defendants disclosed, as all businesses do, that they had an

4  14:01:23   interest in expanding into international markets; however,

5  14:01:28   what they didn't disclose is that they were expanding into

6  14:01:32   international markets that were completely unprofitable, and

7  14:01:35   they were doing so in order to boost their subscriber

8  14:01:39   numbers.  And you can't tout your subscriber numbers if the

9  14:01:43   reality is that they are going to be unprofitable.

10 14:01:47          And in this case, that has been Disney's position,

11 14:01:52   at the start of the class period that it was going to

12 14:01:54   profitably reach subscriber topics, Your Honor.

13 14:01:58          Similarly, I think I have here some of the

14 14:02:01   disclosures that they say either render their statements not

15 14:02:06   false, or with respect to the scheme, render their conduct

16 14:02:12   not deceptive.

17 14:02:15          For example, they say that on their conference

18 14:02:19   calls, they talked about content costs.  They disclosed what

19 14:02:23   the current contest costs were, and occasionally discussed,

20 14:02:26   you know, what they thought they might be.  And they say that

21 14:02:29   they in no way masked the content costs for Disney+. And that

22 14:02:35   is simply not true, Your Honor.

23 14:02:36          The Complaint alleges in detail --

24 14:02:38          THE COURT:  So your position is it's a false

25 14:02:40   statement because it simply isn't true, that representation?

| | |
|---|---|
| 1 14:02:45 | So that is one of the examples. |
| 2 14:02:46 | MS. SHINNEFIELD:  Yes, in terms of their disclosure. |
| 3 14:02:50 | They are saying, "Oh, well, we disclosed content costs; |
| 4 14:02:54 | therefore, our statements regarding content costs could not |
| 5 14:02:57 | have been false or misleading."  And we are saying, "No, you |
| 6 14:03:00 | didn't disclose the aspects of the scheme that we say are |
| 7 14:03:05 | misleading.  We are -- our allegations are that you failed to |
| 8 14:03:10 | disclose certain aspects of your content costs through |
| 9 14:03:15 | these" -- |
| 10 14:03:15 | THE COURT:  What, if you have an example, is it that |
| 11 14:03:19 | they failed to disclose, which would then support your |
| 12 14:03:24 | position that the statement was misleading? |
| 13 14:03:26 | MS. SHINNEFIELD:  Oh, sure.  Your Honor, there is |
| 14 14:03:28 | two that I can think of off the top of my head. |
| 15 14:03:32 | With respect to content costs, one of the ways in |
| 16 14:03:35 | which Disney would make an effort to mask those costs and |
| 17 14:03:41 | make them appear smaller than they were, is when they would |
| 18 14:03:44 | have a show that was designed -- was created from the |
| 19 14:03:51 | beginning to be aired on Disney+, they would air it for a |
| 20 14:03:56 | single day on their regular cable program network, and then |
| 21 14:04:00 | switch it over to Disney+, where it had always been intended |
| 22 14:04:03 | to be.  And then under their accounting policies, they could |
| 23 14:04:07 | then spread the content costs between the two segments, and |
| 24 14:04:12 | report lower content costs for Disney+ than there actually |
| 25 14:04:18 | were through that particular manipulation. |

1  14:04:21    THE COURT:  And you feel that there are examples of

2  14:04:24    that?

3  14:04:25    MS. SHINNEFIELD:  Yes, that are alleged in the

4  14:04:27    Complaint.

5  14:04:27    THE COURT:  Okay.

6  14:04:32    MS. SHINNEFIELD:  Another similar manipulation, Your

7  14:04:34    Honor, it's not similar conduct, but it achieves the same

8  14:04:37    result, which is masking content costs, is that Disney would

9  14:04:44    send movies -- completely skip the theater, movies that were

10  14:04:50    designed, typically Pixar movies, for example, that

11  14:04:54    originally would have been aired in theaters, and then under

12  14:04:56    Disney's business model, would then go to their pay-per-view

13  14:05:01    channel, and people would pay $30 and get it, and then

14  14:05:05    eventually would go to Disney+.  They would air them -- they

15  14:05:09    would send them directly to be in theaters for a day, or not

16  14:05:14    at all, and then send them directly to Disney+ in order to

17  14:05:19    boost its subscriber numbers for Disney+.

18  14:05:22    THE COURT:  And these things were not disclosed?

19  14:05:24    MS. SHINNEFIELD:  No, they were not, Your Honor.

20  14:05:28    THE COURT:  How were Disney's statements about DTC's

21  14:05:34    operating losses misleading when Disney disclosed the

22  14:05:40    charges -- the changes it was making to its financial

23  14:05:42    reporting?

24  14:05:43    So is your answer similar, that they disclosed some

25  14:05:48    things, but didn't disclose enough for the investors to

1  14:05:55  understand what they were actually doing?

2  14:05:57       MS. SHINNEFIELD:  Right.  When they would disclose

3  14:05:59  what their operating costs were for Disney+, or when you say

4  14:06:03  "DTC," that actually refers to Direct-to-Consumer, which

5  14:06:08  refers to not just Disney+, but Disney+, ESPN2, and Hulu,

6  14:06:15  which are all under the DTC umbrella.

7  14:06:19       So specifically when talking about Disney+, our

8  14:06:21  allegations are that when they would represent what the

9  14:06:24  operating costs were, they had engaged in these manipulations

10 14:06:28  to artificially deflate those costs and make Disney+

11 14:06:33  therefore appear more profitable than it actually was.

12 14:06:36       THE COURT:  There don't appear to be any allegations

13 14:06:42  indicating that Disney+ churn, c-h-u-r-n rate increased in

14 14:06:49  February, June or August.

15 14:06:53       Could you identify what you have pled in the

16 14:06:58  Complaint that would satisfy the particularity pleading

17 14:07:05  standard?

18 14:07:05       MS. SHINNEFIELD:  Sure.  Let me go to that section

19 14:07:08  of the Complaint, Your Honor.  If I can just point you there.

20 14:07:16  It's page 134 of the Complaint.  And again, these are

21 14:07:23  statements where Disney's response is, "Well, we didn't have

22 14:07:28  to say anything about churn; therefore, we are not liable for

23 14:07:32  it."  And what we are saying is, "When you say things, like

24 14:07:35  which are alleged false statements here, like we have low

25 14:07:39  churn," or, "We are pleased with our churn," you can't say

14:07:41    that if there are adverse facts showing that your churn

14:07:46    wasn't actually low when compared to Netflix and other

14:07:49    competitors.

14:07:50        And internally, we have CWs that provided us with

14:07:57    information that these were reports that the executives

14:08:01    received on, certainly a weekly, if not daily basis, and it

14:08:04    was a core focus of theirs, is whether people were churning

14:08:08    off of the service.

14:08:09        So that is on page 134, it starts at paragraph 308

14:08:19    through 313.  And for example --

14:08:34        THE COURT:  108 through 313?

14:08:36        MS. SHINNEFIELD:  Yes.

14:08:37        And then specifically on 312, the a, the small a

14:08:43    there, is going to delineate why defendants' false statements

14:08:48    regarding churn were misleading.

14:08:49        For example, it says, "Defendants were not actually

14:08:54    extraordinarily pleased with the low churn rate, but they

14:08:57    were actually concerned by it."

14:08:58        We had conversations with confidential witnesses who

14:09:02    said that they were concerned with the concern -- with the

14:09:07    churn rate, and that is something they were very focused on,

14:09:09    and tracked very closely.

