JONATHAN D. POLKES (admitted *pro hac vice*)
jonathan.polkes@whitecase.com
STACY NETTLETON (admitted *pro hac vice*)
stacy.nettleton@whitecase.com
ADAM B. BANKS (admitted *pro hac vice*)
adam.banks@whitecase.com
SUSAN L. GRACE (admitted *pro hac vice*)
susan.grace@whitecase.com
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200

JOHN W. SPIEGEL (SB 78935)
john.spiegel@mto.com
JOHN M. GILDERSLEEVE (SB 284618)
john.gildersleeve@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Attorneys for Defendants
The Walt Disney Company, Robert Iger,
Robert Chapek, Christine M. McCarthy
and Kareem Daniel

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　　　v.<br><br>THE WALT DISNEY COMPANY, *et al.*,<br><br>　　　　　　Defendants. | Case No. 2:23-cv-03661-CBM(ASx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Filed Concurrently:<br><br>- Notice of Motion & Motion for Judgment on the Pleadings<br>- Request for Judicial Notice and Consideration of Documents Incorporated by Reference<br>- Declaration of John M. Gildersleeve<br>- [Proposed] Order<br><br>Date:　April 29, 2025<br>Time:　10:00 A.M.<br>Ctrm:　8D<br>Judge:　Hon. Consuelo B. Marshall |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION.................................................................................. 1

II.   LEGAL STANDARD ........................................................................... 2

III.  ARGUMENT ........................................................................................ 4

     A.    Plaintiffs Fail to Allege Actionable Misstatements ................................ 4

          1.    The Core Statements Challenged by Plaintiffs Are Not Actionable Under the PSLRA's Safe Harbor .............................. 5

          2.    Other Alleged Misstatements Are Accurate Data ...................... 11

          3.    The Statements of Opinion Are Not Actionable ........................ 14

     B.    Without Actionable Misstatements, Plaintiffs Fail to Allege a Scheme to Defraud ................................................................................ 17

     C.    The Claims Against the Executive Defendants Should Be Dismissed ............................................................................................. 21

          1.    The Section 20A and Section 20(a) Claims Fail ....................... 21

          2.    The Section 10(b) Claim Against Mr. Iger (Count I) Should Be Dismissed ................................................................. 21

IV.  CONCLUSION .................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) .................................................................................. 13

*Brooks v. Dunlop Mfg. Inc.*,
2011 WL 6140912 (N.D. Cal. Dec. 9, 2011) ........................................................... 3

*Chavez v. United States*,
683 F.3d 1102 (9th Cir. 2012) ................................................................................. 3

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ........................................................................ 2, 15, 17

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
47 F. Supp. 3d 1205 (E.D. Wash. 2014),
*aff'd*, 691 F. App'x 393 (9th Cir. 2017) ................................................................ 14

*Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) ................................................................................. 3

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) .................................................................................. 14

*Fleming v. Pickard*,
581 F.3d 922 (9th Cir. 2009) ................................................................................... 2

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999) ................................................................................... 3

*In re AGS, Inc., Sec. Litig.*,
2024 WL 581124 (D. Nev. Feb. 12, 2024),
*aff'd*, 2025 WL 927296 (9th Cir. Mar. 27, 2025) ................................................. 18

*In re Cloudera, Inc. Sec. Litig.*,
121 F.4th 1180 (9th Cir. 2024) ................................................................................ 3

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ............................................................................ 5, 10

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

**TABLE OF AUTHORITIES**
(Continued)

**Page**

*In re Dropbox Sec. Litig.*,
   2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) .......................................................... 12

*In re Eastman Kodak Co. Sec. Litig.*,
   632 F. Supp. 3d 169 (W.D.N.Y. 2022) ...................................................................... 18

*In re eHealth, Inc. Sec. Litig.*,
   2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) ............................................................ 3

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) .......................................................................... 20

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ........................................................................................ 3

*In re Netflix, Inc., Sec. Litig.*,
   964 F. Supp. 2d 1188 (N.D. Cal. 2013) ..................................................................... 13

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................................... 5, 10

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ..................................................................................... 13

*In re Wet Seal Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................................................... 12

*Linenweber v. Sw. Airlines Co.*,
   693 F. Supp. 3d 661 (N.D. Tex. 2023) ...................................................................... 20

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ................................................................................... 21

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ..................................................................................................... 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) .............................................................................................. 15, 17

*Oregon Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ..................................................................................... 14

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Pampena v. Musk*,
2024 WL 3678002 (N.D. Cal. Aug. 5, 2024).......................................................3

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)..............................................................8, 13, 14

*Rabkin v. Lion Biotechs., Inc.*,
2018 WL 905862 (N.D. Cal. Feb. 15, 2018).......................................................20

*SEC v. Hui Feng*,
935 F.3d 721 (9th Cir. 2019)...............................................................................20

*SEC v. Richman*,
2021 WL 5113168 (N.D. Cal. Nov. 3, 2021)......................................................20

*SEC v. Rio Tinto plc*,
41 F. 4th 47 (2d Cir. 2022).................................................................................21

*Simpson v. AOL Time Warner Inc.*,
452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds sub nom Simpson v. Homestore.com, Inc.* 519 F.3d 1041 (9th Cir. 2008) .....................................17, 20

*Webb v. Trader Joe's Co.*,
999 F.3d 1196 (9th Cir. 2021)..............................................................................3

*Weston Fam. P'ship LLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022)..........................................................................5, 13

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021).......................................................5, 11, 15, 17

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)................................................................................3

**STATUTES**

15 U.S.C. § 78u-5(c)..............................................................................................4

15 U.S.C. § 78u-5(c)(1) .....................................................................................5, 8

15 U.S.C. § 78u-5(c)(1)(A)...................................................................................10

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

## TABLE OF AUTHORITIES
### (Continued)

**Page**

15 U.S.C. § 78u-5(i)(1)................................................................................................. 6

