# Exhibit 10

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-Q

☒  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended January 1, 2022

or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File Number 001-38842

## The WALT DISNEY Company

| **Delaware** | | **83-0940635** |
|---|---|---|
| State or Other Jurisdiction of Incorporation or Organization | | I R S  Employer Identification |

**500 South Buena Vista Street**
**Burbank, California 91521**
Address of Principal Executive Offices and Zip Code

**(818) 560-1000**
Registrant's Telephone Number, Including Area Code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0 01 par value | DIS | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232 405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files)    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company  See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act)    Yes ☐    No ☒

There were 1,820,633,408 shares of common stock outstanding as of February 2, 2022

**PART I. FINANCIAL INFORMATION**

**Item 1: Financial Statements**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**
**(unaudited; in millions, except per share data)**

| | | Quarter Ended | | |
|---|---|---|---|---|
| | | January 1, 2022 | | January 2, 2021 |
| **Revenues:** | | | | |
| Services | $ | 19,542 | $ | 14,871 |
| Products | | 2,277 | | 1,378 |
| Total revenues | | 21,819 | | 16,249 |
| **Costs and expenses:** | | | | |
| Cost of services (exclusive of depreciation and amortization) | | (13,161) | | (10,738) |
| Cost of products (exclusive of depreciation and amortization) | | (1,406) | | (1,037) |
| Selling, general, administrative and other | | (3,787) | | (2,917) |
| Depreciation and amortization | | (1,269) | | (1,298) |
| Total costs and expenses | | (19,623) | | (15,990) |
| Restructuring and impairment charges | | — | | (113) |
| Other expense, net | | (436) | | — |
| Interest expense, net | | (311) | | (324) |
| Equity in the income of investees | | 239 | | 224 |
| Income from continuing operations before income taxes | | 1,688 | | 46 |
| Income taxes on continuing operations | | (488) | | (16) |
| Net income from continuing operations | | 1,200 | | 30 |
| Loss from discontinued operations, net of income tax benefit of $14 and $4, respectively | | (48) | | (12) |
| Net income | | 1,152 | | 18 |
| Net income from continuing operations attributable to noncontrolling interests | | (48) | | (1) |
| Net income attributable to Disney | $ | 1,104 | $ | 17 |
| | | | | |
| Earnings (loss) per share attributable to Disney[(1)]: | | | | |
| Diluted | | | | |
| Continuing operations | $ | 0.63 | $ | 0 02 |
| Discontinued operations | | (0.03) | | (0 01) |
| | $ | 0.60 | $ | 0 01 |
| Basic | | | | |
| Continuing operations | $ | 0.63 | $ | 0 02 |
| Discontinued operations | | (0.03) | | (0 01) |
| | $ | 0.61 | $ | 0 01 |
| | | | | |
| Weighted average number of common and common equivalent shares outstanding: | | | | |
| Diluted | | 1,828 | | 1,823 |
| Basic | | 1,819 | | 1,812 |

[(1)]   Total may not equal the sum of the column due to rounding

*See Notes to Condensed Consolidated Financial Statements*

2

**Ex. 10**
**Page 994**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
(unaudited; in millions)

| | Quarter Ended | |
| --- | --- | --- |
| | January 1, 2022 | January 2, 2021 |
| Net income | $ 1,152 | $ 18 |
| Other comprehensive income (loss), net of tax: | | |
| Market value adjustments for hedges | 50 | (173) |
| Pension and postretirement medical plan adjustments | 155 | 150 |
| Foreign currency translation and other | (22) | 277 |
| Other comprehensive income | 183 | 254 |
| Comprehensive income | 1,335 | 272 |
| Net income from continuing operations attributable to noncontrolling interests | (48) | (1) |
| Other comprehensive loss attributable to noncontrolling interests | (19) | (73) |
| Comprehensive income attributable to Disney | $ 1,268 | $ 198 |

*See Notes to Condensed Consolidated Financial Statements*

3

**Ex. 10**
**Page 995**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(unaudited; in millions, except per share data)**

| | | January 1, 2022 | | October 2, 2021 |
|---|---|---|---|---|
| *ASSETS* | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 14,444 | $ | 15,959 |
| Receivables, net | | 14,882 | | 13,367 |
| Inventories | | 1,345 | | 1,331 |
| Content advances | | 1,125 | | 2,183 |
| Other current assets | | 1,117 | | 817 |
| Total current assets | | 32,913 | | 33,657 |
| Produced and licensed content costs | | 30,669 | | 29,549 |
| Investments | | 3,549 | | 3,935 |
| Parks, resorts and other property | | | | |
| Attractions, buildings and equipment | | 65,257 | | 64,892 |
| Accumulated depreciation | | (38,505) | | (37,920) |
| | | 26,752 | | 26,972 |
| Projects in progress | | 4,808 | | 4,521 |
| Land | | 1,121 | | 1,131 |
| | | 32,681 | | 32,624 |
| Intangible assets, net | | 16,574 | | 17,115 |
| Goodwill | | 78,052 | | 78,071 |
| Other assets | | 8,873 | | 8,658 |
| Total assets | $ | 203,311 | $ | 203,609 |
| *LIABILITIES AND EQUITY* | | | | |
| Current liabilities | | | | |
| Accounts payable and other accrued liabilities | $ | 18,709 | $ | 20,894 |
| Current portion of borrowings | | 6,783 | | 5,866 |
| Deferred revenue and other | | 4,545 | | 4,317 |
| Total current liabilities | | 30,037 | | 31,077 |
| Borrowings | | 47,349 | | 48,540 |
| Deferred income taxes | | 8,124 | | 7,246 |
| Other long-term liabilities | | 14,208 | | 14,522 |
| Commitments and contingencies (Note 13) | | | | |
| Redeemable noncontrolling interests | | 9,283 | | 9,213 |
| Equity | | | | |
| Preferred stock | | — | | — |
| Common stock, $0 01 par value, Authorized – 4 6 billion shares, Issued – 1 8 billion shares | | 55,500 | | 55,471 |
| Retained earnings | | 41,547 | | 40,429 |
| Accumulated other comprehensive loss | | (6,276) | | (6,440) |
| Treasury stock, at cost, 19 million shares | | (907) | | (907) |
| Total Disney Shareholders' equity | | 89,864 | | 88,553 |
| Noncontrolling interests | | 4,446 | | 4,458 |
| Total equity | | 94,310 | | 93,011 |
| Total liabilities and equity | $ | 203,311 | $ | 203,609 |

*See Notes to Condensed Consolidated Financial Statements*

4

**Ex. 10**
**Page 996**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
*(unaudited; in millions)*

| | Quarter Ended | | | |
|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | |
| *OPERATING ACTIVITIES* | | | | |
| Net income from continuing operations | $ | 1,200 | $ | 30 |
| Depreciation and amortization | | 1,269 | | 1,298 |
| Net (gain) loss on investments | | 436 | | (80) |
| Deferred income taxes | | 726 | | (105) |
| Equity in the income of investees | | (239) | | (224) |
| Cash distributions received from equity investees | | 223 | | 193 |
| Net change in produced and licensed content costs and advances | | 507 | | 771 |
| Equity-based compensation | | 196 | | 134 |
| Pension and postretirement medical benefit cost amortization | | 155 | | 194 |
| Other, net | | (7) | | (68) |
| Changes in operating assets and liabilities: | | | | |
|     Receivables | | (1,401) | | (1,324) |
|     Inventories | | (14) | | 94 |
|     Other assets | | (115) | | (136) |
|     Accounts payable and other liabilities | | (2,579) | | (642) |
|     Income taxes | | (566) | | (60) |
| Cash (used in) provided by operations - continuing operations | | (209) | | 75 |
| | | | | |
| *INVESTING ACTIVITIES* | | | | |
| Investments in parks, resorts and other property | | (981) | | (760) |
| Other, net | | (6) | | 28 |
| Cash used in investing activities - continuing operations | | (987) | | (732) |
| | | | | |
| *FINANCING ACTIVITIES* | | | | |
| Commercial paper payments, net | | (124) | | (179) |
| Borrowings | | 33 | | 1 |
| Reduction of borrowings | | — | | (139) |
| Proceeds from exercise of stock options | | 33 | | 209 |
| Other, net | | (222) | | (225) |
| Cash used in financing activities - continuing operations | | (280) | | (333) |
| | | | | |
| *CASH FLOWS FROM DISCONTINUED OPERATIONS* | | | | |
| Cash provided by operations - discontinued operations | | 8 | | 9 |
| Cash used in financing activities - discontinued operations | | (12) | | — |
| Cash (used in) provided by discontinued operations | | (4) | | 9 |
| | | | | |
| Impact of exchange rates on cash, cash equivalents and restricted cash | | (35) | | 139 |
| | | | | |
| Change in cash, cash equivalents and restricted cash | | (1,515) | | (842) |
| Cash, cash equivalents and restricted cash, beginning of period | | 16,003 | | 17,954 |
| Cash, cash equivalents and restricted cash, end of period | $ | 14,488 | $ | 17,112 |

*See Notes to Condensed Consolidated Financial Statements*

5

**Ex. 10**
**Page 997**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF EQUITY**
**(unaudited; in millions)**

| | Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Equity Attributable to Disney | | | | | | | |
| | Shares | Common Stock | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Treasury Stock | Total Disney Equity | Non-controlling Interests[1] | Total Equity |
| Balance at October 2, 2021 | 1,818 | $ 55,471 | $ 40,429 | $ (6,440) | $ (907) | $ 88,553 | $ 4,458 | $ 93,011 |
| Comprehensive income | — | — | 1,104 | 164 | — | 1,268 | (4) | 1,264 |
| Equity compensation activity | 3 | 29 | — | — | — | 29 | — | 29 |
| Contributions | — | — | — | — | — | — | 29 | 29 |
| Distributions and other | — | — | 14 | — | — | 14 | (37) | (23) |
| **Balance at January 1, 2022** | **1,821** | **$ 55,500** | **$ 41,547** | **$ (6,276)** | **$ (907)** | **$ 89,864** | **$ 4,446** | **$ 94,310** |
| | | | | | | | | |
| Balance at October 3, 2020 | 1,810 | $ 54,497 | $ 38,315 | $ (8,322) | $ (907) | $ 83,583 | $ 4,680 | $ 88,263 |
| Comprehensive income | — | — | 17 | 181 | — | 198 | (6) | 192 |
| Equity compensation activity | 4 | 165 | — | — | — | 165 | — | 165 |
| Contributions | — | — | — | — | — | — | 5 | 5 |
| Cumulative effect of accounting change | — | — | 110 | — | — | 110 | — | 110 |
| Distributions and other | — | 1 | 14 | — | — | 15 | (22) | (7) |
| Balance at January 2, 2021 | 1,814 | $ 54,663 | $ 38,456 | $ (8,141) | $ (907) | $ 84,071 | $ 4,657 | $ 88,728 |

[1] Excludes redeemable noncontrolling interests

*See Notes to Condensed Consolidated Financial Statements*

6

**Ex. 10**
**Page 998**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

## 1. *Principles of Consolidation*

These Condensed Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP) for interim financial information and the instructions to Rule 10-01 of Regulation S-X  Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements  We believe that we have included all normal recurring adjustments necessary for a fair statement of the results for the interim period  Operating results for the quarter ended January 1, 2022 are not necessarily indicative of the results that may be expected for the year ending October 1, 2022

The terms "Company," "Disney," "we," "us," and "our" are used in this report to refer collectively to the parent company, The Walt Disney Company, as well as the subsidiaries through which its various businesses are actually conducted

These financial statements should be read in conjunction with the Company's 2021 Annual Report on Form 10-K

The Fox sports media business in Mexico was sold in November 2021  The Company recognized a $58 million loss on the sale, which is presented as discontinued operations in the Condensed Consolidated Statements of Income  At October 2, 2021, the assets and liabilities of the Fox sports media business in Mexico were not material and were included in other assets and other liabilities in the Condensed Consolidated Balance Sheets

*Variable Interest Entities*

The Company enters into relationships with or makes investments in other entities that may be variable interest entities (VIE)  A VIE is consolidated in the financial statements if the Company has the power to direct activities that most significantly impact the economic performance of the VIE and has the obligation to absorb losses or the right to receive benefits from the VIE that could potentially be significant (as defined by ASC 810-10-25-38) to the VIE  Hong Kong Disneyland Resort and Shanghai Disney Resort (together the Asia Theme Parks) are VIEs in which the Company has less than 50% equity ownership  Company subsidiaries (the Management Companies) have management agreements with the Asia Theme Parks, which provide the Management Companies, subject to certain protective rights of joint venture partners, with the ability to direct the day-to-day operating activities and the development of business strategies that we believe most significantly impact the economic performance of the Asia Theme Parks  In addition, the Management Companies receive management fees under these arrangements that we believe could be significant to the Asia Theme Parks  Therefore, the Company has consolidated the Asia Theme Parks in its financial statements

*Redeemable Noncontrolling Interests*

The Company consolidates the results of certain subsidiaries that are less than 100% owned and for which the noncontrolling interest shareholders have the rights to require the Company to purchase their interests in these subsidiaries  The most significant of these are Hulu LLC (Hulu) and BAMTech LLC (BAMTech)

Hulu provides direct-to-consumer (DTC) streaming services and is owned 67% by the Company and 33% by NBC Universal (NBCU)  In May 2019, the Company entered into a put/call agreement with NBCU that provided the Company with full operational control of Hulu  Under the agreement, beginning in January 2024, NBCU has the option to require the Company to purchase NBCU's interest in Hulu and the Company has the option to require NBCU to sell its interest in Hulu to the Company, in either case at a redemption value based on NBCU's equity ownership percentage of the greater of Hulu's then equity fair value or a guaranteed floor value of $27 5 billion

NBCU's interest will generally not be allocated its portion of Hulu's losses as the redeemable noncontrolling interest is required to be carried at a minimum value  The minimum value is equal to the fair value as of the May 2019 agreement date accreted to the January 2024 estimated redemption value  At January 1, 2022, NBCU's interest in Hulu is recorded in the Company's financial statements at $8 5 billion

BAMTech provides streaming technology services to third parties and is owned 85% by the Company and 15% by Major League Baseball (MLB)  MLB has the right to sell its interest to the Company and the Company has the right to buy MLB's interest starting five years from and ending ten years after the Company's September 25, 2017 acquisition date of BAMTech in either case at a redemption value based on MLB's equity ownership percentage of the greater of MLB's then equity fair value or a guaranteed floor value ($563 million accreting at 8% annually for eight years from the date of acquisition)

**Ex. 10**
**Page 999**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

The MLB interest is required to be carried at a minimum value equal to its acquisition date fair value accreted to its estimated redemption value through the applicable redemption date Therefore, the MLB interest is generally not allocated its portion of BAMTech losses As of January 1, 2022, the MLB interest was recorded in the Company's financial statements at $822 million

Our estimate of the redemption value of noncontrolling interests requires management to make significant judgments with respect to the future value of the noncontrolling interests We are accreting the noncontrolling interests of both BAMTech and Hulu to their guaranteed floor values If our estimate of the future redemption value increased above either of the guaranteed floor values, we would change our rate of accretion, which would generally increase earnings recorded in "Net income from continuing operations attributable to noncontrolling interests" and thus reduce "Net income attributable to Disney" on the Condensed Consolidated Statements of Income

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements and footnotes thereto Actual results may differ from those estimates

*Reclassifications*

Certain reclassifications have been made in the fiscal 2021 financial statements and notes to conform to the fiscal 2022 presentation

## 2. *Segment Information*

The Company's operations are conducted in the Disney Media and Entertainment Distribution (DMED) and Disney Parks, Experiences and Products (DPEP) segments Our operating segments report separate financial information, which is evaluated regularly by the Chief Executive Officer in order to decide how to allocate resources and to assess performance

Segment operating results reflect earnings before corporate and unallocated shared expenses, restructuring and impairment charges, net other income, net interest expense, income taxes and noncontrolling interests Segment operating income includes equity in the income of investees and excludes impairments of certain equity investments and acquisition accounting amortization of TFCF Corporation (TFCF) and Hulu assets (i e intangible assets and the fair value step-up for film and television costs) recognized in connection with the TFCF acquisition in fiscal 2019 (TFCF and Hulu acquisition amortization) Corporate and unallocated shared expenses principally consist of corporate functions, executive management and certain unallocated administrative support functions

Segment operating results include allocations of certain costs, including information technology, pension, legal and other shared services costs, which are allocated based on metrics designed to correlate with consumption

*Impact of COVID-19*

Since early 2020, the world has been, and continues to be, impacted by the novel coronavirus (COVID-19) and its variants COVID-19 and measures to prevent its spread have impacted our segments in a number of ways, most significantly at the DPEP segment where our theme parks and resorts were closed and cruise ship sailings and guided tours were suspended These operations resumed at various points since May 2020, initially at reduced operating capacities as a result of COVID-19 restrictions In fiscal 2020 and 2021, we delayed, or in some cases, shortened or cancelled theatrical releases In addition, we experienced significant disruptions in the production and availability of content, including the delay of key live sports programming during fiscal 2020 and fiscal 2021

In fiscal 2022, our domestic parks and experiences are generally operating without significant mandatory COVID-19-related capacity restrictions, such as those that were in place during the prior year; however, we continue to manage capacity to address ongoing COVID-19 considerations with respect to guest and cast health and safety Certain of our international operations continue to be impacted by mandatory COVID-19-related capacity and travel restrictions At the DMED segment, our film and television productions have generally resumed, although we have seen disruptions of production activities depending on local circumstances We have generally been able to release our films theatrically in the current quarter, although certain markets continue to impose restrictions on theater openings and capacity

The impact of these disruptions and the extent of their adverse impact on our financial and operating results will depend on the length of time that such disruptions continue This will, in turn, depend on the duration and severity of the impacts of COVID-19 and its variants, and among other things, the impact of governmental actions imposed in response to COVID-19 and individuals' and companies' risk tolerance regarding health matters going forward We have incurred and will continue to incur additional costs to address government regulations and the safety of our employees, guests and talent

**Ex. 10**
**Page 1000**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

Segment revenues and segment operating income (loss) are as follows:

| | Quarter Ended | | | |
| | January 1, 2022 | | January 2, 2021 | |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Disney Media and Entertainment Distribution | $ | 14,585 | $ | 12,661 |
| Disney Parks, Experiences and Products | | 7,234 | | 3,588 |
| Total consolidated revenues | $ | 21,819 | $ | 16,249 |
| **Segment operating income (loss):** | | | | |
| Disney Media and Entertainment Distribution | $ | 808 | $ | 1,451 |
| Disney Parks, Experiences and Products | | 2,450 | | (119) |
| Total segment operating income[1] | $ | 3,258 | $ | 1,332 |

[1] Equity in the income of investees is included in segment operating income as follows:

| | Quarter Ended | | | |
| | January 1, 2022 | | January 2, 2021 | |
|---|---|---|---|---|
| Disney Media and Entertainment Distribution | $ | 245 | $ | 235 |
| Disney Parks, Experiences and Products | | (3) | | (8) |
| Equity in the income of investees included in segment operating income | | 242 | | 227 |
| Amortization of TFCF intangible assets related to equity investees | | (3) | | (3) |
| Equity in the income of investees, net | $ | 239 | $ | 224 |

A reconciliation of segment operating income to income from continuing operations before income taxes is as follows:

| | Quarter Ended | | | |
| | January 1, 2022 | | January 2, 2021 | |
|---|---|---|---|---|
| Segment operating income | $ | 3,258 | $ | 1,332 |
| Corporate and unallocated shared expenses | | (228) | | (232) |
| Restructuring and impairment charges | | — | | (113) |
| Other expense, net | | (436) | | — |
| Interest expense, net | | (311) | | (324) |
| TFCF and Hulu acquisition amortization[1] | | (595) | | (617) |
| Income from continuing operations before income taxes | $ | 1,688 | $ | 46 |

[1] For the quarter ended January 1, 2022 amortization of intangible assets, step-up of film and television costs and intangibles related to TFCF equity investees were $435 million, $157 million and $3 million, respectively  For the quarter ended January 2, 2021 amortization of intangible assets, step-up of film and television costs and intangibles related to TFCF equity investees were $447 million, $167 million, and $3 million, respectively

*Goodwill*

The changes in the carrying amount of goodwill are as follows:

| | DMED | | DPEP | | Total | |
|---|---|---|---|---|---|---|
| Balance at October 2, 2021 | $ | 72,521 | $ | 5,550 | $ | 78,071 |
| Currency translation adjustments and other, net | | (19) | | — | | (19) |
| Balance at January 1, 2022 | $ | 72,502 | $ | 5,550 | $ | 78,052 |

9

**Ex. 10**
**Page 1001**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

## 3. *Revenues*

The following table presents our revenues by segment and major source:

| | Quarter Ended January 1, 2022 | | | Quarter Ended January 2, 2021 | | |
| | DMED | DPEP | Total | DMED | DPEP | Total |
|---|---|---|---|---|---|---|
| Affiliate fees | $ 4,371 | $ — | $ 4,371 | $ 4,402 | $ — | $ 4,402 |
| Advertising | 3,868 | 1 | 3,869 | 3,763 | 1 | 3,764 |
| Subscription fees | 3,598 | — | 3,598 | 2,546 | — | 2,546 |
| Theme park admissions | — | 2,152 | 2,152 | — | 549 | 549 |
| Resort and vacations | — | 1,445 | 1,445 | — | 433 | 433 |
| Retail and wholesale sales of merchandise, food and beverage | — | 2,089 | 2,089 | — | 1,163 | 1,163 |
| TV/SVOD distribution licensing | 1,396 | — | 1,396 | 1,169 | — | 1,169 |
| Theatrical distribution licensing | 529 | — | 529 | 31 | — | 31 |
| Merchandise licensing | — | 1,119 | 1,119 | 5 | 1,090 | 1,095 |
| Home entertainment | 294 | — | 294 | 300 | — | 300 |
| Other | 529 | 428 | 957 | 445 | 352 | 797 |
| | $ 14,585 | $ 7,234 | $ 21,819 | $ 12,661 | $ 3,588 | $ 16,249 |

The following table presents our revenues by segment and primary geographical markets:

| | Quarter Ended January 1, 2022 | | | Quarter Ended January 2, 2021 | | |
| | DMED | DPEP | Total | DMED | DPEP | Total |
|---|---|---|---|---|---|---|
| Americas | $ 11,830 | $ 5,711 | $ 17,541 | $ 10,291 | $ 2,456 | $ 12,747 |
| Europe | 1,538 | 865 | 2,403 | 1,293 | 487 | 1,780 |
| Asia Pacific | 1,217 | 658 | 1,875 | 1,077 | 645 | 1,722 |
| Total revenues | $ 14,585 | $ 7,234 | $ 21,819 | $ 12,661 | $ 3,588 | $ 16,249 |

Revenues recognized in the current and prior-year periods from performance obligations satisfied (or partially satisfied) in previous reporting periods primarily relate to revenues earned on TV/SVOD licenses for titles made available to the licensee in previous reporting periods  For the quarter ended January 1, 2022, $0 4 billion was recognized related to performance obligations satisfied as of October 2, 2021  For the quarter ended January 2, 2021, $0 4 billion was recognized related to performance obligations satisfied as of October 3, 2020

As of January 1, 2022, revenue for unsatisfied performance obligations expected to be recognized in the future is $14 billion, primarily for content and other intellectual property (IP) to be made available in the future under existing agreements with television station affiliates, merchandise licensees and DTC subscribers  Of this amount, we expect to recognize approximately $5 billion in the remainder of fiscal 2022, $4 billion in fiscal 2023, $2 billion in fiscal 2024 and $3 billion thereafter  These amounts include only fixed consideration or minimum guarantees and do not include amounts related to (i) contracts with an original expected term of one year or less (such as most advertising contracts) or (ii) licenses of IP that are solely based on the sales of the licensee

When the timing of the Company's revenue recognition is different from the timing of customer payments, the Company recognizes either a contract asset (customer payment is subsequent to revenue recognition and subject to the Company satisfying additional performance obligations) or deferred revenue (customer payment precedes the Company satisfying the performance obligations)  Consideration due under contracts with payment in arrears is recognized as accounts receivable  Deferred revenues are recognized as (or when) the Company performs under the contract

10

**Ex. 10**
**Page 1002**

THE WALT DISNEY COMPANY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

Contract assets, accounts receivable and deferred revenues from contracts with customers are as follows:

| | January 1, 2022 | | October 2, 2021 |
|---|---|---|---|
| Contract assets | $ | 142 | $ 155 |
| Accounts receivable | | | |
| Current | | 12,649 | 11,190 |
| Non-current | | 1,341 | 1,359 |
| Allowance for credit losses | | (199) | (194) |
| Deferred revenues | | | |
| Current | | 4,278 | 4,067 |
| Non-current | | 575 | 581 |

Contract assets primarily relate to certain multi-season TV/SVOD licensing contracts  Activity for the current and prior-year quarters related to contract assets was not material

For the quarters ended January 1, 2022 and January 2, 2021, the Company recognized revenues of $1 9 billion and $1 5 billion included in the deferred revenue balance at October 2, 2021 and October 3, 2020, respectively  The revenues recognized in both periods were primarily for DTC subscriptions and advances from merchandise and TV/SVOD licensees

We evaluate our allowance for credit losses and estimate collectability of current and non-current accounts receivable based on historical bad debt experience, our assessment of the financial condition of individual companies with which we do business, current market conditions, and reasonable and supportable forecasts of future economic conditions  In times of economic turmoil, our estimates and judgments with respect to the collectability of our receivables are subject to greater uncertainty than in more stable periods

The Company has accounts receivable with original maturities greater than one year related to the sale of film and television program rights and vacation club properties  These receivables are discounted to present value at contract inception and the related revenues are recognized at the discounted amount

The balance of film and television program sales receivables recorded in other non-current assets, net of an allowance for credit losses that is not material, was $0 8 billion as of January 1, 2022  The activity in the allowance for credit losses for the quarter ended January 1, 2022 was not material

The balance of vacation club receivables recorded in other non-current assets, net of an allowance for credit losses that is not material, was $0 6 billion as of January 1, 2022  The activity in the allowance for credit losses for the quarter ended January 1, 2022 was not material

## 4.  *Other Expense, net*

Other expense, net is as follows:

| | Quarter Ended | | | |
|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | |
| DraftKings loss | $ | (432) | $ | (186) |
| fuboTV gain | | — | | 186 |
| Other, net | | (4) | | — |
| Other income expense, net | $ | (436) | $ | — |

For the quarter ended January 1, 2022 and January 2, 2021, the Company recognized a non-cash loss of $432 million and $186 million, respectively, from the adjustment of its investment in DraftKings, Inc  to fair value (DraftKings loss)

For the quarter ended January 2, 2021, the Company recognized a non-cash gain of $186 million from the adjustment of its investment in fuboTV Inc  to fair value (fuboTV gain)

11

**Ex. 10
Page 1003**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

## 5.  *Cash, Cash Equivalents, Restricted Cash and Borrowings*

*Cash, Cash Equivalents and Restricted Cash*

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported in the Condensed Consolidated Balance Sheets to the total of the amounts reported in the Condensed Consolidated Statements of Cash Flows

|  | January 1, 2022 | October 2, 2021 |
|---|---|---|
| Cash and cash equivalents | $ 14,444 | $ 15,959 |
| Restricted cash included in: | | |
| Other current assets | 3 | 3 |
| Other assets | 41 | 41 |
| Total cash, cash equivalents and restricted cash in the statement of cash flows | $ 14,488 | $ 16,003 |

*Borrowings*

During the quarter ended January 1, 2022, the Company's borrowing activity was as follows:

|  | October 2, 2021 | Borrowings | Payments | Other Activity | January 1, 2022 |
|---|---|---|---|---|---|
| Commercial paper with original maturities greater than three months | $ 1,992 | $ 200 | $ (324) | $ 2 | $ 1,870 |
| U S  dollar denominated notes[1] | 49,090 | — | — | (34) | 49,056 |
| Asia Theme Parks borrowings[2] | 1,331 | 33 | — | 27 | 1,391 |
| Foreign currency denominated debt and other[3] | 1,993 | — | — | (178) | 1,815 |
|  | $ 54,406 | $ 233 | $ (324) | $ (183) | $ 54,132 |

[1]  The other activity is primarily due to the amortization of purchase price adjustments on debt assumed in the TFCF acquisition and debt issuance fees

[2]  The other activity is driven by the impact of changes in foreign currency exchange rates

[3]  The other activity is due to market value adjustments for debt with qualifying hedges

At January 1, 2022, the Company's bank facilities, which are with a syndicate of lenders and support our commercial paper borrowings, were as follows:

|  | Committed Capacity | Capacity Used | Unused Capacity |
|---|---|---|---|
| Facility expiring March 2022 | $ 5,250 | $ — | $ 5,250 |
| Facility expiring March 2023 | 4,000 | — | 4,000 |
| Facility expiring March 2025 | 3,000 | — | 3,000 |
| Total | $ 12,250 | $ — | $ 12,250 |

The facilities expiring in March 2023 and March 2025 allow for borrowings at LIBOR-based rates plus a spread depending on the credit default swap spread applicable to the Company's debt, or a fixed spread in the case of the facility expiring in March 2022, subject to a cap and floor that vary with the Company's debt ratings assigned by Moody's Investors Service and Standard and Poor's  The spread above LIBOR can range from 0 18% to 1 63%  The bank facilities specifically exclude certain entities, including the Asia Theme Parks, from any representations, covenants or events of default  The bank facilities contain only one financial covenant, which is interest coverage of three times earnings before interest, taxes, depreciation and amortization, including both intangible amortization and amortization of our film and television production and programming costs  On January 1, 2022 the financial covenant was met by a significant margin  The Company also has the ability to issue up to $500 million of letters of credit under the facility expiring in March 2023, which if utilized, reduces available borrowings under this facility  As of January 1, 2022, the Company has $1 4 billion of outstanding letters of credit, of which none were issued under this facility

**Ex. 10**
**Page 1004**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

*Cruise Ship Credit Facilities*

The Company has credit facilities to finance up to 80% of the contract price of three new cruise ships, which are scheduled to be delivered in 2022, 2024 and 2025  Under the facilities, $1 0 billion in financing is available as of October 2021, $1 1 billion is available beginning in August 2023 and $1 1 billion is available beginning in August 2024  Each tranche of financing may be utilized for a period of 18 months from the initial availability date  If utilized, the interest rates will be fixed at 3 48%, 3 80% and 3 74%, respectively, and the loan and interest will be payable semi-annually over a 12-year period from the borrowing date  Early repayment is permitted subject to cancellation fees

*Interest expense, net*

Interest expense (net of amounts capitalized), interest and investment income, and net periodic pension and postretirement benefit costs (other than service costs) (see Note 9) are reported net in the Condensed Consolidated Statements of Income and consist of the following:

|  | Quarter Ended | | | |
| --- | --- | --- | --- | --- |
|  | January 1, 2022 | | January 2, 2021 | |
| Interest expense | $ | (361) | $ | (404) |
| Interest and investment income | | 34 | | 113 |
| Net periodic pension and postretirement benefit costs (other than service costs) | | 16 | | (33) |
| Interest expense, net | $ | (311) | $ | (324) |

Interest and investment income includes gains and losses on certain publicly traded and non-public investments, investment impairments and interest earned on cash and cash equivalents and certain receivables

**6.  *International Theme Parks***

The Company has a 48% ownership interest in the operations of Hong Kong Disneyland Resort and a 43% ownership interest in the operations of Shanghai Disney Resort  The Asia Theme Parks together with Disneyland Paris are collectively referred to as the International Theme Parks

The following table summarizes the carrying amounts of the Asia Theme Parks' assets and liabilities included in the Company's Condensed Consolidated Balance Sheets:

|  | January 1, 2022 | | October 2, 2021 | |
| --- | --- | --- | --- | --- |
| Cash and cash equivalents | $ | 304 | $ | 287 |
| Other current assets | | 104 | | 95 |
| Total current assets | | 408 | | 382 |
| Parks, resorts and other property | | 6,947 | | 6,928 |
| Other assets | | 172 | | 176 |
| Total assets | $ | 7,527 | $ | 7,486 |
|  | | | | |
| Current liabilities | $ | 488 | $ | 473 |
| Long-term borrowings | | 1,358 | | 1,331 |
| Other long-term liabilities | | 414 | | 422 |
| Total liabilities | $ | 2,260 | $ | 2,226 |

The following table summarizes the International Theme Parks' revenues and costs and expenses included in the Company's Condensed Consolidated Statements of Income for the quarter ended January 1, 2022:

| Revenues | $ | 792 |
| --- | --- | --- |
| Costs and expenses | | (826) |
| Equity in the loss of investees | | (3) |

13

**Ex. 10**
**Page 1005**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

Asia Theme Parks' royalty and management fees of $26 million for the quarter ended January 1, 2022 are eliminated in consolidation, but are considered in calculating earnings attributable to noncontrolling interests

International Theme Parks' cash flows included in the Company's Condensed Consolidated Statements of Cash Flows for the quarter ended January 1, 2022 were $109 million provided by operating activities, $193 million used in investing activities and $62 million provided by financing activities

*Hong Kong Disneyland Resort*

The Government of the Hong Kong Special Administrative Region (HKSAR) and the Company have a 52% and a 48% equity interest in Hong Kong Disneyland Resort, respectively

The Company and HKSAR have provided loans to Hong Kong Disneyland Resort with outstanding balances of $150 million and $100 million, respectively  The interest rate on both loans is three month HIBOR plus 2%, and the maturity date is September 2025  The Company's loan is eliminated in consolidation

The Company has provided Hong Kong Disneyland Resort with a revolving credit facility of HK $2 1 billion ($269 million), which bears interest at a rate of three month HIBOR plus 1 25% and matures in December 2023  The outstanding balance under the line of credit at January 1, 2022 was $124 million  The Company's line of credit is eliminated in consolidation

*Shanghai Disney Resort*

Shanghai Shendi (Group) Co , Ltd (Shendi) and the Company have 57% and 43% equity interests in Shanghai Disney Resort, respectively  A management company, in which the Company has a 70% interest and Shendi a 30% interest, operates Shanghai Disney Resort

The Company has provided Shanghai Disney Resort with loans totaling $905 million, bearing interest at rates up to 8% and maturing in 2036, with early repayment permitted  The Company has also provided Shanghai Disney Resort with a 1 0 billion yuan (approximately $0 2 billion) line of credit bearing interest at 8%  As of January 1, 2022, the total amount outstanding under the line of credit was 0 2 billion yuan (approximately $25 million)  These balances are eliminated in consolidation

Shendi has provided Shanghai Disney Resort with loans totaling 8 0 billion yuan (approximately $1 3 billion), bearing interest at rates up to 8% and maturing in 2036, with early repayment permitted  Shendi has also provided Shanghai Disney Resort with a 1 4 billion yuan (approximately $0 2 billion) line of credit bearing interest at 8%  As of January 1, 2022 the total amount outstanding under the line of credit was 0 2 billion yuan (approximately $33 million)

## 7.  *Produced and Acquired/Licensed Content Costs and Advances*

The Company classifies its capitalized produced and acquired/licensed content costs as long-term assets and classifies advances for live programming rights made prior to the live event as short-term assets  For purposes of amortization and impairment, the capitalized content costs are classified based on their predominant monetization strategy as follows:

- Individual - lifetime value is predominantly derived from third-party revenues that are directly attributable to the specific film or television title (e g  theatrical revenues or sales to third-party television programmers)
- Group - lifetime value is predominantly derived from third-party revenues that are attributable only to a bundle of titles (e g  subscription revenue for a DTC service or affiliate fees for a cable television network)

14

THE WALT DISNEY COMPANY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

Total capitalized produced and licensed content by predominant monetization strategy is as follows:

| | As of January 1, 2022 | | | As of October 2, 2021 | | |
| | Predominantly Monetized Individually | Predominantly Monetized as a Group | Total | Predominantly Monetized Individually | Predominantly Monetized as a Group | Total |
|---|---|---|---|---|---|---|
| Produced content | | | | | | |
| Released, less amortization | $ 5,296 | $ 10,036 | $ 15,332 | $ 4,944 | $ 9,779 | $ 14,723 |
| Completed, not released | 300 | 992 | 1,292 | 630 | 762 | 1,392 |
| In-process | 4,408 | 5,466 | 9,874 | 4,371 | 4,623 | 8,994 |
| In development or pre-production | 205 | 129 | 334 | 351 | 162 | 513 |
| | $ 10,209 | $ 16,623 | 26,832 | $ 10,296 | $ 15,326 | 25,622 |
| Licensed content - Television programming rights and advances | | | 4,962 | | | 6,110 |
| Total produced and licensed content | | | $ 31,794 | | | $ 31,732 |
| Current portion | | | $ 1,125 | | | $ 2,183 |
| Non-current portion | | | $ 30,669 | | | $ 29,549 |

Amortization of produced and licensed content is as follows:

| | Quarter Ended | |
| | January 1, 2022 | January 2, 2021 |
|---|---|---|
| Produced content | | |
| Predominantly monetized individually | $ 1,033 | $ 612 |
| Predominantly monetized as a group | 1,618 | 1,198 |
| | 2,651 | 1,810 |
| Licensed programming rights and advances | 4,811 | 4,539 |
| Total produced and licensed content costs[1] | $ 7,462 | $ 6,349 |

[1] Primarily included in "Costs of services" in the Condensed Consolidated Statements of Income

## 8.   *Income Taxes*

*Interim Period Tax Expense*

Generally, we record interim period tax expense based on the estimated annual effective tax rate using projections of full-year pre-tax earnings and income tax expense, adjusted for tax expense amounts recognized fully in the quarter they occur  We used this approach to determine tax expense in the current quarter of fiscal 2022  For interim periods in fiscal 2021, because of the uncertainties associated with the impact of COVID-19 on our projections of full-year pre-tax earnings and income tax expense, our normal approach of calculating interim period tax expense produced an income tax provision that was not meaningful  Accordingly, we calculated interim period fiscal 2021 tax expense based on the year-to-date earnings before tax, a blended U S  Federal and state statutory tax rate of approximately 23% adjusted for tax expense amounts recognized fully in the quarter they occurred

*Unrecognized Tax Benefits*

The Company's unrecognized tax benefits at both January 1, 2022 and October 2, 2021 were approximately $2 6 billion (before interest and penalties)  In the next twelve months, it is reasonably possible that our unrecognized tax benefits could change due to resolutions of open tax matters, which would reduce our unrecognized tax benefits by $0 3 billion

15

**Ex. 10**
**Page 1007**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

**9.** *Pension and Other Benefit Programs*

The components of net periodic benefit cost are as follows:

| | Pension Plans | | | | Postretirement Medical Plans | | | |
| | Quarter Ended | | | | Quarter Ended | | | |
| | January 1, 2022 | | January 2, 2021 | | January 1, 2022 | | January 2, 2021 | |
|---|---|---|---|---|---|---|---|---|
| Service costs | $ | 100 | $ | 108 | $ | 2 | $ | 3 |
| Other costs (benefits): | | | | | | | | |
| Interest costs | | 124 | | 114 | | 13 | | 12 |
| Expected return on plan assets | | (293) | | (275) | | (15) | | (14) |
| Amortization of previously deferred service costs | | 1 | | 2 | | — | | — |
| Recognized net actuarial loss | | 147 | | 186 | | 7 | | 7 |
| Total other costs (benefits) | | (21) | | 27 | | 5 | | 5 |
| Net periodic benefit cost | $ | 79 | $ | 135 | $ | 7 | $ | 8 |

During the quarter ended January 1, 2022, the Company did not make any material contributions to its pension and postretirement medical plans  The Company currently expects to make approximately $100 million to $150 million in pension and postretirement medical plans contributions in fiscal 2022  Final minimum funding requirements for fiscal 2022 will be determined based on a January 1, 2022 funding actuarial valuation, which is expected to be received by the end of the fourth quarter of fiscal 2022

**10.** *Earnings Per Share*

Diluted earnings per share amounts are based upon the weighted average number of common and common equivalent shares outstanding during the period and are calculated using the treasury stock method for equity-based compensation awards (Awards)  A reconciliation of the weighted average number of common and common equivalent shares outstanding and the number of Awards excluded from the diluted earnings per share calculation, as they were anti-dilutive, are as follows:

| | Quarter Ended | |
| | January 1, 2022 | January 2, 2021 |
|---|---|---|
| Shares (in millions): | | |
| Weighted average number of common and common equivalent shares outstanding (basic) | 1,819 | 1,812 |
| Weighted average dilutive impact of Awards | 9 | 11 |
| Weighted average number of common and common equivalent shares outstanding (diluted) | 1,828 | 1,823 |
| Awards excluded from diluted earnings per share | 4 | 8 |

16

THE WALT DISNEY COMPANY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

## 11. *Equity*

The following tables summarize the changes in each component of accumulated other comprehensive income (loss) (AOCI) including our proportional share of equity method investee amounts:

| AOCI, before tax | Market Value Adjustments for Hedges | | Unrecognized Pension and Postretirement Medical Expense | | Foreign Currency Translation and Other | | AOCI | |
|---|---|---|---|---|---|---|---|---|
| **First quarter of fiscal 2022** | | | | | | | | |
| Balance at October 2, 2021 | $ | (152) | $ | (7,025) | $ | (1,047) | $ | (8,224) |
| Quarter Ended January 1, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | 87 | | 47 | | (37) | | 97 |
| Reclassifications of realized net (gains) losses to net income | | (18) | | 155 | | — | | 137 |
| **Balance at January 1, 2022** | $ | **(83)** | $ | **(6,823)** | $ | **(1,084)** | $ | **(7,990)** |
| **First quarter of fiscal 2021** | | | | | | | | |
| Balance at October 3, 2020 | $ | (191) | $ | (9,423) | $ | (1,088) | $ | (10,702) |
| Quarter Ended January 2, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (185) | | 2 | | 211 | | 28 |
| Reclassifications of realized net (gains) losses to net income | | (43) | | 194 | | — | | 151 |
| Balance at January 2, 2021 | $ | (419) | $ | (9,227) | $ | (877) | $ | (10,523) |

| Tax on AOCI | Market Value Adjustments for Hedges | | Unrecognized Pension and Postretirement Medical Expense | | Foreign Currency Translation and Other | | AOCI | |
|---|---|---|---|---|---|---|---|---|
| **First quarter of fiscal 2022** | | | | | | | | |
| Balance at October 2, 2021 | $ | 42 | $ | 1,653 | $ | 89 | $ | 1,784 |
| Quarter Ended January 1, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (23) | | (11) | | (4) | | (38) |
| Reclassifications of realized net (gains) losses to net income | | 4 | | (36) | | — | | (32) |
| **Balance at January 1, 2022** | $ | **23** | $ | **1,606** | $ | **85** | $ | **1,714** |
| **First quarter of fiscal 2021** | | | | | | | | |
| Balance at October 3, 2020 | $ | 40 | $ | 2,201 | $ | 139 | $ | 2,380 |
| Quarter Ended January 2, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | 46 | | (1) | | (7) | | 38 |
| Reclassifications of realized net (gains) losses to net income | | 9 | | (45) | | — | | (36) |
| Balance at January 2, 2021 | $ | 95 | $ | 2,155 | $ | 132 | $ | 2,382 |

17

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

| AOCI, after tax | Market Value Adjustments for Hedges | | Unrecognized Pension and Postretirement Medical Expense | | Foreign Currency Translation and Other | | AOCI | |
|---|---|---|---|---|---|---|---|---|
| *First quarter of fiscal 2022* | | | | | | | | |
| Balance at October 2, 2021 | $ | (110) | $ | (5,372) | $ | (958) | $ | (6,440) |
| Quarter Ended January 1, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | 64 | | 36 | | (41) | | 59 |
| Reclassifications of realized net (gains) losses to net income | | (14) | | 119 | | — | | 105 |
| **Balance at January 1, 2022** | **$** | **(60)** | **$** | **(5,217)** | **$** | **(999)** | **$** | **(6,276)** |
| | | | | | | | | |
| *First quarter of fiscal 2021* | | | | | | | | |
| Balance at October 3, 2020 | $ | (151) | $ | (7,222) | $ | (949) | $ | (8,322) |
| Quarter Ended January 2, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (139) | | 1 | | 204 | | 66 |
| Reclassifications of realized net (gains) losses to net income | | (34) | | 149 | | — | | 115 |
| Balance at January 2, 2021 | $ | (324) | $ | (7,072) | $ | (745) | $ | (8,141) |

Details about AOCI components reclassified to net income are as follows:

| | Affected line item in the Condensed Consolidated Statements of Operations: | Quarter Ended | | | |
|---|---|---|---|---|---|
| Gain (loss) in net income: | | January 1, 2022 | | January 2, 2021 | |
| Market value adjustments, primarily cash flow hedges | Primarily revenue | $ | 18 | $ | 43 |
| Estimated tax | Income taxes | | (4) | | (9) |
| | | | 14 | | 34 |
| Pension and postretirement medical expense | Interest expense, net | | (155) | | (194) |
| Estimated tax | Income taxes | | 36 | | 45 |
| | | | (119) | | (149) |
| Total reclassifications for the period | | $ | (105) | $ | (115) |

## 12. *Equity-Based Compensation*

Compensation expense related to stock options and restricted stock units (RSUs) is as follows:

| | Quarter Ended | | | |
|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | |
| Stock options | $ | 24 | $ | 25 |
| RSUs | | 172 | | 109 |
| Total equity-based compensation expense[1] | $ | 196 | $ | 134 |
| Equity-based compensation expense capitalized during the period | $ | 30 | $ | 34 |

[1] Equity-based compensation expense is net of capitalized equity-based compensation and estimated forfeitures and excludes amortization of previously capitalized equity-based compensation costs

Unrecognized compensation cost related to unvested stock options and RSUs was $160 million and $2 2 billion, respectively, as of January 1, 2022

18

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

The weighted average grant date fair values of options granted during the quarter ended January 1, 2022 and January 2, 2021 were $47 66 and $55 28, respectively

During the quarter ended January 1, 2022, the Company made equity compensation grants consisting of 1 6 million stock options and 9 1 million RSUs

## 13. *Commitments and Contingencies*

*Legal Matters*

The Company, together with, in some instances, certain of its directors and officers, is a defendant in various legal actions involving copyright, breach of contract and various other claims incident to the conduct of its businesses  Management does not believe that the Company has incurred a probable material loss by reason of any of those actions

## 14. *Fair Value Measurements*

Fair value is defined as the amount that would be received for selling an asset or paid to transfer a liability in an orderly transaction between market participants and is generally classified in one of the following categories:

Level 1 - Quoted prices for identical instruments in active markets

Level 2 - Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which all significant inputs and significant value drivers are observable in active markets

Level 3 - Valuations derived from valuation techniques in which one or more significant inputs or significant value drivers are unobservable

The Company's assets and liabilities measured at fair value are summarized in the following tables by fair value measurement Level:

| | Fair Value Measurement at January 1, 2022 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| Assets | | | | |
| Investments | $ 527 | $ — | $ — | $ 527 |
| Derivatives | | | | |
| Interest rate | — | 100 | — | 100 |
| Foreign exchange | — | 696 | — | 696 |
| Other | — | 18 | — | 18 |
| Liabilities | | | | |
| Derivatives | | | | |
| Interest rate | — | (353) | — | (353) |
| Foreign exchange | — | (525) | — | (525) |
| Other | — | (2) | — | (2) |
| Other | — | (438) | — | (438) |
| Total recorded at fair value | $ 527 | $ (504) | $ — | $ 23 |
| Fair value of borrowings | $ — | $ 58,177 | $ 1,475 | $ 59,652 |

19

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

| | Fair Value Measurement at October 2, 2021 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets | | | | |
| Investments | $ 950 | $ — | $ — | $ 950 |
| Derivatives | | | | |
| Interest rate | — | 186 | — | 186 |
| Foreign exchange | — | 707 | — | 707 |
| Other | — | 10 | — | 10 |
| Liabilities | | | | |
| Derivatives | | | | |
| Interest rate | — | (287) | — | (287) |
| Foreign exchange | — | (618) | — | (618) |
| Other | — | (8) | — | (8) |
| Other | — | (375) | — | (375) |
| Total recorded at fair value | $ 950 | $ (385) | $ — | $ 565 |
| Fair value of borrowings | $ — | $ 58,913 | $ 1,411 | $ 60,324 |

The fair values of Level 2 derivatives are primarily determined by internal discounted cash flow models that use observable inputs such as interest rates, yield curves and foreign currency exchange rates  Counterparty credit risk, which is mitigated by master netting agreements and collateral posting arrangements with certain counterparties, had an impact on derivative fair value estimates that was not material

Level 2 other liabilities are primarily arrangements that are valued based on the fair value of underlying investments, which are generally measured using Level 1 and Level 2 fair value techniques

Level 2 borrowings, which include commercial paper, U S  dollar denominated notes and certain foreign currency denominated borrowings, are valued based on quoted prices for similar instruments in active markets or identical instruments in markets that are not active

Level 3 borrowings include the Asia Theme Park borrowings, which are valued based on the current borrowing cost and credit risk of the Asia Theme Parks as well as prevailing market interest rates

The Company's financial instruments also include cash, cash equivalents, receivables and accounts payable  The carrying values of these financial instruments approximate the fair values

### 15. *Derivative Instruments*

The Company manages its exposure to various risks relating to its ongoing business operations according to a risk management policy  The primary risks managed with derivative instruments are interest rate risk and foreign exchange risk

**Ex. 10
Page 1012**

THE WALT DISNEY COMPANY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

The Company's derivative positions measured at fair value are summarized in the following tables:

| | Current Assets | | Other Assets | | Other Current Liabilities | | Other Long-Term Liabilities | |
|---|---|---|---|---|---|---|---|---|
| | **As of January 1, 2022** | | | | | | | |
| Derivatives designated as hedges | | | | | | | | |
| Foreign exchange | $ | 220 | $ | 264 | $ | (127) | $ | (100) |
| Interest rate | | 17 | | 83 | | (353) | | — |
| Other | | 8 | | 1 | | (1) | | (1) |
| Derivatives not designated as hedges | | | | | | | | |
| Foreign exchange | | 109 | | 103 | | (153) | | (145) |
| Other | | 9 | | — | | — | | — |
| Gross fair value of derivatives | | 363 | | 451 | | (634) | | (246) |
| Counterparty netting | | (253) | | (326) | | 394 | | 185 |
| Cash collateral (received) paid | | (26) | | (4) | | 234 | | 41 |
| Net derivative positions | $ | 84 | $ | 121 | $ | (6) | $ | (20) |

| | Current Assets | | Other Assets | | Other Current Liabilities | | Other Long-Term Liabilities | |
|---|---|---|---|---|---|---|---|---|
| | **As of October 2, 2021** | | | | | | | |
| Derivatives designated as hedges | | | | | | | | |
| Foreign exchange | $ | 165 | $ | 240 | $ | (122) | $ | (83) |
| Interest rate | | — | | 186 | | (287) | | — |
| Other | | 10 | | — | | — | | — |
| Derivatives not designated as hedges | | | | | | | | |
| Foreign exchange | | 183 | | 119 | | (208) | | (205) |
| Other | | (8) | | — | | — | | — |
| Gross fair value of derivatives | | 350 | | 545 | | (617) | | (288) |
| Counterparty netting | | (301) | | (360) | | 460 | | 201 |
| Cash collateral (received) paid | | (3) | | (51) | | 157 | | 73 |
| Net derivative positions | $ | 46 | $ | 134 | $ | — | $ | (14) |

*Interest Rate Risk Management*

The Company is exposed to the impact of interest rate changes primarily through its borrowing activities  The Company's objective is to mitigate the impact of interest rate changes on earnings and cash flows and on the market value of its borrowings  In accordance with its policy, the Company targets its fixed-rate debt as a percentage of its net debt between a minimum and maximum percentage  The Company primarily uses pay-floating and pay-fixed interest rate swaps to facilitate its interest rate risk management activities

The Company designates pay-floating interest rate swaps as fair value hedges of fixed-rate borrowings effectively converting fixed-rate borrowings to variable-rate borrowings indexed to LIBOR  The total notional amount of the Company's pay-floating interest rate swaps at both January 1, 2022 and October 2, 2021, was $15 1 billion

21

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

The following table summarizes fair value hedge adjustments to hedged borrowings:

| | Carrying Amount of Hedged Borrowings | | | | Fair Value Adjustments Included in Hedged Borrowings | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | January 1, 2022 | | October 2, 2021 | | January 1, 2022 | | October 2, 2021 | |
| Borrowings: | | | | | | | | |
| Current | $ | 1,512 | $ | 505 | $ | 14 | $ | 5 |
| Long-term | | 13,957 | | 15,136 | | (290) | | (103) |
| | $ | 15,469 | $ | 15,641 | $ | (276) | $ | (98) |

The following amounts are included in "Interest expense, net" in the Condensed Consolidated Statements of Income:

| | Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | January 1, 2022 | | January 2, 2021 | |
| Gain (loss) on: | | | | |
| Pay-floating swaps | $ | (178) | $ | (147) |
| Borrowings hedged with pay-floating swaps | | 178 | | 147 |
| Benefit (expense) associated with interest accruals on pay-floating swaps | | 37 | | 35 |

The Company may designate pay-fixed interest rate swaps as cash flow hedges of interest payments on floating-rate borrowings  Pay-fixed interest rate swaps effectively convert floating-rate borrowings to fixed-rate borrowings  The unrealized gains or losses from these cash flow hedges are deferred in AOCI and recognized in interest expense as the interest payments occur  The Company did not have pay-fixed interest rate swaps that were designated as cash flow hedges of interest payments at January 1, 2022 or at October 2, 2021, and gains and losses related to pay-fixed interest rate swaps recognized in earnings for the quarter ended January 1, 2022 and January 2, 2021 were not material

*Foreign Exchange Risk Management*

The Company transacts business globally and is subject to risks associated with changing foreign currency exchange rates  The Company's objective is to reduce earnings and cash flow fluctuations associated with foreign currency exchange rate changes, enabling management to focus on core business issues and challenges

The Company enters into option and forward contracts that change in value as foreign currency exchange rates change to protect the value of its existing foreign currency assets, liabilities, firm commitments and forecasted but not firmly committed foreign currency transactions  In accordance with policy, the Company hedges its forecasted foreign currency transactions for periods generally not to exceed four years within an established minimum and maximum range of annual exposure  The gains and losses on these contracts offset changes in the U S  dollar equivalent value of the related forecasted transaction, asset, liability or firm commitment  The principal currencies hedged are the euro, Japanese yen, British pound, Chinese yuan and Canadian dollar  Cross-currency swaps are used to effectively convert foreign currency denominated borrowings into U S  dollar denominated borrowings

The Company designates foreign exchange forward and option contracts as cash flow hedges of firmly committed and forecasted foreign currency transactions  As of January 1, 2022 and October 2, 2021, the notional amounts of the Company's net foreign exchange cash flow hedges were $8 1 billion and $6 9 billion, respectively  Mark-to-market gains and losses on these contracts are deferred in AOCI and are recognized in earnings when the hedged transactions occur, offsetting changes in the value of the foreign currency transactions  Net deferred gains recorded in AOCI for contracts that will mature in the next twelve months total $119 million  The following table summarizes the effect of foreign exchange cash flow hedges on AOCI:

| | Quarter Ended | | | |
| --- | --- | --- | --- | --- |
| | January 1, 2022 | | January 2, 2021 | |
| Gain (loss) recognized in Other Comprehensive Income | $ | 79 | $ | (151) |
| Gain (loss) reclassified from AOCI into the Statements of Operations[1] | | 13 | | 44 |

[1] Primarily recorded in revenue

22

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

The Company designates cross currency swaps as fair value hedges of foreign currency denominated borrowings  The impact of the designated exposure is recorded to "Interest expense, net" to offset the foreign currency impact of the foreign currency denominated borrowing  The non-hedged exposure is recorded to AOCI and is amortized over the life of the cross currency swap  As of January 1, 2022 and October 2, 2021, the total notional amounts of the Company's designated cross currency swaps were Canadian $1 3 billion ($1 0 billion) and Canadian $1 3 billion ($1 0 billion), respectively

The following amounts are included in "Interest expense, net" in the Condensed Consolidated Statements of Income:

| | Quarter Ended | | | |
|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | |
| Gain (loss) on: | | | | |
| Cross currency swaps | $ | 1 | $ | 42 |
| Borrowings hedged with cross currency swaps | | (1) | | (42) |

Foreign exchange risk management contracts with respect to foreign currency denominated assets and liabilities are not designated as hedges and do not qualify for hedge accounting  The notional amounts of these foreign exchange contracts at January 1, 2022 and October 2, 2021 were $3 9 billion and $3 5 billion, respectively  The following table summarizes the net foreign exchange gains or losses recognized on foreign currency denominated assets and liabilities and the net foreign exchange gains or losses on the foreign exchange contracts we entered into to mitigate our exposure with respect to foreign currency denominated assets and liabilities by the corresponding line item in which they are recorded in the Condensed Consolidated Statements of Income:

| | Costs and Expenses | | | | Interest expense, net | | | | Income Tax Expense | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quarter Ended: | January 1, 2022 | | January 2, 2021 | | January 1, 2022 | | January 2, 2021 | | January 1, 2022 | | January 2, 2021 | |
| Net gains (losses) on foreign currency denominated assets and liabilities | $ | (63) | $ | 158 | $ | 1 | $ | (41) | $ | 8 | $ | (59) |
| Net gains (losses) on foreign exchange risk management contracts not designated as hedges | | 33 | | (187) | | — | | 43 | | (8) | | 50 |
| Net gains (losses) | $ | (30) | $ | (29) | $ | 1 | $ | 2 | $ | — | $ | (9) |

*Commodity Price Risk Management*

The Company is subject to the volatility of commodities prices and the Company designates certain commodity forward contracts as cash flow hedges of forecasted commodity purchases  Mark-to-market gains and losses on these contracts are deferred in AOCI and are recognized in earnings when the hedged transactions occur, offsetting changes in the value of commodity purchases  The notional amount of these commodities contracts at January 1, 2022 and October 2, 2021 and related gains or losses recognized in earnings for the quarter and quarter ended January 1, 2022 and January 2, 2021 were not material

*Risk Management – Other Derivatives Not Designated as Hedges*

The Company enters into certain other risk management contracts that are not designated as hedges and do not qualify for hedge accounting  These contracts, which include certain total return swap contracts, are intended to offset economic exposures of the Company and are carried at market value with any changes in value recorded in earnings  The notional amounts of these contracts at both January 1, 2022 and October 2, 2021 were $0 4 billion  The related gains or losses recognized in earnings were not material for the quarters ended January 1, 2022 and January 2, 2021

*Contingent Features and Cash Collateral*

The Company has master netting arrangements by counterparty with respect to certain derivative financial instrument contracts  The Company may be required to post collateral in the event that a net liability position with a counterparty exceeds limits defined by contract and that vary with the Company's credit rating  In addition, these contracts may require a counterparty to post collateral to the Company in the event that a net receivable position with a counterparty exceeds limits defined by contract and that vary with the counterparty's credit rating  If the Company's or the counterparty's credit ratings were to fall below investment grade, such counterparties or the Company would also have the right to terminate our derivative contracts, which could lead to a net payment to or from the Company for the aggregate net value by counterparty of our derivative contracts  The aggregate fair values of derivative instruments with credit-risk-related contingent features in a net liability position by counterparty were $301 million and $244 million on January 1, 2022 and October 2, 2021, respectively

23

THE WALT DISNEY COMPANY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

## 16. *Restructuring and Impairment Charges*

The Company recognized approximately $0 1 billion of restructuring charges during the quarter ended January 2, 2021, primarily for severance  These charges are recorded in "Restructuring and impairment charges" in the Condensed Consolidated Statements of Income

## 17. *New Accounting Pronouncements*

**Accounting Pronouncements Adopted in Fiscal 2022**

*Simplifying the Accounting for Income Taxes*

In December 2019, the Financial Accounting Standards Board (FASB) issued guidance which simplifies the accounting for income taxes  The guidance amends the rules for recognizing deferred taxes for investments, performing intraperiod tax allocations and calculating income taxes in interim periods  It also reduces complexity in certain areas, including the accounting for transactions that result in a step-up in the tax basis of goodwill and allocating taxes to members of a consolidated group  The Company adopted the new guidance in the first quarter of fiscal 2022  The adoption did not have a material impact on our financial statements

*Facilitation of the Effects of Reference Rate Reform*

In March 2020, the FASB issued guidance which provides optional expedients and exceptions for applying current GAAP to contracts, hedging relationships, and other transactions affected by the transition from the use of LIBOR to an alternative reference rate  The guidance is applicable to contracts entered into before January 1, 2023  The Company adopted the new guidance in the first quarter of fiscal 2022  The adoption did not have a material impact on our financial statements

**Accounting Pronouncements Not Yet Adopted**

*Disclosures by Business Entities about Government Assistance*

In November 2021, the FASB issued guidance requiring annual disclosures about transactions with a government that are accounted for by analogizing to a grant or contribution accounting model  The new guidance requires the disclosure of the nature of the transactions, the accounting for the transactions, and the effect of the transactions on the financial statements  The guidance is effective for annual periods beginning with the Company's 2023 fiscal year (with early adoption permitted)  The Company is currently assessing the impacts this guidance will have on its financial statements

24

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Item 2: Management's Discussion and Analysis of Financial Condition and Results of Operations**

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended  Forward-looking statements generally relate to future events or our future financial or operating performance and may include statements concerning, among other things, financial results, the impact of COVID-19 on our businesses and operations, results of operations and competition  In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expects," "plans," "could," "intends," "target," "projects," "believes," "estimates," "potential" or "continue" or the negative of these words or other similar terms or expressions that concern our expectations, strategy, plans or intentions  These statements reflect our current views with respect to future events and are based on assumptions as of the date of this report  These statements are subject to known and unknown risks, uncertainties and other factors, including those described in "Risk Factors" in our 2021 Annual Report on Form 10-K, that may cause our actual results, performance or achievements to be materially different from expectations or results projected or implied by forward-looking statements

A forward-looking statement is neither a prediction nor a guarantee of future events or circumstances  You should not place undue reliance on the forward-looking statements  Unless required by federal securities laws, we assume no obligation to update any of these forward-looking statements, or to update the reasons actual results could differ materially from those anticipated, to reflect circumstances or events that occur after the statements are made

**ORGANIZATION OF INFORMATION**

Management's Discussion and Analysis provides a narrative of the Company's financial performance and condition that should be read in conjunction with the accompanying financial statements  It includes the following sections:

- Consolidated Results
- Significant Developments
- Current Quarter Results Compared to Prior-Year Quarter
- Seasonality
- Business Segment Results
- Corporate and Unallocated Shared Expenses
- Financial Condition
- Supplemental Guarantor Financial Information
- Commitments and Contingencies
- Other Matters
- Market Risk

**Ex. 10**
**Page 1017**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

**CONSOLIDATED RESULTS**

| | | Quarter Ended | | % Change Better (Worse) |
|---|---|---|---|---|
| (in millions, except per share data) | | January 1, 2022 | January 2, 2021 | |
| Revenues: | | | | |
| Services | $ | 19,542 | $ 14,871 | 31 % |
| Products | | 2,277 | 1,378 | 65 % |
| Total revenues | | 21,819 | 16,249 | 34 % |
| Costs and expenses: | | | | |
| Cost of services (exclusive of depreciation and amortization) | | (13,161) | (10,738) | (23) % |
| Cost of products (exclusive of depreciation and amortization) | | (1,406) | (1,037) | (36) % |
| Selling, general, administrative and other | | (3,787) | (2,917) | (30) % |
| Depreciation and amortization | | (1,269) | (1,298) | 2 % |
| Total costs and expenses | | (19,623) | (15,990) | (23) % |
| Restructuring and impairment charges | | — | (113) | 100 % |
| Other expense, net | | (436) | — | nm |
| Interest expense, net | | (311) | (324) | 4 % |
| Equity in the income of investees | | 239 | 224 | 7 % |
| Income from continuing operations before income taxes | | 1,688 | 46 | >100 % |
| Income taxes on continuing operations | | (488) | (16) | >(100) % |
| Net income from continuing operations | | 1,200 | 30 | >100 % |
| Loss from discontinued operations, net of income tax benefit of $14 and $4, respectively | | (48) | (12) | >(100) % |
| Net income | | 1,152 | 18 | >100 % |
| Net income from continuing operations attributable to noncontrolling interests | | (48) | (1) | >(100) % |
| Net income attributable to Disney | $ | 1,104 | $ 17 | >100 % |
| Diluted earnings per share from continuing operations attributable to Disney | $ | 0.63 | $ 0.02 | >100 % |

**SIGNIFICANT DEVELOPMENTS**

*COVID-19 Pandemic*

Since early 2020, the world has been, and continues to be, impacted by COVID-19 and its variants COVID-19 and measures to prevent its spread have impacted our segments in a number of ways, most significantly at the DPEP segment where our theme parks and resorts were closed and cruise ship sailings and guided tours were suspended These operations resumed at various points since May 2020, initially at reduced operating capacities as a result of COVID-19 restrictions In fiscal 2020 and 2021, we delayed, or in some cases, shortened or canceled, theatrical releases In addition, we experienced significant disruptions in the production and availability of content, including the delay of key live sports programming during fiscal 2020 and fiscal 2021

The most significant impact on operating income since the onset of COVID-19 has been at the DPEP segment due to revenue lost In fiscal 2022, our domestic parks and experiences are generally operating without significant mandatory COVID-19-related capacity restrictions, such as those that were in place during the prior-year quarter; however, we continue to manage capacity to address ongoing COVID-19 considerations with respect to guest and cast health and safety Certain of our international operations continue to be impacted by mandatory COVID-19-related capacity and travel restrictions At the DMED segment, our film and television productions have generally resumed, although we have seen disruptions of production activities depending on local circumstances We have generally been able to release our films theatrically in the current quarter, although certain markets continue to impose restrictions on theater openings and capacity

We have incurred, and will continue to incur, costs to address government regulations and the safety of our employees, guests and talent, of which certain costs are capitalized and will be amortized over future periods

The impact of the disruptions on our businesses and costs to address government regulations and the safety of our employees, guests and talent (and the extent of their adverse impact on our financial and operational results) will depend on the length of time that such disruptions continue This will, in turn, depend on the duration and severity of the impacts of

26

**Ex. 10
Page 1018**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

COVID-19 and its variants, and among other things, the impact and duration of governmental actions imposed in response to COVID-19 and individuals' and companies' risk tolerance regarding health matters going forward

**CURRENT QUARTER RESULTS COMPARED TO PRIOR-YEAR QUARTER**

Revenues for the quarter increased 34%, or $5 6 billion, to $21 8 billion; net income attributable to Disney increased to $1 1 billion from $17 million; and diluted earnings per share from continuing operations attributable to Disney (EPS) was $0 63 compared to $0 02 in the prior-year quarter  The EPS increase for the quarter was due to higher segment operating results at DPEP, partially offset by lower operating results at DMED

**Revenues**

Service revenues for the quarter increased 31%, or $4 7 billion, to $19 5 billion due to increased volumes at our theme parks and resorts, higher DTC subscription revenue and higher theatrical revenues  The increase in theme parks and resorts volumes reflects the impact of operating with mandatory capacity restrictions in the prior-year quarter as a result of COVID-19  The increase in subscription revenue was due to subscriber growth and higher retail pricing at Disney+, Hulu, and to a lesser extent, ESPN+

Product revenues for the quarter increased 65%, or $0 9 billion to $2 3 billion due to higher merchandise, food and beverage sales at our theme parks and resorts

**Costs and expenses**

Cost of services for the quarter increased 23%, or $2 4 billion, to $13 2 billion due to higher programming and production costs and technical support expenses at Direct-to-Consumer, increased volumes at our theme parks and resorts, higher sports programming costs at Linear Networks and higher theatrical production cost amortization and theatrical distribution costs at Content Sales/Licensing and Other

Cost of products for the quarter increased 36%, or $0 4 billion, to $1 4 billion due to higher merchandise, food and beverage sales at our theme parks and resorts

Selling, general, administrative and other costs increased 30%, or $0 9 billion, to $3 8 billion due to higher marketing costs

**Restructuring and impairment charges**

Restructuring and impairment charges of $113 million for the prior-year quarter were due to severance

**Other expense, net**

In the current quarter, the Company recognized $436 million in Other expense, net due to a non-cash loss of $432 million to adjust its investment in DraftKings to fair value

In the prior-year quarter, the Company recognized $186 million non-cash loss to adjust its investment in DraftKings to fair value, offset by a $186 million non-cash gain to adjust its investment in fuboTV to fair value

**Interest expense, net**

Interest expense, net is as follows:

| | Quarter Ended | | |
|---|---|---|---|
| (in millions) | January 1, 2022 | January 2, 2021 | % Change Better (Worse) |
| Interest expense | $ (361) | $ (404) | 11 % |
| Interest income, investment income (loss) and other | 50 | 80 | (38) % |
| Interest expense, net | $ (311) | $ (324) | 4 % |

The decrease in interest expense was due to lower average debt balances and higher capitalized interest

The decrease in interest income, investment income (loss) and other was due to lower investment gains, partially offset by a favorable comparison of pension and postretirement benefit costs, other than service cost, which was a benefit in the current quarter and an expense in the prior-year quarter

27

**Ex. 10
Page 1019**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

**Effective Income Tax Rate**

| | Quarter Ended | |
| --- | --- | --- |
| | January 1, 2022 | January 2, 2021 |
| Income from continuing operations before income taxes | $ 1,688 | $ 46 |
| Income tax on continuing operations | 488 | 16 |
| Effective income tax rate - continuing operations | 28.9% | 34 8% |

The effective income tax rate in the current quarter was higher than the U S statutory rate due to unfavorable adjustments related to prior years  The effective income tax rate in the prior-year quarter was higher than the U S statutory rate primarily due to an unfavorable impact from foreign earnings taxed at rates higher than the U S statutory rate, partially offset by favorable adjustments related to prior years

**Noncontrolling Interests**

| | Quarter Ended | | |
| --- | --- | --- | --- |
| (in millions) | January 1, 2022 | January 2, 2021 | % Change Better (Worse) |
| Net income from continuing operations attributable to noncontrolling interests | $ (48) | $ (1) | >(100) % |

The increase in net income from continuing operations attributable to noncontrolling interests was driven by lower losses at Hong Kong Disneyland Resort and Shanghai Disney Resort, partially offset by a higher loss at our DTC sports business

Net income attributable to noncontrolling interests is determined on income after royalties and management fees, financing costs and income taxes, as applicable

**Certain Items Impacting Results in the Quarter**

Results for the quarter ended January 1, 2022 were impacted by the following:

- TFCF and Hulu acquisition amortization of $595 million
- Other expense of $436 million due to the DraftKings loss of $432 million

Results for the quarter ended January 2, 2021 were impacted by the following:

- TFCF and Hulu acquisition amortization of $617 million
- Restructuring charges of $113 million

A summary of the impact of these items on EPS is as follows:

| (in millions, except per share data) | Pre-Tax Income (Loss) | Tax Benefit (Expense)[1] | After-Tax Income (Loss) | EPS Favorable (Adverse)[2] |
| --- | --- | --- | --- | --- |
| Quarter Ended January 1, 2022: | | | | |
| TFCF and Hulu acquisition amortization | $ (595) | $ 139 | $ (456) | $ (0 24) |
| Other expense, net | (436) | 102 | (334) | (0 18) |
| Total | $ (1,031) | $ 241 | $ (790) | $ (0 43) |
| | | | | |
| Quarter Ended January 2, 2021: | | | | |
| TFCF and Hulu acquisition amortization | $ (617) | $ 144 | $ (473) | $ (0 25) |
| Restructuring and impairment charges | (113) | 28 | (85) | (0 05) |
| Total | $ (730) | $ 172 | $ (558) | $ (0 30) |

[1] Tax benefit (expense) amounts are determined using the tax rate applicable to the individual item

[2] EPS is net of noncontrolling interest share, where applicable  Total may not equal the sum of the column due to rounding

28

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

SEASONALITY

The Company's businesses are subject to the effects of seasonality  Consequently, the operating results for the quarter ended January 1, 2022 for each business segment, and for the Company as a whole, are not necessarily indicative of results to be expected for the full year

DMED revenues are subject to seasonal advertising patterns, changes in viewership and subscriber levels, timing and performance of film releases in the theatrical and home entertainment markets, timing of and demand for film and television programs, and the availability of and demand for sports programming  In general, domestic advertising revenues are typically somewhat higher during the fall and somewhat lower during the summer months  In addition, advertising revenues generated from sports programming are impacted by the timing of sports seasons and events, which varies throughout the year or may take place periodically (e g  biannually, quadrennially)  Affiliate revenues vary with the subscriber trends of multi-channel video programming distributors (i e  cable, satellite telecommunications and digital over-the-top service providers)  Theatrical release dates are determined by several factors, including competition and the timing of vacation and holiday periods

DPEP revenues fluctuate with changes in theme park attendance and resort occupancy resulting from the seasonal nature of vacation travel and leisure activities, which generally results in higher revenues during the Company's first and fourth fiscal quarters  Peak attendance and resort occupancy generally occur during the summer months when school vacations occur and during early winter and spring holiday periods  Consumer products revenue fluctuates with consumer purchasing behavior, which generally results in higher revenues during the Company's first fiscal quarter due to the winter holiday season and in the fourth quarter due to back-to-school  In addition, licensing revenues fluctuate with the timing and performance of our film and television content

BUSINESS SEGMENT RESULTS

Below is a discussion of the major revenue and expense categories for our business segments  Costs and expenses for each segment consist of operating expenses, selling, general, administrative and other costs, and depreciation and amortization  Selling, general, administrative and other costs include third-party and internal marketing expenses

Our DMED segment primarily generates revenue across three significant lines of business/distribution platforms: Linear Networks, Direct-to-Consumer and Content Sales/Licensing  Programming and production costs are generally allocated across these businesses based on the estimated relative value of the distribution windows  Programming and production costs to support these businesses/distribution platforms are largely incurred across three content creation groups: Studios, General Entertainment and Sports  Programming and production costs include amortization of acquired licensed programming rights (including sports rights), amortization of capitalized production costs (including participations and residuals) and production costs related to live programming such as news and sports  Costs for initial marketing campaigns are generally recognized in the distribution platform of initial exploitation

The Linear Networks business generates revenue from affiliate fees and advertising sales and from fees from sub-licensing of sports programming to third parties  Operating expenses include programming and production costs, technical support costs, operating labor and distribution costs

The Direct-to-Consumer business generates revenue from subscription fees, advertising sales and pay-per-view and Premier Access fees  Operating expenses include programming and production costs, technology support costs, operating labor and distribution costs  Operating expenses also includes fees paid to Linear Networks for the right to air the linear networks feed and other services

The Content Sales/Licensing business generates revenue from the sale of film and episodic television content in the TV/SVOD and home entertainment markets, distribution of films in the theatrical market, licensing of our music rights, sales of tickets to stage play performances and licensing of our IP for use in stage plays  Operating expenses include programming and production costs, distribution expenses and costs of sales

Our DPEP segment primarily generates revenue from the sale of admissions to theme parks, the sale of food, beverage and merchandise at our theme parks and resorts, charges for room nights at hotels, sales of cruise vacations, sales and rentals of vacation club properties, royalties from licensing our IP for use on consumer goods and the sale of branded merchandise  Revenues are also generated from sponsorships and co-branding opportunities, real estate rent and sales, and royalties from Tokyo Disney Resort  Significant expenses include operating labor, costs of goods sold, infrastructure costs, depreciation and other operating expenses  Infrastructure costs include information systems expense, repairs and maintenance, utilities and fuel, property taxes, retail occupancy costs, insurance and transportation  Other operating expenses include costs for such items as supplies, commissions and entertainment offerings

The Company evaluates the performance of its operating segments based on segment operating income, and management uses total segment operating income as a measure of the overall performance of the operating businesses separate from non-

29

Ex. 10
Page 1021

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

operating factors  Total segment operating income is not a financial measure defined by GAAP, should be reviewed in conjunction with the relevant GAAP financial measure and may not be comparable to similarly titled measures reported by other companies  The Company believes that information about total segment operating income assists investors by allowing them to evaluate changes in the operating results of the Company's portfolio of businesses separate from factors other than business operations that affect net income, thus providing separate insight into both operations and other factors that affect reported results

The following table reconciles income from continuing operations before income taxes to total segment operating income:

| | Quarter Ended | | % Change Better (Worse) |
|---|---|---|---|
| (in millions) | January 1, 2022 | January 2, 2021 | |
| Income from continuing operations before income taxes | $ 1,688 | $ 46 | >100 % |
| Add (subtract): | | | |
| Corporate and unallocated shared expenses | 228 | 232 | 2 % |
| Restructuring and impairment charges | — | 113 | 100 % |
| Other expense, net | 436 | — | nm |
| Interest expense, net | 311 | 324 | 4 % |
| TFCF and Hulu acquisition amortization | 595 | 617 | 4 % |
| Total segment operating income | $ 3,258 | $ 1,332 | >100 % |

The following is a summary of segment revenue and operating income (loss):

| | Quarter Ended | | % Change Better (Worse) |
|---|---|---|---|
| (in millions) | January 1, 2022 | January 2, 2021 | |
| *Revenues:* | | | |
| Disney Media and Entertainment Distribution | $ 14,585 | $ 12,661 | 15 % |
| Disney Parks, Experiences and Products | 7,234 | 3,588 | >100 % |
| | $ 21,819 | $ 16,249 | 34 % |
| *Segment operating income:* | | | |
| Disney Media and Entertainment Distribution | $ 808 | $ 1,451 | (44) % |
| Disney Parks, Experiences and Products | 2,450 | (119) | nm |
| | $ 3,258 | $ 1,332 | >100 % |

Depreciation expense is as follows:

| | Quarter Ended | | % Change Better (Worse) |
|---|---|---|---|
| (in millions) | January 1, 2022 | January 2, 2021 | |
| Disney Media and Entertainment Distribution | $ 153 | $ 167 | 8 % |
| Disney Parks, Experiences and Products | | | |
| Domestic | 398 | 388 | (3) % |
| International | 168 | 176 | 5 % |
| Total Disney Parks, Experiences and Products | 566 | 564 | — % |
| Corporate | 48 | 46 | (4) % |
| Total depreciation expense | $ 767 | $ 777 | 1 % |

30

**Ex. 10**
**Page 1022**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

Amortization of intangible assets is as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | | |
| Disney Media and Entertainment Distribution | $ | 40 | $ | 47 | 15 % |
| Disney Parks, Experiences and Products | | 27 | | 27 | — % |
| TFCF and Hulu | | 435 | | 447 | 3 % |
| Total amortization of intangible assets | $ | 502 | $ | 521 | 4 % |

**BUSINESS SEGMENT RESULTS - Current Quarter Results Compared to Prior-Year Quarter**

**Disney Media and Entertainment Distribution**

Revenue and operating results for the DMED segment are as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | | |
| *Revenues:* | | | | | |
| Linear Networks | $ | 7,706 | $ | 7,693 | — % |
| Direct-to-Consumer | | 4,690 | | 3,504 | 34 % |
| Content Sales/Licensing and Other | | 2,433 | | 1,702 | 43 % |
| Elimination of Intrasegment Revenue[1] | | (244) | | (238) | (3) % |
| | $ | 14,585 | $ | 12,661 | 15 % |
| *Segment operating income (loss):* | | | | | |
| Linear Networks | $ | 1,499 | $ | 1,729 | (13) % |
| Direct-to-Consumer | | (593) | | (466) | (27) % |
| Content Sales/Licensing and Other | | (98) | | 188 | nm |
| | $ | 808 | $ | 1,451 | (44) % |

[1] Reflects fees received by the Linear Networks from other DMED businesses for the right to air our Linear Networks and related services

**Linear Networks**

Operating results for Linear Networks are as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | | |
| Revenues | | | | | |
| Affiliate fees | $ | 4,615 | $ | 4,640 | (1) % |
| Advertising | | 2,839 | | 2,835 | — % |
| Other | | 252 | | 218 | 16 % |
| Total revenues | | 7,706 | | 7,693 | — % |
| Operating expenses | | (5,656) | | (5,421) | (4) % |
| Selling, general, administrative and other | | (755) | | (724) | (4) % |
| Depreciation and amortization | | (38) | | (53) | 28 % |
| Equity in the income of investees | | 242 | | 234 | 3 % |
| Operating Income | $ | 1,499 | $ | 1,729 | (13) % |

**Ex. 10**
**Page 1023**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

*Revenues*

Affiliate revenue is as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | | |
| Domestic Channels | $ | 3,862 | $ | 3,773 | 2 % |
| International Channels | | 753 | | 867 | (13) % |
| | $ | 4,615 | $ | 4,640 | (1) % |

The increase in affiliate revenue at the Domestic Channels was due to an increase of 6% from higher contractual rates, partially offset by a decrease of 4% from fewer subscribers

The decrease in affiliate revenue at the International Channels was due to decreases of 12% from fewer subscribers driven by channel closures in Europe and Asia and 3% from an unfavorable foreign exchange impact, partially offset by an increase of 2% from higher contractual rates

Advertising revenue is as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | | |
| Cable | $ | 1,293 | $ | 1,217 | 6 % |
| Broadcasting | | 900 | | 984 | (9) % |
| Domestic Channels | | 2,193 | | 2,201 | — % |
| International Channels | | 646 | | 634 | 2 % |
| | $ | 2,839 | $ | 2,835 | — % |

The increase in Cable advertising revenue was due to an increase of 6% from higher impressions, partially offset by a decrease of 1% from lower rates  The increase in impressions reflected more units delivered and higher average viewership

The decrease in Broadcasting advertising revenue was due to decreases of 12% from fewer impressions at ABC, reflecting lower average viewership, and 8% from the owned television stations, partially offset by an increase of 11% from higher rates at ABC  The decrease at the owned television stations was due to lower political advertising

The increase in International Channels advertising revenue was due to an increase of 6% from higher rates, partially offset by decreases of 3% from an unfavorable foreign exchange impact and 1% from fewer impressions, reflecting lower average viewership  The decrease in viewership was driven by COVID-19-related timing shifts of Indian Premier League (IPL) cricket matches, which resulted in fewer matches in the current quarter compared to the prior-year quarter  This decrease was partially offset by an increase from the airing of International Cricket Council (ICC) T20 World Cup matches in the current quarter  The ICC T20 World Cup generally occurs every two years and was not held in the prior-year quarter due to COVID-19  IPL cricket matches typically occur in our second and third fiscal quarters  As a result of COVID-19-related timing shifts, we aired 13 matches in the current quarter and 44 matches in the prior-year quarter

Other revenue increased $34 million, to $252 million from $218 million, due to sub-licensing fees from ICC T20 World Cup matches in the current quarter, partially offset by lower sub-licensing fees as a result of fewer IPL cricket matches in the current quarter compared to the prior-year quarter

32

**Ex. 10**
**Page 1024**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Costs and Expenses*

Operating expenses primarily consist of programming and production costs, which are as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
| | January 1, 2022 | | January 2, 2021 | | |
|---|---|---|---|---|---|
| Cable | $ | (3,583) | $ | (3,404) | (5) % |
| Broadcasting | | (800) | | (747) | (7) % |
| Domestic Channels | | (4,383) | | (4,151) | (6) % |
| International Channels | | (894) | | (914) | 2 % |
| | $ | (5,277) | $ | (5,065) | (4) % |

The increase in programming and production costs at Cable was primarily due to higher rights costs for the College Football Playoffs (CFP), NFL and MLB and an increase in sports production costs due to the cancellation of events in the prior-year quarter  These increases were partially offset by lower costs for NBA and golf programming  The increases in CFP and NFL rights costs were due to higher contractual rates  Higher MLB rights costs were due to airing one playoff game in the current quarter, compared to airing no MLB games in the prior-year quarter  Lower NBA and golf programming costs were due to the shift of certain NBA games and the Masters out of fiscal 2020 and into the first quarter of fiscal 2021 due to COVID-19

The increase in programming and production costs at Broadcasting was due to a higher cost mix of programming aired on ABC in the current quarter

Programming and production costs at the International Channels decreased due to lower costs for general entertainment programming, the impact of channel closures and a favorable foreign exchange impact, partially offset by an increase in sports programming costs  The decrease in general entertainment programming costs was driven by a lower cost mix of programming in the current quarter  The increase in sports programming costs was due to higher costs for cricket programming, partially offset by lower soccer programming costs reflecting fewer games in the current quarter  Higher costs for cricket programming were driven by costs for ICC T20 World Cup matches in the current quarter, partially offset by the impact of fewer IPL matches in the current quarter compared to the prior-year quarter

*Operating Income from Linear Networks*

Operating income from Linear Networks decreased $230 million, to $1,499 million from $1,729 million, due to decreases at Cable and Broadcasting

The following table provides supplemental revenue and operating income detail for Linear Networks:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
| | January 1, 2022 | | January 2, 2021 | | |
|---|---|---|---|---|---|
| *Supplemental revenue detail* | | | | | |
| Domestic Channels | $ | 6,152 | $ | 6,070 | 1 % |
| International Channels | | 1,554 | | 1,623 | (4) % |
| | $ | 7,706 | $ | 7,693 | — % |
| *Supplemental operating income detail* | | | | | |
| Domestic Channels | $ | 888 | $ | 1,120 | (21) % |
| International Channels | | 369 | | 375 | (2) % |
| Equity in the income of investees | | 242 | | 234 | 3 % |
| | $ | 1,499 | $ | 1,729 | (13) % |

33

**Ex. 10**
**Page 1025**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

**Direct-to-Consumer**

Operating results for Direct-to-Consumer are as follows:

| (in millions) | Quarter Ended | | | % Change Better (Worse) |
| | January 1, 2022 | | January 2, 2021 | |
| --- | --- | --- | --- | --- |
| Revenues | | | | |
| Subscription fees | $ | 3,598 | $ 2,546 | 41 % |
| Advertising | | 980 | 882 | 11 % |
| TV/SVOD distribution and other | | 112 | 76 | 47 % |
| Total revenues | | 4,690 | 3,504 | 34 % |
| Operating expenses | | (3,922) | (2,921) | (34) % |
| Selling, general, administrative and other | | (1,275) | (970) | (31) % |
| Depreciation and amortization | | (86) | (79) | (9) % |
| Operating Loss | $ | (593) | $ (466) | (27) % |

*Revenues*

The increase in subscription fees was due to increases of 23% from higher subscribers, driven by growth at Disney+, Hulu, and ESPN+, and 18% from higher rates due to increases in retail pricing at Disney+, Hulu, and to a lesser extent, ESPN+

Higher advertising revenue reflected increases of 6% from higher rates due to an increase at Hulu and 5% from higher impressions due to increases at Disney+ and ESPN+

The increase in TV/SVOD distribution and other revenue was due to higher Ultimate Fighting Championship (UFC) pay-per-view fees, which reflected an increase in average buys per event and higher pricing, partially offset by the impact of airing two events in the current quarter compared to three events in the prior-year quarter

The following tables present additional information about our Disney+, ESPN+ and Hulu Direct-to-Consumer (DTC) product offerings[1]

Paid subscribers[2] as of:

| (in millions) | January 1, 2022 | January 2, 2021 | % Change Better (Worse) |
| --- | --- | --- | --- |
| Disney+ | | | |
| Domestic (U S  and Canada) | 42.9 | 36 3 | 18 % |
| International (excluding Disney+ Hotstar)[3] | 41.1 | 29 4 | 40 % |
| Disney+ (excluding Disney+ Hotstar)[4] | 84.0 | 65 7 | 28 % |
| Disney+ Hotstar | 45.9 | 29 2 | 57 % |
| Total Disney+[4] | 129.8 | 94 9 | 37 % |
| ESPN+ | 21.3 | 12 1 | 76 % |
| Hulu | | | |
| SVOD Only | 40.9 | 35 4 | 16 % |
| Live TV + SVOD | 4.3 | 4 0 | 8 % |
| Total Hulu[4] | 45.3 | 39 4 | 15 % |

34

**Ex. 10
Page 1026**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

Average Monthly Revenue Per Paid Subscriber[5] for the quarter ended:

|  | January 1, 2022 | | January 2, 2021 | % Change Better (Worse) |
|---|---|---|---|---|
| Disney+ | | | | |
| Domestic (U S  and Canada) | $ | 6.68 | $ 5 80 | 15 % |
| International (excluding Disney+ Hotstar)[3] | | 5.96 | 4 73 | 26 % |
| Disney+ (excluding Disney+ Hotstar) | | 6.33 | 5 37 | 18 % |
| Disney+ Hotstar | | 1.03 | 0 98 | 5 % |
| Disney+ | | 4.41 | 4 03 | 9 % |
| ESPN+ | | 5.16 | 4 48 | 15 % |
| Hulu | | | | |
| SVOD Only | | 12.96 | 13 51 | (4) % |
| Live TV + SVOD | | 87.01 | 75 11 | 16 % |

[1] In the U S , Disney+, ESPN+ and Hulu SVOD Only are each offered as a standalone service or as a package that includes all three services (the SVOD Bundle)  Effective December 21, 2021, Hulu Live TV + SVOD includes Disney+ and ESPN+ (new Hulu Live TV + SVOD offering), whereas previously, Hulu Live TV + SVOD was offered as a standalone service or with Disney+ and ESPN+ as optional additions (old Hulu Live TV + SVOD offering)  Disney+ is available in more than 80 countries and territories outside the U S  and Canada  In India and certain other Southeast Asian countries, our service is branded Disney+ Hotstar  In certain Latin American countries, we offer Disney+ as well as Star+, a general entertainment SVOD service, which is available on a standalone basis or together with Disney+  Depending on the market, our services can be purchased on our websites, through third party platforms/apps or via wholesale arrangements

[2] Reflects subscribers for which we recognized subscription revenue  Subscribers cease to be a paid subscriber as of their effective cancellation date or as a result of a failed payment method  Subscribers to the SVOD Bundle are counted as a paid subscriber for each service included in the SVOD Bundle and subscribers to the old Hulu Live TV + SVOD offering and new Hulu Live TV + SVOD offering are counted as one paid subscriber for each of the Hulu Live TV + SVOD, Disney+ and ESPN+ offerings  Subscribers include those who receive a service through wholesale arrangements including those for which we receive a fee for the distribution of the service to each subscriber of an existing content distribution tier  In Latin America, if a subscriber has either the standalone Disney+ or Star+ service or both the Disney+ and Star+ services, they are counted as one Disney+ paid subscriber  When we aggregate the total number of paid subscribers across our DTC streaming services, we refer to them as paid subscriptions

[3] Includes the Disney+ service outside the U S  and Canada and the Star+ service in Latin America

[4] Total may not equal the sum of the column due to rounding

[5] Revenue per paid subscriber is calculated based on the average of the monthly average paid subscribers for each month in the period  The monthly average paid subscribers is calculated as the sum of the beginning of the month and end of the month paid subscriber count, divided by two  Disney+ average monthly revenue per paid subscriber is calculated using a daily average of paid subscribers for the period  Revenue includes subscription fees, advertising (excluding revenue earned from selling advertising spots to other Company businesses) and premium and feature add-on revenue but excludes Premier Access and Pay-Per-View revenue  The average revenue per paid subscriber is net of discounts on the SVOD Bundle or other offerings that carry more than one service  Revenue is allocated to each service based on the relative retail price of each service on a standalone basis  Starting in December 2021, revenue for the new Hulu Live TV + SVOD offering is allocated to the SVOD services based on the wholesale price of the SVOD Bundle  In general, wholesale arrangements have a lower average monthly revenue per paid subscriber than subscribers that we acquire directly or through third party platforms

The average monthly revenue per paid subscriber for domestic Disney+ increased from $5 80 to $6 68 due to an increase in retail pricing and a lower mix of wholesale subscribers, partially offset by a higher mix of subscribers to the SVOD Bundle

The average monthly revenue per paid subscriber for international Disney+ (excluding Disney+ Hotstar) increased from $4 73 to $5 96 due to increases in retail pricing

The average monthly revenue per paid subscriber for Disney+ Hotstar increased from $0 98 to $1 03 due to launches in new territories with higher average prices, partially offset by a higher mix of wholesale subscribers

35

Ex. 10
Page 1027

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The average monthly revenue per paid subscriber for ESPN+ increased from $4 48 to $5 16 primarily due to an increase in retail pricing and higher per-subscriber advertising revenue, partially offset by a higher mix of subscribers to the SVOD Bundle

The average monthly revenue per paid subscriber for the Hulu SVOD Only service decreased from $13 51 to $12 96 due to lower per-subscriber advertising revenue and a higher mix of subscribers to the SVOD Bundle, partially offset by an increase in retail pricing

The average monthly revenue per paid subscriber for the Hulu Live TV + SVOD service increased from $75 11 to $87 01 due to increases in retail pricing and higher per-subscriber advertising revenue, partially offset by the impact of the new Hulu Live TV + SVOD offering

*Costs and Expenses*

Operating expenses are as follows:

| (in millions) | Quarter Ended | | | % Change Better (Worse) |
|---|---|---|---|---|
| | January 1, 2022 | | January 2, 2021 | |
| Programming and production costs | | | | |
| Disney+ | $ | (920) | $ | (515) | (79) % |
| Hulu | | (1,832) | | (1,624) | (13) % |
| ESPN+ and other | | (427) | | (240) | (78) % |
| Total programming and production costs | | (3,179) | | (2,379) | (34) % |
| Other operating expense | | (743) | | (542) | (37) % |
| | $ | (3,922) | $ | (2,921) | (34) % |

The increase in programming and production costs at Disney+ was due to more content provided on the service

Higher programming and production costs at Hulu were due to higher subscriber-based fees for programming the Live TV service due to rate increases and the carriage of more networks

The increase in programming and production costs at ESPN+ and other was primarily due to new National Hockey League programming

Other operating expenses increased primarily due to higher technology and distribution costs driven by growth in existing markets and to a lesser extent, expansion to new markets

Selling, general, administrative and other costs increased $305 million, to $1,275 million from $970 million, due to higher marketing costs primarily due to growth in existing markets and to a lesser extent, expansion to new markets

*Operating Loss from Direct-to-Consumer*

The operating loss from Direct-to-Consumer increased $127 million, to $593 million from $466 million, due to higher losses at Disney+, and to a lesser extent, ESPN+, partially offset by improved results at Hulu

36

**Ex. 10
Page 1028**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Supplemental Historical Information for Direct-to-Consumer*

The following tables present the number of paid subscribers for Disney+, ESPN+ and Hulu as of:

| (in millions) | October 2, 2021 | July 3, 2021 | April 3, 2021 | January 2, 2021 |
|---|---|---|---|---|
| **Disney+** | | | | |
| Domestic | 38 8 | 37 9 | 37 3 | 36 3 |
| International (excluding Disney+ Hotstar) | 36 0 | 33 2 | 31 1 | 29 4 |
| Disney+ (excluding Disney+ Hotstar) [1] | 74 8 | 71 1 | 68 4 | 65 7 |
| Disney+ Hotstar | 43 3 | 44 9 | 35 2 | 29 2 |
| Total Disney+ [1] | 118 1 | 116 0 | 103 6 | 94 9 |
| **ESPN+** | 17 1 | 14 9 | 13 8 | 12 1 |
| **Hulu** | | | | |
| SVOD Only | 39 7 | 39 1 | 37 8 | 35 4 |
| Live TV + SVOD | 4 0 | 3 7 | 3 8 | 4 0 |
| Total Hulu [1] | 43 8 | 42 8 | 41 6 | 39 4 |

| (in millions) | October 3, 2020 | June 27, 2020 | March 28, 2020 | December 28, 2019 |
|---|---|---|---|---|
| **Disney+** | | | | |
| Domestic | 33 8 | 31 3 | 28 4 | 25 0 |
| International (excluding Disney+ Hotstar) | 19 5 | 17 5 | 5 1 | 1 5 |
| Disney+ (excluding Disney+ Hotstar) [1] | 53 3 | 48 8 | 33 5 | 26 5 |
| Disney+ Hotstar | 20 3 | 8 7 | — | — |
| Total Disney+ [1] | 73 7 | 57 5 | 33 5 | 26 5 |
| **ESPN+** | 10 3 | 8 5 | 7 9 | 6 6 |
| **Hulu** | | | | |
| SVOD Only | 32 5 | 32 1 | 28 8 | 27 2 |
| Live TV + SVOD | 4 1 | 3 4 | 3 3 | 3 2 |
| Total Hulu [1] | 36 6 | 35 5 | 32 1 | 30 4 |

[1]  Total may not equal the sum of the column due to rounding

37

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The following tables present the average monthly revenue per paid subscriber for the quarter ended:

|  | October 2, 2021 | July 3, 2021 | April 3, 2021 | January 2, 2021 |
|---|---|---|---|---|
| **Disney+** |  |  |  |  |
| Domestic | $        6 81 | $        6 62 | $        6 01 | $        5 80 |
| International (excluding Disney+ Hotstar) | 5 52 | 5 52 | 5 14 | 4 73 |
| Disney+ (excluding Disney+ Hotstar) | 6 24 | 6 12 | 5 61 | 5 37 |
| Disney+ Hotstar | 0 64 | 0 78 | 0 49 | 0 98 |
| Disney+ | 4 12 | 4 16 | 3 99 | 4 03 |
| **ESPN+** | 4 74 | 4 47 | 4 55 | 4 48 |
| **Hulu** |  |  |  |  |
| SVOD Only | 12 75 | 13 15 | 12 08 | 13 51 |
| Live TV + SVOD | 84 89 | 84 09 | 81 83 | 75 11 |

|  | October 3, 2020 | June 27, 2020 | March 28, 2020 | December 28, 2019 |
|---|---|---|---|---|
| **Disney+** |  |  |  |  |
| Domestic | $        5 68 | $        5 71 | $        5 64 | $        5 55 |
| International (excluding Disney+ Hotstar) | 4 61 | 4 50 | 5 50 | 5 60 |
| Disney+ (excluding Disney+ Hotstar) | 5 30 | 5 31 | 5 63 | 5 56 |
| Disney+ Hotstar | 0 98 | 0 57 | — | — |
| Disney+ | 4 52 | 4 62 | 5 63 | 5 56 |
| **ESPN+** | 4 54 | 4 18 | 4 24 | 4 44 |
| **Hulu** |  |  |  |  |
| SVOD Only | 12 59 | 11 39 | 12 06 | 13 15 |
| Live TV + SVOD | 71 90 | 68 11 | 67 75 | 59 47 |

The following tables present operating expenses for the quarter ended:

| (in millions) | October 2, 2021 | July 3, 2021 | April 3, 2021 | January 2, 2021 |
|---|---|---|---|---|
| Programming and production costs |  |  |  |  |
| Disney+ | $        (974) | $        (772) | $        (654) | $        (515) |
| Hulu | (1,730) | (1,700) | (1,626) | (1,624) |
| ESPN+ and other | (278) | (297) | (306) | (240) |
| Total programming and production costs | (2,982) | (2,769) | (2,586) | (2,379) |
| Other operating expense | (703) | (645) | (628) | (542) |
|  | $        (3,685) | $        (3,414) | $        (3,214) | $        (2,921) |

38

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

| (in millions) | October 3, 2020 | | June 27, 2020 | | March 28, 2020 | | December 28, 2019 | |
|---|---|---|---|---|---|---|---|---|
| Programming and production costs | | | | | | | | |
| Disney+ | $ | (490) | $ | (352) | $ | (291) | $ | (219) |
| Hulu | | (1,480) | | (1,517) | | (1,396) | | (1,428) |
| ESPN+ and other | | (222) | | (179) | | (277) | | (273) |
| Total programming and production costs | | (2,192) | | (2,048) | | (1,964) | | (1,920) |
| Other operating expense | | (532) | | (498) | | (501) | | (423) |
| | $ | (2,724) | $ | (2,546) | $ | (2,465) | $ | (2,343) |

**Content Sales/Licensing and Other**

Operating results for Content Sales/Licensing and Other are as follows:

| | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| (in millions) | January 1, 2022 | | January 2, 2021 | | |
| Revenues | | | | | |
| TV/SVOD distribution | $ | 1,195 | $ | 1,022 | 17 % |
| Theatrical distribution | | 529 | | 31 | >100 % |
| Home entertainment | | 294 | | 300 | (2) % |
| Other | | 415 | | 349 | 19 % |
| Total revenues | | 2,433 | | 1,702 | 43 % |
| Operating expenses | | (1,625) | | (1,074) | (51) % |
| Selling, general, administrative and other | | (840) | | (359) | >(100) % |
| Depreciation and amortization | | (69) | | (82) | 16 % |
| Equity in the income of investees | | 3 | | 1 | >100 % |
| Operating Income | $ | (98) | $ | 188 | nm |

*Revenues*

The increase in TV/SVOD distribution revenue reflected higher sales of both episodic television and theatrical film content  The increase in episodic television content sales was primarily due to the sale of more significant titles in the current quarter  Higher theatrical film content sales were driven by an increase in sales of library content and more title availabilities in the free television window

The increase in theatrical distribution revenue was due to the release of nine titles in the current quarter compared to no significant releases in the prior-year quarter as a result of COVID-19, and to a lesser extent, revenue from the co-production of Marvel's *Spider-Man: No Way Home*  Significant releases in the current quarter included *Eternals* and *Encanto*

The increase in other revenue was due to higher sales from stage plays as a result of more performances in the current quarter

*Costs and Expenses*

Operating expenses are as follows:

| | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| (in millions) | January 1, 2022 | | January 2, 2021 | | |
| Programming and production costs | $ | (1,260) | $ | (877) | (44) % |
| Cost of goods sold and distribution costs | | (365) | | (197) | (85) % |
| | $ | (1,625) | $ | (1,074) | (51) % |

The increase in programming and production costs was due to higher production cost amortization driven by an increase in theatrical revenue and higher film cost impairments

39

**Ex. 10**
**Page 1031**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

The increase in cost of goods sold and distribution costs was due to higher costs for stage plays as a result of more performances in the current quarter and an increase in theatrical distribution costs as a result of more theatrical releases

Selling, general administrative and other costs increased $481 million, to $840 million from $359 million, due to higher theatrical marketing costs

*Operating Income from Content Sales/Licensing and Other*

Operating income from Content Sales/Licensing and Other decreased $286 million, to a loss of $98 million from income of $188 million, due to lower theatrical distribution results and higher film cost impairments, partially offset by higher TV/SVOD distribution results

*Items Excluded from Segment Operating Income Related to Disney Media and Entertainment Distribution*

The following table presents supplemental information for items related to the DMED segment that are excluded from segment operating income:

| (in millions) | Quarter Ended | | | % Change Better (Worse) |
| | January 1, 2022 | | January 2, 2021 | |
| --- | --- | --- | --- | --- |
| TFCF and Hulu acquisition amortization[1] | $ | (593) | $ (615) | 4 % |
| Restructuring and impairment charges | | — | (81) | 100 % |

[1] In the current quarter, amortization of step-up on film and television costs was $157 million and amortization of intangible assets was $433 million  In the prior-year quarter, amortization of step-up on film and television costs was $167 million and amortization of intangible assets was $445 million

### Disney Parks, Experiences and Products

Operating results for the DPEP segment are as follows:

| (in millions) | Quarter Ended | | | % Change Better (Worse) |
| | January 1, 2022 | | January 2, 2021 | |
| --- | --- | --- | --- | --- |
| Revenues | | | | |
| Theme park admissions | $ | 2,152 | $ 549 | >100 % |
| Parks & Experiences merchandise, food and beverage | | 1,626 | 553 | >100 % |
| Resorts and vacations | | 1,445 | 433 | >100 % |
| Merchandise licensing and retail | | 1,563 | 1,698 | (8) % |
| Parks licensing and other | | 448 | 355 | 26 % |
| Total revenues | | 7,234 | 3,588 | >100 % |
| Operating expenses | | (3,451) | (2,430) | (42) % |
| Selling, general, administrative and other | | (737) | (678) | (9) % |
| Depreciation and amortization | | (593) | (591) | — % |
| Equity in the loss of investees | | (3) | (8) | 63 % |
| Operating Income (Loss) | $ | 2,450 | $ (119) | nm |

*COVID-19*

Revenues at DPEP benefited from the comparison to the significant adverse impact of closures/reduced operating capacity as a result of the impact of COVID-19 on our theme parks and experiences in the prior-year quarter  In fiscal 2022, our domestic parks and experiences are generally operating without significant mandatory COVID-19-related capacity restrictions, such as those that were in place during the prior year; however, we continue to manage capacity to address ongoing COVID-19 considerations with respect to guest and cast health and safety  Certain of our international operations continue to be impacted by mandatory COVID-19-related capacity and travel restrictions

Walt Disney World Resort, Shanghai Disney Resort and Tokyo Disney Resort were open for the entire quarter in both the current and prior years  Disneyland Resort and Disneyland Paris were open for the entire current quarter, whereas Disneyland Resort was closed for all of the prior-year quarter and Disneyland Paris was closed for approximately 65 days in the prior-year

40

Ex. 10
Page 1032

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

quarter  Hong Kong Disneyland Resort was open for 68 days in the current quarter and 42 days in the prior-year quarter  Cruise ships operated at reduced capacities in the current quarter while sailings were suspended in the prior-year quarter

*Revenues*

The increase in theme park admissions revenue was due to attendance growth and higher average per capita ticket revenue, which was due to attendance mix and the introduction of Genie+ and Lightning Lane

Parks & Experiences merchandise, food and beverage revenue growth was due to higher volumes

The increase in resorts and vacations revenue was primarily due to increases in occupied hotel room nights, passenger cruise days and average daily hotel room rates

Merchandise licensing and retail revenue was lower due to a decrease of 9% from retail due to the closure of a substantial number of Disney-branded retail stores in North America and Europe in the second half of fiscal year 2021

The increase in parks licensing and other revenue was due to higher sponsorship revenue

In addition to revenue, costs and operating income, management uses the following key metrics to analyze trends and evaluate the overall performance of our theme parks and resorts, and we believe these metrics are useful to investors in analyzing the business:

| | Domestic | | International[1] | | Total | |
| | Quarter Ended | | Quarter Ended | | Quarter Ended | |
| | Jan 1, 2022 | Jan 2, 2021 | Jan 1, 2022 | Jan 2, 2021 | Jan 1, 2022 | Jan 2, 2021 |
|---|---|---|---|---|---|---|
| **Parks** | | | | | | |
| Increase (decrease) | | | | | | |
| Attendance[2] | >100% | (74) % | >100% | (61) % | >100% | (71) % |
| Per Capita Guest Spending[3] | 30 % | 1 % | 14 % | (9) % | 32 % | (5) % |
| **Hotels** | | | | | | |
| Occupancy[4] | 73 % | 28 % | 52 % | 13 % | 68 % | 24 % |
| Available Room Nights (in thousands)[5] | 2,542 | 2,644 | 799 | 799 | 3,341 | 3,443 |
| Per Room Guest Spending[6] | $473 | $363 | $380 | $372 | $456 | $364 |

[1] Per capita guest spending growth rate is stated on a constant currency basis  Per room guest spending is stated at the average foreign exchange rate for the same period in the prior year

[2] Attendance is used to analyze volume trends at our theme parks and is based on the number of unique daily entries, i e  a person visiting multiple theme parks in a single day is counted only once  Our attendance count includes complimentary entries but excludes entries by children under the age of three

[3] Per capita guest spending is used to analyze guest spending trends and is defined as total revenue from ticket sales and sales of food, beverage and merchandise in our theme parks, divided by total theme park attendance

[4] Occupancy is used to analyze the usage of available capacity at hotels and is defined as the number of room nights occupied by guests as a percentage of available hotel room nights

[5] Available hotel room nights are defined as the total number of room nights that are available at our hotels and at Disney Vacation Club (DVC) properties located at our theme parks and resorts that are not utilized by DVC members  Available hotel room nights include rooms temporarily taken out of service

[6] Per room guest spending is used to analyze guest spending at our hotels and is defined as total revenue from room rentals and sales of food, beverage and merchandise at our hotels, divided by total occupied hotel room nights

41

Ex. 10
Page 1033

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

*Costs and Expenses*

Operating expenses are as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- |
| | January 1, 2022 | | January 2, 2021 | | |
| Operating labor | $ | (1,515) | $ | (1,030) | (47) % |
| Cost of goods sold and distribution costs | | (798) | | (587) | (36) % |
| Infrastructure costs | | (576) | | (522) | (10) % |
| Other operating expense | | (562) | | (291) | (93) % |
| | $ | (3,451) | $ | (2,430) | (42) % |

The increases in operating labor, cost of goods sold and distribution costs and other operating expenses were due to higher volumes while the increase in infrastructure costs was due to higher volumes and increased technology spending

Selling, general, administrative and other costs increased $59 million, to $737 million from $678 million, due to higher marketing spend

*Segment Operating Income (Loss)*

Segment operating income increased from a loss of $0 1 billion to a profit of $2 5 billion due to increases at our domestic parks and resorts and, to a lesser extent, international parks and resorts, partially offset by a decrease at our consumer products business

The following table presents supplemental revenue and operating income (loss) detail for the DPEP segment:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- |
| | January 1, 2022 | | January 2, 2021 | | |
| *Supplemental revenue detail* | | | | | |
| Parks & Experiences | | | | | |
| Domestic | $ | 4,800 | $ | 1,489 | >100 % |
| International | | 861 | | 378 | >100 % |
| Consumer Products | | 1,573 | | 1,721 | (9) % |
| | $ | 7,234 | $ | 3,588 | >100 % |
| *Supplemental operating income (loss) detail* | | | | | |
| Parks & Experiences | | | | | |
| Domestic | $ | 1,555 | $ | (798) | nm |
| International | | 21 | | (262) | nm |
| Consumer Products | | 874 | | 941 | (7) % |
| | $ | 2,450 | $ | (119) | nm |

*Items Excluded from Segment Operating Income Related to Disney Parks, Experiences and Products*

The following table presents supplemental information for items related to the DPEP segment that are excluded from segment operating income:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- |
| | January 1, 2022 | | January 2, 2021 | | |
| Restructuring and impairment charges | $ | — | $ | (28) | 100 % |
| TFCF and Hulu acquisition amortization | | (2) | | (2) | — % |

42

Ex. 10
Page 1034

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

## CORPORATE AND UNALLOCATED SHARED EXPENSES

| | Quarter Ended | | % Change Better (Worse) |
| --- | --- | --- | --- |
| (in millions) | January 1, 2022 | January 2, 2021 | |
| Corporate and unallocated shared expenses | $ (228) | $ (232) | 2 % |

## FINANCIAL CONDITION

The change in cash and cash equivalents is as follows:

| | Quarter Ended | | % Change Better (Worse) |
| --- | --- | --- | --- |
| (in millions) | January 1, 2022 | January 2, 2021 | |
| Cash (used in) provided by operations - continuing operations | $ (209) | $ 75 | nm |
| Cash used in investing activities - continuing operations | (987) | (732) | (35) % |
| Cash used in financing activities - continuing operations | (280) | (333) | 16 % |
| Cash provided by operations - discontinued operations | 8 | 9 | >100 % |
| Cash used in financing activities - discontinued operations | (12) | — | nm |
| Impact of exchange rates on cash, cash equivalents and restricted cash | (35) | 139 | nm |
| Change in cash, cash equivalents and restricted cash | $ (1,515) | $ (842) | nm |

### Operating Activities

Cash used in continuing operating activities was $0 2 billion for the current quarter compared to cash provided by continuing operating activities of $0 1 billion in the prior-year quarter  The decrease in cash provided by operations was due to lower operating cash flow at DMED, partially offset by higher operating cash flow at DPEP  The decrease in operating cash flow at DMED was due to higher operating cash disbursements and higher spending on film and television productions, partially offset by higher operating cash receipts  Higher operating cash disbursements were driven by increased operating expenses while higher operating cash receipts were due to revenue growth  The increase in operating cash flow at DPEP was due to higher operating cash receipts driven by higher revenue, partially offset by an increase in operating cash disbursements due to higher operating expenses

### Produced and licensed programming costs

The DMED segment incurs costs to produce and license feature film and television content  Film and television production costs include all internally produced content such as live-action and animated feature films, television series, television specials and theatrical stage plays  Programming costs include film or television content rights licensed from third parties for use on the Company's Linear Networks and DTC services  Programming assets are generally recorded when the programming becomes available to us with a corresponding increase in programming liabilities

43

Ex. 10
Page 1035

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The Company's film and television production and programming activity for the quarter ended January 1, 2022 and January 2, 2021 are as follows:

| | Quarter Ended | |
|---|---|---|
| (in millions) | January 1, 2022 | January 2, 2021 |
| Beginning balances: | | |
| Produced and licensed programming assets | $ 31,732 | $ 27,193 |
| Programming liabilities | (4,113) | (4,099) |
| | 27,619 | 23,094 |
| Spending: | | |
| Programming licenses and rights | 3,357 | 2,709 |
| Produced film and television content | 3,598 | 2,869 |
| | 6,955 | 5,578 |
| Amortization: | | |
| Programming licenses and rights | (4,811) | (4,539) |
| Produced film and television content | (2,651) | (1,810) |
| | (7,462) | (6,349) |
| Change in internally produced and licensed content costs | (507) | (771) |
| Other non-cash activity | 205 | 185 |
| Ending balances: | | |
| Produced and licensed programming assets | 31,794 | 27,352 |
| Programming liabilities | (4,477) | (4,844) |
| | $ 27,317 | $ 22,508 |

The Company currently expects its fiscal 2022 spend on produced and licensed content, including sports rights, to be as much as approximately $33 billion, or approximately $8 billion more than fiscal 2021 spend of $25 billion  The increase is driven by higher spend to support our DTC expansion and generally assumes no significant disruptions to production due to COVID-19

**Investing Activities**

Investing activities consist principally of investments in parks, resorts and other property and acquisition and divestiture activity  The Company's investments in parks, resorts and other property for the quarter ended January 1, 2022 and January 2, 2021 are as follows:

| (in millions) | January 1, 2022 | January 2, 2021 |
|---|---|---|
| Disney Media and Entertainment Distribution | $ 169 | $ 177 |
| Disney Parks, Experiences and Products | | |
| Domestic | 457 | 336 |
| International | 202 | 183 |
| Total Disney Parks, Experiences and Products | 659 | 519 |
| Corporate | 153 | 64 |
| | $ 981 | $ 760 |

Capital expenditures at the DMED segment primarily reflect investments in technology and in facilities and equipment for expanding and upgrading broadcast centers, production facilities and television station facilities

Capital expenditures for the DPEP segment are principally for theme park and resort expansion, new attractions, cruise ships, capital improvements and technology  The increase in the current period compared to the prior-year period was primarily due to the temporary suspension of certain capital projects in the prior-year period as a result of COVID-19

Capital expenditures at Corporate primarily reflect investments in corporate facilities, technology and equipment  The increase in the current period compared to the prior-year period was driven by higher spend on corporate facilities

44

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The Company currently expects its fiscal 2022 capital expenditures will be approximately $6 1 billion compared to fiscal 2021 capital expenditures of $3 6 billion The expected increase in capital expenditures is due to higher spending on cruise ship fleet expansion, corporate facilities and production facilities and technology at the DMED segment

**Financing Activities**

Cash used in financing activities was $0 3 billion in the both the current quarter and the prior-year quarter In the current quarter, the Company had a decrease in net borrowings of $0 1 billion compared to a decrease in net borrowings of $0 3 billion in the prior-year quarter The lower decrease in net borrowings was partially offset by lower proceeds from exercise of stock options ($33 million in the current quarter compared to $209 million in the prior-year quarter )

See Note 5 to the Condensed Consolidated Financial Statements for a summary of the Company's borrowing activities during the quarter ended January 1, 2022 and information regarding the Company's bank facilities The Company may use operating cash flows, commercial paper borrowings up to the amount of its unused $12 25 billion bank facilities maturing in March 2022, March 2023 and March 2025, and incremental term debt issuances, to retire or refinance other borrowings before or as they come due

The Company's operating cash flow and access to the capital markets can be impacted by factors outside of its control, including COVID-19, which had an adverse impact on the Company's operating cash flows in fiscal 2020 and 2021 We believe that the Company's financial condition remains strong and that its cash balances, other liquid assets, operating cash flows, access to debt and equity capital markets and borrowing capacity under current bank facilities, taken together, provide adequate resources to fund ongoing operating requirements and upcoming debt maturities as well as future capital expenditures related to the expansion of existing businesses and development of new projects Depending on the unknowable duration and severity of the future impacts of COVID-19 and its variants, the Company may take mitigating actions in the future such as continuing to not declare dividends (the Company did not pay a dividend with respect to fiscal 2020 and 2021 operations and has not declared or paid a dividend with respect to fiscal 2022 operations); reducing or not making certain payments, such as some contributions to our pension and postretirement medical plans; raising financing; suspending capital spending; reducing film and television content investments; or implementing furloughs or reductions in force The impacts on our operating cash flows are subject to uncertainty and may require us to rely more heavily on external funding sources, such as debt and other types of financing

The Company's borrowing costs can also be impacted by short- and long-term debt ratings assigned by nationally recognized rating agencies, which are based, in significant part, on the Company's performance as measured by certain credit metrics such as leverage and interest coverage ratios As of January 1, 2022, Moody's Investors Service's long- and short-term debt ratings for the Company were A2 and P-1 (Stable), respectively, Standard and Poor's long- and short-term debt ratings for the Company were BBB+ and A-2 (Stable), respectively, and Fitch's long- and short-term debt ratings for the Company were A- and F2 (Stable), respectively The Company's bank facilities contain only one financial covenant, relating to interest coverage, which the Company met on January 1, 2022, by a significant margin The Company's bank facilities also specifically exclude certain entities, including the Asia Theme Parks, from any representations, covenants or events of default

**SUPPLEMENTAL GUARANTOR FINANCIAL INFORMATION**

On March 20, 2019 as part of the acquisition of TFCF, The Walt Disney Company ("TWDC") became the ultimate parent of TWDC Enterprises 18 Corp (formerly known as The Walt Disney Company) ("Legacy Disney") Legacy Disney and TWDC are collectively referred to as "Obligor Group", and individually, as a "Guarantor" Concurrent with the close of the TFCF acquisition, $16 8 billion of TFCF's assumed public debt (which then constituted 96% of such debt) was exchanged for senior notes of TWDC (the "exchange notes") issued pursuant to an exemption from registration under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to an Indenture, dated as of March 20, 2019, between TWDC, Legacy Disney, as guarantor, and Citibank, N A , as trustee (the "TWDC Indenture") and guaranteed by Legacy Disney On November 26, 2019, $14 0 billion of the outstanding exchange notes were exchanged for new senior notes of TWDC registered under the Securities Act, issued pursuant to the TWDC Indenture and guaranteed by Legacy Disney In addition, contemporaneously with the closing of the March 20, 2019 exchange offer, TWDC entered into a guarantee of the registered debt securities issued by Legacy Disney under the Indenture dated as of September 24, 2001 between Legacy Disney and Wells Fargo Bank, National Association, as trustee (the "2001 Trustee") (as amended by the first supplemental indenture among Legacy Disney, as issuer, TWDC, as guarantor, and the 2001 Trustee, as trustee)

45

**Ex. 10
Page 1037**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

Other subsidiaries of the Company do not guarantee the registered debt securities of either TWDC or Legacy Disney (such subsidiaries are referred to as the "non-Guarantors") The par value and carrying value of total outstanding and guaranteed registered debt securities of the Obligor Group at January 1, 2022 was as follows:

| (in millions) | TWDC | | Legacy Disney | |
| --- | --- | --- | --- | --- |
| | Par Value | Carrying Value | Par Value | Carrying Value |
| Registered debt with unconditional guarantee | $ 37,339 | $ 39,008 | $ 10,588 | $ 10,617 |

The guarantees by TWDC and Legacy Disney are full and unconditional and cover all payment obligations arising under the guaranteed registered debt securities  The guarantees may be released and discharged upon (i) as a general matter, the indebtedness for borrowed money of the consolidated subsidiaries of TWDC in aggregate constituting no more than 10% of all consolidated indebtedness for borrowed money of TWDC and its subsidiaries (subject to certain exclusions), (ii) upon the sale, transfer or disposition of all or substantially all of the equity interests or all or substantially all, or substantially as an entirety, the assets of Legacy Disney to a third party, and (iii) other customary events constituting a discharge of a guarantor's obligations  In addition, in the case of Legacy Disney's guarantee of registered debt securities issued by TWDC, Legacy Disney may be released and discharged from its guarantee at any time Legacy Disney is not a borrower, issuer or guarantor under certain material bank facilities or any debt securities

Operations are conducted almost entirely through the Company's subsidiaries  Accordingly, the Obligor Group's cash flow and ability to service its debt, including the public debt, are dependent upon the earnings of the Company's subsidiaries and the distribution of those earnings to the Obligor Group, whether by dividends, loans or otherwise  Holders of the guaranteed registered debt securities have a direct claim only against the Obligor Group

Set forth below is summarized financial information for the Obligor Group on a combined basis after elimination of (i) intercompany transactions and balances between TWDC and Legacy Disney and (ii) equity in the earnings from and investments in any subsidiary that is a non-Guarantor  This summarized financial information has been prepared and presented pursuant to the Securities and Exchange Commission Regulation S-X Rule 13-01, "Financial Disclosures about Guarantors and Issuers of Guaranteed Securities" and is not intended to present the financial position or results of operations of the Obligor Group in accordance with GAAP

| Results of operations (in millions) | Quarter Ended January 1, 2022: |
| --- | --- |
| Revenues | $ — |
| Costs and expenses | — |
| Net income (loss) from continuing operations | (291) |
| Net income (loss) | (291) |
| Net income (loss) attributable to TWDC shareholders | (291) |

| Balance Sheet (in millions) | January 1, 2022 | October 2, 2021 |
| --- | --- | --- |
| Current assets | $ 8,451 | $ 9,506 |
| Noncurrent assets | 1,727 | 1,689 |
| Current liabilities | 7,662 | 6,878 |
| Noncurrent liabilities (excluding intercompany to non-Guarantors) | 50,154 | 51,439 |
| Intercompany payables to non-Guarantors | 147,209 | 147,629 |

## COMMITMENTS AND CONTINGENCIES

*Legal Matters*

As disclosed in Note 13 to the Condensed Consolidated Financial Statements, the Company has exposure for certain legal matters

*Guarantees*

See Note 15 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K

*Tax Matters*

As disclosed in Note 10 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K, the Company has exposure for certain tax matters

Ex. 10
Page 1038

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

*Contractual Commitments*

See Note 15 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K

## OTHER MATTERS

### Accounting Policies and Estimates

We believe that the application of the following accounting policies, which are important to our financial position and results of operations, require significant judgments and estimates on the part of management  For a summary of our significant accounting policies, including the accounting policies discussed below, see Note 2 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K

*Produced and Acquired/Licensed Content Costs*

We amortize and test for impairment capitalized film and television production costs based on whether the content is predominantly monetized individually or as a group  See Note 7 to the Condensed Consolidated Financial Statements for further discussion

Production costs that are classified as individual are amortized based upon the ratio of the current period's revenues to the estimated remaining total revenues (Ultimate Revenues)

With respect to produced films intended for theatrical release, the most sensitive factor affecting our estimate of Ultimate Revenues is theatrical performance  Revenues derived from other markets subsequent to the theatrical release are generally highly correlated with theatrical performance  Theatrical performance varies primarily based upon the public interest and demand for a particular film, the popularity of competing films at the time of release and the level of marketing effort  Upon a film's release and determination of the theatrical performance, the Company's estimates of revenues from succeeding windows and markets, which may include imputed license fees for content that is used on our DTC streaming services, are revised based on h storical relationships and an analysis of current market trends

With respect to capitalized television production costs that are classified as individual, the most sensitive factors affecting estimates of Ultimate Revenues are program ratings of the content on our licensees' platforms  Program ratings, which are an indication of market acceptance, directly affect the program's ability to generate advertising and subscriber revenues and are correlated with the license fees we can charge for the content in subsequent windows and for subsequent seasons

Ultimate Revenues are reassessed each reporting period and the impact of any changes on amortization of production cost is accounted for as if the change occurred at the beginning of the current fiscal year  If our estimate of Ultimate Revenues decreases, amortization of costs may be accelerated or result in an impairment  Conversely, if our estimate of Ultimate Revenues increases, cost amortization may be slowed

Produced content costs that are part of a group and acquired/licensed content costs are amortized based on projected usage typically resulting in an accelerated or straight-line amortization pattern  The determination of projected usage requires judgment and is reviewed periodically for changes  If projected usage changes we may need to accelerate or slow the recognition of amortization expense

The amortization of multi-year sports rights is based on our projections of revenues over the contract period, which include advertising revenue and an allocation of affiliate revenue (relative value)  If the annual contractual payments related to each season approximate each season's estimated relative value, we expense the related contractual payments during the applicable season  If estimated relative values by year were to change significantly, amortization of our sports rights costs may be accelerated or slowed

*Revenue Recognition*

The Company has revenue recognition policies for its various operating segments that are appropriate to the circumstances of each business  Refer to Note 2 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K for our revenue recognition policies

*Pension and Postretirement Medical Plan Actuarial Assumptions*

The Company's pension and postretirement medical benefit obligations and related costs are calculated using a number of actuarial assumptions  Two critical assumptions, the discount rate and the expected return on plan assets, are important elements of expense and/or liability measurement, which we evaluate annually  See Note 11 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K for estimated impacts of changes in these assumptions  Other assumptions include the healthcare cost trend rate and employee demographic factors such as retirement patterns, mortality, turnover and rate of compensation increase

47

**Ex. 10**
**Page 1039**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The discount rate enables us to state expected future cash payments for benefits as a present value on the measurement date  A lower discount rate increases the present value of benefit obligations and increases pension and postretirement medical expense  The guideline for setting this rate is a high-quality long-term corporate bond rate  The Company's discount rate was determined by considering yield curves constructed of a large population of high-quality corporate bonds and reflects the matching of the plans' liability cash flows to the yield curves

To determine the expected long-term rate of return on the plan assets, we consider the current and expected asset allocation, as well as historical and expected returns on each plan asset class  A lower expected rate of return on plan assets will increase pension and postretirement medical expense

*Goodwill, Other Intangible Assets, Long-Lived Assets and Investments*

The Company is required to test goodwill and other indefinite-lived intangible assets for impairment on an annual basis and if current events or circumstances require, on an interim basis  The Company performs its annual test of goodwill and indefinite-lived intangible assets for impairment in its fiscal fourth quarter

Goodwill is allocated to various reporting units, which are an operating segment or one level below the operating segment  To test goodwill for impairment, the Company first performs a qualitative assessment to determine if it is more likely than not that the carrying amount of a reporting unit exceeds its fair value  If it is, a quantitative assessment is required  Alternatively, the Company may bypass the qualitative assessment and perform a quantitative impairment test

The qualitative assessment requires the consideration of factors such as recent market transactions, macroeconomic conditions, and changes in projected future cash flows of the reporting unit

The quantitative assessment compares the fair value of each goodwill reporting unit to its carrying amount, and to the extent the carrying amount exceeds the fair value, an impairment of goodwill is recognized for the excess up to the amount of goodwill allocated to the reporting unit

The impairment test for goodwill requires judgment related to the identification of reporting units, the assignment of assets and liabilities to reporting units including goodwill, and the determination of fair value of the reporting units  To determine the fair value of our reporting units, we apply what we believe to be the most appropriate valuation methodology for each of our reporting units  We generally use a present value technique (discounted cash flows) corroborated by market multiples when available and as appropriate  The discounted cash flow analyses are sensitive to our estimates of future revenue growth and margins for these businesses as well as the discount rates used to calculate the present value of future cash flows  In times of adverse economic conditions in the global economy, the Company's long-term cash flow projections are subject to a greater degree of uncertainty than usual  We believe our estimates are consistent with how a marketplace participant would value our reporting units  If we had established different reporting units or utilized different valuation methodologies or assumptions, the impairment test results could differ, and we could be required to record impairment charges

To test its other indefinite-lived intangible assets for impairment, the Company first performs a qualitative assessment to determine if it is more likely than not that the carrying amount of each of its indefinite-lived intangible assets exceeds its fair value  If it is, a quantitative assessment is required  Alternatively, the Company may bypass the qualitative assessment and perform a quantitative impairment test

The qualitative assessment requires the consideration of factors such as recent market transactions, macroeconomic conditions, and changes in projected future cash flows

The quantitative assessment compares the fair value of an indefinite-lived intangible asset to its carrying amount  If the carrying amount of an indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized for the excess  Fair values of indefinite-lived intangible assets are determined based on discounted cash flows or appraised values, as appropriate

The Company tests long-lived assets, including amortizable intangible assets, for impairment whenever events or changes in circumstances (triggering events) indicate that the carrying amount may not be recoverable  Once a triggering event has occurred, the impairment test employed is based on whether the Company's intent is to hold the asset for continued use or to hold the asset for sale  The impairment test for assets held for use requires a comparison of the estimated undiscounted future cash flows expected to be generated over the useful life of the significant assets of an asset group to the carrying amount of the asset group  An asset group is generally established by identifying the lowest level of cash flows generated by a group of assets that are largely independent of the cash flows of other assets and could include assets used across multiple businesses  If the carrying amount of an asset group exceeds the estimated undiscounted future cash flows, an impairment would be measured as the difference between the fair value of the asset group and the carrying amount of the asset group  For assets held for sale, to the extent the carrying value is greater than the asset's fair value less costs to sell, an impairment loss is recognized for the difference  Determining whether a long-lived asset is impaired requires various estimates and assumptions, including whether a

48

**Ex. 10**
**Page 1040**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

triggering event has occurred, the identification of asset groups, estimates of future cash flows and the discount rate used to determine fair values

The Company has investments in equity securities  For equity securities that do not have a readily determinable fair value, we consider forecasted financial performance of the investee companies, as well as volatility inherent in the external markets for these investments  If these forecasts are not met, impairment charges may be recorded

### Allowance for Credit Losses

We evaluate our allowance for credit losses and estimate collectability of accounts receivable based on historical bad debt experience, our assessment of the financial condition of individual companies with which we do business, current market conditions, and reasonable and supportable forecasts of future economic conditions  In times of economic turmoil, including COVID-19, our estimates and judgments with respect to the collectability of our receivables are subject to greater uncertainty than in more stable periods  If our estimate of uncollectible accounts is too low, costs and expenses may increase in future periods, and if it is too high, costs and expenses may decrease in future periods  See Note 3 to the Condensed Consolidated Financial Statements for additional discussion

### Contingencies and Litigation

We are currently involved in certain legal proceedings and, as required, have accrued estimates of the probable and estimable losses for the resolution of these proceedings  These estimates are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies and have been developed in consultation with outside counsel as appropriate  From time to time, we are also involved in other contingent matters for which we accrue estimates for a probable and estimable loss  It is possible, however, that future results of operations for any particular quarterly or annual period could be materially affected by changes in our assumptions or the effectiveness of our strategies related to legal proceedings or our assumptions regarding other contingent matters  See Note 13 to the Condensed Consolidated Financial Statements for more detailed information on litigation exposure

### Income Tax

As a matter of course, the Company is regularly audited by federal, state and foreign tax authorities  From time to time, these audits result in proposed assessments  Our determinations regarding the recognition of income tax benefits are made in consultation with outside tax and legal counsel, where appropriate, and are based upon the technical merits of our tax positions in consideration of applicable tax statutes and related interpretations and precedents and upon the expected outcome of proceedings (or negotiations) with taxing and legal authorities  The tax benefits ultimately realized by the Company may differ from those recognized in our future financial statements based on a number of factors, including the Company's decision to settle rather than litigate a matter, relevant legal precedent related to similar matters and the Company's success in supporting its filing positions with taxing authorities

### Impacts of COVID-19 on Accounting Policies and Estimates

In light of the currently unknown ultimate duration and severity of COVID-19, we face a greater degree of uncertainty than normal in making the judgments and estimates needed to apply our significant accounting policies and may make changes to these estimates and judgments over time  This could result in meaningful impacts to our financial statements in future periods as discussed below

### Produced and Acquired/Licensed Content Costs

Certain of our completed or in progress film and television productions have had their initial release dates delayed  The duration of the delay, market conditions when we release the content, or a change in our release strategy (e g  bypassing certain distribution windows) could have an impact on Ultimate Revenues, which may accelerate amortization or result in an impairment of capitalized film and television production costs

Given the ongoing uncertainty around live sporting events continuing uninterrupted, the amount and timing of revenues derived from the broadcast of these events may differ from the projections of revenues that support our amortization pattern of the rights costs we pay for these events  Such changes in revenues could result in an acceleration or slowing of the amortization of our sports rights costs

### Revenue Recognition

Certain of our affiliate contracts contain commitments with respect to the content to be aired on our television networks (e g  live sports or original content)  If there are delays or cancellations of live sporting events or disruptions to film and television content production activities, we may need to assess the impact on our contractual obligations and adjust the revenue that we recognize related to these contracts

49

**Ex. 10**
**Page 1041**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

*Goodwill, Other Intangible Assets, Long-Lived Assets and Investments*

Given the ongoing impacts of COVID-19 across our businesses, the projected cash flows that we use to assess the fair value of our businesses and assets for purposes of impairment testing are subject to greater uncertainty than normal  If in the future we reduce our estimate of cash flow projections, we may need to impair some of these assets

*Income Tax (See Note 8 to the Condensed Consolidated Financial Statements)*

The determination of interim period tax provisions generally requires the use of a forecasted full-year effective tax rate, which in turn requires a full year forecast of earnings before tax and tax expense  Given the uncertainties created by COVID-19, these forecasts are subject to greater than normal variability, which could lead to volatility in our reported quarterly effective tax rates

*Risk Management Contracts*

The Company employs a variety of financial instruments (derivatives) including interest rate and cross-currency swap agreements and forward and option contracts to manage its exposure to fluctuations in interest rates, foreign currency exchange rates and commodity prices

As a result of the impact of COVID-19 on our businesses, our projected cash flows or projected usage of commodities are subject to a greater degree of uncertainty, which may cause us to recognize gains or losses on our hedging instruments in different periods than the hedged transaction

**New Accounting Pronouncements**

See Note 17 to the Condensed Consolidated Financial Statements for information regarding new accounting pronouncements

**MARKET RISK**

The Company is exposed to the impact of interest rate changes, foreign currency fluctuations, commodity fluctuations and changes in the market values of its investments

**Policies and Procedures**

In the normal course of business, we employ established policies and procedures to manage the Company's exposure to changes in interest rates, foreign currencies and commodities using a variety of financial instruments

Our objectives in managing exposure to interest rate changes are to limit the impact of interest rate volatility on earnings and cash flows and to lower overall borrowing costs  To achieve these objectives, we primarily use interest rate swaps to manage net exposure to interest rate changes related to the Company's portfolio of borrowings  By policy, the Company targets fixed-rate debt as a percentage of its net debt between minimum and maximum percentages

Our objective in managing exposure to foreign currency fluctuations is to reduce volatility of earnings and cash flow in order to allow management to focus on core business issues and challenges  Accordingly, the Company enters into various contracts that change in value as foreign exchange rates change to protect the U S dollar equivalent value of its existing foreign currency assets, liabilities, commitments and forecasted foreign currency revenues and expenses  The Company utilizes option strategies and forward contracts that provide for the purchase or sale of foreign currencies to hedge probable, but not firmly committed, transactions  The Company also uses forward and option contracts to hedge foreign currency assets and liabilities  The principal foreign currencies hedged are the euro, Japanese yen, British pound, Chinese yuan and Canadian dollar  Cross-currency swaps are used to effectively convert foreign currency denominated borrowings to U S dollar denominated borrowings  By policy, the Company maintains hedge coverage between minimum and maximum percentages of its forecasted foreign exchange exposures generally for periods not to exceed four years  The gains and losses on these contracts offset changes in the U S dollar equivalent value of the related exposures  The economic or political conditions in a country could reduce our ability to hedge exposure to currency fluctuations in the country or our ability to repatriate revenue from the country

Our objectives in managing exposure to commodity fluctuations are to use commodity derivatives to reduce volatility of earnings and cash flows arising from commodity price changes  The amounts hedged using commodity swap contracts are based on forecasted levels of consumption of certain commodities, such as fuel oil and gasoline

Our objectives in managing exposures to market-based fluctuations in certain retirement liabilities are to use total return swap contracts to reduce the volatility of earnings arising from changes in these retirement liabilities  The amounts hedged using total return swap contracts are based on estimated liability balances

It is the Company's policy to enter into foreign currency and interest rate derivative transactions and other financial instruments only to the extent considered necessary to meet its objectives as stated above  The Company does not enter into these transactions or any other hedging transactions for speculative purposes

50

**Ex. 10
Page 1042**

**Item 3. Quantitative and Qualitative Disclosures about Market Risk.**

See Item 2, Management's Discussion and Analysis of Financial Condition and Results of Operations, and Note 15 to the Condensed Consolidated Financial Statements

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures** – We have established disclosure controls and procedures to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and that such information is accumulated and made known to the officers who certify the Company's financial reports and to other members of senior management and the Board of Directors as appropriate to allow timely decisions regarding required disclosure

Based on their evaluation as of January 1, 2022, the principal executive officer and principal financial officer of the Company have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) are effective

**Changes in Internal Controls** – There have been no changes in our internal control over financial reporting during the first quarter of fiscal 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting

51

**Ex. 10**
**Page 1043**

## PART II. OTHER INFORMATION

**ITEM 1. Legal Proceedings**

As disclosed in Note 13 to the Condensed Consolidated Financial Statements, the Company is engaged in certain legal matters, and the disclosure set forth in Note 13 relating to certain legal matters is incorporated herein by reference

**ITEM 1A. Risk Factors**

For an enterprise as large and complex as the Company, a wide range of factors could materially affect future developments and performance, including those described in "Risk Factors" in our 2021 Annual Report on Form 10-K and the factors affecting specific business operations identified in connection with the description of these operations and the financial results of these operations elsewhere in our filings with the SEC  There have been no material changes in our risk factors from those disclosed in our 2021 Annual Report on Form 10-K

52

**Ex. 10**
**Page 1044**

**ITEM 2. Unregistered Sales of Equity Securities and Use of Proceeds**

(a) The following table provides information about Company purchases of equity securities that are registered by the Company pursuant to Section 12 of the Exchange Act during the quarter ended January 1, 2022:

| Period | Total Number of Shares Purchased[1] | | Weighted Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs[2] |
|---|---|---|---|---|---|
| October 3, 2021 - October 31, 2021 | 16,599 | $ | 171 24 | — | na |
| November 1, 2021 - November 30, 2021 | 23,036 | | 157 38 | — | na |
| December 1, 2021 - January 1, 2022 | 28,624 | | 147 64 | — | na |
| Total | 68,259 | | 156 67 | — | na |

[1] 68,259 shares were purchased on the open market to provide shares to participants in the Walt Disney Investment Plan These purchases were not made pursuant to a publicly announced repurchase plan or program

[2] Not applicable as the Company no longer has a stock repurchase plan or program

**Ex. 10**
**Page 1045**

**ITEM 5. Other Items**

None

54

**Ex. 10**
**Page 1046**

**ITEM 6. Exhibits**

INDEX OF EXHIBITS

| Number and Description of Exhibit (Numbers Coincide with Item 601 of Regulation S-K) | | Document Incorporated by Reference from a Previous Filing or Filed Herewith, as Indicated below |
|---|---|---|
| 10 1 | Description of Directors Compensation | Filed herewith |
| 10 2 | Amendment dated December 21, 2021 to Amended Employment Agreement dated as of July 1, 2015 between the Company and Christine M. McCarthy † | Exhibit 10 1 to the Current Report on Form 8-K of the Company filed December 21, 2021 |
| 10 3 | Assignment of Employment Agreement dated January 19, 2022 between the Company and Christine M. McCarthy † | Filed herewith |
| 10 4 | Employment Agreement, dated as of December 21, 2021 between the Company and Horacio E. Gutierrez † | Filed herewith |
| 10 5 | Assignment of Employment Agreement dated January 31, 2022 between the Company and Horacio E. Gutierrez † | Filed herewith |
| 10 6 | Employment Agreement, dated as of January 24, 2022 between the Company and Geoffrey S. Morrell † | Filed herewith |
| 10 7 | Temporary Consulting Services Agreement, dated as of January 7, 2022 between the Company and Alan N. Braverman † | Filed herewith |
| 10 8 | Group Personal Excess Liability Insurance Plan † | Filed herewith |
| 10 9 | Third Amendment to the Disney Key Employees Retirement Savings Plan † | Filed herewith |
| 10 10 | Form of Performance-Based Restricted Stock Unit Award Agreement (Three-Year Vesting subject to Total Shareholder Return/ROIC Tests) † | Filed herewith |
| 10 11 | Performance-Based Restricted Stock Unit Award Agreement (Three-Year Vesting subject to Total Shareholder Return/ROIC Tests) for Robert A. Iger dated as of December 14, 2021 † | Filed herewith |
| 10 12 | Non-Qualified Stock Option Award Agreement for Robert A. Iger dated as of December 14, 2021 † | Filed herewith |
| 22 | List of Guarantor Subsidiaries | Filed herewith |
| 31(a) | Rule 13a-14(a) Certification of Chief Executive Officer of the Company in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 31(b) | Rule 13a-14(a) Certification of Chief Financial Officer of the Company in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32(a) | Section 1350 Certification of Chief Executive Officer of the Company in accordance with Section 906 of the Sarbanes-Oxley Act of 2002* | Furnished |
| 32(b) | Section 1350 Certification of Chief Financial Officer of the Company in accordance with Section 906 of the Sarbanes-Oxley Act of 2002* | Furnished |
| 101 | The following materials from the Company's Quarterly Report on Form 10-Q for the quarter ended January 1, 2022 formatted in Inline Extensible Business Reporting Language (iXBRL): (i) the Condensed Consolidated Statements of Income, (ii) the Condensed Consolidated Statements of Comprehensive Income, (iii) the Condensed Consolidated Balance Sheets, (iv) the Condensed Consolidated Statements of Cash Flows, (v) the Condensed Consolidated Statements of Equity and (vi) related notes | Filed herewith |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) | Filed herewith |

\* A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request

† Management Contract or compensatory plan or arrangement

Ex. 10
Page 1047

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized

THE WALT DISNEY COMPANY
(Registrant)

By:     /s/ CHRISTINE M. MCCARTHY

Christine M. McCarthy,
Senior Executive Vice President and Chief Financial Officer

February 9, 2022
Burbank, California

56

Ex. 10
Page 1048

Exhibit 10.1

**NON-MANAGEMENT DIRECTOR COMPENSATION**

**Non-Management Directors:**

• Each Director will receive a Board retainer of $115,000 (prorated for partial periods of service), payable in quarterly installments in arrears.

• Each Director will receive an annual Committee retainer of $10,000 (prorated for partial periods of service) for each Committee of which such Director is a member, payable in quarterly installments in arrears.

• The Chairs of the following committees will receive an additional annual Committee Chair retainer of the amounts indicated (prorated for partial periods of service), payable in quarterly installments in arrears: Audit Committee - $27,500; Compensation Committee - $25,000; Governance and Nominating Committee - $20,000.

• Each Director will receive a quarterly deferred stock unit grant, with a value equal to $60,000 (i.e., $240,000 per year) (prorated for partial periods of service), based on the average of the high and low trading prices of the Company's common stock averaged over the last ten trading days of the quarter. These units will be fully vested when granted and will be distributed to the Director on the second anniversary of the grant date unless the Director makes an election prior to the end of the preceding calendar year (or, for Board service beginning during a calendar year, within 10 calendar days of commencement of service) to defer distribution until termination of the Director's service on the Board. The units will be distributed 100% in shares of the Company's common stock.

• Unless the Board exempts a Director, each Director will be required to retain at all times stock representing no less than 50% of the after-tax value of exercised options and shares received upon distribution of deferred stock units until the director holds shares sufficient to meet any equity retention guidelines set forth in the Company's *Corporate Governance Guidelines*.

**Independent Lead Director**

• If applicable, the Director elected Lead Director shall receive as compensation for such Director's services as Lead Director a fee of $60,000 per year in addition to the compensation received by the Director for such Director's service as a Director and on Committees of the Board.

**Non-Management Chairman**

• If applicable, the Director elected Chairman shall receive as compensation for such Director's services as Chairman a fee of $145,000 per year in addition to the compensation received by the Director for such Director's service as a Director and on Committees of the Board.

**THE WALT DISNEY COMPANY**
**500 South Buena Vista Street**
**Burbank, California 91521**

January 19, 2022

Ms. Christine M. McCarthy
Senior Executive Vice President
and Chief Financial Officer
The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

Re: Assignment of Employment Agreement

Dear Ms. McCarthy:

Reference is made to the employment agreement (the "*Agreement*") dated as of July 1, 2015, as amended, between The Walt Disney Company (the "*Company*") and you, wherein Company employed your services as Senior Executive Vice President and Chief Financial Officer.

1.    Pursuant to Paragraph 8(c) of the Agreement, Company may assign the Agreement or all or any part of its rights thereunder from any Company entity to another Company entity, and in such event the Agreement shall inure to the benefit of such assignee.

2.    Please be advised that Company hereby assigns the Agreement to Disney Financial Services Co., LLC, effective as of January 2, 2022 (the "*Assignment Effective Date*").

3.    Effective as of January 2, 2022, all references to "Company" in the Agreement and its subsequent amendments shall be deemed to be references to Disney Financial Services Co., LLC.

4.    Following the Assignment Effective Date, your title shall continue to be Senior Executive Vice President and Chief Financial Officer, The Walt Disney Company.

As so assigned, the Agreement continues in full force and effect.

THE WALT DISNEY COMPANY

By:    /s/ Paul J. Richardson
       Senior Executive Vice President and
       Chief Human Resources Officer

Date:    January 19, 2022

The above-referenced assignment is hereby accepted.

DISNEY FINANCIAL SERVICES CO., LLC

By:    /s/ Judith M. Agay
       Vice President

Date:    January 19, 2022

**Exhibit 10.4**

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT, dated as of December 21, 2021, by and between The Walt Disney Company, a Delaware corporation (the "*Company*"), and Horacio Gutierrez ("*Executive*").

### WITNESSETH:

WHEREAS, the Company and Executive wish to enter into an agreement (this "*Agreement*") to provide for Executive's service to the Company;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Company and Executive hereby agree as follows:

1.    Employment. Upon the terms and subject to the conditions of this Agreement, the Company hereby employs Executive, and Executive hereby accepts employment by the Company, for the period commencing as of February 1, 2022 (the "*Commencement Date*") and ending on December 31, 2024 (or such earlier date as shall be determined pursuant to Paragraph 5). The period during which Executive is employed pursuant to this Agreement shall be referred to as the "*Employment Period*."

2.    Position and Duties. During the Employment Period, Executive shall serve as Senior Executive Vice President, General Counsel and Secretary of the Company and in such other positions with the Company and its subsidiaries consistent with Executive's position as Senior Executive Vice President, General Counsel and Secretary, as the Company reasonably may assign. Executive's upward reporting structure will be consistent with the upward reporting structure of comparable senior executives. During the Employment Period, Executive shall devote all Executive's business time on a full-time and exclusive basis to the services required hereunder, and shall perform such services in a manner consonant with the duties of Executive's position. Executive shall be subject to the terms and conditions of any applicable policy of the Company (including, without limitation, "The Walt Disney Company and Affiliated Companies Standards of Business Conduct" booklet and the Employee Policy Manual), as reasonably made available and as interpreted from time to time by the Company, provided that, subject to the provisions of Paragraph 7 and the Employee Policy Manual, nothing herein shall preclude Executive from (i) engaging in charitable activities and community affairs, and (ii) managing Executive's personal investments, so long as the activities listed in subclauses (i)-(ii) do not materially interfere, individually or in the aggregate, with the proper performance of Executive's duties and responsibilities hereunder. Notwithstanding the Policy on Board Service contained in the Employee Policy Manual, during the six-month period preceding the Scheduled Expiration Date, Executive shall, upon reasonable notice to and absent objection by the Chief Executive Officer of the Company, be entitled to explore opportunities for service

**Ex. 10
Page 1051**

on the board of directors of any public company that is not a Designated Business, as such term is defined in the Consulting Agreement (Exhibit A, attached hereto). For the avoidance of doubt, actual service on the board of directors of any public company while employed by the Company remains prohibited.

3.    Compensation.

(a)    Base Salary. Effective as of the Commencement Date, Executive shall receive an annual base salary of $1,300,000. Subsequent salary amounts shall be determined by the Company in its sole discretion; provided, however, that none of such subsequent annualized salaries shall be less than $1,300,000. Notwithstanding any other provision of this Agreement or any other Company document reflecting Executive's Base Salary (as defined below), the Company may reduce Executive's Base Salary by any amount up to 50% of Executive's then-current Base Salary for any period of time up to a consecutive or cumulative maximum period of six months if during such applicable period Disney has instituted a Disney-wide salary reduction program broadly applicable to employees at a comparable level to Executive

The amount of annual base salary payable under this Paragraph 3(a) shall be reduced, however, to the extent Executive elects in accordance with Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*"), and the regulations and interpretations thereunder ("*Section 409A*"), to defer such salary under the terms of any deferred compensation or savings plan or arrangement maintained or established by or on behalf of the Company or any of its subsidiaries. Executive's annual base salary payable hereunder, without reduction for any amounts deferred as described above, is referred to herein as the "*Base Salary*." The Company shall pay Executive the portion of Base Salary not deferred at the election of Executive in accordance with its generally applicable policies for comparable senior executives (currently paid on a weekly basis), but not less frequently than in equal monthly installments.

(b)    Annual Incentive Bonus. Executive shall be given the opportunity to earn an annual discretionary incentive bonus in accordance with the annual bonus plan generally applicable to the most senior executives of the Company, as the same may be in effect from time to time (the "*Annual Plan*"). Executive's target annual incentive bonus opportunity under the Annual Plan during each full fiscal year during the term hereof shall be two hundred percent (200%) of Executive's Base Salary in effect at the end of such fiscal year. The actual amount payable to Executive as an annual bonus under the Annual Plan shall be dependent upon the achievement of performance objectives established in accordance with the Annual Plan by the Board of Directors of the Company or the committee of the Board of Directors of the Company responsible for administering such Annual Plan (the "*Compensation Committee*"), which, as to

2

Company performance objectives, shall be substantially the same as the objectives established under the Annual Plan for other senior executive officers of the Company, though individual performance criteria may differ to reflect differences in responsibilities. The preceding sentence shall not limit any power or discretion of the Board of Directors of Company or the Compensation Committee in the administration of the Annual Plan. Any bonus payable pursuant to this Paragraph 3(b) shall be paid at the same time as annual bonuses are generally payable to the most senior executives of Company in accordance with the provisions of the Annual Plan, subject to Executive's continued employment with Company through the date on which such bonuses are paid. If Executive's employment continues until and ends upon the Scheduled Expiration Date, the Chief Executive Officer of the Company will, in his discretion, recommend to the Compensation Committee an annual cash bonus for the fiscal year in which the termination occurs in consideration of Executive's contributions during such fiscal year. Such bonus shall be payable at the same time annual cash bonuses are paid to senior management and shall be based on actual achievement of performance targets, evaluated as if Executive had remained employed through the end of the applicable performance period.

(c)    Eligibility for Equity Awards. Subject to the terms of this Agreement, Executive shall be entitled to participate in any stock option, restricted stock unit, performance share, performance unit or other equity-based long-term incentive compensation plan, program or arrangement generally made available to the most senior executives of Company, on substantially the same terms and conditions as generally apply to such other such executives, except that the size of the awards made to Executive shall reflect Executive's position with the Company and the Compensation Committee's evaluation of Executive's performance and competitive compensation practices. For each full fiscal year during the term hereof, Executive shall receive an annual award with a target accounting award value (which value shall be as determined in accordance with the policies and practices generally applicable to the most senior executives of Company) of five hundred percent (500%) of Executive's Base Salary as expected to be in effect at the end of such fiscal year; it being understood that the form of the award shall be determined by the Compensation Committee and such form shall be subject to the terms of the applicable plan or plans of the Company. The preceding sentence shall not limit any power or discretion of the Board of Directors of Company or the Committee in the administration of any such longterm incentive plan, it being understood, specifically, that the Compensation Committee may adjust (i.e. reduce or increase) the target award value of any award made in respect of any fiscal year based on its evaluation of Executive's performance and/or any economic, financial and/or market conditions affecting the Company. The actual benefits conveyed to Executive in respect of any such awards may be less than, greater than or equal to the targeted award value, as such

3

benefits will be dependent on a series of performance and other factors, such as the value of Company's common stock and satisfaction of any applicable vesting requirements and performance conditions.

(d)    Signing Bonus. In addition to the foregoing, Executive shall receive a special one-time signing bonus in the amount of $2,000,000 (less statutory withholdings) (the "Signing Bonus") payable within ten business days following Company's receipt of Executive's signature on this agreement or Executive's commencement of work hereunder, whichever is the later. In consideration of this Signing Bonus, Executive agrees that if Executive should terminate Executive's employment with Company (or with one of its subsidiaries, in the event Executive may be employed at that time by a subsidiary rather than by Company) other than for Good Reason within two years from the Commencement Date (as defined in paragraph 1 above), Executive shall pay Company a sum equal to (i) the amount of the Signing Bonus, if the Executive's termination occurs prior to the first anniversary of the Commencement Date or (ii) the amount of the Signing Bonus multiplied by a fraction the numerator of which is the number of full months Executive had been employed by the Company through the last date of employment and the denominator of which is twenty-four, if the Executive's termination occurs on or after the first anniversary, and prior to the second anniversary, of the Commencement Date.

(e)    Initial Equity-Based Award. In connection with the commencement of Executive's services hereunder, the Company shall recommend to the Compensation Committee of the board of directors of Company that Executive receive at the first scheduled meeting of such Committee following the Commencement Date an equity award with a target award value of $10,000,000, with the value of each component of the award determined by the Company in accordance with its generally applicable policies, ,it being understood that the form of the award shall be determined by the Compensation Committee, and such form shall be subject to the terms of the applicable plan or plans of Company (the "*Award*"). It is expected that the Award shall be granted in the same forms of grants and same proportions and have substantially the same vesting terms as are generally applicable to the Company's most senior executives in connection with annual equity-based incentive awards made at or shortly prior to time as the Award is made to Executive. The first service vesting date in respect of any portion of the Award that would vest in three equal annual installments shall occur in December 2022, with each of the following two installments to vest in December 2023 and December 2024, respectively. With respect to any portion of the Award as to which the service vesting requirement cliff vests, the service vesting date shall be occur in December 2024. The actual benefits conveyed to Executive in respect of such Award may be less than, greater than, or equal to the targeted award value, as such benefits will be dependent on the value of Disney's common stock, and the satisfaction of applicable vesting

4

requirements, in each case as set forth in the award agreement specific to this Award.

4.    Benefits, Perquisites and Expenses.

(a)    Benefits. During the Employment Period, Executive shall be eligible to participate in (i) each welfare benefit plan sponsored or maintained from time to time by the Company and made available generally to its executive officers, including, without limitation, each such group life, hospitalization, medical, dental, health, accident or disability insurance, vacation or similar plan or program, whether now existing or established hereafter, and (ii) each pension, profit sharing, retirement, deferred compensation or savings plan sponsored or maintained by the Company for its executive officers, whether now existing or established hereafter, in accordance with the generally applicable provisions thereof.

(b)    Perquisites. During the Employment Period, Executive shall be entitled to receive such perquisites as are generally provided to other executive officers of the Company in accordance with the then current policies and practices of the Company.

(c)    Business Expenses. The Company shall pay or reimburse Executive for all reasonable expenses incurred or paid by Executive during the Employment Period in the performance of Executive's duties hereunder, upon presentation of expense statements or vouchers and such other information as the Company may reasonably require and in accordance with the generally applicable policies and procedures of the Company for its executive officers as in effect from time to time.

(d)    Indemnification. The Company shall cause Disney to provide Executive with an indemnification agreement substantially in the form attached hereto as Exhibit A (the "*Indemnification Agreement*"), which agreement shall be signed and delivered to Executive upon execution of this Agreement by the parties hereto.

5.    Termination of Employment.

(a)    Early Termination of the Employment Period. Notwithstanding Paragraph 1, the Employment Period shall end upon the earliest to occur, if any, of (i) Executive's death, (ii) a Termination due to Disability, (iii) a Termination for Cause, (iv) the Termination Date specified in connection with any exercise by the Company of its Termination Right or (v) a Termination for Good Reason. If the Employment Period terminates as of a date specified under this Paragraph 5, Executive shall be deemed to have automatically resigned, effective immediately upon termination, from any and all positions Executive holds with the Company

5

and any of its subsidiaries and affiliates, with no further action required by Executive or the Company or any of its subsidiaries and affiliates.

(b)    <u>Benefits Payable Upon Termination</u>.

(i)    In the event of Executive's death during the Employment Period or a Termination due to Disability, Executive or Executive's beneficiaries or legal representatives shall be provided the Unconditional Entitlements, including, but not limited to, any such Unconditional Entitlements that are or become payable under any Company plan, policy, practice or program or any contract or agreement with the Company by reason of Executive's death or Termination due to Disability. Unless and until a Termination due to Disability, during any period during which Executive is unable to perform the services required hereunder for medical or health-related reasons, Executive's Base Salary shall be payable to Executive and for any such period of approved leave, Executive shall remain an employee of the Company for purposes of stock option and restricted stock unit awards, annual incentive bonus compensation pursuant to Paragraph 3(b) hereof, and equity awards pursuant to Paragraph 3(c) hereof.

(ii)    In the event of Executive's Termination for Cause, Executive shall be provided the Unconditional Entitlements, except that Executive will not be paid the bonus referred to in Paragraph 5(c)(ii) below.

(iii)    In the event of a Termination for Good Reason or the exercise by the Company of its Termination Right, Executive shall be provided the Unconditional Entitlements. In addition, the Company shall provide Executive the Conditional Benefits, subject to (A) Executive's execution of the Release, (B) Executive having not revoked such Release within the seven-day revocation period permitted following delivery of such Release and (C) Executive's execution of the Consulting Agreement, it being understood, for the avoidance of doubt, that any failure by Executive to execute either the Consulting Agreement or the Release or both of them shall not be deemed to be a breach hereof. For Executive to become entitled to the Conditional Benefits, Executive must deliver both (i) the executed Release and (ii) the executed Consulting Agreement to the Company by no later than twenty-two (22) days following the Termination Date.

(c)    <u>Unconditional Entitlements</u>. For purposes of this Agreement, the "*Unconditional Entitlements*" to which Executive may become entitled under Paragraph 5(b) are as follows:

6

(i)    Earned Salary. Any Base Salary earned, but unpaid, including without limitation accrued but unused and unpaid vacation, for services rendered to the Company on or prior to the date on which the Employment Period ends pursuant to Paragraph 5(a) (but excluding any salary and interest accrued thereon payment of which has been deferred, which shall be paid as provided under the applicable plan) shall be paid within 30 days following the termination of Executive's employment hereunder (or such date or earlier dates upon which payment of any part or whole of the foregoing is required under applicable law).

(ii)    Prior Year Bonus. If Executive's employment terminates after the end of a fiscal year but before the annual incentive compensation payable for services rendered in that prior fiscal year has been paid, the annual incentive compensation that would have been payable to Executive for such completed fiscal year in accordance with Paragraph 3(b) shall be paid within 30 days following the termination of Executive's employment hereunder (or such date or earlier dates upon which payment of any part or whole of the foregoing is required under applicable law) or, if any part thereof constitutes a bonus which is subject to or conditioned upon any performance conditions, within thirty (30) days following the determination that such conditions have been met, provided that in all events the bonus shall be paid no later than 120 days following Executive's termination of employment.

(iii)    Benefits. All benefits payable to Executive under any employee benefit plans (including, without limitation any pension plans or 401(k) plans) of the Company or any of its subsidiaries applicable to Executive at the time of termination of Executive's employment with the Company and all amounts and benefits (other than the Conditional Benefits) which are vested or which Executive is otherwise entitled to receive under the terms of or in accordance with any plan, policy, practice or program of, or any contract or agreement with, the Company or any of its subsidiaries, at or subsequent to the date of Executive's termination without regard to the performance by Executive of further services or the resolution of a contingency, shall be paid or provided in accordance with and subject to the terms and provisions of such plans, it being understood that all such benefits shall be determined on the basis of the actual date of termination of Executive's employment with the Company. Notwithstanding the immediately preceding sentence, Executive shall not be entitled to any benefits under any severance plan or policy of the Company or any of its subsidiaries.

(iv)    Indemnities. Any right which Executive may have to claim a defense and/or indemnity for liabilities to or claims asserted by third

7

parties in connection with Executive's activities as an officer, director or employee of the Company or any of its subsidiaries pursuant to the terms of the Indemnification Agreement referenced in Paragraph 4(d) shall be unaffected by Executive's termination of employment and shall remain in effect in accordance with its terms.

(v)     Medical Coverage. Executive shall be entitled to such continuation of health care coverage as is required under, and in accordance with, applicable law or otherwise provided in accordance with the Company's policies. Executive shall be notified in writing pursuant to this Paragraph 5(c)(v) of Executive's rights to continue such coverage after the termination of Executive's employment, provided that Executive timely complies with the conditions to continue such coverage that are applicable at law or pursuant to Company's policies and procedures to a termination of employment at that time. Executive understands and acknowledges that Executive is responsible to make all payments required for any such continued health care coverage that Executive may choose to receive.

(vi)     Business Expenses. Executive shall be entitled to reimbursement, in accordance with the Company's policies regarding expense reimbursement as in effect from time to time, for all business expenses incurred by Executive prior to the termination of employment.

(vii)     Stock Options/RSUs. Except to the extent additional rights are provided upon Executive's qualifying to receive the Conditional Benefits, Executive's rights with respect to any stock options and/or restricted stock units granted to Executive by the Company shall be governed by the terms and provisions of the plans (including plan rules) and award agreements pursuant to which such stock options and restricted stock units were awarded, as in effect at the date Executive's employment terminates.

(d)     Conditional Benefits. For purposes of this Agreement, the "*Conditional Benefits*" to which Executive may become entitled, provided Executive complies with the terms and conditions hereof (including the applicable agreements attached hereto), are as follows:

(i)     Remaining Salary. As further noted in paragraph 2 of the Consulting Agreement, the Company shall pay Executive a lump sum amount equal to the Consulting Amount as compensation for consulting services under the Consulting Agreement. If the Scheduled Expiration Date is later than the end of the Consulting Agreement Period, the Company shall also pay Executive the Severance Amount. The Consulting Amount and the Severance Amount shall be paid on the date

8

that is six months and one day after the Termination Date (or upon Executive's death, if earlier).

(ii)    Stock Options. The Continuing Stock Options shall become exercisable in accordance with the applicable Original Stock Option Award Documents, on the same basis as such options would have become vested and exercisable if Executive had remained employed under this Agreement through the Scheduled Expiration Date. Once exercisable, all Continuing Stock Options shall remain exercisable until the Stock Option Termination Date. All of Executive's Remaining Stock Options that were vested and exercisable at the Termination Date shall remain exercisable until the Stock Option Termination Date. Notwithstanding any other term or provision hereof, any of Executive's stock options which are not vested at the Termination Date, and which are not Continuing Stock Options, shall automatically terminate upon the Termination Date. Except as otherwise expressly provided herein, all of the Remaining Stock Options shall continue to be subject to the Original Stock Option Award Documents. Notwithstanding the foregoing, in the event of Executive's death prior to the Scheduled Expiration Date, all Continuing Stock Options shall vest on the date of Executive's death and all Remaining Stock Options shall be exercisable for the period following Executive's death determined under such Original Stock Option Award Documents on the same basis as though Executive was employed on the date of Executive's death and regardless of when the Stock Option Termination Date would otherwise have occurred. However, any provisions in the Original Stock Option Award Documents relating to disability or change in control of the Company after the Termination Date shall not be operative with respect to any Remaining Stock Options.

(iii)    RSUs. The Continuing Stock Units shall continue to vest in accordance with the terms of the Original RSU Award Documents, on the same basis as such stock units would have become vested if Executive had remained employed under this Agreement through the Scheduled Expiration Date. Except as otherwise expressly provided herein, all such Continuing Stock Units shall be subject to, and administered in accordance with, the Original RSU Award Documents. Any of Executive's restricted stock unit awards that have not become vested on or before the Termination Date, and that are outstanding at the Termination Date, but which are not Continuing Stock Units, shall automatically terminate on the Termination Date. Notwithstanding any term or provision of the Original RSU Award Documents:

9

(A)     any provisions in such Original RSU Award Documents relating to disability shall not be applicable to any such Continuing Stock Units after the Termination Date; and

(B)     in the event of Executive's death after the Termination Date but prior to the Scheduled Expiration Date, the terms and provisions of the Original RSU Award Documents shall be interpreted and applied in the same manner with respect to such Continuing Stock Units as if Executive were an active employee on the date of Executive's death.

(C)     to the extent that, under the Company's compensation practices and policies, any tranche of Continuing Stock Units is subject to the achievement of performance conditions which were imposed solely because Executive was an executive officer of the Company who could have been a covered employee within the meaning of Section 162(m) at the time payment in respect of such award was expected to be made (the "*Applicable 162(m) Criteria*") and such Applicable 162(m) Criteria relate, in whole or in part, to any performance period continuing after the end of the Company's fiscal year in which the Termination Date occurs, such Applicable 162(m) Criteria shall be waived as of the Termination Date with respect to such tranche of the Continuing Stock Units; provided, however, that this Paragraph 5(d)(iii)(C) shall not be applicable if and to the extent, in the reasonable opinion of tax counsel to the Company, the presence of such provision would cause any stock units intended to be qualified as other performance based compensation within the meaning of Section 162(m) of the Code to fail to be so qualified at any time prior to Executive's Termination Date.

(iv)     Pro-Rated Current Year Bonus. The Company shall pay Executive a pro rata annual bonus for the fiscal year in which the Termination Date occurs, determined on the basis of an assumed full year target bonus determined pursuant to Section 3(b) and the number of days in the applicable fiscal year occurring on or before the Termination Date. Such pro-rata current year bonus payable pursuant to the foregoing shall be paid no later than the later of (i) two and a half months after the end of Executive's tax year in which the Termination Date occurs and (ii) two and a half months after the end of the Company's tax year in which the Termination Date occurs.

(v)     Additional Distribution Rules in Respect of Conditional Benefits. The following additional rules shall apply with respect to

10

distribution of the payments and benefits, if any, to be provided to Executive under Paragraph 5(d)(i), (iii) and (iv):

    (A)    It is intended that each installment of the payments and benefits provided under Paragraphs 5(d)(i), (iii) and (iv) shall be treated as a separate "payment" for purposes of Section 409A. Neither the Company nor Executive shall have the right to accelerate or defer the delivery of any such payments or benefits except to the extent specifically permitted or required by Section 409A;

    (B)    Distribution in respect of any tranche of Continuing Stock Units to which Paragraph 5(d)(iii)(C) applies shall be made within 90 days following the later of the date that (i) the service conditions that had originally been specified for such tranche of Continuing Stock Units under the applicable Original RSU Award Documents would otherwise have been satisfied (had Executive continued to be employed) and (ii) the last performance measurement period applicable in respect of such tranche of Continuing Stock Units under the applicable Original RSU Award Documents would otherwise have expired;

    (C)    Each installment of the payments and benefits due under Paragraph 5(d)(i) and (iii) that would, absent this subsection, be paid within the six-month period following Executive's "separation from service" (within the meaning of Section 409A of the Code and as provided in Paragraph 5(g) hereof) from the Company shall not be paid until the date that is six months and one day after such separation from service (or, if earlier, Executive's death), with any such installments that are required to be delayed being accumulated during the six-month period and paid in a lump sum on the date that is six months and one day following Executive's separation from service; provided, however, that the preceding provisions of this sentence shall not apply to any installment of payments and benefits if and to the maximum extent that such installment is deemed to be paid under a separation pay plan that does not provide for a deferral of compensation by reason of the application of Treasury Regulation 1.409A-1(b)(9)(iii) (relating to separation pay upon an involuntary separation from service). (Any installments that qualify for the exception under Treasury Regulation Section 1.409A-1(b)(9)(iii) must be paid no later than the last day of Executive's second taxable year following the taxable year of Executive in which the separation from service occurs.) Any subsequent installments that would be payable more

11

than six months following Executive's separation from service shall be paid in accordance with the dates and terms set forth herein.

(e)    *Definitions*. For purposes of this Paragraph 5, the following terms shall have the meanings ascribed to them below:

"*Consulting Agreement*" means the consulting agreement in the form attached hereto as Exhibit B.

"*Consulting Agreement Period*" means the period established under the Consulting Agreement during which Executive shall be required to provide consulting services to the Company.

"*Consulting Amount*" means a lump sum amount equal to the aggregate Base Salary which would have been earned by Executive during the Employment Period had Executive's employment under this Agreement continued after the Termination Date and through the earlier to occur of (i) the end of the Consulting Agreement Period or (ii) any earlier date that the Consulting Agreement terminates for any reason whatsoever.

"*Continuing Stock Options*" means any of Executive's stock options that were not vested and exercisable at the Termination Date, but that would have become vested and exercisable on or prior to the Latest Stock Option Vesting Date had Executive continued to be employed by the Company through the Scheduled Expiration Date.

"*Continuing Stock Units*" means any of Executive's restricted stock units outstanding at the Termination Date (whether or not subject to performance conditions) that, subject to the satisfaction of any applicable performance conditions, would have become vested on or prior to the Scheduled Expiration Date had Executive continued to be employed by the Company through the Scheduled Expiration Date.

"*Latest Stock Option Vesting Date*" means the date which is three months after the Scheduled Expiration Date.

"*Original Stock Option Award Documents*" means, with respect to any Remaining Stock Option, the terms and provisions of the award agreement and plan pursuant to which such Remaining Stock Option was granted, each as in effect on the Termination Date.

"*Original RSU Award Documents*" means, with respect to any tranche of Continuing Stock Units, the terms and provisions of the award agreement

12

Ex. 10
Page 1062

related to, and the plan governing, such tranche of Continuing Stock Units, each as in effect on the Termination Date.

"*Release*" means the General Release in the form set forth in Exhibit C attached hereto.

"*Remaining Stock Options*" means any of Executive's stock options which are (i) vested at the Termination Date or (ii) Continuing Stock Options.

"*Scheduled Expiration Date*" means December 31, 2024.

"*Severance Amount*" means an amount equal to the aggregate Base Salary which would have been earned by Executive under this Agreement for the period commencing on the day after termination of the Consulting Agreement Period and ending on the Scheduled Expiration Date; provided that if the Company terminates the Consulting Agreement due to Executive's material breach of any term thereof, the Severance Amount shall be reduced to zero.

"*Stock Option Termination Date*" means, with respect to any Remaining Stock Option, the expiration date as stated in the applicable award, taking into account any expiration date extension provided in the applicable award based on Executive's age and/or years of service as of the Scheduled Expiration Date.

"*Termination for Cause*" means a termination based on Executive's (i) conviction of embezzlement, fraud, or other conduct which would constitute a felony; (ii) willful unauthorized disclosure of confidential information; (iii) failure, neglect of, or refusal to substantially perform the duties of the Executive's employment; or (iv) any other act or omission which is a significant breach of the Company's policies or which is significantly injurious to the financial condition or business reputation of the Company or any Affiliate thereof, which termination may be effected (A) immediately upon notice from the Company if the Company shall reasonably and in good faith determine that the conduct or cause specified in such notice is not curable (it being understood that such notice shall describe in reasonable detail the conduct or cause giving rise to such notice and shall state the reason(s) why the Company has determined that such conduct or cause is not curable); or (B) upon twenty business days notice from the Company, if the Company shall and in good faith determine that the conduct or cause specified in such notice is curable (it being understood that such notice shall describe in reasonable detail the conduct or cause giving rise to such notice and shall state the reason(s) why the Company has determined that such conduct or cause is curable and what steps the Company believes should or could be taken to cure such conduct or cause, provided, however, that such opportunity to cure shall only be provided

13

by the Company with respect to a termination of Executive's employment hereunder due to gross negligence); provided that the Company shall not be entitled to terminate Executive's employment for Cause, if Executive has, within five business days after notice in accordance with subclause (B) has been given personally to Executive or otherwise has been received by Executive, commenced in good faith to cure the conduct or cause specified in such notice and completes such cure within 20 business days following the date such notice was received.

"*Termination Date*" means the earlier to occur of (i) the date the Company specifies in writing to Executive in connection with the exercise of its Termination Right or (ii) the date Executive specifies in writing to the Company in connection with any notice to effect a Termination for Good Reason.

"*Termination due to Disability*" means a termination of Executive's employment by the Company because Executive has been incapable, after reasonable accommodation, of substantially fulfilling the positions, duties, responsibilities and obligations set forth in this Agreement because of physical, mental or emotional incapacity resulting from injury, sickness or disease for a period of (i) six (6) consecutive months or (ii) an aggregate of nine (9) months (whether or not consecutive) in any twelve (12) month period, provided that any notice of such termination of employment must be given when Executive is incapable of substantially fulfilling Executive's positions, duties, responsibilities, and obligations hereunder as referred to above and has not resumed such duties. Any question as to the existence, extent or potentiality of Executive's disability shall be determined by a qualified physician selected by the Company with the consent of Executive, which consent shall not be unreasonably withheld.

"*Termination for Good Reason*" means a termination of Executive's employment under this Agreement by Executive within 30 days of the Company's failure to cure, in accordance with the procedures set forth below, any of the following events: (i) a reduction in Executive's compensation rights hereunder (that is, a reduction in Base Salary, target bonus opportunity specified in Paragraph 3(b) or target annual discretionary incentive award specified in Paragraph 3(c) other than as permitted in Paragraph 3(c), it being understood that the failure of Executive to receive an actual bonus for any fiscal year equal to or greater than the target bonus opportunity or to receive in respect of any equity award granted an amount that is equal to or greater than the target annual incentive value ascribed to such award is not a reduction in such compensation rights); (ii) the removal of Executive by the Company from the position of Senior Executive Vice President, General Counsel and

14

Secretary of the Company; (iii) a material reduction in Executive's duties and responsibilities as of the date of this Agreement; (iv) the assignment to Executive of duties that are materially inconsistent with Executive's position or duties or that materially impair Executive's ability to function as Senior Executive Vice President, General Counsel and Secretary of the Company, and any other position in which Executive is then serving; (v) the relocation of Executive's principal office to a location that is more than 50 miles outside of the greater Los Angeles area; or (vi) a material breach of any provision of this Agreement by the Company. In addition, following the occurrence of a Change in Control (as defined in the 2011 Stock Incentive Plan of the Company (the "*2011 Stock Plan*"), the Amended and Restated 2005 Stock Incentive Plan (the "*2005 Stock Plan*") and the Amended and Restated 1995 Stock Incentive Plan (the "*1995 Stock Plan*")), any occurrence that would constitute a Triggering Event for purposes of Section 11 of the 2011 Stock Plan, the 2005 Stock Plan and the 1995 Stock Plan (together with the 2011 Stock Plan and 2005 Stock Plan, the "*Plans*"), as such Plans may be amended and/or superceded from time to time, shall also constitute an event upon which Executive may effect a Termination for Good Reason in accordance with this Agreement. Notwithstanding the foregoing, a termination shall not be treated as a Termination for Good Reason (A) if Executive shall have consented in writing to the occurrence of the specific event giving rise to the claim of Termination for Good Reason (and such consent may reasonably be understood to generally relate to the time period in which such event occurred), or (B) unless Executive shall have delivered a written notice to the Company within three months of having actual knowledge of the occurrence of one of such events stating that Executive intends to terminate Executive's employment for Good Reason and specifying the factual basis for such termination, and such event, if capable of being cured, shall not have been cured within 30 days of the receipt of such notice.

"*Termination Right*" means the right of the Company, in its sole, absolute and unfettered discretion, to terminate Executive's employment under this Agreement for any reason or no reason whatsoever. For the avoidance of doubt, any Termination for Cause effected by the Company shall not constitute the exercise of its Termination Right.

(f)    Conflict With Plans. As permitted under the terms of the applicable Plans, the Company and Executive agree that the definitions of Termination for Cause or Termination for Good Reason set forth in this Paragraph 5 shall apply in place of any similar definition or comparable concept applicable under either of the Plans (or any similar definition in any successor plan), except that, in connection with a "Triggering Event" as defined in the Plans, as such Plans may be amended from time to time, the terms of the

15

applicable plan (and not the definitions of Termination for Cause or Termination for Good Reason set forth in this Paragraph 5) shall apply to determine Executive's rights and entitlements in respect of the awards made under any such plan (and only in respect of such awards)

(g)     Section 409A. To the extent applicable, it is intended that this Agreement comply with the requirements of Section 409A, and this Agreement shall be interpreted in a manner consistent with this intent. Notwithstanding anything else contained herein to the contrary, any payment required to be made to Executive hereunder upon Executive's termination of employment (including any payment pursuant to this Paragraph 5) shall be made promptly after the six month anniversary of Executive's date of termination to the extent necessary to avoid imposition on Executive of any tax penalty imposed under Section 409A of the Code. Solely for purposes of determining the time and form of payments due Executive under this Agreement (including any payments due under Paragraph 3(a)) or otherwise in connection with Executive's termination of employment with the Company, Executive shall not be deemed to have incurred a termination of employment unless and until Executive shall incur a "separation from service" within the meaning of Section 409A of the Code. The parties agree, as permitted in accordance with the final regulations thereunder, a "separation from service" shall occur when Executive and the Company reasonably anticipate that Executive's level of bona fide services for the Company (whether as an employee or an independent contractor) will permanently decrease to no more than 40 percent of the average level of bona fide services performed by Executive for the Company over the immediately preceding 36 months. The determination of whether and when a separation from service has occurred shall be made in accordance with this subparagraph and in a manner consistent with Treasury Regulation Section 1.409A-1(h). To the extent that the Company and Executive determine that any provision of this Agreement could reasonably be expected to result in Executive's being subject to the payment of interest or additional tax under Section 409A, the Company and Executive agree, to the extent reasonably possible as determined in good faith, to amend this Agreement, retroactively, if necessary, in order to avoid the imposition of any such interest or additional tax under Section 409A. All reimbursements and in-kind benefits provided under the Agreement shall be made or provided in accordance with the requirements of Section 409A to the extent that such reimbursements or in-kind benefits are subject to Section 409A, including, where applicable, the requirements that (i) any reimbursement is for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement), (ii) the amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year, (iii) the reimbursement of an eligible expense will be made on or before the last day of the calendar year following

16

Ex. 10
Page 1066

the year in which the expense is incurred and (iv) the right to reimbursement is not subject to set off or liquidation or exchange for any other benefit. Each payment of compensation under the Agreement shall be treated as a separate payment of compensation for purposes of Section 409A. Executive's right to any deferred compensation, as defined under Section 409A, shall not be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment, garnishment by creditors, or borrowing to the extent necessary to avoid tax, penalties, and/or interest under Section 409A.

(h)    Amendment of Existing Agreements. The parties acknowledge and agree that to the extent that this Paragraph 5 affects any of the terms and conditions of Executive's Remaining Stock Options or Continuing Stock Units, this Agreement shall constitute an amendment of the Original Stock Option Award Documents and Original RSU Award Documents as they pertain to Executive.

6.    Exclusive Remedy. Executive shall be under no obligation to mitigate damages or seek other employment or other engagement of Executive's services after this Agreement is terminated pursuant to Paragraph 5 in order to obtain the benefits provided for under Paragraph 5(d) of this Agreement. Executive acknowledges and agrees that the payments and rights provided under Paragraph 5 are fair and reasonable, and are Executive's sole and exclusive remedy, in lieu of all other remedies at law or in equity, for termination of Executive's employment by the Company upon exercise of its Termination Right pursuant to this Agreement or upon a Termination for Good Reason. The failure of Executive to execute and timely deliver the Release and the Consulting Agreement for any reason (i) shall limit Executive's rights in connection with the exercise by the Company of its Termination Right solely to the right to receive the Unconditional Entitlements, (ii) shall not effect a modification of any of Executive's commitments set forth in this Agreement (none of which are contingent upon execution of the Release by Executive) and (iii) shall not preserve or revive any rights waived by Executive hereunder. Subject to Executive's execution and delivery of the Release without revocation thereof and execution and delivery of the Consulting Agreement, (i) the Company agrees to enter into the Release and Consulting Agreement, and (ii) there shall be no offset available to the Company against any amounts due, paid or payable to Executive in respect of the Conditional Benefits and Unconditional Entitlements under Paragraph 5 with respect to any compensation, remuneration or payment attributable to any services that Executive may provide to any third party subsequent to termination of employment hereunder, whether as an employee or otherwise.

7.    Non-competition and Confidentiality.

(a)    Non-competition. During the Employment Period, Executive shall not engage in any business, or become associated with any entity, whether as a

17

principal, partner, employee, consultant, shareholder or otherwise (other than as a holder of not in excess of 1% of the outstanding voting shares of any publicly traded company) that is actively engaged in any business, which is in competition, in any geographic area, with a business conducted by the Company or any subsidiary of the Company at the time of the alleged competition.

(b)      Confidentiality. Executive acknowledges and agrees that Executive executed the standard form of agreement, entitled "The Walt Disney Company and Affiliated Companies Confidentiality Agreement," at the time Executive commenced employment with the Company or one of its affiliated companies in the form then utilized by the Company (the "*Original TWDC Confidentiality Agreement*"). Executive acknowledges and agrees that the Original TWDC Confidentiality Agreement remains in full force and effect through the date that Executive signs the current version of The Walt Disney Company and Affiliated Companies Confidentiality Agreement, attached hereto as Exhibit D, which Executive is required to sign along with this Agreement and which, once signed, will replace the Original TWDC Confidentiality Agreement.

(c)      Company Property. Promptly following Executive's termination of employment, Executive shall return to the Company all property of the Company, and all copies thereof in Executive's possession or under Executive's control, except that Executive may retain notes, files, calendars, contact information and correspondence of a personal nature (whether in hard copy or electronic form), provided, in each case, that no confidential Company information or information intended primarily for internal Company use is contained therein.

(d)      Non-Solicitation of Employees. During the Employment Period and, subject to the provisions of applicable law, during the one-year period following any termination of Executive's employment, Executive shall not, except in the course of carrying out Executive's duties hereunder, directly or indirectly induce any employee of the Company or any of its subsidiaries to terminate employment with such entity, and shall not directly or indirectly, either individually or as owner, agent, employee, consultant or otherwise,

(i)      solicit, encourage or induce the employment or engagement of, or entice from the employment of the Company or any of its subsidiaries, or

(ii)      direct, arrange, participate or assist in any such solicitation, encouragement, inducement or enticement of,

any person who is or was employed by the Company or any subsidiary of either (other than Executive's personal assistant) unless such person shall have ceased to be employed by such entity for a period of at least six (6) months.

18

**Ex. 10**
**Page 1068**

(e)     Injunctive Relief with Respect to Covenants. Executive acknowledges and agrees that the covenants and obligations of Executive with respect to noncompetition, nonsolicitation, confidentiality and the Company property relate to special, unique and extraordinary matters and that a violation of any of the terms of such covenants and obligations may cause the Company and/or its affiliates irreparable injury for which adequate remedies are not available at law. Executive further acknowledges and agrees that (1) the Company and/or its affiliates may seek an injunction, restraining order or such other equitable relief restraining Executive from committing any violation of the covenants and obligations contained in this Paragraph 7 in any court of competent jurisdiction and (2) Executive's acknowledgements in this Paragraph 7 may be relied on in seeking such remedies, which are cumulative and are in addition to any other rights and remedies the Company and/or its affiliates may have at law or in equity.

8.     Miscellaneous.

(a)     Survival. Paragraphs 5 (relating to early termination of the Employment Period), 6 and 7 (relating to nondisclosure and nonsolicitation of employees) shall survive the termination hereof, whether such termination shall be by expiration of the Employment Period in accordance with Paragraph 1 or an early termination of the Employment Period pursuant to Paragraph 5 hereof.

(b)     Binding Effect. This Agreement shall be binding on, and shall inure to the benefit of, the Company and any person or entity that succeeds to the interest of the Company (regardless of whether such succession does or does not occur by operation of law) by reason of a merger, consolidation or reorganization involving the Company or a sale of all or substantially all of the assets of the Company. The Company further agrees that, in the event of a sale of assets as described in the preceding sentence, it shall use its reasonable best efforts to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder in writing as a condition to any assignment thereof to such assignee or transferee. This Agreement shall also inure to the benefit of Executive's heirs, executors, administrators and legal representatives and beneficiaries as provided in Paragraph 8(d).

(c)     Assignment. Except as provided under Paragraph 8(b), and except for transfers and/or assignments of this Agreement from any Company entity to another Company entity, neither this Agreement nor any of the rights or obligations hereunder shall be assigned or delegated by any party hereto without the prior written consent of the other party.

(d)     Beneficiaries/References. Executive shall be entitled, to the extent permitted under any applicable law and the terms of any applicable plan, to select and change a beneficiary or beneficiaries to receive any compensation or benefit

19

payable hereunder following Executive's death by giving the Company written notice thereof. In the event of Executive's death or a judicial determination of Executive's incompetence, reference in this Agreement to Executive shall be deemed, where appropriate, to refer to Executive's beneficiary, estate or other legal representative.

(e)    Entire Agreement. This Agreement shall constitute the entire agreement between the parties hereof, with respect to the matters referred to herein; provided that this Agreement shall not alter, amend, or supercede, except as specifically provided in Paragraph 5, any agreement that includes the terms of any equity grant made to Executive prior to the date hereof or the Indemnification Agreement referenced in Paragraph 4(d), which by their terms survive the termination thereof.

THERE ARE NO PROMISES, REPRESENTATIONS, INDUCEMENTS OR STATEMENTS BETWEEN THE PARTIES OTHER THAN THOSE THAT ARE EXPRESSLY CONTAINED HEREIN.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to limit, modify or supersede The Walt Disney Company and Affiliated Companies Confidentiality Agreement executed by Executive, which shall survive regardless of the termination of this Agreement.

(f)    Representations. Executive represents that Executive's employment hereunder and compliance by Executive with the terms and conditions of this Agreement will not conflict with or result in the breach of any agreement to which Executive is a party or by which Executive may be bound. The Company represents that (i) it is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) it has the full corporate power and authority to execute and deliver this Agreement, and (iii) the execution, delivery and performance of this Agreement has been duly and validly authorized.

(g)    Authority of The Walt Disney Company Board. For the avoidance of doubt, nothing in this Agreement shall preclude the Board of Directors of the Company or the Compensation Committee from its ability to exercise any power or authority to take such actions as it is required or permitted to take as a matter of law or pursuant to the terms of the Company's governing documents. Nothing in this Paragraph 8(g) shall be construed to modify, amend, limit or otherwise impair the rights and entitlements of Executive set forth in the other Paragraphs of this Agreement (including, without limitation, the rights and entitlements specified in Paragraph 5).

20

(h)    Severability; Reformation. In the event that one or more of the provisions of this Agreement shall become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby or relieve the Company or Executive of liability for any breach by Company or Executive of any such remaining provisions. In the event any of subparagraphs (a), (b) or (d) of Paragraph 7 hereof is not enforceable in accordance with its terms, Executive and the Company agree that such subparagraph of such Paragraph 7 shall be reformed to make such subparagraph enforceable in a manner which provides the Company the maximum rights permitted at law.

(i)    Waiver. Waiver by any party hereto of any breach or default by the other party of any of the terms of this Agreement shall not operate as a waiver of any other breach or default, whether similar to or different from the breach or default waived. No waiver of any provision of this Agreement shall be implied from any course of dealing between the parties hereto or from any failure by either party hereto to assert its or Executive's rights hereunder on any occasion or series of occasions.

(j)    Notices. Any notice required or desired to be delivered under this Agreement shall be in writing and shall be delivered personally, by courier service, or by registered mail, return receipt requested, and shall be effective upon actual receipt when delivered personally or by courier and when sent by registered mail, three business days following date of mailing, and shall be addressed as follows (or to such other address as the party entitled to notice shall hereafter designate in accordance with the terms hereof):

If to the Company:

The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

Attention:    Chief Executive Officer
              Facsimile: (818) 560-5960

              and

              Senior Executive Vice President and
              Chief Human Resources Officer
              Facsimile: (818) 560-3245

21

If to Executive:

To the address listed as Executive's principal residence in the Company's human resources records and to Executive's principal place of employment with the Company.

(k)    Amendments. No amendment to this Agreement shall be binding between the parties unless it is in writing and signed by the party against whom enforcement is sought.

(l)    Headings. Headings to paragraphs in this Agreement are for the convenience of the parties only and are not intended to be part of or to affect the meaning or interpretation hereof.

(m)    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and a facsimile signature shall have the same force and effect as one penned in ink.

(n)    Withholding. Any payments provided for herein shall be reduced by any amounts required to be withheld by the Company from time to time under applicable federal, state or local income or employment tax laws or similar statutes or other provisions of law then in effect.

(o)    Governing Law. This Agreement shall be governed by the laws of the State of California, without reference to principles of conflicts or choice of law under which the law of any other jurisdiction would apply.

(p)    No Obligation To Continued Employment. This Agreement does not constitute a commitment of Company with regard to Executive's employment, express or implied, other than to the extent expressly provided for herein. Upon termination of this Agreement, neither Company nor Executive shall have any obligation to the other with respect to continued employment. In the event that

22

Ex. 10
Page 1072

Executive's employment continues for any period of time following the stated expiration date of this Agreement, unless and until agreed to in a new subscribed written document, such employment or any continuation thereof is "at will," and may be terminated without obligation at any time by either party's giving notice to the other, unless otherwise prescribed by applicable law.

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer and Executive has hereunto set Executive's hand as of the day and year first above written.

THE WALT DISNEY COMPANY

Dated:    December 22, 2021                    By:    /s/ Paul J. Richardson

Dated:    December 21, 2021                            /s/ Horacio Gutierrez

23

*Exhibit A*

## INDEMNIFICATION AGREEMENT

AGREEMENT, dated as of December 21, 2021 between The Walt Disney Company, a Delaware corporation (the "Company") and Horacio Gutierrez (the "Indemnitee").

WHEREAS, it is essential to the Company to retain and attract as directors and officers for itself and its subsidiaries the most capable persons available;

WHEREAS, as of even date herewith Indemnitee has entered into an employment agreement to serve as Senior Executive Vice President, General Counsel and Secretary, of the Company;

WHEREAS, in recognition of Indemnitee's need for substantial protection against personal liability in order to enhance Indemnitee's service in the position(s) referred to above, the Company wishes to provide in this Agreement for the indemnification of and the advancing of expenses to Indemnitee to the full extent (whether partial or complete) permitted by law and as set forth in this Agreement, and, to the extent insurance is maintained, for the continued coverage of Indemnitee under the Company's directors' and officers' liability insurance policies;

NOW, THEREFORE, in consideration of the premises and of Indemnitee's continuing to serve, at the Company's request, in the position(s) referred to above, and intending to be legally bound hereby, the parties hereto agree as follows:

1. *Certain Definitions*.

(a)    A "Change in Control" shall be deemed to have occurred if (i) any "person" (as such term is used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing 25% or more of the total voting power represented by the Company's then outstanding Voting Securities, or (ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors of the Company and any new director whose election by the Board of Directors of the Company or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof, or (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the Voting Securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or being converted into Voting Securities of the surviving entity) at least 75% of the total voting power of such surviving entity outstanding immediately after such merger or

**Ex. 10**
**Page 1074**

consolidation, or the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company (in one transaction or a series of transactions) of all or substantially all the Company's assets.

(b)    "Claim" shall mean any threatened, pending or completed action, suit, proceeding or alternate dispute resolution mechanism, or any inquiry, hearing or investigation, whether conducted by the Company or any other party, that Indemnitee in good faith believes might lead to the institution of any such action, suit, proceeding or alternate dispute resolution mechanism, whether civil, criminal, administrative, investigative or other.

(c)    "Expenses" shall include attorneys' fees and all other costs, travel expenses, fees of experts, transcript costs, filing fees, witness fees, telephone charges, postage, delivery service fees, expenses and obligations of any nature whatsoever paid or incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness in or participate in any Claim relating to any Indemnifiable Event.

(d)    "Indemnifiable Event" shall mean any event or occurrence related to the fact that Indemnitee is or was a director, officer, employee, agent or fiduciary of the Company or one of its subsidiaries, or is or was serving at the request of the Company or one of its subsidiaries as a director, officer, employee, trustee, agent or fiduciary of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, or by reason of anything done or not done by Indemnitee in any such capacity.

(g)    "Independent Legal Counsel" shall mean an attorney, selected in accordance with the provisions of Section 3 hereof, who shall not have otherwise performed services for the Company or Indemnitee within the last five years (other than in connection with seeking indemnification under this Agreement). Notwithstanding the foregoing, the term "Independent Legal Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine such Indemnitee's right to indemnification under this Agreement, nor shall Independent Legal Counsel be any person who has been sanctioned or censured for ethical violations of applicable standards of professional conduct.

(e)    A "Potential Change in Control" shall be deemed to have occurred if (i) the Company enters into an agreement or arrangement, the consummation of which would result in the occurrence of a Change in Control; (ii) any person (including the Company) publicly announces an intention to take or to consider taking actions which if consummated would constitute a Change in Control; or (iii) the Board adopts a resolution to the effect that, for purposes of this Agreement, a Potential Change in Control has occurred.

(f)    "Reviewing Party" shall mean any appropriate person or body consisting of a member or members of the Board of Directors of the Company or

2

any other person or body appointed by the Board who is not a party to the particular Claim for which Indemnitee is seeking indemnification, or Independent Legal Counsel.

(g)    "Voting Securities" shall mean any securities of an entity which vote generally in the election of directors.

2.  *Basic Indemnification Arrangement.*

(a)    In the event Indemnitee was, is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, a Claim by reason of (or arising in part out of) an Indemnifiable Event, the Company shall indemnify Indemnitee to the fullest extent permitted by law as soon as practicable but in any event no later than thirty days after written demand is presented to the Company, against any and all Expenses, judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties or amounts paid in settlement) of such Claim and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement (including the creation of the trust referred to in Section 4 hereof). If so requested by Indemnitee, the Company shall advance (within two business days of such request) any and all expenses to Indemnitee (an "Expense Advance"). Notwithstanding anything in this Agreement to the contrary and except as provided in Section 5 and the proviso in the first sentence of Section 2(b) hereof, prior to a Change in Control Indemnitee shall not be entitled to indemnification pursuant to this Agreement in connection with any Claim initiated by Indemnitee against the Company or any director or officer of the Company unless the Company has joined in or consented to the initiation of such Claim.

(b)    Notwithstanding the foregoing, (i) the obligations of the Company under Section 2(a) hereof shall be subject to the condition that the Reviewing Party shall not have determined (in a written opinion, in any case in which the Independent Legal Counsel referred to in Section 3 hereof is involved) that Indemnitee would not be permitted to be indemnified under applicable law, and (ii) the obligation of the Company to make an Expense Advance pursuant to Section 2(a) hereof shall be subject to the condition that, if, when and to the extent that the Reviewing Party determines that Indemnitee would not be permitted to be so indemnified under applicable law, the Company shall be entitled to be reimbursed by Indemnitee (who hereby agrees to reimburse the Company) for all such amounts theretofore paid; provided, however, that if Indemnitee has commenced legal proceedings in a court of competent jurisdiction to secure a determination that Indemnitee should be indemnified under applicable law, any determination made by the Reviewing Party that Indemnitee would not be permitted to be indemnified under applicable law shall not be binding and Indemnitee shall not be required to reimburse the Company for an Expense Advance until a final judicial determination is made with respect thereto (as to which all rights of appeal therefrom have been exhausted or lapsed). Indemnitee's obligation to reimburse the

3

Company for Expense Advances shall be unsecured and no interest shall be charged thereon. If there has not been a Change in Control, the Reviewing Party shall be selected by the Board of Directors of the Company, and if there has been such a Change in Control, (other than a Change in Control which has been approved by a majority of the Board of Directors of the Company who were directors immediately prior to such Change in Control) the Reviewing Party shall be the Independent Legal Counsel referred to in Section 3 hereof. If there has been no determination by the Reviewing Party or if the Reviewing Party determines that Indemnitee substantively would not be permitted to be indemnified in whole or in part under applicable law, Indemnitee shall have the right to commence litigation in any court in the States of California or Delaware having subject matter jurisdiction thereof and in which venue is proper seeking an initial determination by the court or challenging any such determination by the Reviewing Party or any aspect thereof, or the legal or factual bases therefor and the Company hereby consents to service of process and to appear in any such proceeding. Any determination by the Reviewing Party otherwise shall be conclusive and binding on the Company and Indemnitee.

3.      *Change in Control*. The Company agrees that if there is a Change in Control of the Company (other than a Change in Control which has been approved by a majority of the Board of Directors of the Company who were directors immediately prior to such Change in Control) then Independent Legal Counsel shall be selected by Indemnitee and approved by the Company (which approval shall not be unreasonably withheld) and such Independent Legal Counsel shall determine whether the officer or director is entitled to indemnity payments and Expense Advances under this Agreement or any other agreement or Certificate of Incorporation or Bylaws of the Company now or hereafter in effect relating to Claims for Indemnifiable Events. Such Independent Legal Counsel, among other things, shall render its written opinion to the Company and Indemnitee as to whether and to what extent the Indemnitee will be permitted to be indemnified. The Company agrees to pay the reasonable fees of the Independent Legal Counsel and to indemnify fully such Independent Legal Counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or the engagement of Independent Legal Counsel pursuant hereto.

4.      *Establishment of Trust*. In the event of a Potential Change in Control, the Company shall, upon written request by Indemnitee, create a trust for the benefit of Indemnitee and from time to time upon written request of Indemnitee shall fund such trust in an amount sufficient to satisfy any and all Expenses reasonably anticipated at the time of each such request to be incurred in connection with investigating, preparing for and defending any Claim relating to an Indemnifiable Event, and any and all judgments, fines, penalties and settlement amounts of any and all Claims relating to an Indemnifiable Event from time to time actually paid or claimed, reasonably anticipated or proposed to be paid. The amount or amounts to be deposited in the trust pursuant to the foregoing funding obligation shall be determined by the Reviewing Party, in any case in which the Independent Legal Counsel referred to above is involved. The terms of the trust shall provide that upon a Change in Control (i) the trust shall not be revoked or the principal thereof invaded, without the written consent of Indemnitee, (ii) the trustee shall advance, within two business days of

4

a request by Indemnitee, any and all Expenses to Indemnitee (and Indemnitee hereby agrees to reimburse the trust under the circumstances under which Indemnitee would be required to reimburse the Company under Section 2(b) hereof), (iii) the trust shall continue to be funded by the Company in accordance with the funding obligation set forth above, (iv) the trustee shall promptly pay to Indemnitee all amounts for which Indemnitee shall be entitled to indemnification pursuant to this Agreement or otherwise, and (v) all unexpended funds in such trust shall revert to the Company upon a final determination by the Reviewing Party or a court of competent jurisdiction, as the case may be, that Indemnitee has been fully indemnified under the terms of this Agreement. The trustee shall be chosen by Indemnitee. Nothing in this Section 4 shall relieve the Company of any of its obligations under this Agreement. All income earned on the assets held in the trust shall be reported as income by the Company for federal, state, local and foreign tax purposes.

5.    *Indemnification for Additional Expenses*. The Company shall indemnify Indemnitee against any and all expenses (including attorneys' fees) and, if requested by Indemnitee, shall (within two business days of such request) advance such expenses to Indemnitee, which are incurred by Indemnitee in connection with any claim asserted against or in connection with any action brought by Indemnitee for (i) indemnification or advance payment of Expenses by the Company under this Agreement or any other agreement or certificate of incorporation or by-laws of the Company now or hereafter in effect relating to Claims for Indemnifiable Events and/or (ii) recovery under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advance expense payment or insurance recovery, as the case may be.

6.    *Partial Indemnity, Etc*. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of the Expenses, judgments, fines, penalties and amounts paid in settlement of a Claim but not, however, for all of the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled. Moreover, notwithstanding any other provision of this Agreement, to the extent that Indemnitee has been successful on the merits or otherwise in defense of any or all Claims relating in whole or in part to an Indemnifiable Event or in defense of any issue or matter therein, including dismissal without prejudice, Indemnitee shall be indemnified against all Expenses incurred in connection therewith. In connection with any determination by the Reviewing Party or otherwise as to whether Indemnitee is entitled to be indemnified hereunder the burden of proof shall be on the Company to establish that Indemnitee is not so entitled.

7.    *No Presumption*. For purposes of this Agreement, the termination of any claim, action, suit or proceeding, by judgment, order, settlement (whether with or without court approval) or conviction, or upon a plea of nolo contendere, or its equivalent, shall not create a presumption that Indemnitee did not meet any particular standard of conduct or have any particular belief or that a court has determined that indemnification is not permitted by applicable law.

8.    *Non-exclusivity, Etc*. The rights of Indemnitee hereunder shall be in addition to any other rights Indemnitee may have under the certificate of incorporation or by-laws of the Company or one of its subsidiaries or the Delaware General Corporation Law or

5

otherwise. To the extent that a change in the Delaware General Corporation Law (whether by statute or judicial decision) permits greater indemnification by agreement than would be afforded currently under the certificate of incorporation and by-laws of the Company and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.

9.    *No Construction as Employment Agreement*. Nothing contained in this Indemnity Agreement shall be construed as giving Indemnitee any right to be retained in the employ of the Company or any of its subsidiaries, it being understood, for the avoidance of doubt that the foregoing does not limit or otherwise affect the validity of any employment agreement or the enforceability thereof in accordance with its terms.

10.    *Liability Insurance*. To the extent the Company maintains an insurance policy or policies providing directors' and officers' liability insurance, Indemnitee shall be covered by such policy or policies, in accordance with its or their terms, to the maximum extent of the coverage available for any director or officer of the Company.

11.    *Period of Limitations*. No legal action shall be brought and no cause of action shall be asserted by or in the right of the Company or any affiliate of the Company against Indemnitee, Indemnitee's spouse, heirs, executors, administrators or personal or legal representatives after the expiration of two years from the date of accrual of such cause of action, and any claim or cause of action of the Company or its affiliate shall be extinguished and deemed released unless asserted by the timely filing of a legal action within such two-year period; provided, however, that if any shorter period of limitations is otherwise applicable to any such cause of action such shorter period shall govern.

12.    *Amendments, Etc*. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

13.    *Subrogation*. In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

14.    *No Duplication of Payments*. The Company shall not be liable under this Agreement to make any payment in connection with any claim made against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, certificate of incorporation or by-laws of the Company or otherwise) of the amounts otherwise indemnifiable hereunder.

15.    *Binding Effect, Etc*. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company, spouses, heirs, and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise to all,

6

substantially all, or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place. This Agreement shall continue in effect regardless of whether Indemnitee continues to serve as an officer and/or director of any affiliate of Company or of any other enterprise at the Company's request.

16.   *Severability*. The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law. Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable, that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

17.   *Governing Law*. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware applicable to contracts made and to be performed in such state without giving effect to the principles of conflicts of laws.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of December 21, 2021.

THE WALT DISNEY COMPANY

By:      /s/ Paul J. Richardson


         /s/ Horacio Gutierrez


7

*Exhibit B*

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (hereinafter referred to as "**Agreement**") is made and entered into by and between Horacio Gutierrez (hereinafter referred to as "**Consultant**") and The Walt Disney Company (hereinafter referred to as "**Company**") on and as of _____ __, 20__ pursuant to that certain Employment Agreement by and between Executive and Company dated as of December 21, 2021 (the "**Employment Agreement**"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Employment Agreement.

      1.    (a) Unless this Agreement is earlier terminated as hereinafter provided, for a period following the termination of Consultant's employment under the Employment Agreement equal to the lesser of (i) 6 months or (ii) the remaining period of the originally scheduled term of the Employment Agreement (the "**Consulting Agreement Period**"), Consultant shall personally and diligently provide to the Company such consulting services as the Company may reasonably request from time to time, provided that such services shall relate to matters appropriate for an executive employed in the position referred to in paragraph 2 of the Employment Agreement and shall be a type and nature and duration typical for a post-employment consulting agreement with an executive formerly employed in such position, it being understood for the avoidance of doubt that to the extent any such consulting services involve creative services and/or input, such services and/or input shall be limited to existing matters and projects that Company and/or Consultant was working on or involved in (or has specific plans to work on) at the time of termination or any time prior thereto during the Employment Period and shall be in scope and nature generally limited to types of services not inconsistent with Consultant's former position. Consultant shall not be required to report to the Company's offices and shall be permitted, subject to the terms hereof, to provide consulting services to third parties during the term hereof, provided (i) in no event shall consulting services or other services or advice of any nature be provided by Consultant, directly or indirectly (whether as an employee, consultant, independent contractor, agent, partner, principal, owner or otherwise) to any person or entity which directly or indirectly owns, operates, manages, develops, controls or provides services to, any business involved in any of the following activities (a "**Designated Business**"): (A) the conception, creation, development, production, purchase, sale, distribution, broadcast, transmission or other disposition (including, without limitation, the licensing and/or merchandising of related consumer products) of audio and/or visual and/or interactive products or works of any nature in any media, including, without limiting the generality of the foregoing, any activity relating to (i) any aspect of the film, network, cable, broadcasting, mobile communications, television (including pay-per-view, closed circuit or any inter-active form of distribution of film, television or other audio/visual product) or internet businesses or any other businesses based on or using interactive technology (including, without limiting the generality of the foregoing, electronic and/or interactive games, environments, information centers or communities, in each case, of any nature), or (ii) the development, production, marketing, distribution or exploitation by any means or vehicle whatsoever of any film, television or software product or any similar content or product in any media, whether or not now existing, it being understood, however, that, for the avoidance of doubt and notwithstanding any other term or provision hereof, the internal use by any business of any of the interactive, internet-based or other technology or media referred to above in the creation, development and/or production of their products and/or services shall not in and of itself result in such business being a Designated Business to which Consultant is prohibited from

**Ex. 10**
**Page 1081**

directly or indirectly providing services hereunder, (B) the operation, management, development, licensing and promotion of themed resorts, hotels and restaurants or amusement or themed entertainment parks; or (C) the design, development, publishing, promotion or sale of products based on cartoon or other animated characters, films, television and theatrical productions and other intellectual property derived therefrom, in each case, only to the extent (i) that such person or entity is actively engaged in any geographic area in any business which is in competition with a business conducted by The Walt Disney Company or any subsidiary thereof at the time of the performance of such services (the "**Specified Activities**"), and (ii) that any services reasonably required by Company shall at all times be provided with precedence being given to Company and on a "first priority" basis to Company, although Company shall endeavor to provide, when possible, reasonable advance written notice to Consultant of all services required hereunder and to give due consideration, to the extent practicable, to any prior commitments Consultant may have at such time. In no event shall Consultant be required to devote more than 13.5 hours per week to services to Company hereunder (including travel time, but not time to or from the office) and the parties agree and understand that Consultant's expected commitment to such services shall regularly be less than the stated maximum weekly hours.

(b) In the event of a material uncured breach by Consultant of any term or provision of this paragraph 1 hereof, all of which terms and conditions Consultant acknowledges and agrees are material and of the essence of this Agreement, or any other material term or provision hereof, Company shall have the right, in addition to any other right or remedy available to it at law or in equity, to terminate this Agreement. In such event Company shall have no further obligation to make payments or perform or honor any commitments under the Release or to pay or honor any commitments which relate to or constitute any of the Conditional Benefits; provided, however, that notwithstanding the foregoing, except as otherwise specifically provided in the immediately preceding sentence, no breach of this Agreement by Consultant, no termination of this Agreement by Company, and no other action or inaction by either of them (other than the execution by the parties of a written agreement amending or superseding the Release or any part thereof) shall in any event or under any circumstances have any effect whatsoever on the validity, enforceability, binding nature, effect or interpretation of the releases set forth in paragraph 5 and paragraph 7 of the Release, and the releases set forth therein shall remain in full force and effect.

(c) In the event that Consultant shall receive a written notice of breach of this Agreement from the Company, Consultant shall have ten (10) business days to cure such breach unless the Company shall have determined in its good faith business judgment that such breach is not curable. Any such notice of termination pursuant to this paragraph 1 shall set forth in reasonable detail the basis for such breach and shall contain a statement as to whether or not such breach has been determined to be curable by the Company. In the event that Consultant receives a written notice of breach of the Agreement from the Company, Consultant may challenge such finding of a breach, by written notice to the Company, and shall be afforded an opportunity to present Consultant's objection to the Company, in person or in writing, as determined by the Company, prior to Company having any right to terminate this Agreement and the Conditional Benefits provided under the Employment Agreement.

2.    Consultant shall receive gross consulting fees for Consultant's services hereunder which, for any period during the Consulting Agreement Period, shall equal the Consulting Amount.

2

**Ex. 10
Page 1082**

The consulting fee payments shall be made at the date set forth in Paragraph 5(d)(i) of the Employment Agreement.

3.      Company shall reimburse Consultant, in accordance with the procedures of Company then in effect for its senior executives, for reasonable business expenses incurred by Consultant in the course of performing the services hereunder.

4.      Company, its successors, privies and assigns shall be entitled to, and shall, own as their exclusive property all of the results and proceeds of the services performed hereunder (which results and proceeds are hereinafter collectively referred to as the "**Work Product**") in whatever stage of completion, all of which shall be considered a work-for-hire, including, without limitation, all written work, research, plot outlines, computer programs, plans, drawings, paintings, sculptures, fanciful creations, specifications, ideas, scripts, sketches, designs, concepts, software, systems, reports, documentation, and other tangible or intangible work product produced by Consultant as part of Consultant's services performed hereunder. Company shall own all rights in the Work Product in perpetuity throughout the universe including, without limitation, the rights to produce, manufacture, record, reproduce, distribute, transfer or prepare derivative works from the Work Product by any art, medium or method and all copyrights, trademarks and/or patents in the Work Product. Company shall be deemed the sole author of the Work Product and is entitled to the copyright therein (and all renewals and extensions thereof), and the full ownership to the original and all copies of the Work Product. Company shall have the right to dispose of the Work Product and/or make any or all uses thereof as it, at any time and in the exercise of its sole discretion, may desire. Upon Company's request, Consultant shall deliver all originals and copies of the Work Product (whether completed or in process) and all research, plans, designs, specifications and any other work product or information which pertains to the Work Product to Company upon completion of the performed services hereunder or upon earlier termination of this Agreement. Consultant shall not retain, use or disclose any of the Work Product without Company's prior written consent. The termination, completion or breach of this Agreement on whatever grounds and by whomsoever affected shall not affect Company's exclusive ownership of the Work Product. Consultant hereby assigns to Company all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Work Product, including, without limitation, all exclusive exploitation rights, of every kind and nature, including, but not limited to, all trademarks, copyrights and neighboring rights, to the full extent such assignment is allowed by law, and any renewals and extensions therefor throughout the universe, in perpetuity, or for the duration of the rights in each country, and in all languages. Consultant acknowledges that new rights to the Work Product may come into being or be recognized in the future, under the law or in equity (the "**New Exploitation Rights**"), and Consultant intends to and does hereby grant and convey to Company any and all such New Exploitation Rights to the Work Product. Consultant is also aware and acknowledges that new or changed technology, uses, media, format, modes of transmission and methods of distribution, dissemination, exhibition or performance (the "**New Exploitation Methods**") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting the Work Product. Consultant intends to and does hereby grant and convey to Company any and all rights to such New Exploitation Methods with respect to the Work Product. Consultant agrees to execute, at any time upon Company's request, such further documents consistent herewith and do such other acts at the Company's expense as may be required by the Company in its reasonable business judgment to evidence or confirm Company's

3

**Ex. 10**
**Page 1083**

exclusive ownership of and exploitation rights to the Work Product and to effectuate Consultant's purpose to convey such rights to Company including, but not limited to, the New Exploitation Rights and any and all of the New Exploitation Methods. Consultant shall have the right to have any such documents reviewed by counsel with Company giving good faith consideration to changes requested by counsel unless such review and/or consideration is not in Company's reasonable business judgment feasible or prudent in view of material time constraints; provided, however, that notwithstanding the foregoing, if Consultant fails to execute such further documents within 20 business days after receipt of Company's written request to do so, then Company shall have the power of attorney, which Consultant acknowledges is irrevocable and coupled with an interest, to execute such documents on Consultant's behalf. Consultant agrees that Consultant will not seek to (i) challenge, through the courts, administrative governmental bodies, private organizations or in any other manner, the rights of Company to exploit the Work Product by any means whatsoever or (ii) thwart, hinder or subvert the intent of the preceding grants and conveyances to Company, or the collection by Company of any proceeds relating to the rights conveyed under this Agreement. The provisions of this paragraph shall survive the expiration or sooner termination of this Agreement.

5.      This Agreement is for the personal services of Consultant and may not be subcontracted or assigned by Consultant in any fashion, whether by operation of law, or by conveyance of any type, without the prior written consent of Company, which consent Company may withhold in its sole discretion. Company may not assign all or any portion of this Agreement at any time to any of its subsidiaries or to any other person.

6.      (a) Consultant, by virtue of this Agreement, shall acquire no right to use, and shall not use, the name "The Walt Disney Company" or "The Walt Disney Studios" or "Disney" or Disney+" or "ABC" or "ABC, Inc." or "American Broadcasting Companies" or "ESPN" or "Marvel" or "Pixar" or "Lucasfilm, Ltd." or any other word, mark, or name used for, or in connection with, the business activities of Company (either alone or in conjunction with or as a part of any other word, mark, or name) or any marks, fanciful characters or designs of the Company or any of their related, affiliated, or subsidiary companies in any advertising, publicity, or promotion; to express or imply any endorsement by the Company or any of its related, affiliated or subsidiary companies of Consultant's services; or in any other manner whatsoever (whether or not similar to the uses hereinabove specifically prohibited). Consistent with Consultant's obligations under Paragraph 7, this Paragraph 6(a) shall not prevent Consultant from using such names to describe Consultant's activities with respect to Company and its subsidiaries under and prior to the Employment Agreement and under this Agreement.

(b) Consultant hereby represents and warrants to Company that as of the date of this Agreement, Consultant does not provide any services (including, without limitation, as an employee) to any person or entity that (i) is engaged in, or whose affiliated entities are engaged in, one or more of the Specified Activities or (ii) advises or provides consulting services to any person or entity that is engaged in, or whose affiliated entities are engaged in, any business or activity relating to or constituting one or more of the Specified Activities. Consultant further represents and warrants to Company that Consultant shall make written disclosure to Company prior to providing any services, during the term of this Agreement, to any of the above mentioned persons or entities.

4

7.    Consultant may, during the course of Consultant's engagement hereunder, have access to, and acquire knowledge of or from, materials, data, strategies, systems or other information relating to the services hereunder or Company, or its related, affiliated or subsidiary companies, which may not be accessible or known to the general public (including, but not limited to, the existence of this Agreement and the terms hereof and any Work Product not readily available to the general public) ("**Confidential Information**"). Any such knowledge acquired by Consultant shall be kept confidential and shall not be used, published, or divulged by Consultant to any other person, firm, or corporation, or in any advertising or promotion regarding Consultant or Consultant's services, or in any other manner or connection whatsoever without first having obtained the prior written permission of Company, which permission Company may withhold in its sole discretion; provided that Consultant shall have no greater duty or obligation in respect of such Confidential Information than applies to Executive under Paragraph 7(b) of the Employment Agreement and any agreements referred to therein. Upon Company's request, Consultant shall immediately return to Company or destroy, all documents, magnetic copies, or other physical evidence of all Confidential Information in Consultant's possession or in the possession of any of Consultant's directors, officers, employees, agents or representatives (including, without limitation, all copies, transcriptions, notes, extracts, analyses, compilations, studies, or other documents, records, or data prepared by Consultant) which contain or otherwise reflect or are generated from the Confidential Information without retaining any copy thereof, all of the foregoing being Confidential Information and the sole property of Company, Consultant shall certify to Company that all of the foregoing has been returned or destroyed as provided in this paragraph. Consultant agrees that Company would be irreparably harmed by any violation or threatened violation of this paragraph and that, therefore, Company shall be entitled to an injunction prohibiting Consultant from any violation or threatened violation of this paragraph. The provisions of this paragraph shall survive the expiration or sooner termination of this Agreement.

8.    This Agreement shall be construed and interpreted in accordance with the laws of the State of California without regard to conflicts of laws principles.

9.    The terms and provisions of this Agreement, the Release and Paragraphs 5 and 6 of the Employment Agreement constitute the entire agreement between the parties hereto with respect to the subject matter of this Agreement and supersede all previous communications, representations, or agreements, either oral or written, between the parties relating to such subject matter hereof. No change, alteration or modification of this Agreement shall be effective unless made in writing and signed by both parties hereto.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the day and year first above written.

**THE WALT DISNEY COMPANY**                                    **CONSULTANT**

<span style="color:red">–EXHIBIT; NOT FOR EXECUTION–</span>

By: _____        By: _____
Title:

5

**Ex. 10**
**Page 1085**

*Exhibit C*

## GENERAL RELEASE

WHEREAS, Horacio Gutierrez (hereinafter referred to as "Executive") and The Walt Disney Company (hereinafter referred to as the "Company") are parties to an Employment Agreement, dated December 21, 2021 (the "Employment Agreement"), which provided for Executive's employment with the Company on the terms and conditions specified therein; and

WHEREAS, pursuant to paragraph 6 of the Employment Agreement, Executive and the Company have agreed to execute mutual releases of the type and nature set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and mutual promises herein contained and for other good and valuable consideration received in accordance with the terms of the Employment Agreement, it is agreed as follows:

1.    (a)    Upon the later of (i) the execution hereof by the Company and Executive, (ii) the passage of seven days following execution hereof by Executive without Executive's having exercised the revocation rights referred to in paragraph 10 hereof and (iii) the time specified in the Employment Agreement for payment of a particular item of compensation, the Company shall (x) provide Executive the amounts and benefits described in Paragraph 5 of the Employment Agreement and (y) make full payment for vacation and floating holidays accrued but unused as of the date hereof (to the extent, if any, not already paid in accordance with applicable law), less amounts required to be withheld by law or authorized by Executive to be withheld (it being understood that from and after the date hereof no further rights to vacation or floating holidays or compensation therefor shall accrue or be payable to Executive). Such payment shall be made by check payable to Executive.

(b)    The covenants and commitments of the Company referred to herein (including, specifically, but without limitation, any and all benefits conferred upon Executive pursuant to Paragraph 5 of the Employment Agreement) shall be in lieu of and in full and final discharge of any and all obligations to Executive for compensation, severance payments, or any other expectations of payment, remuneration, continued coverage of any nature or benefit on the part of Executive arising out of or in connection with Executive's employment with the Company, or under any agreement, arrangement, commitment, plan, program, practice or policy of the Company, or otherwise, other than as expressly provided in the Employment Agreement.

(c)    Notwithstanding the foregoing or any other term or provision hereof, Executive shall be entitled to such rights as are vested in Executive as of the Termination Date, under and subject to the terms of (i) the Employment Agreement and/or the Consulting Agreement, (ii) any applicable retirement plan(s) to which Executive may be subject, (iii) any applicable stock option plan or other incentive compensation plan of the Company to which Executive may be subject, (iv) any right which Executive now has or may hereafter have to claim a defense and/or indemnity for liabilities to third parties in connection with Executive's activities as an employee of the Company or any of its subsidiaries pursuant to the terms of any applicable statute, under any insurance policy, pursuant to the certificate of incorporation or bylaws or established policies of the Company or any subsidiary thereof or pursuant to written agreement (including, without limitation, the Indemnification Agreement) expressly providing for such indemnity between

Executive and the Company or any subsidiary thereof, and (v) any other applicable employee welfare benefit plans to which Executive may be subject. Further, Executive shall be entitled to (A) reimbursement of all reasonable business expenses incurred by Executive in accordance with Company's practices and policies regarding reimbursement of business expenses, and (B) such continuation of health care coverage as is required under, and subject to, applicable law, of which Executive shall be notified in writing after the Termination Date, provided Executive timely exercises Executive's rights in accordance therewith. Executive understands and acknowledges that all payments for any such continued health care coverage Executive may elect will be paid by Executive, except to the extent the Employment Agreement provides that such payments shall be made by the Company.

2.      Executive confirms that, on or prior to seven (7) days from the date hereof, Executive shall turn over to the Company all files, memoranda, records, credit cards and other documents and physical or personal property that Executive received from the Company or that Executive generated in connection with Executive's employment by the Company or that are the property of the Company provided that Executive may retain notes, files, calendars, contact information and correspondence of a personal nature (whether in hard copy or electronic form), provided, in each case, that no confidential Company information or information intended primarily for internal Company use is contained therein).

3.      It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under law. Should there be any conflict between any provision hereof and any present or future law, such law will prevail, but the provisions affected thereby will be curtailed and limited only to the extent necessary to bring them within the requirements of law, and the remaining provisions of this Agreement will remain in full force and effect and be fully valid and enforceable.

4.      Executive represents and agrees (a) that Executive has to the extent Executive desires discussed all aspects of this Agreement with Executive's attorney, (b) that Executive has carefully read and fully understands all of the provisions of this Agreement, and (c) that Executive is voluntarily entering into this Agreement.

5.      Excluding enforcement of the covenants, promises and/or rights reserved herein and/or in the Employment Agreement, Indemnification Agreement and/or the Consulting Agreement, Executive hereby irrevocably and unconditionally releases, acquits and forever discharges the Company and each of the Company's direct or indirect owners, parent companies, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, affiliates (including, for the avoidance of doubt, The Walt Disney Company and agents, directors, officers, employees, representatives and attorneys of such companies, divisions, subsidiaries and affiliates) and all persons acting by, through, under or in concert with any of them (collectively "Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort or any legal restrictions on the Company's right to terminate

2

employees, or any Federal, state or other governmental statute, regulation or ordinance, including, without limitation, Title VII of the Civil Rights Act of 1964, as amended, the Federal Age Discrimination In Employment Act of 1967, as amended, and the California Fair Employment and Housing Act, all as amended, that Executive now has, or has ever had, or ever will have, against each or any of the Releasees, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring up through the date of Executive's execution hereof that directly or indirectly arise out of, relate to, or are connected in any manner whatsoever with, Executive's services to, or employment by the Company or any of its subsidiaries (any of the foregoing being an "Executive Claim" or, collectively, the "Executive Claims"). This release does not constitute a release of any Executive Claims that cannot be released as a matter of law.

6.    Except as expressly reserved herein, Executive expressly waives and relinquishes all rights and benefits afforded by California Civil Code Section 1542 and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 states as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of the Releasees, Executive expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all Executive Claims that Executive does not know or suspect to exist in Executive's favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Executive Claim or Executive Claims.

7.    Excluding enforcement of the covenants, promises and/or rights reserved herein or in the Employment Agreement, Indemnification Agreement and/or the Consulting Agreement, and except as otherwise provided in the proviso at the end of this sentence, the Company hereby irrevocably and unconditionally releases, acquits and forever discharges Executive, and Executive's heirs, assigns and successors in interest ("Executive Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorney's fees and costs actually incurred), of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort, or any federal, state or other governmental statute, regulation or ordinance, that the Company now has, or has ever had, or ever will have, against Executive and/or the Executive Releasees, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring up through the date of the Company's execution hereof, that directly or indirectly arise out of, relate to, or are connected in any manner whatsoever with, Executive's services to, or employment by the Company (hereinafter referred to as a "Claim" or collectively, the "Claims"); provided, however, that, notwithstanding any other term or provision hereof, any Claim or Claims rising out of, or resulting from, in part or

3

Ex. 10
Page 1088

whole, (i) any illegal or fraudulent act(s) or illegal or fraudulent omission(s) to act of Executive, (ii) any action(s) or omission(s) to act which would constitute self-dealing or a breach of Executive's confidentiality obligations to the Company or any affiliate thereof, or a breach of The Walt Disney Company and Affiliated Companies Confidentiality Agreement executed by Executive, or (iii) the policy of the Board of Directors of the Company, as the same may be in effect from time to time, regarding the ability of the Company to recoup bonus or incentive payments as a result of Company's being required to restate its financial results due to material noncompliance with financial reporting requirements under the securities laws, are hereby expressly excluded in their entirety from the foregoing release, acquittal and discharge and are unaffected thereby (any Claim or Claims not so excluded pursuant to this proviso being hereinafter referred to as a the "Company Claim" or, collectively, as the "Company Claims"). This release does not constitute a release of any Company Claims that cannot be released as a matter of law.

8.      Except as expressly reserved herein, the Company expressly waives and relinquishes all rights and benefits afforded by California Civil Code Section 1542 and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 states as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release, acquittal and discharge of the Executive Releasees with respect to the Company Claims only, the Company expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all the Company Claims that the Company does not know or suspect to exist in the Company's favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Company Claims. Notwithstanding anything in this Release to the contrary, if at any time (whether during or after the Employment Period) the Company is required to restate its financial results due to material noncompliance with financial reporting requirements under the securities laws, nothing in this Release shall be construed to limit the rights of the Company and the Board of Directors of the Company to seek or obtain recovery from Executive of any incentive compensation (including profits realized from the sale of Company securities) previously paid, or the cancellation of any outstanding awards, in accordance with the terms of Company's policy, as in effect from time to time, regarding the ability of the Company to recoup any bonus or incentive payments under such circumstances.

9.      Executive is advised to consult with an attorney before signing this Agreement. Executive understands that Executive has been given a period of 21 days to review and consider this Agreement before signing it pursuant to the Age Discrimination In Employment Act of 1967, as amended. Executive further understands that Executive may use as much of this 21-day period as Executive wishes prior to signing.

4

**Ex. 10**
**Page 1089**

10.    Executive acknowledges and represents that Executive understands that Executive may revoke the waiver of Executive's rights under the Age Discrimination In Employment Act of 1967, as amended, effectuated in this Agreement within 7 days of signing this Agreement. Revocation can be made by delivering a written notice of revocation to the Senior Executive Vice President, General Counsel and Secretary, The Walt Disney Company, 500 South Buena Vista Street, Burbank, California 91521. For this revocation to be effective, written notice must be received by the General Counsel, no later than the close of business on the seventh day after Executive signs this Agreement. If Executive revokes the waiver of Executive's rights under the Age Discrimination In Employment Act of 1967, as amended, the Company shall have no obligations to Executive under this Agreement or the Employment Agreement.

11.    Executive and the Company respectively represent and acknowledge that in executing this Agreement neither of them is relying upon, and has not relied upon, any representation or statement not set forth herein made by any of the agents, representatives or attorneys of the Releasees or of the Executive Releasees with regard to the subject matter, basis or effect of this Agreement or otherwise.

12.    This Agreement shall not in any way be construed as an admission by any of the Releasees or Executive Releasees, respectively, that any of the Releasees or Executive Releasees has acted wrongfully or that the Company or Executive has any rights whatsoever against any of the Releasees or Executive Releasees except as specifically set forth herein, and each of the Releasees and Executive Releasees specifically disclaims any liability to any party for any wrongful acts.

13.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of California. This Agreement is binding on the successors and assigns of, and sets forth the entire agreement between, the parties hereto; fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof; and may not be changed except by explicit written agreement to that effect subscribed by the parties hereto.

PLEASE READ CAREFULLY. THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

–EXHIBIT; NOT FOR EXECUTION–

HORACIO GUTIERREZ

Date: _____

THE WALT DISNEY COMPANY

By: _____

Title: _____

Date: _____

5

**THE WALT DISNEY COMPANY**
**500 South Buena Vista Street**
**Burbank, California 91521**

January 31, 2022

Mr. Horacio E. Gutierrez
Senior Executive Vice President,
General Counsel and Secretary
The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

     Re: <u>Assignment of Employment Agreement</u>

Dear Mr. Gutierrez:

Reference is made to the employment agreement (the "*Agreement*") dated as of December 21, 2021, between The Walt Disney Company (the "*Company*") and you, wherein Company employed your services as Senior Executive Vice President, General Counsel and Secretary.

1.     Pursuant to Paragraph 8(c) of the Agreement, Company may assign the Agreement or all or any part of its rights thereunder from any Company entity to another Company entity, and in such event the Agreement shall inure to the benefit of such assignee.

2.     Please be advised that Company hereby assigns the Agreement to Disney Corporate Services Co., LLC, effective February 1, 2022 (the "*Assignment Effective Date*").

3.     Effective February 1, 2022, all references to "Company" in the Agreement and its subsequent amendments shall be deemed to be references to Disney Corporate Services Co., LLC.

4.     Following the Assignment Effective Date, your title shall continue to be Senior Executive Vice President, General Counsel and Secretary, The Walt Disney Company.

As so assigned, the Agreement continues in full force and effect.

     THE WALT DISNEY COMPANY

     By:     /s/ Paul J. Richardson
             Senior Executive Vice President and
             Chief Human Resources Officer

     Date:     January 31, 2022

The above-referenced assignment is hereby accepted.

DISNEY CORPORATE SERVICES CO., LLC

By:     /s/ Jim Kapenstein
     President

Date:     January 31, 2022

Exhibit 10.6

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT, dated as of January 24, 2022, by and between The Walt Disney Company, a Delaware corporation (the "*Company*"), and Geoff Morrell ("*Executive*").

### WITNESSETH:

WHEREAS, the Company and Executive wish to enter into an agreement (this "*Agreement*") to provide for Executive's service to the Company;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Company and Executive hereby agree as follows:

1.    Employment. Upon the terms and subject to the conditions of this Agreement, the Company hereby employs Executive, and Executive hereby accepts employment by the Company, for the period commencing on January 24, 2022 (the "*Commencement Date*") and ending on December 31, 2024 (or such earlier date as shall be determined pursuant to Paragraph 5). The period during which Executive is employed pursuant to this Agreement shall be referred to as the "*Employment Period*."

2.    Position and Duties.    During the Employment Period, Executive shall serve as Senior Executive Vice President and Chief Corporate Affairs Officer of the Company and in such other positions with the Company and its subsidiaries consistent with Executive's position as Senior Executive Vice President and Chief Corporate Affairs Officer, as the Company reasonably may assign. Executive's upward reporting structure will be consistent with the upward reporting structure of comparable senior executives. During the Employment Period, Executive shall devote all Executive's business time on a full-time and exclusive basis to the services required hereunder, and shall perform such services in a manner consonant with the duties of Executive's position. Executive shall be subject to the terms and conditions of any applicable policy of the Company (including, without limitation, "The Walt Disney Company and Affiliated Companies Standards of Business Conduct" booklet and the Employee Policy Manual), as reasonably made available and as interpreted from time to time by the Company, provided that, subject to the provisions of Paragraph 7 and the Employee Policy Manual, nothing herein shall preclude Executive from (i) engaging in charitable activities and community affairs, and (ii) managing Executive's personal investments, so long as the activities listed in subclauses (i)-(ii) do not materially interfere, individually or in the aggregate, with the proper performance of Executive's duties and responsibilities hereunder. Notwithstanding the Policy on Board Service contained in the Employee Policy Manual, during the six-month period preceding the Scheduled Expiration Date, Executive shall, upon reasonable notice to and absent objection by the Chief Executive Officer of the Company, be entitled to explore opportunities for service

**Ex. 10**
**Page 1092**

on the board of directors of any public company that is not a Designated Business, as such term is defined in the Consulting Agreement (Exhibit B, attached hereto). For the avoidance of doubt, actual service on the board of directors of any public company while employed by the Company remains prohibited.

3.    Compensation.

(a)    Base Salary. Effective January 24, 2022, Executive shall receive an annual base salary of $1,000,000. Subsequent salary amounts shall be determined by the Company in its sole discretion; provided, however, that none of such subsequent annualized salaries shall be less than $1,000,000. Notwithstanding any other provision of this Agreement or any other Company document reflecting Executive's Base Salary (as defined below), the Company may reduce Executive's Base Salary by any amount up to 50% of Executive's then-current Base Salary for any period of time up to a consecutive or cumulative maximum period of six months if during such applicable period Disney has instituted a Disney-wide salary reduction program broadly applicable to employees at a comparable level to Executive.

The amount of annual base salary payable under this Paragraph 3(a) shall be reduced, however, to the extent Executive elects in accordance with Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*"), and the regulations and interpretations thereunder ("*Section 409A*"), to defer such salary under the terms of any deferred compensation or savings plan or arrangement maintained or established by or on behalf of the Company or any of its subsidiaries. Executive's annual base salary payable hereunder, without reduction for any amounts deferred as described above, is referred to herein as the "*Base Salary*." The Company shall pay Executive the portion of Base Salary not deferred at the election of Executive in accordance with its generally applicable policies for comparable senior executives (currently paid on a weekly basis), but not less frequently than in equal monthly installments.

(b)    Annual Incentive Bonus. Executive shall be given the opportunity to earn an annual discretionary incentive bonus in accordance with the annual bonus plan generally applicable to the most senior executives of the Company, as the same may be in effect from time to time (the "*Annual Plan*"). Executive's target annual incentive bonus opportunity under the Annual Plan during each full fiscal year during the term hereof shall be one hundred fifty percent (150%) of Executive's Base Salary in effect at the end of such fiscal year. The actual amount payable to Executive as an annual bonus under the Annual Plan shall be dependent upon the achievement of performance objectives established in accordance with the Annual Plan by the Board of Directors of the Company or the committee of the Board of Directors of the Company responsible for administering such Annual Plan (the "*Compensation Committee*"), which, as to

2

**Ex. 10**
**Page 1093**

Company performance objectives, shall be substantially the same as the objectives established under the Annual Plan for other senior executive officers of the Company, though individual performance criteria may differ to reflect differences in responsibilities. The preceding sentence shall not limit any power or discretion of the Board of Directors of Company or the Compensation Committee in the administration of the Annual Plan. Any bonus payable pursuant to this Paragraph 3(b) shall be paid at the same time as annual bonuses are generally payable to the most senior executives of Company in accordance with the provisions of the Annual Plan, subject to Executive's continued employment with Company through the date on which such bonuses are paid. If Executive's employment continues until and ends upon the Scheduled Expiration Date, the Chief Executive Officer of the Company will, in his discretion, recommend to the Compensation Committee an annual cash bonus for the fiscal year in which the termination occurs in consideration of Executive's contributions during such fiscal year. Such bonus shall be payable at the same time annual cash bonuses are paid to senior management and shall be based on actual achievement of performance targets, evaluated as if Executive had remained employed through the end of the applicable performance period.

    (c)    Eligibility for Equity Awards. Subject to the terms of this Agreement, Executive shall be entitled to participate in any stock option, restricted stock unit, performance share, performance unit or other equity-based long-term incentive compensation plan, program or arrangement generally made available to the most senior executives of Company, on substantially the same terms and conditions as generally apply to such other such executives, except that the size of the awards made to Executive shall reflect Executive's position with the Company and the Compensation Committee's evaluation of Executive's performance and competitive compensation practices. For each full fiscal year during the term hereof, Executive shall receive an annual award with a target accounting award value (which value shall be as determined in accordance with the policies and practices generally applicable to the most senior executives of Company) of four hundred fifty percent (450%) of Executive's Base Salary as expected to be in effect at the end of such fiscal year; it being understood that the form of the award shall be determined by the Compensation Committee and such form shall be subject to the terms of the applicable plan or plans of the Company. The preceding sentence shall not limit any power or discretion of the Board of Directors of Company or the Committee in the administration of any such long-term incentive plan, it being understood, specifically, that the Compensation Committee may adjust (i.e. reduce or increase) the target award value of any award made in respect of any fiscal year based on its evaluation of Executive's performance and/or any economic, financial and/or market conditions affecting the Company. The actual benefits conveyed to Executive in respect of any such awards may be less than, greater than or equal to the targeted award value, as such benefits will be dependent on a series of performance and other factors, such as

3

the value of Company's common stock and satisfaction of any applicable vesting requirements and performance conditions.

(d)    Signing Bonus. In addition to the foregoing, Executive shall receive a special one-time signing bonus in the amount of $2,750,000 (less statutory withholdings) (the "Signing Bonus") payable within ten business days following Company's receipt of Executive's signature on this agreement or Executive's commencement of work hereunder, whichever is the later. In consideration of this Signing Bonus, Executive agrees that if Executive should sever Executive's employment with Company (or with one of its subsidiaries, in the event Executive may be employed at that time by a subsidiary rather than by Company) for any reason whatsoever within Executive's control within two years from the Commencement Date (as defined in paragraph 1 above), Executive shall pay Company a sum equal to Company's total cost of the Signing Bonus.

(e)    Initial Equity-Based Award. In connection with the commencement of Executive's services hereunder, the Company shall recommend to the Compensation Committee of the board of directors of Company that Executive receive a one-time award of long-term incentive stock units with a target award value of $4,750,000, as determined by Company in accordance with its policies and practices generally, it being understood that the form of the award shall be determined by the Compensation Committee, and such form shall be subject to the terms of the applicable plan or plans of Company (the "*Award*"). The actual benefits conveyed to Executive in respect of such Award may be less than, greater than, or equal to the targeted award value, as such benefits will be dependent on the value of Disney's common stock, on the satisfaction of applicable vesting requirements, and, with respect to performance-based restricted stock units, to Disney's exercise of discretion in determining the extent of Executive's overall performance and contributions to Company's business, in each case as set forth in the award agreement specific to this Award. Such long-term incentive stock units shall be scheduled to vest at the rate of one-third (1/3) per year on each of the first through third anniversaries of the grant date, except as to any portion of the award that is provided in performance-based stock units, which portion will cliff vest on the third anniversary of the grant date, in all cases subject to Executive's continued employment by Company and to the other provisions of the applicable stock incentive plan.

4.    Benefits, Perquisites and Expenses.

(a)    Benefits. During the Employment Period, Executive shall be eligible to participate in (i) each welfare benefit plan sponsored or maintained from time to time by the Company and made available generally to its executive officers, including, without limitation, each such group life, hospitalization, medical, dental, health, accident or disability insurance, vacation or similar plan

4

Ex. 10
Page 1095

or program, whether now existing or established hereafter, and (ii) each pension, profit sharing, retirement, deferred compensation or savings plan sponsored or maintained by the Company for its executive officers, whether now existing or established hereafter, in accordance with the generally applicable provisions thereof.

(b)    Perquisites. During the Employment Period, Executive shall be entitled to receive such perquisites as are generally provided to other executive officers of the Company in accordance with the then current policies and practices of the Company.

(c)    Business Expenses. The Company shall pay or reimburse Executive for all reasonable expenses incurred or paid by Executive during the Employment Period in the performance of Executive's duties hereunder, upon presentation of expense statements or vouchers and such other information as the Company may reasonably require and in accordance with the generally applicable policies and procedures of the Company for its executive officers as in effect from time to time.

(d)    Indemnification. The Company shall cause Disney to provide Executive with an indemnification agreement substantially in the form attached hereto as Exhibit A (the "*Indemnification Agreement*"), which agreement shall be signed and delivered to Executive upon execution of this Agreement by the parties hereto.

5.    Termination of Employment.

(a)    Early Termination of the Employment Period. Notwithstanding Paragraph 1, the Employment Period shall end upon the earliest to occur, if any, of (i) Executive's death, (ii) a Termination due to Disability, (iii) a Termination for Cause, (iv) the Termination Date specified in connection with any exercise by the Company of its Termination Right or (v) a Termination for Good Reason. If the Employment Period terminates as of a date specified under this Paragraph 5, Executive shall be deemed to have automatically resigned, effective immediately upon termination, from any and all positions Executive holds with the Company and any of its subsidiaries and affiliates, with no further action required by Executive or the Company or any of its subsidiaries and affiliates.

(b)    Benefits Payable Upon Termination.

(i)    In the event of Executive's death during the Employment Period or a Termination due to Disability, Executive or Executive's beneficiaries or legal representatives shall be provided the Unconditional Entitlements, including, but not limited to, any such Unconditional Entitlements that are or become payable under any Company plan, policy,

5

practice or program or any contract or agreement with the Company by reason of Executive's death or Termination due to Disability. Unless and until a Termination due to Disability, during any period during which Executive is unable to perform the services required hereunder for medical or health-related reasons, Executive's Base Salary shall be payable to Executive and for any such period of approved leave, Executive shall remain an employee of the Company for purposes of stock option and restricted stock unit awards, annual incentive bonus compensation pursuant to Paragraph 3(b) hereof, and equity awards pursuant to Paragraph 3(c) hereof.

(ii)     In the event of Executive's Termination for Cause, Executive shall be provided the Unconditional Entitlements, except that Executive will not be paid the bonus referred to in Paragraph 5(c)(ii) below.

(iii)     In the event of a Termination for Good Reason or the exercise by the Company of its Termination Right, Executive shall be provided the Unconditional Entitlements. In addition, the Company shall provide Executive the Conditional Benefits, subject to (A) Executive's execution of the Release, (B) Executive having not revoked such Release within the seven-day revocation period permitted following delivery of such Release and (C) Executive's execution of the Consulting Agreement, it being understood, for the avoidance of doubt, that any failure by Executive to execute either the Consulting Agreement or the Release or both of them shall not be deemed to be a breach hereof. For Executive to become entitled to the Conditional Benefits, Executive must deliver both (i) the executed Release and (ii) the executed Consulting Agreement to the Company by no later than twenty-two (22) days following the Termination Date.

(c)     Unconditional Entitlements. For purposes of this Agreement, the "*Unconditional Entitlements*" to which Executive may become entitled under Paragraph 5(b) are as follows:

(i)     Earned Salary. Any Base Salary earned, but unpaid, including without limitation accrued but unused and unpaid vacation, for services rendered to the Company on or prior to the date on which the Employment Period ends pursuant to Paragraph 5(a) (but excluding any salary and interest accrued thereon payment of which has been deferred, which shall be paid as provided under the applicable plan) shall be paid within 30 days following the termination of Executive's employment hereunder (or such date or earlier dates upon which payment of any part or whole of the foregoing is required under applicable law).

6

(ii)    Prior Year Bonus. If Executive's employment terminates after the end of a fiscal year but before the annual incentive compensation payable for services rendered in that prior fiscal year has been paid, the annual incentive compensation that would have been payable to Executive for such completed fiscal year in accordance with Paragraph 3(b) shall be paid within 30 days following the termination of Executive's employment hereunder (or such date or earlier dates upon which payment of any part or whole of the foregoing is required under applicable law) or, if any part thereof constitutes a bonus which is subject to or conditioned upon any performance conditions, within thirty (30) days following the determination that such conditions have been met, provided that in all events the bonus shall be paid no later than 120 days following Executive's termination of employment.

(iii)    Benefits. All benefits payable to Executive under any employee benefit plans (including, without limitation any pension plans or 401(k) plans) of the Company or any of its subsidiaries applicable to Executive at the time of termination of Executive's employment with the Company and all amounts and benefits (other than the Conditional Benefits) which are vested or which Executive is otherwise entitled to receive under the terms of or in accordance with any plan, policy, practice or program of, or any contract or agreement with, the Company or any of its subsidiaries, at or subsequent to the date of Executive's termination without regard to the performance by Executive of further services or the resolution of a contingency, shall be paid or provided in accordance with and subject to the terms and provisions of such plans, it being understood that all such benefits shall be determined on the basis of the actual date of termination of Executive's employment with the Company. Notwithstanding the immediately preceding sentence, Executive shall not be entitled to any benefits under any severance plan or policy of the Company or any of its subsidiaries.

(iv)    Indemnities. Any right which Executive may have to claim a defense and/or indemnity for liabilities to or claims asserted by third parties in connection with Executive's activities as an officer, director or employee of the Company or any of its subsidiaries pursuant to the terms of the Indemnification Agreement referenced in Paragraph 4(d) shall be unaffected by Executive's termination of employment and shall remain in effect in accordance with its terms.

(v)    Medical Coverage. Executive shall be entitled to such continuation of health care coverage as is required under, and in accordance with, applicable law or otherwise provided in accordance with the Company's policies. Executive shall be notified in writing pursuant to

7

this Paragraph 5(c)(v) of Executive's rights to continue such coverage after the termination of Executive's employment, provided that Executive timely complies with the conditions to continue such coverage that are applicable at law or pursuant to Company's policies and procedures to a termination of employment at that time. Executive understands and acknowledges that Executive is responsible to make all payments required for any such continued health care coverage that Executive may choose to receive.

(vi)     Business Expenses. Executive shall be entitled to reimbursement, in accordance with the Company's policies regarding expense reimbursement as in effect from time to time, for all business expenses incurred by Executive prior to the termination of employment.

(vii)     Stock Options/RSUs. Except to the extent additional rights are provided upon Executive's qualifying to receive the Conditional Benefits, Executive's rights with respect to any stock options and/or restricted stock units granted to Executive by the Company shall be governed by the terms and provisions of the plans (including plan rules) and award agreements pursuant to which such stock options and restricted stock units were awarded, as in effect at the date Executive's employment terminates.

(d)     Conditional Benefits. For purposes of this Agreement, the "*Conditional Benefits*" to which Executive may become entitled, provided Executive complies with the terms and conditions hereof (including the applicable agreements attached hereto), are as follows:

(i)     Remaining Salary. As further noted in paragraph 2 of the Consulting Agreement, the Company shall pay Executive a lump sum amount equal to the Consulting Amount as compensation for consulting services under the Consulting Agreement. If the Scheduled Expiration Date is later than the end of the Consulting Agreement Period, the Company shall also pay Executive the Severance Amount. The Consulting Amount and the Severance Amount shall be paid on the date that is six months and one day after the Termination Date (or upon Executive's death, if earlier).

(ii)     Stock Options. The Continuing Stock Options shall become exercisable in accordance with the applicable Original Stock Option Award Documents, on the same basis as such options would have become vested and exercisable if Executive had remained employed under this Agreement through the Scheduled Expiration Date. Once exercisable, all Continuing Stock Options shall remain exercisable until the Stock Option Termination Date. All of Executive's Remaining Stock Options

8

that were vested and exercisable at the Termination Date shall remain exercisable until the Stock Option Termination Date. Notwithstanding any other term or provision hereof, any of Executive's stock options which are not vested at the Termination Date, and which are not Continuing Stock Options, shall automatically terminate upon the Termination Date. Except as otherwise expressly provided herein, all of the Remaining Stock Options shall continue to be subject to the Original Stock Option Award Documents. Notwithstanding the foregoing, in the event of Executive's death prior to the Scheduled Expiration Date, all Continuing Stock Options shall vest on the date of Executive's death and all Remaining Stock Options shall be exercisable for the period following Executive's death determined under such Original Stock Option Award Documents on the same basis as though Executive was employed on the date of Executive's death and regardless of when the Stock Option Termination Date would otherwise have occurred. However, any provisions in the Original Stock Option Award Documents relating to disability or change in control of the Company after the Termination Date shall not be operative with respect to any Remaining Stock Options.

(iii)     RSUs. The Continuing Stock Units shall continue to vest in accordance with the terms of the Original RSU Award Documents, on the same basis as such stock units would have become vested if Executive had remained employed under this Agreement through the Scheduled Expiration Date. Except as otherwise expressly provided herein, all such Continuing Stock Units shall be subject to, and administered in accordance with, the Original RSU Award Documents. Any of Executive's restricted stock unit awards that have not become vested on or before the Termination Date, and that are outstanding at the Termination Date, but which are not Continuing Stock Units, shall automatically terminate on the Termination Date. Notwithstanding any term or provision of the Original RSU Award Documents:

(A)     any provisions in such Original RSU Award Documents relating to disability shall not be applicable to any such Continuing Stock Units after the Termination Date; and

(B)     in the event of Executive's death after the Termination Date but prior to the Scheduled Expiration Date, the terms and provisions of the Original RSU Award Documents shall be interpreted and applied in the same manner with respect to such Continuing Stock Units as if Executive were an active employee on the date of Executive's death.

9

Ex. 10
Page 1100

(C)    to the extent that, under the Company's compensation practices and policies, any tranche of Continuing Stock Units is subject to the achievement of performance conditions which were imposed solely because Executive was an executive officer of the Company who could have been a covered employee within the meaning of Section 162(m) at the time payment in respect of such award was expected to be made (the "*Applicable 162(m) Criteria*") and such Applicable 162(m) Criteria relate, in whole or in part, to any performance period continuing after the end of the Company's fiscal year in which the Termination Date occurs, such Applicable 162(m) Criteria shall be waived as of the Termination Date with respect to such tranche of the Continuing Stock Units; provided, however, that this Paragraph 5(d)(iii)(C) shall not be applicable if and to the extent, in the reasonable opinion of tax counsel to the Company, the presence of such provision would cause any stock units intended to be qualified as other performance based compensation within the meaning of Section 162(m) of the Code to fail to be so qualified at any time prior to Executive's Termination Date.

(iv)    Pro-Rated Current Year Bonus. The Company shall pay Executive a pro rata annual bonus for the fiscal year in which the Termination Date occurs, determined on the basis of an assumed full year target bonus determined pursuant to Section 3(b) and the number of days in the applicable fiscal year occurring on or before the Termination Date. Such pro-rata current year bonus payable pursuant to the foregoing shall be paid no later than the later of (i) two and a half months after the end of Executive's tax year in which the Termination Date occurs and (ii) two and a half months after the end of the Company's tax year in which the Termination Date occurs.

(v)    Additional Distribution Rules in Respect of Conditional Benefits. The following additional rules shall apply with respect to distribution of the payments and benefits, if any, to be provided to Executive under Paragraph 5(d)(i), (iii) and (iv):

(A)    It is intended that each installment of the payments and benefits provided under Paragraphs 5(d)(i), (iii) and (iv) shall be treated as a separate "payment" for purposes of Section 409A. Neither the Company nor Executive shall have the right to accelerate or defer the delivery of any such payments or benefits except to the extent specifically permitted or required by Section 409A;

10

(B)     Distribution in respect of any tranche of Continuing Stock Units to which Paragraph 5(d)(iii)(C) applies shall be made within 90 days following the later of the date that (i) the service conditions that had originally been specified for such tranche of Continuing Stock Units under the applicable Original RSU Award Documents would otherwise have been satisfied (had Executive continued to be employed) and (ii) the last performance measurement period applicable in respect of such tranche of Continuing Stock Units under the applicable Original RSU Award Documents would otherwise have expired;

(C)     Each installment of the payments and benefits due under Paragraph 5(d)(i) and (iii) that would, absent this subsection, be paid within the six-month period following Executive's "separation from service" (within the meaning of Section 409A of the Code and as provided in Paragraph 5(g) hereof) from the Company shall not be paid until the date that is six months and one day after such separation from service (or, if earlier, Executive's death), with any such installments that are required to be delayed being accumulated during the six-month period and paid in a lump sum on the date that is six months and one day following Executive's separation from service; provided, however, that the preceding provisions of this sentence shall not apply to any installment of payments and benefits if and to the maximum extent that such installment is deemed to be paid under a separation pay plan that does not provide for a deferral of compensation by reason of the application of Treasury Regulation 1.409A-1(b)(9)(iii) (relating to separation pay upon an involuntary separation from service). (Any installments that qualify for the exception under Treasury Regulation Section 1.409A-1(b)(9)(iii) must be paid no later than the last day of Executive's second taxable year following the taxable year of Executive in which the separation from service occurs.) Any subsequent installments that would be payable more than six months following Executive's separation from service shall be paid in accordance with the dates and terms set forth herein.

(e)     Definitions. For purposes of this Paragraph 5, the following terms shall have the meanings ascribed to them below:

"*Consulting Agreement*" means the consulting agreement in the form attached hereto as Exhibit B.

11

Ex. 10
Page 1102

*"Consulting Agreement Period"* means the period established under the Consulting Agreement during which Executive shall be required to provide consulting services to the Company

*"Consulting Amount"* means a lump sum amount equal to the aggregate Base Salary which would have been earned by Executive during the Employment Period had Executive's employment under this Agreement continued after the Termination Date and through the earlier to occur of (i) the end of the Consulting Agreement Period or (ii) any earlier date that the Consulting Agreement terminates for any reason whatsoever.

*"Continuing Stock Options"* means any of Executive's stock options that were not vested and exercisable at the Termination Date, but that would have become vested and exercisable on or prior to the Latest Stock Option Vesting Date had Executive continued to be employed by the Company through the Scheduled Expiration Date.

*"Continuing Stock Units"* means any of Executive's restricted stock units outstanding at the Termination Date (whether or not subject to performance conditions) that, subject to the satisfaction of any applicable performance conditions, would have become vested on or prior to the Scheduled Expiration Date had Executive continued to be employed by the Company through the Scheduled Expiration Date.

*"Latest Stock Option Vesting Date"* means the date which is three months after the Scheduled Expiration Date.

*"Original Stock Option Award Documents"* means, with respect to any Remaining Stock Option, the terms and provisions of the award agreement and plan pursuant to which such Remaining Stock Option was granted, each as in effect on the Termination Date.

*"Original RSU Award Documents"* means, with respect to any tranche of Continuing Stock Units, the terms and provisions of the award agreement related to, and the plan governing, such tranche of Continuing Stock Units, each as in effect on the Termination Date.

*"Release"* means the General Release in the form set forth in Exhibit C attached hereto.

*"Remaining Stock Options"* means any of Executive's stock options which are (i) vested at the Termination Date or (ii) Continuing Stock Options.

*"Scheduled Expiration Date"* means December 31, 2024.

12

"*Severance Amount*" means an amount equal to the aggregate Base Salary which would have been earned by Executive under this Agreement for the period commencing on the day after termination of the Consulting Agreement Period and ending on the Scheduled Expiration Date; provided that if the Company terminates the Consulting Agreement due to Executive's material breach of any term thereof, the Severance Amount shall be reduced to zero.

"*Stock Option Termination Date*" means, with respect to any Remaining Stock Option, the expiration date as stated in the applicable award, taking into account any expiration date extension provided in the applicable award based on Executive's age and/or years of service as of the Scheduled Expiration Date.

"*Termination for Cause*" means a termination based on Executive's (i) conviction of embezzlement, fraud, or other conduct which would constitute a felony; (ii) willful unauthorized disclosure of confidential information; (iii) failure, neglect of, or refusal to substantially perform the duties of the Executive's employment; or (iv) any other act or omission which is a significant breach of the Company's policies or which is significantly injurious to the financial condition or business reputation of the Company or any Affiliate thereof, which termination may be effected (A) immediately upon notice from the Company if the Company shall reasonably and in good faith determine that the conduct or cause specified in such notice is not curable (it being understood that such notice shall describe in reasonable detail the conduct or cause giving rise to such notice and shall state the reason(s) why the Company has determined that such conduct or cause is not curable); or (B) upon twenty business days notice from the Company, if the Company shall and in good faith determine that the conduct or cause specified in such notice is curable (it being understood that such notice shall describe in reasonable detail the conduct or cause giving rise to such notice and shall state the reason(s) why the Company has determined that such conduct or cause is curable and what steps the Company believes should or could be taken to cure such conduct or cause, provided, however, that such opportunity to cure shall only be provided by the Company with respect to a termination of Executive's employment hereunder due to gross negligence); provided that the Company shall not be entitled to terminate Executive's employment for Cause, if Executive has, within five business days after notice in accordance with subclause (B) has been given personally to Executive or otherwise has been received by Executive, commenced in good faith to cure the conduct or cause specified in such notice and completes such cure within 20 business days following the date such notice was received.

13

"*Termination Date*" means the earlier to occur of (i) the date the Company specifies in writing to Executive in connection with the exercise of its Termination Right or (ii) the date Executive specifies in writing to the Company in connection with any notice to effect a Termination for Good Reason.

"*Termination due to Disability*" means a termination of Executive's employment by the Company because Executive has been incapable, after reasonable accommodation, of substantially fulfilling the positions, duties, responsibilities and obligations set forth in this Agreement because of physical, mental or emotional incapacity resulting from injury, sickness or disease for a period of (i) six (6) consecutive months or (ii) an aggregate of nine (9) months (whether or not consecutive) in any twelve (12) month period, provided that any notice of such termination of employment must be given when Executive is incapable of substantially fulfilling Executive's positions, duties, responsibilities, and obligations hereunder as referred to above and has not resumed such duties. Any question as to the existence, extent or potentiality of Executive's disability shall be determined by a qualified physician selected by the Company with the consent of Executive, which consent shall not be unreasonably withheld.

"*Termination for Good Reason*" means a termination of Executive's employment under this Agreement by Executive within 30 days of the Company's failure to cure, in accordance with the procedures set forth below, any of the following events: (i) a reduction in Executive's compensation rights hereunder (that is, a reduction in Base Salary, target bonus opportunity specified in Paragraph 3(b) or target annual discretionary incentive award specified in Paragraph 3(c) other than as permitted in Paragraph 3(c), it being understood that the failure of Executive to receive an actual bonus for any fiscal year equal to or greater than the target bonus opportunity or to receive in respect of any equity award granted an amount that is equal to or greater than the target annual incentive value ascribed to such award is not a reduction in such compensation rights); (ii) the removal of Executive by the Company from the position of Senior Executive Vice President and Chief Corporate Affairs Officer of the Company; (iii) a material reduction in Executive's duties and responsibilities as of the date of this Agreement; (iv) the assignment to Executive of duties that are materially inconsistent with Executive's position or duties or that materially impair Executive's ability to function as Senior Executive Vice President and Chief Corporate Affairs Officer of the Company, and any other position in which Executive is then serving; (v) the relocation of Executive's principal office to a location that is more than 50 miles outside of the greater Los Angeles area; or (vi) a material breach of any provision of this Agreement by the

14

Company. In addition, following the occurrence of a Change in Control (as defined in the 2011 Stock Incentive Plan of the Company (the "*2011 Stock Plan*"), the Amended and Restated 2005 Stock Incentive Plan (the "*2005 Stock Plan*") and the Amended and Restated 1995 Stock Incentive Plan (the "*1995 Stock Plan*")), any occurrence that would constitute a Triggering Event for purposes of Section 11 of the 2011 Stock Plan, the 2005 Stock Plan and the 1995 Stock Plan (together with the 2011 Stock Plan and 2005 Stock Plan, the "*Plans*"), as such Plans may be amended and/or superceded from time to time, shall also constitute an event upon which Executive may effect a Termination for Good Reason in accordance with this Agreement. Notwithstanding the foregoing, a termination shall not be treated as a Termination for Good Reason (A) if Executive shall have consented in writing to the occurrence of the specific event giving rise to the claim of Termination for Good Reason (and such consent may reasonably be understood to generally relate to the time period in which such event occurred), or (B) unless Executive shall have delivered a written notice to the Company within three months of having actual knowledge of the occurrence of one of such events stating that Executive intends to terminate Executive's employment for Good Reason and specifying the factual basis for such termination, and such event, if capable of being cured, shall not have been cured within 30 days of the receipt of such notice.

"*Termination Right*" means the right of the Company, in its sole, absolute and unfettered discretion, to terminate Executive's employment under this Agreement for any reason or no reason whatsoever. For the avoidance of doubt, any Termination for Cause effected by the Company shall not constitute the exercise of its Termination Right.

(f)    Conflict With Plans. As permitted under the terms of the applicable Plans, the Company and Executive agree that the definitions of Termination for Cause or Termination for Good Reason set forth in this Paragraph 5 shall apply in place of any similar definition or comparable concept applicable under either of the Plans (or any similar definition in any successor plan), except that, in connection with a "Triggering Event" as defined in the Plans, as such Plans may be amended from time to time, the terms of the applicable plan (and not the definitions of Termination for Cause or Termination for Good Reason set forth in this Paragraph 5) shall apply to determine Executive's rights and entitlements in respect of the awards made under any such plan (and only in respect of such awards).

(g)    Section 409A. To the extent applicable, it is intended that this Agreement comply with the requirements of Section 409A, and this Agreement shall be interpreted in a manner consistent with this intent. Notwithstanding anything else contained herein to the contrary, any payment required to be made to

15

Executive hereunder upon Executive's termination of employment (including any payment pursuant to this Paragraph 5) shall be made promptly after the six month anniversary of Executive's date of termination to the extent necessary to avoid imposition on Executive of any tax penalty imposed under Section 409A of the Code. Solely for purposes of determining the time and form of payments due Executive under this Agreement (including any payments due under Paragraph 3(a)) or otherwise in connection with Executive's termination of employment with the Company, Executive shall not be deemed to have incurred a termination of employment unless and until Executive shall incur a "separation from service" within the meaning of Section 409A of the Code. The parties agree, as permitted in accordance with the final regulations thereunder, a "separation from service" shall occur when Executive and the Company reasonably anticipate that Executive's level of bona fide services for the Company (whether as an employee or an independent contractor) will permanently decrease to no more than 40 percent of the average level of bona fide services performed by Executive for the Company over the immediately preceding 36 months. The determination of whether and when a separation from service has occurred shall be made in accordance with this subparagraph and in a manner consistent with Treasury Regulation Section 1.409A-1(h). To the extent that the Company and Executive determine that any provision of this Agreement could reasonably be expected to result in Executive's being subject to the payment of interest or additional tax under Section 409A, the Company and Executive agree, to the extent reasonably possible as determined in good faith, to amend this Agreement, retroactively, if necessary, in order to avoid the imposition of any such interest or additional tax under Section 409A. All reimbursements and in-kind benefits provided under the Agreement shall be made or provided in accordance with the requirements of Section 409A to the extent that such reimbursements or in-kind benefits are subject to Section 409A, including, where applicable, the requirements that (i) any reimbursement is for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement), (ii) the amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year, (iii) the reimbursement of an eligible expense will be made on or before the last day of the calendar year following the year in which the expense is incurred and (iv) the right to reimbursement is not subject to set off or liquidation or exchange for any other benefit. Each payment of compensation under the Agreement shall be treated as a separate payment of compensation for purposes of Section 409A. Executive's right to any deferred compensation, as defined under Section 409A, shall not be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment, garnishment by creditors, or borrowing to the extent necessary to avoid tax, penalties, and/or interest under Section 409A.

16

(h)      Amendment of Existing Agreements. The parties acknowledge and agree that to the extent that this Paragraph 5 affects any of the terms and conditions of Executive's Remaining Stock Options or Continuing Stock Units, this Agreement shall constitute an amendment of the Original Stock Option Award Documents and Original RSU Award Documents as they pertain to Executive.

6.      Exclusive Remedy. Executive shall be under no obligation to mitigate damages or seek other employment or other engagement of Executive's services after this Agreement is terminated pursuant to Paragraph 5 in order to obtain the benefits provided for under Paragraph 5(d) of this Agreement. Executive acknowledges and agrees that the payments and rights provided under Paragraph 5 are fair and reasonable, and are Executive's sole and exclusive remedy, in lieu of all other remedies at law or in equity, for termination of Executive's employment by the Company upon exercise of its Termination Right pursuant to this Agreement or upon a Termination for Good Reason. The failure of Executive to execute and timely deliver the Release and the Consulting Agreement for any reason (i) shall limit Executive's rights in connection with the exercise by the Company of its Termination Right solely to the right to receive the Unconditional Entitlements, (ii) shall not effect a modification of any of Executive's commitments set forth in this Agreement (none of which are contingent upon execution of the Release by Executive) and (iii) shall not preserve or revive any rights waived by Executive hereunder. Subject to Executive's execution and delivery of the Release without revocation thereof and execution and delivery of the Consulting Agreement, (i) the Company agrees to enter into the Release and Consulting Agreement, and (ii) there shall be no offset available to the Company against any amounts due, paid or payable to Executive in respect of the Conditional Benefits and Unconditional Entitlements under Paragraph 5 with respect to any compensation, remuneration or payment attributable to any services that Executive may provide to any third party subsequent to termination of employment hereunder, whether as an employee or otherwise.

7.      Non-competition and Confidentiality.

(a)      Non-competition. During the Employment Period, Executive shall not engage in any business, or become associated with any entity, whether as a principal, partner, employee, consultant, shareholder or otherwise (other than as a holder of not in excess of 1% of the outstanding voting shares of any publicly traded company) that is actively engaged in any business, which is in competition, in any geographic area, with a business conducted by the Company or any subsidiary of the Company at the time of the alleged competition.

(b)      Confidentiality. Executive acknowledges and agrees that Executive has executed or will be required to execute, the standard form of agreement, entitled "The Walt Disney Company and Affiliated Companies Confidentiality

17

Agreement," a copy of which is attached hereto as Exhibit D. The provisions of this paragraph shall survive the expiration or earlier termination of this Agreement.

(c)    Company Property. Promptly following Executive's termination of employment, Executive shall return to the Company all property of the Company, and all copies thereof in Executive's possession or under Executive's control, except that Executive may retain notes, files, calendars, contact information and correspondence of a personal nature (whether in hard copy or electronic form), provided, in each case, that no confidential Company information or information intended primarily for internal Company use is contained therein.

(d)    Non-Solicitation of Employees. During the Employment Period and, subject to the provisions of applicable law, during the one-year period following any termination of Executive's employment, Executive shall not, except in the course of carrying out Executive's duties hereunder, directly or indirectly induce any employee of the Company or any of its subsidiaries to terminate employment with such entity, and shall not directly or indirectly, either individually or as owner, agent, employee, consultant or otherwise,

(i)    solicit, encourage or induce the employment or engagement of, or entice from the employment of the Company or any of its subsidiaries, or

(ii)    direct, arrange, participate or assist in any such solicitation, encouragement, inducement or enticement of,

any person who is or was employed by the Company or any subsidiary of either (other than Executive's personal assistant) unless such person shall have ceased to be employed by such entity for a period of at least six (6) months.

(e)    Injunctive Relief with Respect to Covenants. Executive acknowledges and agrees that the covenants and obligations of Executive with respect to noncompetition, nonsolicitation, confidentiality and the Company property relate to special, unique and extraordinary matters and that a violation of any of the terms of such covenants and obligations may cause the Company and/or its affiliates irreparable injury for which adequate remedies are not available at law. Executive further acknowledges and agrees that (1) the Company and/or its affiliates may seek an injunction, restraining order or such other equitable relief restraining Executive from committing any violation of the covenants and obligations contained in this Paragraph 7 in any court of competent jurisdiction and (2) Executive's acknowledgements in this Paragraph 7 may be relied on in seeking such remedies, which are cumulative and are in addition to any other rights and remedies the Company and/or its affiliates may have at law or in equity.

18

8.    Miscellaneous.

(a)    Survival. Paragraphs 5 (relating to early termination of the Employment Period), 6 and 7 (relating to nondisclosure and nonsolicitation of employees) shall survive the termination hereof, whether such termination shall be by expiration of the Employment Period in accordance with Paragraph 1 or an early termination of the Employment Period pursuant to Paragraph 5 hereof.

(b)    Binding Effect. This Agreement shall be binding on, and shall inure to the benefit of, the Company and any person or entity that succeeds to the interest of the Company (regardless of whether such succession does or does not occur by operation of law) by reason of a merger, consolidation or reorganization involving the Company or a sale of all or substantially all of the assets of the Company. The Company further agrees that, in the event of a sale of assets as described in the preceding sentence, it shall use its reasonable best efforts to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder in writing as a condition to any assignment thereof to such assignee or transferee. This Agreement shall also inure to the benefit of Executive's heirs, executors, administrators and legal representatives and beneficiaries as provided in Paragraph 8(d).

(c)    Assignment. Except as provided under Paragraph 8(b), and except for transfers and/or assignments of this Agreement from any Company entity to another Company entity, neither this Agreement nor any of the rights or obligations hereunder shall be assigned or delegated by any party hereto without the prior written consent of the other party.

(d)    Beneficiaries/References. Executive shall be entitled, to the extent permitted under any applicable law and the terms of any applicable plan, to select and change a beneficiary or beneficiaries to receive any compensation or benefit payable hereunder following Executive's death by giving the Company written notice thereof. In the event of Executive's death or a judicial determination of Executive's incompetence, reference in this Agreement to Executive shall be deemed, where appropriate, to refer to Executive's beneficiary, estate or other legal representative.

(e)    Entire Agreement. This Agreement shall constitute the entire agreement between the parties hereof, with respect to the matters referred to herein; provided that this Agreement shall not alter, amend, or supercede, except as specifically provided in Paragraph 5, any agreement that includes the terms of any equity grant made to Executive prior to the date hereof or the Indemnification Agreement referenced in Paragraph 4(d), which by their terms survive the termination thereof.

19

THERE ARE NO PROMISES, REPRESENTATIONS, INDUCEMENTS OR STATEMENTS BETWEEN THE PARTIES OTHER THAN THOSE THAT ARE EXPRESSLY CONTAINED HEREIN.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to limit, modify or supersede The Walt Disney Company and Affiliated Companies Confidentiality Agreement executed by Executive, which shall survive regardless of the termination of this Agreement.

(f)    Representations. Executive represents that Executive's employment hereunder and compliance by Executive with the terms and conditions of this Agreement will not conflict with or result in the breach of any agreement to which Executive is a party or by which Executive may be bound. The Company represents that (i) it is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) it has the full corporate power and authority to execute and deliver this Agreement, and (iii) the execution, delivery and performance of this Agreement has been duly and validly authorized.

(g)    Authority of The Walt Disney Company Board. For the avoidance of doubt, nothing in this Agreement shall preclude the Board of Directors of the Company or the Compensation Committee from its ability to exercise any power or authority to take such actions as it is required or permitted to take as a matter of law or pursuant to the terms of the Company's governing documents. Nothing in this Paragraph 8(g) shall be construed to modify, amend, limit or otherwise impair the rights and entitlements of Executive set forth in the other Paragraphs of this Agreement (including, without limitation, the rights and entitlements specified in Paragraph 5).

(h)    Severability; Reformation. In the event that one or more of the provisions of this Agreement shall become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby or relieve the Company or Executive of liability for any breach by Company or Executive of any such remaining provisions. In the event any of subparagraphs (a), (b) or (d) of Paragraph 7 hereof is not enforceable in accordance with its terms, Executive and the Company agree that such subparagraph of such Paragraph 7 shall be reformed to make such subparagraph enforceable in a manner which provides the Company the maximum rights permitted at law.

(i)    Waiver. Waiver by any party hereto of any breach or default by the other party of any of the terms of this Agreement shall not operate as a waiver of any other breach or default, whether similar to or different from the breach or default waived. No waiver of any provision of this Agreement shall be implied

20

from any course of dealing between the parties hereto or from any failure by either party hereto to assert its or Executive's rights hereunder on any occasion or series of occasions.

(j)    Notices. Any notice required or desired to be delivered under this Agreement shall be in writing and shall be delivered personally, by courier service, or by registered mail, return receipt requested, and shall be effective upon actual receipt when delivered personally or by courier and when sent by registered mail, three business days following date of mailing, and shall be addressed as follows (or to such other address as the party entitled to notice shall hereafter designate in accordance with the terms hereof):

If to the Company:

The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

Attention:    Chief Executive Officer
          Facsimile: (818) 560-5960

          and

          Senior Executive Vice President,
          General Counsel and Secretary
          Facsimile: (818) 569-5146

If to Executive:

To the address listed as Executive's principal residence in the Company's human resources records and to Executive's principal place of employment with the Company.

(k)    Amendments. No amendment to this Agreement shall be binding between the parties unless it is in writing and signed by the party against whom enforcement is sought.

(l)    Headings. Headings to paragraphs in this Agreement are for the convenience of the parties only and are not intended to be part of or to affect the meaning or interpretation hereof.

(m)    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and a facsimile signature shall have the same force and effect as one penned in ink.

21

(n)    Withholding. Any payments provided for herein shall be reduced by any amounts required to be withheld by the Company from time to time under applicable federal, state or local income or employment tax laws or similar statutes or other provisions of law then in effect.

(o)    Governing Law. This Agreement shall be governed by the laws of the State of California, without reference to principles of conflicts or choice of law under which the law of any other jurisdiction would apply.

(p)    No Obligation To Continued Employment. This Agreement does not constitute a commitment of Company with regard to Executive's employment, express or implied, other than to the extent expressly provided for herein. Upon termination of this Agreement, neither Company nor Executive shall have any obligation to the other with respect to continued employment. In the event that Executive's employment continues for any period of time following the stated expiration date of this Agreement, unless and until agreed to in a new subscribed written document, such employment or any continuation thereof is "at will," and may be terminated without obligation at any time by either party's giving notice to the other, unless otherwise prescribed by applicable law.

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer and Executive has hereunto set Executive's hand as of the day and year first above written.

THE WALT DISNEY COMPANY

Dated:    November 23, 2021                          By:    /s/ Paul J. Richardson

Dated:    November 20, 2021                                 /s/ Geoff Morrell

22

*Exhibit A*

INDEMNIFICATION AGREEMENT

AGREEMENT, dated as of January 24, 2022, between The Walt Disney Company, a Delaware corporation (the "Company") and Geoff Morrell (the "Indemnitee").

WHEREAS, it is essential to the Company to retain and attract as directors and officers for itself and its subsidiaries the most capable persons available;

WHEREAS, Indemnitee is Senior Executive Vice President and Chief Corporate Affairs Officer of the Company;

WHEREAS, in recognition of Indemnitee's need for substantial protection against personal liability in order to enhance Indemnitee's continued service in the position(s) referred to above, the Company wishes to provide in this Agreement for the indemnification of and the advancing of expenses to Indemnitee to the full extent (whether partial or complete) permitted by law and as set forth in this Agreement, and, to the extent insurance is maintained, for the continued coverage of Indemnitee under the Company's directors' and officers' liability insurance policies;

NOW, THEREFORE, in consideration of the premises and of Indemnitee's continuing to serve, at the Company's request, in the position(s) referred to above, and intending to be legally bound hereby, the parties hereto agree as follows:

1.  *Certain Definitions.*

    (a)  A "Change in Control" shall be deemed to have occurred if (i) any "person" (as such term is used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing 25% or more of the total voting power represented by the Company's then outstanding Voting Securities, or (ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors of the Company and any new director whose election by the Board of Directors of the Company or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof, or (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the Voting Securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or being converted into Voting Securities of the surviving entity) at least 75% of the total voting power of such surviving entity outstanding immediately after such merger or consolidation, or the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the

Company (in one transaction or a series of transactions) of all or substantially all the Company's assets.

    *(b)* "Claim" shall mean any threatened, pending or completed action, suit, proceeding or alternate dispute resolution mechanism, or any inquiry, hearing or investigation, whether conducted by the Company or any other party, that Indemnitee in good faith believes might lead to the institution of any such action, suit, proceeding or alternate dispute resolution mechanism, whether civil, criminal, administrative, investigative or other.

    *(c)* "Expenses" shall include attorneys' fees and all other costs, travel expenses, fees of experts, transcript costs, filing fees, witness fees, telephone charges, postage, delivery service fees, expenses and obligations of any nature whatsoever paid or incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness in or participate in any Claim relating to any Indemnifiable Event.

    *(d)* "Indemnifiable Event" shall mean any event or occurrence related to the fact that Indemnitee is or was a director, officer, employee, agent or fiduciary of the Company or one of its subsidiaries, or is or was serving at the request of the Company or one of its subsidiaries as a director, officer, employee, trustee, agent or fiduciary of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, or by reason of anything done or not done by Indemnitee in any such capacity.

    *(g)* "Independent Legal Counsel" shall mean an attorney, selected in accordance with the provisions of Section 3 hereof, who shall not have otherwise performed services for the Company or Indemnitee within the last five years (other than in connection with seeking indemnification under this Agreement). Notwithstanding the foregoing, the term "Independent Legal Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine such Indemnitee's right to indemnification under this Agreement, nor shall Independent Legal Counsel be any person who has been sanctioned or censured for ethical violations of applicable standards of professional conduct.

    *(e)* A "Potential Change in Control" shall be deemed to have occurred if (i) the Company enters into an agreement or arrangement, the consummation of which would result in the occurrence of a Change in Control; (ii) any person (including the Company) publicly announces an intention to take or to consider taking actions which if consummated would constitute a Change in Control; or (iii) the Board adopts a resolution to the effect that, for purposes of this Agreement, a Potential Change in Control has occurred.

    *(f)* "Reviewing Party" shall mean any appropriate person or body consisting of a member or members of the Board of Directors of the Company or any other person or body appointed by the Board who is not a party to the particular Claim for which Indemnitee is seeking indemnification, or Independent Legal Counsel.

2

(g)    "Voting Securities" shall mean any securities of an entity which vote generally in the election of directors.

2.    *Basic Indemnification Arrangement.*

(a)    In the event Indemnitee was, is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, a Claim by reason of (or arising in part out of) an Indemnifiable Event, the Company shall indemnify Indemnitee to the fullest extent permitted by law as soon as practicable but in any event no later than thirty days after written demand is presented to the Company, against any and all Expenses, judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties or amounts paid in settlement) of such Claim and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement (including the creation of the trust referred to in Section 4 hereof). If so requested by Indemnitee, the Company shall advance (within two business days of such request) any and all expenses to Indemnitee (an "Expense Advance"). Notwithstanding anything in this Agreement to the contrary and except as provided in Section 5 and the proviso in the first sentence of Section 2(b) hereof, prior to a Change in Control Indemnitee shall not be entitled to indemnification pursuant to this Agreement in connection with any Claim initiated by Indemnitee against the Company or any director or officer of the Company unless the Company has joined in or consented to the initiation of such Claim.

(b)    Notwithstanding the foregoing, (i) the obligations of the Company under Section 2(a) hereof shall be subject to the condition that the Reviewing Party shall not have determined (in a written opinion, in any case in which the Independent Legal Counsel referred to in Section 3 hereof is involved) that Indemnitee would not be permitted to be indemnified under applicable law, and (ii) the obligation of the Company to make an Expense Advance pursuant to Section 2(a) hereof shall be subject to the condition that, if, when and to the extent that the Reviewing Party determines that Indemnitee would not be permitted to be so indemnified under applicable law, the Company shall be entitled to be reimbursed by Indemnitee (who hereby agrees to reimburse the Company) for all such amounts theretofore paid; provided, however, that if Indemnitee has commenced legal proceedings in a court of competent jurisdiction to secure a determination that Indemnitee should be indemnified under applicable law, any determination made by the Reviewing Party that Indemnitee would not be permitted to be indemnified under applicable law shall not be binding and Indemnitee shall not be required to reimburse the Company for an Expense Advance until a final judicial determination is made with respect thereto (as to which all rights of appeal therefrom have been exhausted or lapsed). Indemnitee's obligation to reimburse the Company for Expense Advances shall be unsecured and no interest shall be charged thereon. If there has not been a Change in Control, the Reviewing Party shall be selected by the Board of Directors of the

3

Company, and if there has been such a Change in Control, (other than a Change in Control which has been approved by a majority of the Board of Directors of the Company who were directors immediately prior to such Change in Control) the Reviewing Party shall be the Independent Legal Counsel referred to in Section 3 hereof. If there has been no determination by the Reviewing Party or if the Reviewing Party determines that Indemnitee substantively would not be permitted to be indemnified in whole or in part under applicable law, Indemnitee shall have the right to commence litigation in any court in the States of California or Delaware having subject matter jurisdiction thereof and in which venue is proper seeking an initial determination by the court or challenging any such determination by the Reviewing Party or any aspect thereof, or the legal or factual bases therefor and the Company hereby consents to service of process and to appear in any such proceeding. Any determination by the Reviewing Party otherwise shall be conclusive and binding on the Company and Indemnitee.

3.    *Change in Control.* The Company agrees that if there is a Change in Control of the Company (other than a Change in Control which has been approved by a majority of the Board of Directors of the Company who were directors immediately prior to such Change in Control) then Independent Legal Counsel shall be selected by Indemnitee and approved by the Company (which approval shall not be unreasonably withheld) and such Independent Legal Counsel shall determine whether the officer or director is entitled to indemnity payments and Expense Advances under this Agreement or any other agreement or Certificate of Incorporation or Bylaws of the Company now or hereafter in effect relating to Claims for Indemnifiable Events. Such Independent Legal Counsel, among other things, shall render its written opinion to the Company and Indemnitee as to whether and to what extent the Indemnitee will be permitted to be indemnified. The Company agrees to pay the reasonable fees of the Independent Legal Counsel and to indemnify fully such Independent Legal Counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or the engagement of Independent Legal Counsel pursuant hereto.

4.    *Establishment of Trust.* In the event of a Potential Change in Control, the Company shall, upon written request by Indemnitee, create a trust for the benefit of Indemnitee and from time to time upon written request of Indemnitee shall fund such trust in an amount sufficient to satisfy any and all Expenses reasonably anticipated at the time of each such request to be incurred in connection with investigating, preparing for and defending any Claim relating to an Indemnifiable Event, and any and all judgments, fines, penalties and settlement amounts of any and all Claims relating to an Indemnifiable Event from time to time actually paid or claimed, reasonably anticipated or proposed to be paid. The amount or amounts to be deposited in the trust pursuant to the foregoing funding obligation shall be determined by the Reviewing Party, in any case in which the Independent Legal Counsel referred to above is involved. The terms of the trust shall provide that upon a Change in Control (i) the trust shall not be revoked or the principal thereof invaded, without the written consent of Indemnitee, (ii) the trustee shall advance, within two business days of a request by Indemnitee, any and all Expenses to Indemnitee (and Indemnitee hereby agrees to reimburse the trust under the circumstances under which Indemnitee would be required to reimburse the Company under Section 2(b) hereof), (iii)

4

the trust shall continue to be funded by the Company in accordance with the funding obligation set forth above, (iv) the trustee shall promptly pay to Indemnitee all amounts for which Indemnitee shall be entitled to indemnification pursuant to this Agreement or otherwise, and (v) all unexpended funds in such trust shall revert to the Company upon a final determination by the Reviewing Party or a court of competent jurisdiction, as the case may be, that Indemnitee has been fully indemnified under the terms of this Agreement. The trustee shall be chosen by Indemnitee. Nothing in this Section 4 shall relieve the Company of any of its obligations under this Agreement. All income earned on the assets held in the trust shall be reported as income by the Company for federal, state, local and foreign tax purposes.

5. *Indemnification for Additional Expenses.* The Company shall indemnify Indemnitee against any and all expenses (including attorneys' fees) and, if requested by Indemnitee, shall (within two business days of such request) advance such expenses to Indemnitee, which are incurred by Indemnitee in connection with any claim asserted against or in connection with any action brought by Indemnitee for (i) indemnification or advance payment of Expenses by the Company under this Agreement or any other agreement or certificate of incorporation or by-laws of the Company now or hereafter in effect relating to Claims for Indemnifiable Events and/or (ii) recovery under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advance expense payment or insurance recovery, as the case may be.

6. *Partial Indemnity, Etc.* If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of the Expenses, judgments, fines, penalties and amounts paid in settlement of a Claim but not, however, for all of the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled. Moreover, notwithstanding any other provision of this Agreement, to the extent that Indemnitee has been successful on the merits or otherwise in defense of any or all Claims relating in whole or in part to an Indemnifiable Event or in defense of any issue or matter therein, including dismissal without prejudice, Indemnitee shall be indemnified against all Expenses incurred in connection therewith. In connection with any determination by the Reviewing Party or otherwise as to whether Indemnitee is entitled to be indemnified hereunder the burden of proof shall be on the Company to establish that Indemnitee is not so entitled.

7. *No Presumption.* For purposes of this Agreement, the termination of any claim, action, suit or proceeding, by judgment, order, settlement (whether with or without court approval) or conviction, or upon a plea of *nolo contendere*, or its equivalent, shall not create a presumption that Indemnitee did not meet any particular standard of conduct or have any particular belief or that a court has determined that indemnification is not permitted by applicable law.

8. *Non-exclusivity, Etc.* The rights of Indemnitee hereunder shall be in addition to any other rights Indemnitee may have under the certificate of incorporation or by-laws of the Company or one of its subsidiaries or the Delaware General Corporation Law or otherwise. To the extent that a change in the Delaware General Corporation Law (whether by statute or judicial decision) permits greater indemnification by agreement than would be

5

**Ex. 10**
**Page 1118**

afforded currently under the certificate of incorporation and by-laws of the Company and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.

9.    *No Construction as Employment Agreement.* Nothing contained in this Indemnity Agreement shall be construed as giving Indemnitee any right to be retained in the employ of the Company or any of its subsidiaries, it being understood, for the avoidance of doubt that the foregoing does not limit or otherwise affect the validity of any employment agreement or the enforceability thereof in accordance with its terms.

10.    *Liability Insurance.* To the extent the Company maintains an insurance policy or policies providing directors' and officers' liability insurance, Indemnitee shall be covered by such policy or policies, in accordance with its or their terms, to the maximum extent of the coverage available for any director or officer of the Company.

11.    *Period of Limitations.* No legal action shall be brought and no cause of action shall be asserted by or in the right of the Company or any affiliate of the Company against Indemnitee, Indemnitee's spouse, heirs, executors, administrators or personal or legal representatives after the expiration of two years from the date of accrual of such cause of action, and any claim or cause of action of the Company or its affiliate shall be extinguished and deemed released unless asserted by the timely filing of a legal action within such two-year period; provided, however, that if any shorter period of limitations is otherwise applicable to any such cause of action such shorter period shall govern.

12.    *Amendments, Etc.* No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

13.    *Subrogation.* In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

14.    *No Duplication of Payments.* The Company shall not be liable under this Agreement to make any payment in connection with any claim made against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, certificate of incorporation or by-laws of the Company or otherwise) of the amounts otherwise indemnifiable hereunder.

15.    *Binding Effect, Etc.* This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company, spouses, heirs, and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise to all, substantially all, or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

6

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place. This Agreement shall continue in effect regardless of whether Indemnitee continues to serve as an officer and/or director of any affiliate of Company or of any other enterprise at the Company's request.

16.    *Severability*. The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law. Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable, that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

17.    *Governing Law*. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware applicable to contracts made and to be performed in such state without giving effect to the principles of conflicts of laws.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of January 24, 2022.

THE WALT DISNEY COMPANY

By: _____

–EXHIBIT; NOT FOR EXECUTION–

_____
Geoff Morrell

7

**Ex. 10**
**Page 1120**

*Exhibit B*

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (hereinafter referred to as "**Agreement**") is made and entered into by and between Geoff Morrell (hereinafter referred to as "**Consultant**") and The Walt Disney Company (hereinafter referred to as "**Company**") on and as of _____, 20__ pursuant to that certain Employment Agreement by and between Executive and Company dated as of January 24, 2022 (the "**Employment Agreement**"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Employment Agreement.

1. (a) Unless this Agreement is earlier terminated as hereinafter provided, for a period following the termination of Consultant's employment under the Employment Agreement equal to the lesser of (i) 6 months or (ii) the remaining period of the originally scheduled term of the Employment Agreement (the "**Consulting Agreement Period**"), Consultant shall personally and diligently provide to the Company such consulting services as the Company may reasonably request from time to time, provided that such services shall relate to matters appropriate for an executive employed in the position referred to in paragraph 2 of the Employment Agreement and shall be a type and nature and duration typical for a post-employment consulting agreement with an executive formerly employed in such position, it being understood for the avoidance of doubt that to the extent any such consulting services involve creative services and/or input, such services and/or input shall be limited to existing matters and projects that Company and/or Consultant was working on or involved in (or has specific plans to work on) at the time of termination or any time prior thereto during the Employment Period and shall be in scope and nature generally limited to types of services not inconsistent with Consultant's former position. Consultant shall not be required to report to the Company's offices and shall be permitted, subject to the terms hereof, to provide consulting services to third parties during the term hereof, provided (i) in no event shall consulting services or other services or advice of any nature be provided by Consultant, directly or indirectly (whether as an employee, consultant, independent contractor, agent, partner, principal, owner or otherwise) to any person or entity which directly or indirectly owns, operates, manages, develops, controls or provides services to, any business involved in any of the following activities (a "**Designated Business**"): (A) the conception, creation, development, production, purchase, sale, distribution, broadcast, transmission or other disposition (including, without limitation, the licensing and/or merchandising of related consumer products) of audio and/or visual and/or interactive products or works of any nature in any media, including, without limiting the generality of the foregoing, any activity relating to (i) any aspect of the film, network, cable, broadcasting, mobile communications, television (including pay-per-view, closed circuit or any inter-active form of distribution of film, television or other audio/visual product) or internet businesses or any other businesses based on or using interactive technology (including, without limiting the generality of the foregoing, electronic and/or interactive games, environments, information centers or communities, in each case, of any nature), or (ii) the development, production, marketing, distribution or exploitation by any means or vehicle whatsoever of any film, television or software product or any similar content or product in any media, whether or not now existing, it being understood, however, that, for the avoidance of doubt and notwithstanding any other term or provision hereof, the internal use by any business of any of the interactive, internet-based or other technology or media referred to above in the creation, development and/or production of their products and/or services shall not in and of itself result in such business being a Designated Business to which Consultant is prohibited from

**Ex. 10**
**Page 1121**

directly or indirectly providing services hereunder, (B) the operation, management, development, licensing and promotion of themed resorts, hotels and restaurants or amusement or themed entertainment parks; or (C) the design, development, publishing, promotion or sale of products based on cartoon or other animated characters, films, television and theatrical productions and other intellectual property derived therefrom, in each case, only to the extent (i) that such person or entity is actively engaged in any geographic area in any business which is in competition with a business conducted by The Walt Disney Company or any subsidiary thereof at the time of the performance of such services (the "**Specified Activities**"), and (ii) that any services reasonably required by Company shall at all times be provided with precedence being given to Company and on a "first priority" basis to Company, although Company shall endeavor to provide, when possible, reasonable advance written notice to Consultant of all services required hereunder and to give due consideration, to the extent practicable, to any prior commitments Consultant may have at such time. In no event shall Consultant be required to devote more than 13.5 hours per week to services to Company hereunder (including travel time, but not time to or from the office) and the parties agree and understand that Consultant's expected commitment to such services shall regularly be less than the stated maximum weekly hours.

(b) In the event of a material uncured breach by Consultant of any term or provision of this paragraph 1 hereof, all of which terms and conditions Consultant acknowledges and agrees are material and of the essence of this Agreement, or any other material term or provision hereof, Company shall have the right, in addition to any other right or remedy available to it at law or in equity, to terminate this Agreement. In such event Company shall have no further obligation to make payments or perform or honor any commitments under the Release or to pay or honor any commitments which relate to or constitute any of the Conditional Benefits; provided, however, that notwithstanding the foregoing, except as otherwise specifically provided in the immediately preceding sentence, no breach of this Agreement by Consultant, no termination of this Agreement by Company, and no other action or inaction by either of them (other than the execution by the parties of a written agreement amending or superseding the Release or any part thereof) shall in any event or under any circumstances have any effect whatsoever on the validity, enforceability, binding nature, effect or interpretation of the releases set forth in paragraph 5 and paragraph 7 of the Release, and the releases set forth therein shall remain in full force and effect.

(c) In the event that Consultant shall receive a written notice of breach of this Agreement from the Company, Consultant shall have ten (10) business days to cure such breach unless the Company shall have determined in its good faith business judgment that such breach is not curable. Any such notice of termination pursuant to this paragraph 1 shall set forth in reasonable detail the basis for such breach and shall contain a statement as to whether or not such breach has been determined to be curable by the Company. In the event that Consultant receives a written notice of breach of the Agreement from the Company, Consultant may challenge such finding of a breach, by written notice to the Company, and shall be afforded an opportunity to present Consultant's objection to the Company, in person or in writing, as determined by the Company, prior to Company having any right to terminate this Agreement and the Conditional Benefits provided under the Employment Agreement.

2. Consultant shall receive gross consulting fees for Consultant's services hereunder which, for any period during the Consulting Agreement Period, shall equal the Consulting Amount.

2

The consulting fee payments shall be made at the date set forth in Paragraph 5(d)(i) of the Employment Agreement.

3  Company shall reimburse Consultant, in accordance with the procedures of Company then in effect for its senior executives, for reasonable business expenses incurred by Consultant in the course of performing the services hereunder.

4. Company, its successors, privies and assigns shall be entitled to, and shall, own as their exclusive property all of the results and proceeds of the services performed hereunder (which results and proceeds are hereinafter collectively referred to as the "**Work Product**") in whatever stage of completion, all of which shall be considered a work-for-hire, including, without limitation, all written work, research, plot outlines, computer programs, plans, drawings, paintings, sculptures, fanciful creations, specifications, ideas, scripts, sketches, designs, concepts, software, systems, reports, documentation, and other tangible or intangible work product produced by Consultant as part of Consultant's services performed hereunder. Company shall own all rights in the Work Product in perpetuity throughout the universe including, without limitation, the rights to produce, manufacture, record, reproduce, distribute, transfer or prepare derivative works from the Work Product by any art, medium or method and all copyrights, trademarks and/or patents in the Work Product. Company shall be deemed the sole author of the Work Product and is entitled to the copyright therein (and all renewals and extensions thereof), and the full ownership to the original and all copies of the Work Product. Company shall have the right to dispose of the Work Product and/or make any or all uses thereof as it, at any time and in the exercise of its sole discretion, may desire. Upon Company's request, Consultant shall deliver all originals and copies of the Work Product (whether completed or in process) and all research, plans, designs, specifications and any other work product or information which pertains to the Work Product to Company upon completion of the performed services hereunder or upon earlier termination of this Agreement. Consultant shall not retain, use or disclose any of the Work Product without Company's prior written consent. The termination, completion or breach of this Agreement on whatever grounds and by whomsoever affected shall not affect Company's exclusive ownership of the Work Product. Consultant hereby assigns to Company all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Work Product, including, without limitation, all exclusive exploitation rights, of every kind and nature, including, but not limited to, all trademarks, copyrights and neighboring rights, to the full extent such assignment is allowed by law, and any renewals and extensions therefor throughout the universe, in perpetuity, or for the duration of the rights in each country, and in all languages. Consultant acknowledges that new rights to the Work Product may come into being or be recognized in the future, under the law or in equity (the "**New Exploitation Rights**"), and Consultant intends to and does hereby grant and convey to Company any and all such New Exploitation Rights to the Work Product. Consultant is also aware and acknowledges that new or changed technology, uses, media, format, modes of transmission and methods of distribution, dissemination, exhibition or performance (the "**New Exploitation Methods**") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting the Work Product. Consultant intends to and does hereby grant and convey to Company any and all rights to such New Exploitation Methods with respect to the Work Product. Consultant agrees to execute, at any time upon Company's request, such further documents consistent herewith and do such other acts at the Company's expense as may be required by the Company in its reasonable business judgment to

3

evidence or confirm Company's exclusive ownership of and exploitation rights to the Work Product and to effectuate Consultant's purpose to convey such rights to Company including, but not limited to, the New Exploitation Rights and any and all of the New Exploitation Methods. Consultant shall have the right to have any such documents reviewed by counsel with Company giving good faith consideration to changes requested by counsel unless such review and/or consideration is not in Company's reasonable business judgment feasible or prudent in view of material time constraints; provided, however, that notwithstanding the foregoing, if Consultant fails to execute such further documents within 20 business days after receipt of Company's written request to do so, then Company shall have the power of attorney, which Consultant acknowledges is irrevocable and coupled with an interest, to execute such documents on Consultant's behalf. Consultant agrees that Consultant will not seek to (i) challenge, through the courts, administrative governmental bodies, private organizations or in any other manner, the rights of Company to exploit the Work Product by any means whatsoever or (ii) thwart, hinder or subvert the intent of the preceding grants and conveyances to Company, or the collection by Company of any proceeds relating to the rights conveyed under this Agreement. The provisions of this paragraph shall survive the expiration or sooner termination of this Agreement.

5. This Agreement is for the personal services of Consultant and may not be subcontracted or assigned by Consultant in any fashion, whether by operation of law, or by conveyance of any type, without the prior written consent of Company, which consent Company may withhold in its sole discretion. Company may not assign all or any portion of this Agreement at any time to any of its subsidiaries or to any other person.

6. (a) Consultant, by virtue of this Agreement, shall acquire no right to use, and shall not use, the name "The Walt Disney Company" or "The Walt Disney Studios" or "Disney" or "Disney+" or "ABC" or "ABC, Inc." or "American Broadcasting Companies" or "ESPN" or "Marvel" or "Pixar" or "Lucasfilm, Ltd." or any other word, mark, or name used for, or in connection with, the business activities of Company (either alone or in conjunction with or as a part of any other word, mark, or name) or any marks, fanciful characters or designs of the Company or any of their related, affiliated, or subsidiary companies in any advertising, publicity, or promotion; to express or imply any endorsement by the Company or any of its related, affiliated or subsidiary companies of Consultant's services; or in any other manner whatsoever (whether or not similar to the uses hereinabove specifically prohibited). Consistent with Consultant's obligations under Paragraph 7, this Paragraph 6(a) shall not prevent Consultant from using such names to describe Consultant's activities with respect to Company and its subsidiaries under and prior to the Employment Agreement and under this Agreement.

(b) Consultant hereby represents and warrants to Company that as of the date of this Agreement, Consultant does not provide any services (including, without limitation, as an employee) to any person or entity that (i) is engaged in, or whose affiliated entities are engaged in, one or more of the Specified Activities or (ii) advises or provides consulting services to any person or entity that is engaged in, or whose affiliated entities are engaged in, any business or activity relating to or constituting one or more of the Specified Activities. Consultant further represents and warrants to Company that Consultant shall make written disclosure to Company prior to providing any services, during the term of this Agreement, to any of the above mentioned persons or entities.

4

7. Consultant may, during the course of Consultant's engagement hereunder, have access to, and acquire knowledge of or from, materials, data, strategies, systems or other information relating to the services hereunder or Company, or its related, affiliated or subsidiary companies, which may not be accessible or known to the general public (including, but not limited to, the existence of this Agreement and the terms hereof and any Work Product not readily available to the general public) ("**Confidential Information**"). Any such knowledge acquired by Consultant shall be kept confidential and shall not be used, published, or divulged by Consultant to any other person, firm, or corporation, or in any advertising or promotion regarding Consultant or Consultant's services, or in any other manner or connection whatsoever without first having obtained the prior written permission of Company, which permission Company may withhold in its sole discretion; provided that Consultant shall have no greater duty or obligation in respect of such Confidential Information than applies to Executive under Paragraph 7(b) of the Employment Agreement and any agreements referred to therein. Upon Company's request, Consultant shall immediately return to Company or destroy, all documents, magnetic copies, or other physical evidence of all Confidential Information in Consultant's possession or in the possession of any of Consultant's directors, officers, employees, agents or representatives (including, without limitation, all copies, transcriptions, notes, extracts, analyses, compilations, studies, or other documents, records, or data prepared by Consultant) which contain or otherwise reflect or are generated from the Confidential Information without retaining any copy thereof, all of the foregoing being Confidential Information and the sole property of Company, Consultant shall certify to Company that all of the foregoing has been returned or destroyed as provided in this paragraph. Consultant agrees that Company would be irreparably harmed by any violation or threatened violation of this paragraph and that, therefore, Company shall be entitled to an injunction prohibiting Consultant from any violation or threatened violation of this paragraph. The provisions of this paragraph shall survive the expiration or sooner termination of this Agreement.

8. This Agreement shall be construed and interpreted in accordance with the laws of the State of California without regard to conflicts of laws principles.

9. The terms and provisions of this Agreement, the Release and Paragraphs 5 and 6 of the Employment Agreement constitute the entire agreement between the parties hereto with respect to the subject matter f this Agreement and supersede all previous communications, representations, or agreements, either oral or written, between the parties relating to such subject matter hereof. No change, alteration or modification of this Agreement shall be effective unless made in writing and signed by both parties hereto.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the day and year first above written.

**COMPANY**                                                    **CONSULTANT**

<span style="color:red">–EXHIBIT; NOT FOR EXECUTION–</span>

By: _____        By: _____
Title:

5

*Exhibit C*

**GENERAL RELEASE**

WHEREAS, Geoff Morrell (hereinafter referred to as "Executive") and The Walt Disney Company (hereinafter referred to as the "Company") are parties to an Employment Agreement, dated January 24, 2022, (the "Employment Agreement"), which provided for Executive's employment with the Company on the terms and conditions specified therein; and

WHEREAS, pursuant to paragraph 6 of the Employment Agreement, Executive and the Company have agreed to execute mutual releases of the type and nature set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and mutual promises herein contained and for other good and valuable consideration received in accordance with the terms of the Employment Agreement, it is agreed as follows:

1. (a) Upon the later of (i) the execution hereof by the Company and Executive, (ii) the passage of seven days following execution hereof by Executive without Executive's having exercised the revocation rights referred to in paragraph 10 hereof and (iii) the time specified in the Employment Agreement for payment of a particular item of compensation, the Company shall (x) provide Executive the amounts and benefits described in Paragraph 5 of the Employment Agreement and (y) make full payment for vacation and floating holidays accrued but unused as of the date hereof (to the extent, if any, not already paid in accordance with applicable law), less amounts required to be withheld by law or authorized by Executive to be withheld (it being understood that from and after the date hereof no further rights to vacation or floating holidays or compensation therefor shall accrue or be payable to Executive). Such payment shall be made by check payable to Executive.

(b) The covenants and commitments of the Company referred to herein (including, specifically, but without limitation, any and all benefits conferred upon Executive pursuant to Paragraph 5 of the Employment Agreement) shall be in lieu of and in full and final discharge of any and all obligations to Executive for compensation, severance payments, or any other expectations of payment, remuneration, continued coverage of any nature or benefit on the part of Executive arising out of or in connection with Executive's employment with the Company, or under any agreement, arrangement, commitment, plan, program, practice or policy of the Company, or otherwise, other than as expressly provided in the Employment Agreement.

(c) Notwithstanding the foregoing or any other term or provision hereof, Executive shall be entitled to such rights as are vested in Executive as of the Termination Date, under and subject to the terms of (i) the Employment Agreement and/or the Consulting Agreement, (ii) any applicable retirement plan(s) to which Executive may be subject, (iii) any applicable stock option plan or other incentive compensation plan of the Company to which Executive may be subject, (iv) any right which Executive now has or may hereafter have to claim a defense and/or indemnity for liabilities to third parties in connection with Executive's activities as an employee of the Company or any of its subsidiaries pursuant to the terms of any applicable statute, under any insurance policy, pursuant to the certificate of incorporation or bylaws or established policies of the Company or any subsidiary thereof or pursuant to written agreement (including, without limitation, the Indemnification Agreement) expressly providing for such indemnity between Executive and the Company or any subsidiary thereof, and (v) any other applicable employee

**Ex. 10**
**Page 1126**

welfare benefit plans to which Executive may be subject. Further, Executive shall be entitled to (A) reimbursement of all reasonable business expenses incurred by Executive in accordance with Company's practices and policies regarding reimbursement of business expenses, and (B) such continuation of health care coverage as is required under, and subject to, applicable law, of which Executive shall be notified in writing after the Termination Date, provided Executive timely exercises Executive's rights in accordance therewith. Executive understands and acknowledges that all payments for any such continued health care coverage Executive may elect will be paid by Executive, except to the extent the Employment Agreement provides that such payments shall be made by the Company.

2. Executive confirms that, on or prior to seven (7) days from the date hereof, Executive shall turn over to the Company all files, memoranda, records, credit cards and other documents and physical or personal property that Executive received from the Company or that Executive generated in connection with Executive's employment by the Company or that are the property of the Company provided that Executive may retain notes, files, calendars, contact information and correspondence of a personal nature (whether in hard copy or electronic form), provided, in each case, that no confidential Company information or information intended primarily for internal Company use is contained therein).

3. It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under law. Should there be any conflict between any provision hereof and any present or future law, such law will prevail, but the provisions affected thereby will be curtailed and limited only to the extent necessary to bring them within the requirements of law, and the remaining provisions of this Agreement will remain in full force and effect and be fully valid and enforceable.

4. Executive represents and agrees (a) that Executive has to the extent Executive desires discussed all aspects of this Agreement with Executive's attorney, (b) that Executive has carefully read and fully understands all of the provisions of this Agreement, and (c) that Executive is voluntarily entering into this Agreement.

5. Excluding enforcement of the covenants, promises and/or rights reserved herein and/or in the Employment Agreement, Indemnification Agreement and/or the Consulting Agreement, Executive hereby irrevocably and unconditionally releases, acquits and forever discharges the Company and each of the Company's direct or indirect owners, parent companies, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, affiliates (including, for the avoidance of doubt, The Walt Disney Company and agents, directors, officers, employees, representatives and attorneys of such companies, divisions, subsidiaries and affiliates) and all persons acting by, through, under or in concert with any of them (collectively "Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort or any legal restrictions on the Company's right to terminate employees, or any Federal, state or other governmental statute, regulation or ordinance, including, without limitation, Title VII of the Civil Rights Act of 1964, as amended, the Federal

2

Age Discrimination In Employment Act of 1967, as amended, and the California Fair Employment and Housing Act, all as amended, that Executive now has, or has ever had, or ever will have, against each or any of the Releasees, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring up through the date of Executive's execution hereof that directly or indirectly arise out of, relate to, or are connected in any manner whatsoever with, Executive's services to, or employment by the Company or any of its subsidiaries (any of the foregoing being an "Executive Claim" or, collectively, the "Executive Claims"). This release does not constitute a release of any Executive Claims that cannot be released as a matter of law.

6. Except as expressly reserved herein, Executive expressly waives and relinquishes all rights and benefits afforded by California Civil Code Section 1542 and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 states as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of the Releasees, Executive expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all Executive Claims that Executive does not know or suspect to exist in Executive's favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Executive Claim or Executive Claims.

7. Excluding enforcement of the covenants, promises and/or rights reserved herein or in the Employment Agreement, Indemnification Agreement and/or the Consulting Agreement, and except as otherwise provided in the proviso at the end of this sentence, the Company hereby irrevocably and unconditionally releases, acquits and forever discharges Executive, and Executive's heirs, assigns and successors in interest ("Executive Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorney's fees and costs actually incurred), of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort, or any federal, state or other governmental statute, regulation or ordinance, that the Company now has, or has ever had, or ever will have, against Executive and/or the Executive Releasees, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring up through the date of the Company's execution hereof, that directly or indirectly arise out of, relate to, or are connected in any manner whatsoever with, Executive's services to, or employment by the Company (hereinafter referred to as a "Claim" or collectively, the "Claims"); provided, however, that, notwithstanding any other term or provision hereof, any Claim or Claims rising out of, or resulting from, in part or whole, (i) any illegal or fraudulent act(s) or illegal or fraudulent omission(s) to act of Executive, (ii) any action(s) or omission(s) to act which would constitute self-dealing or a breach of

3

Ex. 10
Page 1128

Executive's confidentiality obligations to the Company or any affiliate thereof, or a breach of The Walt Disney Company and Affiliated Companies Confidentiality Agreement executed by Executive, or (iii) the policy of the Board of Directors of the Company, as the same may be in effect from time to time, regarding the ability of the Company to recoup bonus or incentive payments as a result of Company's being required to restate its financial results due to material noncompliance with financial reporting requirements under the securities laws, are hereby expressly excluded in their entirety from the foregoing release, acquittal and discharge and are unaffected thereby (any Claim or Claims not so excluded pursuant to this proviso being hereinafter referred to as a the "Company Claim" or, collectively, as the "Company Claims"). This release does not constitute a release of any Company Claims that cannot be released as a matter of law.

8. Except as expressly reserved herein, the Company expressly waives and relinquishes all rights and benefits afforded by California Civil Code Section 1542 and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 states as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release, acquittal and discharge of the Executive Releasees with respect to the Company Claims only, the Company expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all the Company Claims that the Company does not know or suspect to exist in the Company's favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Company Claims. Notwithstanding anything in this Release to the contrary, if at any time (whether during or after the Employment Period) the Company is required to restate its financial results due to material noncompliance with financial reporting requirements under the securities laws, nothing in this Release shall be construed to limit the rights of the Company and the Board of Directors of the Company to seek or obtain recovery from Executive of any incentive compensation (including profits realized from the sale of Company securities) previously paid, or the cancellation of any outstanding awards, in accordance with the terms of Company's policy, as in effect from time to time, regarding the ability of the Company to recoup any bonus or incentive payments under such circumstances.

9. Executive is advised to consult with an attorney before signing this Agreement. Executive understands that Executive has been given a period of 21 days to review and consider this Agreement before signing it pursuant to the Age Discrimination In Employment Act of 1967, as amended. Executive further understands that Executive may use as much of this 21-day period as Executive wishes prior to signing.

10. Executive acknowledges and represents that Executive understands that Executive may revoke the waiver of Executive's rights under the Age Discrimination In Employment Act of

4

1967, as amended, effectuated in this Agreement within 7 days of signing this Agreement. Revocation can be made by delivering a written notice of revocation to the Senior Executive Vice President, General Counsel and Secretary, The Walt Disney Company, 500 South Buena Vista Street, Burbank, California 91521. For this revocation to be effective, written notice must be received by the General Counsel, no later than the close of business on the seventh day after Executive signs this Agreement. If Executive revokes the waiver of Executive's rights under the Age Discrimination In Employment Act of 1967, as amended, the Company shall have no obligations to Executive under this Agreement or the Employment Agreement.

11. Executive and the Company respectively represent and acknowledge that in executing this Agreement neither of them is relying upon, and has not relied upon, any representation or statement not set forth herein made by any of the agents, representatives or attorneys of the Releasees or of the Executive Releasees with regard to the subject matter, basis or effect of this Agreement or otherwise.

12. This Agreement shall not in any way be construed as an admission by any of the Releasees or Executive Releasees, respectively, that any of the Releasees or Executive Releasees has acted wrongfully or that the Company or Executive has any rights whatsoever against any of the Releasees or Executive Releasees except as specifically set forth herein, and each of the Releasees and Executive Releasees specifically disclaims any liability to any party for any wrongful acts.

13. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California. This Agreement is binding on the successors and assigns of, and sets forth the entire agreement between, the parties hereto; fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof; and may not be changed except by explicit written agreement to that effect subscribed by the parties hereto.

PLEASE READ CAREFULLY. THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

–EXHIBIT; NOT FOR EXECUTION–

Geoff Morrell _____

Date: _____

THE WALT DISNEY COMPANY

By: _____

Title: _____

Date: _____

5

*Exhibit D*

**The Walt Disney Company and Affiliated Companies**
**Confidentiality Agreement**

In consideration for my employment and for the compensation to be paid to me by The Walt Disney Company or a division, subsidiary, or affiliate thereof, or any successor of the foregoing (hereinafter termed the "Company"), and in addition to any other obligation, at all times during the term of my employment and thereafter, I do here agree:

1. To hold in strictest confidence, and not disclose (other than as provided below) to any person, firm, or corporation without express authorization of a corporate officer of the Company, any confidential information or trade secret relating to the products, sales, or business of the Company and not to use any such confidential information or trade secret for my own benefit during the term of my employment or thereafter. This non-disclosure obligation does not apply to a disclosure made (i) in confidence to an attorney or, directly or indirectly, to a federal, state or local government official, as long as the disclosure is made solely for the purpose of reporting or investigating a suspected violation of law or (ii) in a complaint or other document filed in a lawsuit or other proceeding, as long as the filing is made under seal.

2. To fully and promptly disclose to the Company and to hold in trust for the sole right and benefit of the Company, any and all intellectual property, discoveries, or trade secrets which I may solely or jointly conceive, design, develop, create or suggest or cause to be conceived, designed, developed or created during the period of time I am in the employ of the Company, which relate to or are connected with my employment or the business of the Company, whether or not conceived or created during my regular working hours. For purposes of this agreement, the term intellectual property shall include, without limitation, any ideas, concepts, literary material, designs, drawings, illustrations and photographs.

3. That right, title, and interest in and to the intellectual property, discoveries and trade secrets referred to in Paragraph 2 above, shall be the sole and absolute property of the Company, subject to the limitations set forth in Paragraph 4 below.

4. That I will and do hereby assign to the Company all my right, title, and interest in and to the intellectual property, discoveries and trade secrets referred to in Paragraph 2 above; provided, however, that no provision in this agreement is intended to require assignment of any of my rights in any intellectual property or discovery if (i) no equipment, supplies, facilities, trade secret or confidential information of the Company was used: and (ii) the discovery was made or the intellectual property was developed entirely on my own time; and (iii) such discovery or intellectual property neither relates to any business of the Company or the Company's actual or demonstrably anticipated research or development nor results from any work performed by me for the Company.

5. I will execute any documents necessary to evidence the Company's proprietary interest in any discovery, intellectual property or trade secret referred to in Paragraph 2 above. In the event the Company is unable, for any reason whatsoever, to secure my signature to any lawful and necessary document required to apply for protection of, or enforce any action with respect to, copyright, trademark or other proprietary rights, I hereby irrevocably designate and appoint the Company, and its duly authorized officers and agents, as my agent and attorney-in-fact, whose power is coupled with an interest, to act for and in my behalf and stead, to execute such documents and to do all other lawfully permitted acts to protect the Company's interest in any copyright, trademark or other proprietary right with the same legal force and effect as if executed by me.

6. That at the time of leaving the employ of the Company, I will deliver to the Company, and will not keep in my possession nor deliver to anyone else, any and all drawings, notes, notebooks, memoranda, treatments, scripts, documents or any other material connected with my employment by the Company or with the business of the Company.

7. In case of interruption of my employment with the Company, by lay-off or otherwise, this agreement, upon reemployment, will be in full force and effect unless specifically superseded by a new agreement.

8. This agreement shall not embrace or include any copyrights or trademarks or other proprietary rights owned or controlled either jointly or separately by me prior to the time of my employment by the Company. I am listing on a separate attached sheet each copyright, trademark or other proprietary right which I claim to be exempt from this agreement.

9. This agreement supersedes any prior agreement with the Company relating to the subject matter set forth herein.

| | |
|---|---|
| Employee Signature | /s/ Geoff Morrell |
| Employee Name | (Print) Geoff Morrell |
| Date (MM/DD/YY) | 11/20/21 |

**Ex. 10**
**Page 1131**

**Exhibit 10.7**

January 7, 2022

Alan Braverman
c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

<u>Temporary Consulting Services</u>

Dear Alan:

Following your retirement as an officer and employee of the Company effective January 7, 2022, to facilitate the smooth transition of the duties and responsibilities of your position and to provide your successor an opportunity to confer with you directly regarding such matters as will enable him efficiently to familiarize himself with such responsibilities, the Company has requested that you provide it with certain limited consulting services on a temporary basis (the "Temporary Services").

Commencing following your termination of employment until March 1, 2022 (or the first day of such later calendar month as you and the Company shall mutually agree), you will provide the Company with such assistance as it shall reasonably request with regard to matters under your supervision during your employment. For the Temporary Services, the Company shall pay you $40,000 on the first day of each month commencing after the date hereof during which this arrangement continues in effect; <u>provided that</u>, if you provide more than 20 hours of service in any calendar month, the Company shall pay you $2,000 per hour for each such additional hour of service. In no event shall you be expected to provide Temporary Services during the period this arrangement remains in effect (the "Temporary Services Period") in excess of 20% of the time you spent, on average, in the performance of your duties for the Company during the 36 month period immediately preceding your retirement.

Not later than the tenth business day of the immediately following calendar month, you will provide the Company a summary of the hours and a brief description of the services performed hereunder during the prior month. To the extent that any additional fees are due for additional services in any calendar month, payment shall be made to you as of the first day of the month next following timely receipt of your summary. During the Temporary Services Period, the Company shall provide you with such administrative support, including an administrative assistant, as shall be necessary or appropriate to assist you in providing the Temporary Services. The Company will also reimburse you, in accordance with, and subject to the terms and conditions of, the expense reimbursement policy applicable to expenses incurred by the Company's officers, for any reasonable travel, lodging and other appropriate expenses you incur in rendering the Temporary Services.

You will not be eligible to participate in any of the Company's employee benefit plans, programs or arrangements during the Temporary Services Period and in no event shall the Temporary Services Period be considered as employment for any purposes under any such plan, program or arrangement. Notwithstanding the foregoing, (i) the Company shall afford you the same rights and protections in respect of the Temporary Services as applied during your employment with the Company under your Indemnification Agreement with the Company and the Company agrees that any claims arising from your performance of the Temporary Services shall be treated as though an "Indemnifiable Event" under such Indemnification Agreement, (ii) you agree to remain bound by the same noncompetition and confidentiality obligations to the Company as were applicable during your employment under your Employment Agreement with the Company and (iii) the Company may withhold from any payments made hereunder any amounts which it reasonably determines to be required to be withheld as a matter of applicable law.

If you agree that the foregoing sets forth our understanding regarding the provision of the Temporary Services, please sign both copies of this letter where indicated below, returning one copy to me and keeping the other for your records.

Sincerely,

Paul J. Richardson
Senior Executive Vice President and
Chief Human Resources Officer

Agreed and Accepted:

/s/ Alan N. Braverman
Alan N. Braverman

2

**Ex. 10**
**Page 1133**

**Exhibit 10.8**

The Walt Disney Company provides certain key employees with personal liability insurance coverage up to ten million dollars. Benefits supplement each such employee's personal homeowner's and automobile liability insurance coverage.

Attached hereto is a representative sample of the insurance policy provided to a participant under the Excess Liability Insurance Plan.



# *GROUP PERSONAL EXCESS LIABILITY POLICY*

**Ex. 10**
**Page 1135**

THIS **PAGE INTENTIONALLY** LEFT **BLANK**

**CHUBB**

## GROUP PERSONAL EXCESS LIABILITY POLICY

### INTRODUCTION

This is your Chubb Group Personal Excess Liability Policy. Together with your Coverage Summary, it explains your coverages and other conditions of your insurance in detail.

This policy is a contract between you and us. READ YOUR POLICY CAREFULLY and keep it in a safe place.

#### Agreement
We agree to provide the insurance described in this policy in return for the premium paid by you or the Sponsoring Organization and your compliance with the policy conditions.

#### Definitions
In this policy, we use words in their plain English meaning. Words with special meanings are defined in the part of the policy where they are used. The few defined terms used throughout the policy are defined here:

**You** means the individual who is a member of the Defined Group shown as the Insured named in the Coverage Summary.

**Spouse** means a partner in marriage or a partner in a civil union recognized under state law and who lives with you.

**We and us** mean the insurance company named in the Coverage Summary.

**Family member** means your spouse or domestic partner or other relative who lives with you, or any other person under 25 in your care or your relative's care who lives with you.

**Domestic partner** means a person in a legal or personal relationship with you, who lives with you and shares a common domestic life with you, and meeting all of the benefits eligibility criteria as defined by the Sponsoring Organization.

**Sponsoring Organization** means the entity, corporation, partnership or sole proprietorship sponsoring and defining the criteria for qualification as an Insured.

**Policy** means your entire Group Personal Excess Liability Policy, including the Coverage Summary.

**Coverage Summary** means the most recent Coverage Summary we issued to you, including any endorsements.

**Occurrence** means an accident or offense to which this insurance applies and which begins within the policy period. Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence.

**Business** means any employment, trade, occupation, profession, or farm operation including the raising or care of animals or any activities intended to realize a benefit or financial gain engaged in on a full-time, part-time or occasional basis.

**Defined Group** means those individuals meeting the criteria for qualification as an Insured as defined by the Sponsoring Organization and accepted by us.

**Follow form** means we cover damages to the extent they are both covered under the Required Primary Underlying Insurance and, not excluded under this policy. Also, the amount of coverage, defense coverages, cancellation and "other insurance" provisions of this policy supersede and replace the similar provisions contained in such other policies. When this policy is called upon to pay losses in excess of required primary underlying policies exhausted by payment of claims, we do not provide broader coverage than provided by such policies. When no primary underlying coverage exists, the extent of coverage provided on a follow form basis will be determined as if the required primary underlying insurance had been purchased from us.

**Covered person** means:
- you or a family member;
- any person using a vehicle or watercraft covered under this policy with permission from you or a family member with respect to their legal responsibility arising out of its use;
- any other person who is a covered person under your Required Primary Underlying Insurance;
- any person or organization with respect to their legal responsibility for covered acts or omissions of you or a family member; or
- any combination of the above.

Ex. 10
Page 1137

## Definitions
(continued)

**Damages** mean the sum that is paid or is payable to satisfy a claim settled by us or resolved by judicial procedure or by a compromise we agree to in writing.

**Personal injury** means the following injuries, and resulting death:
- bodily injury;
- shock, mental anguish, or mental injury;
- false arrest, false imprisonment, or wrongful detention;
- wrongful entry or eviction;
- malicious prosecution or humiliation; and
- libel, slander, defamation of character, or invasion of privacy.

**Bodily injury** means physical bodily harm, including sickness or disease that results from it, and required care, loss of services and resulting death.

**Property damage** means physical injury to or destruction of tangible property and the resulting loss of its use. Tangible property includes the cost of recreating or replacing stocks, bonds, deeds, mortgages, bank deposits, and similar instruments, but does not include the value represented by such instruments. Tangible property does not include the cost of recreating or replacing any software, data or other information that is in electronic form.

**Registered vehicle** means any motorized land vehicle not described in "unregistered vehicle."

**Unregistered vehicle** means:
- any motorized land vehicle not designed for or required to be registered for use on public roads;
- any motorized land vehicle which is in dead storage at your residence;
- any motorized land vehicle used solely on and to service your residence premises;
- any motorized land vehicle used to assist the disabled that is not designed for or required to be registered for use on public roads; or
- golf carts.

---

## GROUP PERSONAL EXCESS COVERAGE

This part of your Group Personal Excess Liability Policy provides you or a family member with liability coverage in excess of your underlying insurance anywhere in the world unless stated otherwise or an exclusion applies.

## Payment for a Loss

### Amount of coverage
The amount of coverage for liability is shown in the Coverage Summary. We will pay on your behalf up to that amount for covered damages from any one occurrence, regardless of how many claims, homes, vehicles, watercraft, or people are involved in the occurrence.

Any costs we pay for legal expenses (see **Defense coverages**) are in addition to the amount of coverage.

### Underlying Insurance
We will pay only for covered damages in excess of all underlying insurance covering those damages, even if the underlying coverage is for more than the minimum amount.

"Underlying insurance" includes all liability coverage that applies to the covered damages, except for other insurance purchased in excess of this policy.

### Required primary underlying insurance
Regardless of whatever other primary underlying insurance may be available in the event of a claim or loss, it is a condition of your policy that you and your family members must maintain in full effect primary underlying liability insurance of the types and in at least the amounts set forth below unless a different amount is shown in your Coverage Summary, covering your personal liability and to the extent you or a family member have such liability exposures, all vehicles and watercraft you or your family members own, or rent for longer than 60 days, or have furnished for longer than 60 days, as follows:

Personal liability (homeowners) for personal injury and property damage in the minimum amount of $300,000 each occurrence.

---

Ex. 10
Page 1138

CHUBB°                    **GROUP PERSONAL EXCESS LIABILITY POLICY**

### Payment for a Loss
(continued)

Registered vehicles in the minimum amount of:
- $250,000/$500,000 bodily injury and $100,000 property damage;
- $300,000/$300,000 bodily injury and $100,000 property damage; or
- $300,000 single limit each occurrence.

Unregistered vehicles in the minimum amount of $300,000 bodily injury and property damage each occurrence.

Registered vehicles with less than four wheels and motorhomes in the minimum amount of:

- $250,000/$500,000 bodily injury and $100,000 property damage;
- $300,000/$300,000 bodily injury and $100,000 property damage; or
- $300,000 single limit each occurrence.

Watercraft less than 26 feet and 50 engine rated horsepower or less for bodily injury and property damage in the minimum amount of $300,000 each occurrence.

Watercraft 26 feet or longer or more than 50 engine rated horsepower for bodily injury and property damage in the minimum amount of $500,000 each occurrence.

Uninsured motorists/underinsured motorist protection in the minimum amounts of:
- $250,000/$500,000 bodily injury and $100,000 property damage;
- $300,000/$300,000 bodily injury and $100,000 property damage; or
- $300,000 single limit each occurrence.

**With** respect to you and your family members residing outside of the United States, the required primary underlying insurance limits of liability shall be the same limits of liability as shown above, unless you and your family members reside in a country where the minimum required primary underlying insurance limits of liability are not available. In these countries, you and your family members must maintain in full effect primary underlying liability insurance limits equal to the maximum limits of liability available in that country for all coverages up to the minimum required primary underlying limits shown in the Coverage Summary under Required Primary Underlying Insurance.

Failure by you or your family members to comply with this condition, or failure of any of your primary underlying insurers due to insolvency or bankruptcy, shall not invalidate this policy. In the event of any such failure, we shall only be liable in excess of the foregoing minimum amounts and to no greater extent with respect to coverages, amounts and defense costs than we would have been had this failure not occurred.

You must also give notice of losses and otherwise cooperate and comply with the terms and conditions of such primary underlying insurance.

### Group Personal Excess Liability Coverage

**We** cover damages a covered person is legally obligated to pay for personal injury or property damage, caused by an occurrence:
- in excess of damages covered by the underlying insurance; or
- from the first dollar of damage where no underlying insurance is required under this policy and no underlying insurance exists; or
- from the first dollar of damage where underlying insurance is required under this policy but no coverage is provided by the underlying insurance for a particular occurrence;

unless stated otherwise or an exclusion applies.

Exclusions to this coverage are described in **Exclusions.**

**Excess uninsured motorists/underinsured motorist protection**
This coverage is in effect only if excess uninsured motorists/underinsure d motorists protection is shown in the Coverage Summary.

**Ex. 10**
**Page 1139**

## *Group Personal Excess Liability Coverage*
(continued)

We cover damages for bodily injury and property damage a covered person is legally entitled to receive from the owner or operator of an uninsured motorized/underinsured motorized land vehicle. We cover these damages in excess of the underlying insurance or the Required Primary Underlying Insurance, whichever is greater, if they are caused by an occurrence during the policy period, unless otherwise stated.

**Amount of coverage.** The maximum amount of excess uninsured motorists/underinsured motorists protection available for any one occurrence is the excess uninsured motorists/underinsure d motorists protection amount shown in the Coverage Summary regardless of the number of vehicles covered by the Required Primary Underlying Insurance. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims, vehicles or people are involved in the occurrence. This coverage will follow form.

**Uninsured motorists/underinsured motorists protection arbitration**

If we and a covered person disagree whether that person is legally entitled to recover damages from the owner or operator of an uninsured motor vehicle/underinsured motor vehicle, or do not agree as to the amount of damages, either party may make a written demand for arbitration. In this event, each party **will** select an arbitrator. The two arbitrators will select a third. If they cannot agree on a third arbitrator within 45 days, either may request that the arbitration be submitted to the American Arbitration Association. When the covered person's recovery exceeds the minimum limit specified in the applicable jurisdiction's financial responsibility law, each party **will** pay the expenses it incurs, and bear the expenses of the third arbitrator equally. Otherwise, we **will** bear all the expenses of the arbitration.

Unless both parties agree otherwise, arbitration will take place in the county and state in which the covered person lives. Local rules of law as to procedure and evidence will apply. A decision agreed to by two arbitrators will be binding unless the recovery amount for bodily injury exceeds the minimum limit specified by the applicable jurisdiction's financial responsibility law. If the amount exceeds that limit, either party may demand the right to a trial. This demand must be made within 60 days of the arbitrator's decision. If this demand is not made, the amount of damages agreed to by the arbitrators will be binding.

**Uninsured/underinsured liability coverage**

This coverage is in effect only if excess uninsured motorists/underinsured motorists protection is shown in the Coverage Summary.

We cover up to a maximum of $1 million for bodily injury and personal injury you or a family member are legally entitled to receive from an uninsured or underinsured negligent person caused by an occurrence, unless stated otherwise or an exclusion applies. We will not pay more than this amount for covered damages from any one occurrence, regardless of how many claims or people are involved in the occurrence. This coverage is excess over the total of any other collectible insurance that covers damages from the occurrence.

All the exclusions under the Group Personal Excess Liability Coverage are applicable to this Uninsured/underinsured liability coverage, and where used, the definition of you or a family member is extended to include negligent person. This coverage also does not apply to damages from an occurrence arising out of any business activities; any activities involving business property or the sale or transfer of property; or the ownership, maintenance, use, loading, unloading, or towing of any motor vehicle, watercraft or aircraft. In addition, this coverage does not apply to damages from an occurrence arising from any employment related harassment, termination, demotion, breach of an oral or written employment contract or agreement or violation of any state or federal wrongful employment practices act or similar law.

We also do not cover any fines, penalties, taxes, punitive, exemplary or multiplied damages, or any claim or suit seeking non-monetary relief, including but not limited to, injunctive relief, declaratory relief or other equitable remedies.

"Negligent person" means an identifiable natural person by legal name who is not a family member, and who is legally responsible for damages sustained by you or a family member caused by an occurrence.

**Duplication of coverage.** We will not make a duplicate payment for any portion of damages for which payment has been made by or on behalf of persons who may be legally responsible, or otherwise covered by any other collectible insurance. Nor will we pay for any portion of damages if you or a family member is entitled to receive payment for the same portion of damages under any workers' compensation law, disability benefits law or similar law.

**Ex. 10**

**Page 1140**



**GROUP PERSONAL EXCESS LIABILITY POLICY**

## Group Personal Excess Liability Coverage
(continued)

**Defense coverages**

We will defend a covered person against any suit seeking covered damages for personal injury or property damage that is either:
- not covered by any underlying insurance; or
- covered by an underlying policy. This will apply to each Defense Coverage as it has been exhausted by payment of claims.

We provide this defense at our expense, with counsel of our choice, even if the suit is groundless, false, or fraudulent. We may investigate, negotiate, and settle any such claim or suit at our discretion.

As part of our investigation, defense, negotiation, or settlement, we will pay:
- all premiums on appeal bonds required in any suit we defend;
- all premiums on bonds to release attachments for any amount up to the amount of coverage (but we are not obligated to apply for or furnish any bond);
- all expenses incurred by us;
- all costs taxed against a covered person;
- all interest accruing after a judgment is entered in a suit we defend on only that part of the judgment we are responsible for paying. We will not pay interest accruing after we have paid the judgment up to the amount of coverage;
- all prejudgment interest awarded against a covered person on that part of the judgment we pay or offer to pay.

We will not pay any prejudgment interest based on that period of time after we make an offer to pay the amount of coverage;
- all earnings lost by each covered person at our request, up to $25,000;
- other reasonable expenses incurred by a covered person at our request; and
- the cost of bail bonds required of a covered person because of a covered loss.

In jurisdictions where we may be prevented by local law from carrying out these Defense Coverages, we will pay only those defense expenses that we agree in writing to pay and that are incurred by you.

## Extra Coverages

In addition to covering damages and defense costs, we also provide other related coverages. These coverages are in addition to the amount of coverage for damages and defense costs unless stated otherwise.

**Shadow defense coverage**

If we are defending you or a family member in a suit seeking covered damages, we will pay reasonable expenses you or a family member incur up to $10,000 or the amount shown in the Coverage Summary for a law firm of your choice to review and monitor the defense. However any recommendation by your persona attorney is not binding on us. We will pay these costs provided that you obtain prior approval from us before incurring any fees or expenses.

**Identity fraud**

**We will** pay for your or a family member's identity fraud expenses, up to a maximum of $25,000, for each identity fraud occurrence.

"Identity fraud" means the act of knowingly transferring or using, without lawful authority, your or a family member's means of identity which constitutes a violation of federal law or a crime under any applicable state or local law.

"Identity fraud occurrence" means any act or series of acts of identity fraud by a person or group commencing in the policy period.

"Identity fraud expenses" means:
- the costs for notarizing affidavits or similar documents for law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;
- the costs for sending certified mail to law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;

Ex. 10
Page 1141

## Extra Coverages
(continued)

- the loan application fees for reapplying for loan(s) due to the rejection of the original application because the lender received incorrect credit information;
- the telephone expenses for calls to businesses, law enforcement agencies, financial institutions or similar credit grantors, and credit agencies;
- earnings lost by you or a family member as a result of time off from work to complete fraud affidavits, meet with law enforcement agencies, credit agencies, merchants, or legal counsel;
- the reasonable attorney fees incurred with prior notice to us for:
- the defense of you or a family member against any suit(s) by businesses or their collection agencies;
- the removal of any criminal or civil judgements wrongly entered against you or a family member;
- any challenge to the information in your or a family member's consumer credit report; and
- the reasonable fees incurred with prior notice to us by an identity fraud mitigation entity to:
- provide services for the activities described above;
- restore accounts or credit standing with financial institutions or similar credit grantors and credit agencies; and
- monitor for up to one year the effectiveness of the fraud mitigation and to detect additional identity fraud activity after the first identify fraud occurrence.

However, such monitoring must begin no later than one year after you or a family member first report an identity fraud occurrence to us.

However, "identity fraud expenses" does not include expenses incurred due to any fraudulent, dishonest or criminal act by a covered person or any person acting with a covered person, or by any authorized representative of a covered person, whether acting alone or in collusion with others.

"Identity fraud mitigation entity" means a company that principally provides professional, specialized services to counter identity fraud for individuals or groups of individuals, or a financial institution that provides similar services.

In addition to the duties described in Policy Terms, Liability Conditions, Your duties after a loss, you shall notify an applicable law enforcement agency.

### Kidnap expenses
We will pay up to a maximum of $100,000 for kidnap expenses you or a family member incurs solely and directly as a result of a kidnap and ransom occurrence. In addition, we also will pay up to $25,000 to any person for information not otherwise available leading to the arrest and conviction of any person(s) who kidnaps you, a family member or a covered relative. The following are not eligible to receive this reward payment:
- you or a family member; or
- a covered relative who witnessed the occurrence.

"Kidnap and ransom occurrence" means the actual or alleged wrongful taking of:
- you;
- one or more family members; or
- one or more covered relatives while visiting or legally traveling with you or a family member;
- from anywhere in the world except those places listed on the United States State Department Bureau of Consular Affairs Travel Warnings list at the time of the occurrence. The occurrence must include a demand for ransom payment which would be paid by you or a family member in exchange for the release of the kidnapped person(s).

"Kidnap expenses" means the reasonable costs for:
- a professional negotiator;
- a professional security consultant;
- professional security guard services;
- a professional public relations consultant;
- travel, meals, lodging and phone expenses incurred by you or a family member;
- advertising, communications and recording equipment;
- related medical, cosmetic, psychiatric and dental expenses incurred by a kidnapped person within 12 months from that person's release;
- attorneys fees;
- a professional forensic analyst;
- earnings lost by you or a family member, up to $25,000.

Ex. 10
Page 1142

CHUBB

## Extra Coverages
(continued)

However, "kidnap expenses" does not include expenses incurred due to any kidnap and ransom occurrence caused by:
- you or a family member;
- a covered relative;
- any guardian, or former guardian of you, a family member or covered relative;
- any estranged spouse or domestic partner, or former spouse or domestic partner of you or a family member;
- any person unrelated to you or a family member who lives with you or a family member or has ever lived with you or a family member for 6 or more months, other than a domestic employee, residential staff, or a person employed by you or a family member for farm work; or
- a civil authority,

or any person acting on behalf of any of the above, whether acting alone or in collusion with others.

"Covered relative" means the following relatives of you, or a spouse or domestic partner who lives with you, or any family member:
- children, their children or other descendents of theirs;
- parents, grandparents or other ancestors of theirs; or
- siblings, their children or other descendents of theirs;

who do not live with you, including spouses or domestic partners of all of the above. Parents, grandparents and other ancestors include adoptive parents, stepparents and stepgrandparents.

**Reputational injury.** If we are defending you or a family member in a suit seeking covered damages, we will pay reasonable and necessary fees or expenses that you or a family member incur for services provided by a reputation management firm to minimize potential injury to the reputation of you or a family member solely as a result of personal injury or property damage, caused by an occurrence if:
- the reputational injury is reported to us as soon as reasonably possible but not later than 30 days after the personal injury or property damage occurrence; and
- you obtain approval of the reputation management firm from us before incurring any fees or expenses, unless stated otherwise or an exclusion applies. There is no deductible for this coverage.

A Reputation management firm means a professional public relations consulting firm, a professional security consulting firm or a professional media management consulting firm.

The maximum amount of coverage for Reputational injury available for any one occurrence is $25,000 or the amount shown in the Coverage Summary. We will not pay more than this amount in any one occurrence for covered damages regardless of how many claims or people are involved in the occurrence.

The maximum annual amount of coverage for Reputational injury shown in the Coverage Summary is the most we will pay for the sum of all covered damages you or a family member incur during the policy period regardless of the number of claims, people, or occurrences.

This coverage does not apply to loss caused by a wrongful employment act covered by Employment Practices Liability Insurance.

## Exclusions

These exclusions apply to your Group Personal Excess Liability Coverage, unless stated otherwise.

**Aircraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading, or towing of any aircraft, except aircraft chartered with crew by you. We do not cover any property damages to aircraft rented to, owned by, or in the care, custody or control of a covered person.

**Hovercraft.** We do not cover any damages arising out of the ownership, maintenance, use, loading, unloading or towing of any hovercraft. We do not cover any property damages to hovercraft rented to, owned by, or in the care, custody or control of a covered person.

**Ex. 10**
**Page 1143**

## Exclusions
(continued)

**Motorized land vehicle racing or track usage.** We do not cover any damages arising out of the ownership, maintenance or use of any motorized land vehicle:

- during any instruction, practice, preparation for, or participation in, any competitive, prearranged or organized racing, speed contest, rally, gymkhana, sports event, stunting activity, or timed event of any kind; or
- on a racetrack, test track or other course of any kind.

**Watercraft and aircraft racing or track usage.** We do not cover any damages arising out of the ownership, maintenance or use of any watercraft or aircraft during any instruction, practice, preparation for, or participation in, any competitive, prearranged or organized racing, speed contest, rally, sports event, stunting activity or timed event of any kind. This exclusion does not apply to you or a family member for sailboat racing even if the sailboat is equipped with an auxiliary motor.

**Motorized land vehicle-related jobs.** We do not cover any damages arising out of the ownership, maintenance, or use of a motorized land vehicle by any person who is employed or otherwise engaged in the business of selling, repairing, servicing, storing, parking, testing, or delivering motorized land vehicles. This exclusion does not apply to you, a family member, or your employee or an employee of a family member for damages arising out of the ownership, maintenance or use of a motorized land vehicle owned by, rented to, or furnished to you or a family member.

**Watercraft related jobs.** We do not cover any damages arising out of the ownership, maintenance, or use of a watercraft by any person who is engaged by or employed by, or is operating a marina, boat repair yard, shipyard, yacht club, boat sales agency, boat service station, or other similar organization. This exclusion does not apply to damages arising out of the ownership, maintenance, or use of a watercraft by you, a family member, or your or a family member's captain or full time paid crew member maintaining or using this watercraft with permission from you or a family member.

**Motorized land vehicle and watercraft loading.** We do not cover any person or organization, other than you or a family member or your or a family member's employees, with respect to the loading or unloading of motorized land vehicles or watercraft.

**Workers' compensation or disability.** We do not cover any damages a covered person is legally:

- required to provide; or
- voluntarily provides

under any:

- workers' compensation;
- disability benefits;
- unemployment compensation; or
- other similar laws.

But we do provide coverage in excess over any other insurance for damages you or a family member is legally required to pay for bodily injury to a domestic employee of a residence covered under the Required Primary Underlying Insurance which are not compensable under workers' compensation, unless another exclusion applies.

**Director's liability.** We do not cover any damages for any covered person's actions or failure to act as an officer or member of a board of directors of any corporation or organization. However, we do cover such damages if you are or a family member is an officer or member of a board of directors of a:

- homeowner, condominium or cooperative association; or
- not for profit corporation or organization for which he or she is not compensated;

unless another exclusion applies.

**Damage to covered person's property.** We do not cover any person for property damage to property owned by any covered person.

**Damage to property in your care.** We do not cover any person for property damage to property rented to, occupied by, used by, or in the care of any covered person, to the extent that the covered person is required by contract to provide insurance. But we do cover such damages for loss caused by fire, smoke, or explosion unless another exclusion applies.

**Wrongful employment act.** We do not cover any damages arising out of a wrongful employment act. A wrongful employment act means any employment discrimination, sexual harassment, or wrongful termination of any residential staff actually or allegedly committed or attempted by a covered person while acting in the capacity as an employer, that violates applicable employment law of any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico.

**Ex. 10**
**Page 1144**

**GROUP PERSONAL EXCESS LIABILITY POLICY**

**CHUBB**

## Exclusions
(continued)

**Employment discrimination** as it relates solely to a wrongful employment act means a violation of applicable employment discrimination law protecting any residential staff based on his or her race, color, religion, creed, age, sex, disability, national origin or other status according to any federal, state, or local statute, regulation, ordinance, or common law of the United States of America, its territories or possessions, or Puerto Rico.

**Sexual harassment** as it relates solely to a wrongful employment act means unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature that:
- is made a condition of employment of any residential staff;
- is used as a basis for employment decisions;
- interferes with performance of any residential staffs duties; or
- creates an intimidating, hostile, or offensive working environment.

**Wrongful termination** as it relates solely to a wrongful employment act means:
- the actual or constructive termination of employment of any residential staff by you or a family member in violation of applicable employment law; or
- breach of duty and care when you or a family member terminates an employment relationship with any residential staff.

**Residential staff** as it relates solely to a wrongful employment act means your or a family member's employee who is:
- employed by you or a family member, or through a firm under an agreement with you or a family member, to perform duties related only to a covered person's domestic, personal, or business pursuits covered under this part of your policy;
- compensated for labor or services directed by you or a family member; and
- employed regularly to work 15 or more hours per week.

Residential staff includes a temporary worker. Residential staff does not include an independent contractor or any covered person.

**Temporary worker** as it relates solely to a wrongful employment act means your or a family member's employee who is:
- employed by you or a family member, or through a firm under an agreement with you or a family member, to perform duties related only to a covered person's domestic, personal, or business pursuits covered under this part of your policy;
- compensated for labor or services directed by you or a family member; and
- employed to work 15 or more hours per week to substitute for any residential staff on leave or to meet seasonal or short-term workload demands for 30 consecutive days or longer during a 6 month period.

Temporary worker does not include an independent contractor or any covered person.

**Discrimination.** We do not cover any damages arising out of discrimination due to age, race, color, sex, creed, national origin, or any other discrimination.

**Intentional acts.** We do not cover any damages arising out of a willful, malicious, fraudulent or dishonest act or any act intended by any covered person to cause personal injury or property damage, even if the injury or damage is of a different degree or type than actually intended or expected. But we do cover such damages if the act was intended to protect people or property unless another exclusion applies. An intentional act is one whose consequences could have been foreseen by a reasonable person.

**Molestation, misconduct or abuse.** We do not cover any damages arising out of any actual, alleged or threatened:
- sexual molestation;
- sexual misconduct or harassment; or
- abuse.

**Nonpermissive use.** We do not cover any person who uses a motorized land vehicle or watercraft without permission from you or a family member.

**Ex. 10
Page 1145**

## Exclusions
(continued)

**Business pursuits.** We do not cover any damages arising out of a covered person's business pursuits, investment or other for-profit activities, for the account of a covered person or others, or business property except on a follow form basis.

But we do cover damages arising out of volunteer work for an organized charitable, religious or community group, an incidental business away from home, incidental business at home, incidental business property, incidental farming, or residence premises conditional business liability unless another exclusion applies. We also cover damages arising out of your or a family member's ownership, maintenance, or use of a private passenger motor vehicle in business activities other than selling, repairing, servicing, storing, parking, testing, or delivering motorized land vehicles.

Unless stated otherwise in your Coverage Summary:

"Incidental business away from home" is a self-employed sales activity, or a self-employed business activity normally undertaken by person under the age of 18 such as newspaper delivery, babysitting, caddying, and lawn care. Either of these activities must:
*   not yield gross revenues in excess of $15,000 in any year;
*   have no employees subject to worker's compensation or other similar disability laws;
*   conform to local, state, and federal laws.

"Incidental business at home" is a business activity, other than farming, conducted on your residence premises which must:
*   not yield gross revenues in excess of $15,000, in any year, except for the business activity of managing one's own personal investments;
*   have no employees subject to worker's compensation or other similar disability laws;
*   conform to local, state, and federal laws.

"Incidental business property" is limited to the rental or holding for rental, to be used as a residence, of a condominium or cooperative unit owned by you or a family member, an apartment unit rented to you or a family member, a one or two family dwelling owned by you or a family member, or a three or four family dwelling owned and occupied by you or a family member. We provide this coverage only for premises covered under the Required Primary Underlying Insurance unless the rental or holding for rental is for:
*   a residence of yours or a family member's that is occasionally rented and that is used exclusively as a residence; or
*   part of a residence of yours or a family member's by one or two roomers or boarders; or
*   part of a residence of yours or a family member's as an office, school, studio, or private garage.

"Incidental farming" is a farming activity which meets all of the following requirements:
*   is incidental to your or a family member's use of the premises as a residence;
*   does not involve employment of others for more than 1,500 hours of farm work during the policy period;
*   does not produce more than $25,000 in gross annual revenue from agricultural operations;
*   and with respect to the raising or care of animals:
*   does not produce more than $50,000 in gross annual revenues;
*   does not involve more than 25 sales transactions during the policy period;
*   does not involve the sale of more than 50 animals during the policy period.

"Residence premises conditional business liability" is limited to business or professional activities when legally conducted by you or a family member at your residence. We provide coverage only for personal injury or property damage arising out of the physical condition of that residence if:
*   you or a family member do not have any employees involved in your business or professional activities who are subject to workers' compensation or other similar disability laws; or, if you or a family member are a doctor or dentist, you do not have more than two employees subject to such laws;
*   you or a family member do not earn annual gross revenues in excess of $5,000, if you or a family member are a home day care provider.

We do not cover damages or consequences resulting from business or professional care or services performed or not performed.

Ex. 10
Page 1146

**CHUBB**

**GROUP PERSONAL EXCESS LIABILITY POLICY**

## Exclusions
(continued)

**The following additional exclusion applies only to "incidental farming" as described under the exclusion, Business pursuits.**

**Contamination.** We do not cover any actual or alleged damages arising out of the discharge, dispersal, seepage, migration or release or escape of pollutants. Nor do we cover any cost or expense arising out of any request, demand or order to:

- extract pollutants from land or water;
- remove, restore or replace polluted or contaminated land or water; or
- test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of pollutants.

However, this exclusion does not apply if the discharge, dispersal, seepage, migration, release or escape is sudden and accidental. A "pollutant" is any solid, liquid, gaseous or thermal irritant or contaminant, including smoke (except smoke from a hostile fire), vapor, soot, fumes, acids, alkalis, chemicals and waste. A "contaminant" is an impurity resulting from the mixture of or contact of a substance with a foreign substance. "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.

**Financial guarantees.** We do not cover any damages for any covered person's financial guarantee of the financial performance of any covered person, other individual or organization.

**Professional services.** We do not cover any damages for any covered person's performing or failure to perform professional services, or for professional services for which any covered person is legally responsible or licensed.

**Acts of war.** We do not cover any damages caused directly or indirectly by war, undeclared war, civil war, insurrection, rebellion, revolution, warlike acts by military forces or personnel, the destruction or seizure of property for a military purpose, or the consequences of any of these actions.

**Contractual liability.** We do not cover any assessments charged against a covered person as a member of a homeowners, condominium or cooperative association. We also do not cover any damages arising from contracts or agreements made in connection with any covered person's business. Nor do we cover any liability for unwritten contracts, or contracts in which the liability of others is assumed after a covered loss.

**Covered person's or dependent's personal injury.** We do not cover any damages for personal injury for any covered person or their dependents where the ultimate beneficiary is the offending party or defendant. We also do not cover any damages for personal injury for which you can be held legally liable, in any way, to a family member, your spouse or domestic partner or for which a family member, your spouse or domestic partner can be held legally liable, in any way, to you.

However, we do cover damages for bodily injury arising out of the use of a motorized land vehicle for which you can be held legally liable to a family member, your spouse or domestic partner or for which a family member, your spouse or domestic partner can be held legally liable to you to the extent that coverage is provided under this policy. This coverage applies only to the extent such damages are covered by primary underlying insurance and exceed the limits of insurance required for that motorized land vehicle under the Required Primary Underlying Insurance provisions of this policy.

**Liability for dependent care.** We do not cover any damages for personal injury for which a covered person's only legal liability is by virtue of a contract or other responsibility for a dependent's care.

**Illness.** We do not cover personal injury or property damage resulting from any illness, sickness or disease transmitted intentionally or unintentionally by a covered person to anyone, or any consequence resulting from that illness, sickness or disease. We also do not cover any damages for personal injury resulting from the fear of contracting any illness, sickness or disease, or any consequence resulting from the fear of contracting any illness, sickness or disease.

**Fungi and mold.** We do not cover any actual or alleged damages or medical expenses arising out of mold, the fear of mold, or any consequences resulting from mold or the fear of mold. "Mold" means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.

**Ex. 10
Page 1147**

## Exclusions
(continued)

**Nuclear or radiation hazard.** We do not cover any damages caused directly or indirectly by nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused.

## POLICY TERMS

This part of your Group Personal Excess Liability Policy explains the conditions that apply to your policy.

## General Conditions

These conditions apply to your policy in general, and to each coverage provided in the policy.

**Policy period**
The effective dates of your policy are shown in the Coverage Summary. Those dates begin at 12:01 a.m. standard time at the mailing address shown.

All coverages on this policy apply only to occurrences that take place while this policy is in effect.

**Transfer of rights**
If we make a payment under this policy, we will assume any recovery rights a covered person has in connection with that loss, to the extent we have paid for the loss.

All of your rights of recovery will become our rights to the extent of any payment we make under this policy. A covered person will do everything necessary to secure such rights; and do nothing after a loss to prejudice such rights. However, you may waive any rights of recovery from another person or organization for a covered loss in writing before the loss occurs.

**Concealment or fraud**
We do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss.

**Application of coverage**
Coverage applies separately to each covered person. However, this provision does not increase the amount of coverage for any one occurrence.

**Assignment**
You cannot transfer your interest in this policy to anyone else unless we agree in writing to the transfer.

**Policy changes**
This policy can be changed only by a written amendment we issue.

**Bankruptcy or insolvency**
We will meet all our obligations under this policy regardless of whether you, your estate, or anyone else or their estate becomes bankrupt or insolvent.

**In case of death**
In the event of your death, coverage will be provided until the end of the policy period or policy anniversary date, whichever occurs first, for any surviving member of your household who is a covered person at the time of death. We will also cover your legal representative or any person having proper temporary custody of your property.

**Liberalization**
We may extend or broaden the coverage provided by this policy. If we do this during the policy period or within 60 days before it begins, without increasing the premium, then the extended or broadened coverage will apply to occurrences after the effective date of the extended or broadened coverage.

**Conforming to state law**
If any provision of this policy conflict<; with any applicable laws of the state you live in, this policy is amended to conform to those laws.

**Conforming to trade sanction laws**
This policy does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

**Ex. 10**
**Page 1148**

**GROUP PERSONAL EXCESS LIABILITY POLICY**

**CHUBB**

## Liability Conditions

These conditions apply to all liability coverages in this policy.

**Other Insurance**
This insurance is excess over any other insurance except for those policies that

- are written specifically to cover excess over the amount of coverage that applies in this policy; and
- schedule this policy as underlying insurance.

**Your duties after a loss**
In case of an accident or occurrence, the covered person shall perform the following duties that apply:

**Notification.** You must notify us or your agent or broker as soon as possible.

**Assistance.** You must provide us with all available information. This includes any suit papers or other documents which help us in the event that we defend you.

**Cooperation.** You must cooperate with us fully in any legal defense. This may include any association by us with the covered person in defense of a claim reasonably likely to involve us.

**Examination.** A person making a claim under this policy must submit as often as we reasonably require:
- to physical exams by physicians we select, which we will pay for; and
- to examination under oath and subscribe the same; and
authorize us to obtain:
- medical reports; and
- other pertinent records.

**Appeals**
If a covered person, or any primary insurer, does not appeal a judgment for covered damages, we may choose to do so. We will then become responsible for all expenses, taxable costs, and interest arising out of the appeal. However, the amount of coverage for damages will not be increased.

## Special Conditions

In the event of conflict with any other conditions of your policy, these conditions supersede.

**Legal action against us**
You agree not to bring action against us unless you have first complied with all conditions of this policy.

You also agree not to bring any action against us until the amount of damages you are legally obligated to pay has been finally determined after an actual trial or appeal, if any, or by a written agreement between you, us and the claimant. No person or organization has any right under this policy to bring us into any action to determine the liability of a covered person.

**Notice of cancellation and coverage termination conditions**
The Sponsoring Organization may cancel this policy by returning it to us or notifying us in writing at any time subject to the following:
- the Sponsoring Organization must notify us in advance of the requested cancellation date; and
- the Sponsoring Organization must provide proof of notification to each member of the Defined Group covered under this policy.

We may cancel this policy or any part of it subject to the following conditions. Our right to cancel applies to each coverage or limit in this policy. In the event we cancel this policy, we are under no obligation to provide you with an opportunity to purchase equivalent coverage.

**Ex. 10**
**Page 1149**

## Special Conditions
(continued)

**Within 60 days.** When this policy or any part of it has been in effect for less than 60 days, we may cancel with 30 days notice for any reason.

**Non payment of premium.** We may cancel this policy or any part of it with 10 days notice if the Sponsoring Organization or you fail to pay the premium by the due date, regardless of whether the premium is payable to us, to our agent, or under any financial credit.

**Misrepresentation.** We may cancel this policy or any part of it with 30 days notice if the coverage was obtained through misrepresentation, fraudulent statements, or omissions or concealment of a fact that is relevant to the acceptance of the risk or to the hazard we assumed.

**Increase in hazard.** We may cancel this policy or any part of it with 30 days notice if there has been a substantial change in the risk which increases the chance of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation, or court decision.

**Procedure.** To cancel this policy or any part of it, we must notify you in writing. This notice will be mailed to the Sponsoring Organization at the mailing address shown in the Coverage Summary and we will obtain a certificate of mailing. This notice will include the date the cancellation is to take effect.

**Termination.** Should an individual for any reason no longer qualify as a member of the Defined Group, coverage will cease sixty (60) days from the date that individual no longer qualifies as a member of the Defined Group, or the policy expiration or cancellation date, whichever comes first.

**Refund.** In the event of cancellation by the Sponsoring Organization or us, we will refund any unearned premium on the effective date of cancellation, or as soon as possible afterwards to the Sponsoring Organization. The unearned premium will be computed short rate for the unexpired term of the policy.

**Ex. 10**
**Page 1150**

Exhibit 10.9

**THIRD AMENDMENT TO THE
DISNEY KEY EMPLOYEES RETIREMENT SAVINGS PLAN
EFFECTIVE JANUARY 1, 2012
(WITH AMENDMENTS ADOPTED THROUGH DECEMBER 2015)**

WHEREAS, The Walt Disney Company (the "Company") maintains the Disney Key Employees Retirement Savings Plan, effective January 1, 2012 (with amendments adopted through December 2015) (the "Plan"); and

WHEREAS, Article 9 of the Plan authorizes the Committee or its delegate to make amendments to the Plan that are necessary and desirable; and

WHEREAS, the Committee desires to update the reference to "Qualified Plan" for a Participating Employer;

NOW, THEREFORE, this Third Amendment to the Plan be and hereby is adopted, effective as of January 1, 2022, as follows:

1.  Hulu, LLC shall be a Participating Employer in the main plan document, subject to the following terms, which shall apply solely to Employees of Hulu, LLC:

    a.  "Qualified Plan" shall refer to the ~~Hulu, LLC Retirement Trust~~ <u>Disney Retirement Savings Plan</u>;

    b.  "Affiliate" shall be determined by replacing any 80% ownership interest condition with a 50% ownership condition.

    c.  "Employer Contributions" means the contributions made to the Qualified plan on behalf of an Eligible Employee, excluding any contributions made under a cash or deferred arrangement intended to satisfy the requirements of Code section 401(k) and any matching contributions thereon.

IN WITNESS WHEREOF, the undersigned has caused this Third Amendment to be executed this 30 day of December, 2021.

/s/ Pascale Thomas
Pascale Thomas

Exhibit 10.10

**THE WALT DISNEY COMPANY**
Schedule of Provisions for
**Performance-Based Restricted Stock Unit Award**
**Pursuant to the 2011 Stock Incentive Plan**
(Three-Year Vesting subject to Total Shareholder Return/ROIC Tests)

<u>Section 1.</u> <u>Restricted Stock Unit Award.</u> This schedule relates to an Award of "**Restricted Stock Units**" pursuant to the 2011 Stock Incentive Plan (the "**Plan**") by The Walt Disney Company ("**Disney**"). All capitalized terms not defined herein shall have the meaning set forth in the Plan. The Award referred to herein constitutes a "**Stock Unit Award**" under the Plan. The Restricted Stock Units are notional units of measurement denominated in Shares of Disney (i.e. one Restricted Stock Unit is equivalent in value to one Share, subject to the terms hereof). The Restricted Stock Units represent an unfunded, unsecured obligation of Disney.

<u>Section 2.</u> <u>Vesting Requirements.</u> The vesting of this Award (other than pursuant to accelerated vesting in certain circumstances as provided in Section 3 below or vesting pursuant to Section 6 below) shall be subject to the satisfaction of the conditions set forth in each of subsections A and B, as applicable, **and**, in each case, subsection C of this Section 2:

A.  **Total Shareholder Return Test.** The vesting of fifty percent of the Stock Units subject to this Award (the "**TSR Target Award Amount**") shall be conditioned upon the satisfaction of a performance vesting requirement (the "**TSR Performance Requirement**") based on Total Shareholder Return of Disney as compared to the Total Shareholder Returns of the S&P 500 Companies, in each case, with respect to the three-year period ending on the Determination Date (as each such term is defined below). To satisfy the TSR Performance Requirement, the TSR Percentile (as hereinafter defined) of Disney must equal or exceed the TSR Percentile of 25.00% of the S&P 500 Companies (the "**S&P 25th TSR Percentile**"). If this requirement is met, the number of Stock Units as to which the TSR Performance Requirement shall be satisfied shall be determined as follows:

    i.  If the TSR Percentile of Disney is equal to "**S&P 25th TSR Percentile**", then the number of Stock Units which shall satisfy the TSR Performance Requirement shall be 50% of the TSR Target Award Amount.

    ii.  If the TSR Percentile of Disney is equal to "**S&P 55th TSR Percentile**", then the number of Stock Units which shall satisfy the TSR Performance Requirement shall be 100% of the TSR Target Award Amount.

    iii.  If the TSR Percentile of Disney equals or exceeds the TSR Percentile of 75.00% of the S&P 500 Companies (the "**S&P 75th TSR Percentile**"), the number of Stock Units which shall satisfy the TSR Performance Requirement shall be 200% of the TSR Target Award Amount.

    iv.  If the TSR Percentile of Disney exceeds the S&P 25th TSR Percentile but is less than the S&P 55th TSR Percentile, or exceeds the S&P 55th TSR Percentile but is less than the S&P 75th TSR Percentile, the percentage of Stock Units as to which the TSR Performance Requirement shall have been satisfied shall be determined by mathematical interpolation between 50% and 100% or 100% and 200%, as applicable. For example, if the TSR Percentile of Disney is 35.00%, then Stock Units equal to 66.67% of the TSR Target Award Amount shall have satisfied the TSR

Performance Requirement; if the TSR Percentile of Disney is 60.00%, then 125.00% of the TSR Target Award Amount shall have satisfied the TSR Performance Requirement.

For the purposes hereof, the terms set forth below shall have the following meanings: "**Determination Date**" shall mean the date which precedes the Scheduled Vesting Date (as hereinafter defined) by one month  For example, for an Award vesting on a January 14 of any specified year, the Determination Date of such Award is December 14 of the prior year.

"**Total Shareholder Return**" shall mean an amount equal to the average of the total return figures for the three-year periods ending on the twenty (20) trading days referred to below as currently reported under "Comparative Returns" by Bloomberg L.P. ("**Bloomberg**") (or any other reporting service that the Committee may designate from time to time):

(i)      for Disney (as such total return figures for Disney may be adjusted by the Committee, by no later than the Scheduled Vesting Date, to take into account any factors which the Committee has determined are not properly reflected in such reported figures) or

(ii)     for any other S&P 500 Company,

in each case for the twenty (20) latest trading days up to and (if the Determination Date is a trading day) including the Determination Date.

"**TSR Percentile**" shall mean the percentile ranking (which shall be carried out to two decimal points) as determined by Disney on the basis of the Total Shareholder Return figures reported by Bloomberg (or any other reporting service that the Committee may designate from time to time) for each of the S&P 500 Companies, including Disney (provided that in the case of Disney adjustments may be made by the Committee with respect to Total Shareholder Return as provided above).

"**S&P 500 Companies**" shall mean all of the companies which are listed on the Standard & Poor's 500 Composite Index, including Disney, on the date which is three years and twenty (20) trading days prior to the Determination Date and which remain continuously listed on the Standard & Poor's 500 Composite Index through and including the Determination Date; provided however, that for the purposes hereof the Standard & Poor's 500 Composite Index shall be deemed to include companies that were removed therefrom during the measurement period but that continued during the entire measurement period to have their shares listed on at least one of the NYSE, NASDAQ, American Stock Exchange, Boston Stock Exchange, Chicago Stock Exchange, National Stock Exchanged (formerly Cincinnati Stock Exchange), NYSE Arca (formerly known as the Pacific Stock Exchange), Philadelphia Stock Exchange or any other exchange(s) that the Committee may designate from time to time.

B.   ROIC Test. The extent to which the remaining fifty percent of the Stock Units subject to this Award (the "**ROIC Target Award Amount**") shall vest shall be conditioned upon the satisfaction of a performance vesting requirement (the "**ROIC Performance Requirement**") related to Annual After-Tax Operating Performance, determined separately with respect to each fiscal year in the three-fiscal year period commencing with the fiscal year in which the Award is made (such three-year period, the "**ROIC Performance Period**"). The ROIC Performance Requirement applicable with respect to each such fiscal year in the ROIC Performance Period shall pertain to Stock Units

2

**Ex. 10**
**Page 1154**

representing one-third of the ROIC Target Award Amount (each, an "**Annual ROIC Target Component**"). For any portion of an Annual ROIC Target Component to become vested, the Committee must determine that the ROIC with respect to the applicable fiscal year equals or exceeds the ROIC Threshold for such fiscal year. If this requirement is met, the percentage of the applicable Annual ROIC Target Component as to which the ROIC Performance Requirement shall be satisfied based on performance in the applicable fiscal year shall be determined as follows:

 i. If ROIC for the applicable fiscal year equals the ROIC Threshold for such fiscal year, then 50% of such Annual ROIC Target Component shall satisfy the ROIC Performance Requirement.

 ii. If ROIC for the applicable fiscal year equals the ROIC Target for such fiscal year, then 100% of such Annual ROIC Target Component shall satisfy the ROIC Performance Requirement

 iii. If ROIC for the applicable fiscal year equals the ROIC Maximum for such fiscal year, then 200% of such Annual ROIC Target Component shall satisfy the ROIC Performance Requirement.

 iv. If ROIC for the applicable fiscal year is above one but below the next performance level specified above, the percentage of such Annual ROIC Target Component which shall satisfy the ROIC Performance Requirement shall be determined by mathematical interpolation between such two performance levels.

The percentage of the ROIC Target Award Amount that shall be deemed to satisfy the ROIC Performance Requirement shall be the average of the percentages of achievement of the ROIC Performance Requirement applicable to each Annual ROIC Target Component, as specified above.

For the purposes hereof, the terms set forth below shall have the following meanings:

"**Annual After-Tax Operating Performance**" with respect to any fiscal year means the sum of (i) and (ii), minus (iii), where (i), (ii) and (iii) are:

 (i) segment operating income for such fiscal year, as reported in Disney's audited financial statements for such fiscal year,

 (ii) corporate and unallocated shared expenses for such fiscal year, as reported in Disney's audited financial statements for such fiscal year, and

 (iii) the amount determined by multiplying the sum of (i) and (ii) by the effective Federal Corporate Tax Rate at the beginning of the Fiscal Year for the year of the grant.

Notwithstanding the foregoing, segment operating income and corporate and unallocated shared expenses as referenced in (i) and (ii) above shall be subject to such adjustments thereto as the Committee deems appropriate in its sole discretion (x) to exclude the effect of extraordinary, unusual and/or nonrecurring items and (y) to reflect such other factors as the Committee deems appropriate to fairly reflect operating performance for

3

**Ex. 10**
**Page 1155**

the applicable fiscal year.

"**Invested Capital**" as of the end of any fiscal year means the remainder of (i) minus (ii), where (i) and (ii) are:

    (i)      Disney's total assets as of the last day of such fiscal year, and

    (ii)     the sum of

        (1)     Disney's cash, cash equivalents and restricted cash as such last day of such fiscal years,

        (2)     Disney's deferred tax assets, and

        (3)     Disney's Non-Interest Bearing Liabilities.

in the case of each item in clause (i) or (ii)(1), (2) and (3) above, as reported in Disney's audited financial statements for such fiscal year, but subject to adjustment by the Committee, by no later than the Scheduled Vesting Date, to take into account any factors or occurrences (such as an acquisition of assets in exchange for stock or a disposition of assets in a spin-off or similar transaction) which the Committee determines inequitably and substantially enlarge or diminish the rights of the Participant and other Plan participants with respect to the Award and similar awards granted under the Plan.

"**Non-Interest Bearing Liabilities**" means the amount of money that a company owes (a liability on the balance sheet, current or non-current), without any interest or penalties accruing to the amount owed. For the avoidance of any doubt, Non-Interest Bearing Liabilities exclude liabilities related to deferred taxes, pension, retirement and leases.

"**ROIC**" with respect to any fiscal year during the ROIC Performance Period means the percentage determined by dividing (i) the Annual After-Tax Operating Performance for such fiscal year by (ii) the average of Invested Capital at the end of such fiscal year and at the end of the immediately prior fiscal year. The Committee shall establish the ROIC separately for each fiscal year during the ROIC Performance Period at such time as the Committee determines to be appropriate following the commencement of such fiscal year

"**ROIC Maximum**" means the level of ROIC specified by the Committee for the applicable fiscal year at which the maximum amount payable with respect to the applicable Annual ROIC Target Component shall be earned.

"**ROIC Target**" means the level of ROIC specified by the Committee for the applicable fiscal year at which the target amount of the applicable Annual ROIC Target Component shall be earned.

"**ROIC Threshold**" means the level of ROIC specified by the Committee for the applicable fiscal year below which no portion of the applicable Annual ROIC Target Component shall be earned.

C.   <u>Service Vesting Requirement</u>. In addition to whichever of the performance vesting requirements of subsection A or B of this Section 2 is applicable to a stated portion of the Stock Units subject to this Award, the right of the Participant to receive payment of this

4

**Ex. 10**
**Page 1156**

Award shall become vested only if he or she remains continuously employed by Disney or an Affiliate from the date hereof until the Scheduled Vesting Date.

If the service vesting requirements of this Section 2.C are not satisfied, all of the Stock Units subject to this Award shall be immediately forfeited and the Participant's rights with respect thereto shall cease.

All Stock Units for which all of the requirements of this Section 2 have been satisfied shall become vested and shall thereafter be payable in accordance with Section 5 hereof. Subject to the terms, conditions and performance-based vesting requirements set forth herein, the Stock Units subject to this Award will vest on the third anniversary date of the Date of Grant (the "**Scheduled Vesting Date**").

Section 3. **Accelerated Vesting.** Notwithstanding the terms and conditions of Section 2 hereof, upon the Participant's death or disability (within the meaning of Section 409A of the Internal Revenue Code), or upon the occurrence of a Triggering Event within the 12-month period following a Change in Control (in accordance with Section 11 of the Plan as in effect as of the date of the Triggering Event), in any case, prior to the Scheduled Vesting Date, the provisions of this Section 3 shall apply to determine the extent to which the Participant's Restricted Stock Units that have not previously been forfeited shall become vested. If such death, disability or Triggering Event occurs while the Participant is employed by Disney (or an affiliate) and

A.  prior to the Determination Date, this Award shall become fully vested (provided that, for this purpose, the performance conditions applicable under subsection A or B of Section 2 shall in each case be deemed to have been satisfied at the 50th percentile of comparative performance), or

B.  after the Determination Date but before the Scheduled Vesting Date, then the number of Restricted Stock Units which shall become vested shall be determined on the same basis as if the Participant had been continuously employed by Disney (or an Affiliate) until the Scheduled Vesting Date.

Any Restricted Stock Units that become vested pursuant to this Section 3 shall be payable in accordance with Section 5 hereof.

Section 4. **Dividend Equivalents.** Any dividends paid in cash on Shares of Disney will be credited to the Participant as additional Restricted Stock Units as if the Restricted Stock Units previously held by the Participant were outstanding Shares, as follows: such credit shall be made in whole Restricted Stock Units only (rounded downward to the nearest whole unit) and shall be based on the fair market value (as defined in the Plan) of the Shares on the date of payment of such dividend. All such additional Restricted Stock Units shall be subject to the same vesting requirements applicable to the Restricted Stock Units in respect of which they were credited and shall be payable in accordance with Section 5 hereof.

Section 5. **Payment of Award.** Payment of vested Restricted Stock Units shall be made within 30 days following the applicable date under Section 2 hereof as of which the vesting requirements under Section 2 hereof shall have been satisfied with respect to any tranche, as applicable (or within 30 days following acceleration of vesting under Section 3 hereof, if applicable). The Restricted Stock Units shall be paid in cash or in Shares (or some combination thereof), as determined by the Committee in its discretion at the time of payment, and in either case shall be paid to the Participant after deduction of applicable withholding taxes in the amount determined by the Committee. If the Participant is a U.S. taxpayer, Disney will withhold all U.S. federal and state taxes as required by law at the then-current rate for supplemental wage income as applicable. If the Participant is resident in a foreign country, the Participant shall be responsible for the payment of any applicable local country taxes, including, without limitation, income taxes, social security taxes, and fringe benefit taxes, and Disney will either withhold such taxes as required by local law, or, alternatively, Participant will be

5

required to pay such taxes directly or, where permitted by local law with respect to fringe benefit taxes, to reimburse Disney or the affiliated entity by whom you are employed for such taxes paid by Disney or such affiliated entity.

Section 6. **Extended Vesting.**

(a) In the event that Participant's employment with Disney or an Affiliate thereof terminates for any reason other than death, disability or "cause" (as further provided in the Plan) at a time when (i) the Participant has attained the age of sixty and has completed at least ten consecutive Service Years (as hereinafter defined) and (ii) at least one year has passed since the Date of Grant of this Award, then the remaining then unvested tranche(s) of this Award shall vest in accordance with the terms and provisions hereof in the same manner as if Participant's employment had continued through the scheduled vesting date(s) of such tranche(s). For purposes of the foregoing, "Service Year" shall mean any full 12-month period during which the Participant was continuously employed by Disney or an affiliate thereof. In determining the total number of consecutive Service Years that the Participant has been so employed, Disney shall apply such rules regarding the bridging of service as the Committee may adopt from time to time.

(b) Notwithstanding any other term or provision hereof, if at the time of termination of employment (other than upon the scheduled expiration date of an employment agreement) Participant is employed pursuant to an employment agreement with Disney or an Affiliate which provides under certain circumstances for the continued vesting of any Stock Units subject to this Award in the event of the termination of such employment agreement prior to its scheduled expiration date (a "Contractual Extension Provision"), then, except as otherwise provided in such employment agreement, (i) this Section 6 shall be interpreted and applied in all respects as if Participant had remained continuously employed by Disney or an Affiliate thereof from the Date of Grant of this Award through the scheduled expiration date of such employment agreement and (ii) the date of termination of Participant's employment for all purposes under this Section 6 shall be deemed to be the scheduled expiration date of such employment agreement.

(c) Solely for purposes of determining whether, and to what extent, the Participant shall have satisfied the service vesting requirement in Section 2.C, the Participant shall be deemed to have continued in employment (without duplication of any service credit afforded with respect to a Contractual Extension Provision) with Disney or an Affiliate during any period for which such entity provides Participant pay in lieu of notice in connection with The Worker Adjustment and Retraining Notification Act, as currently in effect and as the same may be amended from time to time, or any successor statute thereto or any comparable provision of state, local or foreign law applicable to the Participant.

Section 7. **Restrictions on Transfer.** Neither this Award nor any Restricted Stock Units covered hereby may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to Disney as a result of forfeiture of the Restricted Stock Units as provided herein.

Section 8. **No Voting Rights.** The Restricted Stock Units granted pursuant to this Award, whether or not vested, will not confer any voting rights upon the Participant, unless and until the Award is paid in Shares.

Section 9. **Award Subject to Plan.** This Restricted Stock Unit Award is subject to the terms of the Plan, the terms and provisions of which are hereby incorporated by reference. In the event of a conflict or ambiguity between any term or provision contained herein and a term or provision of the Plan, the Plan will govern and prevail.

Section 10. **Changes in Capitalization.** The Restricted Stock Units under this Award shall be subject to the provisions of the Plan relating to adjustments for changes in corporate capitalization.

6

Section 11. **No Right of Employment.** Nothing in this Award Agreement shall confer upon the Participant any right to continue as an employee of Disney or an Affiliate nor interfere in any way with the right of Disney or an Affiliate to terminate the Participant's employment at any time or to change the terms and conditions of such employment.

Section 12. **Data Privacy.** The Participant expressly authorizes and consents to the collection, possession, use, retention and transfer of personal data of the Participant, whether in electronic or other form, by and among Disney, its Affiliates, third-party administrator(s) and other possible recipients, in each case for the exclusive purpose of implementing, administering, facilitating and/or managing the Participant's Awards under, and participation in, the Plan. Such personal data may include, without limitation, the Participant's name, home address and telephone number, date of birth, Social Security Number, social insurance number or other identification number, salary, nationality, job title and other job-related information, tax information, the number of Disney shares held or sold by the Participant, and the details of all Awards (including any information contained in this Award and all Award-related materials) granted to the Participant, whether exercised, unexercised, vested, unvested, cancelled or outstanding ("**Data**"). The Participant acknowledges, understands and agrees that Data will be transferred to Merrill Lynch, which is assisting Disney with the implementation, administration and management of the Plan, and/or to such other third-party plan administrator(s) and/or recipients as may be selected by Disney in the future. The Participant understands that one or more of the administrators or recipients of Data may be located in countries other than the country of Participant's current residence, and that such other countries may have data privacy laws and protections different from, and less protective than, the laws and protections of the country of Participant's current residence, the Member States of the European Union or any other country to which the Participant may be at any time relocated.

Section 13. **Governing Law.** This Award Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, without giving effect to the choice of law principles thereof.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Note: Restricted Stock Units are granted and vested in the United States. You are responsible for any applicable taxes whether you are in the United States or any other country. At the time of vesting, Disney will withhold any minimum statutory local or U.S. taxes, as applicable.

7

**Ex. 10**
**Page 1159**

Exhibit 10.11

**THE WALT DISNEY COMPANY**
Schedule of Provisions for
Performance-Based **Restricted Stock Unit Award**
Pursuant to the 2011 Stock Incentive Plan
(Three-Year Vesting subject to Total Shareholder Return/ROIC Tests)

AWARD AGREEMENT, dated as of December 14, 2021 between The Walt Disney Company, a Delaware corporation ("**Disney**"), and Robert Iger (the "**Participant**"). This Award is granted on **December 14, 2021** (the "**Date of Grant**") by the Compensation Committee of the Disney Board of Directors (the "**Committee**") pursuant to the terms of the 2011 Stock Incentive Plan, as amended (the "**Plan**").

Section 1. **Restricted Stock Unit Award.** Disney hereby grants to the Participant, on the terms and conditions set forth herein, an Award for a target number of Stock Units of 15,960 (such target number of Stock Units, together with such number of additional whole or fractional Stock Unit(s), if any, as may from time to time be credited with respect thereto (as dividend equivalents) pursuant to Section 4 hereof, being referred to herein as the "**Target Award Amount**"). The number of Stock Units which may be awarded hereunder is dependent upon the satisfaction of the conditions set forth herein and may range from no Stock Units to 200% of the Target Award Amount. The Stock Units are notional units of measurement denominated in Shares of Disney (i.e., one Stock Unit is equivalent in value to one Share, subject to the terms hereof). The Stock Units represent an unfunded, unsecured obligation of Disney.

Section 2. **Vesting Requirements.** The vesting of this Award (other than pursuant to accelerated vesting in certain circumstances as provided in Section 3 below or vesting pursuant to Section 6 below) shall be subject to the satisfaction of the conditions set forth in each of subsections A and B, as applicable, **and**, in each case, subsection C of this Section 2:

    A.    Total Shareholder Return Test. The vesting of fifty percent of the Stock Units subject to this Award (the "**TSR Target Award Amount**") shall be conditioned upon the satisfaction of a performance vesting requirement (the "**TSR Performance Requirement**") based on Total Shareholder Return of Disney as compared to the Total Shareholder Returns of the S&P 500 Companies, in each case, with respect to the three-year period ending on the Determination Date (as each such term is defined below). To satisfy the TSR Performance Requirement, the TSR Percentile (as hereinafter defined) of Disney must equal or exceed the TSR Percentile of 25.00% of the S&P 500 Companies (the "**S&P 25th TSR Percentile**"). If this requirement is met, the number of Stock Units as to which the TSR Performance Requirement shall be satisfied shall be determined as follows:

        i    If the TSR Percentile of Disney is equal to "**S&P 25th TSR Percentile**", then the number of Stock Units which shall satisfy the TSR Performance Requirement shall be 50% of the TSR Target Award Amount.

        ii    If the TSR Percentile of Disney is equal to "**S&P 55th TSR Percentile**", then the number of Stock Units which shall satisfy the TSR Performance Requirement shall be 100% of the TSR Target Award Amount.

* If Total Shareholder Return of Disney with respect to the applicable performance period is negative, not more than 100% of the units subject to such award shall be earned and payable

iii   If the TSR Percentile of Disney equals or exceeds the TSR Percentile of 75.00% of the S&P 500 Companies (the "**S&P 75ᵗʰ TSR Percentile**"), the number of Stock Units which shall satisfy the TSR Performance Requirement shall be 200% of the TSR Target Award Amount.*

iv   If the TSR Percentile of Disney exceeds the S&P 25ᵗʰ TSR Percentile but is less than the S&P 55ᵗʰ TSR Percentile, or exceeds the S&P 55ᵗʰ TSR Percentile but is less than the S&P 75ᵗʰ TSR Percentile, the percentage of Stock Units as to which the TSR Performance Requirement shall have been satisfied shall be determined by mathematical interpolation between 50% and 100% or 100% and 200%, as applicable. For example, if the TSR Percentile of Disney is 35.00%, then Stock Units equal to 66.67% of the TSR Target Award Amount shall have satisfied the TSR Performance Requirement; if the TSR Percentile of Disney is 60.00%, then 125.00% of the TSR Target Award Amount shall have satisfied the TSR Performance Requirement.

For the purposes hereof, the terms set forth below shall have the following meanings:

"**Determination Date**" shall mean the date which precedes the Scheduled Vesting Date (as hereinafter defined) by one month. For example, for an Award vesting on a January 14 of any specified year, the Determination Date of such Award is December 14 of the prior year.

"**Total Shareholder Return**" shall mean an amount equal to the average of the total return figures for the three-year periods ending on the twenty (20) trading days referred to below as currently reported under "Comparative Returns" by Bloomberg L.P. ("**Bloomberg**") (or any other reporting service that the Committee may designate from time to time):

   (i)   for Disney (as such total return figures for Disney may be adjusted by the Committee, by no later than the Scheduled Vesting Date, to take into account any factors which the Committee has determined are not properly reflected in such reported figures) or

   (ii)  for any other S&P 500 Company,

in each case for the twenty (20) latest trading days up to and (if the Determination Date is a trading day) including the Determination Date.

"**TSR Percentile**" shall mean the percentile ranking (which shall be carried out to two decimal points) as determined by Disney on the basis of the Total Shareholder Return figures reported by Bloomberg (or any other reporting service that the Committee may designate from time to time) for each of the S&P 500 Companies, including Disney (provided that in the case of Disney adjustments may be made by the Committee with respect to Total Shareholder Return as provided above).

"**S&P 500 Companies**" shall mean all of the companies which are listed on the Standard & Poor's 500 Composite Index, including Disney, on the date which is three years and twenty (20) trading days prior to the Determination Date and which remain continuously listed on the Standard & Poor's 500 Composite Index through and including the Determination Date; provided however, that for the purposes hereof the Standard & Poor's 500 Composite Index shall be deemed to include companies that were removed therefrom during the measurement period but that continued during the entire measurement period to have their shares listed on at least one of

2

Ex. 10
Page 1161

the NYSE, NASDAQ, American Stock Exchange, Boston Stock Exchange, Chicago Stock Exchange, National Stock Exchanged (formerly Cincinnati Stock Exchange), NYSE Arca (formerly known as the Pacific Stock Exchange), Philadelphia Stock Exchange or any other exchange(s) that the Committee may designate from time to time.

B       **ROIC Test**. The extent to which the remaining fifty percent of the Stock Units subject to this Award (the "**ROIC Target Award Amount**") shall vest shall be conditioned upon the satisfaction of a performance vesting requirement (the "**ROIC Performance Requirement**") related to Annual After-Tax Operating Performance, determined separately with respect to each fiscal year in the three-fiscal year period commencing with the fiscal year in which the Award is made (such three-year period, the "**ROIC Performance Period**"). The ROIC Performance Requirement applicable with respect to each such fiscal year in the ROIC Performance Period shall pertain to Stock Units representing one-third of the ROIC Target Award Amount (each, an "**Annual ROIC Target Component**"). For any portion of an Annual ROIC Target Component to become vested, the Committee must determine that the ROIC with respect to the applicable fiscal year equals or exceeds the ROIC Threshold for such fiscal year. If this requirement is met, the percentage of the applicable Annual ROIC Target Component as to which the ROIC Performance Requirement shall be satisfied based on performance in the applicable fiscal year shall be determined as follows:

   i.    If ROIC for the applicable fiscal year equals the ROIC Threshold for such fiscal year, then 50% of such Annual ROIC Target Component shall satisfy the ROIC Performance Requirement.

   ii.   If ROIC for the applicable fiscal year equals the ROIC Target for such fiscal year, then 100% of such Annual ROIC Target Component shall satisfy the ROIC Performance Requirement

   iii.  If ROIC for the applicable fiscal year equals the ROIC Maximum for such fiscal year, then 200% of such Annual ROIC Target Component shall satisfy the ROIC Performance Requirement.

   iv.   If ROIC for the applicable fiscal year is above one but below the next performance level specified above, the percentage of such Annual ROIC Target Component which shall satisfy the ROIC Performance Requirement shall be determined by mathematical interpolation between such two performance levels.

The percentage of the ROIC Target Award Amount that shall be deemed to satisfy the ROIC Performance Requirement shall be the average of the percentages of achievement of the ROIC Performance Requirement applicable to each Annual ROIC Target Component, as specified above.

For the purposes hereof, the terms set forth below shall have the following meanings:

"**Annual After-Tax Operating Performance**" with respect to any fiscal year means the sum of (i) and (ii), minus (iii), where (i), (ii) and (iii) are:

   (i)    segment operating income for such fiscal year, as reported in Disney's audited financial statements for such fiscal year,

3

Ex. 10
Page 1162

(ii)    corporate and unallocated shared expenses for such fiscal year, as reported in Disney's audited financial statements for such fiscal year, and

(iii)    the amount determined by multiplying the sum of (i) and (ii) by the effective Federal Corporate Tax Rate at the beginning of the Fiscal Year for the year of the grant.

Notwithstanding the foregoing, segment operating income and corporate and unallocated shared expenses as referenced in (i) and (ii) above shall be subject to such adjustments thereto as the Committee deems appropriate in its sole discretion (x) to exclude the effect of extraordinary, unusual and/or nonrecurring items and (y) to reflect such other factors as the Committee deems appropriate to fairly reflect operating performance for the applicable fiscal year.

"**Invested Capital**" as of the end of any fiscal year means the remainder of (i) minus (ii), where (i) and (ii) are:

(i)    Disney's total assets as of the last day of such fiscal year, and

(ii)    the sum of

(1)    Disney's cash, cash equivalents and restricted cash as such last day of such fiscal years,

(2)    Disney's deferred tax assets, and

(3)    Disney's Non-Interest Bearing Liabilities.

in the case of each item in clause (i) or (ii)(1), (2) and (3) above, as reported in Disney's audited financial statements for such fiscal year, but subject to adjustment by the Committee, by no later than the Scheduled Vesting Date, to take into account any factors or occurrences (such as an acquisition of assets in exchange for stock or a disposition of assets in a spin-off or similar transaction) which the Committee determines inequitably and substantially enlarge or diminish the rights of the Participant and other Plan participants with respect to the Award and similar awards granted under the Plan.

"**Non-Interest Bearing Liabilities**" means the amount of money that a company owes (a liability on the balance sheet, current or non-current), without any interest or penalties accruing to the amount owed. For the avoidance of any doubt, Non-Interest Bearing Liabilities exclude liabilities related to deferred taxes, pension, retirement and leases.

"**ROIC**" with respect to any fiscal year during the ROIC Performance Period means the percentage determined by dividing (i) the Annual After-Tax Operating Performance for such fiscal year by (ii) the average of Invested Capital at the end of such fiscal year and at the end of the immediately prior fiscal year. The Committee shall establish the ROIC separately for each fiscal year during the ROIC Performance Period at such time as the Committee determines to be appropriate following the commencement of such fiscal year

"**ROIC Maximum**" means the level of ROIC specified by the Committee for the applicable fiscal year at which the maximum amount payable with respect to the applicable Annual ROIC Target Component shall be earned.

4

"**ROIC Target**" means the level of ROIC specified by the Committee for the applicable fiscal year at which the target amount of the applicable Annual ROIC Target Component shall be earned.

"**ROIC Threshold**" means the level of ROIC specified by the Committee for the applicable fiscal year below which no portion of the applicable Annual ROIC Target Component shall be earned.

C      **Service Vesting Requirement**. In addition to whichever of the performance vesting requirements of subsection A or B of this Section 2 is applicable to a stated portion of the Stock Units subject to this Award, the right of the Participant to receive payment of this Award shall become vested only if he or she remains continuously employed by Disney or an Affiliate from the date hereof until the Scheduled Vesting Date.

If the service vesting requirements of this Section 2.C are not satisfied, all of the Stock Units subject to this Award shall be immediately forfeited and the Participant's rights with respect thereto shall cease.

Notwithstanding the foregoing, the service vesting requirement of this Section 2.C shall be waived if the participant's employment with the Company or an Affiliate terminates on December 31, 2021.

All Stock Units for which all of the requirements of this Section 2 have been satisfied shall become vested and shall thereafter be payable in accordance with Section 5 hereof. Subject to the terms, conditions and performance-based vesting requirements set forth herein, the Stock Units subject to this Award will vest on the third anniversary date of the Date of Grant (the "**Scheduled Vesting Date**").

Section 3. **Accelerated Vesting.** Notwithstanding the terms and conditions of Section 2 hereof, upon the Participant's death or disability (within the meaning of Section 409A of the Internal Revenue Code), or upon the occurrence of a Triggering Event within the 12-month period following a Change in Control (in accordance with Section 11 of the Plan as in effect as of the date of the Triggering Event), in any case, prior to the Scheduled Vesting Date, the provisions of this Section 3 shall apply to determine the extent to which the Participant's Restricted Stock Units that have not previously been forfeited shall become vested. If such death, disability or Triggering Event occurs while the Participant is employed by Disney (or an affiliate) and

A      prior to the Determination Date, this Award shall become fully vested (provided that, for this purpose, the performance conditions applicable under subsection A or B of Section 2 shall in each case be deemed to have been satisfied at the 50th percentile of comparative performance), or

B.     after the Determination Date but before the Scheduled Vesting Date, then the number of Restricted Stock Units which shall become vested shall be determined on the same basis as if the Participant had been continuously employed by Disney (or an Affiliate) until the Scheduled Vesting Date.

Any Restricted Stock Units that become vested pursuant to this Section 3 shall be payable in accordance with Section 5 hereof.

Section 4. **Dividend Equivalents.** Any dividends paid in cash on Shares of Disney will be credited to the Participant as additional Restricted Stock Units as if the Restricted Stock Units previously held by the Participant were outstanding Shares, as follows: such credit shall be made in whole Restricted Stock Units only (rounded downward to the nearest whole unit) and shall be based on the fair market value (as defined in the Plan) of the Shares on the date of payment of such dividend. All such additional Restricted Stock Units shall be subject to the

5

same vesting requirements applicable to the Restricted Stock Units in respect of which they were credited and shall be payable in accordance with Section 5 hereof.

Section 5. **Payment of Award.** Payment of vested Restricted Stock Units shall be made within 30 days following the applicable date under Section 2 hereof as of which the vesting requirements under Section 2 hereof shall have been satisfied with respect to any tranche, as applicable (or within 30 days following acceleration of vesting under Section 3 hereof, if applicable). The Restricted Stock Units shall be paid in cash or in Shares (or some combination thereof), as determined by the Committee in its discretion at the time of payment, and in either case shall be paid to the Participant after deduction of applicable withholding taxes in the amount determined by the Committee. If the Participant is a U.S. taxpayer, Disney will withhold all U.S. federal and state taxes as required by law at the then-current rate for supplemental wage income as applicable. If the Participant is resident in a foreign country, the Participant shall be responsible for the payment of any applicable local country taxes, including, without limitation, income taxes, social security taxes, and fringe benefit taxes, and Disney will either withhold such taxes as required by local law, or, alternatively, Participant will be required to pay such taxes directly or, where permitted by local law with respect to fringe benefit taxes, to reimburse Disney or the affiliated entity by whom you are employed for such taxes paid by Disney or such affiliated entity.

Section 6. **Extended Vesting.**

(a)  In the event that Participant's employment with Disney or an Affiliate thereof terminates for any reason other than death, disability or "cause" (as further provided in the Plan) at a time when (i) the Participant has attained the age of sixty and has completed at least ten consecutive Service Years (as hereinafter defined) and (ii) at least one year has passed since the Date of Grant of this Award, provided however, that the one-year requirement in this Section 6(a)(ii) shall be waived if employment with the Company or an Affiliate terminates on December 31, 2021, then the remaining then unvested tranche(s) of this Award shall vest in accordance with the terms and provisions hereof in the same manner as if Participant's employment had continued through the scheduled vesting date(s) of such tranche(s). For purposes of the foregoing, "Service Year" shall mean any full 12-month period during which the Participant was continuously employed by Disney or an affiliate thereof. In determining the total number of consecutive Service Years that the Participant has been so employed, Disney shall apply such rules regarding the bridging of service as the Committee may adopt from time to time.

(b) Notwithstanding any other term or provision hereof, if at the time of termination of employment (other than upon the scheduled expiration date of an employment agreement) Participant is employed pursuant to an employment agreement with Disney or an Affiliate which provides under certain circumstances for the continued vesting of any Stock Units subject to this Award in the event of the termination of such employment agreement prior to its scheduled expiration date (a "Contractual Extension Provision"), then, except as otherwise provided in such employment agreement, (i) this Section 6 shall be interpreted and applied in all respects as if Participant had remained continuously employed by Disney or an Affiliate thereof from the Date of Grant of this Award through the scheduled expiration date of such employment agreement and (ii) the date of termination of Participant's employment for all purposes under this Section 6 shall be deemed to be the scheduled expiration date of such employment agreement.

Section 7. **Restrictions on Transfer.** Neither this Award nor any Restricted Stock Units covered hereby may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to Disney as a result of forfeiture of the Restricted Stock Units as provided herein.

Section 8. **No Voting Rights.** The Restricted Stock Units granted pursuant to this Award, whether or not vested, will not confer any voting rights upon the Participant, unless and until the Award is paid in Shares.

6

Ex. 10
Page 1165

Section 9. **Award Subject to Plan.** This Restricted Stock Unit Award is subject to the terms of the Plan, the terms and provisions of which are hereby incorporated by reference. In the event of a conflict or ambiguity between any term or provision contained herein and a term or provision of the Plan, the Plan will govern and prevail.

Section 10. **Changes in Capitalization.** The Restricted Stock Units under this Award shall be subject to the provisions of the Plan relating to adjustments for changes in corporate capitalization.

Section 11. **No Right of Employment.** Nothing in this Award Agreement shall confer upon the Participant any right to continue as an employee of Disney or an Affiliate nor interfere in any way with the right of Disney or an Affiliate to terminate the Participant's employment at any time or to change the terms and conditions of such employment.

Section 12. **Effect of Employment Agreement.** If the Participant is employed pursuant to an employment agreement with Disney, any provisions thereof relating to the effect of a termination of the Participant's employment upon his or her rights with respect to this Award, including, without limitation, any provisions regarding acceleration of vesting and/or payment of this Award in the event of termination of employment, shall be fully applicable and supersede any provisions hereof with respect to the same subject matter.

Section 13. **Data Privacy.** The Participant expressly authorizes and consents to the collection, possession, use, retention and transfer of personal data of the Participant, whether in electronic or other form, by and among Disney, its Affiliates, third-party administrator(s) and other possible recipients, in each case for the exclusive purpose of implementing, administering, facilitating and/or managing the Participant's Awards under, and participation in, the Plan. Such personal data may include, without limitation, the Participant's name, home address and telephone number, date of birth, Social Security Number, social insurance number or other identification number, salary, nationality, job title and other job-related information, tax information, the number of Disney shares held or sold by the Participant, and the details of all Awards (including any information contained in this Award and all Award-related materials) granted to the Participant, whether exercised, unexercised, vested, unvested, cancelled or outstanding ("**Data**"). The Participant acknowledges, understands and agrees that Data will be transferred to Merrill, which is assisting Disney with the implementation, administration and management of the Plan, and/or to such other third-party plan administrator(s) and/or recipients as may be selected by Disney in the future. The Participant understands that one or more of the administrators or recipients of Data may be located in countries other than the country of Participant's current residence, and that such other countries may have data privacy laws and protections different from, and less protective than, the laws and protections of the country of Participant's current residence, the Member States of the European Union or any other country to which the Participant may be at any time relocated.

Section 14. **Governing Law.** This Award Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, without giving effect to the choice of law principles thereof.

*************************

Note: Restricted Stock Units are granted and vested in the United States. You are responsible for any applicable taxes whether you are in the United States or any other country. At the time of vesting, Disney will withhold any minimum statutory local or U.S. taxes, as applicable.

7

Ex. 10
Page 1166

Exhibit 10.12

## THE WALT DISNEY COMPANY

### Non-Qualified Stock Option Award Agreement

This AWARD AGREEMENT (the "Agreement") is between you, Robert Iger, and The Walt Disney Company ("Disney"), in connection with the Non-Qualified Stock Option Award (the "Option") granted to you on December 14, 2021, by the Compensation Committee of the Board of Directors of Disney pursuant to the terms of the 2011 Stock Incentive Plan, as amended (the "Plan"), the applicable terms and conditions of which are incorporated herein by reference and made a part of this Agreement.

This Option gives you the opportunity to purchase 50,249 shares of Common Stock of The Walt Disney Company at an exercise price of $150.07 per share. The exercise price is the average of the highest and the lowest market prices for the Common Stock on the above grant date as determined pursuant to the Plan.

This Option may not be exercised before December 14, 2022. On or after that date, subject to your continued employment by Disney or an affiliated company (as described further below) and to the other provisions of the Plan, you may exercise the Option with respect to the number of shares set forth opposite the first date below. As the subsequent dates set forth below occur, you may exercise as to the number of shares set forth opposite those dates:

December 14, 2022; 16,750 Shares
December 14, 2023; 16,749 Shares
December 14, 2024; 16,750 Shares

Provided your employment continues, the term of this Option is ten years from the grant date and, therefore, expires on December 14, 2031. If your employment should cease prior to the date on which your grant expires, your right to vest and exercise under the Option will be subject to early

**Ex. 10**
**Page 1167**

termination as provided in Sections 6.5, 12 and 13.2 of the Plan. Except under certain circumstances specified in such Sections, you will generally have the right of continued vesting and exercisability for three months following the date of termination of your employment (such period as it may hereinafter be extended in certain circumstances as provided below being the "Extended Vesting and Exercisability Period"), and any shares that vest during the Extended Vesting and Exercisability Period will be exercisable during such period (or, under certain circumstances, for such longer period as may be provided by the Plan).

You may exercise this Option as to all or part of the number of shares covered by the Option which are then vested by paying the aggregate exercise price and applicable withholding taxes on the gross gain. You will be provided with additional information at the time of exercise about the methods available for exercising your Option and paying your withholding taxes, in accordance with the methods of exercising options permitted under Section 6.6 of the Plan. You are urged to seek advice from your tax accountant or attorney when making decisions regarding the exercise of this Option. This Option may not be transferred or assigned.

Notwithstanding any other term or provision hereof, you agree by acceptance of this Option that, except for certain shares (the "Tax-Available Shares") that may be sold to pay taxes up to the Maximum Tax Liability (as defined below) upon an exercise of a portion of, or all of, this Option, you will hold, for not less than twelve months from the date of exercise of this Option, shares representing no less than one hundred percent (100%) of the shares acquired by you (other than Tax-Available Shares) upon such exercise; provided, however, that the foregoing obligation to hold such shares (and any similar obligation in any non-qualified stock option award previously granted to you) shall not be applicable at any time when you are already holding shares of Common Stock of Disney (including any outstanding restricted stock units (with or without performance-based vesting conditions) awarded to you by with a value equal to at least five times your base salary as in effect at such time (the "Disney Stock Ownership Requirement"). For purposes hereof the term "Maximum Tax Liability" shall mean the amount calculated by multiplying total income recognized, as reported by Disney for Federal income tax purposes, upon an exercise of this Option, by a percentage determined as follows:

2

$$FR + SR (100\text{-}FR) + MR$$

where:

FR = the highest Federal income tax rate in effect at time of exercise of the Option;

SR = the highest state income tax rate, if any, in effect at the time of exercise of the Option in the state where your principle Disney office is located; and

MR = the Medicare tax rate in effect at time of exercise of the Option.

The number of whole shares acquired upon any exercise of the Options that may be sold to discharge the Maximum Tax Liability shall be determined by dividing the Maximum Tax Liability by the fair market value (as defined in Section 2 of the Plan) of one share of Disney common stock on the date of exercise of the Option and disregarding any fractional amount resulting from such calculation.

For the purposes hereof, your commitment to hold the percentage of shares referred to above for not less than twelve months unless you are already in compliance with the Disney Stock Ownership Requirement shall constitute an undertaking by you not to sell, transfer, pledge, encumber, assign or otherwise dispose of, except for certain transfers to "family members" and certain others permitted with the prior approval of the Committee pursuant to Section 6.7 of the Plan, any of such shares during such period.

If you are employed pursuant to an employment agreement with Disney, any provisions thereof relating to the effect of a termination of your employment upon your rights with respect to this Option, including, without limitation, any provision regarding acceleration of this Option, shall be fully applicable and shall supersede the provisions hereof relating to the same subject matter, but in no event shall the restriction on sale of shares acquired upon the exercise of this Option referred herein apply after any termination of your employment with Disney.

3

Ex. 10
Page 1169

In the event that your employment with Disney or an Affiliate thereof terminates for any reason other than death, disability, or "cause" (as further provided in the Plan) at a time when (i) you have attained the age of sixty and have completed at least ten consecutive Service Years (as hereinafter defined) and (ii) at least one year has passed since the Grant Date of this Option, provided, however, that the one-year requirement shall be waived if your employment with the Company or an Affiliate terminates on December 31, 2021, then notwithstanding any other term or provision hereof, the Extended Vesting and Exercisability Period shall continue until the earlier of five years from the date of termination of your employment or the expiration date of this Option as provided above; provided, however, that in the event of your death during such period, all remaining unvested Tranches of this Option shall vest immediately upon such event and thereafter all remaining unexercised Tranches (or portions thereof) of this Option shall be exercisable until the earlier of the expiration of 18 months from date of death or the expiration date of this Option. For purposes of the foregoing, "**Service Year**" shall mean any calendar year during which you have been continuously employed by Disney or an Affiliate thereof for the entire calendar year. In determining the total number of consecutive Service Years that you have been so employed, the Company shall apply such rules regarding the bridging of service as the Committee may adopt from time to time.

Notwithstanding any other term or provision hereof, if you are employed pursuant to an employment agreement with Disney or an Affiliate which provides under certain circumstances for the continued vesting and/or exercisability of this Option in the event of the termination of such employment agreement prior to its scheduled expiration date (a "**Contractual Extension Provision**"), then, except as otherwise expressly provided in such employment agreement, (i) this Option shall be interpreted and applied in all respects to have the same effect as if you had remained continuously employed by Disney or an Affiliate thereof from the Grant Date of this Option through the scheduled expiration date of such employment agreement and (ii) the date of termination of your employment for all purposes hereunder shall be deemed to be the scheduled expiration date of such employment agreement.

4

Solely for purposes of (i) determining whether, and to what extent, the Participant shall have become eligible to exercise all or any portion of this Option and (ii) determining the period during which any vested portion of this Option remains exercisable following termination of the Participant's employment, the Participant shall be deemed to have continued in employment (without duplication of any service credit afforded with respect to a Contractual Extension Provision, as defined below) with Disney or an Affiliate during any period for which the Company provides Participant pay in lieu of notice in connection with The Worker Adjustment and Retraining Notification Act, as currently in effect and as the same may be amended from time to time, or any successor statute thereto or any comparable provision of state, local or foreign law applicable to the Participant.

You expressly authorize and consent to the collection, possession, use, retention and transfer of your personal data, whether in electronic or other form, by and among Disney, its Affiliates, third-party administrator(s) and other possible recipients, in each case for the exclusive purpose of implementing, administering, facilitating and/or managing your Awards under, and participation in, the Plan. Such personal data may include, without limitation, your name, home address and telephone number, date of birth, Social Security Number, social insurance number or other identification number, salary, nationality, job title and other job-related information, tax information, the number of Disney shares held or sold by you, and the details of all Awards (including any information contained in this Award and all Award-related materials) granted to you, whether exercised, unexercised, vested, unvested, cancelled or outstanding ("Data"). You acknowledge, understand and agree that Data will be transferred to Merrill, which is assisting Disney with the implementation, administration and management of the Plan, and/or to such other third-party plan administrator(s) and/or recipients as may be selected by Disney in the future. You understand that one or more of the administrators or recipients of Data may be located in countries other than the country of your current residence, and that such other countries may have data privacy laws and protections different from, and less protective than, the laws and protections of the country of your current residence, the Member States of the European Union or any other country to which you may be at any time relocated.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

5

**Ex. 10**
**Page 1171**

Note: Non-Qualified Stock Options are granted and vested in the United States. You are responsible for any applicable taxes whether you are in the United States or any other country. At the time of exercise, Disney will withhold any minimum statutory local or U.S. taxes, as applicable.

6

Ex. 10
Page 1172

**Exhibit 22**

### List of Guarantor Subsidiaries

TWDC Enterprises 18 Corp ("Legacy Disney") is a subsidiary of The Walt Disney Company ("TWDC") and, as of January 1, 2022, a guarantor of TWDC's registered debt securities. Legacy Disney is also an issuer of registered debt securities, which are guaranteed by TWDC. At January 1, 2022, the registered debt securities were as follows:

**CUSIPs for TWDC Registered Debt Securities Guaranteed by Legacy Disney**

254687FH4 / 254687FJ0 / 254687FK7 / 254687FL5 / 254687FM3 / 254687FN1 / 254687FP6 / 254687FQ4 / 254687FR2 / 254687FS0 / 254687CM6 / 254687CP9 / 254687CR5 / 254687CT1 / 254687CV6 / 254687CX2 / 254687CZ7 / 254687DB9 / 254687DD5 / 254687DF0 / 254687DH6 / 254687DK9 / 254687DM5 / 254687DP8 / 254687DR4 / 254687DT0 / 254687DV5 / 254687DX1 / 254687DZ6 / 254687EB8 / 254687ED4 / 254687EF9 / 254687EH5 / 254687EK8 / 254687EM4 / 254687EP7 / 254687ER3 / 254687ET9 / 254687EV4 / 254687EX0 / 254687EZ5 / 254687FB7 / 254687FD3 / 254687FF8 / 254687FU5 / 254687FV3 / 254687FW1 / 254687FX9 / 254687FY7 / 254687FZ4 / 254687GA8

**CUSIPs for Legacy Disney Registered Debt Securities Guaranteed by TWDC**

25468PCT1 / 25468PDQ6 / 25468PDS2 / 25468PCW4 / 254687CD6 / 25468PDF0 / 25468PDK9 / 25468PDM5 / 25468PDV5 / 25468PBW5 / 25468PCP9 / 25468PCR5 / 25468PCX2 / 25468PDB9 / 25468PDN3 /

**Exhibit 31(a)**

**RULE 13a-14(a) CERTIFICATION IN
ACCORDANCE WITH SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert A  Chapek, Chief Executive Officer of The Walt Disney Company (the "Company"), certify that:

1      I have reviewed this quarterly report on Form 10-Q of the Company;

2      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date:      February 9, 2022                                              By:                    /s/ ROBERT A  CHAPEK
                                                                                                     Robert A  Chapek
                                                                                                     Chief Executive Officer

**Ex. 10
Page 1174**

**Exhibit 31(b)**

**RULE 13a-14(a) CERTIFICATION IN
ACCORDANCE WITH SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Christine M  McCarthy, Senior Executive Vice President and Chief Financial Officer of The Walt Disney Company (the "Company"), certify that:

1    I have reviewed this quarterly report on Form 10-Q of the Company;

2    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Date:    February 9, 2022                           By:        /s/ CHRISTINE M  MCCARTHY

                                                                  Christine M  McCarthy
                                                                  Senior Executive Vice President
                                                                  and Chief Financial Officer

**Ex. 10
Page 1175**

**Exhibit 32(a)**

**CERTIFICATION PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002\***

In connection with the Quarterly Report of The Walt Disney Company (the "Company") on Form 10-Q for the fiscal quarter ended January 1, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert A  Chapek, Chief Executive Officer of the Company, certify, pursuant to 18 U S C  §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1        The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2        The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company

By:        /s/ ROBERT A  CHAPEK

Robert A  Chapek
Chief Executive Officer
February 9, 2022

\*        A signed original of this written statement required by Section 906 has been provided to The Walt Disney Company and will be retained by The Walt Disney Company and furnished to the Securities and Exchange Commission or its staff upon request

**Ex. 10
Page 1176**

**Exhibit 32(b)**

**CERTIFICATION PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002***

In connection with the Quarterly Report of The Walt Disney Company (the "Company") on Form 10-Q for the fiscal quarter ended January 1, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Christine M  McCarthy, Senior Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U S C  §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1       The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2       The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company

By:      /s/ CHRISTINE M  MCCARTHY
_____
Christine M  McCarthy
Senior Executive Vice President
and Chief Financial Officer
February 9, 2022

*       A signed original of this written statement required by Section 906 has been provided to The Walt Disney Company and will be retained by The Walt Disney Company and furnished to the Securities and Exchange Commission or its staff upon request

**Ex. 10**
**Page 1177**