# Exhibit 12

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended July 2, 2022

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____.

Commission File Number 001-38842

**The WALT DISNEY Company**

| **Delaware** | | **83-0940635** |
|---|---|---|
| State or Other Jurisdiction of Incorporation or Organization | | I.R.S. Employer Identification |

**500 South Buena Vista Street**
**Burbank, California 91521**
Address of Principal Executive Offices and Zip Code

**(818) 560-1000**
Registrant's Telephone Number, Including Area Code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.01 par value | DIS | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

There were 1,823,057,777 shares of common stock outstanding as of August 3, 2022.

**PART I. FINANCIAL INFORMATION**

**Item 1: Financial Statements**

### THE WALT DISNEY COMPANY
### CONDENSED CONSOLIDATED STATEMENTS OF INCOME
(unaudited; in millions, except per share data)

| | Quarter Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | July 2, 2022 | | July 3, 2021 | | July 2, 2022 | | July 3, 2021 | |
| Revenues: | | | | | | | | |
| Services | $ | 19,461 | $ | 15,585 | $ | 56,215 | $ | 44,978 |
| Products | | 2,043 | | 1,437 | | 6,357 | | 3,906 |
| Total revenues | | 21,504 | | 17,022 | | 62,572 | | 48,884 |
| Costs and expenses: | | | | | | | | |
| Cost of services (exclusive of depreciation and amortization) | | (12,404) | | (10,251) | | (36,895) | | (29,921) |
| Cost of products (exclusive of depreciation and amortization) | | (1,278) | | (982) | | (3,948) | | (2,869) |
| Selling, general, administrative and other | | (4,100) | | (3,168) | | (11,655) | | (9,198) |
| Depreciation and amortization | | (1,290) | | (1,266) | | (3,846) | | (3,836) |
| Total costs and expenses | | (19,072) | | (15,667) | | (56,344) | | (45,824) |
| Restructuring and impairment charges | | (42) | | (35) | | (237) | | (562) |
| Other income (expense), net | | (136) | | (91) | | (730) | | 214 |
| Interest expense, net | | (360) | | (445) | | (1,026) | | (1,089) |
| Equity in the income of investees | | 225 | | 211 | | 674 | | 648 |
| Income from continuing operations before income taxes | | 2,119 | | 995 | | 4,909 | | 2,271 |
| Income taxes on continuing operations | | (617) | | 133 | | (1,610) | | 9 |
| Net income from continuing operations | | 1,502 | | 1,128 | | 3,299 | | 2,280 |
| Loss from discontinued operations, net of income tax benefit of $0, $2, $14 and $9, respectively | | — | | (5) | | (48) | | (28) |
| Net income | | 1,502 | | 1,123 | | 3,251 | | 2,252 |
| Net income from continuing operations attributable to noncontrolling interests | | (93) | | (205) | | (268) | | (416) |
| Net income attributable to Disney | $ | 1,409 | $ | 918 | $ | 2,983 | $ | 1,836 |
| | | | | | | | | |
| Earnings (loss) per share attributable to Disney[1]: | | | | | | | | |
| Diluted | | | | | | | | |
| Continuing operations | $ | 0.77 | $ | 0.50 | $ | 1.66 | $ | 1.02 |
| Discontinued operations | | — | | — | | (0.03) | | (0.02) |
| | $ | 0.77 | $ | 0.50 | $ | 1.63 | $ | 1.00 |
| Basic | | | | | | | | |
| Continuing operations | $ | 0.77 | $ | 0.51 | $ | 1.66 | $ | 1.03 |
| Discontinued operations | | — | | — | | (0.03) | | (0.02) |
| | $ | 0.77 | $ | 0.50 | $ | 1.64 | $ | 1.01 |
| | | | | | | | | |
| Weighted average number of common and common equivalent shares outstanding: | | | | | | | | |
| Diluted | | 1,825 | | 1,830 | | 1,827 | | 1,827 |
| Basic | | 1,823 | | 1,818 | | 1,821 | | 1,816 |

[1]    Total may not equal the sum of the column due to rounding.

*See Notes to Condensed Consolidated Financial Statements*

2

**Ex. 12**
**Page 1258**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(unaudited; in millions)**

| | Quarter Ended | | | | Nine Months Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | **July 2, 2022** | | July 3, 2021 | | **July 2, 2022** | | July 3, 2021 | |
| Net income | $ | **1,502** | $ | 1,123 | $ | **3,251** | $ | 2,252 |
| Other comprehensive income (loss), net of tax: | | | | | | | | |
| Market value adjustments for hedges | | **428** | | 1 | | **506** | | (62) |
| Pension and postretirement medical plan adjustments | | **119** | | 169 | | **393** | | 510 |
| Foreign currency translation and other | | **(446)** | | (65) | | **(659)** | | 119 |
| Other comprehensive income | | **101** | | 105 | | **240** | | 567 |
| Comprehensive income | | **1,603** | | 1,228 | | **3,491** | | 2,819 |
| Net income from continuing operations attributable to noncontrolling interests | | **(93)** | | (205) | | **(268)** | | (416) |
| Other comprehensive income (loss) attributable to noncontrolling interests | | **69** | | (24) | | **58** | | (82) |
| Comprehensive income attributable to Disney | $ | **1,579** | $ | 999 | $ | **3,281** | $ | 2,321 |

*See Notes to Condensed Consolidated Financial Statements*

3

**Ex. 12**
**Page 1259**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(unaudited; in millions, except per share data)**

| | July 2, 2022 | October 2, 2021 |
|---|---|---|
| *ASSETS* | | |
| Current assets | | |
| Cash and cash equivalents | $ 12,959 | $ 15,959 |
| Receivables, net | 13,685 | 13,367 |
| Inventories | 1,590 | 1,331 |
| Content advances | 1,902 | 2,183 |
| Other current assets | 1,286 | 817 |
| Total current assets | 31,422 | 33,657 |
| Produced and licensed content costs | 34,077 | 29,549 |
| Investments | 3,236 | 3,935 |
| Parks, resorts and other property | | |
| Attractions, buildings and equipment | 65,599 | 64,892 |
| Accumulated depreciation | (39,089) | (37,920) |
| | 26,510 | 26,972 |
| Projects in progress | 5,956 | 4,521 |
| Land | 1,117 | 1,131 |
| | 33,583 | 32,624 |
| Intangible assets, net | 15,334 | 17,115 |
| Goodwill | 77,945 | 78,071 |
| Other assets | 8,477 | 8,658 |
| Total assets | $ 204,074 | $ 203,609 |
| *LIABILITIES AND EQUITY* | | |
| Current liabilities | | |
| Accounts payable and other accrued liabilities | $ 20,858 | $ 20,894 |
| Current portion of borrowings | 5,580 | 5,866 |
| Deferred revenue and other | 4,266 | 4,317 |
| Total current liabilities | 30,704 | 31,077 |
| Borrowings | 46,022 | 48,540 |
| Deferred income taxes | 8,034 | 7,246 |
| Other long-term liabilities | 13,456 | 14,522 |
| Commitments and contingencies (Note 13) | | |
| Redeemable noncontrolling interests | 9,425 | 9,213 |
| Equity | | |
| Preferred stock | — | — |
| Common stock, $0.01 par value, Authorized – 4.6 billion shares, Issued – 1.8 billion shares | 56,087 | 55,471 |
| Retained earnings | 43,462 | 40,429 |
| Accumulated other comprehensive loss | (6,142) | (6,440) |
| Treasury stock, at cost, 19 million shares | (907) | (907) |
| Total Disney Shareholders' equity | 92,500 | 88,553 |
| Noncontrolling interests | 3,933 | 4,458 |
| Total equity | 96,433 | 93,011 |
| Total liabilities and equity | $ 204,074 | $ 203,609 |

*See Notes to Condensed Consolidated Financial Statements*

4

**Ex. 12**
**Page 1260**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(unaudited; in millions)**

| | Nine Months Ended | | | |
| --- | --- | --- | --- | --- |
| | | July 2, 2022 | | July 3, 2021 |
| *OPERATING ACTIVITIES* | | | | |
| Net income from continuing operations | $ | 3,299 | $ | 2,280 |
| Depreciation and amortization | | 3,846 | | 3,836 |
| Net (gain) loss on investments | | 779 | | (325) |
| Deferred income taxes | | 605 | | (749) |
| Equity in the income of investees | | (674) | | (648) |
| Cash distributions received from equity investees | | 575 | | 546 |
| Net change in produced and licensed content costs and advances | | (4,306) | | (3,192) |
| Equity-based compensation | | 723 | | 428 |
| Pension and postretirement medical benefit cost amortization | | 465 | | 582 |
| Other, net | | 492 | | 273 |
| Changes in operating assets and liabilities: | | | | |
| Receivables | | (506) | | (301) |
| Inventories | | (259) | | 236 |
| Other assets | | (684) | | (113) |
| Accounts payable and other liabilities | | (892) | | 341 |
| Income taxes | | 15 | | (260) |
| Cash provided by operations - continuing operations | | 3,478 | | 2,934 |
| | | | | |
| *INVESTING ACTIVITIES* | | | | |
| Investments in parks, resorts and other property | | (3,795) | | (2,468) |
| Other, net | | (77) | | 383 |
| Cash used in investing activities - continuing operations | | (3,872) | | (2,085) |
| | | | | |
| *FINANCING ACTIVITIES* | | | | |
| Commercial paper payments, net | | (275) | | (99) |
| Borrowings | | 152 | | 43 |
| Reduction of borrowings | | (1,400) | | (2,319) |
| Proceeds from exercise of stock options | | 100 | | 405 |
| Other, net | | (824) | | (801) |
| Cash used in financing activities - continuing operations | | (2,247) | | (2,771) |
| | | | | |
| *CASH FLOWS FROM DISCONTINUED OPERATIONS* | | | | |
| Cash provided by (used in) operations - discontinued operations | | 8 | | (2) |
| Cash provided by investing activities - discontinued operations | | — | | 8 |
| Cash used in financing activities - discontinued operations | | (12) | | — |
| Cash (used in) provided by discontinued operations | | (4) | | 6 |
| | | | | |
| Impact of exchange rates on cash, cash equivalents and restricted cash | | (354) | | 77 |
| | | | | |
| Change in cash, cash equivalents and restricted cash | | (2,999) | | (1,839) |
| Cash, cash equivalents and restricted cash, beginning of period | | 16,003 | | 17,954 |
| Cash, cash equivalents and restricted cash, end of period | $ | 13,004 | $ | 16,115 |

*See Notes to Condensed Consolidated Financial Statements*

5

**Ex. 12**
**Page 1261**

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF EQUITY**
**(unaudited; in millions)**

| | | | | | | **Quarter Ended** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Equity Attributable to Disney | | | | | | | | | | |
| | Shares | | Common Stock | | Retained Earnings | | Accumulated Other Comprehensive Income (Loss) | | Treasury Stock | | Total Disney Equity | | Non-controlling Interests[1] | | Total Equity |
| Balance at April 2, 2022 | 1,822 | $ | 55,823 | $ | 42,032 | $ | (6,312) | $ | (907) | $ | 90,636 | $ | 4,023 | $ | 94,659 |
| Comprehensive income (loss) | — | | — | | 1,409 | | 170 | | — | | 1,579 | | (67) | | 1,512 |
| Equity compensation activity | 1 | | 259 | | — | | — | | — | | 259 | | — | | 259 |
| Contributions | — | | — | | — | | — | | — | | — | | 19 | | 19 |
| Distributions and other | — | | 5 | | 21 | | — | | — | | 26 | | (42) | | (16) |
| **Balance at July 2, 2022** | **1,823** | **$** | **56,087** | **$** | **43,462** | **$** | **(6,142)** | **$** | **(907)** | **$** | **92,500** | **$** | **3,933** | **$** | **96,433** |
| | | | | | | | | | | | | | | | |
| Balance at April 3, 2021 | 1,817 | $ | 55,000 | $ | 39,365 | $ | (7,918) | $ | (907) | $ | 85,540 | $ | 4,246 | $ | 89,786 |
| Comprehensive income | — | | — | | 918 | | 81 | | — | | 999 | | 147 | | 1,146 |
| Equity compensation activity | — | | 185 | | — | | — | | — | | 185 | | — | | 185 |
| Contributions | — | | — | | — | | — | | — | | — | | 7 | | 7 |
| Cumulative effect of accounting change | — | | — | | 3 | | — | | — | | 3 | | — | | 3 |
| Distributions and other | — | | (11) | | 25 | | — | | — | | 14 | | (19) | | (5) |
| Balance at July 3, 2021 | 1,817 | $ | 55,174 | $ | 40,311 | $ | (7,837) | $ | (907) | $ | 86,741 | $ | 4,381 | $ | 91,122 |

[1] Excludes redeemable noncontrolling interests.

*See Notes to Condensed Consolidated Financial Statements*

6

**THE WALT DISNEY COMPANY**
**CONDENSED CONSOLIDATED STATEMENTS OF EQUITY**
**(unaudited; in millions)**

| | | | | | | | | | | | | Nine Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Equity Attributable to Disney | | | | | | | | | | | | |
| | Shares | | Common Stock | | Retained Earnings | | Accumulated Other Comprehensive Income (Loss) | | Treasury Stock | | Total Disney Equity | | Non-controlling Interests[1] | | Total Equity | |
| Balance at October 2, 2021 | 1,818 | $ | 55,471 | $ | 40,429 | $ | (6,440) | $ | (907) | $ | 88,553 | $ | 4,458 | $ | 93,011 |
| Comprehensive income (loss) | — | | — | | 2,983 | | 298 | | — | | 3,281 | | (22) | | 3,259 |
| Equity compensation activity | 5 | | 615 | | — | | — | | — | | 615 | | — | | 615 |
| Contributions | — | | — | | — | | — | | — | | — | | 48 | | 48 |
| Distributions and other | — | | 1 | | 50 | | — | | — | | 51 | | (551) | | (500) |
| **Balance at July 2, 2022** | **1,823** | **$** | **56,087** | **$** | **43,462** | **$** | **(6,142)** | **$** | **(907)** | **$** | **92,500** | **$** | **3,933** | **$** | **96,433** |
| | | | | | | | | | | | | | | | |
| Balance at October 3, 2020 | 1,810 | $ | 54,497 | $ | 38,315 | $ | (8,322) | $ | (907) | $ | 83,583 | $ | 4,680 | $ | 88,263 |
| Comprehensive income | — | | — | | 1,836 | | 485 | | — | | 2,321 | | 256 | | 2,577 |
| Equity compensation activity | 7 | | 687 | | — | | — | | — | | 687 | | — | | 687 |
| Contributions | — | | — | | — | | — | | — | | — | | 12 | | 12 |
| Cumulative effect of accounting change | — | | — | | 108 | | — | | — | | 108 | | — | | 108 |
| Distributions and other | — | | (10) | | 52 | | — | | — | | 42 | | (567) | | (525) |
| Balance at July 3, 2021 | 1,817 | $ | 55,174 | $ | 40,311 | $ | (7,837) | $ | (907) | $ | 86,741 | $ | 4,381 | $ | 91,122 |

[1] Excludes redeemable noncontrolling interests.

*See Notes to Condensed Consolidated Financial Statements*

7

**Ex. 12**
**Page 1263**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

## 1. *Principles of Consolidation*

These Condensed Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP) for interim financial information and the instructions to Rule 10-01 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements. We believe that we have included all normal recurring adjustments necessary for a fair statement of the results for the interim period. Operating results for the nine months ended July 2, 2022 are not necessarily indicative of the results that may be expected for the year ending October 1, 2022.

The terms "Company," "Disney," "we," "us," and "our" are used in this report to refer collectively to the parent company, The Walt Disney Company, as well as the subsidiaries through which its various businesses are actually conducted.

These financial statements should be read in conjunction with the Company's 2021 Annual Report on Form 10-K.

The Fox sports media business in Mexico was sold in November 2021. The Company recognized a $58 million loss on the sale, which is presented as discontinued operations in the Condensed Consolidated Statement of Income for the nine months ended July 2, 2022. At October 2, 2021, the assets and liabilities of the Fox sports media business in Mexico were not material and were included in other assets and other liabilities in the Condensed Consolidated Balance Sheets.

*Variable Interest Entities*

The Company enters into relationships with or makes investments in other entities that may be variable interest entities (VIE). A VIE is consolidated in the financial statements if the Company has the power to direct activities that most significantly impact the economic performance of the VIE and has the obligation to absorb losses or the right to receive benefits from the VIE that could potentially be significant (as defined by ASC 810-10-25-38) to the VIE. Hong Kong Disneyland Resort and Shanghai Disney Resort (together the Asia Theme Parks) are VIEs in which the Company has less than 50% equity ownership. Company subsidiaries (the Management Companies) have management agreements with the Asia Theme Parks, which provide the Management Companies, subject to certain protective rights of joint venture partners, with the ability to direct the day-to-day operating activities and the development of business strategies that we believe most significantly impact the economic performance of the Asia Theme Parks. In addition, the Management Companies receive management fees under these arrangements that we believe could be significant to the Asia Theme Parks. Therefore, the Company has consolidated the Asia Theme Parks in its financial statements.

*Redeemable Noncontrolling Interests*

The Company consolidates the results of certain subsidiaries that are less than 100% owned and for which the noncontrolling interest shareholders have the rights to require the Company to purchase their interests in these subsidiaries. The most significant of these are Hulu LLC (Hulu) and BAMTech LLC (BAMTech).

Hulu provides direct-to-consumer (DTC) streaming services and is owned 67% by the Company and 33% by NBC Universal (NBCU). In May 2019, the Company entered into a put/call agreement with NBCU that provided the Company with full operational control of Hulu. Under the agreement, beginning in January 2024, NBCU has the option to require the Company to purchase NBCU's interest in Hulu and the Company has the option to require NBCU to sell its interest in Hulu to the Company, in either case at a redemption value based on NBCU's equity ownership percentage of the greater of Hulu's then equity fair value or a guaranteed floor value of $27.5 billion.

NBCU's interest will generally not be allocated its portion of Hulu's losses, if any, as the redeemable noncontrolling interest is required to be carried at a minimum value. The minimum value is equal to the fair value as of the May 2019 agreement date accreted to the January 2024 estimated redemption value. At July 2, 2022, NBCU's interest in Hulu is recorded in the Company's financial statements at $8.6 billion.

BAMTech provides streaming technology services to third parties and is owned 85% by the Company and 15% by Major League Baseball (MLB). MLB has the right to sell its interest to the Company and the Company has the right to buy MLB's interest starting five years from and ending ten years after the Company's September 25, 2017 acquisition date of BAMTech, in either case at a redemption value based on MLB's equity ownership percentage of the greater of MLB's then equity fair value or a guaranteed floor value ($563 million accreting at 8% annually for eight years from the date of acquisition).

**Ex. 12**
**Page 1264**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

The MLB interest is required to be carried at a minimum value equal to its acquisition date fair value accreted to its estimated redemption value through the applicable redemption date. Therefore, the MLB interest is generally not allocated its portion of BAMTech losses, if any. As of July 2, 2022, the MLB interest was recorded in the Company's financial statements at $825 million.

Our estimate of the redemption value of noncontrolling interests requires management to make significant judgments with respect to the future value of the noncontrolling interests. We are accreting the noncontrolling interests of both BAMTech and Hulu to their guaranteed floor values. If our estimate of the future redemption value increased above either of the guaranteed floor values, we would change our rate of accretion, which would generally increase the amount recorded in "Net income from continuing operations attributable to noncontrolling interests" and thus reduce "Net income attributable to Disney" in the Condensed Consolidated Statements of Income.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements and footnotes thereto. Actual results may differ from those estimates.

*Reclassifications*

Certain reclassifications have been made in the fiscal 2021 financial statements and notes to conform to the fiscal 2022 presentation.

## 2. *Segment Information*

The Company's operations are conducted in the Disney Media and Entertainment Distribution (DMED) and Disney Parks, Experiences and Products (DPEP) segments. Our operating segments report separate financial information, which is evaluated regularly by the Chief Executive Officer in order to decide how to allocate resources and assess performance.

Segment operating results reflect earnings before corporate and unallocated shared expenses, restructuring and impairment charges, net other income, net interest expense, income taxes and noncontrolling interests. Segment operating income includes equity in the income of investees and excludes impairments of certain equity investments and acquisition accounting amortization of TFCF Corporation (TFCF) and Hulu assets (i.e. intangible assets and the fair value step-up for film and television costs) recognized in connection with the TFCF acquisition in fiscal 2019 (TFCF and Hulu acquisition amortization). Corporate and unallocated shared expenses principally consist of corporate functions, executive management and certain unallocated administrative support functions.

Segment operating results include allocations of certain costs, including information technology, pension, legal and other shared services costs, which are allocated based on metrics designed to correlate with consumption.

*Impact of COVID-19*

Since early 2020, the world has been, and continues to be, impacted by the novel coronavirus (COVID-19) and its variants. COVID-19 and measures to prevent its spread have impacted our segments in a number of ways, most significantly at the DPEP segment where our theme parks and resorts were closed and cruise ship sailings and guided tours were suspended. These operations resumed at various points since May 2020, initially at reduced operating capacities as a result of COVID-19 restrictions. In fiscal 2020 and 2021, we delayed, or in some cases, shortened or canceled, theatrical releases. In addition, we experienced significant disruptions in the production and availability of content, including the delay of key live sports programming during fiscal 2020 and fiscal 2021.

In fiscal 2022, our domestic parks and resorts are generally operating without significant COVID-19-related capacity restrictions, such as those that were generally in place during the prior year. In addition, our cruise ships have generally been operating without COVID-19-related capacity restrictions since April 2022. Certain of our international parks and resorts continue to be impacted by COVID-19-related closures and capacity and travel restrictions. At the DMED segment, our film and television productions have generally resumed, although we have seen disruptions of production activities depending on local circumstances. Thus far, we have generally been able to release our films theatrically in fiscal 2022, although certain markets continue to impose restrictions on theater openings and capacity.

The impact of these disruptions and the extent of their adverse impact on our financial and operating results will depend on the length of time that such disruptions continue. This will, in turn, depend on the duration and severity of the impacts of COVID-19 and its variants, and among other things, the impact of governmental actions imposed in response to COVID-19 and individuals' and companies' risk tolerance regarding health matters going forward. We have incurred and will continue to incur additional costs to address government regulations and the safety of our employees, guests and talent.

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

Segment revenues and segment operating income (loss) are as follows:

| | Quarter Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **July 2, 2022** | | July 3, 2021 | | **July 2, 2022** | | July 3, 2021 | |
| *Revenues:* | | | | | | | | |
| Disney Media and Entertainment Distribution | $ | **14,110** | $ | 12,681 | $ | **42,315** | $ | 37,782 |
| Disney Parks, Experiences and Products | | **7,394** | | 4,341 | | **21,280** | | 11,102 |
| Total segment revenues | $ | **21,504** | $ | 17,022 | $ | **63,595** | $ | 48,884 |
| *Segment operating income (loss):* | | | | | | | | |
| Disney Media and Entertainment Distribution | $ | **1,381** | $ | 2,026 | $ | **4,133** | $ | 6,348 |
| Disney Parks, Experiences and Products | | **2,186** | | 356 | | **6,391** | | (169) |
| Total segment operating income[1] | $ | **3,567** | $ | 2,382 | $ | **10,524** | $ | 6,179 |

[1] Equity in the income of investees is included in segment operating income as follows:

| | Quarter Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **July 2, 2022** | | July 3, 2021 | | **July 2, 2022** | | July 3, 2021 | |
| Disney Media and Entertainment Distribution | $ | **230** | $ | 220 | $ | **693** | $ | 681 |
| Disney Parks, Experiences and Products | | **(2)** | | (5) | | **(10)** | | (22) |
| Equity in the income of investees included in segment operating income | | **228** | | 215 | | **683** | | 659 |
| Amortization of TFCF intangible assets related to equity investees | | **(3)** | | (4) | | **(9)** | | (11) |
| Equity in the income of investees, net | $ | **225** | $ | 211 | $ | **674** | $ | 648 |

A reconciliation of segment revenues to total revenues is as follows:

| | Quarter Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | **July 2, 2022** | | July 3, 2021 | | **July 2, 2022** | | July 3, 2021 | |
| Segment revenues | $ | **21,504** | $ | 17,022 | $ | **63,595** | $ | 48,884 |
| Content License Early Termination[1] | | — | | — | | **(1,023)** | | — |
| Total revenues | $ | **21,504** | $ | 17,022 | $ | **62,572** | $ | 48,884 |

[1] During the nine months ended July 2, 2022, the Company recognized a reduction in revenue for amounts to early terminate certain license agreements with a customer for film and television content, which was delivered in previous years, in order for the Company to use the content primarily on our direct-to-consumer services (Content License Early Termination). Because the content is functional intellectual property (IP), we recognized substantially all of the consideration to be paid by the customer under the licenses as revenue in prior years when the content was made available under the agreements. Consequently, we have recorded the amounts to terminate the license agreements, net of remaining amounts of deferred revenue, as a reduction of revenue in the current nine-month period.

10

**Ex. 12**
**Page 1266**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

A reconciliation of segment operating income to income from continuing operations before income taxes is as follows:

|  | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
|  | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Segment operating income | $ 3,567 | $ 2,382 | $ 10,524 | $ 6,179 |
| Content License Early Termination | — | — | (1,023) | — |
| Corporate and unallocated shared expenses | (325) | (212) | (825) | (645) |
| Restructuring and impairment charges | (42) | (35) | (237) | (562) |
| Other income (expense), net[1] | (136) | (91) | (730) | 214 |
| Interest expense, net | (360) | (445) | (1,026) | (1,089) |
| TFCF and Hulu acquisition amortization[2] | (585) | (604) | (1,774) | (1,826) |
| Income from continuing operations before income taxes | $ 2,119 | $ 995 | $ 4,909 | $ 2,271 |

[1] See Note 4 for a discussion of amounts in other income (expense), net.

[2] For the quarter ended July 2, 2022 amortization of intangible assets, step-up of film and television costs and intangibles related to TFCF equity investees were $422 million, $160 million and $3 million, respectively. For the nine months ended July 2, 2022 amortization of intangible assets, step-up of film and television costs and intangibles related to TFCF equity investees were $1,292 million, $473 million and $9 million, respectively. For the quarter ended July 3, 2021 amortization of intangible assets, step-up of film and television costs and intangibles related to TFCF equity investees were $434 million, $166 million, and $4 million, respectively. For the nine months ended July 3, 2021 amortization of intangible assets, step-up of film and television costs and intangibles related to TFCF equity investees were $1,328 million, $487 million and $11 million, respectively.

*Goodwill*

The changes in the carrying amount of goodwill are as follows:

|  | DMED | DPEP | Total |
|---|---|---|---|
| Balance at October 2, 2021 | $ 72,521 | $ 5,550 | $ 78,071 |
| Currency translation adjustments and other, net | (126) | — | (126) |
| Balance at July 2, 2022 | $ 72,395 | $ 5,550 | $ 77,945 |

11

**Ex. 12**
**Page 1267**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

## 3. *Revenues*

The following table presents our revenues by segment and major source:

| | Quarter Ended July 2, 2022 | | | | Quarter Ended July 3, 2021 | | |
| | DMED | DPEP | Content License Early Termination | **Total** | DMED | DPEP | Total |
|---|---|---|---|---|---|---|---|
| Affiliate fees | $ 4,337 | $ — | $ — | **$ 4,337** | $ 4,431 | $ — | $ 4,431 |
| Advertising | 3,534 | 1 | — | **3,535** | 3,163 | — | 3,163 |
| Subscription fees | 3,889 | — | — | **3,889** | 3,156 | — | 3,156 |
| Theme park admissions | — | 2,312 | — | **2,312** | — | 1,152 | 1,152 |
| Resort and vacations | — | 1,805 | — | **1,805** | — | 776 | 776 |
| Retail and wholesale sales of merchandise, food and beverage | — | 1,896 | — | **1,896** | — | 1,262 | 1,262 |
| TV/SVOD distribution licensing | 1,119 | — | — | **1,119** | 1,230 | — | 1,230 |
| Theatrical distribution licensing | 620 | — | — | **620** | 140 | — | 140 |
| Merchandise licensing | — | 916 | — | **916** | 1 | 789 | 790 |
| Home entertainment | 149 | — | — | **149** | 236 | — | 236 |
| Other | 462 | 464 | — | **926** | 324 | 362 | 686 |
| | $ 14,110 | $ 7,394 | $ — | **$ 21,504** | $ 12,681 | $ 4,341 | $ 17,022 |

| | Nine Months Ended July 2, 2022 | | | | Nine Months Ended July 3, 2021 | | |
| | DMED | DPEP | Content License Early Termination | **Total** | DMED | DPEP | Total |
|---|---|---|---|---|---|---|---|
| Affiliate fees | $ 13,310 | $ — | $ — | **$ 13,310** | $ 13,427 | $ — | $ 13,427 |
| Advertising | 10,425 | 3 | — | **10,428** | 9,508 | 2 | 9,510 |
| Subscription fees | 11,374 | — | — | **11,374** | 8,702 | — | 8,702 |
| Theme park admissions | — | 6,437 | — | **6,437** | — | 2,298 | 2,298 |
| Resort and vacations | — | 4,701 | — | **4,701** | — | 1,722 | 1,722 |
| Retail and wholesale sales of merchandise, food and beverage | — | 5,801 | — | **5,801** | — | 3,336 | 3,336 |
| TV/SVOD distribution licensing | 3,639 | — | (1,023) | **2,616** | 4,023 | — | 4,023 |
| Theatrical distribution licensing | 1,373 | — | — | **1,373** | 280 | — | 280 |
| Merchandise licensing | — | 2,928 | — | **2,928** | 11 | 2,670 | 2,681 |
| Home entertainment | 673 | — | — | **673** | 755 | — | 755 |
| Other | 1,521 | 1,410 | — | **2,931** | 1,076 | 1,074 | 2,150 |
| | $ 42,315 | $ 21,280 | $ (1,023) | **$ 62,572** | $ 37,782 | $ 11,102 | $ 48,884 |

12

**Ex. 12**
**Page 1268**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

The following table presents our revenues by segment and primary geographical markets:

|  | Quarter Ended July 2, 2022 | | | Quarter Ended July 3, 2021 | | |
|---|---|---|---|---|---|---|
|  | DMED | DPEP | Total | DMED | DPEP | Total |
| Americas | $ 11,444 | $ 6,130 | $ 17,574 | $ 10,409 | $ 3,295 | $ 13,704 |
| Europe | 1,230 | 897 | 2,127 | 1,209 | 308 | 1,517 |
| Asia Pacific | 1,436 | 367 | 1,803 | 1,063 | 738 | 1,801 |
| Total revenues | $ 14,110 | $ 7,394 | $ 21,504 | $ 12,681 | $ 4,341 | $ 17,022 |
| Content License Early Termination |  |  | — |  |  |  |
|  |  |  | $ 21,504 |  |  |  |

|  | Nine Months Ended July 2, 2022 | | | Nine Months Ended July 3, 2021 | | |
|---|---|---|---|---|---|---|
|  | DMED | DPEP | Total | DMED | DPEP | Total |
| Americas | $ 34,465 | $ 17,400 | $ 51,865 | $ 30,993 | $ 8,165 | $ 39,158 |
| Europe | 4,111 | 2,389 | 6,500 | 3,721 | 1,062 | 4,783 |
| Asia Pacific | 3,739 | 1,491 | 5,230 | 3,068 | 1,875 | 4,943 |
| Total revenues | $ 42,315 | $ 21,280 | $ 63,595 | $ 37,782 | $ 11,102 | $ 48,884 |
| Content License Early Termination |  |  | (1,023) |  |  |  |
|  |  |  | $ 62,572 |  |  |  |

Revenues recognized in the current and prior-year periods from performance obligations satisfied (or partially satisfied) in previous reporting periods primarily relate to revenues earned on TV/SVOD licenses for titles made available to the licensee in previous reporting periods. For the quarter ended July 2, 2022, $0.3 billion was recognized related to performance obligations satisfied as of April 2, 2022. For the nine months ended July 2, 2022, $0.9 billion was recognized related to performance obligations satisfied as of October 2, 2021. For the quarter ended July 3, 2021, $0.3 billion was recognized related to performance obligations satisfied as of April 3, 2021. For the nine months ended July 3, 2021, $1.0 billion was related to performance obligations satisfied as of October 3, 2020.

As of July 2, 2022, revenue for unsatisfied performance obligations expected to be recognized in the future is $12 billion, primarily for content and other IP to be made available in the future under existing agreements with television station affiliates, merchandise licensees and DTC subscribers. Of this amount, we expect to recognize approximately $2 billion in the remainder of fiscal 2022, $5 billion in fiscal 2023, $3 billion in fiscal 2024 and $2 billion thereafter. These amounts include only fixed consideration or minimum guarantees and do not include amounts related to (i) contracts with an original expected term of one year or less (such as most advertising contracts) or (ii) licenses of IP that are solely based on the sales of the licensee.

When the timing of the Company's revenue recognition is different from the timing of customer payments, the Company recognizes either a contract asset (customer payment is subsequent to revenue recognition and subject to the Company satisfying additional performance obligations) or deferred revenue (customer payment precedes the Company satisfying the performance obligations). Consideration due under contracts with payment in arrears is recognized as accounts receivable. Deferred revenues are recognized as (or when) the Company performs under the contract.

Contract assets, accounts receivable and deferred revenues from contracts with customers are as follows:

|  | July 2, 2022 | October 2, 2021 |
|---|---|---|
| Contract assets | $ 74 | $ 155 |
| Accounts receivable |  |  |
| Current | 11,891 | 11,190 |
| Non-current | 1,284 | 1,359 |
| Allowance for credit losses | (198) | (194) |
| Deferred revenues |  |  |
| Current | 4,060 | 4,067 |
| Non-current | 448 | 581 |

Contract assets primarily relate to certain multi-season TV/SVOD licensing contracts. Activity for the current and prior-year periods related to contract assets was not material.

13

### THE WALT DISNEY COMPANY
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

For the quarter and nine months ended July 2, 2022, the Company recognized revenue of $0.4 billion and $3.2 billion, respectively, that was included in the October 2, 2021 deferred revenue balance. For the quarter and nine months ended July 3, 2021, the Company recognized revenue of $0.4 billion and $2.5 billion, respectively, that was included in the October 3, 2020 deferred revenue balance. Amounts deferred generally relate to DTC subscriptions, TV/SVOD licenses and advances from merchandise licensees.

We evaluate our allowance for credit losses and estimate collectability of current and non-current accounts receivable based on historical bad debt experience, our assessment of the financial condition of individual companies with which we do business, current market conditions, and reasonable and supportable forecasts of future economic conditions. In times of economic turmoil, our estimates and judgments with respect to the collectability of our receivables are subject to greater uncertainty than in more stable periods.

The Company has accounts receivable with original maturities greater than one year related to the sale of film and television program rights (TV/SVOD licensing) and vacation club properties. These receivables are discounted to present value at contract inception and the related revenues are recognized at the discounted amount. The balance of TV/SVOD licensing receivables recorded in other non-current assets was $0.7 billion and $0.8 billion at July 2, 2022 and October 2, 2021, respectively. The balance of vacation club receivables recorded in other non-current assets was $0.6 billion at both July 2, 2022 and October 2, 2021. The allowance for credit losses and activity for the period ended July 2, 2022 was not material.

### 4.  *Other Income (Expense), net*

Other income (expense), net is as follows:

|  | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
|  | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| DraftKings loss | $ (136) | $ (217) | $ (726) | $ (98) |
| fuboTV gain | — | — | — | 186 |
| German FTA gain | — | 126 | — | 126 |
| Other, net | — | — | (4) | — |
| Other income (expense), net | $ (136) | $ (91) | $ (730) | $ 214 |

For the quarter and nine months ended July 2, 2022, the Company recognized a non-cash loss of $136 million and $726 million, respectively, from the adjustment of its investment in DraftKings Inc. (DraftKings) to fair value (DraftKings loss). For the prior-year quarter and nine months ended July 3, 2021, the Company recognized a DraftKings loss of $217 million and $98 million, respectively.

For the nine months ended July 3, 2021, the Company recognized a $186 million gain from the sale of our investment in fuboTV Inc. (fuboTV gain).

For the quarter and nine months ended July 3, 2021, the Company recognized a $126 million gain on the sale of its 50% interest in a German free-to-air (FTA) television network (German FTA gain).

### 5.  *Cash, Cash Equivalents, Restricted Cash and Borrowings*

*Cash, Cash Equivalents and Restricted Cash*

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported in the Condensed Consolidated Balance Sheets to the total of the amounts reported in the Condensed Consolidated Statements of Cash Flows.

|  | July 2, 2022 | October 2, 2021 |
|---|---|---|
| Cash and cash equivalents | $ 12,959 | $ 15,959 |
| Restricted cash included in: |  |  |
| Other current assets | 3 | 3 |
| Other assets | 42 | 41 |
| Total cash, cash equivalents and restricted cash in the statement of cash flows | $ 13,004 | $ 16,003 |

14

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

*Borrowings*

During the nine months ended July 2, 2022, the Company's borrowing activity was as follows:

| | October 2, 2021 | | Borrowings | | Payments | | Other Activity | | July 2, 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Commercial paper with original maturities less than three months | $ — | $ | 508 | $ | — | $ | — | $ | **508** |
| Commercial paper with original maturities greater than three months | 1,992 | | 1,022 | | (1,805) | | 1 | | **1,210** |
| U.S. dollar denominated notes[1] | 49,090 | | — | | (1,400) | | (105) | | **47,585** |
| Asia Theme Parks borrowings | 1,331 | | 152 | | — | | (14) | | **1,469** |
| Foreign currency denominated debt and other[2] | 1,993 | | — | | — | | (1,163) | | **830** |
| | $ 54,406 | $ | 1,682 | $ | (3,205) | $ | (1,281) | $ | **51,602** |

[1]  The other activity is due to the amortization of purchase price adjustments on debt assumed in the TFCF acquisition and debt issuance fees.

[2]  The other activity is due to market value adjustments for debt with qualifying hedges.

At July 2, 2022, the Company's bank facilities, which are with a syndicate of lenders and support our commercial paper borrowings, were as follows:

| | Committed Capacity | | Capacity Used | | Unused Capacity |
|---|---|---|---|---|---|
| Facility expiring March 2023 | $ 5,250 | $ | — | $ | 5,250 |
| Facility expiring March 2025 | 3,000 | | — | | 3,000 |
| Facility expiring March 2027 | 4,000 | | — | | 4,000 |
| Total | $ 12,250 | $ | — | $ | 12,250 |

These facilities allow for borrowings at SOFR-based rates plus a fixed spread that varies with the Company's debt ratings assigned by Moody's Investors Service and Standard and Poor's ranging from 0.755% to 1.225%. The bank facilities contain only one financial covenant, relating to interest coverage of three times earnings before interest, taxes, depreciation and amortization, including both intangible amortization and amortization of our film and television production and programming costs, which the Company met on July 2, 2022 by a significant margin. The bank facilities specifically exclude certain entities, including the Asia Theme Parks, from any representations, covenants or events of default. The Company also has the ability to issue up to $500 million of letters of credit under the facility expiring in March 2027, which if utilized, reduces available borrowings under this facility. As of July 2, 2022, the Company has $1.4 billion of outstanding letters of credit, of which none were issued under this facility.

*Cruise Ship Credit Facilities*

The Company has credit facilities to finance up to 80% of the contract price of two new cruise ships, which are scheduled to be delivered in 2024 and 2025. Under the facilities, $1.1 billion is available beginning in August 2023 and $1.1 billion is available beginning in August 2024. Each tranche of financing may be utilized within a period of 18 months from the initial availability date. If utilized, the interest rates will be fixed at 3.80% and 3.74%, respectively, and the loan and interest will be payable semi-annually over a 12-year period from the borrowing date. Early repayment is permitted subject to cancellation fees.

The Company did not utilize and terminated a $1.0 billion credit facility for a new cruise ship, which was delivered in the third quarter of fiscal 2022.

15

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

*Interest expense, net*

Interest expense (net of amounts capitalized), interest and investment income, and net periodic pension and postretirement benefit costs (other than service costs) (see Note 9) are reported net in the Condensed Consolidated Statements of Income and consist of the following:

| | Quarter Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | July 2, 2022 | | July 3, 2021 | | July 2, 2022 | | July 3, 2021 | |
| Interest expense | $ | (380) | $ | (404) | $ | (1,115) | $ | (1,223) |
| Interest and investment income | | 7 | | (9) | | 44 | | 234 |
| Net periodic pension and postretirement benefit costs (other than service costs) | | 13 | | (32) | | 45 | | (100) |
| Interest expense, net | $ | (360) | $ | (445) | $ | (1,026) | $ | (1,089) |

Interest and investment income includes gains and losses on certain publicly traded and non-public investments, investment impairments and interest earned on cash and cash equivalents and certain receivables.

## 6. *International Theme Parks*

The Company has a 48% ownership interest in the operations of Hong Kong Disneyland Resort and a 43% ownership interest in the operations of Shanghai Disney Resort. The Asia Theme Parks together with Disneyland Paris are collectively referred to as the International Theme Parks.

The following table summarizes the carrying amounts of the Asia Theme Parks' assets and liabilities included in the Company's Condensed Consolidated Balance Sheets:

| | July 2, 2022 | | October 2, 2021 | |
| --- | --- | --- | --- | --- |
| Cash and cash equivalents | $ | 214 | $ | 287 |
| Other current assets | | 114 | | 95 |
| Total current assets | | 328 | | 382 |
| Parks, resorts and other property | | 6,631 | | 6,928 |
| Other assets | | 174 | | 176 |
| Total assets | $ | 7,133 | $ | 7,486 |
| | | | | |
| Current liabilities | $ | 546 | $ | 473 |
| Long-term borrowings | | 1,320 | | 1,331 |
| Other long-term liabilities | | 421 | | 422 |
| Total liabilities | $ | 2,287 | $ | 2,226 |

The following table summarizes the International Theme Parks' revenues and costs and expenses included in the Company's Condensed Consolidated Statements of Income for the nine months ended July 2, 2022:

| | | |
| --- | --- | --- |
| Revenues | $ | 2,031 |
| Costs and expenses | | (2,483) |
| Equity in the loss of investees | | (10) |

Asia Theme Parks' royalty and management fees of $46 million for the nine months ended July 2, 2022 are eliminated in consolidation, but are considered in calculating earnings attributable to noncontrolling interests.

International Theme Parks' cash flows included in the Company's Condensed Consolidated Statements of Cash Flows for the nine months ended July 2, 2022 were $147 million provided by operating activities, $572 million used in investing activities and $192 million provided by financing activities.

16

**Ex. 12**
**Page 1272**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

*Hong Kong Disneyland Resort*

The Government of the Hong Kong Special Administrative Region (HKSAR) and the Company have a 52% and a 48% equity interest in Hong Kong Disneyland Resort, respectively.

The Company and HKSAR have provided loans to Hong Kong Disneyland Resort with outstanding balances of $151 million and $101 million, respectively. The interest rate on both loans is three month HIBOR plus 2%, and the maturity date is September 2025. The Company's loan is eliminated in consolidation.

The Company has provided Hong Kong Disneyland Resort with a revolving credit facility of HK $2.1 billion ($268 million), which bears interest at a rate of three month HIBOR plus 1.25% and matures in December 2023. The outstanding balance under the line of credit at July 2, 2022 was $217 million. The Company's line of credit is eliminated in consolidation.

*Shanghai Disney Resort*

Shanghai Shendi (Group) Co., Ltd (Shendi) and the Company have 57% and 43% equity interests in Shanghai Disney Resort, respectively. A management company, in which the Company has a 70% interest and Shendi a 30% interest, operates Shanghai Disney Resort.

The Company has provided Shanghai Disney Resort with loans totaling $919 million, bearing interest at rates up to 8% and maturing in 2036, with early repayment permitted. The Company has also provided Shanghai Disney Resort with a 1.0 billion yuan (approximately $0.2 billion) line of credit bearing interest at 8%. The line of credit was increased to 1.9 billion yuan (approximately $0.3 billion) in July 2022. As of July 2, 2022, the total amount outstanding under the line of credit was 0.7 billion yuan (approximately $112 million). These balances are eliminated in consolidation.

Shendi has provided Shanghai Disney Resort with loans totaling 8.2 billion yuan (approximately $1.2 billion), bearing interest at rates up to 8% and maturing in 2036, with early repayment permitted. Shendi has also provided Shanghai Disney Resort with a 1.4 billion yuan (approximately $0.2 billion) line of credit bearing interest at 8%. The line of credit was increased to 2.6 billion yuan (approximately $0.4 billion) in July 2022. As of July 2, 2022 the total amount outstanding under the line of credit was 1.0 billion yuan (approximately $148 million).

## 7. *Produced and Acquired/Licensed Content Costs and Advances*

The Company classifies its capitalized produced and acquired/licensed content costs as long-term assets and classifies advances for live programming rights made prior to the live event as short-term assets. For purposes of amortization and impairment, the capitalized content costs are classified based on their predominant monetization strategy as follows:

- Individual - lifetime value is predominantly derived from third-party revenues that are directly attributable to the specific film or television title (e.g. theatrical revenues or sales to third-party television programmers)

- Group - lifetime value is predominantly derived from third-party revenues that are attributable only to a bundle of titles (e.g. subscription revenue for a DTC service or affiliate fees for a cable television network)

Total capitalized produced and licensed content by predominant monetization strategy is as follows:

| | As of July 2, 2022 | | | As of October 2, 2021 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Predominantly Monetized Individually | Predominantly Monetized as a Group | **Total** | Predominantly Monetized Individually | Predominantly Monetized as a Group | Total |
| Produced content | | | | | | |
|   Released, less amortization | $ 4,811 | $ 11,841 | $ **16,652** | $ 4,944 | $ 9,779 | $ 14,723 |
|   Completed, not released | 478 | 2,109 | **2,587** | 630 | 762 | 1,392 |
|   In-process | 4,593 | 6,051 | **10,644** | 4,371 | 4,623 | 8,994 |
|   In development or pre-production | 261 | 315 | **576** | 351 | 162 | 513 |
| | $ 10,143 | $ 20,316 | **30,459** | $ 10,296 | $ 15,326 | 25,622 |
| Licensed content - Television programming rights and advances | | | **5,520** | | | 6,110 |
| Total produced and licensed content | | | $ **35,979** | | | $ 31,732 |
| | | | | | | |
| Current portion | | | $ **1,902** | | | $ 2,183 |
| Non-current portion | | | $ **34,077** | | | $ 29,549 |

17

**Ex. 12**
**Page 1273**

THE WALT DISNEY COMPANY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

Amortization of produced and licensed content is as follows:

|  | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
|  | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Produced content |  |  |  |  |
| Predominantly monetized individually | $ 878 | $ 757 | $ 2,749 | $ 2,127 |
| Predominantly monetized as a group | 1,674 | 1,391 | 4,795 | 3,830 |
|  | 2,552 | 2,148 | 7,544 | 5,957 |
| Licensed programming rights and advances | 3,258 | 3,019 | 10,908 | 9,781 |
| Total produced and licensed content costs[1] | $ 5,810 | $ 5,167 | $ 18,452 | $ 15,738 |

[1] Primarily included in "Costs of services" in the Condensed Consolidated Statements of Income.

## 8. *Income Taxes*

*Interim Period Tax Expense*

Generally, we record interim period tax expense based on the estimated annual effective tax rate using projections of full-year pre-tax earnings and income tax expense, adjusted for tax expense amounts recognized fully in the quarter they occur. We used this approach to determine tax expense in the first three quarters of fiscal 2022. For interim periods in fiscal 2021, because of the uncertainties associated with the impact of COVID-19 on our projections of full-year pre-tax earnings and income tax expense, our normal approach of calculating interim period tax expense produced an income tax provision that was not meaningful. Accordingly, we calculated interim period fiscal 2021 tax expense based on the year-to-date earnings before tax, a blended U.S. Federal and state statutory tax rate of approximately 23% adjusted for tax expense amounts recognized fully in the quarter they occurred.

*Unrecognized Tax Benefits*

During the nine months ended July 2, 2022, the Company decreased its gross unrecognized tax benefits (before interest and penalties) by $0.2 billion from $2.6 billion to $2.4 billion. In the next twelve months, it is reasonably possible that our unrecognized tax benefits could change due to resolutions of open tax matters, which would reduce our unrecognized tax benefits by $0.1 billion.

## 9. *Pension and Other Benefit Programs*

The components of net periodic benefit cost are as follows:

|  | Pension Plans | | | | Postretirement Medical Plans | | | |
|---|---|---|---|---|---|---|---|---|
|  | Quarter Ended | | Nine Months Ended | | Quarter Ended | | Nine Months Ended | |
|  | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Service costs | $ 100 | $ 108 | $ 302 | $ 325 | $ 2 | $ 3 | $ 7 | $ 8 |
| Other costs (benefits): |  |  |  |  |  |  |  |  |
| Interest costs | 124 | 114 | 374 | 343 | 13 | 12 | 39 | 35 |
| Expected return on plan assets | (293) | (275) | (880) | (824) | (15) | (14) | (44) | (41) |
| Amortization of previously deferred service costs | 3 | 2 | 5 | 8 | — | — | — | — |
| Recognized net actuarial loss | 149 | 186 | 441 | 557 | 6 | 7 | 20 | 22 |
| Total other costs (benefits) | (17) | 27 | (60) | 84 | 4 | 5 | 15 | 16 |
| Net periodic benefit cost | $ 83 | $ 135 | $ 242 | $ 409 | $ 6 | $ 8 | $ 22 | $ 24 |

During the nine months ended July 2, 2022, the Company did not make any material contributions to its pension and postretirement medical plans and does not currently expect to make any material contributions for the remainder of fiscal 2022.

18

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

Final minimum funding requirements for fiscal 2022 will be determined based on a January 1, 2022 funding actuarial valuation, which is expected to be received by the end of the fourth quarter of fiscal 2022.

## 10. *Earnings Per Share*

Diluted earnings per share amounts are based upon the weighted average number of common and common equivalent shares outstanding during the period and are calculated using the treasury stock method for equity-based compensation awards (Awards). A reconciliation of the weighted average number of common and common equivalent shares outstanding and the number of Awards excluded from the diluted earnings per share calculation, as they were anti-dilutive, are as follows:

| | Quarter Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Shares (in millions): | | | | |
| Weighted average number of common and common equivalent shares outstanding (basic) | **1,823** | 1,818 | **1,821** | 1,816 |
| Weighted average dilutive impact of Awards | **2** | 12 | **6** | 11 |
| Weighted average number of common and common equivalent shares outstanding (diluted) | **1,825** | 1,830 | **1,827** | 1,827 |
| Awards excluded from diluted earnings per share | **26** | 3 | **13** | 5 |

19

**Ex. 12**
**Page 1275**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

## 11. *Equity*

The following tables summarize the changes in each component of accumulated other comprehensive income (loss) (AOCI) including our proportional share of equity method investee amounts:

| AOCI, before tax | Market Value Adjustments for Hedges | | Unrecognized Pension and Postretirement Medical Expense | | Foreign Currency Translation and Other | | AOCI | |
|---|---|---|---|---|---|---|---|---|
| **Third quarter of fiscal 2022** | | | | | | | | |
| Balance at April 2, 2022 | $ | (51) | $ | (6,668) | $ | (1,280) | $ | (7,999) |
| Quarter Ended July 2, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | 601 | | — | | (404) | | 197 |
| Reclassifications of realized net (gains) losses to net income | | (27) | | 155 | | — | | 128 |
| **Balance at July 2, 2022** | $ | **523** | $ | **(6,513)** | $ | **(1,684)** | $ | **(7,674)** |
| | | | | | | | | |
| **Third quarter of fiscal 2021** | | | | | | | | |
| Balance at April 3, 2021 | $ | (283) | $ | (8,978) | $ | (961) | $ | (10,222) |
| Quarter Ended July 3, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (1) | | 29 | | (52) | | (24) |
| Reclassifications of realized net (gains) losses to net income | | 4 | | 194 | | — | | 198 |
| Balance at July 3, 2021 | $ | (280) | $ | (8,755) | $ | (1,013) | $ | (10,048) |
| | | | | | | | | |
| **Nine months ended fiscal 2022** | | | | | | | | |
| Balance at October 2, 2021 | $ | (152) | $ | (7,025) | $ | (1,047) | $ | (8,224) |
| Nine Months Ended July 2, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | 741 | | 47 | | (637) | | 151 |
| Reclassifications of realized net (gains) losses to net income | | (66) | | 465 | | — | | 399 |
| **Balance at July 2, 2022** | $ | **523** | $ | **(6,513)** | $ | **(1,684)** | $ | **(7,674)** |
| | | | | | | | | |
| **Nine months ended fiscal 2021** | | | | | | | | |
| Balance at October 3, 2020 | $ | (191) | $ | (9,423) | $ | (1,088) | $ | (10,702) |
| Nine Months Ended July 3, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (55) | | 86 | | 75 | | 106 |
| Reclassifications of realized net (gains) losses to net income | | (34) | | 582 | | — | | 548 |
| Balance at July 3, 2021 | $ | (280) | $ | (8,755) | $ | (1,013) | $ | (10,048) |

20

**Ex. 12**
**Page 1276**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

| Tax on AOCI | Market Value Adjustments for Hedges | | Unrecognized Pension and Postretirement Medical Expense | | Foreign Currency Translation and Other | | AOCI | |
|---|---|---|---|---|---|---|---|---|
| *Third quarter of fiscal 2022* | | | | | | | | |
| Balance at April 2, 2022 | $ | 19 | $ | 1,570 | $ | 98 | $ | 1,687 |
| Quarter Ended July 2, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (152) | | — | | 27 | | (125) |
| Reclassifications of realized net (gains) losses to net income | | 6 | | (36) | | — | | (30) |
| **Balance at July 2, 2022** | **$** | **(127)** | **$** | **1,534** | **$** | **125** | **$** | **1,532** |
| | | | | | | | | |
| *Third quarter of fiscal 2021* | | | | | | | | |
| Balance at April 3, 2021 | $ | 69 | $ | 2,097 | $ | 138 | $ | 2,304 |
| Quarter Ended July 3, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | — | | (9) | | (37) | | (46) |
| Reclassifications of realized net (gains) losses to net income | | (2) | | (45) | | — | | (47) |
| Balance at July 3, 2021 | $ | 67 | $ | 2,043 | $ | 101 | $ | 2,211 |
| | | | | | | | | |
| *Nine months ended fiscal 2022* | | | | | | | | |
| Balance at October 2, 2021 | $ | 42 | $ | 1,653 | $ | 89 | $ | 1,784 |
| Nine Months Ended July 2, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (184) | | (11) | | 36 | | (159) |
| Reclassifications of realized net (gains) losses to net income | | 15 | | (108) | | — | | (93) |
| **Balance at July 2, 2022** | **$** | **(127)** | **$** | **1,534** | **$** | **125** | **$** | **1,532** |
| | | | | | | | | |
| *Nine months ended fiscal 2021* | | | | | | | | |
| Balance at October 3, 2020 | $ | 40 | $ | 2,201 | $ | 139 | $ | 2,380 |
| Nine Months Ended July 3, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | 22 | | (23) | | (38) | | (39) |
| Reclassifications of realized net (gains) losses to net income | | 5 | | (135) | | — | | (130) |
| Balance at July 3, 2021 | $ | 67 | $ | 2,043 | $ | 101 | $ | 2,211 |

21

THE WALT DISNEY COMPANY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

| AOCI, after tax | Market Value Adjustments for Hedges | | Unrecognized Pension and Postretirement Medical Expense | | Foreign Currency Translation and Other | | AOCI | |
|---|---|---|---|---|---|---|---|---|
| **Third quarter of fiscal 2022** | | | | | | | | |
| Balance at April 2, 2022 | $ | (32) | $ | (5,098) | $ | (1,182) | $ | (6,312) |
| Quarter Ended July 2, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | 449 | | — | | (377) | | 72 |
| Reclassifications of realized net (gains) losses to net income | | (21) | | 119 | | — | | 98 |
| **Balance at July 2, 2022** | **$** | **396** | **$** | **(4,979)** | **$** | **(1,559)** | **$** | **(6,142)** |
| | | | | | | | | |
| **Third quarter of fiscal 2021** | | | | | | | | |
| Balance at April 3, 2021 | $ | (214) | $ | (6,881) | $ | (823) | $ | (7,918) |
| Quarter Ended July 3, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (1) | | 20 | | (89) | | (70) |
| Reclassifications of realized net (gains) losses to net income | | 2 | | 149 | | — | | 151 |
| Balance at July 3, 2021 | $ | (213) | $ | (6,712) | $ | (912) | $ | (7,837) |
| | | | | | | | | |
| **Nine months ended fiscal 2022** | | | | | | | | |
| Balance at October 2, 2021 | $ | (110) | $ | (5,372) | $ | (958) | $ | (6,440) |
| Nine Months Ended July 2, 2022: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | 557 | | 36 | | (601) | | (8) |
| Reclassifications of realized net (gains) losses to net income | | (51) | | 357 | | — | | 306 |
| **Balance at July 2, 2022** | **$** | **396** | **$** | **(4,979)** | **$** | **(1,559)** | **$** | **(6,142)** |
| | | | | | | | | |
| **Nine months ended fiscal 2021** | | | | | | | | |
| Balance at October 3, 2020 | $ | (151) | $ | (7,222) | $ | (949) | $ | (8,322) |
| Nine Months Ended July 3, 2021: | | | | | | | | |
| Unrealized gains (losses) arising during the period | | (33) | | 63 | | 37 | | 67 |
| Reclassifications of realized net (gains) losses to net income | | (29) | | 447 | | — | | 418 |
| Balance at July 3, 2021 | $ | (213) | $ | (6,712) | $ | (912) | $ | (7,837) |

22

**Ex. 12**
**Page 1278**

# THE WALT DISNEY COMPANY
## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

Details about AOCI components reclassified to net income are as follows:

| Gain (loss) in net income: | Affected line item in the Condensed Consolidated Statements of Operations: | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|---|
| | | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Market value adjustments, primarily cash flow hedges | Primarily revenue | $ 27 | $ (4) | $ 66 | $ 34 |
| Estimated tax | Income taxes | (6) | 2 | (15) | (5) |
| | | 21 | (2) | 51 | 29 |
| Pension and postretirement medical expense | Interest expense, net | (155) | (194) | (465) | (582) |
| Estimated tax | Income taxes | 36 | 45 | 108 | 135 |
| | | (119) | (149) | (357) | (447) |
| Total reclassifications for the period | | $ (98) | $ (151) | $ (306) | $ (418) |

## 12. Equity-Based Compensation

Compensation expense related to stock options and restricted stock units (RSUs) is as follows:

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Stock options | $ 23 | $ 24 | $ 68 | $ 72 |
| RSUs | 250 | 134 | 655 | 356 |
| Total equity-based compensation expense[1] | $ 273 | $ 158 | $ 723 | $ 428 |
| Equity-based compensation expense capitalized during the period | $ 39 | $ 25 | $ 109 | $ 81 |

[1] Equity-based compensation expense is net of capitalized equity-based compensation and estimated forfeitures and excludes amortization of previously capitalized equity-based compensation costs.

Unrecognized compensation cost related to unvested stock options and RSUs was $110 million and $1.9 billion, respectively, as of July 2, 2022.

During the nine months ended July 2, 2022 and July 3, 2021, the weighted average grant date fair values for options granted were $46.86 and $57.06, respectively, and for RSUs were $139.55 and $178.71, respectively.

During the nine months ended July 2, 2022, the Company made equity compensation grants consisting of 1.7 million stock options and 11.9 million RSUs.

## 13. Commitments and Contingencies

*Legal Matters*

The Company, together with, in some instances, certain of its directors and officers, is a defendant in various legal actions involving copyright, breach of contract and various other claims incident to the conduct of its businesses. Management does not believe that the Company has incurred a probable material loss by reason of any of those actions.

## 14. Fair Value Measurements

Fair value is defined as the amount that would be received for selling an asset or paid to transfer a liability in an orderly transaction between market participants and is generally classified in one of the following categories:

Level 1 - Quoted prices for identical instruments in active markets

**Ex. 12
Page 1279**

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

Level 2 - Quoted prices for similar instruments in active markets; quoted prices for identical or similar instruments in markets that are not active; and model-derived valuations in which all significant inputs and significant value drivers are observable in active markets

Level 3 - Valuations derived from valuation techniques in which one or more significant inputs or significant value drivers are unobservable

The Company's assets and liabilities measured at fair value are summarized in the following tables by fair value measurement Level:

| | **Fair Value Measurement at July 2, 2022** | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| Assets | | | | |
| Investments | $ 228 | $ — | $ — | $ 228 |
| Derivatives | | | | |
| Interest rate | — | 1 | — | 1 |
| Foreign exchange | — | 1,573 | — | 1,573 |
| Other | — | 34 | — | 34 |
| Liabilities | | | | |
| Derivatives | | | | |
| Interest rate | — | (1,228) | — | (1,228) |
| Foreign exchange | — | (789) | — | (789) |
| Other | — | (4) | — | (4) |
| Other | — | (368) | — | (368) |
| Total recorded at fair value | $ 228 | $ (781) | $ — | $ (553) |
| Fair value of borrowings | $ — | $ 48,178 | $ 1,552 | $ 49,730 |

| | Fair Value Measurement at October 2, 2021 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| Assets | | | | |
| Investments | $ 950 | $ — | $ — | $ 950 |
| Derivatives | | | | |
| Interest rate | — | 186 | — | 186 |
| Foreign exchange | — | 707 | — | 707 |
| Other | — | 10 | — | 10 |
| Liabilities | | | | |
| Derivatives | | | | |
| Interest rate | — | (287) | — | (287) |
| Foreign exchange | — | (618) | — | (618) |
| Other | — | (8) | — | (8) |
| Other | — | (375) | — | (375) |
| Total recorded at fair value | $ 950 | $ (385) | $ — | $ 565 |
| Fair value of borrowings | $ — | $ 58,913 | $ 1,411 | $ 60,324 |

The fair values of Level 2 derivatives are primarily determined by internal discounted cash flow models that use observable inputs such as interest rates, yield curves and foreign currency exchange rates. Counterparty credit risk, which is mitigated by master netting agreements and collateral posting arrangements with certain counterparties, had an impact on derivative fair value estimates that was not material.

Level 2 other liabilities are primarily arrangements that are valued based on the fair value of underlying investments, which are generally measured using Level 1 and Level 2 fair value techniques.

**Ex. 12**
**Page 1280**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

Level 2 borrowings, which include commercial paper, U.S. dollar denominated notes and certain foreign currency denominated borrowings, are valued based on quoted prices for similar instruments in active markets or identical instruments in markets that are not active.

Level 3 borrowings include the Asia Theme Park borrowings, which are valued based on the current borrowing cost and credit risk of the Asia Theme Parks as well as prevailing market interest rates.

The Company's financial instruments also include cash, cash equivalents, receivables and accounts payable. The carrying values of these financial instruments approximate the fair values.

## 15. *Derivative Instruments*

The Company manages its exposure to various risks relating to its ongoing business operations according to a risk management policy. The primary risks managed with derivative instruments are interest rate risk and foreign exchange risk.

The Company's derivative positions measured at fair value are summarized in the following tables:

| | As of July 2, 2022 | | | |
| --- | --- | --- | --- | --- |
| | Current Assets | Other Assets | Other Current Liabilities | Other Long-Term Liabilities |
| **Derivatives designated as hedges** | | | | |
| Foreign exchange | $ 581 | $ 645 | $ (142) | $ (222) |
| Interest rate | — | 1 | (1,228) | — |
| Other | 28 | 4 | (3) | (1) |
| **Derivatives not designated as hedges** | | | | |
| Foreign exchange | 166 | 181 | (204) | (221) |
| Other | 2 | — | — | — |
| Gross fair value of derivatives | 777 | 831 | (1,577) | (444) |
| Counterparty netting | (496) | (520) | 681 | 335 |
| Cash collateral (received) paid | (165) | (54) | 896 | 74 |
| Net derivative positions | $ 116 | $ 257 | $ — | $ (35) |

| | As of October 2, 2021 | | | |
| --- | --- | --- | --- | --- |
| | Current Assets | Other Assets | Other Current Liabilities | Other Long-Term Liabilities |
| **Derivatives designated as hedges** | | | | |
| Foreign exchange | $ 165 | $ 240 | $ (122) | $ (83) |
| Interest rate | — | 186 | (287) | — |
| Other | 10 | — | — | — |
| **Derivatives not designated as hedges** | | | | |
| Foreign exchange | 183 | 119 | (208) | (205) |
| Other | (8) | — | — | — |
| Gross fair value of derivatives | 350 | 545 | (617) | (288) |
| Counterparty netting | (301) | (360) | 460 | 201 |
| Cash collateral (received) paid | (3) | (51) | 157 | 73 |
| Net derivative positions | $ 46 | $ 134 | $ — | $ (14) |

*Interest Rate Risk Management*

The Company is exposed to the impact of interest rate changes primarily through its borrowing activities. The Company's objective is to mitigate the impact of interest rate changes on earnings and cash flows and on the market value of its borrowings. In accordance with its policy, the Company targets its fixed-rate debt as a percentage of its net debt between a

25

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

minimum and maximum percentage. The Company primarily uses pay-floating and pay-fixed interest rate swaps to facilitate its interest rate risk management activities.

The Company designates pay-floating interest rate swaps as fair value hedges of fixed-rate borrowings effectively converting fixed-rate borrowings to variable-rate borrowings indexed to LIBOR. The total notional amount of the Company's pay-floating interest rate swaps at both July 2, 2022 and October 2, 2021, was $15.1 billion.

The following table summarizes fair value hedge adjustments to hedged borrowings:

| | Carrying Amount of Hedged Borrowings | | | | Fair Value Adjustments Included in Hedged Borrowings | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | July 2, 2022 | | October 2, 2021 | | July 2, 2022 | | October 2, 2021 | |
| Borrowings: | | | | | | | | |
| Current | $ | 1,496 | $ | 505 | $ | (4) | $ | 5 |
| Long-term | | 12,993 | | 15,136 | | (1,224) | | (103) |
| | $ | 14,489 | $ | 15,641 | $ | (1,228) | $ | (98) |

The following amounts are included in "Interest expense, net" in the Condensed Consolidated Statements of Income:

| | Quarter Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | July 2, 2022 | | July 3, 2021 | | July 2, 2022 | | July 3, 2021 | |
| Gain (loss) on: | | | | | | | | |
| Pay-floating swaps | $ | (210) | $ | 165 | $ | (1,129) | $ | (559) |
| Borrowings hedged with pay-floating swaps | | 210 | | (165) | | 1,129 | | 559 |
| Benefit (expense) associated with interest accruals on pay-floating swaps | | 6 | | 36 | | 76 | | 107 |

The Company may designate pay-fixed interest rate swaps as cash flow hedges of interest payments on floating-rate borrowings. Pay-fixed interest rate swaps effectively convert floating-rate borrowings to fixed-rate borrowings. The unrealized gains or losses from these cash flow hedges are deferred in AOCI and recognized in interest expense as the interest payments occur. The Company did not have pay-fixed interest rate swaps that were designated as cash flow hedges of interest payments at July 2, 2022 or at October 2, 2021, and gains and losses related to pay-fixed interest rate swaps recognized in earnings for the quarter ended July 2, 2022 and July 3, 2021 were not material.

*Foreign Exchange Risk Management*

The Company transacts business globally and is subject to risks associated with changing foreign currency exchange rates. The Company's objective is to reduce earnings and cash flow fluctuations associated with foreign currency exchange rate changes, enabling management to focus on core business issues and challenges.

The Company enters into option and forward contracts that change in value as foreign currency exchange rates change to protect the value of its existing foreign currency assets, liabilities, firm commitments and forecasted but not firmly committed foreign currency transactions. In accordance with policy, the Company hedges its forecasted foreign currency transactions for periods generally not to exceed four years within an established minimum and maximum range of annual exposure. The gains and losses on these contracts offset changes in the U.S. dollar equivalent value of the related forecasted transaction, asset, liability or firm commitment. The principal currencies hedged are the euro, Japanese yen, British pound, Chinese yuan and Canadian dollar. Cross-currency swaps are used to effectively convert foreign currency denominated borrowings into U.S. dollar denominated borrowings.

26

# THE WALT DISNEY COMPANY
## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited; tabular dollars in millions, except for per share data)

The Company designates foreign exchange forward and option contracts as cash flow hedges of firmly committed and forecasted foreign currency transactions. As of July 2, 2022 and October 2, 2021, the notional amounts of the Company's net foreign exchange cash flow hedges were $8.2 billion and $6.9 billion, respectively. Mark-to-market gains and losses on these contracts are deferred in AOCI and are recognized in earnings when the hedged transactions occur, offsetting changes in the value of the foreign currency transactions. Net deferred gains recorded in AOCI for contracts that will mature in the next twelve months total $444 million. The following table summarizes the effect of foreign exchange cash flow hedges on AOCI:

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Gain (loss) recognized in Other Comprehensive Income | $ 583 | $ (6) | $ 704 | $ (65) |
| Gain (loss) reclassified from AOCI into the Statements of Operations[1] | 16 | (8) | 42 | 32 |

[1] Primarily recorded in revenue.

The Company designates cross currency swaps as fair value hedges of foreign currency denominated borrowings. The impact from the change in foreign currency on both the cross currency swap and borrowing is recorded to "Interest expense, net." The impact from interest rate changes is recorded in AOCI and is amortized over the life of the cross currency swap. As of both July 2, 2022 and October 2, 2021, the total notional amounts of the Company's designated cross currency swaps were Canadian $1.3 billion ($1.0 billion).

The following amounts are included in "Interest expense, net" in the Condensed Consolidated Statements of Income:

| | Quarter Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Gain (loss) on: | | | | |
| Cross currency swaps | $ (30) | $ 19 | $ (18) | $ 75 |
| Borrowings hedged with cross currency swaps | 30 | (19) | 18 | (75) |

Foreign exchange risk management contracts with respect to foreign currency denominated assets and liabilities are not designated as hedges and do not qualify for hedge accounting. The notional amounts of these foreign exchange contracts at July 2, 2022 and October 2, 2021 were $4.5 billion and $3.5 billion, respectively. The following table summarizes the net foreign exchange gains or losses recognized on foreign currency denominated assets and liabilities and the net foreign exchange gains or losses on the foreign exchange contracts we entered into to mitigate our exposure with respect to foreign currency denominated assets and liabilities by the corresponding line item in which they are recorded in the Condensed Consolidated Statements of Income:

| | Costs and Expenses | | Interest expense, net | | Income Tax Expense | |
|---|---|---|---|---|---|---|
| Quarter Ended: | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 | July 2, 2022 | July 3, 2021 |
| Net gains (losses) on foreign currency denominated assets and liabilities | $ (275) | $ 16 | $ 29 | $ (19) | $ 96 | $ 5 |
| Net gains (losses) on foreign exchange risk management contracts not designated as hedges | 257 | (42) | (28) | 20 | (89) | — |
| Net gains (losses) | $ (18) | $ (26) | $ 1 | $ 1 | $ 7 | $ 5 |
| | | | | | | |
| Nine Months Ended: | | | | | | |
| Net gains (losses) on foreign currency denominated assets and liabilities | $ (420) | $ 77 | $ 17 | $ (74) | $ 141 | $ (29) |
| Net gains (losses) on foreign exchange risk management contracts not designated as hedges | 327 | (138) | (18) | 75 | (132) | 30 |
| Net gains (losses) | $ (93) | $ (61) | $ (1) | $ 1 | $ 9 | $ 1 |

27

THE WALT DISNEY COMPANY
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

*Commodity Price Risk Management*

The Company is subject to the volatility of commodities prices and the Company designates certain commodity forward contracts as cash flow hedges of forecasted commodity purchases. Mark-to-market gains and losses on these contracts are deferred in AOCI and are recognized in earnings when the hedged transactions occur, offsetting changes in the value of commodity purchases. The notional amount of these commodities contracts at July 2, 2022 and October 2, 2021 and related gains or losses recognized in earnings for the quarter and nine months ended July 2, 2022 and July 3, 2021 were not material.

*Risk Management – Other Derivatives Not Designated as Hedges*

The Company enters into certain other risk management contracts that are not designated as hedges and do not qualify for hedge accounting. These contracts, which include certain total return swap contracts, are intended to offset economic exposures of the Company and are carried at market value with any changes in value recorded in earnings. The notional amounts of these contracts at July 2, 2022 and October 2, 2021 were $0.3 billion and $0.4 billion, respectively. The related gains or losses recognized in earnings were not material for the quarters ended July 2, 2022 and July 3, 2021.

*Contingent Features and Cash Collateral*

The Company has master netting arrangements by counterparty with respect to certain derivative financial instrument contracts. The Company may be required to post collateral in the event that a net liability position with a counterparty exceeds limits defined by contract and that vary with the Company's credit rating. In addition, these contracts may require a counterparty to post collateral to the Company in the event that a net receivable position with a counterparty exceeds limits defined by contract and that vary with the counterparty's credit rating. If the Company's or the counterparty's credit ratings were to fall below investment grade, such counterparties or the Company would also have the right to terminate our derivative contracts, which could lead to a net payment to or from the Company for the aggregate net value by counterparty of our derivative contracts. The aggregate fair values of derivative instruments with credit-risk-related contingent features in a net liability position by counterparty were $1,005 million and $244 million on July 2, 2022 and October 2, 2021, respectively.

## 16. *Restructuring and Impairment Charges*

For the quarter and nine months ended July 2, 2022, the Company recognized charges of $42 million and $0.2 billion, respectively, primarily due to asset impairments related to our businesses in Russia. For the quarter ended July 3, 2021, the Company recognized charges of $35 million, primarily for severance at our parks and experience businesses. For the nine months ended July 3, 2021, the Company recognized charges of $0.6 billion, primarily due to the planned closure of an animation studio and a substantial number of our Disney-branded retail stores as well as severance costs at our parks and experiences and other businesses. These charges are recorded in "Restructuring and impairment charges" in the Condensed Consolidated Statements of Income.

## 17. *New Accounting Pronouncements*

**Accounting Pronouncements Adopted in Fiscal 2022**

*Simplifying the Accounting for Income Taxes*

In December 2019, the Financial Accounting Standards Board (FASB) issued guidance which simplifies the accounting for income taxes. The guidance amends the rules for recognizing deferred taxes for investments, performing intraperiod tax allocations and calculating income taxes in interim periods. It also reduces complexity in certain areas, including the accounting for transactions that result in a step-up in the tax basis of goodwill and allocating taxes to members of a consolidated group. The Company adopted the new guidance in the first quarter of fiscal 2022. The adoption did not have a material impact on our financial statements.

*Facilitation of the Effects of Reference Rate Reform*

In March 2020, the FASB issued guidance which provides optional expedients and exceptions for applying current GAAP to contracts, hedging relationships, and other transactions affected by the transition from the use of LIBOR to an alternative reference rate. The guidance is applicable to contracts entered into before January 1, 2023. The Company adopted the new guidance in the first quarter of fiscal 2022. The adoption did not have a material impact on our financial statements.

**Accounting Pronouncements Not Yet Adopted**

*Disclosures by Business Entities about Government Assistance*

In November 2021, the FASB issued guidance requiring annual disclosures about transactions with a government that are accounted for by analogizing to a grant or contribution accounting model. The new guidance requires the disclosure of the nature of the transactions, the accounting for the transactions, and the effect of the transactions on the financial statements. The

28

**Ex. 12**
**Page 1284**

**THE WALT DISNEY COMPANY**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
(unaudited; tabular dollars in millions, except for per share data)

guidance is effective for annual periods beginning with the Company's 2023 fiscal year (with early adoption permitted). While the guidance will not have an effect on the Company's Consolidated Statements of Operations or Consolidated Balance Sheets upon adoption, the Company is currently assessing the impacts this guidance will have on its financial statement disclosures.

29

**Ex. 12**
**Page 1285**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Item 2: Management's Discussion and Analysis of Financial Condition and Results of Operations**

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements generally relate to future events or our future financial or operating performance and may include statements concerning, among other things, financial results, the impact of COVID-19 on our businesses and operations, results of operations and competition. In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "would," "should," "expects," "plans," "could," "intends," "target," "projects," "believes," "estimates," "anticipates," "potential" or "continue" or the negative of these words or other similar terms or expressions that concern our expectations, strategy, plans or intentions. These statements reflect our current views with respect to future events and are based on assumptions as of the date of this report. These statements are subject to known and unknown risks, uncertainties and other factors, including those described in our 2021 Annual Report on Form 10-K, including under the captions "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business," in our quarterly reports on Form 10-Q, including under the captions "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," and in our subsequent filings with the Securities and Exchange Commission, that may cause our actual results, performance or achievements to be materially different from expectations or results projected or implied by forward-looking statements.

A forward-looking statement is neither a prediction nor a guarantee of future events or circumstances. You should not place undue reliance on the forward-looking statements. Unless required by federal securities laws, we assume no obligation to update any of these forward-looking statements, or to update the reasons actual results could differ materially from those anticipated, to reflect circumstances or events that occur after the statements are made.

**ORGANIZATION OF INFORMATION**

Management's Discussion and Analysis provides a narrative of the Company's financial performance and condition that should be read in conjunction with the accompanying financial statements. It includes the following sections:

- Consolidated Results
- Significant Developments
- Current Quarter Results Compared to Prior-Year Quarter
- Current Period Results Compared to Prior-Year Period
- Seasonality
- Business Segment Results
- Corporate and Unallocated Shared Expenses
- Financial Condition
- Supplemental Guarantor Financial Information
- Commitments and Contingencies
- Other Matters
- Market Risk

30

**Ex. 12**
**Page 1286**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

## CONSOLIDATED RESULTS

| (in millions, except per share data) | Quarter Ended | | % Change Better (Worse) | Nine Months Ended | | % Change Better (Worse) |
|---|---|---|---|---|---|---|
| | July 2, 2022 | July 3, 2021 | | July 2, 2022 | July 3, 2021 | |
| Revenues: | | | | | | |
| Services | $ 19,461 | $ 15,585 | 25 % | $ 56,215 | $ 44,978 | 25 % |
| Products | 2,043 | 1,437 | 42 % | 6,357 | 3,906 | 63 % |
| Total revenues | 21,504 | 17,022 | 26 % | 62,572 | 48,884 | 28 % |
| Costs and expenses: | | | | | | |
| Cost of services (exclusive of depreciation and amortization) | (12,404) | (10,251) | (21) % | (36,895) | (29,921) | (23) % |
| Cost of products (exclusive of depreciation and amortization) | (1,278) | (982) | (30) % | (3,948) | (2,869) | (38) % |
| Selling, general, administrative and other | (4,100) | (3,168) | (29) % | (11,655) | (9,198) | (27) % |
| Depreciation and amortization | (1,290) | (1,266) | (2) % | (3,846) | (3,836) | — % |
| Total costs and expenses | (19,072) | (15,667) | (22) % | (56,344) | (45,824) | (23) % |
| Restructuring and impairment charges | (42) | (35) | (20) % | (237) | (562) | 58 % |
| Other income (expense), net | (136) | (91) | (49) % | (730) | 214 | nm |
| Interest expense, net | (360) | (445) | 19 % | (1,026) | (1,089) | 6 % |
| Equity in the income of investees | 225 | 211 | 7 % | 674 | 648 | 4 % |
| Income from continuing operations before income taxes | 2,119 | 995 | >100 % | 4,909 | 2,271 | >100 % |
| Income taxes on continuing operations | (617) | 133 | nm | (1,610) | 9 | nm |
| Net income from continuing operations | 1,502 | 1,128 | 33 % | 3,299 | 2,280 | 45 % |
| Loss from discontinued operations, net of income tax benefit of $0, $2, $14 and $9, respectively | — | (5) | 100 % | (48) | (28) | (71) % |
| Net income | 1,502 | 1,123 | 34 % | 3,251 | 2,252 | 44 % |
| Net income from continuing operations attributable to noncontrolling interests | (93) | (205) | 55 % | (268) | (416) | 36 % |
| Net income attributable to Disney | $ 1,409 | $ 918 | 53 % | $ 2,983 | $ 1,836 | 62 % |
| Diluted earnings per share from continuing operations attributable to Disney | $ 0.77 | $ 0.50 | 54 % | $ 1.66 | $ 1.02 | 63 % |

## SIGNIFICANT DEVELOPMENTS

*COVID-19 Pandemic*

Since early 2020, the world has been, and continues to be, impacted by COVID-19 and its variants. COVID-19 and measures to prevent its spread have impacted our segments in a number of ways, most significantly at the DPEP segment where our theme parks and resorts were closed and cruise ship sailings and guided tours were suspended. These operations resumed at various points since May 2020, initially at reduced operating capacities as a result of COVID-19 restrictions. In fiscal 2020 and 2021, we delayed, or in some cases, shortened or canceled, theatrical releases. In addition, we experienced significant disruptions in the production and availability of content, including the delay of key live sports programming during fiscal 2020 and fiscal 2021.

The most significant impact on operating income since the onset of COVID-19 has been at the DPEP segment due to revenue lost. In fiscal 2022, our domestic parks and resorts are generally operating without significant COVID-19-related capacity restrictions, such as those that were generally in place during the prior year. In addition, our cruise ships have generally been operating without COVID-19-related capacity restrictions since April 2022. Certain of our international parks and resorts continue to be impacted by COVID-19-related closures and capacity and travel restrictions. At the DMED segment, our film and television productions have generally resumed, although we have seen disruptions of production activities depending on local circumstances. Thus far, we have generally been able to release our films theatrically in fiscal 2022, although certain markets continue to impose restrictions on theater openings and capacity.

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

We have incurred, and will continue to incur, costs to address government regulations and the safety of our employees, guests and talent, of which certain costs are capitalized and will be amortized over future periods.

The impact of the disruptions on our businesses and costs to address government regulations and the safety of our employees, guests and talent (and the extent of their adverse impact on our financial and operational results) will depend on the length of time that such disruptions continue. This will, in turn, depend on the duration and severity of the impacts of COVID-19 and its variants, and among other things, the impact and duration of governmental actions imposed in response to COVID-19 and individuals' and companies' risk tolerance regarding health matters going forward.

### CURRENT QUARTER RESULTS COMPARED TO PRIOR-YEAR QUARTER

Revenues for the quarter increased 26%, or $4.5 billion, to $21.5 billion; net income attributable to Disney increased to $1.4 billion from $0.9 billion; and diluted earnings per share from continuing operations attributable to Disney (EPS) increased to $0.77 from $0.50 in the prior-year quarter. The EPS increase for the quarter was due to higher segment operating income, partially offset by the comparison to an income tax benefit in the prior-year quarter. Higher segment operating results were due to growth at DPEP, partially offset by lower operating results at DMED.

**Revenues**

Service revenues for the quarter increased 25%, or $3.9 billion, to $19.5 billion due to increased revenues at our theme parks and resorts and in DTC subscription, theatrical distribution and advertising revenue. The increase at theme parks and resorts was due to higher volumes, which generally reflected the impact of operating with capacity restrictions in the prior-year quarter as a result of COVID-19, and higher average per capita ticket revenue. The increase in DTC subscription revenue was due to subscriber growth and higher average rates.

Product revenues for the quarter increased 42%, or $0.6 billion, to $2.0 billion due to higher sales volumes of merchandise, food and beverage at our theme parks and resorts.

**Costs and expenses**

Cost of services for the quarter increased 21%, or $2.2 billion, to $12.4 billion due to increased volumes at our theme parks and resorts, higher programming and production costs and, to a lesser extent, higher technical support costs at Direct-to-Consumer. The increase in programming and production costs was due to higher costs at Direct-to-Consumer primarily due to more content provided on the Disney+ service and higher subscriber-based fees at Hulu and, to a lesser extent, an increase due to higher theatrical distribution revenue.

Cost of products for the quarter increased 30%, or $0.3 billion, to $1.3 billion due to higher merchandise, food and beverage sales at our theme parks and resorts.

Selling, general, administrative and other costs increased 29%, or $0.9 billion, to $4.1 billion driven by higher marketing costs at our direct-to-consumer, theatrical distribution and, to a lesser extent, parks and experiences businesses, partially offset by lower marketing costs at our linear channels.

**Restructuring and impairment charges**

In the current quarter, the Company recorded charges of $42 million primarily due to asset impairments related to our businesses in Russia.

In the prior-year quarter, the Company recorded charges of $35 million due to asset impairments and severance costs related to the planned closure of an animation studio and a substantial number of our Disney-branded retail stores as well as severance costs at our parks and experience businesses.

**Other income (expense), net**

In the current quarter, the Company recorded the DraftKings loss of $136 million. In the prior-year quarter, the Company recorded the DraftKings loss of $217 million and the German FTA gain of $126 million.

32

**Ex. 12**
**Page 1288**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

**Interest expense, net**

Interest expense, net is as follows:

| | | Quarter Ended | | |
|---|---|---|---|---|
| (in millions) | July 2, 2022 | July 3, 2021 | | % Change Better (Worse) |
| Interest expense | $    (380) | $    (404) | | 6 % |
| Interest income, investment income and other | 20 | (41) | | nm |
| Interest expense, net | $    (360) | $    (445) | | 19 % |

The decrease in interest expense was due to lower average debt balances and higher capitalized interest, partially offset by higher average rates.

The increase in interest income, investment income and other was due to a favorable comparison of pension and postretirement benefit costs, other than service cost, which was a benefit in the current quarter and an expense in the prior-year quarter, and lower investment losses in the current quarter.

**Effective Income Tax Rate**

| | | Quarter Ended | |
|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 |
| Income from continuing operations before income taxes | $    2,119 | $ | 995 |
| Income tax on continuing operations | 617 | | (133) |
| Effective income tax rate - continuing operations | 29.1% | | (13.4)% |

The effective income tax rate in the current quarter was higher than the U.S. statutory rate due to higher effective tax rates on foreign earnings, including the impact of foreign losses and foreign tax credits for which we are unable to recognize a tax benefit. The effective income tax rate was a benefit in the prior-year quarter due to favorable adjustments related to prior years.

**Noncontrolling Interests**

| | | Quarter Ended | | |
|---|---|---|---|---|
| (in millions) | July 2, 2022 | July 3, 2021 | | % Change Better (Worse) |
| Net income from continuing operations attributable to noncontrolling interests | $    (93) | $    (205) | | 55 % |

The decrease in net income from continuing operations attributable to noncontrolling interests was due to higher losses at Shanghai Disney Resort, partially offset by higher results at ESPN.

Net income attributable to noncontrolling interests is determined on income after royalties and management fees, financing costs and income taxes, as applicable.

**Certain Items Impacting Results in the Quarter**

Results for the quarter ended July 2, 2022 were impacted by the following:

- TFCF and Hulu acquisition amortization of $585 million
- Other expense of $136 million reflecting the DraftKings loss
- Impairment charges of $42 million

Results for the quarter ended July 3, 2021 were impacted by the following:

- TFCF and Hulu acquisition amortization of $604 million
- Other expense of $91 million reflecting the DraftKings loss of $217 million, partially offset by the German FTA gain of $126 million
- Restructuring and impairment charges of $35 million

33

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

A summary of the impact of these items on EPS is as follows:

| (in millions, except per share data) | Pre-Tax Income (Loss) | | Tax Benefit (Expense)[1] | | After-Tax Income (Loss) | | EPS Favorable (Adverse)[2] | |
|---|---|---|---|---|---|---|---|---|
| **Quarter Ended July 2, 2022:** | | | | | | | | |
| TFCF and Hulu acquisition amortization | $ | (585) | $ | 136 | $ | (449) | $ | (0.24) |
| Other expense | | (136) | | 32 | | (104) | | (0.06) |
| Restructuring and impairment charges | | (42) | | 10 | | (32) | | (0.02) |
| Total | $ | (763) | $ | 178 | $ | (585) | $ | (0.32) |
| | | | | | | | | |
| **Quarter Ended July 3, 2021:** | | | | | | | | |
| TFCF and Hulu acquisition amortization | $ | (604) | $ | 141 | $ | (463) | $ | (0.25) |
| Other expense, net | | (91) | | 22 | | (69) | | (0.04) |
| Restructuring and impairment charges | | (35) | | 8 | | (27) | | (0.01) |
| Total | $ | (730) | $ | 171 | $ | (559) | $ | (0.30) |

[1] Tax benefit (expense) amounts are determined using the tax rate applicable to the individual item.

[2] EPS is net of noncontrolling interest share, where applicable. Total may not equal the sum of the column due to rounding.

## CURRENT NINE-MONTH PERIOD RESULTS COMPARED TO PRIOR-YEAR NINE-MONTH PERIOD

Revenues for the current period increased $13.7 billion, to $62.6 billion; net income attributable to Disney increased $1.1 billion, to $3.0 billion; and EPS was $1.66 compared to $1.02 in the prior-year period. The EPS increase was due to higher segment operating results reflecting growth at DPEP, partially offset by lower operating results at DMED. The increase in segment operating results was partially offset by the recognition of an income tax benefit in the prior-year period, a reduction in revenue for the Content License Early Termination and a higher DraftKings loss in the current period compared to the prior-year period.

### Revenues

Service revenues for the current period increased 25%, or $11.2 billion, to $56.2 billion, due to increased revenues at our theme parks and resorts, higher DTC subscription revenue and, to a lesser extent, higher theatrical distribution and advertising revenue. These increases were partially offset by a reduction in revenue for the Content License Early Termination. The increase at theme parks and resorts was due to higher volumes, which generally reflected the impact of operating with capacity restrictions in the prior-year period as a result of COVID-19, and higher average per capita ticket revenue. The increase in DTC subscription revenue was due to subscriber growth and higher average rates.

Product revenues for the current period increased 63%, or $2.5 billion, to $6.4 billion, due to higher sales volumes of merchandise, food and beverage at our theme parks and resorts.

### Costs and expenses

Cost of services for the current period increased 23%, or $7.0 billion, to $36.9 billion, due to higher programming and production costs, increased volumes at our theme parks and resorts and higher technical support expenses at Direct-to-Consumer. The increase in programming and production costs was due to higher costs at Disney+ primarily due to more content provided on the service, increased sports programming costs, higher subscriber-based fees at Hulu and an increase in production cost amortization due to theatrical revenue growth. These increases were partially offset by lower programming and production costs as a result of international channel closures.

Cost of products for the current period increased 38%, or $1.1 billion, to $3.9 billion, due to higher merchandise, food and beverage sales at our theme parks and resorts.

Selling, general, administrative and other costs for the current period increased 27%, or $2.5 billion, to $11.7 billion, due to higher marketing costs at our direct-to-consumer, theatrical distribution and, to a lesser extent, parks and experiences businesses.

### Restructuring and impairment charges

In March 2022, in response to events in Russia and Ukraine, the Company announced a pause of its operations in Russia, which include theatrical distribution and other licensing businesses and the distribution of the Disney Channel. These businesses generate approximately two percent of the Company's operating income. In the current period, the Company

**Ex. 12
Page 1290**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

recorded charges of $237 million primarily due to the impairment of an intangible and other assets related to our businesses in Russia. We may incur additional charges to exit these businesses, which are not anticipated to be material.

In the prior-year period, the Company recorded charges of $562 million due to asset impairments and severance costs primarily related to the planned closure of an animation studio and a substantial number of our Disney-branded retail stores as well as severance costs at our parks and experiences and other businesses.

**Other income (expense), net**

In the current period, the Company recorded the DraftKings loss of $726 million. In the prior-year period, the Company recorded the fuboTV gain of $186 million, the German FTA gain of $126 million and the DraftKings loss of $98 million.

**Interest expense, net**

Interest expense, net is as follows:

| (in millions) | Nine Months Ended | | % Change Better (Worse) |
|---|---|---|---|
| | July 2, 2022 | July 3, 2021 | |
| Interest expense | $ (1,115) | $ (1,223) | 9 % |
| Interest income, investment income and other | 89 | 134 | (34) % |
| Interest expense, net | $ (1,026) | $ (1,089) | 6 % |

The decrease in interest expense was due to lower average debt balances and higher capitalized interest, partially offset by higher average rates.

The decrease in interest income, investment income and other was due to investment losses in the current period compared to investment gains in the prior-year period. This decrease was partially offset by a favorable comparison of pension and postretirement benefits costs, other than service cost, which was a benefit in the current period and expense in the prior-year period.

**Effective Income Tax Rate**

| | Nine Months Ended | |
|---|---|---|
| | July 2, 2022 | July 3, 2021 |
| Income from continuing operations before income taxes | $ 4,909 | $ 2,271 |
| Income tax on continuing operations | 1,610 | (9) |
| Effective income tax rate - continuing operations | 32.8% | (0.4)% |

The effective income tax rate in the current period was higher than the U.S. statutory rate primarily due to higher effective tax rates on foreign earnings, including the impact of new tax regulations that limit our ability to utilize certain foreign tax credits. We recognized an income tax benefit in the prior-year period due to favorable adjustments related to prior years, partially offset by higher effective tax rates on foreign earnings. Higher effective tax rates on foreign earnings in both the current and prior-year periods reflected the impact of foreign losses and foreign tax credits for which we are unable to recognize a tax benefit.

**Noncontrolling Interests**

| (in millions) | Nine Months Ended | | % Change Better (Worse) |
|---|---|---|---|
| | July 2, 2022 | July 3, 2021 | |
| Net income from continuing operations attributable to noncontrolling interests | $ (268) | $ (416) | 36 % |

The decrease in net income from continuing operations attributable to noncontrolling interests for the current period was due to higher losses at Shanghai Disney Resort and our DTC sports business, partially offset by higher results at ESPN.

**Certain Items Impacting Results in the Year**

Results for the nine months ended July 2, 2022 were impacted by the following:

- TFCF and Hulu acquisition amortization of $1,774 million
- A $1.0 billion reduction in revenue for the Content License Early Termination
- Other expense of $730 million reflecting the DraftKings loss

35

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

- Impairment charges of $237 million

Results for the nine months ended July 3, 2021 were impacted by the following:

- TFCF and Hulu acquisition amortization of $1,826 million
- Restructuring and impairment charges of $562 million
- Other income of $214 million reflecting the fuboTV gain of $186 million, German FTA gain of $126 million and DraftKings loss of $98 million

A summary of the impact of these items on EPS is as follows:

| (in millions, except per share data) | Pre-Tax Income (Loss) | | Tax Benefit (Expense)[1] | | After-Tax Income (Loss) | | EPS Favorable (Adverse)[2] | |
|---|---|---|---|---|---|---|---|---|
| Nine Months Ended July 2, 2022: | | | | | | | | |
| TFCF and Hulu acquisition amortization | $ | (1,774) | $ | 413 | $ | (1,361) | $ | (0.73) |
| Contract License Early Termination | | (1,023) | | 238 | | (785) | | (0.43) |
| Other income (expense), net | | (730) | | 170 | | (560) | | (0.31) |
| Restructuring and impairment charges | | (237) | | 55 | | (182) | | (0.10) |
| Total | $ | (3,764) | $ | 876 | $ | (2,888) | $ | (1.57) |
| Nine Months Ended July 3, 2021: | | | | | | | | |
| TFCF and Hulu acquisition amortization | $ | (1,826) | $ | 425 | $ | (1,401) | $ | (0.74) |
| Restructuring and impairment charges | | (562) | | 132 | | (430) | | (0.24) |
| Other income (expense), net | | 214 | | (49) | | 165 | | 0.09 |
| Total | $ | (2,174) | $ | 508 | $ | (1,666) | $ | (0.89) |

[1] Tax benefit (expense) amounts are determined using the tax rate applicable to the individual item.

[2] EPS is net of noncontrolling interest share, where applicable. Total may not equal the sum of the column due to rounding.

## SEASONALITY

The Company's businesses are subject to the effects of seasonality. Consequently, the operating results for the nine months ended July 2, 2022 for each business segment, and for the Company as a whole, are not necessarily indicative of results to be expected for the full year.

DMED revenues are subject to seasonal advertising patterns, changes in viewership and subscriber levels, timing and performance of film releases in the theatrical and home entertainment markets, timing of and demand for film and television programs, and the availability of and demand for sports programming. In general, domestic advertising revenues are typically somewhat higher during the fall and somewhat lower during the summer months. In addition, advertising revenues generated from sports programming are impacted by the timing of sports seasons and events, which varies throughout the year or may take place periodically (e.g. biannually, quadrennially). Affiliate revenues vary with the subscriber trends of multi-channel video programming distributors (i.e. cable, satellite telecommunications and digital over-the-top service providers). Theatrical release dates are determined by several factors, including competition and the timing of vacation and holiday periods.

DPEP revenues fluctuate with changes in theme park attendance and resort occupancy resulting from the seasonal nature of vacation travel and leisure activities, which generally results in higher revenues during the Company's first and fourth fiscal quarters. Peak attendance and resort occupancy generally occur during the summer months when school vacations occur and during early winter and spring holiday periods. Consumer products revenue fluctuates with consumer purchasing behavior, which generally results in higher revenues during the Company's first fiscal quarter due to the winter holiday season and in the fourth quarter due to back-to-school. In addition, licensing revenues fluctuate with the timing and performance of our film and television content.

## BUSINESS SEGMENT RESULTS

Below is a discussion of the major revenue and expense categories for our business segments. Costs and expenses for each segment consist of operating expenses, selling, general, administrative and other costs, and depreciation and amortization. Selling, general, administrative and other costs include third-party and internal marketing expenses.

Our DMED segment primarily generates revenue across three significant lines of business/distribution platforms: Linear Networks, Direct-to-Consumer and Content Sales/Licensing. Programming and production costs are generally allocated across

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

these businesses based on the estimated relative value of the distribution windows. Programming and production costs to support these businesses/distribution platforms are largely incurred across three content creation groups: Studios, General Entertainment and Sports. Programming and production costs include amortization of acquired licensed programming rights (including sports rights), amortization of capitalized production costs (including participations and residuals) and production costs related to live programming such as news and sports. Costs for initial marketing campaigns are generally recognized in the distribution platform of initial exploitation.

The Linear Networks business generates revenue from affiliate fees and advertising sales and from fees from sub-licensing of sports programming to third parties. Operating expenses include programming and production costs, technical support costs, operating labor and distribution costs.

The Direct-to-Consumer business generates revenue from subscription fees, advertising sales and pay-per-view and Premier Access fees. Operating expenses include programming and production costs, technology support costs, operating labor and distribution costs. Operating expenses also includes fees paid to Linear Networks for the right to air the linear network feeds and other services.

The Content Sales/Licensing business generates revenue from the sale of film and episodic television content in the TV/SVOD and home entertainment markets, distribution of films in the theatrical market, licensing of our music rights, sales of tickets to stage play performances and licensing of our IP for use in stage plays. Operating expenses include programming and production costs, distribution expenses and costs of sales.

Our DPEP segment primarily generates revenue from the sale of admissions to theme parks, the sale of food, beverage and merchandise at our theme parks and resorts, charges for room nights at hotels, sales of cruise vacations, sales and rentals of vacation club properties, royalties from licensing our IP for use on consumer goods and the sale of branded merchandise. Revenues are also generated from sponsorships and co-branding opportunities, real estate rent and sales, and royalties from Tokyo Disney Resort. Significant expenses include operating labor, costs of goods sold, infrastructure costs, depreciation and other operating expenses. Infrastructure costs include information systems expense, repairs and maintenance, utilities and fuel, property taxes, retail occupancy costs, insurance and transportation. Other operating expenses include costs for such items as supplies, commissions and entertainment offerings.

The Company evaluates the performance of its operating segments based on segment operating income, and management uses total segment operating income as a measure of the overall performance of the operating businesses separate from non-operating factors. Total segment operating income is not a financial measure defined by GAAP, should be reviewed in conjunction with the relevant GAAP financial measure and may not be comparable to similarly titled measures reported by other companies. The Company believes that information about total segment operating income assists investors by allowing them to evaluate changes in the operating results of the Company's portfolio of businesses separate from factors other than business operations that affect net income, thus providing separate insight into both operations and other factors that affect reported results.

The following table reconciles total revenues to segment revenues:

| (in millions) | Quarter Ended | | % Change Better (Worse) | Nine Months Ended | | % Change Better (Worse) |
|---|---|---|---|---|---|---|
| | July 2, 2022 | July 3, 2021 | | July 2, 2022 | July 3, 2021 | |
| Total revenues | $ 21,504 | $ 17,022 | 26 % | $ 62,572 | $ 48,884 | 28 % |
| Content License Early Termination | — | — | nm | 1,023 | — | nm |
| Segment revenues | $ 21,504 | $ 17,022 | 26 % | $ 63,595 | $ 48,884 | 30 % |

37

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The following table reconciles income from continuing operations before income taxes to total segment operating income:

| (in millions) | Quarter Ended July 2, 2022 | | Quarter Ended July 3, 2021 | | % Change Better (Worse) | Nine Months Ended July 2, 2022 | | Nine Months Ended July 3, 2021 | | % Change Better (Worse) |
|---|---|---|---|---|---|---|---|---|---|---|
| Income from continuing operations before income taxes | $ | 2,119 | $ | 995 | >100 % | $ | 4,909 | $ | 2,271 | >100 % |
| Add (subtract): | | | | | | | | | | |
| Content License Early Termination | | — | | — | nm | | 1,023 | | — | nm |
| Corporate and unallocated shared expenses | | 325 | | 212 | (53) % | | 825 | | 645 | (28) % |
| Restructuring and impairment charges | | 42 | | 35 | (20) % | | 237 | | 562 | 58 % |
| Other (income) expense, net | | 136 | | 91 | (49) % | | 730 | | (214) | nm |
| Interest expense, net | | 360 | | 445 | 19 % | | 1,026 | | 1,089 | 6 % |
| TFCF and Hulu acquisition amortization | | 585 | | 604 | 3 % | | 1,774 | | 1,826 | 3 % |
| Total segment operating income | $ | 3,567 | $ | 2,382 | 50 % | $ | 10,524 | $ | 6,179 | 70 % |

The following is a summary of segment revenue and operating income (loss):

| (in millions) | Quarter Ended July 2, 2022 | | Quarter Ended July 3, 2021 | | % Change Better (Worse) | Nine Months Ended July 2, 2022 | | Nine Months Ended July 3, 2021 | | % Change Better (Worse) |
|---|---|---|---|---|---|---|---|---|---|---|
| *Segment Revenues:* | | | | | | | | | | |
| Disney Media and Entertainment Distribution | $ | 14,110 | $ | 12,681 | 11 % | $ | 42,315 | $ | 37,782 | 12 % |
| Disney Parks, Experiences and Products | | 7,394 | | 4,341 | 70 % | | 21,280 | | 11,102 | 92 % |
| | $ | 21,504 | $ | 17,022 | 26 % | $ | 63,595 | $ | 48,884 | 30 % |
| *Segment operating income (loss):* | | | | | | | | | | |
| Disney Media and Entertainment Distribution | $ | 1,381 | $ | 2,026 | (32) % | $ | 4,133 | $ | 6,348 | (35) % |
| Disney Parks, Experiences and Products | | 2,186 | | 356 | >100 % | | 6,391 | | (169) | nm |
| | $ | 3,567 | $ | 2,382 | 50 % | $ | 10,524 | $ | 6,179 | 70 % |

Depreciation expense is as follows:

| (in millions) | Quarter Ended July 2, 2022 | | Quarter Ended July 3, 2021 | | % Change Better (Worse) | Nine Months Ended July 2, 2022 | | Nine Months Ended July 3, 2021 | | % Change Better (Worse) |
|---|---|---|---|---|---|---|---|---|---|---|
| Disney Media and Entertainment Distribution | $ | 163 | $ | 153 | (7) % | $ | 485 | $ | 453 | (7) % |
| Disney Parks, Experiences and Products | | | | | | | | | | |
| Domestic | | 434 | | 383 | (13) % | | 1,236 | | 1,162 | (6) % |
| International | | 161 | | 178 | 10 % | | 496 | | 538 | 8 % |
| Total Disney Parks, Experiences and Products | | 595 | | 561 | (6) % | | 1,732 | | 1,700 | (2) % |
| Corporate | | 47 | | 47 | — % | | 141 | | 139 | (1) % |
| Total depreciation expense | $ | 805 | $ | 761 | (6) % | $ | 2,358 | $ | 2,292 | (3) % |

**Ex. 12
Page 1294**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

Amortization of intangible assets is as follows:

| (in millions) | Quarter Ended | | % Change Better (Worse) | Nine Months Ended | | % Change Better (Worse) |
| | July 2, 2022 | July 3, 2021 | | July 2, 2022 | July 3, 2021 | |
|---|---|---|---|---|---|---|
| Disney Media and Entertainment Distribution | $ 36 | $ 44 | 18 % | $ 115 | $ 135 | 15 % |
| Disney Parks, Experiences and Products | 27 | 27 | — % | 81 | 81 | — % |
| TFCF and Hulu | 422 | 434 | 3 % | 1,292 | 1,328 | 3 % |
| Total amortization of intangible assets | $ 485 | $ 505 | 4 % | $ 1,488 | $ 1,544 | 4 % |

**BUSINESS SEGMENT RESULTS - Current Quarter Results Compared to Prior-Year Quarter**

**Disney Media and Entertainment Distribution**

Revenue and operating results for the DMED segment are as follows:

| (in millions) | Quarter Ended | | % Change Better (Worse) |
| | July 2, 2022 | July 3, 2021 | |
|---|---|---|---|
| *Revenues:* | | | |
| Linear Networks | $ 7,189 | $ 6,956 | 3 % |
| Direct-to-Consumer | 5,058 | 4,256 | 19 % |
| Content Sales/Licensing and Other | 2,111 | 1,681 | 26 % |
| Elimination of Intrasegment Revenue[1] | (248) | (212) | (17) % |
| | $ 14,110 | $ 12,681 | 11 % |
| *Segment operating income (loss):* | | | |
| Linear Networks | $ 2,469 | $ 2,187 | 13 % |
| Direct-to-Consumer | (1,061) | (293) | >(100) % |
| Content Sales/Licensing and Other | (27) | 132 | nm |
| | $ 1,381 | $ 2,026 | (32) % |

[1] Reflects fees received by the Linear Networks from other DMED businesses for the right to air our Linear Networks and related services.

**Linear Networks**

Operating results for Linear Networks are as follows:

| (in millions) | Quarter Ended | | % Change Better (Worse) |
| | July 2, 2022 | July 3, 2021 | |
|---|---|---|---|
| Revenues | | | |
| Affiliate fees | $ 4,585 | $ 4,643 | (1) % |
| Advertising | 2,470 | 2,200 | 12 % |
| Other | 134 | 113 | 19 % |
| Total revenues | 7,189 | 6,956 | 3 % |
| Operating expenses | (4,091) | (4,091) | — % |
| Selling, general, administrative and other | (823) | (851) | 3 % |
| Depreciation and amortization | (34) | (42) | 19 % |
| Equity in the income of investees | 228 | 215 | 6 % |
| Operating Income | $ 2,469 | $ 2,187 | 13 % |

39

**Ex. 12
Page 1295**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Revenues*

Affiliate revenue is as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| Domestic Channels | $ | 3,884 | $ | 3,791 | 2 % |
| International Channels | | 701 | | 852 | (18) % |
| | $ | 4,585 | $ | 4,643 | (1) % |

The increase in affiliate revenue at the Domestic Channels reflected an increase of 6% from higher contractual rates, partially offset by a decrease of 3% from fewer subscribers.

The decrease in affiliate revenue at the International Channels reflected decreases of 12% from fewer subscribers due to channel closures in Asia, Latin America and Europe and 5% from an unfavorable foreign exchange impact.

Advertising revenue is as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| Cable | $ | 1,027 | $ | 831 | 24 % |
| Broadcasting | | 755 | | 877 | (14) % |
| Domestic Channels | | 1,782 | | 1,708 | 4 % |
| International Channels | | 688 | | 492 | 40 % |
| | $ | 2,470 | $ | 2,200 | 12 % |

The increase in Cable advertising revenue was due to increases of 22% from rates and 5% from impressions, which reflected higher average viewership.

The decrease in Broadcasting advertising revenue was due to decreases of 12% from a shift in the timing of The Academy Awards at ABC and 12% from fewer impressions at ABC, reflecting lower average viewership and, to a lesser extent, fewer units delivered. Fewer units delivered reflected the impact of more hours programmed by ESPN due to the timing of the NBA Finals. The timing of the Academy Awards and the NBA Finals were both impacted by COVID-19 in the prior year. The Academy Awards aired in the second quarter in the current fiscal year compared to the third quarter in the prior fiscal year while the 2021 NBA Finals were aired in the third quarter of the current year compared to fourth quarter of the prior year. These decreases were partially offset by increases of 7% from higher rates at ABC and 1% from the owned television stations. The increase at the owned television stations was due to the benefit of higher rates resulting from an increase in political advertising, partially offset by the impact of the timing of The Academy Awards.

The increase in International Channels advertising revenue was due to increases of 43% from higher impressions reflecting an increase in average viewership and 7% from higher rates, partially offset by a decrease of 8% from an unfavorable foreign exchange impact. The increase in average viewership was due to airing 64 Indian Premier League (IPL) cricket matches in the current quarter, compared to 29 matches in the prior-year quarter. IPL cricket matches typically occur in our second and third fiscal quarters. The increase in the number of matches in the current quarter was due to a shift in the timing of matches from the third quarter to the fourth quarter in the prior fiscal year as a result of COVID-19 and the IPL adding matches to the current season.

Other revenue increased $21 million, to $134 million from $113 million, driven by higher sub-licensing fees from IPL cricket matches in the current quarter compared to the prior-year quarter.

40

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Costs and Expenses*

Operating expenses primarily consist of programming and production costs, which are as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- |
| | July 2, 2022 | | July 3, 2021 | | |
| Cable | $ | (2,066) | $ | (2,055) | (1) % |
| Broadcasting | | (614) | | (798) | 23 % |
| Domestic Channels | | (2,680) | | (2,853) | 6 % |
| International Channels | | (1,000) | | (845) | (18) % |
| | $ | (3,680) | $ | (3,698) | — % |

Programming and production costs at Cable were comparable to the prior-year quarter as higher rights costs for NBA programming and an increase in sports production costs were largely offset by lower MLB and soccer rights costs. Higher NBA programming costs reflected the timing of the NBA Finals, which are programmed by ESPN and aired on ABC, and contractual rate increases, partially offset by fewer regular season games in the current quarter as a result of a delayed start of the 2021 NBA season due to COVID-19. Lower costs for MLB programming were due to airing 13 games in the current quarter compared to 44 games in the prior-year quarter. The decrease in soccer programming costs reflected the comparison to the airing of UEFA Euro 2020 in the prior-year quarter. UEFA Euro typically occurs every four years. UEFA Euro 2020 was originally scheduled to occur in fiscal 2020, but was held in fiscal 2021 due to COVID-19.

The decrease in programming and production costs at Broadcasting was due to a lower cost mix of programming and, to a lesser extent, the timing of the NBA Finals, which are programmed by ESPN. The lower cost mix of programming reflected the timing of The Academy Awards and fewer hours of scripted and acquired reality programming, partially offset by the cost of new National Hockey League (NHL) programming. We acquired the rights to NHL programming starting with the 2021/2022 season.

Programming and production costs at the International Channels increased due to higher sports programming costs reflecting more IPL cricket matches in the current quarter, partially offset by the impact of channel closures and a favorable foreign exchange impact.

Selling, general administrative and other costs decreased $28 million, to $823 million from $851 million, driven by lower marketing costs, partially offset by higher compensation costs.

*Operating Income from Linear Networks*

Operating income from Linear Networks increased $282 million, to $2,469 million from $2,187 million, due to increases at Cable and Broadcasting, partially offset by a decrease at the International Channels.

The following table provides supplemental revenue and operating income detail for Linear Networks:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- |
| | July 2, 2022 | | July 3, 2021 | | |
| *Supplemental revenue detail* | | | | | |
| Domestic Channels | $ | 5,700 | $ | 5,561 | 2 % |
| International Channels | | 1,489 | | 1,395 | 7 % |
| | $ | 7,189 | $ | 6,956 | 3 % |
| *Supplemental operating income detail* | | | | | |
| Domestic Channels | $ | 2,075 | $ | 1,803 | 15 % |
| International Channels | | 166 | | 169 | (2) % |
| Equity in the income of investees | | 228 | | 215 | 6 % |
| | $ | 2,469 | $ | 2,187 | 13 % |

41

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

**Direct-to-Consumer**

Operating results for Direct-to-Consumer are as follows:

| (in millions) | Quarter Ended | | | | | % Change Better (Worse) |
|---|---|---|---|---|---|---|
| | **July 2, 2022** | | July 3, 2021 | | | |
| Revenues | | | | | | |
| Subscription fees | $ | **3,889** | $ | 3,156 | | 23 % |
| Advertising | | **1,018** | | 909 | | 12 % |
| TV/SVOD distribution and other | | **151** | | 191 | | (21) % |
| Total revenues | | **5,058** | | 4,256 | | 19 % |
| Operating expenses | | **(4,536)** | | (3,414) | | (33) % |
| Selling, general, administrative and other | | **(1,494)** | | (1,048) | | (43) % |
| Depreciation and amortization | | **(89)** | | (87) | | (2) % |
| Operating Loss | $ | **(1,061)** | $ | (293) | | >(100) % |

*Revenues*

The increase in subscription fees reflected increases of 21% from higher subscribers, due to growth at Disney+, Hulu and ESPN+, and 5% from higher rates due to increases in retail pricing at Hulu and Disney+, partially offset by a decrease of 2% from an unfavorable foreign exchange impact.

Higher advertising revenue reflected increases of 10% from higher impressions due to growth at Disney+ and, to a lesser extent, at ESPN+, and 3% from higher rates due to an increase at Hulu. The increase in impressions at Disney+ was due to airing 64 IPL matches in the current quarter compared to 29 matches in the prior-year quarter.

The decrease in TV/SVOD distribution and other revenue was due to lower Disney+ Premier Access revenues, partially offset by an increase in Ultimate Fighting Championship (UFC) pay-per-view fees. Lower Disney+ Premier Access revenues reflected no releases in the current quarter compared to *Cruella* in the prior-year quarter. The increase in UFC pay-per-view fees was due to airing four events in the current quarter compared to three events in the prior-year quarter and higher pricing, partially offset by lower average buys per event.

The following tables present additional information about our Disney+, ESPN+ and Hulu product offerings[1].

Paid subscribers[2] as of:

| (in millions) | July 2, 2022 | July 3, 2021 | % Change Better (Worse) |
|---|---|---|---|
| Disney+ | | | |
| Domestic (U.S. and Canada) | **44.5** | 37.9 | 17 % |
| International (excluding Disney+ Hotstar)[3] | **49.2** | 33.2 | 48 % |
| Disney+ (excluding Disney+ Hotstar)[4] | **93.6** | 71.1 | 32 % |
| Disney+ Hotstar | **58.4** | 44.9 | 30 % |
| Total Disney+[4] | **152.1** | 116.0 | 31 % |
| ESPN+ | **22.8** | 14.9 | 53 % |
| Hulu | | | |
| SVOD Only | **42.2** | 39.1 | 8 % |
| Live TV + SVOD | **4.0** | 3.7 | 8 % |
| Total Hulu[4] | **46.2** | 42.8 | 8 % |

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

Average Monthly Revenue Per Paid Subscriber[5] for the quarter ended:

| | July 2, 2022 | | July 3, 2021 | % Change Better (Worse) |
|---|---|---|---|---|
| Disney+ | | | | |
| Domestic (U.S. and Canada) | $ | 6.27 | $ 6.62 | (5) % |
| International (excluding Disney+ Hotstar)[3] | | 6.31 | 5.52 | 14 % |
| Disney+ (excluding Disney+ Hotstar) | | 6.29 | 6.12 | 3 % |
| Disney+ Hotstar | | 1.20 | 0.78 | 54 % |
| Global Disney+ | | 4.35 | 4.16 | 5 % |
| ESPN+ | | 4.55 | 4.47 | 2 % |
| Hulu | | | | |
| SVOD Only | | 12.92 | 13.15 | (2) % |
| Live TV + SVOD | | 87.92 | 84.09 | 5 % |

[1] In the U.S., Disney+, ESPN+ and Hulu SVOD Only are each offered as a standalone service or as a package that includes all three services (the SVOD Bundle). Effective December 21, 2021, Hulu Live TV + SVOD includes Disney+ and ESPN+ (the new Hulu Live TV + SVOD offering), whereas previously, Hulu Live TV + SVOD was offered as a standalone service or with Disney+ and ESPN+ as optional additions (the old Hulu Live TV + SVOD offering). Effective March 15, 2022, Hulu SVOD Only is also offered with Disney+ as an optional add-on. Disney+ is available in more than 150 countries and territories outside the U.S. and Canada. In India and certain other Southeast Asian countries, the service is branded Disney+ Hotstar. In certain Latin American countries, we offer Disney+ as well as Star+, a general entertainment SVOD service, which is available on a standalone basis or together with Disney+ (Combo+). Depending on the market, our services can be purchased on our websites, through third-party platforms/apps or via wholesale arrangements.

[2] Reflects subscribers for which we recognized subscription revenue. Subscribers cease to be a paid subscriber as of their effective cancellation date or as a result of a failed payment method. Subscribers to the SVOD Bundle are counted as a paid subscriber for each service included in the SVOD Bundle and subscribers to the Hulu Live TV + SVOD offerings are counted as one paid subscriber for each of the Hulu Live TV + SVOD, Disney+ and ESPN+ offerings. A Hulu SVOD Only subscriber that adds Disney+ is counted as one paid subscriber for each of the Hulu SVOD Only and Disney+ offerings. In Latin America, if a subscriber has either the standalone Disney+ or Star+ service or subscribes to Combo+, the subscriber is counted as one Disney+ paid subscriber. Subscribers include those who receive a service through wholesale arrangements including those for which we receive a fee for the distribution of the service to each subscriber of an existing content distribution tier. When we aggregate the total number of paid subscribers across our DTC streaming services, we refer to them as paid subscriptions.

[3] Includes the Disney+ service outside the U.S. and Canada and the Star+ service in Latin America.

[4] Total may not equal the sum of the column due to rounding.

[5] Average monthly revenue per paid subscriber is calculated based on the average of the monthly average paid subscribers for each month in the period. The monthly average paid subscribers is calculated as the sum of the beginning of the month and end of the month paid subscriber count, divided by two. Disney+ average monthly revenue per paid subscriber is calculated using a daily average of paid subscribers for the period. Revenue includes subscription fees, advertising (excluding revenue earned from selling advertising spots to other Company businesses) and premium and feature add-on revenue but excludes Premier Access and Pay-Per-View revenue. The average revenue per paid subscriber is net of discounts on offerings that carry more than one service. Revenue is allocated to each service based on the relative retail price of each service on a standalone basis. Revenue for the new Hulu Live TV + SVOD offering is allocated to the SVOD services based on the wholesale price of the SVOD Bundle. In general, wholesale arrangements have a lower average monthly revenue per paid subscriber than subscribers that we acquire directly or through third-party platforms.

The average monthly revenue per paid subscriber for domestic Disney+ decreased from $6.62 to $6.27 due to a higher mix of subscribers to multi-product offerings, partially offset by an increase in retail pricing.

**Ex. 12**
**Page 1299**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The average monthly revenue per paid subscriber for international Disney+ (excluding Disney+ Hotstar) increased from $5.52 to $6.31 due to increases in retail pricing, partially offset by an unfavorable foreign exchange impact and a higher mix of wholesale subscribers.

The average monthly revenue per paid subscriber for Disney+ Hotstar increased from $0.78 to $1.20 due to higher per-subscriber advertising revenue.

The average monthly revenue per paid subscriber for ESPN+ increased from $4.47 to $4.55 due to an increase in retail pricing and, to a lesser extent, a lower mix of annual subscribers and higher per-subscriber advertising revenue, partially offset by a higher mix of subscribers to multi-product offerings.

The average monthly revenue per paid subscriber for the Hulu SVOD Only service decreased from $13.15 to $12.92 due to lower per-subscriber advertising revenue and a higher mix of subscribers to multi-product and promotional offerings, partially offset by an increase in retail pricing.

The average monthly revenue per paid subscriber for the Hulu Live TV + SVOD service increased from $84.09 to $87.92 due to an increase in retail pricing and higher per-subscriber advertising revenue, partially offset by a higher mix of subscribers to multi-product offerings.

*Costs and Expenses*

Operating expenses are as follows:

| (in millions) | Quarter Ended | | % Change Better (Worse) |
|---|---|---|---|
| | July 2, 2022 | July 3, 2021 | |
| Programming and production costs | | | |
|   Disney+ | $ (1,435) | $ (772) | (86) % |
|   Hulu | (1,894) | (1,700) | (11) % |
|   ESPN+ and other | (385) | (297) | (30) % |
| Total programming and production costs | (3,714) | (2,769) | (34) % |
| Other operating expense | (822) | (645) | (27) % |
| | $ (4,536) | $ (3,414) | (33) % |

The increase in programming and production costs at Disney+ was primarily due to more content provided on the service, including the impact of airing more IPL matches in the current quarter.

Higher programming and production costs at Hulu were primarily due to higher subscriber-based fees for programming the Live TV service due to an increase in the number of subscribers, rate increases and the carriage of more networks.

The increase in programming and production costs at ESPN+ and other was primarily due to higher rights costs for UFC programming due to airing four events in the current quarter compared to three events in the prior-year quarter and new NHL, golf and soccer programming.

Other operating expenses increased due to higher technology and distribution costs at Disney+ reflecting growth in existing markets and, to a lesser extent, expansion to new markets.

Selling, general, administrative and other costs increased $446 million, to $1,494 million from $1,048 million, primarily due to higher marketing costs at Hulu and Disney+.

*Operating Loss from Direct-to-Consumer*

The operating loss from Direct-to-Consumer increased $768 million, to $1,061 million from $293 million, due to a higher loss at Disney+, lower operating income at Hulu and, to a lesser extent, a higher loss at ESPN+.

44

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

**Content Sales/Licensing and Other**

Operating results for Content Sales/Licensing and Other are as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| Revenues | | | | | |
| TV/SVOD distribution | $ | 937 | $ | 1,012 | (7) % |
| Theatrical distribution | | 620 | | 140 | >100 % |
| Home entertainment | | 149 | | 236 | (37) % |
| Other | | 405 | | 293 | 38 % |
| Total revenues | | 2,111 | | 1,681 | 26 % |
| Operating expenses | | (1,414) | | (1,056) | (34) % |
| Selling, general, administrative and other | | (650) | | (430) | (51) % |
| Depreciation and amortization | | (76) | | (68) | (12) % |
| Equity in the income of investees | | 2 | | 5 | (60) % |
| Operating Income | $ | (27) | $ | 132 | nm |

*Revenues*

The decrease in TV/SVOD distribution revenue was due to lower sales of theatrical film content primarily due to the shift from licensing content to third parties to distributing on our DTC services.

The increase in theatrical distribution revenue was due to the release of *Doctor Strange In The Multiverse of Madness, Lightyear,* and *The Bob's Burgers Movie* in the current quarter compared to *Cruella* in the prior-year quarter.

The decrease in home entertainment revenue was primarily due to lower unit sales of catalog titles.

The increase in other revenue was due to higher revenue from stage plays reflecting more performances in the current quarter as productions were generally shut down in the prior-year quarter due to COVID-19, partially offset by an unfavorable foreign exchange impact.

*Costs and Expenses*

Operating expenses are as follows:

| (in millions) | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| Programming and production costs | $ | (1,123) | $ | (861) | (30) % |
| Cost of goods sold and distribution costs | | (291) | | (195) | (49) % |
| | $ | (1,414) | $ | (1,056) | (34) % |

The increase in programming and production costs was due to higher production cost amortization driven by an increase in theatrical revenue.

The increase in cost of goods sold and distribution costs was due to higher costs for stage plays as a result of more performances in the current quarter.

Selling, general administrative and other costs increased $220 million, to $650 million from $430 million, driven by higher theatrical marketing costs, due to more titles released in the current quarter compared to the prior-year quarter, and, to a lesser extent, an unfavorable foreign exchange impact.

*Operating Income from Content Sales/Licensing and Other*

Operating income from Content Sales/Licensing and Other decreased $159 million, to a loss of $27 million from income of $132 million, driven by an unfavorable foreign exchange impact and lower TV/SVOD distribution and home entertainment results, partially offset by higher stage play and theatrical results.

45

**Ex. 12
Page 1301**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Items Excluded from Segment Operating Income Related to Disney Media and Entertainment Distribution*

The following table presents supplemental information for items related to the DMED segment that are excluded from segment operating income:

| (in millions) | Quarter Ended | | % Change Better (Worse) |
| --- | --- | --- | --- |
| | July 2, 2022 | July 3, 2021 | |
| TFCF and Hulu acquisition amortization[1] | $ (583) | $ (602) | 3 % |
| Restructuring and impairment charges[2] | (34) | (1) | >(100) % |
| German FTA gain | — | 126 | — % |

[1] In the current quarter, amortization of step-up on film and television costs was $160 million and amortization of intangible assets was $420 million. In the prior-year quarter, amortization of step-up on film and television costs was $166 million and amortization of intangible assets was $432 million.

[2] Charges for the current quarter were primarily due to asset impairments related to our businesses in Russia.

**Disney Parks, Experiences and Products**

Operating results for the DPEP segment are as follows:

| (in millions) | Quarter Ended | | % Change Better (Worse) |
| --- | --- | --- | --- |
| | July 2, 2022 | July 3, 2021 | |
| Revenues | | | |
| Theme park admissions | $ 2,312 | $ 1,152 | >100 % |
| Parks & Experiences merchandise, food and beverage | 1,688 | 914 | 85 % |
| Resorts and vacations | 1,805 | 776 | >100 % |
| Merchandise licensing and retail | 1,175 | 1,137 | 3 % |
| Parks licensing and other | 414 | 362 | 14 % |
| Total revenues | 7,394 | 4,341 | 70 % |
| Operating expenses | (3,729) | (2,718) | (37) % |
| Selling, general, administrative and other | (855) | (674) | (27) % |
| Depreciation and amortization | (622) | (588) | (6) % |
| Equity in the loss of investees | (2) | (5) | 60 % |
| Operating Income | $ 2,186 | $ 356 | >100 % |

*COVID-19*

Revenues at DPEP benefited from the comparison to the closures/reduced operating capacity at certain of our theme parks and experiences in the prior-year quarter as a result of COVID-19. In fiscal 2022, our domestic parks and resorts are generally operating without significant COVID-19-related capacity restrictions, such as those that were generally in place during the prior year. In addition, our cruise ships have generally been operating without COVID-19-related capacity restrictions since April 2022. Certain of our international parks and resorts continue to be impacted by COVID-19-related closures and capacity and travel restrictions.

Walt Disney World Resort and Tokyo Disney Resort were open for the entire quarter in both the current and prior years. Disneyland Resort and Disneyland Paris were open for the entire current quarter. In the prior-year quarter, Disneyland Resort was open for 65 days and Disneyland Paris was open for 19 days. Shanghai Disney Resort was open for 3 days in the current quarter and for all of the prior-year quarter. Hong Kong Disneyland Resort was open for 54 days in the current quarter and 72 days in the prior-year quarter. Cruise ships were operating for the entire current quarter, whereas sailings were suspended in the prior-year quarter.

*Revenues*

The increase in theme park admissions revenue was due to attendance growth and higher average per capita ticket revenue. Higher attendance was due to increases at Disneyland Resort, Walt Disney World Resort and Disneyland Paris, partially offset by a decrease at Shanghai Disney Resort. Growth in average per capita ticket revenue was due to the introduction of Genie+ and Lightning Lane at our domestic parks in the first quarter of the current fiscal year and a reduced

**Ex. 12
Page 1302**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

impact from promotions in the current quarter at Walt Disney World Resort, partially offset by an unfavorable attendance mix at Disneyland Resort.

Parks & Experiences merchandise, food and beverage revenue growth was due to higher volumes.

Higher resorts and vacations revenue was primarily due to increases in occupied hotel room nights, passenger cruise days and average daily hotel room rates.

Merchandise licensing and retail revenue growth was due to an increase of 12% from merchandise licensing, partially offset by a decrease of 7% from retail. The revenue growth at merchandise licensing was due to an increase in sales of merchandise based on Star Wars, including the current quarter release of the licensed game, *LEGO: The Skywalker Saga*, higher minimum guarantee shortfall recognition and increases in sales of Mickey and Minnie and Toy Story merchandise. The decrease in retail revenues was due to the closure of a substantial number of Disney-branded retail stores in North America and Europe in the second half of fiscal year 2021.

The increase in parks licensing and other revenue was due to increases in sponsorship revenue and royalties from Tokyo Disney Resort.

In addition to revenue, costs and operating income, management uses the following key metrics to analyze trends and evaluate the overall performance of our theme parks and resorts, and we believe these metrics are useful to investors in analyzing the business:

|  | Domestic | | International[1] | | Total | |
|---|---|---|---|---|---|---|
|  | Quarter Ended | | Quarter Ended | | Quarter Ended | |
|  | **Jul 2, 2022** | Jul 3, 2021 | **Jul 2, 2022** | Jul 3, 2021 | **Jul 2, 2022** | Jul 3, 2021 |
| Parks | | | | | | |
| Increase (decrease) | | | | | | |
| Attendance[2] | **93 %** | nm | **17 %** | nm | **69 %** | nm |
| Per Capita Guest Spending[3] | **10 %** | nm | **28 %** | 13 % | **18 %** | 92 % |
| Hotels | | | | | | |
| Occupancy[4] | **90 %** | 50 % | **61 %** | 20 % | **83 %** | 43 % |
| Available Hotel Room Nights (in thousands)[5] | **2,501** | 2,589 | **793** | 793 | **3,294** | 3,382 |
| Per Room Guest Spending[6] | **$446** | $375 | **$439** | $414 | **$445** | $379 |

[1] Per capita guest spending growth rate is stated on a constant currency basis. Per room guest spending is stated at the average foreign exchange rate for the same period in the prior year.

[2] Attendance is used to analyze volume trends at our theme parks and is based on the number of unique daily entries, i.e. a person visiting multiple theme parks in a single day is counted only once. Our attendance count includes complimentary entries but excludes entries by children under the age of three.

[3] Per capita guest spending is used to analyze guest spending trends and is defined as total revenue from ticket sales and sales of food, beverage and merchandise in our theme parks, divided by total theme park attendance.

[4] Occupancy is used to analyze the usage of available capacity at hotels and is defined as the number of room nights occupied by guests as a percentage of available hotel room nights.

[5] Available hotel room nights is defined as the total number of room nights that are available at our hotels and at Disney Vacation Club (DVC) properties located at our theme parks and resorts that are not utilized by DVC members. Available hotel room nights include rooms temporarily taken out of service.

[6] Per room guest spending is used to analyze guest spending at our hotels and is defined as total revenue from room rentals and sales of food, beverage and merchandise at our hotels, divided by total occupied hotel room nights.

47

**Ex. 12**
**Page 1303**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Costs and Expenses*

Operating expenses are as follows:

| (in millions) | | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|---|
| | | July 2, 2022 | | July 3, 2021 | | |
| Operating labor | $ | (1,693) | $ | (1,220) | | (39) % |
| Cost of goods sold and distribution costs | | (679) | | (486) | | (40) % |
| Infrastructure costs | | (731) | | (584) | | (25) % |
| Other operating expense | | (626) | | (428) | | (46) % |
| | $ | (3,729) | $ | (2,718) | | (37) % |

The increase in operating labor was due to higher volumes and inflation, while the increases in cost of goods sold and distribution costs and other operating expenses were due to higher volumes. Higher infrastructure costs were primarily due to increases in volumes and technology spending.

Selling, general, administrative and other costs increased $181 million, to $855 million from $674 million, primarily due to increases in marketing and compensation costs.

Depreciation and amortization increased $34 million, to $622 million from $588 million, due to higher depreciation at our domestic theme parks and resorts.

*Segment Operating Income*

Segment operating income increased from $0.4 billion to $2.2 billion due to growth at domestic parks and experiences and, to a lesser extent, at international parks and resorts.

The following table presents supplemental revenue and operating income (loss) detail for the DPEP segment:

| (in millions) | | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|---|
| | | July 2, 2022 | | July 3, 2021 | | |
| *Supplemental revenue detail* | | | | | | |
| Parks & Experiences | | | | | | |
| Domestic | $ | 5,423 | $ | 2,656 | | >100 % |
| International | | 788 | | 526 | | 50 % |
| Consumer Products | | 1,183 | | 1,159 | | 2 % |
| | $ | 7,394 | $ | 4,341 | | 70 % |
| *Supplemental operating income (loss) detail* | | | | | | |
| Parks & Experiences | | | | | | |
| Domestic | $ | 1,651 | $ | 2 | | >100 % |
| International | | (64) | | (210) | | 70 % |
| Consumer Products | | 599 | | 564 | | 6 % |
| | $ | 2,186 | $ | 356 | | >100 % |

***Items Excluded from Segment Operating Income Related to Disney Parks, Experiences and Products***

The following table presents supplemental information for items related to the DPEP segment that are excluded from segment operating income:

| (in millions) | | Quarter Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|---|
| | | July 2, 2022 | | July 3, 2021 | | |
| Restructuring and impairment charges[1] | $ | — | $ | (35) | | 100 % |
| TFCF and Hulu acquisition amortization | | (2) | | (2) | | — % |

[1] Charges in the prior-year quarter were due to severance at our parks and resorts businesses.

**Ex. 12
Page 1304**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

**BUSINESS SEGMENT RESULTS - Current Period Nine-Month Results Compared to the Prior-Year Nine-Month Period**

**Disney Media and Entertainment Distribution**

Revenue and operating results for the DMED segment are as follows:

| (in millions) | Nine Months Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| *Revenues:* | | | | | |
| Linear Networks | $ | 22,011 | $ | 21,395 | 3 % |
| Direct-to-Consumer | | 14,651 | | 11,759 | 25 % |
| Content Sales/Licensing and Other | | 6,410 | | 5,299 | 21 % |
| Elimination of Intrasegment Revenue[1] | | (757) | | (671) | (13) % |
| | $ | 42,315 | $ | 37,782 | 12 % |
| *Segment operating income (loss):* | | | | | |
| Linear Networks | $ | 6,783 | $ | 6,765 | — % |
| Direct-to-Consumer | | (2,541) | | (1,049) | >(100) % |
| Content Sales/Licensing and Other | | (109) | | 632 | nm |
| | $ | 4,133 | $ | 6,348 | (35) % |

[1] Reflects fees received by the Linear Networks from other DMED businesses for the right to air our Linear Networks and related services.

**Linear Networks**

Operating results for Linear Networks are as follows:

| (in millions) | Nine Months Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| Revenues | | | | | |
| Affiliate fees | $ | 14,067 | $ | 14,098 | — % |
| Advertising | | 7,392 | | 6,850 | 8 % |
| Other | | 552 | | 447 | 23 % |
| Total revenues | | 22,011 | | 21,395 | 3 % |
| Operating expenses | | (13,331) | | (12,703) | (5) % |
| Selling, general, administrative and other | | (2,480) | | (2,465) | (1) % |
| Depreciation and amortization | | (108) | | (131) | 18 % |
| Equity in the income of investees | | 691 | | 669 | 3 % |
| Operating Income | $ | 6,783 | $ | 6,765 | — % |

*Revenues*

Affiliate revenue is as follows:

| (in millions) | Nine Months Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| Domestic Channels | $ | 11,869 | $ | 11,491 | 3 % |
| International Channels | | 2,198 | | 2,607 | (16) % |
| | $ | 14,067 | $ | 14,098 | — % |

**Ex. 12**
**Page 1305**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

Growth in affiliate revenue at the Domestic Channels reflected an increase of 6% from higher contractual rates, partially offset by a decrease of 3% from fewer subscribers.

The decrease in affiliate revenue at the International Channels reflected decreases of 13% from fewer subscribers, due to channel closures, and 5% from an unfavorable foreign exchange impact. These decreases were partially offset by an increase of 2% from higher contractual rates.

Advertising revenue is as follows:

| (in millions) | Nine Months Ended | | | | % Change Better (Worse) |
| | July 2, 2022 | | July 3, 2021 | | |
|---|---|---|---|---|---|
| Cable | $ | 3,153 | $ | 2,759 | 14 % |
| Broadcasting | | 2,451 | | 2,583 | (5) % |
| Domestic Channels | | 5,604 | | 5,342 | 5 % |
| International Channels | | 1,788 | | 1,508 | 19 % |
| | $ | 7,392 | $ | 6,850 | 8 % |

Cable advertising revenue growth was due to increases of 7% from higher rates and 6% from increased impressions, reflecting higher average viewership.

The decrease in Broadcasting advertising revenue reflected a decrease of 14% from fewer impressions at ABC and a decrease of 1% from the owned television stations, partially offset by an increase of 10% from higher rates at ABC. The decrease in ABC impressions reflected lower average viewership. The decrease at the owned television stations was due to lower rates resulting from a decrease in political advertising.

The increase in International Channels advertising revenue was due to increases of 16% from higher impressions, reflecting an increase in average viewership, and 8% from higher rates, partially offset by a decrease of 6% from an unfavorable foreign exchange impact. The increase in average viewership reflected more cricket matches aired in the current period, primarily due to the airing of International Cricket Council (ICC) T20 World Cup matches in the current period and an increase in IPL and Board of Control for Cricket in India (BCCI) matches in the current period compared to the prior-year period. The ICC T20 World Cup generally occurs every two years and was not held in the prior-year period due to COVID-19. We aired 87 IPL matches in the current period and 73 matches in the prior-year period. The increase in the number of IPL matches was due to COVID-19-related timing shifts and the IPL adding matches to the current season. The increase in the number of BCCI matches aired in the current period was driven by COVID-19-related cancellations of certain BCCI matches in the prior-year period.

Other revenue increased $105 million, to $552 million from $447 million, due to sub-licensing fees from ICC T20 World Cup matches and higher sub-licensing fees from BCCI cricket matches in the current period compared to the prior-year period.

*Costs and Expenses*

Operating expenses primarily consist of programming and production costs, which are as follows:

| (in millions) | Nine Months Ended | | | | % Change Better (Worse) |
| | July 2, 2022 | | July 3, 2021 | | |
|---|---|---|---|---|---|
| Cable | $ | (7,423) | $ | (6,974) | (6) % |
| Broadcasting | | (2,152) | | (2,203) | 2 % |
| Domestic Channels | | (9,575) | | (9,177) | (4) % |
| International Channels | | (2,588) | | (2,366) | (9) % |
| | $ | (12,163) | $ | (11,543) | (5) % |

The increase in programming and production costs at Cable was due to higher rights costs for NFL, NBA and college sports and an increase in sports production costs. These increases were partially offset by lower MLB, soccer and golf rights costs. Higher NFL rights costs were primarily due to airing three additional regular season games in the current period compared to the prior-year period and contractual rate increases. The current period included 16 regular season games, a wild card playoff game and the Pro Bowl while the prior-year period included 13 regular season games and a wild card playoff game. The increase in NBA programming costs reflected the impact of COVID-19 on the timing of the 2020 and 2021 seasons and contractual rate increases. Due to COVID-19, four of the 2020 NBA Finals games were aired in the first quarter of fiscal

**Ex. 12**
**Page 1306**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

2021. All of the 2021 NBA Finals games were aired in the fourth quarter of fiscal 2021, and all of the 2022 NBA Finals games were aired in the third quarter of fiscal 2022. The increase in rights costs for college sports was driven by higher contractual rates for the College Football Playoffs. The increase in sports production costs was due to the return of ESPN-hosted college events, which were canceled in the prior-year period due to COVID-19, and NFL and NHL programming additions. Lower MLB programming costs were due to airing 13 regular season games and 1 playoff game in the current period compared to 44 regular season games in the prior-year period. The decrease in soccer programming costs was due to the airing of UEFA Euro 2020 in the prior-year period. Lower golf programming costs were due to airing one Masters tournament in fiscal 2022 compared to airing two Masters tournaments in fiscal 2021. Due to COVID-19, the 2020 Masters that was originally scheduled to occur in the third quarter of fiscal 2020 shifted to the first quarter of fiscal 2021.

The decrease in programming and production costs at Broadcasting was primarily due to a lower average cost programming aired in the current period, partially offset by a higher cost mix of programming in the current period and production cost increases for news. The higher cost mix reflected more hours of specials and scripted programming, partially offset by fewer hours of acquired reality programming.

The increase in programming and production costs at the International Channels was due to higher sports programming costs driven by airing ICC T20 World Cup cricket matches in the current period and higher costs for IPL and BCCI cricket rights, partially offset by the impact of channel closures and a favorable foreign exchange impact. The increase in costs for IPL and BCCI cricket rights was due to more matches and higher average costs per match.

*Equity in the Income of Investees*

Income from equity investees increased $22 million, to $691 million from $669 million, due to higher income from A+E Television Networks driven by lower programming costs and higher program sales, partially offset by lower affiliate revenue and an increase in marketing costs.

*Operating Income from Linear Networks*

Operating income from Linear Networks increased $18 million, to $6,783 million from $6,765 million, due to an increase at Broadcasting, which was largely offset by a decrease at the International Channels.

The following table provides supplemental revenue and operating income detail for Linear Networks:

| (in millions) | Nine Months Ended | | | | | % Change Better (Worse) |
|---|---|---|---|---|---|---|
| | | July 2, 2022 | | July 3, 2021 | | |
| *Supplemental revenue detail* | | | | | | |
| Domestic Channels | $ | 17,678 | $ | 17,049 | | 4 % |
| International Channels | | 4,333 | | 4,346 | | — % |
| | $ | 22,011 | $ | 21,395 | | 3 % |
| *Supplemental operating income detail* | | | | | | |
| Domestic Channels | $ | 5,312 | $ | 5,204 | | 2 % |
| International Channels | | 780 | | 892 | | (13) % |
| Equity in the income of investees | | 691 | | 669 | | 3 % |
| | $ | 6,783 | $ | 6,765 | | — % |

51

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

**Direct-to-Consumer**

Operating results for Direct-to-Consumer are as follows:

|  | Nine Months Ended | | % Change Better (Worse) |
|---|---|---|---|
| (in millions) | July 2, 2022 | July 3, 2021 | |
| Revenues | | | |
| Subscription fees | $ 11,374 | $ 8,702 | 31 % |
| Advertising | 2,889 | 2,508 | 15 % |
| TV/SVOD distribution and other | 388 | 549 | (29) % |
| Total revenues | 14,651 | 11,759 | 25 % |
| Operating expenses | (12,860) | (9,549) | (35) % |
| Selling, general, administrative and other | (4,059) | (3,028) | (34) % |
| Depreciation and amortization | (273) | (231) | (18) % |
| Operating Loss | $ (2,541) | $ (1,049) | >(100) % |

*Revenues*

The increase in subscription fees reflected increases of 21% from higher subscribers due to growth at Disney+, Hulu and ESPN+, and 11% from higher rates due to increases in retail pricing at Disney+ and Hulu, partially offset by a decrease of 1% from an unfavorable foreign exchange impact.

Higher advertising revenue reflected an increase of 11% from higher impressions due to increases at Disney+, Hulu and ESPN+, and an increase of 6% from higher rates due to an increase at Hulu. The increase in impressions at Disney+ was due to airing 87 IPL matches and 45 ICC T20 World Cup matches in the current period compared to 73 IPL matches and no ICC T20 World Cup matches in the prior-year period.

The decrease in TV/SVOD distribution and other revenue was due to the absence of Disney+ Premier Access revenues in the current period compared to revenues for *Raya and the Last Dragon* and *Cruella* in the prior-year period and, to a lesser extent, a decrease in UFC pay-per-view fees. The decrease in UFC pay-per-view fees reflected the impact of airing nine events in the current period compared to ten events in the prior-year period and lower average buys per event, partially offset by higher pricing.

The following table presents Average Monthly Revenue Per Paid Subscriber for the nine months ended (see additional discussion of metrics under the quarterly results analysis of Business Segment Results):

|  | July 2, 2022 | July 3, 2021 | % Change Better (Worse) |
|---|---|---|---|
| Disney+ | | | |
| Domestic (U.S. and Canada) | $ 6.42 | $ 6.18 | 4 % |
| International (excluding Disney+ Hotstar) | 6.22 | 5.19 | 20 % |
| Disney+ (excluding Disney+ Hotstar) | 6.32 | 5.74 | 10 % |
| Disney+ Hotstar | 1.01 | 0.70 | 44 % |
| Global Disney+ | 4.37 | 4.08 | 7 % |
| | | | |
| ESPN+ | 4.79 | 4.50 | 6 % |
| | | | |
| Hulu | | | |
| SVOD Only | 12.88 | 12.90 | — % |
| Live TV + SVOD | 87.90 | 80.14 | 10 % |

The average monthly revenue per paid subscriber for domestic Disney+ increased from $6.18 to $6.42 due to an increase in retail pricing and a lower mix of wholesale subscribers, partially offset by a higher mix of subscribers to multi-product offerings.

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The average monthly revenue per paid subscriber for international Disney+ (excluding Disney+ Hotstar) increased from $5.19 to $6.22 due to increases in retail pricing, partially offset by an unfavorable foreign exchange impact and a higher mix of wholesale subscribers.

The average monthly revenue per paid subscriber for Disney+ Hotstar increased from $0.70 to $1.01 primarily due to higher per-subscriber advertising revenue.

The average monthly revenue per paid subscriber for ESPN+ increased from $4.50 to $4.79 driven by an increase in retail pricing and, to a lesser extent, higher per-subscriber advertising revenue, partially offset by a higher mix of subscribers to multi-product offerings.

The average monthly revenue per paid subscriber for the Hulu SVOD Only service decreased from $12.90 to $12.88 due to lower per-subscriber advertising revenue and a higher mix of subscribers to multi-product and promotional offerings, largely offset by an increase in retail pricing.

The average monthly revenue per paid subscriber for the Hulu Live TV + SVOD service increased from $80.14 to $87.90 primarily due to increases in retail pricing, higher per-subscriber advertising revenue and, to a lesser extent, an increase in per-subscriber premium and feature add-on revenue, partially offset by a higher mix of subscribers to multi-product offerings.

*Costs and Expenses*

Operating expenses are as follows:

| (in millions) | Nine Months Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- |
| | July 2, 2022 | | July 3, 2021 | | |
| Programming and production costs | | | | | |
| Disney+ | $ | (3,551) | $ | (1,941) | (83) % |
| Hulu | | (5,639) | | (4,950) | (14) % |
| ESPN+ and other | | (1,266) | | (843) | (50) % |
| Total programming and production costs | | (10,456) | | (7,734) | (35) % |
| Other operating expense | | (2,404) | | (1,815) | (32) % |
| | $ | (12,860) | $ | (9,549) | (35) % |

The increase in programming and production costs at Disney+ was primarily due to more content provided on the service.

Higher programming and production costs at Hulu were primarily due to higher subscriber-based fees for programming the Live TV service due to the carriage of more networks, rate increases and an increase in the number of subscribers.

The increase in programming and production costs at ESPN+ and other was primarily due to new NHL and soccer programming.

Other operating expenses increased due to higher technology and distribution costs at Disney+ due to growth in existing markets and, to a lesser extent, expansion to new markets.

Selling, general, administrative and other costs increased $1,031 million, to $4,059 million from $3,028 million, due to higher marketing costs at Disney+ and Hulu.

Depreciation and amortization increased $42 million, to $273 million from $231 million, primarily due to increased investment in technology assets.

*Operating Loss from Direct-to-Consumer*

The operating loss from Direct-to-Consumer increased $1,492 million, to $2,541 million from $1,049 million, due to higher losses at Disney+ and, to a lesser extent, at ESPN+ and lower operating income at Hulu.

53

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

**Content Sales/Licensing and Other**

Operating results for Content Sales/Licensing and Other are as follows:

| (in millions) | Nine Months Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| Revenues | | | | | |
| TV/SVOD distribution | $ | 3,109 | $ | 3,378 | (8) % |
| Theatrical distribution | | 1,373 | | 280 | >100 % |
| Home entertainment | | 673 | | 755 | (11) % |
| Other | | 1,255 | | 886 | 42 % |
| Total revenues | | 6,410 | | 5,299 | 21 % |
| Operating expenses | | (4,271) | | (3,266) | (31) % |
| Selling, general, administrative and other | | (2,031) | | (1,187) | (71) % |
| Depreciation and amortization | | (219) | | (226) | 3 % |
| Equity in the income (loss) of investees | | 2 | | 12 | (83) % |
| Operating Income (Loss) | $ | (109) | $ | 632 | nm |

*Revenues*

The decrease in TV/SVOD distribution revenue was due to lower sales of episodic television and, to a lesser extent, theatrical film content. The decrease in episodic television sales was due to lower sales of *Modern Family* and *How I Met Your Mother* in the current period compared to the prior-year period, whereas lower sales of theatrical film content was primarily due to the shift from licensing content to third parties to distributing on our DTC services.

The increase in theatrical distribution revenue was due to the release of 14 titles in the current period compared to five titles in the prior-year period and revenue from the co-production of Marvel's *Spider-Man: No Way Home*. Titles released in the current period included *Doctor Strange In The Multiverse of Madness, Eternals*, *Encanto* and *Lightyear.* Titles released in the prior-year period included *Cruella, Raya And The Last Dragon*, and *Soul*, which was only distributed theatrically in international markets.

The decrease in home entertainment revenue was due to lower unit sales of catalog titles, partially offset by higher sales of new release titles.

The increase in other revenue was due to higher revenue from stage plays as a result of more performances in the current period as productions were generally shut down in the prior-year period due to COVID-19.

*Costs and Expenses*

Operating expenses are as follows:

| (in millions) | Nine Months Ended | | | | % Change Better (Worse) |
|---|---|---|---|---|---|
| | July 2, 2022 | | July 3, 2021 | | |
| Programming and production costs | $ | (3,292) | $ | (2,653) | (24) % |
| Cost of goods sold and distribution costs | | (979) | | (613) | (60) % |
| | $ | (4,271) | $ | (3,266) | (31) % |

The increase in programming and production costs was due to higher production cost amortization and, to a lesser extent, higher film cost impairments. The increase in production cost amortization was due to higher theatrical revenue in the current period, partially offset by a decrease due to lower TV/SVOD distribution revenue.

Higher cost of goods sold and distribution costs were due to more stage play performances and theatrical releases in the current period compared to the prior-year period.

Selling, general, administrative and other costs increased $844 million, to $2,031 million from $1,187 million, due to higher theatrical marketing costs.

**Ex. 12
Page 1310**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Operating Income from Content Sales/Licensing and Other*

Operating income from Content Sales/Licensing and Other decreased $741 million, to a loss of $109 million from income of $632 million, due to lower theatrical distribution results, higher film cost impairments and lower TV/SVOD distribution results.

*Items Excluded from Segment Operating Income Related to Disney Media and Entertainment Distribution*

The following table presents supplemental information for items related to the DMED segment that are excluded from segment operating income:

| (in millions) | Nine Months Ended | | % Change Better (Worse) |
| --- | --- | --- | --- |
| | July 2, 2022 | July 3, 2021 | |
| TFCF and Hulu acquisition amortization[1] | $ (1,768) | $ (1,820) | 3 % |
| Content License Early Termination | (1,023) | — | nm |
| Restructuring and impairment charges[2] | (229) | (305) | 25 % |
| German FTA gain | — | 126 | — % |

[1]  In the current period, amortization of step-up on film and television costs was $473 million and amortization of intangible assets was $1,286 million. In the prior-year period, amortization of step-up on film and television costs was $487 million and amortization of intangible assets was $1,322 million.

[2]  Charges for the current period were due to the impairment of an intangible and other assets related to our businesses in Russia. Charges for the prior-year period were primarily due to asset impairments and severance costs related to the closure of an animation studio.

**Disney Parks, Experiences and Products**

Operating results for the DPEP segment are as follows:

| (in millions) | Nine Months Ended | | % Change Better (Worse) |
| --- | --- | --- | --- |
| | July 2, 2022 | July 3, 2021 | |
| Revenues | | | |
| Theme park admissions | $ 6,437 | $ 2,298 | >100 % |
| Parks & Experiences merchandise, food and beverage | 4,829 | 2,025 | >100 % |
| Resorts and vacations | 4,701 | 1,722 | >100 % |
| Merchandise licensing and retail | 3,902 | 3,980 | (2) % |
| Parks licensing and other | 1,411 | 1,077 | 31 % |
| Total revenues | 21,280 | 11,102 | 92 % |
| Operating expenses | (10,665) | (7,456) | (43) % |
| Selling, general, administrative and other | (2,401) | (2,012) | (19) % |
| Depreciation and amortization | (1,813) | (1,781) | (2) % |
| Equity in the loss of investees | (10) | (22) | 55 % |
| Operating Income (Loss) | $ 6,391 | $ (169) | nm |

*COVID-19*

Revenues at DPEP benefited from the comparison to the closures/reduced operating capacity at certain of our theme parks and experiences in the prior-year period as a result of the impact of COVID-19. Walt Disney World Resort and Tokyo Disney Resort were open for the entire period in both the current and prior year. Disneyland Resort and Disneyland Paris were open for the entire current period. In the prior-year period, Disneyland Resort was open for 65 days and Disneyland Paris was open for 45 days. Shanghai Disney Resort was open for 170 days in the current period and open for all of the prior-year period. Hong Kong Disneyland Resort was open for 125 days in the current period and 147 days in the prior-year period. Cruise ships were operating for the entire current period, whereas sailings were suspended in the prior-year period.

**Ex. 12**
**Page 1311**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Revenues*

The increase in theme park admissions revenue was due to attendance growth and higher average per capita ticket revenue. Higher attendance was due to increases at Disneyland Resort, Walt Disney World Resort and Disneyland Paris, partially offset by a decrease at Shanghai Disney Resort. Growth in average per capita ticket revenue was due to the introduction of Genie+ and Lightning Lane at our domestic parks in the first quarter of the current fiscal year, a reduced impact from promotions in the current period and a favorable attendance mix at Walt Disney World Resort, partially offset by an unfavorable attendance mix at Disneyland Resort.

Parks & Experiences merchandise, food and beverage revenue growth was due to higher volumes.

Higher resorts and vacations revenue was primarily due to increases in occupied hotel room nights, passenger cruise days and average daily hotel room rates.

The decrease in merchandise licensing and retail revenue was primarily due to a decrease of 8% from retail, partially offset by an increase of 6% from merchandise licensing. The decrease in retail revenues was due to the closure of a substantial number of Disney-branded retail stores in North America and Europe in the second half of fiscal year 2021. The revenue growth at merchandise licensing was driven by higher sales of merchandise based on Mickey and Minnie, Star Wars, Disney Princesses and Toy Story merchandise, partially offset by a decrease in sales of merchandise based on Frozen. Higher sales of Star Wars merchandise included the current period release of the licensed game, *LEGO: The Skywalker Saga*, and merchandise based on *The Mandalorian*.

The increase in parks licensing and other revenue was due to increases in sponsorship revenue, royalties from Tokyo Disney Resort and real estate sales.

In addition to revenue, costs and operating income, management uses the following key metrics to analyze trends and evaluate the overall performance of our theme parks and resorts, and we believe these metrics are useful to investors in analyzing the business (see additional discussion of metrics under the quarterly analysis of Business Segment Results):

| | Domestic | | International | | Total | |
| | Nine Months Ended | | Nine Months Ended | | Nine Months Ended | |
| | **July 2, 2022** | July 3, 2021 | **July 2, 2022** | July 3, 2021 | **July 2, 2022** | July 3, 2021 |
|---|---|---|---|---|---|---|
| Parks | | | | | | |
| Increase (decrease) | | | | | | |
| Attendance | **nm** | (46) % | **64 %** | (21) % | **nm** | (40) % |
| Per Capita Guest Spending | **17 %** | 13 % | **21 %** | (3) % | **23 %** | 6 % |
| Hotels | | | | | | |
| Occupancy | **82 %** | 37 % | **53 %** | 14 % | **75 %** | 32 % |
| Available Hotel Room Nights (in thousands) | **7,564** | 7,882 | **2,380** | 2,378 | **9,944** | 10,260 |
| Per Room Guest Spending | **$450** | $361 | **$379** | $392 | **$438** | $364 |

*Costs and Expenses*

Operating expenses are as follows:

| | Nine Months Ended | | % Change |
| (in millions) | **July 2, 2022** | July 3, 2021 | Better (Worse) |
|---|---|---|---|
| Operating labor | $ **(4,818)** | $ (3,262) | (48) % |
| Cost of goods sold and distribution costs | **(2,119)** | (1,494) | (42) % |
| Infrastructure costs | **(1,958)** | (1,649) | (19) % |
| Other operating expense | **(1,770)** | (1,051) | (68) % |
| | $ **(10,665)** | $ (7,456) | (43) % |

The increases in operating labor, cost of goods sold and distribution costs and other operating expenses were due to higher volumes, while the increase in infrastructure costs was due to higher volumes and increased technology spending.

56

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

Selling, general, administrative and other costs increased $389 million, to $2,401 million from $2,012 million, due to higher marketing spend and, to a lesser extent, inflation.

Depreciation and amortization increased $32 million, to $1,813 million from $1,781 million, due to higher depreciation at our domestic theme parks and resorts.

*Segment Operating Income (Loss)*

Segment operating results increased from a loss of $169 million to income of $6.4 billion due to growth at domestic parks and experiences and, to a lesser extent, at international parks and resorts.

The following table presents supplemental revenue and operating income (loss) detail for the DPEP segment:

| | | Nine Months Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- | --- |
| (in millions) | | July 2, 2022 | | July 3, 2021 | | |
| *Supplemental revenue detail* | | | | | | |
| Parks & Experiences | | | | | | |
| Domestic | $ | 15,121 | $ | 5,880 | | >100 % |
| International | | 2,223 | | 1,166 | | 91 % |
| Consumer Products | | 3,936 | | 4,056 | | (3) % |
| | $ | 21,280 | $ | 11,102 | | 92 % |
| *Supplemental operating income (loss) detail* | | | | | | |
| Parks & Experiences | | | | | | |
| Domestic | $ | 4,591 | $ | (1,383) | | nm |
| International | | (311) | | (852) | | 63 % |
| Consumer Products | | 2,111 | | 2,066 | | 2 % |
| | $ | 6,391 | $ | (169) | | nm |

*Items Excluded from Segment Operating Income Related to Disney Parks, Experiences and Products*

The following table presents supplemental information for items related to the DPEP segment that are excluded from segment operating income:

| | | Nine Months Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- | --- |
| (in millions) | | July 2, 2022 | | July 3, 2021 | | |
| Restructuring and impairment charges[1] | $ | — | $ | (252) | | 100 % |
| TFCF and Hulu acquisition amortization | | (6) | | (6) | | — % |

[1]  The prior-year period includes asset impairments and severance costs related to the planned closure of a substantial number of our Disney-branded retail stores and severance costs related to other workforce reductions.

**CORPORATE AND UNALLOCATED SHARED EXPENSES**

| | Quarter Ended | | | | % Change Better (Worse) | Nine Months Ended | | | | % Change Better (Worse) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| (in millions) | | July 2, 2022 | | July 3, 2021 | | | July 2, 2022 | | July 3, 2021 | |
| Corporate and unallocated shared expenses | $ | (325) | $ | (212) | (53) % | $ | (825) | $ | (645) | (28) % |

Corporate and unallocated shared expenses increased $113 million, from $212 million to $325 million in the current quarter and increased $180 million, from $645 million to $825 million for the current nine-month period driven by higher compensation and human resource-related cost.

57

**Ex. 12**
**Page 1313**

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)

**FINANCIAL CONDITION**

The change in cash and cash equivalents is as follows:

| (in millions) | Nine Months Ended | | | | | % Change Better (Worse) |
|---|---|---|---|---|---|---|
| | | July 2, 2022 | | July 3, 2021 | | |
| Cash provided by operations - continuing operations | $ | 3,478 | $ | | 2,934 | 19 % |
| Cash used in investing activities - continuing operations | | (3,872) | | | (2,085) | (86) % |
| Cash used in financing activities - continuing operations | | (2,247) | | | (2,771) | 19 % |
| Cash (used in) provided by discontinued operations | | (4) | | | 6 | nm |
| Impact of exchange rates on cash, cash equivalents and restricted cash | | (354) | | | 77 | nm |
| Change in cash, cash equivalents and restricted cash | $ | (2,999) | $ | | (1,839) | (63) % |

**Operating Activities**

Cash provided by continuing operating activities increased 19% due to higher operating cash flow at DPEP and lower pension plan contributions, partially offset by lower operating cash flow at DMED and a partial payment for the Content License Early Termination. The increase in operating cash flow at DPEP was due to higher operating cash receipts driven by higher revenue, partially offset by an increase in operating cash disbursements due to higher operating expenses. The decrease in operating cash flow at DMED was due to higher operating cash disbursements and higher spending on film and television productions, partially offset by higher operating cash receipts. Higher operating cash disbursements were driven by increased operating expenses while higher operating cash receipts were due to revenue growth.

*Produced and licensed programming costs*

The DMED segment incurs costs to produce and license feature film and television content. Film and television production costs include all internally produced content such as live-action and animated feature films, television series, television specials and theatrical stage plays. Programming costs include film or television content rights licensed from third parties for use on the Company's Linear Networks and DTC services. Programming assets are generally recorded when the programming becomes available to us with a corresponding increase in programming liabilities.

58

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The Company's film and television production and programming activity for the nine months ended July 2, 2022 and July 3, 2021 are as follows:

|  | Nine Months Ended | |
| --- | --- | --- |
| (in millions) | July 2, 2022 | July 3, 2021 |
| Beginning balances: | | |
| Produced and licensed programming assets | $ 31,732 | $ 27,193 |
| Programming liabilities | (4,113) | (4,099) |
|  | 27,619 | 23,094 |
| Spending: | | |
| Programming licenses and rights | 10,850 | 9,692 |
| Produced film and television content | 11,908 | 9,238 |
|  | 22,758 | 18,930 |
| Amortization: | | |
| Programming licenses and rights | (10,908) | (9,781) |
| Produced film and television content | (7,544) | (5,957) |
|  | (18,452) | (15,738) |
| Change in internally produced and licensed content costs | 4,306 | 3,192 |
| Other non-cash activity | 209 | 179 |
| Ending balances: | | |
| Produced and licensed programming assets | 35,979 | 30,256 |
| Programming liabilities | (3,845) | (3,791) |
|  | $ 32,134 | $ 26,465 |

The Company currently expects its fiscal 2022 spend on produced and licensed content, including sports rights, to be approximately $30 billion, or approximately $5 billion more than fiscal 2021 spend of $25 billion. The increase is driven by higher spend to support our DTC expansion and generally assumes no significant disruptions to production due to COVID-19.

**Investing Activities**

Investing activities consist principally of investments in parks, resorts and other property and acquisition and divestiture activity. The Company's investments in parks, resorts and other property for the nine months ended July 2, 2022 and July 3, 2021 are as follows:

| (in millions) | July 2, 2022 | July 3, 2021 |
| --- | --- | --- |
| Disney Media and Entertainment Distribution | $ 543 | $ 582 |
| Disney Parks, Experiences and Products | | |
| Domestic | 2,226 | 1,121 |
| International | 584 | 502 |
| Total Disney Parks, Experiences and Products | 2,810 | 1,623 |
| Corporate | 442 | 263 |
|  | $ 3,795 | $ 2,468 |

Capital expenditures at the DMED segment primarily reflect investments in technology and in facilities and equipment for expanding and upgrading broadcast centers, production facilities and television station facilities.

Capital expenditures for the DPEP segment are principally for theme park and resort expansion, new attractions, cruise ships, capital improvements and technology. The increase in the current period compared to the prior-year period was primarily due to higher spend on cruise ship fleet expansion.

Capital expenditures at Corporate primarily reflect investments in corporate facilities, technology and equipment. The increase in the current period compared to the prior-year period was driven by higher spend on corporate facilities.

**Ex. 12**
**Page 1315**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The Company currently expects its fiscal 2022 capital expenditures will be approximately $5.0 billion compared to fiscal 2021 capital expenditures of $3.6 billion. The expected increase in capital expenditures is due to higher spending on cruise ship fleet expansion and corporate facilities.

**Financing Activities**

Cash used in financing activities was $2.2 billion in the current nine months compared to $2.8 billion in the prior-year nine months. In the current nine months, the Company made payments on borrowings of $1.5 billion compared to payments of $2.4 billion in the prior-year nine months. In addition, in the current nine months, the Company received proceeds from exercise of stock options of $0.1 billion compared to proceeds of $0.4 billion in the prior-year nine months.

See Note 5 to the Condensed Consolidated Financial Statements for a summary of the Company's borrowing activities during the nine months ended July 2, 2022 and information regarding the Company's bank facilities. The Company may use operating cash flows, commercial paper borrowings up to the amount of its unused $12.25 billion bank facilities and incremental term debt issuances to retire or refinance other borrowings before or as they come due.

The Company's operating cash flow and access to the capital markets can be impacted by factors outside of its control, including COVID-19, which had an adverse impact on the Company's operating cash flows in fiscal 2020 and 2021. We believe that the Company's financial condition is strong and that its cash balances, other liquid assets, operating cash flows, access to debt and equity capital markets and borrowing capacity under current bank facilities, taken together, provide adequate resources to fund ongoing operating requirements and upcoming debt maturities as well as future capital expenditures related to the expansion of existing businesses and development of new projects. In addition, the Company could undertake other measures to ensure sufficient liquidity, such as continuing to not declare dividends (the Company did not pay a dividend with respect to fiscal 2020 and 2021 operations and has not declared or paid a dividend with respect to fiscal 2022 operations); reducing or not making certain payments, such as some contributions to our pension and postretirement medical plans; raising financing; suspending capital spending; reducing film and television content investments; or implementing furloughs or reductions in force.

The Company's borrowing costs can also be impacted by short- and long-term debt ratings assigned by nationally recognized rating agencies, which are based, in significant part, on the Company's performance as measured by certain credit metrics such as leverage and interest coverage ratios. As of July 2, 2022, Moody's Investors Service's long- and short-term debt ratings for the Company were A2 and P-1 (Stable), respectively, Standard and Poor's long- and short-term debt ratings for the Company were BBB+ and A-2 (Positive), respectively, and Fitch's long- and short-term debt ratings for the Company were A- and F2 (Stable), respectively. The Company's bank facilities contain only one financial covenant, relating to interest coverage of three times earnings before interest, taxes, depreciation and amortization, including both intangible amortization and amortization of our film and television production and programming costs, which the Company met on July 2, 2022, by a significant margin. The Company's bank facilities also specifically exclude certain entities, including the Asia Theme Parks, from any representations, covenants or events of default.

**SUPPLEMENTAL GUARANTOR FINANCIAL INFORMATION**

On March 20, 2019 as part of the acquisition of TFCF, The Walt Disney Company ("TWDC") became the ultimate parent of TWDC Enterprises 18 Corp. (formerly known as The Walt Disney Company) ("Legacy Disney"). Legacy Disney and TWDC are collectively referred to as "Obligor Group", and individually, as a "Guarantor". Concurrent with the close of the TFCF acquisition, $16.8 billion of TFCF's assumed public debt (which then constituted 96% of such debt) was exchanged for senior notes of TWDC (the "exchange notes") issued pursuant to an exemption from registration under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to an Indenture, dated as of March 20, 2019, between TWDC, Legacy Disney, as guarantor, and Citibank, N.A., as trustee (the "TWDC Indenture") and guaranteed by Legacy Disney. On November 26, 2019, $14.0 billion of the outstanding exchange notes were exchanged for new senior notes of TWDC registered under the Securities Act, issued pursuant to the TWDC Indenture and guaranteed by Legacy Disney. In addition, contemporaneously with the closing of the March 20, 2019 exchange offer, TWDC entered into a guarantee of the registered debt securities issued by Legacy Disney under the Indenture dated as of September 24, 2001 between Legacy Disney and Wells Fargo Bank, National Association, as trustee (the "2001 Trustee") (as amended by the first supplemental indenture among Legacy Disney, as issuer, TWDC, as guarantor, and the 2001 Trustee, as trustee).

60

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

Other subsidiaries of the Company do not guarantee the registered debt securities of either TWDC or Legacy Disney (such subsidiaries are referred to as the "non-Guarantors"). The par value and carrying value of total outstanding and guaranteed registered debt securities of the Obligor Group at July 2, 2022 was as follows:

| (in millions) | TWDC | | Legacy Disney | |
| --- | --- | --- | --- | --- |
| | Par Value | Carrying Value | Par Value | Carrying Value |
| Registered debt with unconditional guarantee | $ 37,320 | $ 38,162 | $ 9,170 | $ 9,007 |

The guarantees by TWDC and Legacy Disney are full and unconditional and cover all payment obligations arising under the guaranteed registered debt securities. The guarantees may be released and discharged upon (i) as a general matter, the indebtedness for borrowed money of the consolidated subsidiaries of TWDC in aggregate constituting no more than 10% of all consolidated indebtedness for borrowed money of TWDC and its subsidiaries (subject to certain exclusions), (ii) upon the sale, transfer or disposition of all or substantially all of the equity interests or all or substantially all, or substantially as an entirety, the assets of Legacy Disney to a third party, and (iii) other customary events constituting a discharge of a guarantor's obligations. In addition, in the case of Legacy Disney's guarantee of registered debt securities issued by TWDC, Legacy Disney may be released and discharged from its guarantee at any time Legacy Disney is not a borrower, issuer or guarantor under certain material bank facilities or any debt securities.

Operations are conducted almost entirely through the Company's subsidiaries. Accordingly, the Obligor Group's cash flow and ability to service its debt, including the public debt, are dependent upon the earnings of the Company's subsidiaries and the distribution of those earnings to the Obligor Group, whether by dividends, loans or otherwise. Holders of the guaranteed registered debt securities have a direct claim only against the Obligor Group.

Set forth below is summarized financial information for the Obligor Group on a combined basis after elimination of (i) intercompany transactions and balances between TWDC and Legacy Disney and (ii) equity in the earnings from and investments in any subsidiary that is a non-Guarantor. This summarized financial information has been prepared and presented pursuant to the Securities and Exchange Commission Regulation S-X Rule 13-01, "Financial Disclosures about Guarantors and Issuers of Guaranteed Securities" and is not intended to present the financial position or results of operations of the Obligor Group in accordance with GAAP.

| Results of operations (in millions) | Nine Months Ended July 2, 2022 |
| --- | --- |
| Revenues | $ — |
| Costs and expenses | — |
| Net income (loss) from continuing operations | (642) |
| Net income (loss) | (642) |
| Net income (loss) attributable to TWDC shareholders | (642) |

| Balance Sheet (in millions) | July 2, 2022 | October 2, 2021 |
| --- | --- | --- |
| Current assets | $ 5,502 | $ 9,506 |
| Noncurrent assets | 1,629 | 1,689 |
| Current liabilities | 6,059 | 6,878 |
| Noncurrent liabilities (excluding intercompany to non-Guarantors) | 48,584 | 51,439 |
| Intercompany payables to non-Guarantors | 146,296 | 147,629 |

## COMMITMENTS AND CONTINGENCIES

*Legal Matters*

As disclosed in Note 13 to the Condensed Consolidated Financial Statements, the Company has exposure for certain legal matters.

*Guarantees*

See Note 15 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K.

*Tax Matters*

As disclosed in Note 10 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K, the Company has exposure for certain tax matters.

**Ex. 12
Page 1317**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Contractual Commitments*

See Note 15 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K.

**OTHER MATTERS**

**Accounting Policies and Estimates**

We believe that the application of the following accounting policies, which are important to our financial position and results of operations, require significant judgments and estimates on the part of management. For a summary of our significant accounting policies, including the accounting policies discussed below, see Note 2 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K.

*Produced and Acquired/Licensed Content Costs*

We amortize and test for impairment of capitalized film and television production costs based on whether the content is predominantly monetized individually or as a group. See Note 7 to the Condensed Consolidated Financial Statements for further discussion.

Production costs that are classified as individual are amortized based upon the ratio of the current period's revenues to the estimated remaining total revenues (Ultimate Revenues).

With respect to produced films intended for theatrical release, the most sensitive factor affecting our estimate of Ultimate Revenues is theatrical performance. Revenues derived from other markets subsequent to the theatrical release are generally highly correlated with theatrical performance. Theatrical performance varies primarily based upon the public interest and demand for a particular film, the popularity of competing films at the time of release and the level of marketing effort. Upon a film's release and determination of the theatrical performance, the Company's estimates of revenues from succeeding windows and markets, which may include imputed license fees for content that is used on our DTC streaming services, are revised based on historical relationships and an analysis of current market trends.

With respect to capitalized television production costs that are classified as individual, the most sensitive factor affecting estimates of Ultimate Revenues is program ratings of the content on our licensees' platforms. Program ratings, which are an indication of market acceptance, directly affect the program's ability to generate advertising and subscriber revenues and are correlated with the license fees we can charge for the content in subsequent windows and for subsequent seasons.

Ultimate Revenues are reassessed each reporting period and the impact of any changes on amortization of production cost is accounted for as if the change occurred at the beginning of the current fiscal year. If our estimate of Ultimate Revenues decreases, amortization of costs may be accelerated or result in an impairment. Conversely, if our estimate of Ultimate Revenues increases, cost amortization may be slowed.

Produced content costs that are part of a group and acquired/licensed content costs are amortized based on projected usage, typically resulting in an accelerated or straight-line amortization pattern. The determination of projected usage requires judgment and is reviewed periodically for changes. If projected usage changes we may need to accelerate or slow the recognition of amortization expense.

The amortization of multi-year sports rights is based on our projections of revenues over the contract period, which include advertising revenue and an allocation of affiliate revenue (relative value). If the annual contractual payments related to each season approximate each season's estimated relative value, we expense the related contractual payments during the applicable season. If estimated relative values by year were to change significantly, amortization of our sports rights costs may be accelerated or slowed.

*Revenue Recognition*

The Company has revenue recognition policies for its various operating segments that are appropriate to the circumstances of each business. Refer to Note 2 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K for our revenue recognition policies.

*Pension and Postretirement Medical Plan Actuarial Assumptions*

The Company's pension and postretirement medical benefit obligations and related costs are calculated using a number of actuarial assumptions. Two critical assumptions, the discount rate and the expected return on plan assets, are important elements of expense and/or liability measurement, which we evaluate annually. See Note 11 to the Consolidated Financial Statements in the 2021 Annual Report on Form 10-K for estimated impacts of changes in these assumptions. Other assumptions include the healthcare cost trend rate and employee demographic factors such as retirement patterns, mortality, turnover and rate of compensation increase.

**Ex. 12**
**Page 1318**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

The discount rate enables us to state expected future cash payments for benefits as a present value on the measurement date. A lower discount rate increases the present value of benefit obligations and increases pension and postretirement medical expense. The guideline for setting this rate is a high-quality long-term corporate bond rate. The Company's discount rate was determined by considering yield curves constructed of a large population of high-quality corporate bonds and reflects the matching of the plans' liability cash flows to the yield curves.

To determine the expected long-term rate of return on the plan assets, we consider the current and expected asset allocation, as well as historical and expected returns on each plan asset class. A lower expected rate of return on plan assets will increase pension and postretirement medical expense.

*Goodwill, Other Intangible Assets, Long-Lived Assets and Investments*

The Company is required to test goodwill and other indefinite-lived intangible assets for impairment on an annual basis and if current events or circumstances require, on an interim basis. The Company performs its annual test of goodwill and indefinite-lived intangible assets for impairment in its fiscal fourth quarter.

Goodwill is allocated to various reporting units, which are an operating segment or one level below the operating segment. To test goodwill for impairment, the Company first performs a qualitative assessment to determine if it is more likely than not that the carrying amount of a reporting unit exceeds its fair value. If it is, a quantitative assessment is required. Alternatively, the Company may bypass the qualitative assessment and perform a quantitative impairment test.

The qualitative assessment requires the consideration of factors such as recent market transactions, macroeconomic conditions, and changes in projected future cash flows of the reporting unit.

The quantitative assessment compares the fair value of each goodwill reporting unit to its carrying amount, and to the extent the carrying amount exceeds the fair value, an impairment of goodwill is recognized for the excess up to the amount of goodwill allocated to the reporting unit.

The impairment test for goodwill requires judgment related to the identification of reporting units, the assignment of assets and liabilities to reporting units including goodwill, and the determination of fair value of the reporting units. To determine the fair value of our reporting units, we apply what we believe to be the most appropriate valuation methodology for each of our reporting units. We generally use a present value technique (discounted cash flows) corroborated by market multiples when available and as appropriate. The discounted cash flow analyses are sensitive to our estimates of future revenue growth and margins for these businesses as well as the discount rates used to calculate the present value of future cash flows. In times of adverse economic conditions in the global economy, the Company's long-term cash flow projections are subject to a greater degree of uncertainty than usual. We believe our estimates are consistent with how a marketplace participant would value our reporting units. If we had established different reporting units or utilized different valuation methodologies or assumptions, the impairment test results could differ, and we could be required to record impairment charges.

To test its other indefinite-lived intangible assets for impairment, the Company first performs a qualitative assessment to determine if it is more likely than not that the carrying amount of each of its indefinite-lived intangible assets exceeds its fair value. If it is, a quantitative assessment is required. Alternatively, the Company may bypass the qualitative assessment and perform a quantitative impairment test.

The qualitative assessment requires the consideration of factors such as recent market transactions, macroeconomic conditions, and changes in projected future cash flows.

The quantitative assessment compares the fair value of an indefinite-lived intangible asset to its carrying amount. If the carrying amount of an indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized for the excess. Fair values of indefinite-lived intangible assets are determined based on discounted cash flows or appraised values, as appropriate.

The Company tests long-lived assets, including amortizable intangible assets, for impairment whenever events or changes in circumstances (triggering events) indicate that the carrying amount may not be recoverable. Once a triggering event has occurred, the impairment test employed is based on whether the Company's intent is to hold the asset for continued use or to hold the asset for sale. The impairment test for assets held for use requires a comparison of the estimated undiscounted future cash flows expected to be generated over the useful life of the significant assets of an asset group to the carrying amount of the asset group. An asset group is generally established by identifying the lowest level of cash flows generated by a group of assets that are largely independent of the cash flows of other assets and could include assets used across multiple businesses. If the carrying amount of an asset group exceeds the estimated undiscounted future cash flows, an impairment would be measured as the difference between the fair value of the asset group and the carrying amount of the asset group. For assets held for sale, to the extent the carrying value is greater than the asset's fair value less costs to sell, an impairment loss is recognized for the difference. Determining whether a long-lived asset is impaired requires various estimates and assumptions, including whether a

63

**Ex. 12**
**Page 1319**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

triggering event has occurred, the identification of asset groups, estimates of future cash flows and the discount rate used to determine fair values.

The Company has investments in equity securities. For equity securities that do not have a readily determinable fair value, we consider forecasted financial performance of the investee companies, as well as volatility inherent in the external markets for these investments. If these forecasts are not met, impairment charges may be recorded.

*Allowance for Credit Losses*

We evaluate our allowance for credit losses and estimate collectability of accounts receivable based on historical bad debt experience, our assessment of the financial condition of individual companies with which we do business, current market conditions, and reasonable and supportable forecasts of future economic conditions. In times of economic turmoil, including COVID-19, our estimates and judgments with respect to the collectability of our receivables are subject to greater uncertainty than in more stable periods. If our estimate of uncollectible accounts is too low, costs and expenses may increase in future periods, and if it is too high, costs and expenses may decrease in future periods. See Note 3 to the Condensed Consolidated Financial Statements for additional discussion.

*Contingencies and Litigation*

We are currently involved in certain legal proceedings and, as required, have accrued estimates of the probable and estimable losses for the resolution of these proceedings. These estimates are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies and have been developed in consultation with outside counsel as appropriate. From time to time, we are also involved in other contingent matters for which we accrue estimates for a probable and estimable loss. It is possible, however, that future results of operations for any particular quarterly or annual period could be materially affected by changes in our assumptions or the effectiveness of our strategies related to legal proceedings or our assumptions regarding other contingent matters. See Note 13 to the Condensed Consolidated Financial Statements for more detailed information on litigation exposure.

*Income Tax*

As a matter of course, the Company is regularly audited by federal, state and foreign tax authorities. From time to time, these audits result in proposed assessments. Our determinations regarding the recognition of income tax benefits are made in consultation with outside tax and legal counsel, where appropriate, and are based upon the technical merits of our tax positions in consideration of applicable tax statutes and related interpretations and precedents and upon the expected outcome of proceedings (or negotiations) with taxing and legal authorities. The tax benefits ultimately realized by the Company may differ from those recognized in our future financial statements based on a number of factors, including the Company's decision to settle rather than litigate a matter, relevant legal precedent related to similar matters and the Company's success in supporting its filing positions with taxing authorities.

**Impacts of COVID-19 on Accounting Policies and Estimates**

In light of the currently unknown ultimate duration and severity of COVID-19, we face a greater degree of uncertainty than normal in making the judgments and estimates needed to apply our significant accounting policies and may make changes to these estimates and judgments over time. This could result in meaningful impacts to our financial statements in future periods as discussed below.

*Produced and Acquired/Licensed Content Costs*

Certain of our completed or in progress film and television productions have had their initial release dates delayed. The duration of the delay, market conditions when we release the content, or a change in our release strategy (e.g. bypassing certain distribution windows) could have an impact on Ultimate Revenues, which may accelerate amortization or result in an impairment of capitalized film and television production costs.

Given the ongoing uncertainty around live sporting events continuing uninterrupted, the amount and timing of revenues derived from the broadcast of these events may differ from the projections of revenues that support our amortization pattern of the rights costs we pay for these events. Such changes in revenues could result in an acceleration or slowing of the amortization of our sports rights costs.

*Revenue Recognition*

Certain of our affiliate contracts contain commitments with respect to the content to be aired on our television networks (e.g. live sports or original content). If there are delays or cancellations of live sporting events or disruptions to film and television content production activities, we may need to assess the impact on our contractual obligations and adjust the revenue that we recognize related to these contracts.

**Ex. 12**
**Page 1320**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

*Goodwill, Other Intangible Assets, Long-Lived Assets and Investments*

Given the ongoing impacts of COVID-19 across our businesses, the projected cash flows that we use to assess the fair value of our businesses and assets for purposes of impairment testing are subject to greater uncertainty than normal. If in the future we reduce our estimate of cash flow projections, we may need to impair some of these assets.

*Income Tax (See Note 8 to the Condensed Consolidated Financial Statements)*

The determination of interim period tax provisions generally requires the use of a forecasted full-year effective tax rate, which in turn requires a full year forecast of earnings before tax and tax expense. Given the uncertainties created by COVID-19, these forecasts are subject to greater than normal variability, which could lead to volatility in our reported quarterly effective tax rates.

*Risk Management Contracts*

The Company employs a variety of financial instruments (derivatives) including interest rate and cross-currency swap agreements and forward and option contracts to manage its exposure to fluctuations in interest rates, foreign currency exchange rates and commodity prices.

As a result of the impact of COVID-19 on our businesses, our projected cash flows or projected usage of commodities are subject to a greater degree of uncertainty, which may cause us to recognize gains or losses on our hedging instruments in different periods than the hedged transaction.

**New Accounting Pronouncements**

See Note 17 to the Condensed Consolidated Financial Statements for information regarding new accounting pronouncements.

**MARKET RISK**

The Company is exposed to the impact of interest rate changes, foreign currency fluctuations, commodity fluctuations and changes in the market values of its investments.

**Policies and Procedures**

In the normal course of business, we employ established policies and procedures to manage the Company's exposure to changes in interest rates, foreign currencies and commodities using a variety of financial instruments.

Our objectives in managing exposure to interest rate changes are to limit the impact of interest rate volatility on earnings and cash flows and to lower overall borrowing costs. To achieve these objectives, we primarily use interest rate swaps to manage net exposure to interest rate changes related to the Company's portfolio of borrowings. By policy, the Company targets fixed-rate debt as a percentage of its net debt between minimum and maximum percentages.

Our objective in managing exposure to foreign currency fluctuations is to reduce volatility of earnings and cash flow in order to allow management to focus on core business issues and challenges. Accordingly, the Company enters into various contracts that change in value as foreign exchange rates change to protect the U.S. dollar equivalent value of its existing foreign currency assets, liabilities, commitments and forecasted foreign currency revenues and expenses. The Company utilizes option strategies and forward contracts that provide for the purchase or sale of foreign currencies to hedge probable, but not firmly committed, transactions. The Company also uses forward and option contracts to hedge foreign currency assets and liabilities. The principal foreign currencies hedged are the euro, Japanese yen, British pound, Chinese yuan and Canadian dollar. Cross-currency swaps are used to effectively convert foreign currency denominated borrowings to U.S. dollar denominated borrowings. By policy, the Company maintains hedge coverage between minimum and maximum percentages of its forecasted foreign exchange exposures generally for periods not to exceed four years. The gains and losses on these contracts offset changes in the U.S. dollar equivalent value of the related exposures. The economic or political conditions in a country have reduced and in the future could reduce our ability to hedge exposure to currency fluctuations in the country or our ability to repatriate revenue from the country.

Our objectives in managing exposure to commodity fluctuations are to use commodity derivatives to reduce volatility of earnings and cash flows arising from commodity price changes. The amounts hedged using commodity swap contracts are based on forecasted levels of consumption of certain commodities, such as fuel oil and gasoline.

Our objectives in managing exposures to market-based fluctuations in certain retirement liabilities are to use total return swap contracts to reduce the volatility of earnings arising from changes in these retirement liabilities. The amounts hedged using total return swap contracts are based on estimated liability balances.

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (continued)**

It is the Company's policy to enter into foreign currency and interest rate derivative transactions and other financial instruments only to the extent considered necessary to meet its objectives as stated above. The Company does not enter into these transactions or any other hedging transactions for speculative purposes.

66

**Item 3. Quantitative and Qualitative Disclosures about Market Risk.**

See Item 2, Management's Discussion and Analysis of Financial Condition and Results of Operations, and Note 15 to the Condensed Consolidated Financial Statements.

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures** – We have established disclosure controls and procedures to ensure that the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and that such information is accumulated and made known to the officers who certify the Company's financial reports and to other members of senior management and the Board of Directors as appropriate to allow timely decisions regarding required disclosure.

Based on their evaluation as of July 2, 2022, the principal executive officer and principal financial officer of the Company have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) are effective.

**Changes in Internal Controls** – There have been no changes in our internal control over financial reporting during the third quarter of fiscal 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Ex. 12**
**Page 1323**

**PART II. OTHER INFORMATION**

**ITEM 1. Legal Proceedings**

As disclosed in Note 13 to the Condensed Consolidated Financial Statements, the Company is engaged in certain legal matters, and the disclosure set forth in Note 13 relating to certain legal matters is incorporated herein by reference.

**ITEM 1A. Risk Factors**

For an enterprise as large and complex as the Company, a wide range of factors could materially affect future developments and performance, including those described in "Risk Factors" in our 2021 Annual Report on Form 10-K and the factors affecting specific business operations identified in connection with the description of these operations and the financial results of these operations elsewhere in our filings with the SEC. There have been no material changes in our risk factors from those disclosed in our 2021 Annual Report on Form 10-K.

**Ex. 12**
**Page 1324**

**ITEM 2. Unregistered Sales of Equity Securities and Use of Proceeds**

(a) The following table provides information about Company purchases of equity securities that are registered by the Company pursuant to Section 12 of the Exchange Act during the quarter ended July 2, 2022:

| Period | Total Number of Shares Purchased[1] | | Weighted Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs[2] |
|---|---|---|---|---|---|
| April 3, 2022 - April 30, 2022 | 23,363 | $ | 125.98 | — | na |
| May 1, 2022 - May 31, 2022 | 42,751 | | 105.99 | — | na |
| June 1, 2022 - July 2, 2022 | 36,469 | | 97.09 | — | na |
| Total | 102,583 | | 107.38 | — | na |

[1]   102,583 shares were purchased on the open market to provide shares to participants in the Walt Disney Investment Plan. These purchases were not made pursuant to a publicly announced repurchase plan or program.

[2]   Not applicable as the Company no longer has a stock repurchase plan or program.

**Ex. 12**
**Page 1325**

**ITEM 5. Other Items**

None.

70

**ITEM 6. Exhibits**

INDEX OF EXHIBITS

| Number and Description of Exhibit<br>(Numbers Coincide with Item 601 of Regulation S-K) | Document Incorporated by Reference from a Previous Filing or Filed Herewith, as Indicated below |
|---|---|
| 10.1 Amendment dated July 15, 2022 to the Employment Agreement dated February 24, 2020, between the Company and Robert Chapek † | Filed herewith |
| 10.2 Amendment dated July 21, 2022 to the Employment Agreement dated December 21, 2021, between Disney Corporate Services Co., LLC and Horacio E. Gutierrez and to the Indemnification Agreement dated December 21, 2021, between the Company and Horacio E. Gutierrez † | Filed herewith |
| 10.3 Employment Agreement, dated June 29, 2022, between the Company and Kristina K. Schake † | Filed herewith |
| 10.4 Consulting Agreement, dated July 14, 2022, between the Company and Alan N. Braverman † | Filed herewith |
| 10.5 Amended and Restated General Release, dated June 23, 2022, between the Company and Geoff Morrell † | Filed herewith |
| 10.6 Form of Non-Qualified Stock Option Award Agreement † | Filed herewith |
| 10.7 Form of Restricted Stock Unit Award Agreement (Time-Based Vesting) † | Filed herewith |
| 22 List of Guarantor Subsidiaries | Filed herewith |
| 31(a) Rule 13a-14(a) Certification of Chief Executive Officer of the Company in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 31(b) Rule 13a-14(a) Certification of Chief Financial Officer of the Company in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32(a) Section 1350 Certification of Chief Executive Officer of the Company in accordance with Section 906 of the Sarbanes-Oxley Act of 2002* | Furnished |
| 32(b) Section 1350 Certification of Chief Financial Officer of the Company in accordance with Section 906 of the Sarbanes-Oxley Act of 2002* | Furnished |
| 101 The following materials from the Company's Quarterly Report on Form 10-Q for the quarter ended July 2, 2022 formatted in Inline Extensible Business Reporting Language (iXBRL): (i) the Condensed Consolidated Statements of Income, (ii) the Condensed Consolidated Statements of Comprehensive Income, (iii) the Condensed Consolidated Balance Sheets, (iv) the Condensed Consolidated Statements of Cash Flows, (v) the Condensed Consolidated Statements of Equity and (vi) related notes | Filed herewith |
| 104 Cover Page Interactive Data File (embedded within the Inline XBRL document) | Filed herewith |

\*   This certification is deemed not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liability of that section, nor shall it be deemed incorporated by reference into any filing under the Securities Act of 1933, as amended or the Exchange Act.

†   Management Contract or compensatory plan or arrangement.

71

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

THE WALT DISNEY COMPANY
(Registrant)

By:     /s/ CHRISTINE M. MCCARTHY

Christine M. McCarthy,
Senior Executive Vice President and Chief Financial Officer

August 10, 2022
Burbank, California

72

**Ex. 12**
**Page 1328**

**Exhibit 10.1**

**THE WALT DISNEY COMPANY**
**500 South Buena Vista Street**
**Burbank, California 91521**

July 15, 2022

Mr. Robert Chapek
Chief Executive Officer
The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

Employment Agreement
dated as of February 24, 2020

     This letter amends the captioned employment agreement (the "Agreement") to (1) extend the term thereof by replacing the date February 28, 2023, in Paragraph 1 thereof with the date June 30, 2025, and (2) increase the target accounting award value specified in the third sentence of Paragraph 3(c) from $15 million to $20 million.

     Additionally, to conform such term to the definition contained in the employment agreements applicable to the Company's most recent agreements with senior executives, the defined term of "Termination for Cause" as set forth in Paragraph 5(e) of the Agreement is amended to read as follows:

> "***Termination for Cause***" means a termination based on Executive's (i) conviction of embezzlement, fraud, or other conduct which would constitute a felony; (ii) willful unauthorized disclosure of confidential information; (iii) failure, neglect of, or refusal to substantially perform the duties of the Executive's employment; or (iv) any other act or omission which is a significant breach of the Company's policies or which is significantly injurious to the financial condition or business reputation of the Company or any Affiliate thereof, which termination may be effected (A) immediately upon notice from the Company if the Company shall reasonably and in good faith determine that the conduct or cause specified in such notice is not curable (it being understood that such notice shall describe in reasonable detail the conduct or cause giving rise to such notice and shall state the reason(s) why the Company has determined that such conduct or cause is not curable); or (B) upon twenty business days notice from the Company, if the Company shall and in good faith determine that the conduct or cause specified in such notice is curable (it being understood that such notice shall describe in reasonable detail the conduct or cause giving rise to such notice and shall state the reason(s) why the Company has determined that such conduct or cause is curable and what steps the Company believes should or could be taken to cure such conduct or cause, provided, however, that such opportunity to cure shall only be provided by the Company with respect to a termination of Executive's

**Ex. 12**
**Page 1329**

employment hereunder due to gross negligence); provided that the Company shall not be entitled to terminate Executive's employment for Cause, if Executive has, within five business days after notice in accordance with subclause (B) has been given personally to Executive or otherwise has been received by Executive, commenced in good faith to cure the conduct or cause specified in such notice and completes such cure within 20 business days following the date such notice was received.

Except as modified as specified above, the Agreement shall otherwise continue in accordance with its terms.

If you agree that the foregoing sets forth our full understanding regarding the amendment of the Agreement, please evidence your agreement and acceptance by counter-signing this letter where indicated below.

THE WALT DISNEY COMPANY

By:  /s/ Paul Richardson
Paul Richardson
Senior Executive Vice President and
Chief Human Resources Officer

Date:  July 15, 2022

AGREED AND ACCEPTED

/s/ Robert Chapek
Robert Chapek

Date:    July 15, 2022

**Ex. 12**
**Page 1330**

**Exhibit 10.2**

**DISNEY CORPORATE SERVICES CO., LLC**
**500 South Buena Vista Street**
**Burbank, California 91521**

July 21, 2022

Mr. Horacio E. Gutierrez
Senior Executive Vice President
and General Counsel
The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

> **RE: <u>Amendment to that certain Employment Agreement, dated as of December 21, 2021, by and between Disney Corporate Services Co., LLC and Horacio E. Gutierrez (the "Employment Agreement"); and to that certain Indemnification Agreement, dated as of December 21, 2021, by and between The Walt Disney Company and Horacio E. Gutierrez (the "Indemnification Agreement")</u>**

Dear Mr. Gutierrez:

This letter agreement will confirm that the Employment Agreement and Indemnification Agreement are hereby amended as follows, effective as of June 29, 2022:

1. The first sentence of Paragraph 2 of the Employment Agreement is hereby deleted in its entirety and replaced with the following:

> During the Employment Period, Executive shall serve as Senior Executive Vice President and General Counsel, The Walt Disney Company, and in such other positions with the Company and its subsidiaries consistent with Executive's position as Senior Executive Vice President and General Counsel, The Walt Disney Company, as the Company reasonably may assign.

2. References to "Senior Executive Vice President, General Counsel and Secretary of the Company" in the definition of "Termination for Good Reason" in Paragraph 5(e) of the Employment Agreement are hereby deleted and replaced with "Senior Executive Vice President and General Counsel, The Walt Disney Company."

3. The reference to "Senior Executive Vice President, General Counsel and Secretary, of the Company" in the third paragraph of the Indemnification Agreement is hereby deleted and replaced with "Senior Executive Vice President and General Counsel, The Walt Disney Company."

As amended hereby, the Employment Agreement and the Indemnification Agreement shall continue in full force and effect in accordance with their terms. If the foregoing accurately reflects your understanding of our mutual agreement, please so indicate in the space provided below and return an executed copy hereof to us at your earliest convenience.

Very truly yours,

DISNEY CORPORATE SERVICES
CO., LLC

By: <u>/s/ Jim Kapenstein</u>
President

Date: <u>July 21, 2022</u>

ACCEPTED AND AGREED TO:

<u>/s/ Horacio E. Gutierrez</u>
Horacio E. Gutierrez

Date: <u>July 21, 2022</u>

**Ex. 12**
**Page 1331**

Exhibit 10.3

<u>EMPLOYMENT AGREEMENT</u>

EMPLOYMENT AGREEMENT, dated as of June 29, 2022, by and between The Walt Disney Company, a Delaware corporation (the "***Company***"), and Kristina K. Schake ("***Executive***").

<u>W I T N E S S E T H</u>:

WHEREAS, the Company has most recently employed Executive pursuant to an employment agreement, dated as of April 1, 2022, which is scheduled to expire by its own terms on March 31, 2025 (the "Prior Agreement"), and which shall be superseded in its entirety on the date hereof by this Agreement except as otherwise provided in Paragraph 8(e) hereof; and

WHEREAS, the Company and Executive wish to enter into an agreement (this "***Agreement***") to provide for Executive's continued service to the Company;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Company and Executive hereby agree as follows:

1.    <u>Employment</u>. Upon the terms and subject to the conditions of this Agreement, the Company hereby employs Executive, and Executive hereby accepts employment by the Company, for the period commencing as of June 29, 2022 (the "***Commencement Date***") and ending on June 29, 2025 (or such earlier date as shall be determined pursuant to Paragraph 5). The period during which Executive is employed pursuant to this Agreement shall be referred to as the "***Employment Period***."

2.    <u>Position and Duties</u>. During the Employment Period, Executive shall serve as Senior Executive Vice President and Chief Communications Officer of the Company and in such other positions with the Company and its subsidiaries consistent with Executive's position as Senior Executive Vice President and Chief Communications Officer, as the Company reasonably may assign. Executive's upward reporting structure will be consistent with the upward reporting structure of comparable senior executives. During the Employment Period, Executive shall devote all Executive's business time on a full-time and exclusive basis to the services required hereunder, and shall perform such services in a manner consonant with the duties of Executive's position. Executive shall be subject to the terms and conditions of any applicable policy of the Company (including, without limitation, "The Walt Disney Company and Affiliated Companies Standards of Business Conduct" booklet and the Employee Policy Manual), as reasonably made available and as interpreted from time to time by the Company, provided that, subject to the provisions of Paragraph 7 and the Employee Policy Manual, nothing herein shall preclude Executive from (<u>i</u>) engaging in charitable activities and community affairs, and (ii) managing Executive's personal investments, so long as the activities listed in subclauses (i)-(ii) do not materially interfere, individually or in the aggregate, with the proper performance of Executive's duties and responsibilities hereunder.

3.      Compensation.

(a)      Base Salary. Commencing May 1, 2022, Executive shall receive an annual base salary of $725,000. Subsequent salary amounts shall be determined by the Company in its sole discretion; provided, however, that none of such subsequent annualized salaries shall be less than $725,000. Notwithstanding any other provision of this Agreement or any other Company document reflecting Executive's Base Salary (as defined below), the Company may reduce Executive's Base Salary by any amount up to 50% of Executive's then-current Base Salary for any period of time up to a consecutive or cumulative maximum period of six months if during such applicable period Disney has instituted a Disney-wide salary reduction program broadly applicable to employees at a comparable level to Executive

The amount of annual base salary payable under this Paragraph 3(a) shall be reduced, however, to the extent Executive elects in accordance with Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*"), and the regulations and interpretations thereunder ("*Section 409A*"), to defer such salary under the terms of any deferred compensation or savings plan or arrangement maintained or established by or on behalf of the Company or any of its subsidiaries. Executive's annual base salary payable hereunder, without reduction for any amounts deferred as described above, is referred to herein as the "*Base Salary*." The Company shall pay Executive the portion of Base Salary not deferred at the election of Executive in accordance with its generally applicable policies for comparable senior executives (currently paid on a weekly basis), but not less frequently than in equal monthly installments.

(b)      Annual Incentive Bonus. Executive shall be given the opportunity to earn an annual discretionary incentive bonus in accordance with the annual bonus plan generally applicable to the most senior executives of the Company, as the same may be in effect from time to time (the "*Annual Plan*"). Executive's target annual incentive bonus opportunity under the Annual Plan during each full fiscal year during the term hereof shall be one hundred twenty-five percent (125%) of Executive's Base Salary in effect at the end of such fiscal year. The actual amount payable to Executive as an annual bonus under the Annual Plan shall be dependent upon the achievement of performance objectives established in accordance with the Annual Plan by the Board of Directors of the Company or the committee of the Board of Directors of the Company responsible for administering such Annual Plan (the "*Compensation Committee*"), which, as to Company performance objectives, shall be substantially the same as the objectives established under the Annual Plan for other senior executive officers of the Company, though individual performance criteria may differ to reflect differences in responsibilities. The preceding sentence shall not limit any power or discretion of the Board of Directors of Company or the Compensation Committee in the

2

administration of the Annual Plan. Any bonus payable pursuant to this Paragraph 3(b) shall be paid at the same time as annual bonuses are generally payable to the most senior executives of Company in accordance with the provisions of the Annual Plan, subject to Executive's continued employment with Company through the date on which such bonuses are paid. If Executive's employment continues until and ends upon the Scheduled Expiration Date, the Chief Executive Officer of the Company will, in his discretion, recommend to the Compensation Committee an annual cash bonus for the fiscal year in which the termination occurs in consideration of Executive's contributions during such fiscal year. Such bonus shall be payable at the same time annual cash bonuses are paid to senior management and shall be based on actual achievement of performance targets, evaluated as if Executive had remained employed through the end of the applicable performance period.

     (c)    <u>Eligibility for Equity Awards</u>. Subject to the terms of this Agreement, Executive shall be entitled to participate in any stock option, restricted stock unit, performance share, performance unit or other equity-based long-term incentive compensation plan, program or arrangement generally made available to the most senior executives of Company, on substantially the same terms and conditions as generally apply to such other such executives, except that the size of the awards made to Executive shall reflect Executive's position with the Company and the Compensation Committee's evaluation of Executive's performance and competitive compensation practices. For each full fiscal year during the term hereof, Executive shall receive an annual award with a target accounting award value (which value shall be as determined in accordance with the policies and practices generally applicable to the most senior executives of Company) of two hundred fifty percent (250%) of Executive's Base Salary as expected to be in effect at the end of such fiscal year; it being understood that the form of the award shall be determined by the Compensation Committee and such form shall be subject to the terms of the applicable plan or plans of the Company. The preceding sentence shall not limit any power or discretion of the Board of Directors of Company or the Committee in the administration of any such long-term incentive plan, it being understood, specifically, that the Compensation Committee may adjust (i.e. reduce or increase) the target award value of any award made in respect of any fiscal year based on its evaluation of Executive's performance and/or any economic, financial and/or market conditions affecting the Company. The actual benefits conveyed to Executive in respect of any such awards may be less than, greater than or equal to the targeted award value, as such benefits will be dependent on a series of performance and other factors, such as the value of Company's common stock and satisfaction of any applicable vesting requirements and performance conditions.

     (d)    <u>Promotion Equity-Based Award</u>. In connection with the commencement of Executive's services hereunder, the Company shall

3

**Ex. 12**<br>**Page 1334**

recommend to the Compensation Committee of the board of directors of Company that Executive receive a one-time award of long-term incentive stock units with a target award value of $53,000, as determined by Company in accordance with its policies and practices generally, it being understood that the form of the award shall be determined by the Compensation Committee, and such form shall be subject to the terms of the applicable plan or plans of Company (the "*Award*"). The actual benefits conveyed to Executive in respect of such Award may be less than, greater than, or equal to the targeted award value, as such benefits will be dependent on the value of Disney's common stock, on the satisfaction of applicable vesting requirements, and, with respect to performance-based restricted stock units, to Disney's exercise of discretion in determining the extent of Executive's overall performance and contributions to Company's business, in each case as set forth in the award agreement specific to this Award. Such long-term incentive stock units shall be scheduled to vest at the rate of one-third (1/3) per year on each of the first through third anniversaries of the grant date, except as to any portion of the award that is provided in performance-based stock units, which portion will cliff vest on the third anniversary of the grant date, in all cases subject to Executive's continued employment by Company and to the other provisions of the applicable stock incentive plan.

4. <u>Benefits, Perquisites and Expenses</u>.

(a)    <u>Benefits</u>. During the Employment Period, Executive shall be eligible to participate in (<u>i</u>) each welfare benefit plan sponsored or maintained from time to time by the Company and made available generally to its executive officers, including, without limitation, each such group life, hospitalization, medical, dental, health, accident or disability insurance, vacation or similar plan or program, whether now existing or established hereafter, and (<u>ii</u>) each pension, profit sharing, retirement, deferred compensation or savings plan sponsored or maintained by the Company for its executive officers, whether now existing or established hereafter, in accordance with the generally applicable provisions thereof.

(b)    <u>Perquisites</u>. During the Employment Period, Executive shall be entitled to receive such perquisites as are generally provided to other executive officers of the Company in accordance with the then current policies and practices of the Company.

(c)    <u>Business Expenses</u>. The Company shall pay or reimburse Executive for all reasonable expenses incurred or paid by Executive during the Employment Period in the performance of Executive's duties hereunder, upon presentation of expense statements or vouchers and such other information as the Company may reasonably require and in accordance with the generally applicable policies and

4

**Ex. 12**
**Page 1335**

procedures of the Company for its executive officers as in effect from time to time.

(d)    Indemnification. The Company shall cause Disney to provide Executive with an indemnification agreement substantially in the form attached hereto as Exhibit A (the "***Indemnification Agreement***"), which agreement shall be signed and delivered to Executive upon execution of this Agreement by the parties hereto.

5.    Termination of Employment.

(a)    Early Termination of the Employment Period. Notwithstanding Paragraph 1, the Employment Period shall end upon the earliest to occur, if any, of (i) Executive's death, (ii) a Termination due to Disability, (iii) a Termination for Cause, (iv) the Termination Date specified in connection with any exercise by the Company of its Termination Right or (v) a Termination for Good Reason. If the Employment Period terminates as of a date specified under this Paragraph 5, Executive shall be deemed to have automatically resigned, effective immediately upon termination, from any and all positions Executive holds with the Company and any of its subsidiaries and affiliates, with no further action required by Executive or the Company or any of its subsidiaries and affiliates.

(b)    Benefits Payable Upon Termination.

(i)    In the event of Executive's death during the Employment Period or a Termination due to Disability, Executive or Executive's beneficiaries or legal representatives shall be provided the Unconditional Entitlements, including, but not limited to, any such Unconditional Entitlements that are or become payable under any Company plan, policy, practice or program or any contract or agreement with the Company by reason of Executive's death or Termination due to Disability. Unless and until a Termination due to Disability, during any period during which Executive is unable to perform the services required hereunder for medical or health-related reasons, Executive's Base Salary shall be payable to Executive and for any such period of approved leave, Executive shall remain an employee of the Company for purposes of stock option and restricted stock unit awards, annual incentive bonus compensation pursuant to Paragraph 3(b) hereof, and equity awards pursuant to Paragraph 3(c) hereof.

(ii)    In the event of Executive's Termination for Cause, Executive shall be provided the Unconditional Entitlements, except that Executive will not be paid the bonus referred to in Paragraph 5(c)(ii) below.

5

(iii)    In the event of a Termination for Good Reason or the exercise by the Company of its Termination Right, Executive shall be provided the Unconditional Entitlements. In addition, the Company shall provide Executive the Conditional Benefits, subject to (A) Executive's execution of the Release, (B) Executive having not revoked such Release within the seven-day revocation period permitted following delivery of such Release and (C) Executive's execution of the Consulting Agreement, it being understood, for the avoidance of doubt, that any failure by Executive to execute either the Consulting Agreement or the Release or both of them shall not be deemed to be a breach hereof. For Executive to become entitled to the Conditional Benefits, Executive must deliver both (i) the executed Release and (ii) the executed Consulting Agreement to the Company by no later than twenty-two (22) days following the Termination Date.

(c)    Unconditional Entitlements. For purposes of this Agreement, the "*Unconditional Entitlements*" to which Executive may become entitled under Paragraph 5(b) are as follows:

(i)    Earned Salary. Any Base Salary earned, but unpaid, including without limitation accrued but unused and unpaid vacation, for services rendered to the Company on or prior to the date on which the Employment Period ends pursuant to Paragraph 5(a) (but excluding any salary and interest accrued thereon payment of which has been deferred, which shall be paid as provided under the applicable plan) shall be paid within 30 days following the termination of Executive's employment hereunder (or such date or earlier dates upon which payment of any part or whole of the foregoing is required under applicable law).

(ii)    Prior Year Bonus. If Executive's employment terminates after the end of a fiscal year but before the annual incentive compensation payable for services rendered in that prior fiscal year has been paid, the annual incentive compensation that would have been payable to Executive for such completed fiscal year in accordance with Paragraph 3(b) shall be paid within 30 days following the termination of Executive's employment hereunder (or such date or earlier dates upon which payment of any part or whole of the foregoing is required under applicable law) or, if any part thereof constitutes a bonus which is subject to or conditioned upon any performance conditions, within thirty (30) days following the determination that such conditions have been met, provided that in all events the bonus shall be paid no later than 120 days following Executive's termination of employment.

(iii)    Benefits. All benefits payable to Executive under any employee benefit plans (including, without limitation any pension plans or

6

401(k) plans) of the Company or any of its subsidiaries applicable to Executive at the time of termination of Executive's employment with the Company and all amounts and benefits (other than the Conditional Benefits) which are vested or which Executive is otherwise entitled to receive under the terms of or in accordance with any plan, policy, practice or program of, or any contract or agreement with, the Company or any of its subsidiaries, at or subsequent to the date of Executive's termination without regard to the performance by Executive of further services or the resolution of a contingency, shall be paid or provided in accordance with and subject to the terms and provisions of such plans, it being understood that all such benefits shall be determined on the basis of the actual date of termination of Executive's employment with the Company. Notwithstanding the immediately preceding sentence, Executive shall not be entitled to any benefits under any severance plan or policy of the Company or any of its subsidiaries.

(iv)    Indemnities. Any right which Executive may have to claim a defense and/or indemnity for liabilities to or claims asserted by third parties in connection with Executive's activities as an officer, director or employee of the Company or any of its subsidiaries pursuant to the terms of the Indemnification Agreement referenced in Paragraph 4(d) shall be unaffected by Executive's termination of employment and shall remain in effect in accordance with its terms.

(v)    Medical Coverage. Executive shall be entitled to such continuation of health care coverage as is required under, and in accordance with, applicable law or otherwise provided in accordance with the Company's policies. Executive shall be notified in writing pursuant to this Paragraph 5(c)(v) of Executive's rights to continue such coverage after the termination of Executive's employment, provided that Executive timely complies with the conditions to continue such coverage that are applicable at law or pursuant to Company's policies and procedures to a termination of employment at that time. Executive understands and acknowledges that Executive is responsible to make all payments required for any such continued health care coverage that Executive may choose to receive.

(vi)    Business Expenses. Executive shall be entitled to reimbursement, in accordance with the Company's policies regarding expense reimbursement as in effect from time to time, for all business expenses incurred by Executive prior to the termination of employment.

(vii)    Stock Options/RSUs. Except to the extent additional rights are provided upon Executive's qualifying to receive the Conditional

7

Benefits, Executive's rights with respect to any stock options and/or restricted stock units granted to Executive by the Company shall be governed by the terms and provisions of the plans (including plan rules) and award agreements pursuant to which such stock options and restricted stock units were awarded, as in effect at the date Executive's employment terminates.

(d)    Conditional Benefits. For purposes of this Agreement, the "***Conditional Benefits***" to which Executive may become entitled, provided Executive complies with the terms and conditions hereof (including the applicable agreements attached hereto), are as follows:

(i)    Remaining Salary. As further noted in paragraph 2 of the Consulting Agreement, the Company shall pay Executive a lump sum amount equal to the Consulting Amount as compensation for consulting services under the Consulting Agreement. If the Scheduled Expiration Date is later than the end of the Consulting Agreement Period, the Company shall also pay Executive the Severance Amount. The Consulting Amount and the Severance Amount shall be paid on the date that is six months and one day after the Termination Date (or upon Executive's death, if earlier).

(ii)    Stock Options. The Continuing Stock Options shall become exercisable in accordance with the applicable Original Stock Option Award Documents, on the same basis as such options would have become vested and exercisable if Executive had remained employed under this Agreement through the Scheduled Expiration Date. Once exercisable, all Continuing Stock Options shall remain exercisable until the Stock Option Termination Date. All of Executive's Remaining Stock Options that were vested and exercisable at the Termination Date shall remain exercisable until the Stock Option Termination Date. Notwithstanding any other term or provision hereof, any of Executive's stock options which are not vested at the Termination Date, and which are not Continuing Stock Options, shall automatically terminate upon the Termination Date. Except as otherwise expressly provided herein, all of the Remaining Stock Options shall continue to be subject to the Original Stock Option Award Documents. Notwithstanding the foregoing, in the event of Executive's death prior to the Scheduled Expiration Date, all Continuing Stock Options shall vest on the date of Executive's death and all Remaining Stock Options shall be exercisable for the period following Executive's death determined under such Original Stock Option Award Documents on the same basis as though Executive was employed on the date of Executive's death and regardless of when the Stock Option Termination Date would otherwise have occurred. However, any provisions in the

8

Original Stock Option Award Documents relating to disability or change in control of the Company after the Termination Date shall not be operative with respect to any Remaining Stock Options.

(iii)    RSUs. The Continuing Stock Units shall continue to vest in accordance with the terms of the Original RSU Award Documents, on the same basis as such stock units would have become vested if Executive had remained employed under this Agreement through the Scheduled Expiration Date. Except as otherwise expressly provided herein, all such Continuing Stock Units shall be subject to, and administered in accordance with, the Original RSU Award Documents. Any of Executive's restricted stock unit awards that have not become vested on or before the Termination Date, and that are outstanding at the Termination Date, but which are not Continuing Stock Units, shall automatically terminate on the Termination Date. Notwithstanding any term or provision of the Original RSU Award Documents:

(A)    any provisions in such Original RSU Award Documents relating to disability shall not be applicable to any such Continuing Stock Units after the Termination Date; and

(B)    in the event of Executive's death after the Termination Date but prior to the Scheduled Expiration Date, the terms and provisions of the Original RSU Award Documents shall be interpreted and applied in the same manner with respect to such Continuing Stock Units as if Executive were an active employee on the date of Executive's death.

(C)    to the extent that, under the Company's compensation practices and policies, any tranche of Continuing Stock Units is subject to the achievement of performance conditions which were imposed solely because Executive was an executive officer of the Company who could have been a covered employee within the meaning of Section 162(m) at the time payment in respect of such award was expected to be made (the "*Applicable 162(m) Criteria*") and such Applicable 162(m) Criteria relate, in whole or in part, to any performance period continuing after the end of the Company's fiscal year in which the Termination Date occurs, such Applicable 162(m) Criteria shall be waived as of the Termination Date with respect to such tranche of the Continuing Stock Units; provided, however, that this Paragraph 5(d)(iii)(C) shall not be applicable if and to the extent, in the reasonable opinion of tax counsel to the Company, the presence of such provision would cause any stock units intended to be qualified as other performance based compensation within the

9

meaning of Section 162(m) of the Code to fail to be so qualified at any time prior to Executive's Termination Date.

(iv)    <u>Pro-Rated Current Year Bonus</u>. The Company shall pay Executive a pro rata annual bonus for the fiscal year in which the Termination Date occurs, determined on the basis of an assumed full year target bonus determined pursuant to Section 3(b) and the number of days in the applicable fiscal year occurring on or before the Termination Date. Such pro-rata current year bonus payable pursuant to the foregoing shall be paid no later than the later of (<u>i</u>) two and a half months after the end of Executive's tax year in which the Termination Date occurs and (<u>ii</u>) two and a half months after the end of the Company's tax year in which the Termination Date occurs.

(v)    <u>Additional Distribution Rules in Respect of Conditional Benefits</u>. The following additional rules shall apply with respect to distribution of the payments and benefits, if any, to be provided to Executive under Paragraph 5(d)(i), (iii) and (iv):

(A)    It is intended that each installment of the payments and benefits provided under Paragraphs 5(d)(i), (iii) and (iv) shall be treated as a separate "payment" for purposes of Section 409A. Neither the Company nor Executive shall have the right to accelerate or defer the delivery of any such payments or benefits except to the extent specifically permitted or required by Section 409A;

(B)    Distribution in respect of any tranche of Continuing Stock Units to which Paragraph 5(d)(iii) (C) applies shall be made within 90 days following the later of the date that (<u>i</u>) the service conditions that had originally been specified for such tranche of Continuing Stock Units under the applicable Original RSU Award Documents would otherwise have been satisfied (had Executive continued to be employed) and (<u>ii</u>) the last performance measurement period applicable in respect of such tranche of Continuing Stock Units under the applicable Original RSU Award Documents would otherwise have expired;

(C)    Each installment of the payments and benefits due under Paragraph 5(d)(i) and (iii) that would, absent this subsection, be paid within the six-month period following Executive's "separation from service" (within the meaning of Section 409A of the Code and as provided in Paragraph 5(g) hereof) from the Company shall not be paid until the date that is six months and one day after such separation from service (or, if earlier, Executive's

10

death), with any such installments that are required to be delayed being accumulated during the six-month period and paid in a lump sum on the date that is six months and one day following Executive's separation from service; provided, however, that the preceding provisions of this sentence shall not apply to any installment of payments and benefits if and to the maximum extent that such installment is deemed to be paid under a separation pay plan that does not provide for a deferral of compensation by reason of the application of Treasury Regulation 1.409A-1(b)(9)(iii) (relating to separation pay upon an involuntary separation from service). (Any installments that qualify for the exception under Treasury Regulation Section 1.409A-1(b)(9)(iii) must be paid no later than the last day of Executive's second taxable year following the taxable year of Executive in which the separation from service occurs.) Any subsequent installments that would be payable more than six months following Executive's separation from service shall be paid in accordance with the dates and terms set forth herein.

(e)     <u>Definitions</u>. For purposes of this Paragraph 5, the following terms shall have the meanings ascribed to them below:

"***Consulting Agreement***" means the consulting agreement in the form attached hereto as Exhibit B.

"***Consulting Agreement Period***" means the period established under the Consulting Agreement during which Executive shall be required to provide consulting services to the Company.

"***Consulting Amount***" means a lump sum amount equal to the aggregate Base Salary which would have been earned by Executive during the Employment Period had Executive's employment under this Agreement continued after the Termination Date and through the earlier to occur of (<u>i</u>) the end of the Consulting Agreement Period or (<u>ii</u>) any earlier date that the Consulting Agreement terminates for any reason whatsoever.

"***Continuing Stock Options***" means any of Executive's stock options that were not vested and exercisable at the Termination Date, but that would have become vested and exercisable on or prior to the Latest Stock Option Vesting Date had Executive continued to be employed by the Company through the Scheduled Expiration Date.

"***Continuing Stock Units***" means any of Executive's restricted stock units outstanding at the Termination Date (whether or not subject to performance conditions) that, subject to the satisfaction of any applicable

11

performance conditions, would have become vested on or prior to the Scheduled Expiration Date had Executive continued to be employed by the Company through the Scheduled Expiration Date.

"*Latest Stock Option Vesting Date*" means the date which is three months after the Scheduled Expiration Date.

"*Original Stock Option Award Documents*" means, with respect to any Remaining Stock Option, the terms and provisions of the award agreement and plan pursuant to which such Remaining Stock Option was granted, each as in effect on the Termination Date.

"*Original RSU Award Documents*" means, with respect to any tranche of Continuing Stock Units, the terms and provisions of the award agreement related to, and the plan governing, such tranche of Continuing Stock Units, each as in effect on the Termination Date.

"*Release*" means the General Release in the form set forth in Exhibit C attached hereto.

"*Remaining Stock Options*" means any of Executive's stock options which are (i) vested at the Termination Date or (ii) Continuing Stock Options.

"*Scheduled Expiration Date*" means June 29, 2025.

"*Severance Amount*" means an amount equal to the aggregate Base Salary which would have been earned by Executive under this Agreement for the period commencing on the day after termination of the Consulting Agreement Period and ending on the Scheduled Expiration Date; provided that if the Company terminates the Consulting Agreement due to Executive's uncured material breach of any term thereof, the Severance Amount shall be reduced to zero.

"*Stock Option Termination Date*" means, with respect to any Remaining Stock Option, the expiration date as stated in the applicable award, taking into account any expiration date extension provided in the applicable award based on Executive's age and/or years of service as of the Scheduled Expiration Date.

"*Termination for Cause*" means a termination based on Executive's (i) conviction of embezzlement, fraud, or other conduct which would constitute a felony; (ii) willful unauthorized disclosure of confidential information; (iii) failure, neglect of, or refusal to substantially perform the duties of the Executive's employment; or (iv) any other act or omission which is a significant breach of the Company's policies or which is

12

significantly injurious to the financial condition or business reputation of the Company or any Affiliate thereof, which termination may be effected (A) immediately upon notice from the Company if the Company shall reasonably and in good faith determine that the conduct or cause specified in such notice is not curable (it being understood that such notice shall describe in reasonable detail the conduct or cause giving rise to such notice and shall state the reason(s) why the Company has determined that such conduct or cause is not curable); or (B) upon twenty business days notice from the Company, if the Company shall and in good faith determine that the conduct or cause specified in such notice is curable (it being understood that such notice shall describe in reasonable detail the conduct or cause giving rise to such notice and shall state the reason(s) why the Company has determined that such conduct or cause is curable and what steps the Company believes should or could be taken to cure such conduct or cause, provided, however, that such opportunity to cure shall only be provided by the Company with respect to a termination of Executive's employment hereunder due to gross negligence); provided that the Company shall not be entitled to terminate Executive's employment for Cause, if Executive has, within five business days after notice in accordance with subclause (B) has been given personally to Executive or otherwise has been received by Executive, commenced in good faith to cure the conduct or cause specified in such notice and completes such cure within 20 business days following the date such notice was received.

"***Termination Date***" means the earlier to occur of (i̲) the date the Company specifies in writing to Executive in connection with the exercise of its Termination Right or (ii̲) the date Executive specifies in writing to the Company in connection with any notice to effect a Termination for Good Reason.

"***Termination due to Disability***" means a termination of Executive's employment by the Company because Executive has been incapable, after reasonable accommodation, of substantially fulfilling the positions, duties, responsibilities and obligations set forth in this Agreement because of physical, mental or emotional incapacity resulting from injury, sickness or disease for a period of (i̲) six (6) consecutive months or (ii̲) an aggregate of nine (9) months (whether or not consecutive) in any twelve (12) month period, provided that any notice of such termination of employment must be given when Executive is incapable of substantially fulfilling Executive's positions, duties, responsibilities, and obligations hereunder as referred to above and has not resumed such duties. Any question as to the existence, extent or potentiality of Executive's disability shall be

13

determined by a qualified physician selected by the Company with the consent of Executive, which consent shall not be unreasonably withheld.

"***Termination for Good Reason***" means a termination of Executive's employment under this Agreement by Executive within 30 days of the Company's failure to cure, in accordance with the procedures set forth below, any of the following events: (i) a reduction in Executive's compensation rights hereunder (that is, a reduction in Base Salary, target bonus opportunity specified in Paragraph 3(b) or target annual discretionary incentive award specified in Paragraph 3(c) other than as permitted in Paragraph 3(c), it being understood that the failure of Executive to receive an actual bonus for any fiscal year equal to or greater than the target bonus opportunity or to receive in respect of any equity award granted an amount that is equal to or greater than the target annual incentive value ascribed to such award is not a reduction in such compensation rights); (ii) the removal of Executive by the Company from the position of Senior Executive Vice President and Chief Communications Officer of the Company; (iii) a material reduction in Executive's duties and responsibilities as of the date of this Agreement; (iv) the assignment to Executive of duties that are materially inconsistent with Executive's position or duties or that materially impair Executive's ability to function as Senior Executive Vice President and Chief Communications Officer of the Company, and any other position in which Executive is then serving; (v) the relocation of Executive's principal office to a location that is more than 50 miles outside of the greater Los Angeles area; or (vi) a material breach of any provision of this Agreement by the Company. In addition, following the occurrence of a Change in Control (as defined in the 2011 Stock Incentive Plan of the Company (the "***2011 Stock Plan***"), the Amended and Restated 2005 Stock Incentive Plan (the "***2005 Stock Plan***") and the Amended and Restated 1995 Stock Incentive Plan (the "***1995 Stock Plan***")), any occurrence that would constitute a Triggering Event for purposes of Section 11 of the 2011 Stock Plan, the 2005 Stock Plan and the 1995 Stock Plan (together with the 2011 Stock Plan and 2005 Stock Plan, the "***Plans***"), as such Plans may be amended and/or superceded from time to time, shall also constitute an event upon which Executive may effect a Termination for Good Reason in accordance with this Agreement. Notwithstanding the foregoing, a termination shall not be treated as a Termination for Good Reason (A) if Executive shall have consented in writing to the occurrence of the specific event giving rise to the claim of Termination for Good Reason (and such consent may reasonably be understood to generally relate to the time period in which such event occurred), or (B) unless Executive shall have delivered a written notice to the Company within three months of having actual knowledge of the occurrence of one of such events stating that Executive

14

intends to terminate Executive's employment for Good Reason and specifying the factual basis for such termination, and such event, if capable of being cured, shall not have been cured within 30 days of the receipt of such notice.

"***Termination Right***" means the right of the Company, in its sole, absolute and unfettered discretion, to terminate Executive's employment under this Agreement for any reason or no reason whatsoever. For the avoidance of doubt, any Termination for Cause effected by the Company shall not constitute the exercise of its Termination Right.

(f)    Conflict With Plans. As permitted under the terms of the applicable Plans, the Company and Executive agree that the definitions of Termination for Cause or Termination for Good Reason set forth in this Paragraph 5 shall apply in place of any similar definition or comparable concept applicable under either of the Plans (or any similar definition in any successor plan), except that, in connection with a "Triggering Event" as defined in the Plans, as such Plans may be amended from time to time, the terms of the applicable plan (and not the definitions of Termination for Cause or Termination for Good Reason set forth in this Paragraph 5) shall apply to determine Executive's rights and entitlements in respect of the awards made under any such plan (and only in respect of such awards).

(g)    Section 409A. To the extent applicable, it is intended that this Agreement comply with the requirements of Section 409A, and this Agreement shall be interpreted in a manner consistent with this intent. Notwithstanding anything else contained herein to the contrary, any payment required to be made to Executive hereunder upon Executive's termination of employment (including any payment pursuant to this Paragraph 5) shall be made promptly after the six month anniversary of Executive's date of termination to the extent necessary to avoid imposition on Executive of any tax penalty imposed under Section 409A of the Code. Solely for purposes of determining the time and form of payments due Executive under this Agreement (including any payments due under Paragraph 3(a)) or otherwise in connection with Executive's termination of employment with the Company, Executive shall not be deemed to have incurred a termination of employment unless and until Executive shall incur a "separation from service" within the meaning of Section 409A of the Code. The parties agree, as permitted in accordance with the final regulations thereunder, a "separation from service" shall occur when Executive and the Company reasonably anticipate that Executive's level of bona fide services for the Company (whether as an employee or an independent contractor) will permanently decrease to no more than 40 percent of the average level of bona fide services performed by Executive for the Company over the immediately preceding 36 months. The determination of whether and when a separation from service has occurred shall be made in

15

accordance with this subparagraph and in a manner consistent with Treasury Regulation Section 1.409A-1(h). To the extent that the Company and Executive determine that any provision of this Agreement could reasonably be expected to result in Executive's being subject to the payment of interest or additional tax under Section 409A, the Company and Executive agree, to the extent reasonably possible as determined in good faith, to amend this Agreement, retroactively, if necessary, in order to avoid the imposition of any such interest or additional tax under Section 409A. All reimbursements and in-kind benefits provided under the Agreement shall be made or provided in accordance with the requirements of Section 409A to the extent that such reimbursements or in-kind benefits are subject to Section 409A, including, where applicable, the requirements that (i) any reimbursement is for expenses incurred during Executive's lifetime (or during a shorter period of time specified in this Agreement), (ii) the amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year, (iii) the reimbursement of an eligible expense will be made on or before the last day of the calendar year following the year in which the expense is incurred and (iv) the right to reimbursement is not subject to set off or liquidation or exchange for any other benefit. Each payment of compensation under the Agreement shall be treated as a separate payment of compensation for purposes of Section 409A. Executive's right to any deferred compensation, as defined under Section 409A, shall not be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment, garnishment by creditors, or borrowing to the extent necessary to avoid tax, penalties, and/or interest under Section 409A.

(h)     Amendment of Existing Agreements. The parties acknowledge and agree that to the extent that this Paragraph 5 affects any of the terms and conditions of Executive's Remaining Stock Options or Continuing Stock Units, this Agreement shall constitute an amendment of the Original Stock Option Award Documents and Original RSU Award Documents as they pertain to Executive.

6.     Exclusive Remedy. Executive shall be under no obligation to mitigate damages or seek other employment or other engagement of Executive's services after this Agreement is terminated pursuant to Paragraph 5 in order to obtain the benefits provided for under Paragraph 5(d) of this Agreement. Executive acknowledges and agrees that the payments and rights provided under Paragraph 5 are fair and reasonable, and are Executive's sole and exclusive remedy, in lieu of all other remedies at law or in equity, for termination of Executive's employment by the Company upon exercise of its Termination Right pursuant to this Agreement or upon a Termination for Good Reason. The failure of Executive to execute and timely deliver the Release and the Consulting Agreement for any reason (i) shall limit Executive's rights in connection with the exercise by the Company of its Termination Right solely to the right to receive the Unconditional Entitlements, (ii) shall not effect a modification of any of Executive's

16

commitments set forth in this Agreement (none of which are contingent upon execution of the Release by Executive) and (iii) shall not preserve or revive any rights waived by Executive hereunder. Subject to Executive's execution and delivery of the Release without revocation thereof and execution and delivery of the Consulting Agreement, (i) the Company agrees to enter into the Release and Consulting Agreement, and (ii) there shall be no offset available to the Company against any amounts due, paid or payable to Executive in respect of the Conditional Benefits and Unconditional Entitlements under Paragraph 5 with respect to any compensation, remuneration or payment attributable to any services that Executive may provide to any third party subsequent to termination of employment hereunder, whether as an employee or otherwise.

7.    Non-competition and Confidentiality.

(a)    Non-competition. During the Employment Period, Executive shall not engage in any business, or become associated with any entity, whether as a principal, partner, employee, consultant, shareholder or otherwise (other than as a holder of not in excess of 1% of the outstanding voting shares of any publicly traded company) that is actively engaged in any business, which is in competition, in any geographic area, with a business conducted by the Company or any subsidiary of the Company at the time of the alleged competition.

(b)    Confidentiality. Without limiting the generality of the foregoing, Executive acknowledges signing and delivering to Company The Walt Disney Company and Affiliated Companies Confidentiality Agreement and Executive agrees that all terms and conditions contained therein, and all of Executive's obligations and commitments provided for therein, shall be deemed, and hereby are, incorporated into this Agreement as if set forth in full herein. The provisions of this paragraph shall survive the expiration or earlier termination of this Agreement.

(c)    Company Property. Promptly following Executive's termination of employment, Executive shall return to the Company all property of the Company, and all copies thereof in Executive's possession or under Executive's control, except that Executive may retain notes, files, calendars, contact information and correspondence of a personal nature (whether in hard copy or electronic form), provided, in each case, that no confidential Company information or information intended primarily for internal Company use is contained therein.

(d)    Non-Solicitation of Employees. During the Employment Period and, subject to the provisions of applicable law, during the one-year period following any termination of Executive's employment, Executive shall not, except in the course of carrying out Executive's duties hereunder, directly or indirectly induce any employee of the Company or any of its affiliates, whom Executive knows by reason of Executive's employment with Company, to

17

terminate employment with such entity, and shall not directly or indirectly, either individually or as owner, agent, employee, consultant or otherwise,

 (i) solicit, encourage or induce the employment or engagement of, or entice from the employment of the Company or any of its subsidiaries, or

 (ii) direct, arrange, participate or assist in any such solicitation, encouragement, inducement or enticement of,

any person who is or was employed by the Company or any subsidiary of either (other than Executive's personal assistant) unless such person shall have ceased to be employed by such entity for a period of at least six (6) months.

 (e) <u>Injunctive Relief with Respect to Covenants</u>. Executive acknowledges and agrees that the covenants and obligations of Executive with respect to noncompetition, nonsolicitation, confidentiality and the Company property relate to special, unique and extraordinary matters and that a violation of any of the terms of such covenants and obligations may cause the Company and/or its affiliates irreparable injury for which adequate remedies are not available at law. Executive further acknowledges and agrees that (1) the Company and/or its affiliates may seek an injunction, restraining order or such other equitable relief restraining Executive from committing any violation of the covenants and obligations contained in this Paragraph 7 in any court of competent jurisdiction and (2) Executive's acknowledgements in this Paragraph 7 may be relied on in seeking such remedies, which are cumulative and are in addition to any other rights and remedies the Company and/or its affiliates may have at law or in equity.

8. <u>Miscellaneous</u>.

 (a) <u>Survival</u>. Paragraphs 5 (relating to early termination of the Employment Period), 6 and 7 (relating to nondisclosure and nonsolicitation of employees) shall survive the termination hereof, whether such termination shall be by expiration of the Employment Period in accordance with Paragraph 1 or an early termination of the Employment Period pursuant to Paragraph 5 hereof.

 (b) <u>Binding Effect</u>. This Agreement shall be binding on, and shall inure to the benefit of, the Company and any person or entity that succeeds to the interest of the Company (regardless of whether such succession does or does not occur by operation of law) by reason of a merger, consolidation or reorganization involving the Company or a sale of all or substantially all of the assets of the Company. The Company further agrees that, in the event of a sale of assets as described in the preceding sentence, it shall use its reasonable best efforts to cause such assignee or transferee to expressly assume the liabilities, obligations and duties of the Company hereunder in writing as a condition to any assignment

18

<strong>Ex. 12<br>Page 1349</strong>

thereof to such assignee or transferee. This Agreement shall also inure to the benefit of Executive's heirs, executors, administrators and legal representatives and beneficiaries as provided in Paragraph 8(d).

(c)     <u>Assignment</u>. Except as provided under Paragraph 8(b), and except for transfers and/or assignments of this Agreement from any Company entity to another Company entity, neither this Agreement nor any of the rights or obligations hereunder shall be assigned or delegated by any party hereto without the prior written consent of the other party.

(d)     <u>Beneficiaries/References</u>. Executive shall be entitled, to the extent permitted under any applicable law and the terms of any applicable plan, to select and change a beneficiary or beneficiaries to receive any compensation or benefit payable hereunder following Executive's death by giving the Company written notice thereof. In the event of Executive's death or a judicial determination of Executive's incompetence, reference in this Agreement to Executive shall be deemed, where appropriate, to refer to Executive's beneficiary, estate or other legal representative.

(e)     <u>Entire Agreement</u>. This Agreement shall constitute the entire agreement between the parties hereof, with respect to the matters referred to herein; provided that this Agreement shall not alter, amend, or supercede, except as specifically provided in Paragraph 5, any agreement that includes the terms of any equity grant made to Executive prior to the date hereof or the Indemnification Agreement referenced in Paragraph 4(d), which by their terms survive the termination thereof.

> THERE ARE NO PROMISES, REPRESENTATIONS, INDUCEMENTS OR STATEMENTS BETWEEN THE PARTIES OTHER THAN THOSE THAT ARE EXPRESSLY CONTAINED HEREIN.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to limit, modify or supersede The Walt Disney Company and Affiliated Companies Confidentiality Agreement executed by Executive, which shall survive regardless of the termination of this Agreement.

(f)     <u>Representations</u>. Executive represents that Executive's employment hereunder and compliance by Executive with the terms and conditions of this Agreement will not conflict with or result in the breach of any agreement to which Executive is a party or by which Executive may be bound. The Company represents that (i) it is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) it has the full corporate power and authority to execute and deliver this Agreement, and

19

(iii) the execution, delivery and performance of this Agreement has been duly and validly authorized.

(g)    Authority of The Walt Disney Company Board. For the avoidance of doubt, nothing in this Agreement shall preclude the Board of Directors of the Company or the Compensation Committee from its ability to exercise any power or authority to take such actions as it is required or permitted to take as a matter of law or pursuant to the terms of the Company's governing documents. Nothing in this Paragraph 8(g) shall be construed to modify, amend, limit or otherwise impair the rights and entitlements of Executive set forth in the other Paragraphs of this Agreement (including, without limitation, the rights and entitlements specified in Paragraph 5).

(h)    Severability; Reformation. In the event that one or more of the provisions of this Agreement shall become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby or relieve the Company or Executive of liability for any breach by Company or Executive of any such remaining provisions. In the event any of subparagraphs (a), (b) or (d) of Paragraph 7 hereof is not enforceable in accordance with its terms, Executive and the Company agree that such subparagraph of such Paragraph 7 shall be reformed to make such subparagraph enforceable in a manner which provides the Company the maximum rights permitted at law.

(i)    Waiver. Waiver by any party hereto of any breach or default by the other party of any of the terms of this Agreement shall not operate as a waiver of any other breach or default, whether similar to or different from the breach or default waived. No waiver of any provision of this Agreement shall be implied from any course of dealing between the parties hereto or from any failure by either party hereto to assert its or Executive's rights hereunder on any occasion or series of occasions.

(j)    Notices. Any notice required or desired to be delivered under this Agreement shall be in writing and shall be delivered personally, by courier service, or by registered mail, return receipt requested, and shall be effective upon actual receipt when delivered personally or by courier and when sent by registered mail, three business days following date of mailing, and shall be addressed as follows (or to such other address as the party entitled to notice shall hereafter designate in accordance with the terms hereof):

20

If to the Company:

> The Walt Disney Company
> 500 South Buena Vista Street
> Burbank, California 91521
>
> Attention:    Chief Executive Officer
>                      Facsimile: (818) 560-5960
>
>                      and
>
>                      Senior Executive Vice President,
>                      General Counsel and Secretary
>                      Facsimile: (818) 569-5146

If to Executive:

To the address listed as Executive's principal residence in the Company's human resources records and to Executive's principal place of employment with the Company.

(k)    Amendments. No amendment to this Agreement shall be binding between the parties unless it is in writing and signed by the party against whom enforcement is sought.

(l)    Headings. Headings to paragraphs in this Agreement are for the convenience of the parties only and are not intended to be part of or to affect the meaning or interpretation hereof.

(m)    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and a facsimile signature shall have the same force and effect as one penned in ink.

(n)    Withholding. Any payments provided for herein shall be reduced by any amounts required to be withheld by the Company from time to time under applicable federal, state or local income or employment tax laws or similar statutes or other provisions of law then in effect.

(o)    Governing Law. This Agreement shall be governed by the laws of the State of California, without reference to principles of conflicts or choice of law under which the law of any other jurisdiction would apply.

**Ex. 12**
**Page 1352**

(p)    No Obligation To Continued Employment. This Agreement does not constitute a commitment of Company with regard to Executive's employment, express or implied, other than to the extent expressly provided for herein. Upon termination of this Agreement, neither Company nor Executive shall have any obligation to the other with respect to continued employment. In the event that Executive's employment continues for any period of time following the stated expiration date of this Agreement, unless and until agreed to in a new subscribed written document, such employment or any continuation thereof is "at will," and may be terminated without obligation at any time by either party's giving notice to the other, unless otherwise prescribed by applicable law.

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer and Executive has hereunto set Executive's hand as of the day and year first above written.

THE WALT DISNEY COMPANY

Dated:            July 18, 2022                    By:    /s/ Paul Richardson

Dated:            July 18, 2022                    /s/ Kristina K. Schake
                                                   Kristina K. Schake

22

**Ex. 12**
**Page 1353**

**Exhibit A**

INDEMNIFICATION AGREEMENT

AGREEMENT, dated as of June 29, 2022, between The Walt Disney Company, a Delaware corporation (the "Company") and Kristina K. Schake (the "Indemnitee").

WHEREAS, it is essential to the Company to retain and attract as directors and officers for itself and its subsidiaries the most capable persons available;

WHEREAS, Indemnitee is Senior Executive Vice President and Chief Communications Officer, of the Company;

WHEREAS, in recognition of Indemnitee's need for substantial protection against personal liability in order to enhance Indemnitee's continued service in the position(s) referred to above, the Company wishes to provide in this Agreement for the indemnification of and the advancing of expenses to Indemnitee to the full extent (whether partial or complete) permitted by law and as set forth in this Agreement, and, to the extent insurance is maintained, for the continued coverage of Indemnitee under the Company's directors' and officers' liability insurance policies;

NOW, THEREFORE, in consideration of the premises and of Indemnitee's continuing to serve, at the Company's request, in the position(s) referred to above, and intending to be legally bound hereby, the parties hereto agree as follows:

1. *Certain Definitions*.

    *(a)* A "<u>Change in Control</u>" shall be deemed to have occurred if (i) any "person" (as such term is used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under said Act), directly or indirectly, of securities of the Company representing 25% or more of the total voting power represented by the Company's then outstanding Voting Securities, or (ii) during any period of two consecutive years, individuals who at the beginning of such period constitute the Board of Directors of the Company and any new director whose election by the Board of Directors of the Company or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority thereof, or (iii) the stockholders of the Company approve a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the Voting Securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or being converted into Voting Securities of the surviving entity) at least 75% of the total voting power of such surviving entity outstanding immediately after such merger or consolidation, or the stockholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the

**Ex. 12**
**Page 1354**

Company (in one transaction or a series of transactions) of all or substantially all the Company's assets.

*(b)* "<u>Claim</u>" shall mean any threatened, pending or completed action, suit, proceeding or alternate dispute resolution mechanism, or any inquiry, hearing or investigation, whether conducted by the Company or any other party, that Indemnitee in good faith believes might lead to the institution of any such action, suit, proceeding or alternate dispute resolution mechanism, whether civil, criminal, administrative, investigative or other.

*(c)* "<u>Expenses</u>" shall include attorneys' fees and all other costs, travel expenses, fees of experts, transcript costs, filing fees, witness fees, telephone charges, postage, delivery service fees, expenses and obligations of any nature whatsoever paid or incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness in or participate in any Claim relating to any Indemnifiable Event.

*(d)* "<u>Indemnifiable Event</u>" shall mean any event or occurrence related to the fact that Indemnitee is or was a director, officer, employee, agent or fiduciary of the Company or one of its subsidiaries, or is or was serving at the request of the Company or one of its subsidiaries as a director, officer, employee, trustee, agent or fiduciary of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, or by reason of anything done or not done by Indemnitee in any such capacity.

*(g)* "<u>Independent Legal Counsel</u>" shall mean an attorney, selected in accordance with the provisions of Section 3 hereof, who shall not have otherwise performed services for the Company or Indemnitee within the last five years (other than in connection with seeking indemnification under this Agreement). Notwithstanding the foregoing, the term "Independent Legal Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine such Indemnitee's right to indemnification under this Agreement, nor shall Independent Legal Counsel be any person who has been sanctioned or censured for ethical violations of applicable standards of professional conduct.

*(e)* A "<u>Potential Change in Control</u>" shall be deemed to have occurred if (i) the Company enters into an agreement or arrangement, the consummation of which would result in the occurrence of a Change in Control; (ii) any person (including the Company) publicly announces an intention to take or to consider taking actions which if consummated would constitute a Change in Control; or (iii) the Board adopts a resolution to the effect that, for purposes of this Agreement, a Potential Change in Control has occurred.

*(f)* "<u>Reviewing Party</u>" shall mean any appropriate person or body consisting of a member or members of the Board of Directors of the Company or any other person or body appointed by the Board who is not a party to the particular Claim for which Indemnitee is seeking indemnification, or Independent Legal Counsel.

2

*(g)* "Voting Securities" shall mean any securities of an entity which vote generally in the election of directors.

2.    *Basic Indemnification Arrangement.*

(a)  In the event Indemnitee was, is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, a Claim by reason of (or arising in part out of) an Indemnifiable Event, the Company shall indemnify Indemnitee to the fullest extent permitted by law as soon as practicable but in any event no later than thirty days after written demand is presented to the Company, against any and all Expenses, judgments, fines, penalties and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties or amounts paid in settlement) of such Claim and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement (including the creation of the trust referred to in Section 4 hereof). If so requested by Indemnitee, the Company shall advance (within two business days of such request) any and all expenses to Indemnitee (an "Expense Advance"). Notwithstanding anything in this Agreement to the contrary and except as provided in Section 5 and the proviso in the first sentence of Section 2(b) hereof, prior to a Change in Control Indemnitee shall not be entitled to indemnification pursuant to this Agreement in connection with any Claim initiated by Indemnitee against the Company or any director or officer of the Company unless the Company has joined in or consented to the initiation of such Claim.

(b)  Notwithstanding the foregoing, (i) the obligations of the Company under Section 2(a) hereof shall be subject to the condition that the Reviewing Party shall not have determined (in a written opinion, in any case in which the Independent Legal Counsel referred to in Section 3 hereof is involved) that Indemnitee would not be permitted to be indemnified under applicable law, and (ii) the obligation of the Company to make an Expense Advance pursuant to Section 2(a) hereof shall be subject to the condition that, if, when and to the extent that the Reviewing Party determines that Indemnitee would not be permitted to be so indemnified under applicable law, the Company shall be entitled to be reimbursed by Indemnitee (who hereby agrees to reimburse the Company) for all such amounts theretofore paid; provided, however, that if Indemnitee has commenced legal proceedings in a court of competent jurisdiction to secure a determination that Indemnitee should be indemnified under applicable law, any determination made by the Reviewing Party that Indemnitee would not be permitted to be indemnified under applicable law shall not be binding and Indemnitee shall not be required to reimburse the Company for an Expense Advance until a final judicial determination is made with respect thereto (as to which all rights of appeal therefrom have been exhausted or lapsed). Indemnitee's obligation to reimburse the Company for Expense Advances shall be unsecured and no interest shall be charged thereon. If there has not been a Change in Control, the Reviewing Party shall be selected by the Board of Directors of the Company, and if there has been such a Change in Control, (other than a

3

Change in Control which has been approved by a majority of the Board of Directors of the Company who were directors immediately prior to such Change in Control) the Reviewing Party shall be the Independent Legal Counsel referred to in Section 3 hereof. If there has been no determination by the Reviewing Party or if the Reviewing Party determines that Indemnitee substantively would not be permitted to be indemnified in whole or in part under applicable law, Indemnitee shall have the right to commence litigation in any court in the States of California or Delaware having subject matter jurisdiction thereof and in which venue is proper seeking an initial determination by the court or challenging any such determination by the Reviewing Party or any aspect thereof, or the legal or factual bases therefor and the Company hereby consents to service of process and to appear in any such proceeding. Any determination by the Reviewing Party otherwise shall be conclusive and binding on the Company and Indemnitee.

3.    *Change in Control*. The Company agrees that if there is a Change in Control of the Company (other than a Change in Control which has been approved by a majority of the Board of Directors of the Company who were directors immediately prior to such Change in Control) then Independent Legal Counsel shall be selected by Indemnitee and approved by the Company (which approval shall not be unreasonably withheld) and such Independent Legal Counsel shall determine whether the officer or director is entitled to indemnity payments and Expense Advances under this Agreement or any other agreement or Certificate of Incorporation or Bylaws of the Company now or hereafter in effect relating to Claims for Indemnifiable Events. Such Independent Legal Counsel, among other things, shall render its written opinion to the Company and Indemnitee as to whether and to what extent the Indemnitee will be permitted to be indemnified. The Company agrees to pay the reasonable fees of the Independent Legal Counsel and to indemnify fully such Independent Legal Counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or the engagement of Independent Legal Counsel pursuant hereto.

4.    *Establishment of Trust*. In the event of a Potential Change in Control, the Company shall, upon written request by Indemnitee, create a trust for the benefit of Indemnitee and from time to time upon written request of Indemnitee shall fund such trust in an amount sufficient to satisfy any and all Expenses reasonably anticipated at the time of each such request to be incurred in connection with investigating, preparing for and defending any Claim relating to an Indemnifiable Event, and any and all judgments, fines, penalties and settlement amounts of any and all Claims relating to an Indemnifiable Event from time to time actually paid or claimed, reasonably anticipated or proposed to be paid. The amount or amounts to be deposited in the trust pursuant to the foregoing funding obligation shall be determined by the Reviewing Party, in any case in which the Independent Legal Counsel referred to above is involved. The terms of the trust shall provide that upon a Change in Control (i) the trust shall not be revoked or the principal thereof invaded, without the written consent of Indemnitee, (ii) the trustee shall advance, within two business days of a request by Indemnitee, any and all Expenses to Indemnitee (and Indemnitee hereby agrees to reimburse the trust under the circumstances under which Indemnitee would be required to reimburse the Company under Section 2(b) hereof), (iii) the trust shall continue to be funded by the Company in accordance with the

4

funding obligation set forth above, (iv) the trustee shall promptly pay to Indemnitee all amounts for which Indemnitee shall be entitled to indemnification pursuant to this Agreement or otherwise, and (v) all unexpended funds in such trust shall revert to the Company upon a final determination by the Reviewing Party or a court of competent jurisdiction, as the case may be, that Indemnitee has been fully indemnified under the terms of this Agreement. The trustee shall be chosen by Indemnitee. Nothing in this Section 4 shall relieve the Company of any of its obligations under this Agreement. All income earned on the assets held in the trust shall be reported as income by the Company for federal, state, local and foreign tax purposes.

5.    *Indemnification for Additional Expenses*. The Company shall indemnify Indemnitee against any and all expenses (including attorneys' fees) and, if requested by Indemnitee, shall (within two business days of such request) advance such expenses to Indemnitee, which are incurred by Indemnitee in connection with any claim asserted against or in connection with any action brought by Indemnitee for (i) indemnification or advance payment of Expenses by the Company under this Agreement or any other agreement or certificate of incorporation or by-laws of the Company now or hereafter in effect relating to Claims for Indemnifiable Events and/or (ii) recovery under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advance expense payment or insurance recovery, as the case may be.

6.    *Partial Indemnity, Etc*. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of the Expenses, judgments, fines, penalties and amounts paid in settlement of a Claim but not, however, for all of the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled. Moreover, notwithstanding any other provision of this Agreement, to the extent that Indemnitee has been successful on the merits or otherwise in defense of any or all Claims relating in whole or in part to an Indemnifiable Event or in defense of any issue or matter therein, including dismissal without prejudice, Indemnitee shall be indemnified against all Expenses incurred in connection therewith. In connection with any determination by the Reviewing Party or otherwise as to whether Indemnitee is entitled to be indemnified hereunder the burden of proof shall be on the Company to establish that Indemnitee is not so entitled.

7.    *No Presumption*. For purposes of this Agreement, the termination of any claim, action, suit or proceeding, by judgment, order, settlement (whether with or without court approval) or conviction, or upon a plea of *nolo contendere*, or its equivalent, shall not create a presumption that Indemnitee did not meet any particular standard of conduct or have any particular belief or that a court has determined that indemnification is not permitted by applicable law.

8.    *Non-exclusivity, Etc*. The rights of Indemnitee hereunder shall be in addition to any other rights Indemnitee may have under the certificate of incorporation or by-laws of the Company or one of its subsidiaries or the Delaware General Corporation Law or otherwise. To the extent that a change in the Delaware General Corporation Law (whether by statute or judicial decision) permits greater indemnification by agreement than would be afforded currently under the certificate of incorporation and by-laws of the

5

Company and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.

9. *No Construction as Employment Agreement*. Nothing contained in this Indemnity Agreement shall be construed as giving Indemnitee any right to be retained in the employ of the Company or any of its subsidiaries, it being understood, for the avoidance of doubt that the foregoing does not limit or otherwise affect the validity of any employment agreement or the enforceability thereof in accordance with its terms.

10. *Liability Insurance*. To the extent the Company maintains an insurance policy or policies providing directors' and officers' liability insurance, Indemnitee shall be covered by such policy or policies, in accordance with its or their terms, to the maximum extent of the coverage available for any director or officer of the Company.

11. *Period of Limitations*. No legal action shall be brought and no cause of action shall be asserted by or in the right of the Company or any affiliate of the Company against Indemnitee, Indemnitee's spouse, heirs, executors, administrators or personal or legal representatives after the expiration of two years from the date of accrual of such cause of action, and any claim or cause of action of the Company or its affiliate shall be extinguished and deemed released unless asserted by the timely filing of a legal action within such two-year period; provided, however, that if any shorter period of limitations is otherwise applicable to any such cause of action such shorter period shall govern.

12. *Amendments, Etc*. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

13. *Subrogation*. In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

14. *No Duplication of Payments*. The Company shall not be liable under this Agreement to make any payment in connection with any claim made against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, certificate of incorporation or by-laws of the Company or otherwise) of the amounts otherwise indemnifiable hereunder.

15. *Binding Effect, Etc*. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company, spouses, heirs, and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise to all, substantially all, or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent

6

that the Company would be required to perform if no such succession had taken place. This Agreement shall continue in effect regardless of whether Indemnitee continues to serve as an officer and/or director of any affiliate of Company or of any other enterprise at the Company's request.

16.    *Severability*. The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law. Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable, that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

17.    *Governing Law*. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware applicable to contracts made and to be performed in such state without giving effect to the principles of conflicts of laws.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of June 29, 2022.

THE WALT DISNEY COMPANY

By:    _____

**--EXHIBIT;NOT FOR EXECUTION--**

_____
Kristina K. Schake

7

**Ex. 12**
**Page 1360**

**Exhibit B**

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** (hereinafter referred to as "**Agreement**") is made and entered into by and between Kristina K. Schake (hereinafter referred to as "**Consultant**") and The Walt Disney Company (hereinafter referred to as "**Company**") on and as of _____, 20__ pursuant to that certain Employment Agreement by and between Executive and Company dated as of June 29, 2022 (the "**Employment Agreement**"). All capitalized terms not defined herein shall have the meaning ascribed to them in the Employment Agreement.

1.   (a)   Unless this Agreement is earlier terminated as hereinafter provided, for a period following the termination of Consultant's employment under the Employment Agreement equal to the lesser of (i) 6 months or (ii) the remaining period of the originally scheduled term of the Employment Agreement (the "**Consulting Agreement Period**"), Consultant shall personally and diligently provide to the Company such consulting services as the Company may reasonably request from time to time, provided that such services shall relate to matters appropriate for an executive employed in the position referred to in paragraph 2 of the Employment Agreement and shall be a type and nature and duration typical for a post-employment consulting agreement with an executive formerly employed in such position, it being understood for the avoidance of doubt that to the extent any such consulting services involve creative services and/or input, such services and/or input shall be limited to existing matters and projects that Company and/or Consultant was working on or involved in (or has specific plans to work on) at the time of termination or any time prior thereto during the Employment Period and shall be in scope and nature generally limited to types of services not inconsistent with Consultant's former position. Consultant shall not be required to report to the Company's offices and shall be permitted, subject to the terms hereof, to provide consulting services to third parties during the term hereof, provided (i) in no event shall consulting services or other services or advice of any nature be provided by Consultant, directly or indirectly (whether as an employee, consultant, independent contractor, agent, partner, principal, owner or otherwise) to any person or entity which directly or indirectly owns, operates, manages, develops, controls or provides services to, any business involved in any of the following activities (a "**Designated Business**"): (A) the conception, creation, development, production, purchase, sale, distribution, broadcast, transmission or other disposition (including, without limitation, the licensing and/or merchandising of related consumer products) of audio and/or visual and/or interactive products or works of any nature in any media, including, without limiting the generality of the foregoing, any activity relating to (i) any aspect of the film, network, cable, broadcasting, mobile communications, television (including pay-per-view, closed circuit or any inter-active form of distribution of film, television or other audio/visual product) or internet businesses or any other businesses based on or using interactive technology (including, without limiting the generality of the foregoing, electronic and/or interactive games, environments, information centers or communities, in each case, of any nature), or (ii) the development, production, marketing, distribution or exploitation by any means or vehicle whatsoever of any film, television or software product or any similar content or product in any media, whether or not now existing, it being understood, however, that, for the avoidance of doubt and notwithstanding any other term or provision hereof, the internal use by any business of any of the interactive, internet-based or other technology or media referred to above in the creation, development and/or production of their products and/or services shall not in and of itself result in such business being a Designated Business to which Consultant is prohibited from directly or

**Ex. 12**
**Page 1361**

indirectly providing services hereunder, (<u>B</u>) the operation, management, development, licensing and promotion of themed resorts, hotels and restaurants or amusement or themed entertainment parks; or (<u>C</u>) the design, development, publishing, promotion or sale of products based on cartoon or other animated characters, films, television and theatrical productions and other intellectual property derived therefrom, in each case, only to the extent (i) that such person or entity is actively engaged in any geographic area in any business which is in competition with a business conducted by The Walt Disney Company or any subsidiary thereof at the time of the performance of such services (the "**Specified Activities**"), and (ii) that any services reasonably required by Company shall at all times be provided with precedence being given to Company and on a "first priority" basis to Company, although Company shall endeavor to provide, when possible, reasonable advance written notice to Consultant of all services required hereunder and to give due consideration, to the extent practicable, to any prior commitments Consultant may have at such time. In no event shall Consultant be required to devote more than 13.5 hours per week to services to Company hereunder (including travel time, but not time to or from the office) and the parties agree and understand that Consultant's expected commitment to such services shall regularly be less than the stated maximum weekly hours.

(b)    In the event of a material uncured breach by Consultant of any term or provision of this paragraph 1 hereof, all of which terms and conditions Consultant acknowledges and agrees are material and of the essence of this Agreement, or any other material term or provision hereof, Company shall have the right, in addition to any other right or remedy available to it at law or in equity, to terminate this Agreement. In such event Company shall have no further obligation to make payments or perform or honor any commitments under the Release or to pay or honor any commitments which relate to or constitute any of the Conditional Benefits; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, except as otherwise specifically provided in the immediately preceding sentence, no breach of this Agreement by Consultant, no termination of this Agreement by Company, and no other action or inaction by either of them (other than the execution by the parties of a written agreement amending or superseding the Release or any part thereof) shall in any event or under any circumstances have any effect whatsoever on the validity, enforceability, binding nature, effect or interpretation of the releases set forth in paragraph 5 and paragraph 7 of the Release, and the releases set forth therein shall remain in full force and effect.

(c)    In the event that Consultant shall receive a written notice of breach of this Agreement from the Company, Consultant shall have ten (10) business days to cure such breach unless the Company shall have determined in its good faith business judgment that such breach is not curable. Any such notice of termination pursuant to this paragraph 1 shall set forth in reasonable detail the basis for such breach and shall contain a statement as to whether or not such breach has been determined to be curable by the Company. In the event that Consultant receives a written notice of breach of the Agreement from the Company, Consultant may challenge such finding of a breach, by written notice to the Company, and shall be afforded an opportunity to present Consultant's objection to the Company, in person or in writing, as determined by the Company, prior to Company having any right to terminate this Agreement and the Conditional Benefits provided under the Employment Agreement.

2.    Consultant shall receive gross consulting fees for Consultant's services hereunder which, for any period during the Consulting Agreement Period, shall equal the Consulting Amount.

2

The consulting fee payments shall be made at the date set forth in Paragraph 5(d)(i) of the Employment Agreement.

3.    Company shall reimburse Consultant, in accordance with the procedures of Company then in effect for its senior executives, for reasonable business expenses incurred by Consultant in the course of performing the services hereunder.

4.    Company, its successors, privies and assigns shall be entitled to, and shall, own as their exclusive property all of the results and proceeds of the services performed hereunder (which results and proceeds are hereinafter collectively referred to as the "**Work Product**") in whatever stage of completion, all of which shall be considered a work-for-hire, including, without limitation, all written work, research, plot outlines, computer programs, plans, drawings, paintings, sculptures, fanciful creations, specifications, ideas, scripts, sketches, designs, concepts, software, systems, reports, documentation, and other tangible or intangible work product produced by Consultant as part of Consultant's services performed hereunder. Company shall own all rights in the Work Product in perpetuity throughout the universe including, without limitation, the rights to produce, manufacture, record, reproduce, distribute, transfer or prepare derivative works from the Work Product by any art, medium or method and all copyrights, trademarks and/or patents in the Work Product. Company shall be deemed the sole author of the Work Product and is entitled to the copyright therein (and all renewals and extensions thereof), and the full ownership to the original and all copies of the Work Product. Company shall have the right to dispose of the Work Product and/or make any or all uses thereof as it, at any time and in the exercise of its sole discretion, may desire. Upon Company's request, Consultant shall deliver all originals and copies of the Work Product (whether completed or in process) and all research, plans, designs, specifications and any other work product or information which pertains to the Work Product to Company upon completion of the performed services hereunder or upon earlier termination of this Agreement. Consultant shall not retain, use or disclose any of the Work Product without Company's prior written consent. The termination, completion or breach of this Agreement on whatever grounds and by whomsoever affected shall not affect Company's exclusive ownership of the Work Product. Consultant hereby assigns to Company all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Work Product, including, without limitation, all exclusive exploitation rights, of every kind and nature, including, but not limited to, all trademarks, copyrights and neighboring rights, to the full extent such assignment is allowed by law, and any renewals and extensions therefor throughout the universe, in perpetuity, or for the duration of the rights in each country, and in all languages. Consultant acknowledges that new rights to the Work Product may come into being or be recognized in the future, under the law or in equity (the "**New Exploitation Rights**"), and Consultant intends to and does hereby grant and convey to Company any and all such New Exploitation Rights to the Work Product. Consultant is also aware and acknowledges that new or changed technology, uses, media, format, modes of transmission and methods of distribution, dissemination, exhibition or performance (the "**New Exploitation Methods**") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting the Work Product. Consultant intends to and does hereby grant and convey to Company any and all rights to such New Exploitation Methods with respect to the Work Product. Consultant agrees to execute, at any time upon Company's request, such further documents consistent herewith and do such other acts at the Company's expense as may be required by the Company in its reasonable business judgment to evidence or confirm Company's exclusive ownership of and exploitation rights

3

to the Work Product and to effectuate Consultant's purpose to convey such rights to Company including, but not limited to, the New Exploitation Rights and any and all of the New Exploitation Methods. Consultant shall have the right to have any such documents reviewed by counsel with Company giving good faith consideration to changes requested by counsel unless such review and/or consideration is not in Company's reasonable business judgment feasible or prudent in view of material time constraints; provided, however, that notwithstanding the foregoing, if Consultant fails to execute such further documents within 20 business days after receipt of Company's written request to do so, then Company shall have the power of attorney, which Consultant acknowledges is irrevocable and coupled with an interest, to execute such documents on Consultant's behalf. Consultant agrees that Consultant will not seek to (i) challenge, through the courts, administrative governmental bodies, private organizations or in any other manner, the rights of Company to exploit the Work Product by any means whatsoever or (ii) thwart, hinder or subvert the intent of the preceding grants and conveyances to Company, or the collection by Company of any proceeds relating to the rights conveyed under this Agreement. The provisions of this paragraph shall survive the expiration or sooner termination of this Agreement.

5.    This Agreement is for the personal services of Consultant and may not be subcontracted or assigned by Consultant in any fashion, whether by operation of law, or by conveyance of any type, without the prior written consent of Company, which consent Company may withhold in its sole discretion. Company may not assign all or any portion of this Agreement at any time to any of its subsidiaries or to any other person.

6.    (a)    Consultant, by virtue of this Agreement, shall acquire no right to use, and shall not use, the name "The Walt Disney Company" or "The Walt Disney Studios" or "Disney" or Disney+" or "ABC" or "ABC, Inc." or "American Broadcasting Companies" or "ESPN" or "Marvel" or "Pixar" or "Lucasfilm, Ltd." or any other word, mark, or name used for, or in connection with, the business activities of Company (either alone or in conjunction with or as a part of any other word, mark, or name) or any marks, fanciful characters or designs of the Company or any of their related, affiliated, or subsidiary companies in any advertising, publicity, or promotion; to express or imply any endorsement by the Company or any of its related, affiliated or subsidiary companies of Consultant's services; or in any other manner whatsoever (whether or not similar to the uses hereinabove specifically prohibited). Consistent with Consultant's obligations under Paragraph 7, this Paragraph 6(a) shall not prevent Consultant from using such names to describe Consultant's activities with respect to Company and its subsidiaries under and prior to the Employment Agreement and under this Agreement.

(b)    Consultant hereby represents and warrants to Company that as of the date of this Agreement, Consultant does not provide any services (including, without limitation, as an employee) to any person or entity that (i) is engaged in, or whose affiliated entities are engaged in, one or more of the Specified Activities or (ii) advises or provides consulting services to any person or entity that is engaged in, or whose affiliated entities are engaged in, any business or activity relating to or constituting one or more of the Specified Activities. Consultant further represents and warrants to Company that Consultant shall make written disclosure to Company prior to providing any services, during the term of this Agreement, to any of the above mentioned persons or entities.

4

7.    Consultant may, during the course of Consultant's engagement hereunder, have access to, and acquire knowledge of or from, materials, data, strategies, systems or other information relating to the services hereunder or Company, or its related, affiliated or subsidiary companies, which may not be accessible or known to the general public (including, but not limited to, the existence of this Agreement and the terms hereof and any Work Product not readily available to the general public) ("**Confidential Information**"). Any such knowledge acquired by Consultant shall be kept confidential and shall not be used, published, or divulged by Consultant to any other person, firm, or corporation, or in any advertising or promotion regarding Consultant or Consultant's services, or in any other manner or connection whatsoever without first having obtained the prior written permission of Company, which permission Company may withhold in its sole discretion; provided that Consultant shall have no greater duty or obligation in respect of such Confidential Information than applies to Executive under Paragraph 7(b) of the Employment Agreement and any agreements referred to therein. Upon Company's request, Consultant shall immediately return to Company or destroy, all documents, magnetic copies, or other physical evidence of all Confidential Information in Consultant's possession or in the possession of any of Consultant's directors, officers, employees, agents or representatives (including, without limitation, all copies, transcriptions, notes, extracts, analyses, compilations, studies, or other documents, records, or data prepared by Consultant) which contain or otherwise reflect or are generated from the Confidential Information without retaining any copy thereof, all of the foregoing being Confidential Information and the sole property of Company, Consultant shall certify to Company that all of the foregoing has been returned or destroyed as provided in this paragraph. Consultant agrees that Company would be irreparably harmed by any violation or threatened violation of this paragraph and that, therefore, Company shall be entitled to an injunction prohibiting Consultant from any violation or threatened violation of this paragraph. The provisions of this paragraph shall survive the expiration or sooner termination of this Agreement.

8. This Agreement shall be construed and interpreted in accordance with the laws of the State of California without regard to conflicts of laws principles.

9. The terms and provisions of this Agreement, the Release and Paragraphs 5 and 6 of the Employment Agreement constitute the entire agreement between the parties hereto with respect to the subject matter of this Agreement and supersede all previous communications, representations, or agreements, either oral or written, between the parties relating to such subject matter hereof. No change, alteration or modification of this Agreement shall be effective unless made in writing and signed by both parties hereto.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the day and year first above written.

**COMPANY**                                        **Consultant**

<span style="color:red">**--EXHIBIT; NOT FOR EXECUTION**</span>

By: _____    By: _____
Title: _____

5

**Ex. 12**
**Page 1365**

**Exhibit C**

**GENERAL RELEASE**

WHEREAS, Kristina K. Schake (hereinafter referred to as "Executive") and The Walt Disney Company (hereinafter referred to as the "Company") are parties to an Employment Agreement, dated as of June 29, 2022 (the "Employment Agreement"), which provided for Executive's employment with the Company on the terms and conditions specified therein; and

WHEREAS, pursuant to paragraph 6 of the Employment Agreement, Executive and the Company have agreed to execute mutual releases of the type and nature set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and mutual promises herein contained and for other good and valuable consideration received in accordance with the terms of the Employment Agreement, it is agreed as follows:

1.    (a)    Upon the later of (i) the execution hereof by the Company and Executive, (ii) the passage of seven days following execution hereof by Executive without Executive's having exercised the revocation rights referred to in paragraph 10 hereof and (iii) the time specified in the Employment Agreement for payment of a particular item of compensation, the Company shall (x) provide Executive the amounts and benefits described in Paragraph 5 of the Employment Agreement and (y) make full payment for vacation and floating holidays accrued but unused as of the date hereof (to the extent, if any, not already paid in accordance with applicable law), less amounts required to be withheld by law or authorized by Executive to be withheld (it being understood that from and after the date hereof no further rights to vacation or floating holidays or compensation therefor shall accrue or be payable to Executive). Such payment shall be made by check payable to Executive.

(b)    The covenants and commitments of the Company referred to herein (including, specifically, but without limitation, any and all benefits conferred upon Executive pursuant to Paragraph 5 of the Employment Agreement) shall be in lieu of and in full and final discharge of any and all obligations to Executive for compensation, severance payments, or any other expectations of payment, remuneration, continued coverage of any nature or benefit on the part of Executive arising out of or in connection with Executive's employment with the Company, or under any agreement, arrangement, commitment, plan, program, practice or policy of the Company, or otherwise, other than as expressly provided in the Employment Agreement.

(c)    Notwithstanding the foregoing or any other term or provision hereof, Executive shall be entitled to such rights as are vested in Executive as of the Termination Date, under and subject to the terms of (i) the Employment Agreement and/or the Consulting Agreement, (ii) any applicable retirement plan(s) to which Executive may be subject, (iii) any applicable stock option plan or other incentive compensation plan of the Company to which Executive may be subject, (iv) any right which Executive now has or may hereafter have to claim a defense and/or indemnity for liabilities to third parties in connection with Executive's activities as an employee of the Company or any of its subsidiaries pursuant to the terms of any applicable statute, under any insurance policy, pursuant to the certificate of incorporation or bylaws or established policies of the Company or any subsidiary thereof or pursuant to written agreement (including, without limitation, the Indemnification Agreement) expressly providing for such indemnity between Executive and the Company or any subsidiary thereof, and (v) any other applicable employee

1

**Ex. 12**
**Page 1366**

welfare benefit plans to which Executive may be subject. Further, Executive shall be entitled to (A) reimbursement of all reasonable business expenses incurred by Executive in accordance with Company's practices and policies regarding reimbursement of business expenses, and (B) such continuation of health care coverage as is required under, and subject to, applicable law, of which Executive shall be notified in writing after the Termination Date, provided Executive timely exercises Executive's rights in accordance therewith. Executive understands and acknowledges that all payments for any such continued health care coverage Executive may elect will be paid by Executive, except to the extent the Employment Agreement provides that such payments shall be made by the Company.

2.    Executive confirms that, on or prior to seven (7) days from the date hereof, Executive shall turn over to the Company all files, memoranda, records, credit cards and other documents and physical or personal property that Executive received from the Company or that Executive generated in connection with Executive's employment by the Company or that are the property of the Company provided that Executive may retain notes, files, calendars, contact information and correspondence of a personal nature (whether in hard copy or electronic form), provided, in each case, that no confidential Company information or information intended primarily for internal Company use is contained therein).

3.    It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under law. Should there be any conflict between any provision hereof and any present or future law, such law will prevail, but the provisions affected thereby will be curtailed and limited only to the extent necessary to bring them within the requirements of law, and the remaining provisions of this Agreement will remain in full force and effect and be fully valid and enforceable.

4.    Executive represents and agrees (a) that Executive has to the extent Executive desires discussed all aspects of this Agreement with Executive's attorney, (b) that Executive has carefully read and fully understands all of the provisions of this Agreement, and (c) that Executive is voluntarily entering into this Agreement.

5.    Excluding enforcement of the covenants, promises and/or rights reserved herein and/or in the Employment Agreement, Indemnification Agreement and/or the Consulting Agreement, Executive hereby irrevocably and unconditionally releases, acquits and forever discharges the Company and each of the Company's direct or indirect owners, parent companies, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, affiliates (including, for the avoidance of doubt, The Walt Disney Company and agents, directors, officers, employees, representatives and attorneys of such companies, divisions, subsidiaries and affiliates) and all persons acting by, through, under or in concert with any of them (collectively "Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort or any legal restrictions on the Company's right to terminate employees, or any Federal, state or other governmental statute, regulation or ordinance, including, without limitation, Title VII of the Civil Rights Act of 1964, as amended, the Federal

2

Age Discrimination In Employment Act of 1967, as amended, and the California Fair Employment and Housing Act, all as amended, that Executive now has, or has ever had, or ever will have, against each or any of the Releasees, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring up through the date of Executive's execution hereof that directly or indirectly arise out of, relate to, or are connected in any manner whatsoever with, Executive's services to, or employment by the Company or any of its subsidiaries (any of the foregoing being an "Executive Claim" or, collectively, the "Executive Claims"). This release does not constitute a release of any Executive Claims that cannot be released as a matter of law.

6.    Except as expressly reserved herein, Executive expressly waives and relinquishes all rights and benefits afforded by California Civil Code Section 1542 and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 states as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of the Releasees, Executive expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all Executive Claims that Executive does not know or suspect to exist in Executive's favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Executive Claim or Executive Claims.

7.     Excluding enforcement of the covenants, promises and/or rights reserved herein or in the Employment Agreement, Indemnification Agreement and/or the Consulting Agreement, and except as otherwise provided in the proviso at the end of this sentence, the Company hereby irrevocably and unconditionally releases, acquits and forever discharges Executive, and Executive's heirs, assigns and successors in interest ("Executive Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorney's fees and costs actually incurred), of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort, or any federal, state or other governmental statute, regulation or ordinance, that the Company now has, or has ever had, or ever will have, against Executive and/or the Executive Releasees, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring up through the date of the Company's execution hereof, that directly or indirectly arise out of, relate to, or are connected in any manner whatsoever with, Executive's services to, or employment by the Company (hereinafter referred to as a "Claim" or collectively, the "Claims"); provided, however, that, notwithstanding any other term or provision hereof, any Claim or Claims rising out of, or resulting from, in part or whole, (i) any illegal or fraudulent act(s) or illegal or fraudulent omission(s) to act of Executive,

3

(ii) any action(s) or omission(s) to act which would constitute self-dealing or a breach of Executive's confidentiality obligations to the Company or any affiliate thereof, or a breach of The Walt Disney Company and Affiliated Companies Confidentiality Agreement executed by Executive, or (iii) the policy of the Board of Directors of the Company, as the same may be in effect from time to time, regarding the ability of the Company to recoup bonus or incentive payments as a result of Company's being required to restate its financial results due to material noncompliance with financial reporting requirements under the securities laws, are hereby expressly excluded in their entirety from the foregoing release, acquittal and discharge and are unaffected thereby (any Claim or Claims not so excluded pursuant to this proviso being hereinafter referred to as a the "Company Claim" or, collectively, as the "Company Claims"). This release does not constitute a release of any Company Claims that cannot be released as a matter of law.

8.    Except as expressly reserved herein, the Company expressly waives and relinquishes all rights and benefits afforded by California Civil Code Section 1542 and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 states as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release, acquittal and discharge of the Executive Releasees with respect to the Company Claims only, the Company expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all the Company Claims that the Company does not know or suspect to exist in the Company's favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Company Claims. Notwithstanding anything in this Release to the contrary, if at any time (whether during or after the Employment Period) the Company is required to restate its financial results due to material noncompliance with financial reporting requirements under the securities laws, nothing in this Release shall be construed to limit the rights of the Company and the Board of Directors of the Company to seek or obtain recovery from Executive of any incentive compensation (including profits realized from the sale of Company securities) previously paid, or the cancellation of any outstanding awards, in accordance with the terms of Company's policy, as in effect from time to time, regarding the ability of the Company to recoup any bonus or incentive payments under such circumstances.

9.    Executive is advised to consult with an attorney before signing this Agreement. Executive understands that Executive has been given a period of 21 days to review and consider this Agreement before signing it pursuant to the Age Discrimination In Employment Act of 1967, as amended. Executive further understands that Executive may use as much of this 21-day period as Executive wishes prior to signing.

Ex. 12
Page 1369

10.     Executive acknowledges and represents that Executive understands that Executive may revoke the waiver of Executive's rights under the Age Discrimination In Employment Act of 1967, as amended, effectuated in this Agreement within 7 days of signing this Agreement. Revocation can be made by delivering a written notice of revocation to the Senior Executive Vice President, General Counsel and Secretary, The Walt Disney Company, 500 South Buena Vista Street, Burbank, California 91521. For this revocation to be effective, written notice must be received by the General Counsel, no later than the close of business on the seventh day after Executive signs this Agreement. If Executive revokes the waiver of Executive's rights under the Age Discrimination In Employment Act of 1967, as amended, the Company shall have no obligations to Executive under this Agreement or the Employment Agreement.

11.     Executive and the Company respectively represent and acknowledge that in executing this Agreement neither of them is relying upon, and has not relied upon, any representation or statement not set forth herein made by any of the agents, representatives or attorneys of the Releasees or of the Executive Releasees with regard to the subject matter, basis or effect of this Agreement or otherwise.

12.     This Agreement shall not in any way be construed as an admission by any of the Releasees or Executive Releasees, respectively, that any of the Releasees or Executive Releasees has acted wrongfully or that the Company or Executive has any rights whatsoever against any of the Releasees or Executive Releasees except as specifically set forth herein, and each of the Releasees and Executive Releasees specifically disclaims any liability to any party for any wrongful acts.

13.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of California. This Agreement is binding on the successors and assigns of, and sets forth the entire agreement between, the parties hereto; fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof; and may not be changed except by explicit written agreement to that effect subscribed by the parties hereto.

PLEASE READ CAREFULLY. THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

**--EXHIBIT; NOT FOR EXECUTION--**

Kristina, K. Schake

Date: 

THE WALT DISNEY COMPANY

By: 
Title: 
Date: 

5

**Exhibit 10.4**

July 14, 2022

Alan Braverman
c/o The Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521

<u>Consulting Services</u>

Dear Alan:

You and the Company have agreed that, effective commencing June 2, 2002 and continuing until December 31, 2022 (the "Consulting Services Period"), you will provide the Company with such assistance as it shall reasonably request with regard to matters under your supervision during your employment (the "Consulting Services"). For the Consulting Services, the Company shall pay you a monthly fee of $40,000, which shall be paid (i) for services in June, within 10 business days of the date hereof and (ii) for services in each month after June, on the first day of the next following month. If you provide more than 20 hours of Consulting Service in any calendar month, the Company shall also pay you $2,000 per hour for each such additional hour of service. In no event shall you be expected to provide Consulting Services during the Consulting Services Period in excess of 20% of the time you spent, on average, in the performance of your duties for the Company during the 36 month period immediately preceding your retirement from employment.

Not later than the tenth business day of the immediately following calendar month, you will provide the Company a summary of the hours and a brief description of the services performed hereunder during the prior month. To the extent that any additional fees are due for additional services in any calendar month, payment shall be made to you as of the first day of the month next following timely receipt of your summary. During the Consulting Services Period, the Company shall provide you with such administrative support, including an administrative assistant, as shall be necessary or appropriate to assist you in providing the Consulting Services. The Company will also reimburse you, in accordance with, and subject to the terms and conditions of, the expense reimbursement policy applicable to expenses incurred by the Company's officers, for any reasonable travel, lodging and other appropriate expenses you incur in rendering the Consulting Services.

You will not be eligible to participate in any of the Company's employee benefit plans, programs or arrangements during the Consulting Services Period and in no event shall the Consulting Services Period be considered as employment for any purposes under any such plan, program or arrangement. Notwithstanding the foregoing, (i) the Company shall afford you the same rights and protections in respect of the Consulting

**Ex. 12**
**Page 1371**

Services as applied during your employment with the Company under your Indemnification Agreement with the Company and the Company agrees that any claims arising from our performance of the Consulting Services shall be treated as though an "Indemnifiable Event" under such Indemnification Agreement, (ii) you agree to be bound by the same noncompetition and confidentiality obligations to the Company as were applicable during your employment under your Employment Agreement with the Company and (iii) the Company may withhold from any payments made hereunder any amounts which it reasonably determines to be required to be withheld as a matter of applicable law.

If you agree that the foregoing sets forth our understanding regarding the provision of the Consulting Services, please sign both copies of this letter where indicated below, returning one copy to me and keeping the other for your records.

Sincerely,

/s/ Paul J. Richardson
Paul J. Richardson
Senior Executive Vice President and
Chief Human Resources Officer


AGREED AND ACCEPTED

/s/ Alan N. Braverman
Alan N. Braverman


**Ex. 12**
**Page 1372**

**Exhibit 10.5**

## AMENDED AND RESTATED GENERAL RELEASE

WHEREAS, Geoff Morrell (hereinafter referred to as "Executive") and The Walt Disney Company (hereinafter referred to as the "Company") are parties to an Employment Agreement, dated January 24, 2022, (the "Employment Agreement"), which provided for Executive's employment with the Company on the terms and conditions specified therein; and

WHEREAS, pursuant to paragraph 6 of the Employment Agreement, Executive and the Company have agreed to execute mutual releases of the type and nature set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and mutual promises herein contained and for other good and valuable consideration received in accordance with the terms of the Employment Agreement, it is agreed as follows:

1.        (a) Upon the later of (i) the execution hereof by the Company and Executive, (ii) the passage of seven days following execution hereof by Executive without Executive's having exercised the revocation rights referred to in paragraph 10 hereof and (iii) the time specified in the Employment Agreement for payment of a particular item of compensation, the Company shall (A) provide Executive the amounts and benefits described in Paragraph 5 of the Employment Agreement; (B) make full payment for vacation and floating holidays accrued but unused as of the date hereof (to the extent, if any, not already paid in accordance with applicable law), less amounts required to be withheld by law or authorized by Executive to be withheld (it being understood that from and after the date hereof no further rights to vacation or floating holidays or compensation therefor shall accrue or be payable to Executive), with such payment to be made by check payable to Executive; (C) pay to Executive a severance in the amount of $386,301.00, to be paid no later than the later of either (i) two and a half months after the end of Executive's tax year in which the Termination Date (as defined in the Employment Agreement and the letter dated April 29, 2022, in which the Company exercised its Termination Right) occurs or (ii) two and a half months after the end of the Company's tax year in which the Termination Date occurs; (D) pay to Executive $500,000 to account for Executive's unique circumstances, including Executive and Executive's family's relocation, which amount shall be paid no later than ten (10) days following the Termination Date; and (E) arrange for and cover the costs to return Executive's household goods that were shipped from Washington, D.C, to southern California back to their point of origin in Washington, D.C. (provided Executive signs appropriate liability waivers). In addition, in relation to Executive's purchase of a home in Pasadena, California, which purchase closed on or about April 21, 2022 (the "Pasadena Property"), Company will pay Executive a sum representing the total closing costs paid by Executive on the sale of the Pasadena Property. This payment will be made to Executive within ten business days following Company's receipt of valid documentation reflecting the sales price and closing costs. Additionally, the Parties agree to participate in a Guaranteed Buyout ("GBO") whereby Executive shall sell the Pasadena Property to the Company through Weichert Workforce Mobility Inc. ("Weichert") – a corporate relocation and workforce mobility services provider. Following the GBO transaction, if Executive's proceeds from the sale of the Pasadena Property to Weichert exceed the amount of $1,360,025.75, which equates to the down payment Executive made when he purchased the Pasadena Property, the Company will offset such proceeds against Executive's Pro-Rated Current Year Bonus set forth in Paragraph 5(d)(iv) of the Employment Agreement. Such offset shall not affect the amount of Executive's severance set forth in this paragraph above.

1

(b)      The covenants and commitments of the Company referred to herein (including, specifically, but without limitation, any and all benefits conferred upon Executive pursuant to Paragraph 5 of the Employment Agreement) shall be in lieu of and in full and final discharge of any and all obligations to Executive for compensation, severance payments, or any other expectations of payment, remuneration, continued coverage of any nature or benefit on the part of Executive arising out of or in connection with Executive's employment with the Company, or under any agreement, arrangement, commitment, plan, program, practice or policy of the Company, or otherwise, other than as expressly provided in the Employment Agreement.

(c)      Notwithstanding the foregoing or any other term or provision hereof, Executive shall be entitled to such rights as are vested in Executive as of the Termination Date, under and subject to the terms of (i) the Employment Agreement and/or the Consulting Agreement, (ii) any applicable retirement plan(s) to which Executive may be subject, (iii) any applicable stock option plan or other incentive compensation plan of the Company to which Executive may be subject, (iv) any right which Executive now has or may hereafter have to claim a defense and/or indemnity for liabilities to third parties in connection with Executive's activities as an employee of the Company or any of its subsidiaries pursuant to the terms of any applicable statute, under any insurance policy, pursuant to the certificate of incorporation or bylaws or established policies of the Company or any subsidiary thereof or pursuant to written agreement (including, without limitation, the Indemnification Agreement) expressly providing for such indemnity between Executive and the Company or any subsidiary thereof, and (v) any other applicable employee welfare benefit plans to which Executive may be subject. Further, Executive shall be entitled to (A) reimbursement of all reasonable business expenses incurred by Executive in accordance with Company's practices and policies regarding reimbursement of business expenses, and (B) such continuation of health care coverage as is required under, and subject to, applicable law, of which Executive shall be notified in writing after the Termination Date, provided Executive timely exercises Executive's rights in accordance therewith. Executive understands and acknowledges that all payments for any such continued health care coverage Executive may elect will be paid by Executive, except to the extent the Employment Agreement provides that such payments shall be made by the Company.

2.      Executive confirms that, on or prior to seven (7) days from the date hereof, Executive shall turn over to the Company all files, memoranda, records, credit cards and other documents and physical or personal property that Executive received from the Company or that Executive generated in connection with Executive's employment by the Company or that are the property of the Company provided that Executive may retain notes, files, calendars, contact information and correspondence of a personal nature (whether in hard copy or electronic form), provided, in each case, that no confidential Company information or information intended primarily for internal Company use is contained therein).

3.      It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under law. Should there be any conflict between any provision hereof and any present or future law, such law will prevail, but the provisions affected thereby will be curtailed and limited only to the extent necessary to bring them within the requirements of law, and the remaining provisions of this Agreement will remain in full force and effect and be fully valid and enforceable.

**Ex. 12**
**Page 1374**

4.      Executive represents and agrees (a) that Executive has to the extent Executive desires discussed all aspects of this Agreement with Executive's attorney, (b) that Executive has carefully read and fully understands all of the provisions of this Agreement, and (c) that Executive is voluntarily entering into this Agreement.

5.      Excluding enforcement of the covenants, promises and/or rights reserved herein and/or in the Employment Agreement, Indemnification Agreement and/or the Consulting Agreement, Executive hereby irrevocably and unconditionally releases, acquits and forever discharges the Company and each of the Company's direct or indirect owners, parent companies, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, divisions, subsidiaries, affiliates (including, for the avoidance of doubt, The Walt Disney Company and agents, directors, officers, employees, representatives and attorneys of such companies, divisions, subsidiaries and affiliates) and all persons acting by, through, under or in concert with any of them (collectively "Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort or any legal restrictions on the Company's right to terminate employees, or any Federal, state or other governmental statute, regulation or ordinance, including, without limitation, Title VII of the Civil Rights Act of 1964, as amended, the Federal Age Discrimination In Employment Act of 1967, as amended, and the California Fair Employment and Housing Act, all as amended, that Executive now has, or has ever had, or ever will have, against each or any of the Releasees, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring up through the date of Executive's execution hereof that directly or indirectly arise out of, relate to, or are connected in any manner whatsoever with, Executive's services to, or employment by the Company or any of its subsidiaries (any of the foregoing being an "Executive Claim" or, collectively, the "Executive Claims"). This release does not constitute a release of any Executive Claims that cannot be released as a matter of law.

6.      Except as expressly reserved herein, Executive expressly waives and relinquishes all rights and benefits afforded by California Civil Code Section 1542 and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 states as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of the Releasees, Executive expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all Executive Claims that Executive does not know or suspect to exist in Executive's favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Executive Claim or Executive Claims.

3

7.      Excluding enforcement of the covenants, promises and/or rights reserved herein or in the Employment Agreement, Indemnification Agreement and/or the Consulting Agreement, and except as otherwise provided in the proviso at the end of this sentence, the Company hereby irrevocably and unconditionally releases, acquits and forever discharges Executive, and Executive's heirs, assigns and successors in interest ("Executive Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorney's fees and costs actually incurred), of any nature whatsoever, known or unknown, suspected or unsuspected, including, but not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith and fair dealing, express or implied, or any tort, or any federal, state or other governmental statute, regulation or ordinance, that the Company now has, or has ever had, or ever will have, against Executive and/or the Executive Releasees, by reason of any and all acts, omissions, events, circumstances or facts existing or occurring up through the date of the Company's execution hereof, that directly or indirectly arise out of, relate to, or are connected in any manner whatsoever with, Executive's services to, or employment by the Company (hereinafter referred to as a "Claim" or collectively, the "Claims"); provided, however, that, notwithstanding any other term or provision hereof, any Claim or Claims rising out of, or resulting from, in part or whole, (i) any illegal or fraudulent act(s) or illegal or fraudulent omission(s) to act of Executive, (ii) any action(s) or omission(s) to act which would constitute self-dealing or a breach of Executive's confidentiality obligations to the Company or any affiliate thereof, or a breach of The Walt Disney Company and Affiliated Companies Confidentiality Agreement executed by Executive, or (iii) the policy of the Board of Directors of the Company, as the same may be in effect from time to time, regarding the ability of the Company to recoup bonus or incentive payments as a result of Company's being required to restate its financial results due to material noncompliance with financial reporting requirements under the securities laws, are hereby expressly excluded in their entirety from the foregoing release, acquittal and discharge and are unaffected thereby (any Claim or Claims not so excluded pursuant to this proviso being hereinafter referred to as a the "Company Claim" or, collectively, as the "Company Claims"). This release does not constitute a release of any Company Claims that cannot be released as a matter of law.

8.      Except as expressly reserved herein, the Company expressly waives and relinquishes all rights and benefits afforded by California Civil Code Section 1542 and does so understanding and acknowledging the significance of such specific waiver of Section 1542. Section 1542 states as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

4

**Ex. 12**

**Page 1376**

Thus, notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release, acquittal and discharge of the Executive Releasees with respect to the Company Claims only, the Company expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all the Company Claims that the Company does not know or suspect to exist in the Company's favor at the time of execution hereof, and that this Agreement contemplates the extinguishment of any such Company Claims. Notwithstanding anything in this Release to the contrary, if at any time (whether during or after the Employment Period) the Company is required to restate its financial results due to material noncompliance with financial reporting requirements under the securities laws, nothing in this Release shall be construed to limit the rights of the Company and the Board of Directors of the Company to seek or obtain recovery from Executive of any incentive compensation (including profits realized from the sale of Company securities) previously paid, or the cancellation of any outstanding awards, in accordance with the terms of Company's policy, as in effect from time to time, regarding the ability of the Company to recoup any bonus or incentive payments under such circumstances.

9.      Executive is advised to consult with an attorney before signing this Agreement. Executive understands that Executive has been given a period of 21 days to review and consider this Agreement before signing it pursuant to the Age Discrimination In Employment Act of 1967, as amended. Executive further understands that Executive may use as much of this 21-day period as Executive wishes prior to signing.

10.     Executive acknowledges and represents that Executive understands that Executive may revoke the waiver of Executive's rights under the Age Discrimination In Employment Act of 1967, as amended, effectuated in this Agreement within 7 days of signing this Agreement. Revocation can be made by delivering a written notice of revocation to the Senior Executive Vice President, General Counsel and Secretary, The Walt Disney Company, 500 South Buena Vista Street, Burbank, California 91521. For this revocation to be effective, written notice must be received by the General Counsel, no later than the close of business on the seventh day after Executive signs this Agreement. If Executive revokes the waiver of Executive's rights under the Age Discrimination In Employment Act of 1967, as amended, the Company shall have no obligations to Executive under this Agreement or the Employment Agreement.

11.     Executive and the Company respectively represent and acknowledge that in executing this Agreement neither of them is relying upon, and has not relied upon, any representation or statement not set forth herein made by any of the agents, representatives or attorneys of the Releasees or of the Executive Releasees with regard to the subject matter, basis or effect of this Agreement or otherwise.

12.     This Agreement shall not in any way be construed as an admission by any of the Releasees or Executive Releasees, respectively, that any of the Releasees or Executive Releasees has acted wrongfully or that the Company or Executive has any rights whatsoever against any of the Releasees or Executive Releasees except as specifically set forth herein, and each of the Releasees and Executive Releasees specifically disclaims any liability to any party for any wrongful acts.

13.     Company and Executive agree that the internal messaging concerning Executive's departure will be the following: "After three months in this new role, it has become clear to me that for a number of reasons it is not the right fit. After talking this over with Bob, I have decided to leave the company to pursue other opportunities. I wish him and everyone at Disney the very best." Executive agrees not to make any statements inconsistent with this messaging to any person other than his

5

spouse and professional representatives. Executive agrees not to discuss the circumstances of his departure with any media outlet, whether or not consistent with this messaging. If Company is asked about the circumstances of Executive's departure, it will respond consistently with the agreed internal messaging. Executive acknowledges and agrees that Executive continues to be bound by The Walt Disney Company and Affiliated Companies Confidentiality Agreement that Executive signed when Executive commenced employment.

14.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of California. This Agreement is binding on the successors and assigns of, and sets forth the entire agreement between, the parties hereto; fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof; and may not be changed except by explicit written agreement to that effect subscribed by the parties hereto.

PLEASE READ CAREFULLY. THIS SETTLEMENT AGREEMENT AND GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

/S/ Geoff Morrell

Geoff Morrell

Date:  June 21, 2022


THE WALT DISNEY COMPANY

By:  /s/ Paul Richardson

Title:  Sr. Exec Vice Pres, Human Resources

Date:  June 23, 2022

6

**Ex. 12**
**Page 1378**

**Exhibit 10.6**

**THE WALT DISNEY COMPANY**

**Non-Qualified Stock Option Award Agreement**

This AWARD AGREEMENT (the "**Agreement**") is between you, **Participant Name**, and The Walt Disney Company ("**Disney**"), in connection with the Non-Qualified Stock Option Award (the "**Option**") granted to you on **Grant Date**, by the Compensation Committee of the Board of Directors of Disney pursuant to the terms of the 2011 Stock Incentive Plan, as amended (the "**Plan**"), the applicable terms and conditions of which are incorporated herein by reference and made a part of this Agreement.

This Option gives you the opportunity to purchase #### shares of Common Stock of The Walt Disney Company at an exercise price of **$Option Price** per share. The exercise price is the average of the highest and the lowest market prices for the Common Stock on the above grant date as determined pursuant to the Plan.

This Option may not be exercised before **First Vest Date**. On or after that date, subject to your continued employment by Disney or an affiliated company (as described further below) and to the other provisions of the Plan, you may exercise the Option with respect to the number of shares set forth opposite the first date below. As the subsequent dates set forth below occur, you may exercise as to the number of shares set forth opposite those dates:

        **Vest Date 1; Exercise Qty 1** Shares

        **Vest Date 2; Exercise Qty 2** Shares

        **Vest Date 3; Exercise Qty 3** Shares

        [**Vest Date 4; Exercise Qty 4** Shares

        **Vest Date 5; Exercise Qty 5** Shares

        **Vest Date 6; Exercise Qty 6** Shares][1]

---

[1] Applicable if semi-annual vesting

Provided your employment continues, the term of this Option is ten years from the grant date and, therefore, expires on **[insert tenth anniversary date of grant date]**. If your employment should cease prior to the date on which your grant expires, your right to vest and exercise under the Option will be subject to early termination as provided in Sections 6.5, 12 and 13.2 of the Plan. Except under certain circumstances specified in such Sections, you will generally have the right of continued vesting and exercisability for three months following the date of termination of your employment (such period as it may hereinafter be extended in certain circumstances as provided below being the "Extended Vesting and Exercisability Period"), and any shares that vest during the Extended Vesting and Exercisability Period will be exercisable during such period (or, under certain circumstances, for such longer period as may be provided by the Plan).

You may exercise this Option as to all or part of the number of shares covered by the Option which are then vested by paying the aggregate exercise price and applicable withholding taxes on the gross gain. You will be provided with additional information at the time of exercise about the methods available for exercising your Option and paying your withholding taxes, in accordance with the methods of exercising options permitted under Section 6.6 of the Plan. You are urged to seek advice from your tax accountant or attorney when making decisions regarding the exercise of this Option. This Option may not be transferred or assigned.

Notwithstanding any other term or provision hereof, you agree by acceptance of this Option that, except for certain shares (the "Tax-Available Shares") that may be sold to pay taxes up to the Maximum Tax Liability (as defined below) upon an exercise of a portion of, or all of, this Option, you will hold, for not less than twelve months from the date of exercise of this Option, shares representing no less than **[seventy-five percent (75%)]/[one hundred percent (100%)]** of the shares acquired by you (other than Tax-Available Shares) upon such exercise; provided, however, that the foregoing obligation to hold such shares (and any similar obligation in any non-qualified stock option award previously granted to you) shall not be applicable at any time when you are already holding shares of Common Stock of Disney (including any outstanding restricted stock units (with or without performance-based vesting conditions) awarded to you by with a value equal to at least **[three]/[five]**, times your base salary as in effect at such time (the "Disney Stock Ownership Requirement"). For purposes hereof the term "Maximum Tax Liability" shall mean the amount calculated by multiplying

2

total income recognized, as reported by Disney for Federal income tax purposes, upon an exercise of this Option, by a percentage determined as follows:

$$FR + SR (100-FR) + MR$$

where:

FR = the highest Federal income tax rate in effect at time of exercise of the Option;

SR = the highest state income tax rate, if any, in effect at the time of exercise of the Option in the state where your principle Disney office is located; and

MR = the Medicare tax rate in effect at time of exercise of the Option.

The number of whole shares acquired upon any exercise of the Options that may be sold to discharge the Maximum Tax Liability shall be determined by dividing the Maximum Tax Liability by the fair market value (as defined in Section 2 of the Plan) of one share of Disney common stock on the date of exercise of the Option and disregarding any fractional amount resulting from such calculation.

For the purposes hereof, your commitment to hold the percentage of shares referred to above for not less than twelve months unless you are already in compliance with the Disney Stock Ownership Requirement shall constitute an undertaking by you not to sell, transfer, pledge, encumber, assign or otherwise dispose of, except for certain transfers to "family members" and certain others permitted with the prior approval of the Committee pursuant to Section 6.7 of the Plan, any of such shares during such period.

If you are employed pursuant to an employment agreement with Disney, any provisions thereof relating to the effect of a termination of your employment upon your rights with respect to this Option, including, without limitation, any provision regarding acceleration of this Option, shall be fully

3

applicable and shall supersede the provisions hereof relating to the same subject matter, but in no event shall the restriction on sale of shares acquired upon the exercise of this Option referred herein apply after any termination of your employment with Disney.

In the event that your employment with Disney or an Affiliate thereof terminates for any reason other than death, Disability, or "cause" (as further provided in the Plan) at a time when (i) you have attained the age of sixty and have completed at least ten consecutive Service Years (as hereinafter defined) and (ii) at least one year has passed since the Grant Date of this Option, then notwithstanding any other term or provision hereof, the Extended Vesting and Exercisability Period shall continue until the earlier of five years from the date of termination of your employment or the expiration date of this Option as provided above; provided, however, that in the event of your death during such period, all remaining unvested Tranches of this Option shall vest immediately upon such event and thereafter all remaining unexercised Tranches (or portions thereof) of this Option shall be exercisable until the earlier of the expiration of 18 months from date of death or the expiration date of this Option.

In the event that your employment with Disney or an Affiliate thereof terminates for any reason other than death, Disability, "cause" (as provided in Section 12 of the Plan) or a sixty and ten Termination, at a time when (i) you have attained the age of fifty-five and have completed at least three consecutive Service Years, and notwithstanding any other term or provision hereof, you may continue to exercise any portion of your stock options that shall have become vested (including during the three month period after your date of termination included in Extended Vesting and Exercisability Period) until the earlier of 18 months from the date of termination of your active employment or the expiration date of this Stock Option Award (the "Additional Exercisability Period").

For purposes of the foregoing, "**Service Year**" shall mean any calendar year during which you have been continuously employed by Disney or an Affiliate thereof for the entire calendar year. In determining the total number of consecutive Service Years that you have been so employed, the

4

Company shall apply such rules regarding the bridging of service as the Committee may adopt from time to time.

Notwithstanding any other term or provision hereof, if you are employed pursuant to an employment agreement with Disney or an Affiliate which provides under certain circumstances for the continued vesting and/or exercisability of this Option in the event of the termination of such employment agreement prior to its scheduled expiration date (a "**Contractual Extension Provision**"), then, except as otherwise expressly provided in such employment agreement, (i) this Option shall be interpreted and applied in all respects to have the same effect as if you had remained continuously employed by Disney or an Affiliate thereof from the Grant Date of this Option through the scheduled expiration date of such employment agreement and (ii) the date of termination of your employment for all purposes hereunder shall be deemed to be the scheduled expiration date of such employment agreement.

Solely for purposes of (i) determining whether, and to what extent, the Participant shall have become eligible to exercise all or any portion of this Option and (ii) determining the period during which any vested portion of this Option remains exercisable following termination of the Participant's employment, the Participant shall be deemed to have continued in employment (without duplication of any service credit afforded with respect to a Contractual Extension Provision, as defined below) with Disney or an Affiliate during any period for which the Company provides Participant pay in lieu of notice in connection with The Worker Adjustment and Retraining Notification Act, as currently in effect and as the same may be amended from time to time, or any successor statute thereto or any comparable provision of state, local or foreign law applicable to the Participant.

You expressly authorize and consent to the collection, possession, use, retention and transfer of your personal data, whether in electronic or other form, by and among Disney, its Affiliates, third-party administrator(s) and other possible recipients, in each case for the exclusive purpose of implementing, administering, facilitating and/or managing your Awards under, and participation in, the Plan. Such personal data may include, without limitation, your name, home address and telephone number, date of birth, Social Security Number, social insurance number or other identification number, salary,

5

nationality, job title and other job-related information, tax information, the number of Disney shares held or sold by you, and the details of all Awards (including any information contained in this Award and all Award-related materials) granted to you, whether exercised, unexercised, vested, unvested, cancelled or outstanding ("**Data**"). You acknowledge, understand and agree that Data will be transferred to Merrill Lynch, which is assisting Disney with the implementation, administration and management of the Plan, and/or to such other third-party plan administrator(s) and/or recipients as may be selected by Disney in the future. You understand that one or more of the administrators or recipients of Data may be located in countries other than the country of your current residence, and that such other countries may have data privacy laws and protections different from, and less protective than, the laws and protections of the country of your current residence, the Member States of the European Union or any other country to which you may be at any time relocated.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Note: Non-Qualified Stock Options are granted and vested in the United States. You are responsible for any applicable taxes whether you are in the United States or any other country. At the time of exercise, Disney will withhold any minimum statutory local or U.S. taxes, as applicable.

6

**Exhibit 10.7**

**THE WALT DISNEY COMPANY**
**Schedule of Provisions for Certain**
**Time-Vested Restricted Stock Unit Awards**
**Pursuant to the 2011 Stock Incentive Plan**

AWARD AGREEMENT, dated as of **Dated** between The Walt Disney Company, a Delaware corporation ("Disney"), and **Participant Name** (the "**Participant**"). This Award is granted on **Grant Date** (the "**Date of Grant**") by the Compensation Committee of the Disney Board of Directors (the "**Committee**").

Section 1. Restricted Stock Unit Award. Disney hereby grants to the Participant, on the terms and conditions set forth herein, an Award of **####** Restricted Stock Units. This schedule relates to an Award of "Restricted Stock Units" (the "Award Agreement") pursuant to the 2011 Stock Incentive Plan, as amended (the "**Plan**") by Disney. All capitalized terms not defined herein shall have the meanings set forth in the Plan. The Award referred to herein constitutes a "Stock Unit Award" under the Plan. The Restricted Stock Units are notional units of measurement denominated in shares of Common Stock of Disney ("**Shares**") (i.e., one Restricted Stock Unit is equivalent in value to one Share, subject to the terms hereof). The Restricted Stock Units represent an unfunded, unsecured obligation of Disney. This Award is subdivided into [three]/[six] "tranches," each of which constitute one [third]/[sixth] of the Award.

Section 2. Vesting Requirements. Subject to accelerated vesting in certain circumstances as provided in Section 3 below and to the terms of Section 6 below regarding extended vesting, your right to receive payment of this Award shall become vested only if you remain continuously employed by Disney or an Affiliate from the date hereof [(i) in the case of the first tranche, until the first anniversary of the Date of Grant, (ii) in the case of the second tranche, until the second anniversary of the Date of Grant and (iii) in the case of the third tranche, until the third anniversary of the Date of Grant]/[(i) in the case of the first tranche, until six months after Date of Grant, (ii) in the case of the second tranche, until twelve months after Date of Grant, (iii) in the case of the third tranche, until eighteen months after Date of Grant, (iv) in the case of the fourth tranche, until twenty-four months after Date of Grant, (v) in the case of the fifth tranche, until thirty months after Date of Grant and (vi) in the case of the sixth tranche, until thirty-six months after Date of Grant]. Except as otherwise provided in Sections 3 or 6 below, if the service vesting requirements of this Section 2 are not satisfied for a tranche, the applicable number of Restricted Stock Units shall be immediately forfeited and your rights with respect thereto shall cease. All Restricted Stock Units for which the requirements of this Section 2 have been satisfied shall become vested and shall thereafter be payable in accordance with Section 5 hereof.

Section 3. Accelerated Vesting. Notwithstanding the terms and conditions of Section 2 hereof, upon your death or Disability (to the extent permitted under applicable local law), or upon the occurrence of a Triggering Event within the 12-month period following a Change in Control (in accordance with Section 11 of the Plan as in effect on the date hereof), this Award shall become fully vested and shall be payable in accordance with Section 5 hereof to the extent that it has not previously been forfeited.

Section 4. Dividend Equivalents. Any dividends paid in cash or Shares will be credited to you as additional Restricted Stock Units as if the Restricted Stock Units you previously held were outstanding Shares, as follows: such credit shall be made in whole Restricted Stock Units only (rounded downward to the nearest whole unit) and shall be based on the Fair Market Value of the Shares on the date of payment of such dividend. All such additional Restricted Stock Units shall be subject to the same vesting requirements applicable to the Restricted Stock Units in respect of which they were credited and shall be payable in accordance with Section 5 hereof.

Section 5. Payment of Award. Payment of vested Restricted Stock Units shall be made within 30 days of the applicable vesting date under Section 2 hereof as of which the vesting requirements under Section 2 hereof shall have been satisfied with respect to any tranche (or within 30 days of the acceleration of vesting under Section 3

1

**Ex. 12**
**Page 1385**

hereof). The Restricted Stock Units shall be paid in cash or in Shares (or some combination thereof), as determined by the Committee in its discretion at the time of payment, and in either case shall be paid to you after satisfaction of any withholding obligation for all income tax, social insurance contributions, National Insurance contributions, payroll tax, fringe benefits tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("Tax-Related Items") in the amount determined by the Committee.

Section 6. <u>Extended Vesting.</u>

(a)    In the event that your employment with Disney or an Affiliate thereof terminates for any reason other than death, Disability or "cause" (as provided in Section 12 of the Plan) at a time when (i) you have attained the age of 60 and have completed at least 10 consecutive Service Years (as hereinafter defined) and (ii) at least one year has passed since the Date of Grant, then the remaining then unvested tranche(s) of this Award shall vest in accordance with the terms and provisions hereof in the same manner as if your employment had continued through the scheduled vesting date(s) of such tranche(s); provided, however, that in the event of your death prior to any such scheduled vesting date(s), all remaining then unvested tranche(s) of this Award shall vest and be payable immediately upon such event. For purposes of the foregoing, "Service Year" shall mean any 12-month period during which you were continuously employed by Disney or an Affiliate thereof. In determining the total number of consecutive Service Years that you have been so employed, Disney shall apply such rules regarding the bridging of service as the Committee may adopt from time to time.

(b)    Notwithstanding any other term or provision hereof, if at the time of termination of employment (other than upon the scheduled expiration date of an employment agreement) you are employed pursuant to an employment agreement with Disney or an Affiliate which provides under certain circumstances for the continued vesting of any Restricted Stock Units subject to this Award in the event of the termination of such employment agreement prior to its scheduled expiration date (a "Contractual Extension Provision"), then, except as otherwise provided in such employment agreement, (i) this Section 6 shall be interpreted and applied in all respects as if you had remained continuously employed by Disney or an Affiliate thereof from the Date of Grant through the scheduled expiration date of such employment agreement and (ii) the date of termination of your employment for all purposes under this Section 6 shall be deemed to be the scheduled expiration date of such employment agreement.

(c)    Solely for purposes of determining whether, and to what extent, you have satisfied the service vesting requirement in Section 2, you will be deemed to have continued in employment (without duplication of any service credit afforded with respect to a Contractual Extension Provision) with Disney or an Affiliate during any period for which the Company provides you with pay in lieu of notice in connection with The Worker Adjustment and Retraining Notification Act, as currently in effect and as the same may be amended from time to time, or any successor statute thereto or any comparable provision of state, local or foreign law applicable in your jurisdiction.

Section 7. <u>Responsibility for Taxes.</u> Restricted Stock Units are granted and vested in the United States. At the time of vesting, if you are a U.S. taxpayer, Disney will withhold all U.S. federal, state and local taxes as required by applicable law at the then-current rate for supplemental wage income. If you are resident outside the U.S., you shall be responsible for the payment of all Tax-Related Items, and Disney will either withhold the Tax-Related Items as required by applicable law, or, alternatively, you will be required to pay the Tax-Related Items directly or, where permitted by applicable law with respect to fringe benefits or employer social taxes, to reimburse Disney or, if different, the Affiliate by whom you are employed (the "Employer") for the Tax-Related Items paid by Disney or the Employer.

Regardless of any action Disney or the Employer takes with respect to any Tax-Related Items, you acknowledge that the ultimate liability for all Tax-Related Items is and remains your responsibility and may exceed the amount actually withheld by Disney or the Employer, if any, whether you are in the United States or any other country. You further acknowledge that Disney and/or the Employer (i) make no representations or undertakings

2

regarding the treatment of any Tax-Related Items in connection with any aspect of the Restricted Stock Units, including, but not limited to, the grant, vesting or settlement of the Restricted Stock Units, the issuance of Shares upon settlement of the Restricted Stock Units, the subsequent sale of Shares acquired pursuant to such issuance and the receipt of any dividends and/or dividend equivalents; and (ii) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Restricted Stock Units to reduce or eliminate your liability for Tax-Related Items or achieve any particular tax result. Further, if you are subject to tax in more than one jurisdiction, you acknowledge that Disney and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

Prior to any relevant taxable or tax withholding event, as applicable, you agree to pay or make adequate arrangements satisfactory to Disney and/or the Employer to satisfy all Tax-Related Items. In this regard, you authorize Disney and/or the Employer, or their respective agents, at their discretion, to satisfy any applicable withholding obligations with regard to all Tax-Related Items by one or a combination of the following: (i) withholding from your wages or other cash compensation payable to you by Disney and/or the Employer; (ii) withholding from proceeds of the sale of Shares acquired upon vesting/settlement of the Restricted Stock Units either through a voluntary sale or through a mandatory sale arranged by Disney (on your behalf pursuant to this authorization without further consent); or (iii) withholding in Shares to be issued upon settlement of the Restricted Stock Units.

Disney may withhold or account for Tax-Related Items by considering statutory withholding rates or other withholding rates, including maximum rates applicable in your jurisdiction, in which case you may receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent in Shares. If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, you are deemed to have been issued the full number of Shares subject to the vested Restricted Stock Units, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items.

Finally, you shall pay to Disney or the Employer any amount of Tax-Related Items that Disney or the Employer may be required to withhold or account for as a result of your participation in the Plan that cannot be satisfied by the means previously described. Disney may refuse to issue or deliver the Shares or the proceeds of the sale of Shares, if you fail to comply with your Tax-Related Items obligations.

Section 8. <u>Restrictions on Transfer.</u> Neither this Award nor any Restricted Stock Units covered hereby may be sold, assigned, transferred, encumbered, hypothecated or pledged by you, other than to Disney as a result of forfeiture of the Restricted Stock Units as provided herein.

Section 9. <u>No Voting Rights.</u> The Restricted Stock Units granted pursuant to this Award, whether or not vested, will not confer any voting rights upon you, unless and until the Award is paid in Shares.

Section 10. <u>Award Subject to Plan.</u> This Restricted Stock Unit Award is subject to the terms of the Plan, the terms and provisions of which are hereby incorporated by reference. In the event of a conflict or ambiguity between any term or provision contained herein and a term or provision of the Plan, the Plan will govern and prevail.

Section 11. <u>Changes in Capitalization.</u> The Restricted Stock Units under this Award shall be subject to the provisions of the Plan relating to adjustments for changes in corporate capitalization.

Section 12. <u>Nature of Grant.</u> In accepting the Restricted Stock Unit Award, you acknowledge, understand and agree that:

(a)     the Plan is established voluntarily by Disney, it is discretionary in nature, and may be amended, suspended or terminated by Disney at any time, to the extent permitted by the Plan;

3

(b)      the grant of the Restricted Stock Units is exceptional, voluntary and occasional and does not create any contractual or other right to receive future grants of restricted stock units, or benefits in lieu of restricted stock units, even if restricted stock units have been granted in the past;

(c)      all decisions with respect to future Restricted Stock Unit or other grants, if any, will be at the sole discretion of Disney;

(d)      your participation in the Plan shall not confer upon you any right to employment or service with the Employer, Disney or any other Affiliate, and shall not interfere with the ability of the Employer to terminate your employment or service relationship (if any) at any time or to change the terms and conditions of such employment or service relationship (if any);

(e)      you are voluntarily participating in the Plan;

(f)      the Restricted Stock Units and the Shares subject to the Restricted Stock Units, and the income and value of same, are not intended to replace any pension rights or compensation;

(g)      the Restricted Stock Unit Award and your participation in the Plan will not be interpreted to form an employment or service agreement or relationship with Disney or any Affiliate;

(h)      the future value of the Shares subject to the Restricted Stock Units is unknown, indeterminable and cannot be predicted with certainty;

(i)      unless otherwise agreed with Disney, the Restricted Stock Units and the Shares subject to the Restricted Stock Units, and the income and value of same, are not granted as consideration for, or in connection with, any service you may provide as a director of any Affiliate;

(j)      no claim or entitlement to compensation or damages shall arise from any forfeiture of the Restricted Stock Units resulting from termination of your employment or service relationship (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or providing services or the terms of your employment or service agreement, if any);

(k)      for purposes of the Restricted Stock Units, your employment or service relationship will be considered terminated as of the date you are no longer actively providing services to Disney, the Employer or any other Affiliate (regardless of the reason for such termination and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or providing services or the terms of your employment or service agreement, if any) and except in the case of death or Disability in accordance with Section 3 hereof and unless otherwise expressly provided in this Award Agreement or determined by Disney, your right to vest in the Restricted Stock Units under the Plan, if any, will terminate effective as of such date and will not be extended by any notice period (e.g., the period of your employment service would not include any contractual notice period or any period of "garden leave" or similar period mandated under employment laws in the jurisdiction where you are employed or providing services or the terms of your employment or service agreement, if any); the Committee shall have the exclusive discretion to determine when you are no longer actively providing services for purposes of your Restricted Stock Unit Award (including whether you may still be considered to be providing services while on a leave of absence);

(l)      the Restricted Stock Units and the Shares subject to the Restricted Stock Units, and the income and value of same, are not part of normal or expected compensation or salary for purposes of calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments;

4

**Ex. 12
Page 1388**

(m)  unless otherwise provided in the Plan or by Disney in its discretion, the Restricted Stock Units and the benefits evidenced by this Award Agreement do not create any entitlement to have the Restricted Stock Units or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting the Shares; and

(n)  if you are providing services outside the United States:

(i)  the Restricted Stock Units and the Shares subject to the Restricted Stock Units, and the income and value of same, are not part of normal or expected compensation or salary for any purpose; and

(ii)  neither Disney, the Employer nor any other Affiliate shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Restricted Stock Units or of any amounts due to you pursuant to the settlement of the Restricted Stock Units or the subsequent sale of any Shares acquired upon settlement.

Section 13. <u>No Advice Regarding Grant.</u> Disney is not providing any tax, legal or financial advice, nor is Disney making any recommendations regarding your participation in the Plan, or your acquisition or sale of the Shares subject to the Restricted Stock Units. You understand and agree that you should consult with your own personal tax, legal and financial advisors regarding participation in the Plan before taking any action related to the Plan.

Section 14. <u>Governing Law and Venue.</u> This Award Agreement shall be construed and enforced in accordance with the internal substantive laws of the State of Delaware, U.S.A., without giving effect to the choice of law principles thereof. For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by the Restricted Stock Units and this Award Agreement, the parties hereby submit to and consent to the sole and exclusive jurisdiction of the State of California, U.S.A. and agree that such litigation shall be conducted only in the courts of Los Angeles County, California, U.S.A., or the federal courts for the United States for the Central District of California, and no other courts, where this grant is made and/or to be performed.

Section 15. <u>Electronic Delivery and Acceptance.</u> Disney may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by Disney or a third party designated by Disney.

Section 16. <u>Language.</u> You acknowledge that you are sufficiently proficient in English to understand the terms and conditions of this Award Agreement and the Plan or have had the ability to consult with an advisor who is sufficiently proficient in the English language. Furthermore, if you have received this Award Agreement, or any other document related to the Restricted Stock Units and/or the Plan translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control.

Section 17. <u>Severability.</u> The provisions of this Award Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Section 18. <u>Imposition of Other Requirements.</u> Disney reserves the right to impose other requirements on the Restricted Stock Units and the Shares acquired upon vesting/settlement of the Restricted Stock Units, to the extent Disney determines it is necessary or advisable for legal or administrative reasons, and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

Section 19. <u>Data Privacy.</u>

5

(a)    Purposes of Processing. Disney processes Data (as defined below) for purposes that include administering and managing your participation in the Plan and facilitating compliance with applicable tax, exchange control, securities and labor law.

(b)    Data Collection and Usage. Disney and the Employer process information about you that includes the following for purposes of this Award Agreement: your name, home address, telephone number, email address, date of birth, social security number (or similar national identifier), salary, nationality, job title, any shares or directorships held in Disney, details of all Awards granted under the Plan or any other entitlement to shares awarded, canceled, exercised, vested, unvested or outstanding in your favor ("Data").

(c)    Stock Plan Administration Service Providers. Disney transfers Data to Merrill Lynch, Pierce, Fenner & Smith Incorporated and certain of its affiliates ("Merrill"), which is assisting Disney with the implementation, administration and management of the Plan. Disney may select a different service provider or additional service providers and share Data with such other provider(s) serving in a similar manner. You may be asked to agree on separate terms and data processing practices with Merrill or such other provider(s), with such agreement being a condition to the ability to participate in the Plan.

(d)    International Data Transfers. You understand and acknowledge that any processing by Disney and/or Merrill under this Award Agreement may involve a transfer of Data from your home jurisdiction to the U.S.

(e)    Data Subject Rights. You may have a number of rights under the data privacy laws in your jurisdiction. Depending on where you are based, such rights may include the right to (i) request access to or copies of Data Disney processes, (ii) rectify incorrect Data, (iii) delete Data, (iv) restrict the processing of Data, (v) restrict the portability of Data, (vi) lodge complaints with competent authorities in your jurisdiction, and/or (vii) receive a list with the names and addresses of any potential recipients of Data. To receive information regarding these rights or to exercise these rights, you can contact your local human resources representative.

(f)    Contractual Requirement. Where necessary, your provision of Data and its processing as described above is a contractual requirement for you to participate in the Plan. Your participation in the Plan and your acceptance of the Restricted Stock Unit Award is purely voluntary. You can refuse to provide Data, as a result of which you will not be able to participate in the Plan, but your career and salary will not be affected in any way.

Section 20. <u>Waiver.</u> You acknowledge that a waiver by Disney of breach of any provision of this Award Agreement shall not operate or be construed as a waiver of any other provision of this Award Agreement, or of any subsequent breach by you or any other Participant.

Section 21. <u>Insider Trading/Market Abuse Laws.</u> You acknowledge that, depending on your or your broker's country of residence or where the Shares are listed, you may be subject to insider trading restrictions and/or market abuse laws, which may affect your ability to acquire or sell or attempt to sell Shares or rights to Shares (e.g., Restricted Stock Units), either directly or indirectly, or rights linked to the value of Shares under the Plan during such times as you are considered to have "inside information" regarding Disney (as defined by or determined under the laws in the applicable jurisdiction or the laws in your country). Local insider trading laws and regulations may prohibit the cancellation or amendment of orders you placed before you possessed inside information. Furthermore, you could be prohibited from (i) disclosing the inside information to any third party (other than on a "need to know" basis) and (ii) "tipping" third parties or causing them to otherwise to buy or sell securities. Keep in mind third parties include fellow employees. Any restrictions under these laws or regulations are separate from and in addition to any restrictions that may be imposed under Disney's insider trading policy. You acknowledge that it is your responsibility to comply with any applicable restrictions, including those imposed under Disney's insider trading policy, and you should consult with your own personal legal and financial advisors on this matter before taking any action related to the Plan.

6

**Ex. 12**
**Page 1390**

Section 22. <u>Foreign Asset/Account Reporting Requirements.</u> You acknowledge that there may be certain foreign asset and/or account reporting requirements which may affect your ability to acquire or hold Shares acquired under the Plan or cash received from participating in the Plan (including from any dividends received or sale proceeds arising from the sale of Shares) in a brokerage or bank account outside your country. You understand that you may be required to report such accounts, assets or transactions to the tax or other authorities in your country. You also may be required to repatriate sale proceeds or other funds received as a result of your participation in the Plan to your country through a designated bank or broker and/or within a certain time after receipt. You acknowledge that it is your responsibility to comply with all such requirements, and that you should consult your personal legal and tax advisors, as applicable, to ensure your compliance.

**********************

Note: Restricted Stock Units are granted and vested in the United States. You are responsible for any applicable taxes whether you are in the United States or any other country. At the time of vesting, Disney will withhold any minimum statutory local or U.S. taxes, as applicable.

7

**Ex. 12**
**Page 1391**

**Exhibit 22**

### List of Guarantor Subsidiaries

TWDC Enterprises 18 Corp ("Legacy Disney") is a subsidiary of The Walt Disney Company ("TWDC") and, as of July 2, 2022, a guarantor of TWDC's registered debt securities. Legacy Disney is also an issuer of registered debt securities, which are guaranteed by TWDC. At July 2, 2022, the registered debt securities were as follows:

**CUSIPs for TWDC Registered Debt Securities Guaranteed by Legacy Disney**

254687FH4 / 254687FJ0 / 254687FK7 / 254687FL5 / 254687FM3 / 254687FN1 / 254687FP6 / 254687FQ4 / 254687FR2 / 254687FS0 / 254687CM6 / 254687CP9 / 254687CR5 / 254687CT1 / 254687CV6 / 254687CX2 / 254687CZ7 / 254687DB9 / 254687DD5 / 254687DF0 / 254687DH6 / 254687DK9 / 254687DM5 / 254687DP8 / 254687DR4 / 254687DT0 / 254687DV5 / 254687DX1 / 254687DZ6 / 254687EB8 / 254687ED4 / 254687EF9 / 254687EH5 / 254687EK8 / 254687EM4 / 254687EP7 / 254687ER3 / 254687ET9 / 254687EV4 / 254687EX0 / 254687EZ5 / 254687FB7 / 254687FD3 / 254687FF8 / 254687FU5 / 254687FV3 / 254687FW1 / 254687FX9 / 254687FY7 / 254687FZ4 / 254687GA8

**CUSIPs for Legacy Disney Registered Debt Securities Guaranteed by TWDC**

25468PCW4 / 254687CD6 / 25468PDF0 / 25468PDK9 / 25468PDM5 / 25468PDV5 / 25468PBW5 / 25468PCP9 / 25468PCR5 / 25468PCX2 / 25468PDB9 / 25468PDN3 /

**Exhibit 31(a)**

**RULE 13a-14(a) CERTIFICATION IN
ACCORDANCE WITH SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert A. Chapek, Chief Executive Officer of The Walt Disney Company (the "Company"), certify that:

1.    I have reviewed this quarterly report on Form 10-Q of the Company;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    August 10, 2022            By:    /s/ ROBERT A. CHAPEK

                                                    Robert A. Chapek
                                                    Chief Executive Officer

**Exhibit 31(b)**

**RULE 13a-14(a) CERTIFICATION IN
ACCORDANCE WITH SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, Christine M. McCarthy, Senior Executive Vice President and Chief Financial Officer of The Walt Disney Company (the "Company"), certify that:

1.  I have reviewed this quarterly report on Form 10-Q of the Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    August 10, 2022                    By:    /s/ CHRISTINE M. MCCARTHY

                                                   Christine M. McCarthy
                                                   Senior Executive Vice President
                                                   and Chief Financial Officer

**Ex. 12
Page 1394**

**Exhibit 32(a)**

**CERTIFICATION PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of The Walt Disney Company (the "Company") on Form 10-Q for the fiscal quarter ended July 2, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert A. Chapek, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1.    The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


By:    /s/ ROBERT A. CHAPEK

Robert A. Chapek
Chief Executive Officer
August 10, 2022

**Ex. 12**
**Page 1395**

**Exhibit 32(b)**

## CERTIFICATION PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of The Walt Disney Company (the "Company") on Form 10-Q for the fiscal quarter ended July 2, 2022 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Christine M. McCarthy, Senior Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1.    The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By:    /s/ CHRISTINE M. MCCARTHY

Christine M. McCarthy
Senior Executive Vice President
and Chief Financial Officer
August 10, 2022

**Ex. 12**
**Page 1396**