14:09:16        And it says, the defendants -- one of the CWs, it's

14:09:19    CW Number 2, it's a different CW -- so we had two different

14:09:23    CWs that actually corroborated one another's testimony -- she

1 14:09:28   stated that the churn rate at Disney+ was significantly

2 14:09:31   higher than Hulu.

3 14:09:32        And as I said to you earlier, since Hulu and Disney+

4 14:09:38   are both under the Disney umbrella, executives could see that

5 14:09:41   the Hulu churn rate, see the Disney+ churn rate, and see that

6 14:09:46   one was significantly higher than the other, and that was at

7 14:09:49   Disney+.

8 14:09:49        And according to the same CW, that it was a constant

9 14:09:55   problem, and that they referred to churn as the leaky bucket

10 14:09:59   at Disney; meaning every time they acquired subscribers, they

11 14:10:04   weren't high quality subscribers, they were people who would

12 14:10:06   join the service because they got it for free, or, they were

13 14:10:09   in an international market, where the content wasn't actually

14 14:10:13   tailored to them, and they would churn off.  So it was a

15 14:10:17   constant situation where they were obtaining subscribers, but

16 14:10:21   then they would be losing subscribers at the same time.

17 14:10:25        THE COURT:  I believe it is your position that

18 14:10:28   individual defendants are liable for alleged misstatements

19 14:10:34   by, and I'll spell, C-h-a-p-e-k-'-s contract renewal, which

20 14:10:42   were made by the Disney board of directors, and they are not

21 14:10:47   named as defendants here.

22 14:10:49        MS. SHINNEFIELD:  Right.  That would be corporate

23 14:10:51   scienter in that particular regard.  That would be a claim

24 14:10:53   against Disney itself, because the statement I believe was

25 14:10:59   issued as a press release, and then quoted from one of its

| | |
|---|---|
| 1 14:11:02 | members of the board of directors.  And certainly, under |
| 2 14:11:04 | Ninth Circuit law, the scienter and statements made by |
| 3 14:11:08 | someone that high up at the company are imputed to the |
| 4 14:11:10 | company for purposes of establishing liability. |
| 5 14:11:14 | THE COURT:  So this question, you may feel that |
| 6 14:11:16 | you've already answered it, but I'll ask it just in case you |
| 7 14:11:20 | have a different answer, or more to add. |
| 8 14:11:23 | Which allegations under the "scheme liability" |
| 9 14:11:29 | sections in the Complaint show that the principal purpose and |
| 10 14:11:36 | effect of defendants' actions was to create a false |
| 11 14:11:41 | appearance of fact in furtherance of a scheme? |
| 12 14:11:44 | MS. SHINNEFIELD:  So if you look at the scheme |
| 13 14:11:47 | section, Your Honor, we -- the way that we pled it, is we |
| 14 14:11:50 | pled it as nine different artifices.  And so each of those |
| 15 14:11:55 | artifices would be a deceptive act that was taken in |
| 16 14:12:01 | furtherance of the scheme, in which the primary purpose was |
| 17 14:12:04 | to create a false appearance of fact. |
| 18 14:12:07 | And so for each of those artifices, we set forth the |
| 19 14:12:10 | defendant who was involved in that deceptive conduct, what |
| 20 14:12:14 | that conduct was, and why we allege it was deceptive. |
| 21 14:12:19 | So it's each of those nine artifices.  And then in |
| 22 14:12:23 | each section it will say, for example, "Chapek is alleged to |
| 23 14:12:28 | have taken, been involved in all nine artifices."  So at |
| 24 14:12:32 | least nine deceptive acts in furtherance of the fraud, which |
| 25 14:12:35 | the primary purpose was to conceal a true fact. |

1 14:12:40       THE COURT:  And would you cite to the same

2 14:12:43   allegations in support of Disney's intent to commit fraud?

3 14:12:50       MS. SHINNEFIELD:  Yes.  I mean, it's -- the elements

4 14:12:54   for a scheme claim are virtually identical to that of a

5 14:12:58   misstatement claim under 10-b.  But the first prong, instead

6 14:13:02   of a misstatement, it's deceptive conduct.  So it's a very --

7 14:13:07   and then the rest of the prongs are very similar in the way

8 14:13:11   that they are applied to a scheme claim, as opposed to a

9 14:13:14   traditional misstatement claim under 10b-5(b).

10 14:13:17       THE COURT:  So since this is a Motion to Dismiss,

11 14:13:23   typically one asks for leave to amend if the Court should

12 14:13:28   find that there are not sufficient facts.

13 14:13:32       Are you requesting leave to amend?

14 14:13:33       MS. SHINNEFIELD:  We would appreciate that

15 14:13:35   opportunity, Your Honor.  This is a case that it's actually

16 14:13:39   not too far off, the conduct, and as people retire, as people

17 14:13:45   leave the company, we find that more information is always

18 14:13:48   coming out.  And as we said in our Complaint, the *Wall Street

19 14:13:52   Journal* and the *New York Times*, and many other reputable

20 14:13:57   sources have, it's pretty remarkable in this case, have

21 14:13:59   reported a lot on the facts at the heart of this case, and

22 14:14:02   those facts continue to emerge.

23 14:14:04       So, yes, if the Court were to dismiss this case, we

24 14:14:07   would definitely seek leave to amend.

25 14:14:10       THE COURT:  And do you have those additional facts

1 14:14:13    now, as opposed to facts that you hope to obtain as a result

2 14:14:18    of discovery?

3 14:14:19        MS. SHINNEFIELD:  Certainly, we believe the facts

4 14:14:23    will be much more voluminous once we obtain discovery, but as

5 14:14:28    there have been news reports that have come out since we

6 14:14:32    filed the Complaint that do provide additional detail, and

7 14:14:35    corroborate claims that we have in here, but also provide

8 14:14:39    other aspects that we didn't know at the time that we pled

9 14:14:42    this.

10 14:14:43        THE COURT:  All right.  Anything else that you wish

11 14:14:47    to add to the arguments that have been raised in your papers,

12 14:14:56    or cases cited that, as you reviewed them again, you may have

13 14:15:02    decided you missed something, or didn't explain it very well?

14 14:15:06        MS. SHINNEFIELD:  Sure.  If you will indulge me for

15 14:15:10    just a couple of points, Your Honor.

16 14:15:11        We submitted a notice of recent authority ourself,

17 14:15:14    and it is a case in *York County vs. HP*, and it's in the

18 14:15:22    Northern District of California.  And it is a scheme case.

19 14:15:26    And I just -- I draw your attention to it just because scheme

20 14:15:29    cases are much more rare, and there is less legal authority

21 14:15:34    on them.  And this is an in-circuit case in which scheme

22 14:15:42    cases were upheld, and it applies the same pleading standard

23 14:15:46    that plaintiffs advocated for in their papers.

24 14:15:50        We cited the *Galena* case, which is another

25 14:15:54    in-circuit case, but since there was no Ninth Circuit

114:15:56 authority on this particular issue, we think that the Court's

214:16:00 opinion in *HP* might be instructive to the Court when they are

314:16:04 looking at the pleading standard.

414:16:07         And then one other matter I wanted to just briefly

514:16:14 mention is, I just touched briefly on loss causation, Your

614:16:24 Honor.  We feel like this is a case where loss causation is

714:16:28 incredibly straightforward.