**RULES**

Fed. R. Civ. P. 12(c) ..............................................................................................2, 3

## I.     INTRODUCTION

In granting in part and denying in part Defendants' Motion to Dismiss the Consolidated Complaint ("CC"), the Court held that certain alleged misstatements are non-actionable puffery or otherwise immaterial.  *See* Order Re: Defendants' Motion to Dismiss [ECF No. 111] ("Order") at 1–2.  But the Court did not address the many alleged misstatements that are not actionable under the PSLRA's safe harbor for forward-looking statements.  These statements are core to the Complaint, animating both Plaintiffs' misstatement allegations and their theory of scheme liability.  Defendants bring this motion for judgment on the pleadings for the Court to apply that critical statutory protection at the pleading stage, and address other grounds for dismissal not decided by the Order.

Plaintiffs' sprawling Complaint launches more than 200 pages of hindsight attacks on business decisions Disney made regarding its Disney+ streaming service as the company weathered the years after the Covid-19 pandemic.  But at bottom, the Complaint faults Defendants for failing to predict the future.  Its premise is that Defendants deceived investors by issuing false subscriber targets and profitability forecasts for Disney+, then engaged in various business strategies that, because they were directed at achieving those targets, supposedly constituted a fraudulent scheme.

Both the subscriber targets and profitability forecasts—the bases from which the entire Complaint proceeds—are quintessential forward-looking statements that are not actionable under the PSLRA's safe harbor.  That is, the core allegations of the Complaint, and supposed impetus for the alleged scheme, are non-actionable statements under the securities laws.  Whether or not Disney met its goals, such projections about the future cannot support a securities fraud claim.  Nor can the strategic choices Disney made to achieve those targets form any part of a fraudulent scheme, especially when the strategies were fully disclosed to investors.  And as it

happens, Disney reached the profitability target that Plaintiffs contend was a sham; Disney's streaming business achieved profitability by 2024, right on schedule.

Many of the other alleged misstatements, which the Order did not expressly address, cannot survive Plaintiffs' admissions that Disney's reporting of historical metrics every quarter was accurate and "literally true." Sept. 17, 2024 Hr'g Tr. 5:10-25 [ECF No. 106]. Finally, the remaining alleged misstatements are opinions, which the Court's Order likewise did not address and which are not actionable because Plaintiffs fail to allege that Defendants did not actually hold the beliefs they expressed or that the opinions were "objectively untrue." *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017). In short, the Complaint fails to allege any actionable misstatements under the securities laws.

Without any actionable misstatements, Plaintiffs' scheme theory of Rule 10b-5 liability falls apart, too. Plaintiffs claim that Defendants erected nine so-called "artifices" to support their efforts to meet the subscriber and profitability targets and convince investors that Disney was "on track" to meet them. But a scheme requires conduct that has a principal purpose of deceiving investors. And Plaintiffs claim that the "artifices" were deceptive principally because they were a means of chasing supposedly unobtainable projections—projections that are non-actionable to begin with. Nor, in any event, could the business plans that Plaintiffs challenge as comprising the scheme be deceptive in their own right—they were disclosed to investors. After discounting the statements already dismissed by the Court and those otherwise not actionable, the scheme theory fails as well.

## II.    <u>LEGAL STANDARD</u>

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*,

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

581 F.3d 922, 925 (9th Cir. 2009).

"Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, 'a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy.'" *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (quoting *Brooks v. Dunlop Mfg. Inc.*, 2011 WL 6140912, at *3 (N.D. Cal. Dec. 9, 2011)); *see, e.g.*, *Pampena v. Musk*, 2024 WL 3678002, at *2 (N.D. Cal. Aug. 5, 2024) ("The legal standards governing Rules 12(c) and 12(b)(6) are functionally identical . . . ." (internal quotation omitted)). "Because motions for judgment on the pleadings are functionally identical to Rule 12(b)(6) motions, when ruling on either type of motion courts must consider the complaint in its entirety, as well as … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir. 2021) (internal citations and quotations omitted).

"Securities fraud complaints face heightened pleading requirements. 'At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of [Rule] 9(b) and the [PSLRA]." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)); *see, e.g.*, *In re Cloudera, Inc. Sec. Litig.*, 121 F.4th 1180, 1186 (9th Cir. 2024) ("[W]hen fraud is involved, Federal Rule of Civil Procedure 9(b) imposes a higher pleading standard.").

"Granting judgment on the pleadings is appropriate where a complaint fails to satisfy the pleading standards of the PSLRA." *In re eHealth, Inc. Sec. Litig.*, 2023 WL 6390593, at *2 (N.D. Cal. Sept. 28, 2023) (citing *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980 (9th Cir. 1999) (affirming judgment on the pleadings because complaint "fail[ed] to satisfy the rigorous pleading standards of' PSLRA)); *see also Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353

F.3d 1125, 1134 (9th Cir. 2004) (affirming judgment on the pleadings under PSLRA).

### III.   <u>ARGUMENT</u>

On February 19, 2025, the Court issued its Order granting in part and denying in part Defendants' Motion to Dismiss.  The Order did not address all grounds for dismissal.  Defendants now bring this motion for judgment on the pleadings for the Court to address those grounds and dismiss the Complaint.

As to the alleged false or misleading statements, the Order did not apply the PSLRA's safe harbor for forward-looking statements.  *See* 15 U.S.C. § 78u-5(c). Applying the safe harbor leaves few alleged misstatements in the Complaint, and those statements either are concededly accurate or are non-actionable statements of opinion, another basis for dismissal that the Order did not address.