814:16:29         Under the Ninth Circuit standard, it's merely a

914:16:34 matter of proximate causation, you just have to show -- and I

1014:16:37 think defendants say this in their reply -- that you just

1114:16:40 have to show a relationship between -- between the harm that

1214:16:46 was suffered and the fraud-related information that came to

1314:16:50 light.

1414:16:50         And in this case, on each of the three drops that

1514:16:54 form the basis for our loss causation, specific negative

1614:16:59 information about Disney+ came out on those days that was new

1714:17:04 information to the public; all of them resulted in

1814:17:09 significant stock price drops.  After each drop, that's the

1914:17:14 case, Your Honor.  And so based on the Ninth Circuit

2014:17:18 precedent, this is a very straightforward loss causation case

2114:17:22 from our perspective.

2214:17:23         THE COURT:  All right.  Thank you.

2314:17:26         MS. SHINNEFIELD:  I only had one other point.  My

2414:17:28 colleague, Nicole Gilliland, actually is our specialist on

2514:17:32 the 20A claim.  So I think she had a point she wanted to make

1 14:17:36  on the 20A insider trading claims, because they are a little

2 14:17:40  more rare.

3 14:17:40        THE COURT:  Fine.  She may do so.

4 14:17:49        And state your name for the record again, please.

5 14:17:50        MS. GILLILAND:  Nicole Gilliland on behalf of

6 14:17:52  plaintiffs in the class.

7 14:17:53        THE COURT:  And you will be addressing specifically?

8 14:17:58        MS. GILLILAND:  Plaintiffs' insider trading claims

9 14:18:03  against Mr. Iger.

10 14:18:04        Your Honor asked whether Mr. Iger is a Section 10b

11 14:18:07  defendant.  And my colleague made clear Mr. Iger is not a

12 14:18:11  misstatement defendant under Section 10b or a scheme

13 14:18:15  defendant, but he is a Section 10b insider trading defendant.

14 14:18:21        And the Ninth Circuit in *America West* makes clear

15 14:18:22  that a defendant can be liable under Section 10b for insider

16 14:18:26  trading regardless of whether they make any misstatements, or

17 14:18:29  engage in a scheme to defraud.

18 14:18:31        In Defendants' Motion to Dismiss, they do not

19 14:18:33  challenge Plaintiffs' Section 10b insider trading claim.  So

20 14:18:38  any arguments regarding that claim should be waived, and

21 14:18:40  should stand on those grounds alone.

22 14:18:42        And because plaintiffs did not challenge the 10b

23 14:18:45  claim, I would like to direct the Court to where plaintiffs

24 14:18:48  do allege the claim.

25 14:18:48        THE COURT:  Well, if defendants aren't raising it,

| | |
|---|---|
| 1 14:18:51 | then it probably isn't necessary, but I'll allow it. |
| 2 14:18:56 | MS. GILLILAND:  Okay.  It's in paragraphs 254 to 265 |
| 3 14:18:59 | of the Complaint, plaintiffs detail Mr. Iger's trading.  He |
| 4 14:19:04 | sold $375 million worth of his stock.  It also details the |
| 5 14:19:10 | material, nonpublic information that he possessed when he |
| 6 14:19:13 | sold.  And those are the two elements of a Section 10b |
| 7 14:19:16 | insider trading claim. |
| 8 14:19:18 | THE COURT:  All right.  Thank you. |
| 9 14:19:20 | MS. GILLILAND:  And just briefly as it relates to |
| 10 14:19:22 | the Section 20A claim, as plaintiffs stated in their Motion |
| 11 14:19:26 | to Dismiss Opposition, the Ninth Circuit has made clear that |
| 12 14:19:29 | Section 10b insider trading can be the predicate violation |
| 13 14:19:34 | for Section 20A insider trading.  So that element is |
| 14 14:19:38 | satisfied. |
| 15 14:19:39 | Regarding the only other element to a Section 20A |
| 16 14:19:42 | insider trading claim, which is contemporaneous trading, |
| 17 14:19:45 | defendants have conceded that plaintiffs satisfied that |
| 18 14:19:48 | element for at least two of Mr. Iger's trades. |
| 19 14:19:52 | THE COURT:  All right.  Thank you. |
| 20 14:19:53 | MS. GILLILAND:  Thank you, Your Honor. |
| 21 14:19:55 | THE COURT:  A few questions for defense, and also |
| 22 14:19:58 | defense counsel can respond to comments made by plaintiffs' |
| 23 14:20:04 | counsel if you feel that there is something more that you |
| 24 14:20:07 | need to place on the record. |
| 25 14:20:08 | So why don't we do that first, and then the Court |

1 14:20:11   will make some inquiry.

2 14:20:12        MR. EARNHARDT:  Okay.  Thank you, Your Honor.  Wes

3 14:20:16   Earnhardt on behalf of defendants.

4 14:20:17        Let me start with where plaintiffs ended.  They do

5 14:20:20   not plead a Section 10b insider trading claim against

6 14:20:24   Mr. Iger.  The Complaint has three counts.  Count 1 is

7 14:20:29   Section 10b-5(a) through (c) against all defendants, no

8 14:20:33   difference between Mr. Iger or anyone else.  Count 2 is

9 14:20:36   Section 20A, and Count 3 is Section 20a.  That is the sum

10 14:20:43   total of all of the counts in the Complaint.  There is no

11 14:20:46   separate count for insider trading under Section 10 against

12 14:20:49   Mr. Iger.

13 14:20:49        Unless the Court has questions on that, I would like

14 14:20:56   to respond to some of the other arguments they made.

15 14:20:58        THE COURT:  No.  You may.

16 14:21:01        MR. EARNHARDT:  I'll try to address the rest of the

17 14:21:03   arguments in the order you first heard them.

18 14:21:06        You asked, Your Honor, how the plaintiffs respond to

19 14:21:10   our showing that the subscriber growth of Disney+ was going

20 14:21:16   to come from expansion into international markets, wholesale

21 14:21:21   promotions, and spend on content.  And Counsel said that

22 14:21:25   their position is not that the statements -- that the figures

23 14:21:30   were wrong, I think she said they were literally true, but

24 14:21:33   she said they were incomplete, and that is the basis for

25 14:21:36   their claim under the securities laws.

1 14:21:38          I would like to read to the Court from the Ninth

2 14:21:42     Circuit's decision in *Police Retirement Systems vs. Intuitive*

3 14:21:47     *Surgical.*

4 14:21:47          THE COURT:  A case cited in the brief?

5 14:21:49          MR. EARNHARDT:  Yes, Your Honor.

6 14:21:50          The Ninth Circuit in that case, and many other

7 14:21:52     cases, made clear that, "Rule 10b-5 prohibits only misleading

8 14:21:58     and untrue statements; not statements that are incomplete.

9 14:22:02     We have expressly declined to require a rule of completeness

10 14:22:06    for securities disclosures, because no matter how detailed

11 14:22:11    and accurate disclosure statements are, there are likely to

12 14:22:14    be additional details that could have been disclosed but were

13 14:22:16    not.  In practical terms, to be actionable under securities

14 14:22:20    laws, an admission must be misleading, it must affirmatively

15 14:22:24    create an impression of a state of affairs that differs in a

16 14:22:27    material way from the one that actually exists."

17 14:22:31          So the question is, Your Honor, is whether anything

18 14:22:33    that defendants said about Disney+ created a misleading state

19 14:22:36    of affairs.