As to the alleged scheme, the Order held that "Plaintiffs have sufficiently pled Defendants Chapek, Daniel, and McCarthy engaged in deceptive conduct beyond simply making misstatements."  Order at 1.  But the Order did not address whether Plaintiffs' theory of scheme liability could survive if there were no actionable misstatements.   Because Plaintiffs fail to plead particularized facts showing actionable false or misleading statements or a scheme to defraud, the Court should enter judgment dismissing the Complaint.

### A.   <u>Plaintiffs Fail to Allege Actionable Misstatements</u>

The Court's Order held that some of the alleged misstatements are not actionable because they are puffery or immaterial, Order at 1-2, but did not apply the PSLRA's safe harbor for forward-looking statements.  Many of the statements challenged in the Complaint are not actionable under the safe harbor.  The remaining statements, also not addressed by the Court's Order, either disclosed data Plaintiffs concede are "literally true," or are non-actionable statements of opinion.

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

### 1. The Core Statements Challenged by Plaintiffs Are Not Actionable Under the PSLRA's Safe Harbor

In alleging securities fraud, Plaintiffs charge Defendants with speaking too optimistically about the prospects of Disney+. As it turns out, Disney met its 2024 target for its streaming business profitability. But even if Disney had fallen short, the projections on which Plaintiffs have built their case are not actionable under the PSLRA's safe harbor for forward-looking statements.

"[E]ven if a statement would otherwise be actionable under [Section 10(b)], the PSLRA carves out a 'safe harbor for forward-looking statements' by adding § 21E to the Securities Exchange Act . . . . This safe harbor 'is designed to protect companies and their officials' when they merely fall short of their 'optimistic projections.'" *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017)); *see, e.g., Weston Fam. P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) (finding safe harbor applies "even if a statement is objectively false or misleading").

Under the safe harbor, "a person . . . shall not be liable with respect to any forward-looking statement" that *either* (A) is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements" *or* (B) is not "made with actual knowledge … that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1); *see Tesla*, 985 F.3d at 1190 ("a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading" (quoting *Quality Sys.*, 865 F.3d at 1141) (emphasis added)). "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the [speaker] is irrelevant." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

As explained below, the core statements challenged by Plaintiffs, and not addressed by the Court's Order, are not actionable under the safe harbor.

-5-

### (a) The Disney+ Projections Were Forward-Looking

The PSLRA defines forward-looking statements to include "(A) a statement containing a projection of revenues, income . . . or other financial items"; "(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; "(C) a statement of future economic performance"; and "(D) any statement of the assumptions underlying or relating to any statement described in [] (A), (B), or (C)." 15 U.S.C. § 78u-5(i)(1).

Under this definition, the following statements challenged by Plaintiffs— projections of future performance and operations, statements of goals and objectives, and explanations of underlying assumptions—are forward-looking:

- "[W]e're spending a lot of money . . .  in order to create the content *that's going to keep consumers coming back and keep not only our sub number growing but also our engagement growing across all of our platforms.*" CC ¶ 279;

- "[W]e've got plenty of product in the pipeline coming.  And *I think that's going to be enough to fuel that growth again, that we're confident about delivering in the long term.*" CC ¶ 282;

- "[W]e are increasing our overall long-term content expense for Disney+, and *we believe we are well positioned to achieve the subscriber target of 230 million to 260 million by fiscal 2024* that we laid out . . . . And *we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024.*" CC ¶ 283;

- "[W]e always say that library titles tend to increase engagement and minimize churn, but new titles . . . actually add subs.  And *that is actually the reason why we're pretty confident that the increase in content flow . . . will actually lead to the types of results that we're anticipating.*" CC ¶ 284;

-6-
MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

- "[W]e believe that great content *is going to drive our subs, and those subs then in scale will drive our profitability*. . . . And *we're very confident that going forward, we're going to hit both of those sub guidance and profitability guidance* …. We can do a lot of modeling. And *that modeling suggests . . . that Disney+ guidance is going to be very achievable . . . .*"  CC ¶ 286;

- "[O]ur team uses all of the information available to us when determining how best to allocate our creative content budgets across all platforms, *with the goal to maximize both audience engagement and commercial impact*."  CC ¶ 277;

- "And *next year, we plan to bring Disney+ to consumers in 50-plus additional countries . . . . Our goal is to more than double the numbers of countries we are currently in* to over 160 by fiscal year '23."  CC ¶ 297;

- "[I]n terms of getting the growth rate back up to where it's been historically, *is really going to come in the third and the fourth quarters. The third quarter will be powered* not necessarily by the content, but by the number of adds that we have in terms of markets . . . . And the fourth quarter *will be more of a function of that*."  CC ¶ 298;

- "The other thing . . . that's *going to drive the international business* is the predominance of local content that we are developing . . . ."  CC ¶ 299;

- "We believe these premium local originals, along with branded content with broad international appeal, *will attract new subscribers and drive engagement*."  CC ¶ 300;

- "*[A]s we now double down on our content investment going forward . . .* everyone appreciates the fact that they've got more time to do what they do best, given this increase in output that we have.  *We're ramping*

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

*up in scale in this . . . new content, and it really enables on the other end, on the distribution end for . . . an objective assessment* for what's right for distribution . . . ."  CC ¶ 306;

- "[Disney is] *well situated to leverage our position for long-term profitability and success*" and "*we still expect Disney+ to achieve profitability in fiscal 2024.*"  CC ¶ 316

(all emphasis added); *see also* CC ¶¶ 150, 158-59, 165, 172, 194-195, 201, 205, 207-210, 273-274, 279, 285 (additional forward-looking statements protected by the safe harbor).