20 14:22:37          Counsel pointed to one example.  She said that

21 14:22:41    defendants were saying subscribers were growing, but that

22 14:22:44    they were not clear that that was coming from expansion into

23 14:22:48    international markets.  Simply not true, Your Honor.

24 14:22:50          Defendants described that, in Exhibit 13, this is

25 14:23:05    where this is cited, that, "We expect subscriber growth to

1 14:23:08    come primarily from outside the United States."

2 14:23:14           In the same report -- well, actually, the

3 14:23:19    Exhibit 15, which is made at the same time, defendants made

4 14:23:23    clear that the average monthly revenue per paid subscriber

5 14:23:26    outside of the United States is lower than the average

6 14:23:30    monthly revenue per subscriber in North America and Europe.

7 14:23:34           So defendants disclosed that most subscriber growth

8 14:23:37    was going to come from outside of the U.S., and that those

9 14:23:40    subscribers provided less revenue.

10 14:23:44           Counsel then said that the content cost, while

11 14:23:48    disclosed accurately, were misleading, because she said that

12 14:23:53    it misdescribed that the content costs were going to be

13 14:23:57    amortized based on what platform was using the content.

14 14:24:01           But again, defendants describe that and disclose

15 14:24:06    that precisely.  And this a quote from Exhibit 26 that we

16 14:24:11    filed with our Motion to Dismiss, where defendant said,

17 14:24:14    "Under our new segment structure, the operating results of

18 14:24:17    the production and distribution activities are reported in

19 14:24:20    the same segment."  This is the critical point, "And the

20 14:24:24    fully loaded production costs will be allocated across the

21 14:24:30    distribution platforms which are utilizing the content.  So

22 14:24:34    wherever the content is shown, that is where the costs will

23 14:24:36    be allocated."  And then they disclosed every single month

24 14:24:39    exactly what those costs were, and there is no indication

25 14:24:42    that those were inaccurate.

She also said that it was misleading that certain titles were going straight to Direct-to-Consumer and were not being distributed through traditional means.

Again, defendants disclosed exactly that. At Exhibit 35 to our Motion to Dismiss, it says, "We are producing exclusive content for our DTC streaming services." Same Exhibit 28, it says, "Consumer is the" -- "Content is the single biggest driver to not only acquiring subscribers, but retaining them, and we expect to forego revenue from traditional sources because we are steering content direct to Disney+." So those were also disclosed.

Your Honor, churn, Your Honor asked some questions about churn. You asked what were the facts that would plausibly allege that the churn figures were incorrect when they were mentioned in 2021? And I didn't hear any facts given in response, and so let me explain what is happening there.

Plaintiffs cite two statements that defendants made about churn, both from 2021. They said that there has been a price increase, and they are pleased that churn has not dramatically increased in relation to that price increase, and that they are pleased with churn. Those statements were in 2021.

The only facts that plaintiffs plead about the actual churn rates are from 2022. And what they say is that

1  14:26:14    in 2022, churn had increased from the year before.

2  14:26:18            So that doesn't make the 2021 statements misleading;

3  14:26:21    if anything, it proves they were true.  In 2021, we were

4  14:26:25    pleased with churn.  By 2022, churn had increased.

5  14:26:29            Your Honor asked some questions about what were the

6  14:26:34    facts that plausibly allege that the principal purpose and

7  14:26:39    effect of the scheme was to defraud investors.  I would just

8  14:26:42    like to say, Your Honor, that that is the right question.  It

9  14:26:44    cannot be a scheme to conduct bad business.  There has to be

10 14:26:47    a principal purpose and effect of misleading investors, and

11 14:26:51    there simply is no allegation to that effect.

12 14:26:53            As we set forth in our content, each of the nine

13 14:26:57    artifices of the alleged scheme that they say exist were

14 14:27:00    fully disclosed to investors, and were part of the business

15 14:27:03    plan.  So steering content to Disney+ and away from

16 14:27:06    traditional sources, fully disclosed.  Giving subscribers

17 14:27:11    wholesale arrangement deals, fully disclosed.  In fact, it

18 14:27:15    was disclosed in an earnings call that 50 percent of new

19 14:27:18    subscribers were coming from wholesale arrangements.

20 14:27:21            Third alleged artifice, increased content spin.

21 14:27:24    Defendants allege that content spin would quadruple from $2

22 14:27:29    billion to $8 billion during the class period to get

23 14:27:32    subscribers to Disney+.

24 14:27:35            Expanding to international markets, disclosed.  The

25 14:27:36    reorganization into Disney Media and Entertainment

1 14:27:39    Distribution, disclosed.  Accounting practices, disclosed.

2 14:27:42    All of the things that they say were artifices were fully

3 14:27:45    disclosed.

4 14:27:46           And not only that, Your Honor, defendants warned

5 14:27:49    that all of these plans were risky and might fail.  They

6 14:27:52    explicitly told investors that, "We may not successfully

7 14:27:56    execute on our Direct-to-Consumer strategy."  That is at

8 14:28:00    Exhibit 15.

9 14:28:00           So when you have a situation where defendants

10 14:28:04    accurately disclosed the plan, accurately disclosed the

11 14:28:08    results of the plan as they were happening, and informed

12 14:28:13    investors that the plan was risky and might not work, you

13 14:28:15    can't have a securities fraud claim.

14 14:28:17           If I could point Your Honor to just a few cases that

15 14:28:20    we believe make this an easy dismissal?

16 14:28:23           THE COURT:  Cases cited in the briefs?

17 14:28:25           MR. EARNHARDT:  Yes, Your Honor.  Each one is cited

18 14:28:27    in the brief.

19 14:28:27           The first case --

20 14:28:28           THE COURT:  Then I think it's not necessary to

21 14:28:30    repeat the cases.

22 14:28:32           MR. EARNHARDT:  Okay.  Thank you, Your Honor.

23 14:28:34           I will refer -- they submitted a case that she

24 14:28:38    mentioned called *York vs. HP*.

25 14:28:45           THE COURT:  In the additional case filings.

1 14:28:47          MR. EARNHARDT:  Yes.

2 14:28:48          I will say that that case is nothing like this one.

3 14:28:50   In that case there were sham sales.  Essentially, they were

4 14:28:52   engaged in gray marketing where they were counting as a sale

5 14:28:57   sales that actually hadn't happened, and were doing pull-ins

6 14:28:59   to try to increase the number of sales.  There is nothing

7 14:29:02   like that here.  That case resulted in an SEC investigation,

8 14:29:06   and an SEC fine.  There is nothing like that in this case.

9 14:29:09          And, in fact, if you look at each of their cases

10 14:29:12   that they cite in which there has been a scheme liability

11 14:29:16   claim that has survived a Motion to Dismiss, they all involve

12 14:29:20   some manipulative act where the only purpose of the act could

13 14:29:26   have been to mislead investors; not an ordinary business

14 14:29:30   plan.

15 14:29:30          So, for example, they cite the *SEC vs. Hui Feng*

16 14:29:36   case.  A lawyer set up sham companies off sea to direct money

17 14:29:41   away from his clients.  They cite the *Medtronic* case.  They

18 14:29:44   lied about the results of a medical device.  They cite the

19 14:29:49   *Guevoura vs. Sillerman* case out of the Southern District of

20 14:29:53   New York.  There, someone lied and said they are going to

21 14:29:55   purchase this company when he knew he wasn't going to, just

22 14:29:58   to drive up the price.

23 14:29:59          THE COURT:  So the bottom line is this additional

24 14:30:01   authority isn't helpful to the Court?