All of the above statements are projections of plans and objectives for the future performance and operations of Disney+, as well as statements of underlying assumptions such as developing content and expanding internationally.  As the Ninth Circuit has held, "classic growth and revenue projections[] . . . are forward-looking on their face."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014).  Indeed, Plaintiffs have conceded that many of these statements are forward-looking.  *See* Pls.' Opp. To Defs.' Consolidated Mot. to Dismiss Consolidated Compl. [ECF No. 80] at 24-25 ("MTD Opp.").  Accordingly, the statements are not actionable under the statutory safe harbor as long as they were "accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1).

          (b)     The Disney+ Projections Were Accompanied by Meaningful Cautionary Statements

Each of the forward-looking statements was "accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1).  Disney warned investors at length about the risks posed by Disney+ and its direct-to-consumer (DTC) strategy more broadly, telling investors even before launching Disney+ that its strategy would require heavy operating losses in initial years and might never succeed.

In every annual and quarterly SEC filing in the class period, Disney warned

-8-

investors that its DTC strategy presented significant risks to Disney's profitability. Disney explained, among other things, that: Disney+ would not be profitable until five years after its launch and would require billions of dollars in operating losses; Disney "expect[ed] to forgo revenue from traditional sources" in the interim; Disney "anticipate[d] an increase in programming and production investments to create exclusive content for Disney+"; the DTC model may not "ultimately be as profitable as … existing business models"; "[c]hanges in [Disney's] business strategy or restructuring of [its] businesses may increase [its] costs or otherwise affect the profitability of [its] businesses"; and "investments related to direct-to-consumer offerings" "may have short-term returns that are negative or low and the ultimate business prospects may be uncertain."[1]

In the same annual and quarterly SEC filings, Disney further warned that: (i) Disney "must often invest substantial amounts in film production, television programming, [and] other content production" "before [it] know[s] the extent to which these products will earn consumer acceptance"; (ii) the success of DTC model "depend[ed] on acceptance of [its] offerings and products by consumers outside the U.S., and their success therefore depends on [its] ability to successfully predict and adapt to changing consumer tastes and preferences outside as well as inside the U.S."; and (iii) "[i]f [its] entertainment offerings and products do not achieve sufficient consumer acceptance," Disney's "subscription fees" "may decline or fail to grow to the extent [it] anticipate[d] when making investment decisions and thereby adversely affect the profitability of one or more of [its] businesses."[2]

---

[1] Ex. 1, 2019 10-K (11/20/19) at 23-26, 55; *see also* Ex. 2, Q1 FY20 Form 10-Q ("10-Q") (2/4/2020) at 208; Ex. 3, Q2 FY20 10-Q (5/5/2020) at 301-04; Ex. 4, Q3 FY20 10-Q (8/4/2020) at 397-400; Ex. 5, 2020 10-K (11/25/2020) at 436-41; Ex. 6, Q1 FY21 10-Q (2/11/2021) at 609-12; Ex. 7, Q2 FY21 10-Q (5/13/2021) at 721-24; Ex. 8, Q3 FY21 10-Q (8/12/2021) at 805-08; Ex. 9, 2021 10-K (11/24/2021) at 882-87; Ex. 10, Q1 FY22 10-Q (2/9/2022) at 1044; Ex. 11, Q2 FY22 10-Q (5/11/2022) at 1246; Ex. 12, Q3 FY22 10-Q (8/10/2022) at 1324; Ex. 13, 2022 10-K (11/29/2022) at 1419-22, 1426; Ex. 14, Q1 FY23 10-Q (2/8/2023) at 1627; Ex. 15, Q2 FY23 10-Q (5/10/2023) at 1723.

[2] *See* note 1, *supra*.

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

Disney repeated similar warnings on quarterly earnings calls, telling investors that forward-looking statements included "expected results, growth, profitability," "statements regarding the future of our offerings (including our direct-to-consumer offerings) including content, launch dates and timing," and "expectations about . . . potential customers or subscribers," and explaining that such statements "are subject to risks and uncertainties and actual results might differ materially from those discussed in, or implied by, the forward-looking statements."[3]  In accordance with the PSLRA's provision addressing oral forward-looking statements, Disney directed investors to SEC filings that "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. § 78u-5(c)(1)(A).

Disney's extensive cautionary statements "identif[ied] important factors that could cause actual results to differ materially from those in the forward looking statement[s]." *Cutera*, 610 F.3d at 1112; *see id.* (factors such as "ability to continue increasing sales performance worldwide" were sufficiently cautionary); *see also Quality Sys.*, 865 F.3d at 1146, 1148 (finding "volume and timing of systems sales and installations" to be "sufficiently meaningful" risk factors).  Among the many factors described above, Disney cited "restructuring or strategic initiatives including our [DMED] reorganization announced October 2020."[4]

*Tesla* is instructive.  Tesla projected that it would be able to produce "5,000

---

[3] Ex. 16, Q1 FY20 Earnings Call (2/4/2020) at 1803; Ex. 17, Disney Investor Day Presentation (12/10/2020) at 1809, 1904; Ex. 18, Q2 FY21 Earnings Call (5/13/2021) at 1936-38; Ex. 19, JPM Conference Call, 5/24/2021 at 1962; Ex. 20, Goldman Sachs Communacopia Conference (9/21/2021) at 1990; Ex. 21, Q4 FY21 Earnings Call (11/10/2021) at 2021-22; Ex. 22, Q1 FY22 Earnings Call (2/9/2022) at 2053-54; Ex. 23, Morgan Stanley Technology, Media and Telecom Conference (3/7/2022) at 2057; Ex. 24, Q2 FY22 Earnings Call (5/11/2022) at 2111-12; Ex. 25, Q3 FY22 Earnings Call (8/11/2022) at 2135; Ex. 26, Q4 FY22 Earnings Call (11/8/2022) at 2176-78.
[4] Ex. 20, Goldman Sachs Communacopia Conference (9/21/2021) at 1990; *see also* Ex. 25, Q3 FY22 Earnings Call (8/11/2022) at 2135; Ex. 26, Q4 FY22 Earnings Call (11/8/2022) at 2176-78; Ex. 18, Q2 FY21 Earnings Call (5/13/2021) at 1936-38; Ex. 21, Q4 FY21 Earnings Call (11/10/2021) at 2021-22; Ex. 24, Q2 FY22 Earnings Call (5/11/2022) at 2111-12; Ex. 22, Q1 FY22 Earnings Call (2/9/2022) at 2053-54.