25 14:30:03          MR. EARNHARDT:  Correct, Your Honor.  It's not

1 14:30:05  helpful to the Court, because it's nothing like the case at

2 14:30:07  bar.

3 14:30:07          THE COURT:  Okay.  Some additional questions.

4 14:30:10          Looking at the judicially-noticed documents, things

5 14:30:16  that would be incorporated by reference, is it your position

6 14:30:20  that defendants disclose that they were going to implement an

7 14:30:26  aggressive "growth at any costs" or growth first strategy for

8 14:30:36  Disney+?

9 14:30:38          MR. EARNHARDT:  Yes, that is our position.  In fact,

10 14:30:41  they repeated that every single quarter of the class period.

11 14:30:44  They said that we are going to --

12 14:30:46          THE COURT:  So which of the notices should the Court

13 14:30:49  be reviewing for that disclosure?

14 14:30:51          MR. EARNHARDT:  So there is a -- two answers, Your

15 14:30:55  Honor.  There is a chart on page 6 of our Motion to Dismiss

16 14:30:57  brief that compiles numerous disclosures over time.  It's

17 14:31:01  hard to, because they did it every single quarter, it's

18 14:31:05  difficult to point to one, but that chart describes the

19 14:31:08  massive content spend that was happening every single

20 14:31:11  quarter, and the massive operating losses that were happening

21 14:31:14  at the same time, and the decrease in the average revenue per

22 14:31:18  user that was happening as a result.

23 14:31:20          So what that was saying to investors, and they said

24 14:31:23  it in words, as well, is, "Look, we are spending a lot of

25 14:31:25  money on content that is causing us to lose a lot of money in

14:31:29  profits, billions and billions of dollars, because we are

14:31:31  going to grow our subscriber base at, you know, even to the

14:31:35  sacrifice of profits, because that is our strategy."

14:31:38          And then there were -- that is at page 8 of our

14:31:41  Motion to Dismiss brief.

14:31:42          And then there are, in words, defendant said that --

14:31:52          THE COURT:  And are you now referring to one of the

14:31:55  documents --

14:31:56          MR. EARNHARDT:  Yes.

14:31:56          THE COURT:  -- that is incorporated by reference?

14:31:58  So it's helpful if you identify the exhibit number, the

14:32:03  docket -- document number, the name, and where within the

14:32:08  document.

14:32:09          MR. EARNHARDT:  So this is Exhibit 10 that I'm

14:32:11  reading from, at page 147 through 150, and also at 179.  And

14:32:16  there are more examples like this at page 3 of our motion.

14:32:19  And it says, "There can be no assurance that Disney's

14:32:25  Direct-to-Consumer offerings and other efforts will

14:32:27  successfully respond to shifting patterns of content

14:32:31  consumption, and that there is no assurance that the

14:32:34  Direct-to-Consumer model will be as profitable as its

14:32:39  existing business models."  And then refers to the content

14:32:42  spend that it's creating in trying to achieve those goals.

14:32:46  So that is Exhibit 10.

14:32:47          Same document at page 147.  It makes clear that, "We

114:32:50  expect to forego revenue from traditional sources in

214:32:54  furtherance of this goal of driving subscribers to Disney+."

314:32:58          And then Exhibit 15, at page 556, it makes clear

414:33:04  that, "We might not succeed in that strategy, and that it may

514:33:07  ultimately fail."

614:33:07          THE COURT:  Okay.  Thank you.

714:33:09          The definition of "paid subscriber" stated in

814:33:16  Disney's SEC filings, what is your position as to whether

914:33:20  that disclosed to -- disclosed that Disney was counting

1014:33:27  individuals who were merely entitled to, but never activated

1114:33:35  a subscription through a promotional partnership as a paid

1214:33:39  subscriber?

1314:33:40          So how are you using paid subscriber here as stated

1414:33:49  in the filings?

1514:33:50          MR. EARNHARDT:  Disney very clearly stated that paid

1614:33:53  subscriber includes those who receive the service by

1714:33:57  purchasing a different service and receiving it at no cost.

1814:34:00          So, for example, Exhibit 13 at 356, which is the

1914:34:07  February 4, 2020 earnings transcript, Disney disclosed,

2014:34:13  "Consumers have continued to sign up for the service directly

2114:34:17  at Disney+.com and through Verizon, which offers a free year

2214:34:22  of Disney+ to many of its customers at no additional cost."

2314:34:25          So that is describing the vast majority of customers

2414:34:29  who received Disney+ because they had Verizon, but never

2514:34:32  actually used the service.

1  14:34:34    And then at the same -- we cite this at our reply

2  14:34:37    brief at page 6, the same quarter one 2020 earnings call,

3  14:34:43    Disney made clear that 50 percent of new subscribers were

4  14:34:47    from these type of wholesale arrangements, in which they are

5  14:34:50    getting Disney+ not by getting the service directly, but

6  14:34:53    instead, by buying some other service and getting Disney+

7  14:34:56    along with it.  50 percent from those arrangements, and

8  14:35:01    20 percent subscribers were from the Verizon deal alone.

9  14:35:04    And then the last point I'll make on this, Your

10 14:35:06    Honor, there are extensive disclosures on this, I could keep

11 14:35:08    going, but this is the last one I'll cite, is Exhibit 14 at

12 14:35:11    page 422, Disney disclosed that these were wholesale

13 14:35:15    arrangements.  And they said, "Wholesale arrangements have a

14 14:35:19    lower average monthly revenue per paid subscriber than

15 14:35:23    subscribers that we acquire directly or through third-party

16 14:35:26    platforms like Apple."

17 14:35:29    THE COURT:  So a couple of more questions about the

18 14:35:32    churn rate.

19 14:35:35    Is it your position that not disclosing the churn

20 14:35:40    rate along with subscriber growth rate is not misleading?

21 14:35:47    MR. EARNHARDT:  It's not misleading, Your Honor.  A

22 14:35:49    few points on that.

23 14:35:50    First, there is just no dispute that Disney had no

24 14:35:53    free-standing duty to report churn statistics.

25 14:35:57    For example, the Ninth Circuit in the *Netflix* case

1  14:36:00  made clear that Netflix, when it was transitioning from DVD

2  14:36:06  distribution to streaming distribution, had no duty to

3  14:36:08  disclose all the various metrics that an investor might be

4  14:36:12  interested in related to that changed business strategy.

5  14:36:15  There, it was profit margin; here, it's churn.  So there is

6  14:36:18  no -- and that case, I have to say, is on all fours with this

7  14:36:22  one.  The claims that were made against Netflix are almost

8  14:36:26  exactly the same as the claims made against Disney, and those

9  14:36:29  were dismissed.

10  14:36:30       So first of all, there is no free-standing duty to

11  14:36:32  describe churn statistics.

12  14:36:33       So the second point is in order to be required to

13  14:36:37  disclose churn, it would have to be that the failure to

14  14:36:40  disclose churn would make some other statement misleading,

15  14:36:43  some other hard metric misleading, and that is simply not

16  14:36:47  true.

17  14:36:48       So the number of subscribers, and the average

18  14:36:50  revenue per subscriber, does not depend on the churn rate.

19  14:36:55  And in fact, when you are disclosing that your average

20  14:36:58  revenue per subscriber is going down over time, which

21  14:37:01  defendants did, that is consistent with, not making

22  14:37:04  misleading, the idea that churn rate is going up.