-10-

vehicles per week by the end of 2017" and repeatedly told investors that it was "on track" to meet that target. 985 F.3d at 1194–95. Tesla missed its projection, but the Ninth Circuit affirmed dismissal, holding that Tesla's projection and its statements reaffirming it were forward-looking and accompanied by "detailed and specific" cautionary statements that Tesla may face "significant delays or other complications in the design, manufacture, launch and production ramp of new vehicles." *Id.* at 1193 n.3. Like Tesla, Disney set a goal (achieving subscriber and profitability targets), projected when it would meet the goal (fiscal year 2024), reaffirmed the projection, and warned investors why it might come up short.

That is all the statutory safe harbor requires. "[A] plaintiff cannot defeat that invocation of § 21E's safe harbor merely by alleging, for example, that the company knew that the announced forward-looking objective was unlikely to be achieved." *Tesla*, 985 F.3d at 1190. Indeed, Disney met its target for Disney+ streaming profitability. Ex. 27, Q3 FY24 Earnings Report (8/7/2024) at 2181. The Court should hold that the challenged statements discussed in this section—which form the core of Plaintiffs' theory of fraud—are not actionable under the safe harbor.

### 2. Other Alleged Misstatements Are Accurate Data

After considering the PSLRA's safe harbor, most of the remaining alleged misstatements concern Disney's concededly accurate reporting of historical subscriber growth and data, and DTC operating losses. Each quarter in the putative class period, Disney reported DTC operating losses,[5] how many paid subscribers Disney+ had, and Disney+'s average revenue per user (ARPU).[6] For example,

---

[5] Ex. 28, 2021 8-K (2/1/2021) at 2208, 2211, 6; Ex. 6, Q1 FY21 10-Q (2/11/2021) at 592; Ex. 7, Q2 FY21 10-Q (5/13/2021) at 696; Ex. 8, Q3 FY21 10-Q (8/12/2021) at 780; Ex. 10, Q1 FY22 10-Q (2/9/2022) at 1026; Ex. 11, Q2 FY22 10-Q (5/11/2022) at 1219; Ex. 12, Q3 FY22 10-Q (8/10/2022) at 1297; Ex. 29, 2022 8-K (11/8/2022) at 2219; Ex. 14, Q1 FY23 10-Q (02/08/2023) at 1611; Ex. 15, Q2 FY23 10-Q (5/10/2023) at 1698.
[6] Ex. 2, Q1 FY20 10-Q (2/3/2020) at 198; Ex. 3, Q2 FY20 10-Q (5/5/2020) at 279; Ex. 4, Q3 FY20 10-Q (8/4/2020) at 374; Ex. 5, 2020 10-K (11/25/2020) at 462-63; Ex. 6, Q1 FY21 10-Q (2/11/2021) at 593; Ex. 7, Q2 FY21 10-Q (5/13/2021) at 696-97; Ex. 9, 2021 10-K (11/24/2021) at 901; Ex. 10, Q1 FY22 10-Q (2/9/2022) at

-11-
MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs challenge as misleading Disney's statement that "there were 94.9 million Disney+ paid subscribers as of the end of Fiscal Q1 2021," CC ¶ 268, and its statement that Disney had "significant subscriber growth at our streaming services which added . . . 14.4 million Disney+ subscribers." CC ¶ 274; *see also* CC ¶¶ 150, 269-273, 275. Plaintiffs also challenge Defendants' reporting of results for the DTC and Disney+ businesses—for example, challenging Disney's 2021 Form 10-K, which reported that "operating loss from Direct-to-Consumer decreased $1,234 million, to $1,679 million from $2,913 million due to improved results at Hulu and, to a lesser extent, ESPN+, partially offset by a higher loss at Disney+." CC ¶ 294; *see also* CC ¶¶ 218, 221, 288-293.

But Plaintiffs now concede that these numbers are accurate. As Plaintiffs put it at oral argument on the motion to dismiss, Disney's "***statements about the subscriber numbers and subscriber growth were literally true***." Sept. 17, 2024 Hr'g Tr. 5:21-22; *see also id*. at 5:10-15 ("The number of subscribers they are reporting, for example, 155 million, we don't contest that that is a literally true number.").

These admissions doom Plaintiffs' claim that Disney's accurate historical reporting of subscriber data and financial results was fraudulent. Courts have "repeatedly refused to find disclosure of accurate historical data misleading." *In re Dropbox Sec. Litig*., 2020 WL 6161502, at *7 (N.D. Cal. Oct. 21, 2020) (collecting cases); *see also In re Wet Seal Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1162 (C.D. Cal. 2007) ("[d]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future").

Plaintiffs appear to complain that the concededly "true" reporting of historical subscriber numbers and financial results was nonetheless misleading because

---

1026-27; Ex. 11, Q2 FY22 10-Q (5/11/2022) at 1220-21; Ex. 12, Q3 FY22 10-Q (8/10/2022) at 1298-99; Ex. 13, 2022 10-K (11/29/2022) at 1438-39; Ex. 14, Q1 FY23 10-Q (2/8/2023) at 1611-12; Ex. 15, Q2 FY23 10-Q (5/10/2023) at 1698-1700.