23  14:37:07       So a third point.  The only two affirmative

24  14:37:10  statements that defendants said about churn are in June of

25  14:37:14  2021, they said, "We've seen no significantly higher churn as

1 14:37:20   a result of a price increase for Disney+."  That is the first

2 14:37:25   statement.  And there is absolutely no fact alleged that that

3 14:37:28   is not true and wasn't believed at the time.  So that is --

4 14:37:31   that is not misleading, and you don't have to describe the

5 14:37:34   actual churn numbers, because there is nothing alleged to

6 14:37:37   make that misleading.

7 14:37:38            Again, the only facts they allege about the churn

8 14:37:41   rate were a year later in 2022, and that can't make something

9 14:37:45   in 2021 misleading.

10 14:37:46           The second statement is from August 2021.  And there

11 14:37:51   is a question at an earnings release, and the following is

12 14:37:54   said, "And you asked the question about churn, we are really

13 14:37:57   pleased with churn."  And that is what it says.

14 14:38:01           Again, there is no indication that Mr. Chapek wasn't

15 14:38:04   pleased with churn when he made that statement, and there is

16 14:38:06   no indication that churn had increased as of August 2021.  No

17 14:38:09   facts alleged whatsoever about problems with churn as of that

18 14:38:13   date.

19 14:38:14           This type of claim was rejected by the Ninth Circuit

20 14:38:17   in the case *Weston vs. Twitter*, that is at 29 F.4th 611,

21 14:38:22   where the Ninth Circuit expressly held that later statements

22 14:38:26   about knowledge at the end of the class period cannot be used

23 14:38:30   to show the falsity of earlier statements at a different time

24 14:38:33   in the class period, because different things could have been

25 14:38:35   learned in the interim.

1 14:38:36    So there is nothing misleading about churn pleaded

2 14:38:39    in the Complaint.

3 14:38:41    THE COURT:  So I'll follow up, and you may feel that

4 14:38:44    you've answered the question, but wouldn't the disclosure of

5 14:38:49    of the churn rate have informed investors that some of the

6 14:38:54    growth being reported was only temporary?  So is your answer

7 14:39:00    maybe just there is no requirement to make that disclosure,

8 14:39:05    or otherwise?  I'll let you answer it.

9 14:39:10    MR. EARNHARDT:  So number one, I don't think it's

10 14:39:14    true as a factual matter that disclosing the churn rate would

11 14:39:17    have said anything about whether the growth was temporary or

12 14:39:20    not.

13 14:39:20    So when you are thinking about whether subscribers

14 14:39:23    are growing, it's sort of like a bathtub.  If you pulled the

15 14:39:26    drain and the water is going out, is it leaving faster than

16 14:39:29    it's coming in or not?  If the water out of the spigot is

17 14:39:32    going faster than the water in the drain, the water is going

18 14:39:35    to rise even though you pulled the drain.

19 14:39:38    And so describing the churn rate doesn't tell you

20 14:39:40    anything about whether the total number of subscribers are

21 14:39:43    going to grow, because you have to know how many you are

22 14:39:45    going to get.

23 14:39:46    Well, what Disney did instead, is they described

24 14:39:49    every single quarter the number of subscribers that they had

25 14:39:52    that quarter, and how it related to the subscribers in the

1 14:39:55    previous quarter, and that is not misleading based on churn.

2 14:39:59         What Disney also described is the methodologies they

3 14:40:03    were using to attract subscribers.  They were very expressed

4 14:40:06    that they were going to international markets.  We are using

5 14:40:09    wholesale deals.  We are increasing promotions.  We are

6 14:40:15    increasing content costs.

7 14:40:16         And the Ninth Circuit in a case called *Apollo*,

8 14:40:20    774 --

9 14:40:20         THE COURT:  So this is not cited in the papers?

10 14:40:22         MR. EARNHARDT:  It is.  It is. 774 F.3d 598.  It's

11 14:40:27    directly responsive to this point.

12 14:40:29         In that case, the question was whether Apollo

13 14:40:32    disclosed enough about -- they were operating an online

14 14:40:36    university, and the allegation was the students they were

15 14:40:38    attracting to their online university were low quality

16 14:40:42    students that weren't likely to stay enrolled, they were

17 14:40:44    going to sign up and then leave.  And for that reason it was

18 14:40:47    overstating the revenue of the online university to talk

19 14:40:50    about the number of students enrolled.

20 14:40:52         The Ninth Circuit rejected the claim that was

21 14:40:54    misleading, saying that they disclosed where it was that they

22 14:40:58    were getting the students from by advertising that this is an

23 14:41:02    online school, and to folks who may not have wanted to attend

24 14:41:05    college in person, and investors would know that those types

25 14:41:08    of folks are more likely to churn from an educational

14:41:13  standpoint.

14:41:14          Same thing here.  Disney disclosed all of the ways

14:41:16  they were growing the subscribers, including going to

14:41:19  international markets, giving promotions, by increasing

14:41:22  content costs.  And so by doing that, the Ninth Circuit has

14:41:24  said it's not misleading to describe the accurate numbers of

14:41:29  subscribers that you have.

14:41:31          THE COURT:  Okay.  All right.  Thank you.

14:41:34          Anything that has not been addressed that, as you

14:41:39  review your papers, you would like to comment upon for the

14:41:45  understanding of the Court?

14:41:46          MR. EARNHARDT:  Your Honor, I would like to just say

14:41:49  one word about loss causation.

14:41:51          THE COURT:  You may.

14:41:51          MR. EARNHARDT:  So first of all, plaintiffs say that

14:41:55  loss causation cannot be a basis on which to grant a Motion

14:41:58  to Dismiss in this circuit.  That is demonstrably false.

14:42:01          The Ninth Circuit in the *Tesla* case, 985 F.3d 1180,

14:42:09  dismissed claims based on loss causation.  We submitted a

14:42:10  Notice of Supplemental Authority for the *Espy* case where

14:42:14  claims were dismissed on loss causation.

14:42:17          The second point --

14:42:18          THE COURT:  At what stage?  Were these summary

14:42:20  judgment cases, trial cases, or 12(b)(6)?

14:42:25          MR. EARNHARDT:  12(b)(6) Motion to Dismiss.  Both of

1 14:42:28    those were 12(b)(6) Motion to Dismiss cases.

2 14:42:30         Plaintiffs said today, and in their papers, they

3 14:42:33    said that loss causation is just a proximate cause issue.

4 14:42:37    And in their papers, they cite this *First Solar* case for that

5 14:42:40    proposition.

6 14:42:41         What they admit, Your Honor, and I think what the

7 14:42:43    critical part of that case is, is the following:  "When

8 14:42:46    plaintiffs plead a causation theory based on market

9 14:42:49    revelation of the fraud, the Court naturally evaluates

10 14:42:54   whether plaintiff had pleaded or proved the facts relevant to

11 14:42:57   their theory."  That is from the *First Solar* case at 754.

12 14:43:01        Here, plaintiffs plead a market revelation theory of

13 14:43:05   causation.  At paragraph 384 of their Complaint, they say

14 14:43:09   that, "Defendants' misrepresentations and fraudulent conduct

15 14:43:14   became apparent to the market through three separate

16 14:43:17   disclosures."  So they are pleading a corrected disclosure

17 14:43:20   theory of loss causation.  So you ask yourself, have they

18 14:43:23   pleaded facts to substantiate that theory?  And they haven't.