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

Disney supposedly did not disclose additional information, including information about strategies "to generate subscriber growth" or "key churn metrics." *E.g.*, CC ¶¶ 276, 287. But "Section 10(b) and Rule 10b-5 'do not create an affirmative duty to disclose any and all material information.'" *Twitter*, 29 F.4th at 620 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Nor do companies have an obligation to "disclose a negative internal development [unless] its omission would make other statements materially misleading." *Id.* As the Ninth Circuit has held, there is no "rule of completeness for securities disclosures because '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'" *Intuitive Surgical*, 759 F.3d at 1061 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); *see In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 881 (9th Cir. 2012) (finding that though "some investors might have wanted more extensive information" that does not "make the alleged original statements false or misleading"); *Brody*, 280 F.3d at 1006 (rejecting notion that "once a disclosure is made, there is a duty to make it complete and accurate"). Rather, a duty to disclose arises "only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives*, 563 U.S. at 44, 45 (clarifying that "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose . . . by controlling what they say to the market").

Plaintiffs' emphasis on Defendants' supposed failure to disclose so-called "churn" rates along with its actual subscriber figures is pure distraction. The disclosure of the actual subscriber numbers every quarter was not misleading because the more granular churn rates were not also disclosed. *See In re Netflix, Inc., Sec. Litig.*, 964 F. Supp. 2d 1188, 1193 (N.D. Cal. 2013) (rejecting argument that once "Netflix began to discuss its focus on streaming, it had a duty to disclose all manner of information about streaming's margins," including subscriber churn).

-13-

The actual subscriber numbers disclosed every quarter reflected net changes in subscribers, including those who "churned" off the service. As it bears repeating, Plaintiffs do not challenge—and now concede—the truthfulness of that reporting. Reporting more granular information about churn may be something these Plaintiffs claim to have wanted to know. But the Ninth Circuit does not permit such "rule of completeness" claims for precisely this reason: Plaintiffs in search of a claim always can claim they wanted more. *Intuitive Surgical*, 759 F.3d at 1061.

Plaintiffs have also suggested that Disney's accounting treatment for its DTC operations involved "manipulations" to make Disney+ appear more profitable than it was. *See* Sept. 17, 2024 Hr'g Tr 9:7-14. But an "actionable securities fraud claim" requires more than mere "[d]issatisfaction with a company's . . . . approach to accounting." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 533 (9th Cir. 2024). "Generally accepted accounting principles [] tolerate a range of reasonable treatments, leaving the choice among alternatives to management." *Or. Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 609 (9th Cir. 2014) (citation omitted). And Plaintiffs do not allege what accounting standard Disney did not comply with, any restatement of Disney's financials, or even a hint of criticism by auditors. *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 47 F. Supp. 3d 1205, 1221 (E.D. Wash. 2014) ("[T]he failure of any agency to require Sterling to restate its financials . . . and the fact that Plaintiff has not alleged that any external auditors counseled against Sterling's accounting practices weigh against Plaintiff's allegations of accounting fraud."), *aff'd*, 691 F. App'x 393 (9th Cir. 2017). Plaintiffs' pejorative characterization of Disney's accounting treatment as "manipulations" does not convert the accurate disclosure of correct financial data to securities fraud.

### 3.    The Statements of Opinion Are Not Actionable

Finally, while the Court's Order held that certain challenged statements are puffery and immaterial, Order at 1-2, it did not address that other statements are

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

non-actionable statements of opinion.

"[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect" or the "issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015); *see City of Dearborn Heights*, 856 F.3d at 610 (*Omnicare* applies to Section 10(b) claims). Such statements are actionable only if the speaker does not hold the stated belief or if they convey untrue facts about the basis for the belief. *See Tesla*, 985 F.3d at 1189.

The only remaining alleged misstatements—many of which overlap with the statements that are not actionable under the safe harbor—are subjective statements of opinion that likewise are not actionable:

- "[W]e've got plenty of product in the pipeline coming. And *I think that's going to be enough* to fuel that growth again, that *we're confident about delivering* in the long term." CC ¶ 282;

- "[W]e are increasing our overall long-term content expense for Disney+, and *we believe we are well positioned* to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out . . . . And *we also remain confident in our expectation* that Disney+ will achieve profitability in fiscal 2024." CC ¶ 283;

- "[W]e always say that library titles tend to increase engagement and minimize churn, but new titles . . . actually add subs. And that is actually the reason why *we're pretty confident that the increase in content flow . . . will actually lead* to the types of results that we're anticipating." CC ¶ 284;

- "*[W]e believe* that great content is going to drive our subs, and those subs then in scale will drive our profitability. . . . And *we're very confident* that going forward, we're going to hit both of those sub guidance and profitability guidance . . . ." CC ¶ 286;

- "And *I think*, again, it really goes back to the price value that we're offering our guests . . . . So the fact that our churn is so low, our engagement is so high, our retention is so high amongst the local quarters where we're taking price increases, I think, says everything about it."  CC ¶ 296;

- "The other thing . . . that's *going to drive the international business* is the predominance of local content that we are developing . . . ."  CC ¶ 299;

- "*We believe* these premium local originals, along with branded content with broad international appeal, will attract new subscribers and drive engagement."  CC ¶ 300;

- "[I]n regard to the specific churn related to the anniversary of the Verizon launch promotion from last November 2020, *we're really happy with the conversion numbers that we have seen* there going from the promotion to become paid subscribers."  CC ¶ 308;

- "[O]ur first price increase that you mentioned in the first 16 months happened recently, and *we've seen no significantly higher churn* as a result of that."  CC ¶ 309;

- "*We're really pleased with churn*. . . . So the fact that our churn is low, our engagement is so high, our retention is so high amongst the local quarters where we're taking price increases, I think, says everything about it."  CC ¶ 310;

- "*[W]e're extraordinarily pleased with the low churn that we see*, particularly given the bundle.  *The bundle is really efficient* in terms of churn.  And *that gives us a lot of bullishness* when it comes to the idea of bigger offerings from Disney."  CC ¶ 311

(all emphasis added); *see also* CC ¶¶ 150, 158-159, 194, 201, 206-210, 227, 268, 271-272, 275, 285, 297, 306, 316 (additional opinion statements).