19 14:43:26        And the reason, I agree it's very simple, but it's a

20 14:43:28   really simple reason for dismissal, is that everything that

21 14:43:30   they say caused the stock price drop on the corrective

22 14:43:34   disclosure dates had been disclosed previously.  And because

23 14:43:37   it had been disclosed previously, it can't be a source of new

24 14:43:40   information that caused the stock price to decline on those

25 14:43:44   dates.

1 14:43:44        Very quickly, the first is November 11, 2021.  They

2 14:43:48   say that the alleged disclosure was slow subscriber growth,

3 14:43:51   and that is what caused the stock price to fall, but Disney

4 14:43:55   had already disclosed that in September of 2021.  So that

5 14:43:58   wasn't new information.

6 14:43:59        The second alleged corrective disclosure is that

7 14:44:02   there was going to be a $1.47 billion operating loss.  They

8 14:44:06   say that was announced on November 9, 2022; but in fact,

9 14:44:10   Disney had already disclosed the prior quarter that there was

10 14:44:13   going to be exactly that amount of operating loss.  So that

11 14:44:16   wasn't new information, either.

12 14:44:17        Third corrective disclosure was May 11, 2023, and

13 14:44:23   they say the alleged cause of the stock price on that date

14 14:44:26   was Mr. Iger was taking a strategic pivot away from

15 14:44:31   subscriber growth; and instead, focusing on profitability.

16 14:44:34   But Mr. Iger had disclosed that on February 8, 2023, two

17 14:44:40   months before.

18 14:44:41        So for each instance that what they are saying moved

19 14:44:43   the stock price was not new information.  And under *Basic vs.*

20 14:44:46   *Levinson*, only -- from the Supreme Court -- "Only new

21 14:44:49   information can move the stock price."

22 14:44:50        So their loss causation theory fails.

23 14:44:55        THE COURT:  All right.  Thank you.

24 14:44:56        Plaintiffs' counsel wish to respond to any of the

25 14:44:59   comments?

14:45:03    1        MS. SHINNEFIELD:  Yes, please, Your Honor.

14:45:04    2        THE COURT:  All right.  You may.

14:45:07    3        MS. SHINNEFIELD:  Since we are on that train of

14:45:09    4    thought, let's start with loss causation, Your Honor.

14:45:11    5        Plaintiffs strongly disagree that the information

14:45:15    6    that defendants say was disclosed, and therefore rendered the

14:45:19    7    disclosures no longer new information, is simply false.

14:45:25    8        If you look, for example, let's start with the first

14:45:28    9    disclosure on November 10, 2021, and that is where defendants

14:45:33   10    actually disclosed two new pieces of information.  One, it

14:45:36   11    was the first time they had ever missed their subscriber

14:45:39   12    growth targets since the inception of Disney+.

14:45:43   13        So in the prior quarter, they said -- they

14:45:45   14    disclosed, "We are going to have only single-digit growth

14:45:49   15    next quarter."  They in no way said that they were going to

14:45:52   16    miss the consensus targets for their subscriber numbers for

14:45:56   17    the first time, which is what the market reacted to.

14:45:59   18        Additionally, they disclosed on that date, which was

14:46:03   19    also new information, that Disney's operating losses were

14:46:07   20    going to continue to mount over the next several months.

14:46:11   21        And here, they just actually say something that is

14:46:15   22    incorrect with respect to what the disclosure actually said.

14:46:22   23    They say that McCarthy, who is the CFO, had already told

14:46:27   24    investors that losses were going to be pushed out to 2022.

14:46:31   25        And I'll read to you what she actually said.  She

14:46:34    said, "We previously stated that we expected Disney+ would

14:46:38    reach its peak losses between fiscal 2020 and fiscal 2022.

14:46:45    Consistent with this range, our expectation today is that

14:46:48    Disney will reach its peak year of losses in 2021."

14:46:52         So the last statement that McCarthy made on this

14:46:55    left investors with the impression that peak losses were

14:46:58    going to be in 2021.  And this disclosure now is that they

14:47:03    are not going to be incurred until 2022.  That was new

14:47:08    information.

14:47:08         And if you look at the November 8, 2022 disclosure,

14:47:15    where they again say this is all old news, and what they are

14:47:19    referring to, Your Honor, that was disclosed was a

14:47:22    $1.47 billion operating loss in DTC.

14:47:28         And the stock price plummeted that day when they

14:47:31    announced it, unsurprisingly.  And they claim this wasn't new

14:47:36    news to investors, because McCarthy had told the investors

14:47:39    the prior quarter, when announcing a $1.1 billion operating

14:47:43    loss, to expect similar year-over-year increases the next

14:47:47    quarter.

14:47:48         But again, Your Honor, you have to look closely to

14:47:49    what the disclosures actually say.  It's simply not true.  In

14:47:55    the prior quarter, McCarthy was talking about content costs,

14:47:58    and told investors to expect content costs to increase the

14:48:02    same next quarter as they had year over year.  Said nothing

14:48:05    about operating costs.  Operating costs is the $1.47 billion

1 14:48:11  loss that actually was announced on the disclosure date,

2 14:48:14  which was entirely new information.

3 14:48:16      And, Your Honor, it was entirely new information, as

4 14:48:18  alleged in the Complaint, to Disney's own board of directors.

5 14:48:22  I mean, this is pretty uncharted waters we are in, Your

6 14:48:25  Honor, when there is a showdown between the CFO of a company,

7 14:48:29  and the CEO of the company at a board meeting, and the CFO

8 14:48:34  tells the CEO that he has to come clean about the numbers.

9 14:48:39  And she specifically tells the board that the issues are the

10 14:48:41  ballooning content costs and DMED.

11 14:48:45      And Chapek goes on the call, and he really tries to

12 14:48:48  downplay the magnitude of that loss; and ultimately, he's

13 14:48:53  fired for it.

14 14:48:54      So, Your Honor, the board was shocked by the

15 14:48:57  information about how large these operating costs is.  It

16 14:49:00  defies credulity to say that investors were somehow on notice

17 14:49:05  at this point.

18 14:49:05      And finally, with respect to the March 10, 2023

19 14:49:10  disclosure, this is where Defendant Iger has come back to the

20 14:49:15  company, he's now the CEO, and he announces a whole host of

21 14:49:21  measures that have to be implemented basically to unwind this

22 14:49:24  fraud that has been occurring over the past years on Chapek's

23 14:49:27  watch.  He says that he has to slash content costs by, I

24 14:49:33  think $3 billion.  And he says he is going to have to write

25 14:49:37  off content that was made to pursue subscribers, 1.5 to

$1.8 million, an impairment charge.  Investors had never heard a word about Disney taking a 1.5 to $1.8 billion impairment charge at this point in time.

He also said they were going to be exiting the international markets that they had entered into unprofitably.

Basically, on this date, Mr. Iger was coming clean about all the steps the company would have to do to actually operate profitably for Disney+, which they had not been doing under Chapek's rank.

Shifting briefly to another topic, Your Honor.  I think one of the first things that Counsel mentioned, there was some suggestion that we were trying to hold them to a standard on falsity of -- that it wasn't complete, that their disclosures were not complete.  That is not what we are saying, Your Honor.  We are saying that they were absolutely misleading, that you can't state the good without also providing the bad.  It's not that they didn't say enough, it's what they did say was misleading given the adverse facts that they failed to disclose.