-16-

These opinion statements are non-actionable as a matter of law. Plaintiffs fail to plead particularized facts showing that Defendants "did not hold the belief[s] [they] professed and that the belief is objectively untrue," or that there was "no reasonable basis for the belief." *City of Dearborn*, 856 F.3d at 615-16; *see Tesla*, 985 F.3d at 1196 ("Given that a 'pure statement of opinion' is generally not actionable, . . . Tesla's remark . . . that 'great progress' was being made on battery production would potentially be an actionable false statement only if, as the district court put it, Tesla had been 'making no progress at all.'" (quoting *Omnicare*, 575 U.S. at 187)).

**B.     Without Actionable Misstatements, Plaintiffs Fail to Allege a Scheme to Defraud**

Without actionable alleged misstatements, Plaintiffs' alternative theory of Rule 10b-5 liability—a scheme to defraud—collapses. A scheme requires conduct that has a principal purpose of deceiving investors. *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom Simpson v. Homestore.com, Inc.* 519 F.3d 1041 (9th Cir. 2008). Alleged misstatements are integral to each "artifice" on which Plaintiffs rely in asserting that Defendants' alleged conduct deceived investors. Plaintiffs allege that Defendants "embark[ed] on their scheme by holding a half-day pep rally for analysts and investors called Investor Day . . . [where] they created an illusion of robust, sustainable, and profitable subscriber growth." CC ¶ 6. But considered in the absence of the non-actionable statements that drove this purported scheme, the Complaint describes ordinary accounting, marketing, and organizational decisions "that [are] consistent with the defendants' normal course of business." *Simpson*, 452 F.3d at 1050.

The Court's Order did not address whether Plaintiffs' scheme theory would state a claim absent any actionable false or misleading statements. To be sure, the Order stated: "The Court finds that Plaintiffs have sufficiently pled Defendants

-17-

Chapek, Daniel, and McCarthy engaged in deceptive conduct beyond simply making misstatements, as required for scheme liability under Rule 10b-5(a) and (c)." Order at 1. But the Order did not address whether the supposedly deceptive conduct would meet the heightened standard for securities fraud liability in the *absence* of any actionable misstatements. Significantly, Plaintiffs never contended as much: in opposing the motion to dismiss, Plaintiffs never claimed that, standing alone, the allegedly "deceptive" conduct sufficed to state a fraud claim. *See* MTD Opp. at 8 (admitting that "alleged acts are closely connected to the alleged misrepresentations and omissions"). Courts routinely reject scheme claims that rely on non-actionable misstatements. *See, e.g.*, *In re AGS*, *Inc., Sec. Litig.*, 2024 WL 581124, at *5 (D. Nev. Feb. 12, 2024) (finding scheme theory "irrelevant" and granting Rule 12(c) motion dismissing claim where, as here, plaintiff "pleaded only a single cause of action under rule 10b-5" and the alleged scheme was "based on the same alleged set of facts as its misrepresentation claim") *aff'd*, 2025 WL 927296 (9th Cir. Mar. 27, 2025); *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 190 (W.D.N.Y. 2022) (where "alleged making of false statements and omissions was a key part of the claimed scheme," failure to allege "any material false statements or omissions" was "fatal to Plaintiffs' scheme liability claim").

The Court should now consider that question—and viewed in the absence of the alleged misstatements, Plaintiffs' scheme theory fails. As in *AGS* and *Kodak*, the alleged scheme is fundamentally driven by the alleged (and non-actionable) misstatements, namely, subscriber and financial projections for Disney+ that, under the PSLRA's safe harbor, are not actionable. *See* Part III.A.1, *supra*. Plaintiffs allege that "Chapek, Daniel, and McCarthy launched the scheme by intentionally setting an unattainably high Disney+ subscriber target." CC ¶ 122. They then allege that, having set that fraudulent target, Defendants took business actions that, while fully disclosed, were "artifices" to prop up the deception:

> With Wall Street's attention now directly focused on Disney+, Defendants needed to convince investors that the

-18-

subscriber and profitability targets were achievable each quarter. To accomplish this phase of the scheme, Chapek, Daniel, and McCarthy (i) employed numerous unsustainable growth-at-any-cost artifices to achieve short-term quarterly subscriber growth; (ii) unequivocally reassured investors each quarter that the 230-260 million subscriber and profitability targets were squarely on track; and (iii) concealed the runaway costs and devastating financial effects resulting from the growth-at-any-cost scheme.

CC ¶ 7; *see* CC ¶ 204 (alleging that Defendants "continue[d] the scheme" by not "soften[ing] their positions on Disney+ subscriber growth and profitability"). They then allege that the supposed scheme ended not when the business strategies came to light (they were already disclosed), but when the initial projection was supposedly revealed as "a fiction": "[I]nvestors began to learn that Disney+ was a very different business from the one they were sold. The 230-260 million subscriber target was a fiction." CC ¶ 11.