And that is directly from the Ninth Circuit's opinion in *Schueneman*.  And frankly, the case that defendants cite in their Notice of Supplemental Authority, *Macquarie*, addresses that very issue, too.  It speaks to half truths. It says half truths you can be liable for them under 10b-5.

1  14:51:19       It says specifically that if you are going to talk
2  14:51:21  about something, you have to do so truthfully, and you have
3  14:51:25  to disclose the adverse facts that cut against the statements
4  14:51:28  that you are making.
5  14:51:29       Specifically, I'll just quote it, it says,
6  14:51:33  "Representations that state the truth only so far as it goes,
7  14:51:39  while admitting critical qualifying information, can be held
8  14:51:44  liable under Rule 10b." And that is exactly the theory of
9  14:51:46  liability for all of our misstatements in this case, Your
10 14:51:49  Honor.
11 14:51:49       Two other, what I hope are quick points, because you
12 14:51:53  have been very patient with your time today. Looking at the
13 14:52:00  scheme claims, and some of the ways in which defendants have
14 14:52:04  claimed that their fraudulent conduct, or their deceptive
15 14:52:09  conduct was disclosed.
16 14:52:11       Specifically with respect to churn, Your Honor, when
17 14:52:15  I was speaking earlier about the two CWs who provided
18 14:52:19  information saying that churn was a constant source of
19 14:52:24  concern, that they were hyperfocused on it, that it was a
20 14:52:27  leaky bucket, the timeframe of those CWs, one of them, the
21 14:52:32  first one, was only at the company through mid-2021. So the
22 14:52:36  facts about which they were speaking were necessarily from
23 14:52:39  the start of the class period through 2021.
24 14:52:42       And the second CW was only at the company through
25 14:52:46  mid-2022. So those allegations also would relate from the

1 14:52:51   start of the class period to mid-2022.

2 14:52:54           So that provides a timeframe for the churn events.

3 14:52:59           Similarly, if you look -- let me see.

4 14:53:05   THE COURT:  So plaintiffs' counsel now is commenting

5 14:53:09   on argument of defense counsel, things that you feel that you

6 14:53:16   need to address, correct?

7 14:53:18           MS. SHINNEFIELD:  Just responding.

8 14:53:19           THE COURT:  Okay.

9 14:53:20           MS. SHINNEFIELD:  Just one -- another point on that

10 14:53:22   matter, Your Honor.

11 14:53:23           If you -- going back to one of the artifices that

12 14:53:30   plaintiffs discussed earlier, which was Disney steering films

13 14:53:35   to Disney+ at the expense of profits, one of the things that

14 14:53:41   they cite to is a generic disclosure that just says, Disney

15 14:53:48   said that it would forego revenue from traditional sources,

16 14:53:51   and they say in the short-term.  The actual disclosure does

17 14:53:54   not say in the short-term, Your Honor.

18 14:53:56           But where this disclosure comes from, just for

19 14:53:58   context, is a November 2019 10-K that precedes the class

20 14:54:03   period, that preceding Chapek even being CEO, which precedes

21 14:54:08   plaintiffs even claiming that a scheme exists.  So it's

22 14:54:12   unfathomable, Your Honor, that a disclosure from 2019 somehow

23 14:54:16   put investors on notice of a scheme that wasn't even

24 14:54:19   occurring at this point in time.

25 14:54:21           And just kind of as a broader theme, Your Honor,

1  14:54:24  that is how we view defendants' argument in this case, is we

2  14:54:30  allege conduct is deceptive, and then they go and find some

3  14:54:34  topic that defendants disclosed about, a very generic

4  14:54:40  comment, and say, "Oh, it applies to that."  And they never

5  14:54:42  disclosed the actual deceptive conduct that we allege

6  14:54:46  occurred.

7  14:54:46       And if you look at -- if you look specifically at

8  14:54:50  what we are alleging occurred, and why we allege defendants

9  14:54:53  were doing that, it's never disclosed; nor would it be.  That

10 14:54:58  was the whole point of the scheme.

11 14:55:01       I think that is all I have, but I think my colleague

12 14:55:04  had one response just on the 20A claim.

13 14:55:08       THE COURT:  One additional response.  I'll let

14 14:55:10  Counsel.

15 14:55:11       MS. SHINNEFIELD:  Thank you.

16 14:55:12       MS. GILLILAND:  Your Honor, defendants' only

17 14:55:21  response to the fact that they failed to challenge

18 14:55:24  plaintiffs' Section 10b insider trading claim against

19 14:55:29  Mr. Iger is the incorrect statement that plaintiffs never

20 14:55:31  stated the claim.

21 14:55:32       Defense counsel directed your attention to page 179

22 14:55:35  of the Complaint, where plaintiffs list the claim for relief

23 14:55:39  for Section 10b.  There, plaintiffs list "all defendants".

24 14:55:44  That includes Mr. Iger as a Section 10b defendant.

25 14:55:47       Also, in paragraph 412, plaintiffs state that, "All

defendants engaged in acts or transactions" -- that includes

selling -- "that operated as a fraud or deceit on investors."

And the Ninth Circuit in *America West* makes clear that

insider trading is a deceptive device under Section 10b.

And regardless of whether plaintiffs stated a

separate claim for insider trading under Section 10b, they

have clearly stated the elements, which is trading while in

possession of material nonpublic information.

And in the Ninth Circuit's *Johnson vs. Aljian* case

cited in the papers, the Court held that, "For predicate

violation for Section 20A" -- which is plaintiffs' Section

10b insider trading claim -- "plaintiffs need only state the

elements and need not state a separate claim."

So plaintiffs would state that we have stated a

separate Section 10b insider trading claim, but even if we

haven't, we have stated the elements, which is sufficient to

satisfy the predicate violation requirement.

THE COURT:  Thank you.

It's defendants' motion, so normally I would give

defendant the final word on this, but is there anything that

plaintiffs have now placed on the record that you feel that

you need to respond to?

MR. EARNHARDT:  Very quickly, Your Honor.

It's not sufficient under the security laws to

engage in group pleading.  You can't say, "We have a claim

114:57:10    under 10(a), (b) and (c) against Defendants 1, 2, 3 and 4,"

214:57:15    and expect us to even have notice that that means there is a

314:57:19    specific insider trading claim as to Mr. Iger specifically.

414:57:23    That wasn't -- even under a notice pleading standard, that

514:57:26    would fail.  It certainly fails under the PSLRA, and Rule

614:57:30    9(b), which is what they have to meet here.

714:57:32            I guess the final point, Your Honor, is companies

814:57:38    should be encouraged to try new, risky business plans if it's

914:57:45    in the best interests of shareholders.  And sometimes those

1014:57:48    plans work, and sometimes they don't.

1114:57:50            If this Complaint states a claim for securities

1214:57:53    fraud, given the extensive disclosures by defendants of what

1314:57:58    the plan was, the accurate disclosure of what the results of

1414:58:02    that plan was as they were happening at the end, and the risk

1514:58:05    of the plan, then any time a company tries something new and

1614:58:09    fails, they will have to stand for a securities fraud claim.

1714:58:13    And that simply is not the law.

1814:58:15            Thank you, Your Honor.

1914:58:16            THE COURT:  All right.  Thank you.  The matter is

2014:58:18    deemed submitted.

21                    *****     *****     *****

22

23

24

25

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-titled matter.

3

4

5

6    ---------------------------

7

8    Amy C. Diaz, RPR, CRR          October 2, 2024

9    S/  Amy Diaz

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25