Each of the so-called "artifices" traces back to the fundamental—and non-actionable—alleged misstatements projecting subscriber growth and profitability targets. The artifices are the ordinary business decisions that Disney made in its effort to achieve its targets and projections: (1) setting targets that Disney hoped to achieve, as Plaintiffs' confidential witness confirms (CC ¶¶ 147-154); (2) internally reorganizing (CC ¶¶ 155-163); (3) debuting content on Disney+ (CC ¶¶ 164-168); (4) increasing content spend to grow subscribers (CC ¶¶ 169-180); (5) providing discounts and promotions to attract customers (CC ¶¶ 181-190); (6) launching in international markets (CC ¶¶ 191-203); (7) disclosing accurate hard metrics so that investors could judge Disney's progress for themselves (CC ¶¶ 204-213); (8) disclosing how these business changes would be accounted for (CC ¶¶ 214-223); and (9) describing overall subscriber numbers showing the effects of churn on a quarter by quarter basis (CC ¶¶ 224-228).

Put another way, under Plaintiffs' telling, it is the alleged misstatements relating to subscriber growth and profitability that drove the scheme and rendered the "artifices" deceptive. To be sure, there is nothing inherently deceptive about a

-19-

corporate reorganization, increasing spending to drive subscriber growth, promotions to attract customers, or investing in foreign markets and so forth. Rather, Plaintiffs claim, these strategies were deceptive because they were aligned with what they allege were misleading statements about the subscriber targets and profitability. But if there is nothing fraudulent about Defendants' subscriber and profitability predictions, then the supposed artifices are not deceptive either; they are simply ordinary business strategy decisions.

Disagreements about business strategy decisions do not state a scheme claim because Plaintiffs must allege conduct with the "principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson*, 452 F.3d at 1049. "Conduct by the defendant that does not have a principal legitimate business purpose, such as the invention of sham corporate entities to misrepresent the flow of income, may have a principal purpose of creating a false appearance." *Id.* at 1050. Courts have therefore required *inherently* deceptive conduct—which Plaintiffs do not allege—to sustain scheme claims based on non-statement conduct. *See SEC v. Hui Feng*, 935 F.3d 721, 737 (9th Cir. 2019) (collecting scam commissions); *Rabkin v. Lion Biotechs., Inc.*, 2018 WL 905862, at *17 (N.D. Cal. Feb. 15, 2018) (hiring fake financial advisors to publish sham articles); *SEC v. Richman*, 2021 WL 5113168, at *8 (N.D. Cal. Nov. 3, 2021) (submitting fake records to insurance companies for sham claims); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1185–86 (D. Or. 2015) (paying companies to place sham articles without disclosing illicit payments).

Ultimately, Plaintiffs are attempting to recast non-actionable statements into actionable ones under Rule 10b-5 by dubbing them a "scheme"—and thereby avoid the PSLRA's safe harbor and other pleading requirements for misstatements. That result would eviscerate a critical protection of the statute. As courts have recognized, allowing private plaintiffs to convert alleged misstatements into a "scheme" to avoid the PSLRA's protections would "circumvent Congress's

-20-

directive." *Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 687-88 (N.D. Tex. 2023) (dismissing scheme claim where "alleged scheme consist[ed] of misstatements" that were not actionable); *cf. SEC v. Rio Tinto plc*, 41 F.4th 47, 52 (2d Cir. 2022) (rejecting attempt "to shoehorn [] allegations into a claim for scheme liability" where doing so "would undermine []key features of Rule 10b-5(b)").

## C.    The Claims Against the Executive Defendants Should Be Dismissed

### 1.    The Section 20A and Section 20(a) Claims Fail

Both the Section 20A claim against Ms. McCarthy, and the Section 20(a) control-person claims, fail for lack of a predicate violation. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must [] allege a violation of § 10(b) or Rule 10b 5.").

### 2.    The Section 10(b) Claim Against Mr. Iger (Count I) Should Be Dismissed

At the very least, Count I of the Complaint should be dismissed insofar as it alleges a Section 10(b) violation against Mr. Iger. Plaintiffs conceded during oral argument on the motion to dismiss that they do not allege Mr. Iger was a scheme defendant or that he made any false or misleading statement. Sept. 17, 2024 Hr'g Tr. 4:16-21 ("[Mr. Iger] is not alleged to be a scheme defendant under Rule 10b-5(a) or (c) . . . . He is not alleged to have made any false or misleading statements under 10b-5(b), as well."). This concession is consistent with Plaintiffs' pleadings. Nowhere in the Complaint do Plaintiffs allege that Mr. Iger participated in any scheme. *See, e.g.*, CC ¶¶ 147-228 (scheme allegations are limited to Mr. Chapek, Mr. Daniel, and Ms. McCarthy). And nowhere do Plaintiffs contend that Mr. Iger made any alleged misstatement. *See* CC ¶¶ 266-316. Further, the Order dismissed the Section 20A insider trading claim against Mr. Iger for failure to allege an underlying violation. *See* Order at 2. So, any Section 10(b) claim against Mr. Iger that is predicated on allegations of improper insider trading fails as well.

-21-

## IV.   CONCLUSION

The Court should grant judgment on the pleadings for Defendants.

Dated:  March 28, 2025                    Respectfully submitted,

WHITE & CASE LLP
MUNGER, TOLLES & OLSON LLP

By: _____ */s/ John W. Spiegel* _____
                    JOHN W. SPIEGEL

Attorneys for Defendants
The Walt Disney Company, Robert Iger,
Robert Chapek, Christine M. McCarthy
and Kareem Daniel

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS

**L.R. 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,973 words, which complies with the word limit of L.R. 11-6.1.

Dated: March 28, 2025                    */s/ John W. Spiegel*

MEMORANDUM OF POINTS & AUTHORITIES ISO MOTION FOR JUDGMENT ON THE PLEADINGS