ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (200643)
RYAN A. LLORENS (225196)
JESSICA T. SHINNEFIELD (234432)
JEFFREY J. STEIN (265268)
NICOLE Q. GILLILAND (335132)
JESSICA E. ROBERTSON (352207)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
ryanl@rgrdlaw.com
jshinnefield@rgrdlaw.com
jstein@rgrdlaw.com
ngilliland@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, on Behalf of Itself and All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>                    Defendants. | Case No. 2:23-cv-03661-CBM (ASx)<br><br>CLASS ACTION<br><br>JOINT STIPULATION REGARDING PLAINTIFFS' MOTION TO COMPEL CUSTODIANS AND SEARCH TERMS **[REDACTED]**<br><br>Date:  January 6, 2026<br>Time:  10:00 a.m.<br>Ctrm.:  540, 5th Floor<br>Judge:  Honorable Alka Sagar<br><br>Discovery Cutoff:  August 21, 2026<br>Pretrial Conference: July 14, 2027<br>Trial:  August 17. 2027 |

4934-6279-9994.v1

**TABLE OF CONTENTS**

**Page**

I.   PLAINTIFFS' POSITION ....................................................................... 1

    A.   Introduction ............................................................................... 1

    B.   Factual Background .................................................................... 3

    C.   Procedural Background ............................................................... 5

    D.   Legal Standard ........................................................................... 7

    E.   Argument .................................................................................... 8

        1.   Defendants Fail to Apply Searches to Critical Custodians ........ 8

        2.   Defendants Exclude Critical Custodians ................................. 10

            a.   Defendants' Generic Objections Are Legally Insufficient .................................................................. 11

            b.   Plaintiffs' Proposed Custodians .................................... 14

                (1)   Managers and Senior Employees in Key Departments ........................................................... 15

                (2)   Directors on Disney's Compensation Committee .......................................................... 20

                (3)   Co-Chairs of Disney Entertainment .................... 22

                (4)   Executives Involved in Disney's Leadership Crisis ................................................................. 24

                (5)   Chapek's and Iger's Chiefs of Staff ..................... 26

        3.   Defendants Refuse to Run *Any* of Plaintiffs' Proposed Search Terms ....................................................................... 27

            a.   Defendants' Categorical Refusal to Run *Any* of Plaintiffs' Proposed Searches Violates the ESI Agreement and Rule 26 .............................................. 27

            b.   Plaintiffs' Proposed Searches Are Necessary to Remedy Blatant Deficiencies in Defendants' Search Proposal ............................................................ 29

            c.   Defendants Impose Unduly Restricted Timeframes on Many of Their Searches ........................................... 32

        4.   Plaintiffs' Search Proposal Is Proportional to the Needs of the Case ...................................................................... 33

- i -

|  | | **Page** |
|---|---|---|
| F. | Conclusion | 35 |
| II. | DEFENDANTS' POSITION | 36 |
| A. | Introduction | 36 |
| B. | Factual and Procedural Background | 39 |
| C. | Legal Standard | 44 |
| D. | Argument | 45 |
|  | 1. Defendants Proffered Robust Search Terms and Modified Them in Good Faith, While Plaintiffs Seek Unbounded Searches and Now Request Unfounded Relief. | 45 |
|  | a. Defendants' Searches Are Robust and Proportional to the Needs of the Case. | 46 |
|  | b. Plaintiffs Do Not Even Attempt to Justify the Exponential and Disproportionate Discovery They Seek. | 47 |
|  | c. Notwithstanding Plaintiffs' Unreasonable Demands, Defendants Have Modified Their Robust Searches in Good Faith. | 53 |
|  | 2. Plaintiffs' Additional Custodians Are Overbroad, Duplicative, and Disproportionate to the Needs of this Case. | 57 |
|  | a. Defendants' Custodian Selections Are Relevant, Proportional, and Entitled to Deference. | 57 |
|  | b. Plaintiffs Have Not Identified Specific Deficiencies Justifying the Addition of Their 16 Custodians. | 60 |
|  | (i) Defendants Are Not Required to Designate Low-Relevance, Duplicative Lower-Level Employees. | 62 |
|  | (ii) The High Burden and Duplication of Plaintiffs' Chief of Staff Custodians Outweigh Their Marginal Relevance. | 66 |
|  | (iii) Plaintiffs' Burdensome Board of Director Custodian Requests Duplicate Board Materials Defendants Will Produce. | 67 |

4934-6279-9994.v1

**Page**

               (iv)    The High Burden of Plaintiffs' Disney
Senior Leadership Custodians
Outweigh Their Minimal Relevance. ........ 68

     3.       Plaintiffs Search Protocol Is Disproportionate to the
Needs of the Case and Contrary to the PSLRA........................ 69

   E.     Conclusion ..................................................................................... 71

4934-6279-9994.v1

# I.   PLAINTIFFS' POSITION

## A.   Introduction

This discovery dispute boils down to a simple, asymmetric conflict: Plaintiffs[1] have repeatedly narrowed requests to focus on case-dispositive evidence, while Defendants refuse to produce it.  In this securities fraud action, Plaintiffs allege Defendants used a "growth-at-any-cost" scheme and accounting manipulations to deceive investors about the sustainable growth and profitability of Disney+.  The discovery Plaintiffs seek is surgically targeted at the core allegations of Defendants' scheme: the internal data, analyses, and communications that will expose the disconnect between Defendants' public statements and what the internal metrics reflected.

The parties' Stipulated Electronic Discovery Agreement (ECF 174) (the "ESI Agreement") requires a collaborative, good-faith effort to agree on discovery methods. Plaintiffs have honored that agreement, repeatedly narrowing and refining their requests to reach a compromise.  Defendants have responded by rejecting all but a token two of Plaintiffs' proposed custodians and every single one of Plaintiffs' proposed search terms.  After Plaintiffs narrowed their requests for a third time, Defendants unilaterally declared an "impasse" and refused to negotiate further, forcing this motion.

Defendants' position rests on four errors:

***First***, Defendants have refused to collect documents from 16 of Plaintiffs' proposed custodians on the ground that they are "lower-level" employees.  This is a non sequitur; relevance is dictated by the nature of the evidence, not where the holder

---

[1]   "Plaintiffs" collectively refers to Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund, Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987, and Central Pennsylvania Teamsters Health and Welfare Fund, and plaintiffs Local 272 Labor-Management Pension Fund and John Patrick Talbot. "Defendants" collectively refers to The Walt Disney Company ("Disney" or the "Company"), Robert Iger, Robert Chapek, Christine M. McCarthy, and Kareem Daniel.

4934-6279-9994.v1

sits on the organizational chart. Plaintiffs' proposed custodians are the finance directors, data analysts, and strategy managers who created the reports, tracked the metrics, and lived the data. These managers were on the front lines, grappling daily with the "leaky bucket" of subscribers, the unsustainable content spending, and the stagnating growth that Defendants failed to disclose to investors. Because they hold non-duplicative ESI central to falsity and scienter, their rank is legally irrelevant.

*Second*, Defendants' custodian objections are internally inconsistent. On the one hand, Defendants refuse to add Plaintiffs' 16 proposed custodians, claiming that they are "lower-level" and that "only information available to senior Disney employees is relevant." On the other hand, Defendants simultaneously hide what those senior employees saw by refusing to run dozens of their own search terms against Disney's senior-most executives, excluding Defendant Iger from 21 searches, Defendant Chapek from 13, and Defendants McCarthy, and Daniel from seven searches each. Inexplicably, five of Defendants' own searches – concerning critical topics like third-party partnerships and U.S. Securities and Exchange Commission ("SEC") filings – exclude Iger, Chapek, McCarthy, and Daniel (collectively, the "Individual Defendants"). Defendants cannot have it both ways by arguing that only senior executives matter while, at the same time, systematically excluding those same executives from their own searches.

*Third*, Defendants' "undue burden" objection is conclusory and unsupported. They have refused to run *any* of Plaintiffs' targeted search terms, even those that return fewer than 200 documents. These are not broad, burdensome requests; they are surgical searches – like for the "leaky bucket" metaphor (186 hits) and 10b5-1 trading plans (178 hits) – that go to the heart of Plaintiffs' allegations and Defendants' affirmative defenses. Defendants' persistent refusal to run even these indisputably targeted searches confirms their objection is not about burden; it is about hiding discovery.

- 2 -

4934-6279-9994.v1

***Fourth***, Defendants' proposed search protocol is engineered to miss candid discussions. For example, it systematically excludes the Company's own internal shorthand, such as "subs" for subscribers, rendering key searches ineffective. Similarly, Defendants' search for "churn" is rendered meaningless by also requiring the terms "Disney+" and "subscri*" in the same document, disregarding the reality that employees discussing "churn" internally would not use such a formal, conjunctive string. These deliberate carve-outs and artificial restrictions ensure that Defendants' protocol will miss the most candid and relevant discussions.

Proportionality likewise favors Plaintiffs. This is a high-stakes securities class action seeking to recover billions of dollars in investor losses. The information sought is not tangential; it is the primary evidence of scienter and falsity. It is exclusively in Defendants' possession, and Disney, a corporation with a market capitalization exceeding $200 billion, has the resources to collect and produce it.

Judicial intervention is now necessary to cut through this gamesmanship and secure the relevant, proportional discovery to which Plaintiffs are entitled. Plaintiffs respectfully request that this Court grant their motion in its entirety and compel Defendants to: (1) add Plaintiffs' 16 proposed targeted custodians; (2) run Plaintiffs' proposed searches; and (3) apply the searches (proposed by both parties) across all designated custodians, including the Individual Defendants.

**B.    Factual Background**

This securities action arises from a scheme by Disney and its senior executives – Chapek (former CEO), Iger (former Executive Chairman and current CEO), McCarthy (former CFO), and Daniel (former head of Disney Media and Entertainment ("DMED")) – to create the illusion of sustainable and profitable growth at Disney+. Plaintiffs allege Defendants used short-term tactics and accounting maneuvers to manufacture subscriber gains while concealing churn and mounting

- 3 -

4934-6279-9994.v1

costs, and then reinforced the illusion through materially false and misleading statements to investors.  *See* ¶¶119-146, 266-317.[2]

Plaintiffs allege nine coordinated artifices that advanced this scheme:

1.  Setting unattainably high Disney+ subscriber targets to prop up Disney's declining stock price (¶¶147-154);

2.  Reorganizing the Company to create DMED, centralizing complete control over Disney+-related decisions (¶¶155-163);

3.  Using DMED to steer content directly to Disney+, bypassing traditional (and lucrative) theater and pay-per-view windows to spike subscriber counts (¶¶164-168);

4.  Spending prolifically on content to drive short-term subscriber growth despite adverse economics (¶¶169-180);

5.  Entering third-party partnerships that generated deeply discounted subscriptions prone to rapid churn (¶¶181-190);

6.  Launching Disney+ in dozens of unprofitable international markets to inflate subscriber numbers (¶¶191-203);

7.  Reassuring investors that Disney+ remained on track to achieve 230-260 million subscribers and profitability by 2024 (¶¶204-213);

8.  Employing accounting manipulations to obscure escalating Disney+ costs (¶¶214-223); and

9.  Concealing Disney+'s high subscriber "churn" rate (*i.e.*, cancellations) (¶¶224-228).

Consistent with these tactics, Defendants issued a steady stream of materially false and misleading statements related to Disney+ and Disney's direct-to-consumer ("DTC") streaming business.  *See* ¶¶266-317.  For example, Defendants repeatedly told investors "we're extraordinarily pleased with the low churn" (¶311) and "our

---

[2]  All "¶_" and "¶¶_" references are to the Corrected Consolidated Complaint for Violations of the Federal Securities Law (ECF 68) (the "Complaint").

- 4 -

4934-6279-9994.v1

churn has declined" (¶310) even as internal documents showed churn was elevated and a "constant problem." ¶312. These statements painted a picture of durable, profitable growth that did not match what Defendants were seeing internally.

The truth began to emerge through a series of corrective disclosures. On November 10, 2021, Disney disclosed a significant slowdown in Disney+ subscriber growth and warned that Disney+ losses would peak in 2022 (not 2021). ¶385. On November 8, 2022, Disney shocked investors with a $1.47 billion loss in Disney's DTC segment. ¶390. In the lead-up to that announcement, internal turmoil mounted regarding Disney's deteriorating financial condition and Chapek's ability to continue leading the Company. ¶¶245-250. Within days, Disney fired Chapek and reinstalled Iger, who finally began unwinding the growth at-any-cost scheme after internally criticizing, but failing to stop it, while Chapek was CEO. ¶¶251-252. Finally, on May 10, 2023, Disney announced, among other things, a massive $1.5-$1.8 billion impairment charge related to removing content from Disney+ and cautioned that DTC losses were expected to continue. ¶394.

## C.    Procedural Background

The ESI Agreement requires a collaborative, good-faith process: "the parties will attempt in good faith to come to an agreement on search and culling methods used to identify responsive information." ECF 174 at 1. Under this framework, Defendants – as the producing party – were obligated to propose initial search terms in response to Plaintiffs' First Set of Requests for Production of Documents to All Defendants (the "First RFPs"). *Id.* at 3. The ESI Agreement then calls for Plaintiffs to "provide any additional search terms that [they] believe[] are necessary to identify responsive documents." *Id.* The ESI Agreement also provides that "the parties shall meet and confer regarding which custodian's files will be searched." *Id.* at 2.

- 5 -

Consistent with this framework, Plaintiffs served their First RFPs on June 4, 2025. *See* Ex. D.[3] Defendants served their responses and objections to the First RFPs on July 7, 2025. *See* Ex. E. On August 15, 2025, Defendants transmitted a proposed search protocol, including initial search term and custodian proposals. *See* Ex. F. Plaintiffs identified significant deficiencies in Defendants' proposals, which they repeatedly communicated to Defendants.

In accordance with the ESI Agreement's iterative process, on September 3, 2025, Plaintiffs provided Defendants with a supplemental proposal ("September 3 Search Proposal") tailored to close critical gaps and ensure the collection of relevant, responsive documents – adding targeted search terms and custodians where Defendants' proposal fell short. *See* ECF 174 at 3; *see also* Ex. G. Although Defendants provided a hit report on September 12, 2025 (*see* Ex. H), they summarily rejected the September 3 Search Proposal, refused to run a single one of Plaintiffs' proposed search terms, and declined to add any of Plaintiffs' proposed custodians.

Seeking compromise despite that refusal, Plaintiffs narrowed their proposal on September 19, 2025 – materially reducing both the number of additional searches and the list of additional custodians – and explained in detail the relevance of each proposed custodian. *See* Ex. I. On September 25, 2025, Defendants provided Plaintiffs with a hit report for Plaintiffs' proposed searches. *See* Ex. SS.

During an October 3, 2025 meet-and-confer, Defendants reiterated that they would not run ***any*** of Plaintiffs' search terms and would add only two of Plaintiffs' custodians. Shinnefield Decl., ¶6. Four days later, Defendants declared that negotiations "ha[d] gone on for far too long" and proposed submitting the dispute to the Court the following week. *See* Ex. J. Plaintiffs nonetheless made a third, good-faith effort to resolve the impasse: on October 10, 2025, Plaintiffs provided a further-

---

[3]    Exhibits A-SS referenced herein are attached to the Declaration of Jessica T. Shinnefield in Support of Joint Stipulation Regarding Plaintiffs' Motion to Compel Custodians and Search Terms ("Shinnefield Decl."), filed concurrently herewith.

- 6 -

4934-6279-9994.v1

revised search term proposal ("October 10 Search Proposal"), accompanied by 12 pages detailing specific deficiencies in Defendants' searches and proposing concrete fixes. *See* Ex. K.

Defendants' October 16, 2025 hit report confirmed the minimal burden posed by many of Plaintiffs' targeted terms. Ex. L. For example, one of Plaintiffs' proposed searches yielded only ***183 total hits*** (approximately 0.003% of searchable documents), and another only ***178 total hits*** (same). *Id.* Defendants refused to run even these low-volume, high-relevance searches.

On October 17, 2025, Plaintiffs again invited continued discussion and stated a willingness to refine any term presenting a legitimate concern. Ex. M. One week later, on October 24, 2025, Defendants announced they would not meet and confer further concerning the search protocol. Ex. N.

In sum, Plaintiffs followed the ESI Agreement's collaborative architecture – narrowing proposals three separate times, supplying detailed rationales, and engaging repeatedly – while Defendants rejected Plaintiffs' terms wholesale, added only two custodians, and unilaterally ended negotiations. Court intervention is therefore warranted.

### D.    Legal Standard

Federal Rule of Civil Procedure 26 permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "'The relevance standard is commonly recognized as one that is necessarily broad in scope in order to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Leon v. URL Pharma, Inc.*, 2025 WL 1723148, at *3 (C.D. Cal. May 16, 2025).[4]

---

[4]    Unless otherwise noted, all citations are omitted and emphasis is added.

- 7 -

Proportionality turns on "'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 2025 WL 1009362, at *1 (N.D. Cal. Apr. 4, 2025) (quoting Fed. R. Civ. P. 26(b)(1)). Where, as here, critical information resides with the producing party, proportionality favors production.

The resisting party bears the burden to substantiate any objection. "'It is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery.'" *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2019 WL 13108021, at *1 (C.D. Cal. June 25, 2019) (quoting *Pom Wonderful LLC v. Coca-Cola Co.*, 2009 WL 10655335, at *3 (C.D. Cal. Nov. 30, 2009)); *Bible v. Rio Props., Inc.*, 246 F.R.D. 614, 618 (C.D. Cal. 2007) (same). The law is well-established that "'generalized objections of burdensomeness'" will not suffice. *Strategic Partners, Inc. v. FIGS, Inc.*, 2020 WL 2527056, at *7 (C.D. Cal. Feb. 6, 2020) (quoting *Pappas v. Naked Juice Co. of Glendora, Inc.*, 2012 WL 12885108, at *2 (C.D. Cal. Oct. 18, 2012)). Rather, "'[t]he objecting party bears the burden of demonstrating specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive.'" *Pappas*, 2012 WL 12885108, at *2.

### E. Argument

#### 1. Defendants Fail to Apply Searches to Critical Custodians

Defendants' search protocol suffers from a threshold defect: it does not run many of Defendants' own search terms across the Individual Defendants' files. Their proposal excludes Iger from 21 searches, Chapek from 13, and McCarthy and Daniel from seven each. Inexplicably, five defense searches – on topics such as third-party partnerships, SEC filings, and tone-at-the-top – exclude ***all*** Individual Defendants

- 8 -

4934-6279-9994.v1

altogether.[5]  Their protocol also cabins 26 of 51 searches to a narrow subset of custodians, further distorting the record.

All search terms should be applied to all Individual Defendants.  Their knowledge of the internal facts – and the divergence between those facts and their public statements – goes directly to scienter, falsity, materiality, and loss causation. Defendants' position is internally inconsistent: elsewhere they resist Plaintiffs' proposed "lower-level" custodians on the theory that only senior leadership matters; yet here they refuse to run searches across those very senior leaders' files. Defendants have offered no explanation for this contradiction.

Plaintiffs flagged these defects in detail.  On October 10, 2025 Plaintiffs identified (among other issues): (1) the exclusion of Iger from searches concerning earnings calls and meetings of Disney's Board of Directors (the "Board") in which he participated, and from a search concerning the DMED reorganization he called a "mistake"; (2) the exclusion of Chapek, Iger, and Daniel from searches regarding content costs, operating losses, and international launches; and (3) the exclusion of Chapek, Iger, and McCarthy from searches concerning third-party partnerships. Ex. K at 44-55.  Plaintiffs also highlighted comparable gaps for other key custodians, such as omitting Rebecca Campbell (the executive who led Disney+'s international expansion) from searches about that expansion, and excluding Investor Relations custodians from searches tied to stock-price movements. *Id.*  Defendants' October 16, 2025 letter ignored these issues and declared an impasse.  When Plaintiffs sought to confer again on October 17, 2025 Defendants refused.  *See* Exs. L-M.  Defendants identified no instance of search terms returning abnormal volumes of irrelevant

---

[5]  In their recent submission to the Court regarding the identification of confidential witnesses, Defendants described "Chapek's management style and departure" and "Disney's partnership with Verizon," among other topics, as "matters core to the Complaint."  Defendants – Brief Summary of Position, dated October 30, 2025, at 2.  It is untenable for Defendants to contend that these matters are important enough to require discovery from the confidential witnesses, but that they do not require discovery from the Individual Defendants themselves.

- 9 -

material from any particular custodian. Indeed, when Plaintiffs asked for a custodian-by-custodian hit report, Defendants flatly refused. *See* Shinnefield Decl., ¶7.

Plaintiffs respectfully request an order requiring Defendants to run all searches across the files of all designated custodians. At minimum, the Court should direct Defendants to: (1) apply every search term to the Individual Defendants' files; and (2) correct the specific custodian omissions identified above, including the application of relevant search terms to Rebecca Campbell and Disney's Investor Relations custodians.

## 2. Defendants Exclude Critical Custodians

Defendants have likewise treated custodian selection as a unilateral exercise. They have rejected Plaintiffs' modest additions – individuals who directly participated in the events at issue and whose departments sit at the core of Plaintiffs' allegations – thereby leaving material gaps in the collection. The Court should order Defendants to add the 16 custodians Plaintiffs have identified.

Defendants, as the parties resisting discovery, bear "'the burden of showing that discovery should not be allowed'" and "'the burden of clarifying, explaining, and supporting [their] objections with competent evidence.'" *Stetsyk v. Kelly Mitchell Grp., Inc.*, 2020 WL 10457861, at *2 (C.D. Cal. Dec. 18, 2020); *see also Garner v. Amazon.com, Inc.*, 2022 WL 16553158, at *2 (W.D. Wash. Oct. 31, 2022) (granting plaintiffs' motion to compel 36 additional custodians where "[d]efendants make no attempt to explain how or why running the searches . . . is onerous, nor do they provide any data regarding the amount of time or expense incurred in reviewing and producing responsive documents"). Rather than carrying that burden, Defendants incorrectly claim their initial custodian list is "entitled to deference." Ex. H at 2. No such deference is required. Defendants' obligation to identify likely sources of relevant ESI does not grant them *carte blanche* to impose an incomplete set. *See Tremblay v. OpenAI, Inc.*, 2024 WL 4512055, at *2 (N.D. Cal. Oct. 16, 2024) (ordering defendants to add custodians selected by plaintiffs and noting that

- 10 -

4934-6279-9994.v1

"[d]efendants' concern as to the wisdom of [p]laintiffs' [custodian] choice . . . is not necessarily determinative"); *see also Pappas*, 2012 WL 12885108, at *1 ("it is not up to defendant to decide what plaintiffs need to prosecute or defend this action").

### a. Defendants' Generic Objections Are Legally Insufficient

Defendants' generic objections – labeling Plaintiffs' proposed custodians "lower-level," "cumulative," or "duplicative," and asserting that "only the information . . . available to senior Disney employees is relevant" – are legally insufficient and factually incorrect. *See* Ex. J at 3-6. Courts have consistently held that it is "not necessary" to allege that proposed custodians had any involvement in the alleged misstatements "in order to establish that they may have relevant ESI." *See In re Envision Healthcare Corp. Sec. Litig.*, 2020 WL 6750397, at *3 (M.D. Tenn. Nov. 16, 2020); *see id.* at *10 (ordering defendants to search the files of 22 custodians in addition to the existing 57 custodians). "[E]ven if the conspiracy is among higher-level executives, lower-level employees may ***possess*** important, relevant information which could reasonably lead to admissible evidence." *Kleen Prods. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *15 (N.D. Ill. Sep. 28, 2012) (emphasis in original) (ordering two defendants to each add eight more custodians to the existing 75 and 28 custodians, respectively); *see also Blankenship v. Fox News Network, LLC*, 2020 WL 9718873, at *14-*15 (S.D.W. Va. Sep. 21, 2020) (compelling production of communications among employees beyond those who allegedly engaged in wrongdoing).

Nor is discovery confined to senior leadership where corporate knowledge and scienter are at issue. Even if top executives made or approved the statements, ESI from the teams who generated the inputs – metrics, forecasts, and analyses – often reveals what the company and defendants knew and when. For example, in *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716 (C.D. Cal. Mar. 12, 2012), the court ordered the defendants to search the files of additional employees because "it is

- 11 -

4934-6279-9994.v1

highly relevant to inquire as to whether other officers, directors, employees, or agents of Toyota, as well as the Corporate Defendants – charged with the knowledge of its directors, officers, and agents – were aware of, or recklessly disregarded, information that would contradict the statements its officers and spokespersons made." *Id.* at \*11. Thus, "[t]he fact that responsive documents may arguably be more relevant for one stated purpose than another is not sufficient to sustain a relevance objection so long as the requested discovery is relevant for at least some permissible purpose." *Andes Cap. Fin. LLC v. Crossed Keys LLC*, 2022 WL 2191796, at \*6 (D. Kan. June 17, 2022).

Communications "below the highest echelon" are frequently the most candid and least curated; they capture execution details, risk flags, and day-to-day reactions that senior-level files may not. *See Fam. Wireless #1, LLC v. Auto. Techs., Inc.*, 2016 WL 2930887, at \*3 (D. Conn. May 19, 2016) (communications "below the highest echelon of management" in which "lower-level employees may discuss execution of policies amongst themselves and with third parties other than their superiors . . . may be particularly revealing"). Overlap in roles does not equal identity of content. *See Affinity Credit Union v. Apple Inc.*, 2024 WL 3859802, at \*4 (N.D. Cal. Aug. 16, 2024) ("[A]n overlap in responsibilities with other custodians" does not "indicate a perfect overlap in responsive documents."). Thus, even when higher-level employees have already been designated as custodians, collecting documents from mid-level employees responsible for specific functions that are important to the case is necessary and non-duplicative.

*Rusoff v. Happy Grp., Inc.*, 2023 WL 114224, at \*4 (N.D. Cal. Jan. 5, 2023), is instructive. In *Rusoff*, the court ordered the collection of documents from a senior manager of a marketing team, even though two higher-level marketing directors were already custodians. *Id.* The court reasoned that the senior manager's role in "developing and overseeing" relevant workflows and "executing the 'marching orders' from higher level executives" meant that he likely had distinct, relevant

- 12 -

communications about internal corporate strategy and external messaging that were "less likely to be carefully phrased" than the communications of more senior employees. *Id.*

The same is true in the instant case. The relevant information is not limited to written documents in the files of senior executives, but also includes the methodologies, analyses, reactions, and concerns of those within Disney who were on the ground and well-placed to know, *e.g.*, whether Defendants' public statements were false or misleading, and whether Defendants engaged in the alleged scheme. Indeed, the documents least likely to be duplicative of Defendants' existing custodians are the one-on-one or small-group communications in which, as a general matter, individuals more frequently share their unfiltered thoughts and reactions and often avoid copying their bosses.

Information from additional employees is particularly important here given the serious questions about which internal sets of financial data were reliable. As alleged, when McCarthy advised the Board in September 2022 that Chapek's "rosy outlook" was untethered from reality, Chapek blamed "McCarthy's poor financial management," while McCarthy reportedly countered that DMED (headed by Daniel) provided "unreliable" and "constantly changing . . . forecasts." ¶¶246-247. Where senior executives dispute which numbers are reliable, discovery must reach the analysts, finance leads, and operational managers who generated, vetted, and circulated those numbers.

Further, when senior executives are alerted to a problem – such as a gap between the public Disney+ subscriber and profitability targets and the reality within Disney – they are likely to receive a summary of the situation, which may be delivered in writing or even orally. Documents in the custody of lower-level individuals, such as meeting summaries and discussions about next steps, frequently shed a distinct light on what senior executives were told and how they responded to unwelcome information.

- 13 -

4934-6279-9994.v1

On the other hand, if a company's culture discouraged bad news from reaching the C-suite, that dynamic supports severe recklessness: executives lacked a reasonable basis for their public assurances. *See, e.g.*, ¶65 (describing Disney's "toxic culture" in which Defendant Chapek's "management style was to disregard things he didn't want to hear"). ESI memorializing what was raised, to whom, and with what response often resides in the files of those below the top tier.

Defendants' rote duplication and burden narratives are further undermined by their own custodian choices. Their current list includes six corporate-level accounting custodians with substantial overlap. Ex. F. When Plaintiffs proposed swapping some of those for more relevant custodians, Defendants refused, asserting only that collection had already begun. Raw review volumes from Defendants' self-selected custodians cannot justify excluding Plaintiffs' targeted additions – particularly where Defendants provide no quantitative showing of burden tied to the specific custodians Plaintiffs propose.

Plaintiffs cannot perform the "impossible" and "provide examples of documents [they do] not have." *See Blackrock Allocation Target Shares: Series S. Portfolio v. Bank of N.Y. Mellon*, 2018 WL 2215510, at *8 n.13 (S.D.N.Y. May 15, 2018). But the record amply demonstrates that relevant, non-duplicative ESI will be found beyond the files of senior leadership. The Court should compel Defendants to add the 16 custodians identified by Plaintiffs and to proceed with collection and search accordingly.

### b. Plaintiffs' Proposed Custodians

Each of Plaintiffs' proposed custodians – grouped below – held responsibility for functions central to the alleged "growth-at-any-cost" scheme and the alleged misstatements. Rank is beside the point. What matters is custody of unique, decision-grade ESI (metrics, analyses, forecasts, and candid communications) that is not reasonably duplicative of C-suite files.

- 14 -

4934-6279-9994.v1

**(1)    Managers and Senior Employees in Key Departments**

Defendants' custodian list omits core groups that generated and interpreted Disney+ subscriber metrics, churn analyses, budgeting, marketing finance, and distribution strategy – the very engines of the alleged fraud.  Plaintiffs, therefore, identify one senior employee per function (seven total), chosen for distinct, non-overlapping visibility into subscriber growth, profitability, and churn:

(a)    **Eduardo Bezerra (Director, Subscriber & Engagement Finance)**. ███████████████████████████████████████████████████ *See, e.g.*, Ex. P at -4720. ██████████████████████████████████████████████

*Id.*  Defendants concede the Subscriber & Engagement Finance group's importance but claim Bezerra's documents are captured elsewhere in his "reporting chain."  *See* Ex. J at 4. ████████████████████████████████████████████████████████████████████████ Ex. P at -4721.  Designating the director who sat atop this unique function is plainly warranted.

(b)    **Michael Chin (Director, Tactical Opportunities)**.    Since November 2021, Chin has led Disney's Tactical Opportunities team, which is "focused on Disney+ and Hulu strategic initiatives for profitability and subscriber growth."[6] ██████████████████████ *See, e.g.*, Ex. R. ████████

---

[6]    Ex. Q.

- 15 -

4934-6279-9994.v1

████████████████████████████████████

████████████████████████████████████

████████████████████████ Ex. S at -3397. Defendants propose no Tactical Opportunities custodian and offer only speculation about duplication up the chain. *See* Ex. J at 4. That unsupported speculation cannot defeat collection from the leader of this growth-and-profitability workstream.

(c)   **David Chodniewicz (Vice President, Data Science & Analytics, Disney Streaming Services)**. From April 2019 to January 2022, Chodniewicz was "[r]esponsible for subscriber and engagement growth for Disney+," influencing operating plans and content decisions by defining, measuring, and monitoring key performance metrics.[7] Chodniewicz's team also conducted important analyses of Disney+ churn. ¶55. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ *See* Ex. U at -5196. Defendants label him "duplicative" of existing custodian Laura Evans, who left Chodniewicz's role less than a month into the period December 10, 2020 to May 10, 2023 (the "Class Period"). Ex. J at 5.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████ *See* Ex. V at -8781. Any Vice President who held this seat during the Class Period – including Chodniewicz (and his January 2022 successor, not yet identified) – should be a custodian.

(d)   **Nick Lewerke (Vice President, Content Planning & Analysis)**. Lewerke led the team responsible for optimizing "windowing" strategies for distributing Disney content – how and when content moves across platforms like

---

[7]   Ex. T.

- 16 -

Disney+, theaters, and pay-per-view.[8] *See* Ex. X ██████████████ ██████████████. Those responsibilities bear directly on Plaintiffs' allegations that Defendants routed content to Disney+ to inflate subscribers while bypassing lucrative theater and pay-per-view windows.  ¶¶128, 164-168.  Lewerke's responsibilities are also central to Plaintiffs' allegations that Defendants manipulated content distribution and windowing to artificially shift Disney+ costs to other divisions.  ¶¶222-223. Defendants offer no Content Planning & Analysis custodian.

Defendants dismiss Lewerke as focused on title-level performance. ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *See* Ex. Y ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████ *See* Ex. Z. ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ *See* Ex. AA. ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████

Accordingly, the Court should compel Defendants to add Lewerke as a custodian because ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████ are relevant, non-duplicative of other custodians' files, and proportional to the needs of this case.

(e)  **Matthew Kambic (Vice President, Marketing Finance, Disney Streaming)**.  Kambic managed global marketing budgets across Disney Streaming

---

[8]  Ex. W.

- 17 -

4934-6279-9994.v1

and provided strategic financial leadership to streaming marketing teams, including analysis of Disney Streaming promotional offers.[9] Kambic likely has highly relevant information concerning the Disney+ promotional content releases and third-party promotions that Plaintiffs allege constituted unsustainable efforts to boost subscriber growth. ████████████████ (Ex. CC) ████████████████ ████████████ Ex. DD at-7217. Defendants have proposed no Marketing Finance custodians and respond generically that they have designated finance custodians from other groups and that Kambic was in the same "reporting chain" as more senior existing custodians. Ex. J at 4. But Marketing Finance is a distinct decision node linking spend to subscriber and earnings outcomes; Kambic's files are uniquely probative.

(f) **Jon Pang (Director, DMED Strategy)**. Pang was "responsible for content distribution and monetization across [Disney's] streaming, linear television, and theatrical platforms."[10] His strategy work sits at the intersection of subscriber growth, profitability, and windowing – precisely where Plaintiffs allege unsustainable tactics were deployed. Defendants dismiss Pang as a "lower-level employee whose reporting line includes other employees that Defendants have listed as custodians." Ex. J at 5. That label ignores function: DMED Strategy operationalized the distribution choices that drove – or degraded – Disney+ economics. Pang's custodial files matter.

(g) **Jack Reiman (Senior Data Analyst, Subscriber Analytics, Disney Streaming Services)**. Reiman "[s]pearheaded subscriber analytics initiatives

---

[9] Ex. BB.

[10] Ex. EE.

- 18 -

at Disney Streaming Services" to "driv[e] growth and profitability."[11]  Specifically, his work involved "acquisition funnel measurement strategies to optimize subscriber growth," creating a "framework to describe 3rd party partner cannibalization of retail (DTC) subscribers to enhance partnership effectiveness," and improving "daily executive reporting data quality."[12]  These analyses go to the heart of alleged unsustainable growth via third-party partnerships and churn.  Defendants offer no custodian whose primary charge was subscriber analytics for Disney Streaming Services.  Yet, they refuse to collect Reiman's documents, characterizing him as "lower-level" within a senior reporting line.  *See* Ex. J at 5.  Notwithstanding Defendants' conclusory "lower-level" label, the Court should compel Defendants to add Reiman as a custodian because his subscriber-acquisition and churn analytics – including partner-cannibalization modeling and executive reporting – are probative of Plaintiffs' claims, not duplicative of any existing custodian's files, and plainly proportional to the needs of this case.  After all, where the dispute centers on what the numbers actually showed, the analyst who measured subscriber growth and built executive dashboards is indispensable.

In sum, these seven proposed custodians anchor distinct functional vantage points – subscriber finance, tactical growth initiatives, data science and churn analytics, windowing strategy, marketing finance, DMED distribution strategy, and subscriber analytics – that collectively generated the very numbers, models, and day-to-day assessments at issue.  Their files are where one finds cohort-level churn dashboards, promotion and discount ROI models, partner-cannibalization analyses, windowing and distribution scenario memos, assumptions logs underlying subscriber and revenue forecasts, candid email threads, and notes of one-to-one meetings.  These are not the curated summaries that typically reside in executive or generic FP&A

---

[11]    Ex. FF.

[12]    *Id.*

- 19 -

repositories.  In fact, Disney's own materials confirm these functions are not subsumed by FP&A or executive files.  Together, these custodians will allow the jury to trace who built the metrics, what assumptions changed and when, what was escalated, and how internal facts diverged from public messaging – all central to falsity, scienter, and loss causation.  The incremental burden is minimal and proportional: seven narrowly scoped custodians, with no meaningful duplication because each custodian occupies a distinct function and reporting line with unique materials not captured in executive or FP&A files.

### (2) Directors on Disney's Compensation Committee

Defendants refuse to add Mary Barra, Maria Elena Lagomasino, and Mark Parker as custodians.  Each served on Disney's Board and its Compensation Committee (which Lagomasino chaired).  Plaintiffs initially sought all Board members as custodians, but, narrowing to minimize burden, now seek only the Compensation Committee members because that committee evaluated Defendant Chapek's performance, and several of its members were reluctant to renew his contract and later played a central role in his ouster.[13]

The Compensation Committee directly tied Chapek's pay to streaming subscriber growth and, as alleged, commended and rewarded him while he pursued unsustainable tactics to inflate Disney+ subscribers.  *See* ¶¶241-242, 375. ███████ ████████████████████████████████████████████████████ (*see* Ex. GG), the Board renewed Chapek's contract in June 2022 and publicly declared "full confidence in him and his leadership team."  ¶¶243, 314, 339.

Contemporaneous reporting further underscores these directors' relevance: according to *The Wall Street Journal*, Barra and Parker "had been reluctant to go along" with renewal but were persuaded that unanimous Board support might improve

---

[13] *See* Disney's 2023 Proxy Statement at 27, www.sec.gov/Archives/edgar/data/1744489/000119312523025766/d354565ddefc14a.htm (last visited Nov. 17, 2025).

- 20 -

Chapek's performance. *See* ¶315(b). Soon after, at a September 2022 Board meeting attended by Barra, Lagomasino, and Parker, Defendant McCarthy disclosed Disney's deteriorating financial results while Chapek attempted to defend performance – an inflection point at the center of Plaintiffs' claims. *See* ¶¶246-251; Ex. RR at 19-20. Barra, Lagomasino, and Parker then participated in deliberations culminating in Chapek's removal and Iger's reinstatement as CEO, which included Disney executives directly telling Parker and other Board members that they no longer supported Chapek as CEO. *See* ¶¶251-253.

The Compensation Committee members' communications are uniquely probative. They will show: (1) what the Board was told (and when) about Disney+ shortfalls and DMED losses; (2) how those facts shaped the Compensation Committee's assessment of Chapek's credibility and strategy; (3) whether the Board unanimously renewed Chapek's contract (as they told investors); and (4) why the Board reversed course after renewing him. That evidence bears on the gap between internal briefings and public messaging and whether Disney's leadership, including the Board and the Individual Defendants, knew or recklessly disregarded contradictory information.

Defendants respond that Board Chair Susan Arnold is already a custodian and that they are collecting from "Boardvantage." *See* Ex. J at 4. That is insufficient. Arnold did *not* serve on the Compensation Committee that evaluated Chapek's performance and, according to *The Wall Street Journal*, was not among the directors who expressed reluctance to renew his contract in June 2022. And Boardvantage largely houses formal minutes, decks, and resolutions; it is not a substitute for the directors' own ESI (emails, messages, and informal exchanges) that capture candid reactions, concerns, and one-to-one discussions. Given these are non-employee directors who did not have day-to-day responsibilities at the Company, the incremental volume is likely modest, further reducing any burden.

- 21 -

4934-6279-9994.v1

In short, adding Barra, Lagomasino, and Parker as custodians is a narrowly tailored, common-sense step.  Their emails and messages – distinct from formal Boardvantage materials – bear directly on Chapek's contract renewal, the September 2022 briefing on deteriorating results, and the subsequent decision to remove him. That evidence goes to falsity, scheme, and scienter, and is not reasonably duplicative of other custodians.  Because these are non-employee directors with limited repositories, the incremental burden is modest and proportional to the needs of the case.  The Court should compel Defendants to designate these Compensation Committee members as custodians.

### (3)  Co-Chairs of Disney Entertainment

Alan Bergman and Dana Walden should be added as custodians.  In February 2023, they were named Co-Chairs of Disney Entertainment, where they "oversee [Disney's] streaming businesses and manage all content decisions for those services, including Disney+."[14]  Before then, during the core part of the Class Period, Walden chaired General Entertainment Content, where she was in charge of content for Disney's streaming platforms, including Disney+, and Bergman chaired Disney Studios, where he oversaw Disney's film production companies.  Their roles placed them at the fulcrum of the content-distribution choices and profitability tradeoffs that lie at the center of Plaintiffs' allegations.

Defendants resist adding Bergman and Walden as custodians on the ground that their focus was "the creative side of Disney's content business." *See* Ex. J at 4.  But both Bergman and Walden were vocally critical of Chapek's leadership and were central figures in his removal as CEO.  According to *CNBC*, Walden and Bergman informed the Board that they no longer supported Chapek as CEO – an important step in Iger's return. *See* ¶251.  Further, the DMED reorganization – one of the artifices in

---

[14]  Press Release, The Walt Disney Company, The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability to Creative Business (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/.

- 22 -

4934-6279-9994.v1

Plaintiffs' scheme allegations – concentrated decision-making about where content would be monetized (theaters/pay-per-view vs. Disney+), directly affecting subscriber acquisition, churn, revenue timing, and cost allocation. According to media accounts, Bergman criticized the DMED reorganization, advised Chapek not to implement it, and clashed with Chapek and Daniel over distribution choices. Walden, as the General Entertainment Content Chair, was responsible for the very content flows used to inflate subscriber counts. Distinct information about those disputes and decisions will likely be found in Bergman's and Walden's files. Plaintiffs are entitled to discovery from internal critics of Chapek's activities like Bergman and Walden, not just from Chapek's likely defenders.

Defendants also assert that these events are "not foundational" to Plaintiffs' allegations. *See id.* at 4. This claim is both factually and legally incorrect. Factually, the DMED reorganization was central to Chapek's growth-at-any-cost scheme, and Chapek's firing and Iger's re-hiring as the scheme unraveled are key events in this case. *See* ¶163. Legally, Defendants misstate the applicable standard. Discovery is not limited to matters that are "foundational" to this case – a standard Defendants appear to have invented. Discovery extends to all matters that are relevant. Here, Bergman and Walden are important witnesses who likely possess highly relevant documents about core events alleged in the Complaint in which they personally participated. They should be added as custodians.

The Court should compel Defendants to designate Bergman and Walden as custodians. Their contemporaneous communications and working files uniquely illuminate the frictions in Disney's executive ranks brought about by the DMED reorganization, how content was routed to Disney+, what senior leadership understood about the attendant subscriber/profitability tradeoffs, and how those facts informed the decision to remove Chapek. This is evidence within Disney's exclusive control and plainly proportional to the needs of this high-stakes securities action.

- 23 -

4934-6279-9994.v1

**(4)      Executives Involved in Disney's Leadership Crisis**

Defendants also refuse to search the files of two Disney executives who were central figures in the events that led to the replacement of Chapek with Iger as CEO, a critical event in the unraveling of the fraud in this case.

(a)      **Horacio Gutierrez (Chief Legal and Compliance Officer)**. Gutierrez served as "a strategic advisor" to both "executive leadership and the Board"[15] and was instrumental in the events leading to Chapek's ouster. Plaintiffs seek only relevant, non-privileged business communications for a narrow window – September 1, 2022-November 30, 2022 – when he personally participated in key business decisions. Gutierrez attended the September 2022 Board meeting where McCarthy went off-script to preview Disney's dismal financial results, which she blamed on Chapek. At the ensuing management retreat in Orlando, Gutierrez "invited, half-forced" McCarthy, Daniel, members of the DMED finance team, and other executives to meet "to figure out a strategy" regarding the fact that Disney was about to announce a massive and totally unexpected $1.5 billion loss to investors. ¶248. *CNBC* reported that "Gutierrez told colleagues that people were entitled to their own opinions but not their own facts." *Id.* According to *CNBC*, Gutierrez ultimately told the Board that he no longer supported Chapek as CEO. ¶251.

Defendants reflexively hide behind a boilerplate assertion that adding Gutierrez as a custodian "will entail a burdensome privilege review." Ex. J at 4. That objection is overstated and, in any event, manageable. Plaintiffs limit the request to the three-month period when he played a key role in business decisions. The law is clear: when in-house counsel wades into the commercial side of the business, "in-house counsel's business advice is not protected by attorney-client privilege." *Dolby Lab'ys Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 866 (N.D. Cal. 2019). A tailored

---

[15]      *Horacio Gutierrez*, The Walt Disney Company, https://thewaltdisneycompany.com/leaders/horacio-gutierrez/ (last visited Nov. 17, 2025).

- 24 -

production, accompanied by a categorical privilege log for truly privileged materials, addresses Defendants' concern while providing Plaintiffs with highly relevant evidence. Defendants' final claim – that Gutierrez's documents are duplicative – is equally meritless. Defendants cannot seriously suggest that the Chair of Disney's Board or a junior lawyer focused on securities filings would possess the same candid, high-stakes communications as the Chief Legal and Compliance Officer who was personally in the trenches, forcing executives to confront a $1.5 billion loss and lobbying the Board to fire the CEO.

(b) **Paul Richardson (Chief Human Resources Officer)**. Richardson was described in a *CNBC* report as a member of the small "inner circle" that Defendant Chapek relied on because Chapek "didn't trust most of the existing leadership, largely because of their ties to Iger."[16] Richardson attended the September 2022 Board meeting where McCarthy bluntly outlined Disney's deteriorating financial results to an internal audience. As Chief Human Resources Officer, Richardson also occupies at a unique vantage point for complaints regarding Disney's "toxic culture" and Chapek's and Daniel's problematic leadership – both of which are expressly alleged by Plaintiffs. *See* ¶¶340-350. These bear directly on scienter and the credibility of Defendants' public statements. *Id.* While Defendants have agreed to produce certain employment files, they have designated ***no*** Human Resources custodians; formal employment files are no substitute for the candid, real-time communications, complaints, and summaries in the Chief Human Resource Officer's ESI.

These targeted additions are proportional and relevant. The request for Gutierrez is tightly limited in time (September 1, 2022-November 30, 2022) and seeks only non-privileged business communications reflecting his role as a strategic adviser

---

[16] Alex Sherman, *Disney's wildest ride: Iger, Chapek and the making of an epic succession mess*, CNBC (Sep. 6, 2023), https://www.cnbc.com/2023/09/06/disney-succession-mess-iger-chapek.html.

- 25 -

during the September 2022 Board meeting, the Orlando management retreat, and the post-November 8, 2022 earnings-call deliberations.  Richardson's materials are likewise circumscribed, focused on his participation in the September 2022 Board meeting and his first-hand knowledge of leadership dynamics and culture concerns alleged in the Complaint.  As a member of Chapek's "inner circle" and the Chief Human Resources Officer, he is the central, indispensable custodian for communications concerning Plaintiffs' core allegations of a "toxic culture" and problematic leadership.  His documents are directly relevant to what senior leadership knew, when they knew it, and how they responded.  Given the narrow scope, unique vantage points, and modest expected volumes, the likely benefit of these custodians far outweighs any asserted burden.

### (5)    Chapek's and Iger's Chiefs of Staff

In a final, telling example of their obstruction, Defendants refuse to add Claire Lee (Chapek's Chief of Staff) and Nancy Lee (Iger's Chief of Staff) as custodians.  In those critical gatekeeping roles, they controlled the flow of information into and out of the CEO and Executive Chairman offices, coordinated cross-functional briefings, and tracked follow-ups – making them indispensable to determining what internal data and feedback actually reached these Defendants.

Produced documents and media reports confirm their central role in the scheme. Claire Lee was part of the small "inner circle" that Chapek relied on, according to a *CNBC* report.  *See* Ex. HH at -1750.  *See id. See* Ex. II.

- 26 -

4934-6279-9994.v1

Defendants' claim that these custodians are "duplicative of Iger and Chapek" is specious. *See* Ex. J at 5. Chiefs of Staff by their very function control the flow of information and regularly brief the executive. As such, they are well-placed to possess documents containing information known to the executive, but which may not be found in the executive's files. These documents include preparatory materials, briefing summaries, action items, and back-channel updates; they are precisely the materials that establish scienter.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ *See* Ex. HH. █████████████

███████████████████████████████████████████████████████

████████████████████████████████████ *See* Ex. JJ. These kinds of records, by their very nature, almost certainly would not be found in Iger's own custodial files.

Because Chiefs of Staff are the gatekeepers, conduits, and note-takers of the most consequential information that reached Chapek and Iger, their ESI is uniquely probative and not reasonably cumulative. The Court should compel Defendants to add Claire Lee and Nancy Lee as custodians. Any incremental burden is modest and dwarfed by the clear necessity and proportionality of this core request.

   **3.**  **Defendants Refuse to Run *Any* of Plaintiffs' Proposed Search Terms**

     **a.**  **Defendants' Categorical Refusal to Run *Any* of Plaintiffs' Proposed Searches Violates the ESI Agreement and Rule 26**

By flatly refusing to run *even a single one* of Plaintiffs' proposed searches – which are necessary to capture documents responsive to Plaintiffs' document requests – Defendants have violated their discovery obligations under both the Federal Rules of Civil Procedure and the ESI Agreement. *See generally Apple, Inc. v. Samsung Elecs.*

- 27 -

4934-6279-9994.v1

*Co. Ltd.*, 2013 WL 1942163, at \*3 (N.D. Cal. May 9, 2013) (explaining that "transparency and collaboration is essential to meaningful, cost-effective discovery").

Throughout September and October 2025, the parties met and conferred about search terms. Defendants made only minor tweaks to their own terms but refused to add even one term proposed by Plaintiffs, declaring Plaintiffs' searches "a non-starter" and maintaining that position despite Plaintiffs' repeated compromises. *See* Ex. H at 2. That stance contravenes the ESI Agreement's requirement of iterative, good-faith collaboration.

Despite Defendants' persistent refusal to meaningfully consider Plaintiffs' proposed search terms, Plaintiffs have continuously endeavored to reach a compromise by further refining and narrowing their proposed searches. In response to Defendants' September 12, 2025 criticisms – (1) that Plaintiffs' terms could pick up irrelevant lines of business (*e.g.*, Parks, Cruises) and (2) that Plaintiffs' proposal would not fit the Court's discovery schedule – Plaintiffs promptly tightened search strings, applied shorter time windows, and proposed a materially narrowed set of terms. *See* Ex. I. Plaintiffs also alleviated concerns about the discovery schedule by working cooperatively to obtain an extension of the fact discovery cutoff by more than seven months (from January 5, 2026 to August 21, 2026). On October 7, 2025, Defendants made minor modifications to their proposed search terms, but informed Plaintiffs that they were unwilling to run *any* of the revised searches in Plaintiffs' September 19, 2025 proposal. Ex. J.

In a third effort to reach a compromise and avoid burdening the Court with unnecessary motion practice, Plaintiffs further refined their proposal on October 10, 2025, reducing it to just 67 search terms (down from 91). Ex. K at 2. On October 16, 2025, Defendants dismissed that good-faith narrowing, asserting incorrectly that Plaintiffs' latest proposal was "not different in substance or magnitude from prior iterations of Plaintiffs' proposals." *See* Ex. L at 1. Having rejected all three of Plaintiffs' proposals, refused to run a *single* one of Plaintiffs' terms, and unilaterally

- 28 -

4934-6279-9994.v1

declared an impasse, Defendants left Plaintiffs no choice but to seek the Court's intervention.

Courts have rejected this very tactic. In *In re eBay Seller Antitrust Litig.*, 2009 WL 10694848 (N.D. Cal. July 13, 2009), the court held that a defendant's "failure to incorporate any of plaintiffs' input into the terms ultimately applied undercuts its request to shut off any further effort to retrieve relevant responsive documents." *Id.* at *2. The court ordered defendants – who had already reviewed 650,000 documents and produced 1.9 million pages – to apply over 100 additional, plaintiff-proposed terms, explaining that any overlap did not render plaintiffs' terms superfluous and could be addressed through de-duplication. *Id.* The same reasoning applies here: Defendants cannot stonewall Plaintiffs' targeted terms, and any overlap can be removed through routine de-duplication.

The Court should compel Defendants to run Plaintiffs' proposed search terms (as narrowed in the September 19 and October 10 proposals) across the agreed custodians (and the additional custodians addressed above), with ordinary de-duplication, so that responsive documents are collected and produced in accordance with the ESI Agreement.

### b. Plaintiffs' Proposed Searches Are Necessary to Remedy Blatant Deficiencies in Defendants' Search Proposal

As Plaintiffs repeatedly explained during the meet-and-confer process, Defendants' proposed terms and timeframes fail to target issues central to the parties' claims and defenses – gaps that Plaintiffs' October 10 Search Proposal squarely cures. On October 10, 2025, Plaintiffs sent Defendants a letter identifying numerous critical deficiencies in each of Defendants' 51 proposed searches and mapping the specific terms proposed by Plaintiffs designed to fix them. *See* Ex. K at Appendix B. Nonetheless, Defendants refuse to remedy those deficiencies and still will not run *even a single* Plaintiff-proposed term.

- 29 -

4934-6279-9994.v1

***First***, Defendants' protocol is too restrictive: it requires hits for "Disney+," "D+," or "DTC" in many searches even though employees working within Disney's streaming organizations – Disney Streaming Services and DMED – typically do not spell out "Disney+" when emailing each other because the subject is understood. Thirty-six of Defendants' 51 searches require at least one of these labels.  For example, Defendants' Search No. 8 demands "(Disney+ or D+) ***AND*** subscri* ***AND*** churn," even though employees commonly referred to "churn" on its own. *Compare* Ex. O at 030 *with* Ex. K at 8 (proposing "churn" as a standalone term).  ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ *See, e.g.*, Ex. KK at -1137

████████████████████████████████████████████████████████████

███████████████████████████████████ These hits arrived by luck, not design.  By forcing "churn" to appear only when coupled with other modifiers, especially the formal "Disney+"/"D+" or "subscriber" label, the current queries will systematically miss the many internal communications that use everyday shorthand ("churn," "subs") without those requirements.  The Court should require queries that track how Disney's teams actually wrote, not formal labels they often omitted in internal communications.

***Second***, Defendants arbitrarily exclude the internal shorthand "sub"/"subs," even though that is how Disney personnel routinely referred to subscribers.  Plaintiffs proposed adding "sub" and "subs" as synonyms; Defendants insist on only "subscriber" or "subscri*."  *See* Ex. K at Appendix A.  ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ *See, e.g.*, Ex. LL at -3675; Ex. MM at -3629; Ex.NN at -4871.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

- 30 -

4934-6279-9994.v1

██████████████████████████████████████████████████████

████████ *See* Ex. OO at -0829; *see also* Ex. PP at -4901 ████████████

████████████████████████ Ex. QQ at -1732 ████████████

████████████████████ Absent the "sub/subs" synonyms Plaintiffs proposed, plainly responsive documents will be missed.[17]

***Third***, Defendants require in their Search Nos. 29-32 "Disney+"/"D+" matches even in searches where such a constraint makes little sense – *e.g.*, executive compensation, executive securities transactions, executive departures, and the decision to rehire Iger. Embedding "Disney+" as a mandatory qualifier in these categories is unreasonable and will predictably exclude responsive materials that address those topics without the formal service name.

***Fourth***, Defendants propose limited terms about management style and tone-at-the-top – issues that go directly to scienter – and will only run them across centralized files, rather than across individual custodian's files. *See* ¶¶340-350. Plaintiffs proposed a narrowly tailored search string to capture these communications; Defendants have offered no explanation for refusing to run it.

***Fifth***, Defendants reject low-burden, high-relevance Plaintiffs' terms without reason. For example, Plaintiffs proposed "(leak or hole) w/5 bucket" to capture documents reflecting employees' "leaky bucket" metaphor for Disney+ churn – "[n]o matter how much water you put in, some leaks out." *See* ¶53. Although this search hits upon just 186 documents, Defendants refuse to run it. *See* Ex. O at 42. Likewise, Defendants refuse to run "10b51" or "trading plan" even though these terms go to Defendants' own affirmative defenses – and hit upon only 178 documents. *Id.* at 51; ECF 113 at 81 ("Defendants are not liable because they did not trade on or possess

---

[17] To reduce burden, Plaintiffs do not propose "sub" or "subs" as standalone searches, but rather, would include them as alternative terms in search strings that also include "subscri*" or "subscriber." On the other hand, Plaintiffs propose "churn" as a standalone search because that highly-specific term is unlikely to be used outside of a relevant context.

- 31 -

4934-6279-9994.v1

material non-public information, nor trade contemporaneously, but rather pursuant to a pre-existing 10b5-1 trading plan adopted in good faith.").

Given the concrete examples in Ex. K at Appendix B mapping fixes to flaws in Defendants' search protocol, Plaintiffs' proposed searches are necessary, targeted, and proportional.  The Court should compel Defendants to implement Plaintiffs' October 10 proposed searches, with ordinary de-duplication, so that responsive ESI is collected and produced in accordance with the ESI Agreement.

**c.    Defendants Impose Unduly Restricted Timeframes on Many of Their Searches**

Defendants' proposed timeframes are too narrow and will exclude large swaths of responsive ESI.  Take Request No. 5 to the First RFPs, which seeks documents concerning the DMED reorganization, including: (1) the decision to implement DMED; (2) organizational and reporting-structure changes; (3) changes to the financial reporting structure (including intersegment transfer pricing); (4) internal reactions to DMED; and (5) the purpose and effects of DMED.  Ex. D at 13.  These topics are central to Plaintiffs' allegations that Chapek, Daniel, and McCarthy engineered – and then exploited – the DMED restructuring to inflate Disney+ subscriber numbers.  *See* ¶¶125, 155-164, 215-222.

Yet to locate documents on issues that span the entire Class Period, Defendants would search *only four custodians* – Chapek, Daniel, McCarthy, and David Lindbom – and *only for two months* (from September 1 to October 31, 2020).  *See* Ex. O at Search Term Nos. 6-7.  That artificial window would slice off more than two-and-a-half years of DMED-related discovery, including the effects of DMED and internal reactions – core issues in this case.  *See* ¶¶155-168, 214-223, 304-307.  Defendants' own hit report underscores the problem: one DMED search returned *just 11 total hits* (Search Term No. 7), and the other only 2,561 (Search Term No. 6) – together less than 0.04% of total hits – despite DMED's centrality to this case.  *See* Ex. O.

- 32 -

4934-6279-9994.v1

Other proposed timeframe windows are likewise under-inclusive. Defendants' Search Term No. 33 purports to capture documents related to Chapek's statements on the November 8, 2022 earnings call, which Plaintiffs allege were false and misleading. *See* ¶¶316-317. But Defendants' search starts on October 1, 2022, even though, in ***September*** 2022, McCarthy warned Chapek and the Board about the true state of the business during an executive presentation – context squarely relevant to the preparation and content of the November call. *See* ¶¶246-247, 317(b), 364. Plaintiffs' October 10 Search Proposal reasonably moves the start date back just one month to September 2022; Defendants refuse without any explanation. *See* Ex. K.

Similarly, Defendants' timeframe for Search Term No. 37 ends on February 8, 2023, even though the Complaint alleges Iger's cost-cutting remediation – removing underperforming content and recognizing impairments – continued through ***at least*** July 2023. *See* ¶¶252-253. Ending the search in early February 2023 will arbitrarily exclude months of alleged remedial actions and communications that go to falsity, scienter, and loss causation. *See* Ex. O.

In sum, the cramped windows in Defendants' proposal exclude planning, implementation, reaction, and remediation phases that the Complaint puts squarely at issue. Plaintiffs' October 10 Search Proposal corrects these defects with targeted, proportionate timeframes aligned to the life cycle of each topic. Defendants should be compelled to run Plaintiffs' proposed searches.

### 4. Plaintiffs' Search Proposal Is Proportional to the Needs of the Case

Defendants' principal objection to Plaintiffs' October 10 Search Proposal – that it could yield a review set exceeding one million documents – does not establish undue burden. "[T]he 'mere fact that responding to a discovery request will require the objecting party to expend considerable time, effort and expense consulting, reviewing and analyzing huge volumes of documents and information is an

- 33 -

4934-6279-9994.v1

insufficient basis to object to a relevant discovery request.'"  *FIGS*, 2020 WL 2527056, at *7 (quoting *Pappas*, 2012 WL 12885108, at *2).

In document-intensive securities class actions alleging multi-year schemes, such as this case, courts routinely oversee productions measured in the millions.  *See Garner*, 2022 WL 16553158, at *2 (rejecting defendants' contention that ***adding 3.1 million documents*** to their review population was overly burdensome); *N.Y. State Tchrs.' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 231 (E.D. Mich. 2016), (defendants ***produced over 13 million pages of documents***), *aff'd sub nom. Marro v. N.Y. State Tchrs.' Ret. Sys.*, 2017 WL 6398014 (6th Cir. Nov. 27, 2017); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 376 (S.D.N.Y. 2013) ("Defendants ***produced approximately 35 million pages* . . . .**"); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *5 (S.D.N.Y. Dec. 23, 2009) (defendants produced "***over thirty-four million pages of documents***"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *1 (S.D.N.Y. Nov. 8, 2010) (defendants ***produced "more than 2.4 million pages of documents***"); *In re Am. Apparel, Inc. S'holder Litig.*, 2014 WL 10212865, at *3 (C.D. Cal. July 28, 2014) ("defendants produced more than 1.5 million pages of documents"); *Herrera v. Wells Fargo Bank, N.A.*, 2021 WL 9374975, at *5 (C.D. Cal. Nov. 16, 2021) (defendants ***produced "more than a million pages of documents***").  And those production figures necessarily understate the work those defendants undertook: productions reflect only the responsive, non-privileged subset.  By definition, the collections and review sets that led to those productions were some multiple larger, culled through standard tools (de-duplication, responsiveness screening, privilege screening) before production.

Defendants' fixation on raw document counts also ignores Rule 26(b)(1)'s holistic proportionality analysis, which considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense . . . outweighs its likely benefit."  Fed. R.

- 34 -

4934-6279-9994.v1

Civ. P. 26(b)(1).  As the resisting party, Defendants bear the burden of showing disproportionality and "clarifying, explaining, and supporting [their] objections." *See Bible*, 246 F.R.D. at 618.

Applied here, every Rule 26 factor favors Plaintiffs' proposal. ***First***, Plaintiffs' search terms and custodians are narrowly tailored to the claims and defenses, refined over multiple rounds to target core topics. ***Second***, the stakes are substantial: this putative class action seeks recovery of billions of dollars for many thousands of investors. ***Third***, the key ESI (internal data, analyses, and communications bearing on falsity, scienter, and loss causation) resides exclusively with Defendants. ***Fourth***, Disney's resources (a market capitalization exceeding $200 billion and 200 document reviewers assigned to this case) weigh in favor of production commensurate with the case. ***Fifth***, as discussed in §E, the requested discovery is central to resolving the merits at trial. ***Finally***, even if review is costly (and Defendants have not shown that it is), the likely benefit outweighs the burden, particularly with ordinary culling tools, such as de-duplication, that minimize review volume. *See, e.g.*, *Garner*, 2022 WL 16553158, at 1 (finding requests proportional given "the importance of the issues at stake," "the amount in controversy," defendants' "exclusive access to the information," and Amazon's resources).

Accordingly, Plaintiffs' October 10 Search Proposal is proportional to the needs of the case under Rule 26(b)(1) and should be implemented in full.

**F.    Conclusion**

Because the discovery sought is relevant and proportional under Rule 26(b)(1), the Court should grant Plaintiffs' motion to compel and order Defendants to: (1) add the requested custodians (including the Individual Defendants and the additional custodians identified herein); (2) implement Plaintiffs' October 10 Search Proposal; and (3) apply all searches (from both sides) across all designated custodians with reasonable, topic-appropriate timeframes.

- 35 -

4934-6279-9994.v1

## II.    DEFENDANTS' POSITION

### A.    Introduction

Plaintiffs' Motion has nothing to do with obtaining reasonable, proportional document discovery. Although Plaintiffs paper their motion with rote accusations of Defendants' "gamesmanship," and defend their proposed searches with perfunctory (and demonstrably false) labels such as "narrow" or "surgically targeted," J.S. at 1, Plaintiffs never even *acknowledge*, much less justify, the true extent of what they are asking this Court to order. Indeed, from reading Plaintiffs' position, one would never know that:

- Defendants' search proposal already provides for Defendants to review over 898,890 documents with over 9.6 million pages. This alone demonstrates the absurdity of Plaintiffs' accusation that Defendants are somehow "hiding discovery," "engineer[ing] their searches to deliberately "miss candid discussions," or "refus[ing] to produce" relevant evidence. J.S. at 1–3.

- Defendants have already agreed to search the files of 38 custodians, including the seniormost current and former executives of the Company, Disney's Board chair, senior personnel in the relevant lines of business, *and* lower-level personnel involved in business functions relevant to Plaintiffs' claims. This is a huge number of custodians fully consistent with the number in the cases that Plaintiffs cite. Plaintiffs' purported justification for requiring even more custodians collapses under the weight of their own arguments. The additional custodians they seek are either already well represented by multiple current custodians in the same business areas and reporting chains (as the exhibits Plaintiffs attach to their motion demonstrate) or have at best a tangential relationship to the issues at stake in this litigation. Adding the 16 proposed custodians—that is, a more than 40% increase from an already

- 36 -

4934-6279-9994.v1

massive number—would add a crushing additional burden of review by Defendants without any material increase in relevant discovery.

- Setting aside the additional custodians, Plaintiffs' proposed additional search terms alone increase Defendants' review population by over 2.67 million documents and 28.56 million pages—that is, *in addition to* the massive number of documents Defendants have already agreed to produce, That total also reflects running Plaintiffs proposed searches only on the existing 38 custodians.  Adding Plaintiffs requested 16 custodians would balloon that increase to potentially over 3.24 million documents with over 34.64 million pages. Tellingly, Plaintiffs hide the ball by never directly telling the Court of the consequences of their demands. Rather than be candid about these consequences, Plaintiffs instead make statements that simply defy reality to the effect that their proposal is "surgically targeted," or "narrow."

- Plaintiffs' search terms are also facially overbroad. The key drivers of the overwhelming burden on Defendants are individual searches that *each alone* result in hundreds of thousands of additional documents, the majority of which are highly unlikely to be responsive to Plaintiffs' Requests. For example, Plaintiffs propose that Defendants review *every* email from 54 people that contains the term "DMED"—the name of an entire division of a global conglomerate. That certainly is not a "surgically targeted" search. Nor is a search for documents containing generic terms like "news" or "analyst" in proximity to equally generic terms like "story" and "report" a "surgically targeted" search reasonably designed to locate relevant documents.

- Instead of addressing any of their demonstrably overbroad searches, Plaintiffs focus their motion on a handful of discrete requested modifications to Defendants' searches—modifications that Defendants have offered to make if they would resolve Plaintiffs concerns. *See* J.S. at 31. For example, Plaintiffs

- 37 -

4934-6279-9994.v1

propose inserting the terms "sub" or "subs" as shorthand for "subscriber" on many searches. But in the meet and confer process, Plaintiffs always took an all or nothing approach: they never agreed to drop any of the clearly overbroad and onerous searches. As stated below, Defendants remain willing to make sensible modifications and run certain reasonable additional searches.

In the end, the dispute before this Court is narrow. As it relates to search terms, Plaintiffs ostensibly ask the Court to order Defendants to run all of their proposed additional searches, but their motion does not even discuss the overwhelming majority of them or offer *any* explanation for why they are necessary or proportional, given the broad searches Defendants are already running. Plaintiffs have therefore offered no basis for the Court to order Defendants to conduct them. Instead, Plaintiffs focus their motion on six discrete alleged deficiencies with *Defendants'* searches. As discussed below, Defendants have agreed to address three of these issues with the modifications Plaintiffs request. That leaves only three minor disputed issues to be resolved.

Plaintiffs' request for additional custodians is an equally narrow and straightforward issue. Defendants have designated a robust and thorough roster of custodians, now including the Individual Defendants in additional searches. None of Plaintiffs' custodian additions are necessary, given the substantial overlap with the existing set of 38 custodians, and particularly not at this stage when Defendants' review and production are ongoing and Plaintiffs cannot point to a specific deficiency that additional custodians are needed to address.

*            *            *

At bottom, Plaintiffs' demands have nothing to do with actually obtaining discovery. Rather, Plaintiffs' Motion is a textbook example of the "abuse of the discovery process" that Congress adopted the Private Securities Litigation Reform Act (PSLRA) to prevent. *SG Cowen Sec. Corp. v. U.S. Dist. Court*, 189 F.3d 909, 911 (9th Cir 1999) (citation omitted). Defendants have already agreed to review a million

- 38 -

4934-6279-9994.v1

documents covering all aspects of Plaintiffs' allegations. Plaintiffs are represented by the most experienced and competent counsel available—they already have more than enough documents produced from senior officers and a director to try and prove their case. But Plaintiffs are here asking for millions more pages of documents from dozens of more custodians, without any clearly particularized basis, all while brushing off the burden as insubstantial supposedly because Disney is a well-resourced company. Congress and the courts warned against exactly these tactics: "vexatious discovery requests" designed not to elicit necessary and bona fide discovery, but to extract "extortionate settlements." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006). Defendants request that the Court deny Plaintiffs' Motion "as a check against [Plaintiffs'] abusive litigation." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007).

**B.      Factual and Procedural Background**

Plaintiffs' Procedural Background, *see* J.S. at 5-7, omits key facts concerning Defendants' good-faith effort to negotiate search terms and meet and confer regarding the parties' search proposals.  Over the course of three months, Defendants repeatedly sought to reach agreement on a search protocol. Contrary to Plaintiffs' argument that Defendants violated the ESI Agreement's "collaborative architecture," Defendants modified many searches to address concerns Plaintiffs raised. In response, Plaintiffs refused to meaningfully narrow their proposals and instead insisted on an all-or-nothing approach.

***August 15, 2025.*** Defendants provided Plaintiffs with their proposed search protocol. *See* Pls.' Ex. F ("**Defendants' August 15 Search Protocol**"). Defendants proposed collecting from 36 custodians and numerous non-custodial sources, including Disney+ subscriber projection files, organizational data, and personnel files. *See* Pls.' Ex. H at 1. The 36 custodians included the Individual Defendants as well as Disney personnel that received information and made decisions about the subject of

- 39 -

4934-6279-9994.v1

Plaintiffs' allegations, including Disney+ subscriber projections, distributing and accounting for content costs, the DMED reorganization, and communicating information to investors. Defendants also designated lower-level personnel with responsibility for Disney+ subscriber projections and SEC disclosures.

Defendants' August 15 Search Protocol also proposed 51 unique searches designed to capture documents responsive to each of Plaintiffs' Requests. As the ESI Agreement requires, Defendants' searches incorporated "appropriate nomenclature, acronyms, [and] codewords" used within Disney, as well as synonyms for particular terms. ECF 174 at 3. Based on collections to that point, Defendants' August 15 Search Protocol hit on over 750,000 documents. Pls.' Ex. H at 2. As discussed below, including attachments, Defendants' current search protocol hits on more than 898,890 documents. *See* Johnston Ex. 2 at 1. This figure does not include other sets of documents Defendants will review, including short-form communications and non-custodial sources such as Disney+ subscriber projection files, which add an estimated 110,000 documents to Defendants' review population.[18]

***September 3, 2025.*** Plaintiffs responded by proposing an entirely *new* set of 91 searches to be run ***on top of*** Defendants' searches. *See* Pls.' Ex. G ("**Plaintiffs' September 3 Search Protocol**"). Plaintiffs also demanded that Defendants add 22 additional custodians. Although Plaintiffs now characterize their September 3 Search Protocol as "tailored to close critical gaps" in Defendants' searches, J.S. at 6, that is demonstrably false. In reality, Plaintiffs' proposed search results dwarfed Defendants' proposal: running Plaintiffs' searches on only Defendants' proposed custodians added over two million documents to Defendants' review set; adding the 22 additional custodians requested by Plaintiffs would have far exceeded that total. Pls.' Ex. H at 11. Moreover, numerous searches Plaintiffs proposed were facially overbroad and

---

[18] Defendants continue to load and process data, which will increase Defendants' review population further.

4934-6279-9994.v1

unlikely to yield responsive documents when applied to senior executives at a company like Disney, which is a diversified global conglomerate.

Plaintiffs now claim that Defendants "summarily rejected" this proposal, J.S. at 6, but this, too, is wrong: the proposal was simply unworkable. Plaintiffs did not simply edit or redline Defendants' searches. Rather, Plaintiffs drafted a completely new set of additional searches that was so complex that it could not be analyzed with the standard platform used by Disney's industry-leading vendor, FTI Consulting.[19] For example, many of Plaintiffs' proposed searches exceeded the 450-character limit for searches on the vendor's platform; so, just to generate a hit report, the vendor had to break down Plaintiffs' proposal into over 110 individual searches.  Given all this, Defendants declined to adopt Plaintiffs' protocol but stated that they were "willing to negotiate modest revisions" to Defendants' protocol. Pls.' Ex. H at 2.

***September 19, 2025.*** Plaintiffs sent Defendants a second protocol. *See* Pls.' Ex. I ("**Plaintiffs' September 19 Search Protocol**"). Contrary to Plaintiffs' suggestion that this was somehow a "narrowed" proposal, this new protocol only exacerbated the problems of their prior one. The searches were even longer and more complex— indeed, to run a hit count this time, Defendants' vendor had to break Plaintiffs' proposal into nearly *three thousand* separate searches requiring the vendor to write bespoke code to process them. *See* Johnston Decl. at ¶ 8; Defs.' Ex. 1 at 1-2; Defs.' Ex. 2 at 1, 3-4. Still, the breadth of Plaintiffs' search results remained materially the same, yielding a review population of 2.45 million documents, or 1.68 million additional documents over Defendants' proposal, once again before accounting for any of the additional custodians Plaintiffs demanded.

---

[19] Plaintiffs' searches included so-called "term roots" which added to the complexity of each search. For example, any search that contained the term root "FIN" had to include the following string of additional terms: profit* OR loss* OR "operating margin*" OR ARPU OR unprofitab* OR income OR "break-even" OR "break* even" OR RPU.

- 41 -

***October 3, 2025***. The parties met and conferred. Defendants addressed purported "deficiencies" in Defendants' protocol. Defendants expanded the scope of 17 searches through adding custodians to searches, expanding search logic, and lengthening time periods. *See* Pls.' Ex. J at 2. Defendants also agreed to add the Chair of the Disney Board and the senior executive in charge of international growth as custodians.

Defendants proposed that the parties seek the Court's intervention regarding Plaintiffs' continued demand that Defendants run all of their additional searches. The parties had already spent two months discussing the search protocol and the discovery cut-off was then less than three months away. Pls.' Ex. J at 2. In response, Plaintiffs represented that they would "endeavor to provide a redline to Defendants' proposed search terms." Defs.' Ex. 3 at 2.

***October 10, 2025.*** Plaintiffs reneged on that representation, and, instead of providing a redline to Defendants' searches, Plaintiffs served Defendants with a third, separate search protocol on October 10, 2025 ("**Plaintiffs' October 10 Search Protocol**"). Contrary to their current representations, Plaintiffs' October 10 Search Protocol was not materially narrower. It contained a new set of 67 searches in addition to the 51 searches Defendants had proposed. Plaintiffs' proposed searches added over 1.53 million documents across 29 million pages to the existing review population—a 188% increase. Many of Plaintiffs' individual searches each added hundreds of thousands of documents. That number also reflected the results from running Plaintiffs' searches only on the set of 38 custodians Defendants agreed to search. Adding the custodians Plaintiffs demanded would have further increased that total.

Plaintiffs' October 10 Search Protocol again contained overbroad searches unlikely to yield responsive documents. To cite one of numerous examples, Plaintiffs wanted Defendants to review all documents that hit on two sets of generic terms

- 42 -

("investor," "analyst," "news," "note," "public"), run on every custodian, including members of Disney's Investor Relations team, which added 308,439 documents to Defendants' review population, based only on the existing custodians. *See* Pls.' Ex. L at 2-3.

Plaintiffs never explained how each of these individual searches addressed purported "deficiencies." Still, Defendants again expressed willingness to "make reasonable modifications to their search terms in response to bona fide, targeted concerns about deficiencies in Defendants' production." *Id.* at 3. And Defendants reiterated that they were "currently assessing the reasonableness and proportionality of certain modifications, such as the addition of 'sub OR subs OR subscriber*' modifiers to a limited number of searches." Pls.' Ex. N at 1.

***This Motion.*** Plaintiffs' Motion now puts forth yet another proposal—this one far broader than any they offered Defendants' during the meet and confer period ("**Plaintiffs' Joint Stipulation Search Protocol**"). In particular, the parties previously appeared to agree that certain searches would not be run across all custodians, because running search terms on those who were uninvolved in the subject matter of the search risks a high number of false hits.[20] Now, for the first time, Plaintiffs request that the Court order Defendants to run both parties' proposed search terms over *all* custodians, including Plaintiffs' 16 proposed custodians.[21] *See* J.S. at 3, 35. That exponentially expands the review population.

---

[20] For example, Plaintiffs' October 10 Search Proposal requested one search related to monitoring of Disney+ content performance only on the files of six custodians.

[21] It is unclear from Plaintiffs' Motion which set of their search terms they request the Court to order. Compare J.S. at 29 (requesting the Court to order Defendants to run "Plaintiffs' search terms (as narrowed in the September 19 and October 10 proposals") and J.S. at 35 (arguing "Plaintiffs' October 10 Search Proposal is proportional to the needs of the case"). Regardless of whether Plaintiffs request the September 19 Search Protocol or their October 10 Search Protocol, both proposals are overbroad, unduly burdensome, and disproportionate to the needs of this case, consistent with the arguments Defendants advance below.

- 43 -

As shown in the chart below, Plaintiffs' current proposal, run on all 54 custodians they seek, results in a review population exceeding 4.1 million documents—more than 3.2 million more than Defendants' current proposal. Johnston Decl. ¶ 12. As discussed below, Defendants' current proposal reflects modifications to address certain of the supposed "deficiencies" identified by Plaintiffs. In total, the modifications Defendants have agreed to add over 134,160 documents to Defendants review population since Defendants' initial proposal.

| Search Protocol | Total Review Population | Incremental Review Population Over Defendants' Current Protocol |
|---|---|---|
| Defendants' October 7 Search Protocol | 835,084 | N/A |
| Defendants' Current Search Protocol | 898,894 | N/A |
| Plaintiffs' October 10 Search Protocol | 2,433,285 | 1,560,550 |
| Plaintiffs' Joint Stipulation Search Protocol (Defendants' 38 Custodians) | 3,572,960 | 2,674,086 |
| Plaintiffs' Joint Stipulation Search Protocol (Plaintiffs' 54 Custodians) | 4,142,676 | 3,243,782 |

### C.   Legal Standard

Under Rule 26, discovery must be relevant and not disproportionate to the needs of the case. Fed. R. Civ. P. 26(b)(1); *BlackBerry Ltd. v. Facebook, Inc.*, 2019 WL 4544425, at *5 (C.D. Cal. Aug. 19, 2019). Proportionality is assessed according

- 44 -

4934-6279-9994.v1

to "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Discovery requests that are "unreasonably cumulative or duplicative" "must" be limited. Fed. R. Civ. P. 26(b)(2)(C)(i). "This proportionality requirement is designed to avoid sweeping discovery that is untethered to the claims and defenses in litigation." *Radio Music License Comm., Inc. v. Global Music Rights, LLC*, 2020 WL 7636280, at *2 (C.D. Cal. Jan. 2, 2020) (citations omitted).

### D.    Argument

#### 1.    Defendants Proffered Robust Search Terms and Modified Them in Good Faith, While Plaintiffs Seek Unbounded Searches and Now Request Unfounded Relief.

From the outset, Defendants offered Plaintiffs a comprehensive search protocol that more than satisfies Rule 26's relevance and proportionality requirements. It fully addresses all aspects of Plaintiffs' allegations and requires Defendants to review more than one million documents. Yet Plaintiffs now ask this Court to order Defendants to review over three million *more*—an overbroad and undue burden that surpasses anything Plaintiffs ever sought during the Parties' three months of negotiation. Conspicuously, however, Plaintiffs make no effort to acknowledge—much less justify—this exponential, overbroad, and disproportionate additional discovery demand. That is, Plaintiffs nowhere explain how the bulk of their proposed searches— some of which individually add hundreds of thousands of documents to Defendants' review population—fill any purported gaps in Defendants' proposed search terms or are reasonably tailored to uncover responsive documents. This failure to show the need for such overbroad searches alone requires rejecting Plaintiffs' proposal.

Instead, Plaintiffs focus their motion on six narrow purported "deficiencies" in Defendants' proposal. *See* J.S. at 29-32. As explained below, Defendants indicated

- 45 -

4934-6279-9994.v1

that they were amenable to making certain of Plaintiffs' modifications to address these concerns during the meet-and-confer process, and remain amenable to doing so now.  Certain others of Plaintiffs' proposals remain unworkable. But in all events, Plaintiffs have failed to discuss, let alone justify, the lion's share of the searches driving the increased burden on Defendants—those searches should be rejected out of hand.

### a.    Defendants' Searches Are Robust and Proportional to the Needs of the Case.

Defendants have implemented a robust and sophisticated search protocol designed to capture all relevant and responsive documents proportional to the needs of this case. As discussed below, Defendants' Current Search Protocol requires Defendants to review an estimated 1.017 million documents consisting of: (i) 898,894 documents from Defendants' 38 custodians and centralized non-custodial sources (*i.e.,* Disney's database of forensic investigations files); (ii) an estimated 48,000 short form communications (*i.e.,* texts and instant messages), *see* ECF 174 at 1; and (iii) an estimated 70,000 documents from targeted centralized databases that concern subscriber projections, strategy and planning, and executive reporting materials, which Defendants have collected and will review without search terms.[22] Plaintiffs load their motion with bare accusations of deficiencies in Defendants' searches, but they nowhere even mention the full scope of Defendants' discovery protocol.

Those results arise from Defendants' carefully-crafted 51 searches that target documents responsive to Plaintiffs' requests. For example, to locate responsive materials about the "quality" of Disney+ subscriptions, Defendants searched all custodian and non-custodial sources—over the entirety of the relevant period—for Disney+ documents that discussed subscribers and one of three broad terms

---

[22] Defendants continue to collect, process, and sort data; these figures reflect Defendants' good-faith estimates based upon analysis of the number of documents and/or the data contained within these databases.

- 46 -

4934-6279-9994.v1

concerning subscriber quality.[23] And although Plaintiffs claim that Defendants' searches are "engineered to miss candid discussions" and "the Company's own internal shorthand," J.S. at 3, Defendants proactively crafted good-faith search terms to include the Company's standard nomenclature. For instance, Plaintiffs' fourth RFP seeks "all documents and communications concerning any iteration of the Five-Year Plan." Pls.' Ex. E at 13. Disney personnel sometimes colloquially refer to the Five-Year Plan as the "Long Range Plan," or the "LRP" for short. Rather than shield these communications from discovery, Defendants added the terms "long range plan," "long-range plan," and "LRP" to their proposed searches to ensure Plaintiffs receive all responsive materials.[24] Johnston Ex. 2 at 2, row 5. In short, Defendants' methodologies thus reflect Defendants' "prerogative to select reasonable ESI search protocols" and support the "presumption [that] exists in favor of [Defendants'] selected search terms." *Allergan, Inc. v. Revance Therapeutics, Inc.*, 2025 WL 1013987 , at *3 (M.D. Tenn. Feb. 12, 2025).

### b. Plaintiffs Do Not Even Attempt to Justify the Exponential and Disproportionate Discovery They Seek.

Plaintiffs' Joint Stipulation Search Protocol demands that Defendants review more than 44.24 million pages across 4.14 million documents, accounting for Plaintiffs' 16 requested custodians. That is more than ***four and a half times*** the 9.6 million pages across 898,894 documents that Defendants have already agreed to review under their search protocol—even after accounting for any de-duplication resulting from overlaps in the parties' searches. Johnston Decl. ¶ 14. And, contrary to Plaintiffs' suggestion that they have continually "narrow[ed]" their search proposal, this newest demand, set forth for the first time in their motion to compel, is broader

---

[23] Defendants' Search No. 4 utilized the following search string: ("Disney+" OR "D+") AND subscri* AND (quality OR leak* OR "ARPU"). Johnston Ex. 2 at 2, row 4. "ARPU" stands for "average revenue per user."  Johnston Ex. 2 at 2, row 4.
[24] Defendants' Search No. 5 utilized the following search string: ("Disney+" OR "D+") AND ("five-year plan" OR "five year plan" OR FYP OR 5YP OR "long range plan" OR "long-range plan" OR LRP). *See* Johnston Ex. 2 at 2, row 5.

4934-6279-9994.v1

and more burdensome than anything Plaintiffs ever sought during the Parties' three months of negotiations.

This is also a staggering burden. Even based only on the existing 38 custodians, reviewing the massive set of documents Plaintiffs demand would add an estimated 64,876 hours to Defendants' first-level review alone.[25] This estimate does not account for additional attorney time for collections from 16 new custodians, second-level review, and privilege review. This is a daunting task given the Court's fast-approaching March 31, 2026 deadline for the substantial completion of document production—a deadline crunch of Plaintiffs' own making. Indeed, on October 7—that is seven weeks ago—Defendants proposed that the parties seek judicial intervention on this issue using the Court's Informal Discovery Dispute Resolution procedure, in the interest of resolving this dispute as expeditiously as possible. *See* Pls.' Ex. J at 1. Plaintiffs refused, contending that this "is not the 'discrete dispute' that Judge Sagar's informal procedures are designed to handle," and that their argument "cannot be condensed into a 'brief, succinct position.'" Defs.' Ex. 4 at 1 (quoting the Court's Informal Discovery Dispute Resolution procedures).

Significantly, Plaintiffs' Motion nowhere confronts this burden or explains why their additional review demand—which dwarfs Defendants' proposal—is proportional to the needs of this case. Indeed, Plaintiffs incredulously deride Defendants' burden arguments as "conclusory and unsupported," but Plaintiffs' Motion nowhere even ***mentions*** the additional demands their requests impose on Defendants. In other words,

---

[25] Defendants have quantified the burden of Plaintiffs' Joint Stipulation Search Protocol in the Johnston Declaration, which sets this case apart from the cases Plaintiffs cite in their proportionality argument. *See* J.S. at 34. The only case Plaintiffs cite involving a motion to compel is a consumer protection case, not a "securities class action[] alleging [a] multi-year scheme." J.S. at 34 (citing *Garner v. Amazon.com, Inc.*, 2022 WL 16553158, at *2 (W.D. Wash. Oct. 31, 2022)). In *Garner*, the court held it was "impossible" to assess burden, because the defendants provided "no data regarding the amount of time or expense incurred reviewing and producing responsive documents." *Garner*, 2022 WL 16553158, at *2. The remaining cases Plaintiffs cite are settlement fairness decisions that did not involve courts compelling additional discovery.

- 48 -

4934-6279-9994.v1

Plaintiffs ask this Court to order massive (and overbroad) additional discovery requests without even telling the Court the burden that it entails.

Plaintiffs likewise do not explain how or why their overbroad searches are necessary to fill in any gaps in Defendants' already robust searches. As discussed below, Plaintiffs focus their motion on six minor deficiencies that impact only a *fraction* of the additional review population—and Defendants will agree to make certain of these modifications. *See infra* § II.D.1.c. But Plaintiffs are silent as to the real drivers of this massively expanded review population—the facially overbroad, generic, catch-all search terms that Plaintiffs propose, and the files of the newly-expanded set of custodians they want to search. Because Plaintiffs never explain why these searches are necessary or proportional to the needs of this case—particularly given the searches Defendants are already running—there is no basis for the Court to order Defendants to run them.

In particular, by way of example only, Plaintiffs are entirely silent as to why the following search terms are necessary:

- **"DMED" Search.** Defendants have already several searches designed to identify documents relating to Plaintiffs' allegations concerning the DMED reorganization. *See, e.g.*, Johnston Ex. 2 at 7, rows 34-36. Without identifying any deficiency in that search in their motion, Plaintiffs now demand that Defendants search for the single term "DMED"—an acronym for Disney Media and Entertainment Distribution, an umbrella business segment within a multinational multimedia company—across *all* custodians' parent emails for the entirety of the relevant period. Johnston Ex. 2 at 15, row 59. This is not a "targeted search term[]." J.S. at 2. In addition to the various streaming services under its direct-to-consumer segment, DMED also covered linear networks, domestic cable, theatrical and music distribution, and staging/licensing for live entertainment events. This single search would add at least 133,820 more

- 49 -

4934-6279-9994.v1

documents to the review population—*after* de-duplication for all the documents Defendants already identified from their searches capturing DMED-related material. Johnston Ex. 2, at 9, row 10. And this is without accounting for any additional custodians Plaintiffs seek. Plaintiffs offer no rationale for why this is necessary or likely to yield unique, relevant documents, and ignore that running such terms across all custodians will sweep in vast swaths of irrelevant material, given the size and complexity of Disney's operations.

- **Investor/Public Disclosure Search.** Defendants already have targeted searches that capture investor and public disclosure-related documents. *See, e.g.*, Johnston Ex. 2 at 6, rows 24-26. Plaintiffs point to no deficiency in those searches, nor explain why their additional search is necessary. Nonetheless, Plaintiffs demand two more generic, sweeping searches that contain the commonplace words "earning," "investor," or "analyst" within 15 words of 34 other common terms, including "news," "story," "report," "note," or "public." *See* Johnston Ex. 2 at 11, row 29. Many of Defendants' proposed custodians are senior executives at Disney, who are not solely in the Disney+ business (the subject of Plaintiffs' claims) but who oversee a diversified global business with other major business segments that encompass theme parks, resorts, cruise lines, consumer products, and retail, among other operations. Running this generic search across these executives whose responsibilities go far beyond the subject matters of Plaintiffs' claims would clearly capture communications wholly unrelated to those claims. This search run across the existing custodians, would increase Defendants' review population by 303,064 documents, without accounting for any additional custodians. Johnston Ex. 2, at 11, row 29. That sum alone suggests that the search is likely returning significant numbers of false hits given the targeted searches Defendants are

- 50 -

already running. Plaintiffs make no effort to explain why such a sweeping additional search is justified.

- **Subscriber Growth Search.** Defendants already have robust searches intended to target documents concerning allegedly lower-than-expected Disney+ subscriber growth, and have already agreed to review over 200,000 documents hitting on these searches. *See* Johnston Ex. 2 at 4-5, rows 16-23. Plaintiffs do not identify any gaps or deficiencies in those searches, yet they propose a search which includes all documents that contain "Disney+," "D+," "Disney Plus," "sub OR subs OR subscriber*" within 20 words of any one of 30 other generic terms, including any version of "number," "walk," "trend" or "result*." Johnston Ex. 2 at 15, row 63. This search alone would increase Defendants' review population by 274,733 documents without accounting for additional custodians, and would likely include mainly irrelevant materials given Defendants numerous existing searches. Johnston Ex. 2, at 15, row 63. Again, Plaintiffs made no attempt to explain or justify the breadth of this search.

- **Content Performance Search.** Defendants already ran searches designed to capture documents concerning Disney+'s content performance, an issue which is at best tangentially related to Plaintiffs' allegations. *See* Johnston Ex. 2 at 2-3, rows 9-13. Again, without explaining why the existing searches are insufficient, Plaintiffs propose two additional, generic searches. The first would include variations on the term "show" and variations of the terms "view," engage," or "perform." *See* Johnston Ex. 2 at 11, row 24. The second search would capture any document which refers to "quality" within 25 words of "show," "movie," "title," "series," or "feature." *See* Johnston Ex. 2 at 11, row 25. It is not hard to see how searching for these generic terms across custodians in a business involving shows and movies would result in a

- 51 -

4934-6279-9994.v1

significant amount of documents wholly unrelated to Plaintiffs' claims about Disney+ subscriber targets and profitability. Respectively, these searches would each increase Defendants' review population by 177,833 and 259,258 documents, without accounting for any additional custodians. Plaintiffs do not even discuss why these searches are necessary or proportional. Johnston Ex. 2, at 11, rows 24 & 25.

- **"Tone-at-the-top"/Management Style Search.** Defendants agreed to search files of employee complaints and management audits to address Plaintiffs' allegations regarding "tone-at-the top" and critiques of Daniel and Chapek's management styles. Plaintiffs nonetheless proposed a search with their names within 20 words of a mind-boggling array of 25 terms, including: "mean girl," "Eeyore," "dictator," "highway," "autocrat*," "blind," and "pressure*." *See* Johnston Ex. 2 at 12, row 37. This search, which relates to a topic which is of *minimal* relevance to Plaintiffs' fraud allegations, and with respect to which Plaintiffs again provide no justification or explanation why it is relevant or necessary, would increase Defendants' review population by 30,626 documents, without accounting for any additional custodians. In any event, Defendants have already agreed to run targeted searches related to this topic. *See infra* § II.D.1.c.

These examples alone—each of which Plaintiffs ignore in their motion and make no attempt to defend—account for a large swath of the additional documents Plaintiffs seek, *before* running these terms across the 16 additional custodians. The Court should reject Plaintiffs' literally baseless request for Defendants to run them. *See Crews v. Rivian Automotive, Inc.*, 2024 WL 5689108, at *2 (C.D. Cal. June 21, 2024) (rejecting plaintiff's "unreasonably overbroad" and "overinclusive" search terms); *Scott, Jr. v. Martin Luther King, Jr.-Los Angeles (MLK-LA) Healthcare Corp.*, 2021 WL 5000677, at *1 (C.D. Cal. Jan. 15, 2021) (ruling plaintiff's that search terms were

- 52 -

4934-6279-9994.v1

"overly broad, not relevant to the request, and not proportional to the needs of the case").

What is more, Plaintiffs now ask the Court to order Defendants to "apply the searches (proposed by ***both*** parties) ***across all designated custodians***, including the Individual Defendants." J.S. at 3 (emphasis added).[26] This is a radical departure from anything Plaintiffs ever requested during the meet-and-confer process.[27] Running every search term across every custodian is a recipe for massive numbers of false hits and irrelevant documents. Even Plaintiffs recognized in their prior proposals the need to limit certain searches to certain custodians.

Plaintiffs' current demand is not just larger than any previous request—it is a wholesale, indiscriminate expansion that would overwhelm the discovery process with irrelevant and duplicative material. This is the opposite of the "surgically targeted" approach Plaintiffs claim to pursue. *See* J.S. at 1. Tellingly, Plaintiffs make no effort to justify this massive expansion as necessary or proportional. Their silence speaks volumes: despite Defendants repeatedly explaining—both in writing and in meet-and-confer—how and why these searches are overbroad and ill-suited to locate responsive materials, Plaintiffs have refused to alter or defend them. *See, e.g.,* Pls.' Ex. L at 1-4.

**c.    Notwithstanding Plaintiffs' Unreasonable Demands, Defendants Have Modified Their Robust Searches in Good Faith.**

Given that Plaintiffs failed to even try to defend the vast majority of their proposed searches, the Court need not wade into the morass of Plaintiffs' proposed searches with multiple terms and modifiers.  Instead, Plaintiffs only argue that

---

[26] *See also id.* at 10 ("Plaintiffs respectfully request an order requiring Defendants to run all searches across the files of all designated custodians."); *id.* at 29 ("The Court should compel Defendants to run Plaintiffs' proposed search terms (as narrowed in the September 19 and October 10 proposals) across the agreed custodians (and the additional custodians addressed above)"); *id.* at 35 (asking the Court to order Defendants to "apply all searches (from both sides) across all designated custodians with reasonable, topic-appropriate timeframes.").
[27] *See e.g., supra* n.4.

- 53 -

4934-6279-9994.v1

Defendants' searches are flawed for six reasons. Plaintiffs contend that Defendants improperly: (1) exclude custodians from their searches (one or more of the Individual Defendants from twenty-two searches), Rebecca Campbell from two searches (Nos. 20-21), and investor relations personnel from one search (No. 40), J.S. at 8-10; (2) exclude the shorthand "sub" or "subs" from searches about subscribers, *id.* at 30-31; (3) narrow searches using "Disney+," "D+," or "DTC", *id.* at 30-31; (4) limit three searches to narrow timeframes, *id.* at 32-33; (5) restrict searches about the Individual Defendants' "management style[s]" to "centralized files," *id.* at 31; and (6) reject Plaintiffs' low hit-count searches, *id.* at 31-32.[28]

Defendants have not, as Plaintiffs assert, "rejected Plaintiffs' terms wholesale" and "refused to negotiate." J.S. at 1, 7. Defendants have repeatedly told Plaintiffs that "they will make reasonable modifications to their search terms in response to bona fide, targeted concerns about deficiencies in Defendants' productions." Pls.' Ex. L at 3; *see also* Pls.' Ex. H at 2 ("Defendants remain willing to negotiate modest revisions to its own search protocol"); Pls.' Ex. J at 3 ("Plaintiffs have now offered to modify Defendants' searches. Please provide any proposed modifications by October 9, 2025"). Defendants did so before, and they will do so now.[29]

---

[28] Plaintiffs overstate these alleged deficiencies. For example, Plaintiffs assert that "Defendants require . . . 'Disney+'/'D+' matches even in searches where such a constraint makes little sense—*e.g.*, executive compensation . . . and the decision to rehire Iger." J.S. at 31. But Defendants *do not* use such limiters in the searches concerning executive compensation or the decision to rehire Iger. As noted above, Plaintiffs raised this concern in early October, after which Defendants removed these limiters and broadened their review in good faith. *See* Pls.' Ex. J at 2 (explaining that "Disney+," "D+," and "DTC" modifiers would be removed from several searches); *see also* Johnston Ex. 2 at 3, rows 29, 32.

[29] Defendants already made good-faith modifications to their search protocol in response to Plaintiffs' particularized concerns. On October 7, 2025, Defendants added Rebecca Campbell and Susan Arnold as custodians to fill alleged gaps in Defendants' document collection, and Defendants modified 16 searches to address Plaintiffs' stated concerns that certain additional searches were too narrowly limited by custodian; included limiting terms like "Disney+", "D+," or "DTC"; too limited in timeframe; and used "AND" instead of "OR" connectors. Accordingly, Defendants'

- 54 -

4934-6279-9994.v1

Defendants agree to expand their review to address certain concerns Plaintiffs articulate in their Motion. Specifically, Defendants will broaden their searches as follows: (1) add each of the Individual Defendants where they are omitted as custodians,[30] add Rebecca Campbell to Searches 20-21, and add Investor Relations personnel to Search 40; (2) use "sub," "subs," and "subscriber*" as synonyms in lieu of "subscrib*"; (3) expand the timeframe limiters for the three searches Plaintiffs claim are too narrow[31]; and (4) integrate Plaintiffs' low hit-count "leaky bucket" and 10-b5 searches into Defendants' searches. These modifications have increased Defendants' review population to more than 898,894 documents based on search terms alone, without accounting for any of Plaintiffs' 16 proposed custodians, additional searches, short-form communications, or Defendants' linear review of targeted materials. *See* Johnston Decl. at ¶ 14; Johnston Ex. 2, at 1.

Defendants maintain their objections with respect to only three of Plaintiffs' specific alleged deficiencies. *First,* Defendants will not remove the terms "Disney+," "D+," or "DTC" from all of its searches, including Search No. 8, which limits searches for "churn" to documents that also refer to Disney+. *See* J.S. at 30-31. These limiters are reasonably tailored to locate responsive documents relating to Plaintiffs' claims which concern Disney+ and Disney's Direct to Consumer business, and they weed out large swaths of nonresponsive material when used in conjunction with

modification included: (i) adding custodians to searches; (ii) removing "Disney+", "D+," or "DTC" limiters where appropriate; (iii) broadening a temporal limitation; and (iv) replacing "AND" connectors with expansive "OR" connectors. Pls.' Ex. J. Plaintiffs characterize these revisions as "minor tweaks," J.S. at 28, but when applied to the Defendants' current collections, they increase Defendants' review population by more than 134,160 documents—more than 17.5%. *See* Johnston Decl. at ¶ 16.

[30] There is one exception. As addressed below, Defendants will not add the Individual Defendants as custodians for Search 51, which was specifically designed to search Defendants' internal databases for complaints and investigations. *See infra* § II.D.1.c.

[31] Defendants will use the start and/or end dates that Plaintiffs request in their Joint Statement, but will extend the end date for Search Nos. 6 and 7 by only two months for the reasons described below. *See infra* § II.D.1.c.

- 55 -

common streaming-industry terms like "churn." Plaintiffs provide a single example of a responsive email that would have hit on the term "churn" alone but not "churn" and "Disney+." *See* Pls.' Ex. KK. Even if this document escaped Defendants' review, "[t]he Federal Rules of Civil Procedure do not require perfection or a guarantee that every possible responsible document has been found or produced[.]" *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 631 (C.D. Cal. 2013); *see also In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2021 WL 5299847, at *4 (S.D. Fla. Nov. 15, 2021) (Rule 26 does not require "a perfect or even optimal search. It requires a 'reasonable' inquiry."). But it did not. Given that Plaintiffs *received* this email, this example does not demonstrate that Defendants' searches are unreasonable or deficient. Quite the opposite: it shows that Defendants various searches form a broad net that capture all manner of responsive information.

*Second*, Plaintiffs asked Defendants to run searches pertaining to "management style and tone-at-the-top" across custodial files—not only centralized files. *See* J.S. at 31. Defendants have offered to search management audit files and Disney's formal complaint database for these complaints any other issue related to Disney+ subscribers, finances, or costs.[32] Accordingly, Plaintiffs will receive all responsive formal complaints, in addition to audit documentation, that mention Daniels' or Chapek's leadership, tone, style, performance, or decision-making. But running Defendants' search and Plaintiffs' proposed search across all custodians is needlessly overbroad. For example, they would hit on *any* custodian document that mentions "Disney+" and "finance" and any document concerning Disney's corporate "performance" or "leadership" that mentions Daniels or Chapek. Moreover, Plaintiffs have articulated no particularized need for this search other than that it may go to

---

[32] *See* Johnston Ex. 2 at 8, row 51 (("Disney+" OR "D+") AND ((sub OR subs OR subscriber*) OR finan* OR cost*)) OR ("Chapek" OR (Kareem AND ("Daniel" OR "Dan")) AND (lead* OR "tone" OR "style" OR perform* OR "decision-making")).

4934-6279-9994.v1

scienter. Plaintiffs provide no support for the proposition that informal communications pertaining to "management style" are pertinent to a scienter analysis, and as discussed above, *see supra* § II.D.1.b, generalized internal complaints about an organization are not relevant.

*Third*, Plaintiffs take issue with the date range Defendants have selected for Defendants' Searches 6 and 7, which capture documents related to the creation of DMED and the implementation of the reorganization that occurred in fall 2020. *See* J.S. at 32; Johnston Ex. 2 at 2, rows 6,7. Defendants initially proposed a date range of September 1, 2020 to October 31, 2020; in the spirit of good faith, Defendants agree to extend that date range to December 31, 2020.  Any further lengthening of the time frame is inappropriate, as the DMED reorganization was formalized on October 12, 2020. Plaintiffs also completely disregard that four of Defendants' other searches include the term "DMED." *See, e.g.,* Johnston Ex. 2 at 7, rows 34-36. As mentioned above, following the DMED reorganization, that division constituted two-thirds of Disney's corporate organization, encompassing streaming, content-creation, distribution, linear television networks, and marketing. While DMED's *formation* may be pertinent to Plaintiffs' allegations, its operations beyond Disney+ are not. Any request for Defendants to run searches with no limitations regarding "DMED" is blatantly disproportional to the needs of this case.

### 2. Plaintiffs' Additional Custodians Are Overbroad, Duplicative, and Disproportionate to the Needs of this Case.

#### a. Defendants' Custodian Selections Are Relevant, Proportional, and Entitled to Deference.

Defendants agreed to search 38 custodians, including every Individual Defendant, all current and former senior executives, the Chair of Disney's Board of Directors, and key personnel directly involved in Disney+ subscriber and profitability projections, DMED accounting and operations, content distribution, and investor communications at issue in this case. Plaintiffs' Motion never even mentions the

- 57 -

breadth of custodians Defendants have already agreed to search. But, as shown below, these custodians cover the waterfront of the business functions and senior executives involved in Plaintiffs' allegations.

Notably, Plaintiffs ignore that this is a securities litigation alleging that senior management engaged in a scheme to mislead investors about the attainability of subscriber targets and profitability projections for Disney+. Thus, contrary to Plaintiffs' suggestion that Defendants have focused on senior management to "distort[] the record," J.S. at 9, these custodians are precisely the individuals most likely to have relevant evidence concerning the purported "scheme" and Disney's disclosures. Indeed, courts instruct that discovery should focus on "line- and executive-level personnel with substantial knowledge and involvement" in the key allegations. *See Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, 2019 WL 6108220, at *8 (N.D. Ill. Nov. 15, 2019).

Specifically, Defendants have collected from:

***Individual Defendants,*** including Robert Iger, Robert Chapek, Christine McCarthy, and Kareem Daniel. These custodians may potentially possess communications relevant to, among other allegations, Plaintiffs' allegations regarding Disney+ targets, the creation of DMED, and purportedly "unsustainable" content growth. *See, e.g.,* Compl. ¶¶ 147-63, 168-80. Defendants have revised their search protocol to include the Individual Defendants as custodians on all but one search designed exclusively to be run on forensic files. *See supra* § II.D.2.b.i.

***Senior leadership***, including Board Chair Susan Arnold, Alisa Bowen, Justin Connolly, Michael Paull, Zenia Mucha, Kristina Schake, Jolene Negre, Rebecca Campbell, David Lindbom, Brent Woodford, and Arthur Bochner, Chapek's Chief-of-Staff. These custodians may potentially possess communications relevant to, among other allegations, Plaintiffs' allegations regarding publicly announced subscriber targets, the DMED reorganization subscriber growth strategy, public disclosures, and

- 58 -

4934-6279-9994.v1

Chapek's renewal as CEO. *See, e.g.*, Compl. ¶¶ 147-253; ¶¶267-303; ¶¶ 316-334. Following a meet and confer with Plaintiffs, Defendants added Susan Arnold and Rebecca Campbell as custodians. Contrary to Plaintiffs' assertions, Defendants have not only included senior executives but also individuals from each of the departments and business segments core to Plaintiffs' allegations.

*Strategy and finance personnel*, including Bryan Castellani, Patrick Garrison, Justin Warbrooke, Rojeh Avanesian, David Haskett, Vanda Mehta Krants, Denise Morgan, Justin Petrosini, Laura Evans, Jeffrey Grenn, Lukas Wickart, and Stefan Rasch. These custodians may potentially possess communications relevant to, among other allegations, Plaintiffs' allegations regarding the formation of DMED, content distribution, subscriber growth, forecasting both subscriber numbers and profitability, accounting practices, and disclosures made to investors. *See, e.g.*, Compl. ¶¶ 147-253; ¶¶267-303; ¶¶ 316-334.

*Accounting personnel*, including Jim Gray, Brent Woodford, and Richard Brookbanks. These custodians may potentially possess communications relevant to, among other allegations, Plaintiffs' allegations regarding Disney's accounting processes, including during and after the DMED reorganization, and the allocation of content costs. *See, e.g.*, Compl. ¶¶ 176, 214-223.

*Members of Disney's Investor Relations team*, including Nathan Harris, Jennifer Kettnich, Veda Kong, Alexia Quadrani, and Lowell Singer. These custodians may potentially possess communications relevant to, among other allegations, Plaintiffs' allegations regarding Disney's disclosures to investors in connection with Disney+ subscriber growth, profitability the reorganization, and content costs. *See, e.g.*, Compl. ¶¶204-213; 266- 317.

*Individuals responsible for DMED operations*, including Namrata Patel, Daniel Wiegand, James Zasowski, and Cindy Wang. These custodians may potentially possess communications relevant to, among other allegations, Plaintiffs' allegations

- 59 -

regarding the formation of DMED, internal operations at DMED, decisions about content develop and releases, decisions related to content costs, and accounting. *See, e.g.*, Compl. ¶¶ 155-163; 164-168; 222-223; 304-307.

Plaintiffs argue no "deference" to Defendants' custodian selections "is required." J.S. at 10. Numerous authorities disagree. Defendants' custodian selections *are* entitled to deference, based on the "general understanding [that] has emerged among the district courts that have addressed the issue: the producing party is in the best position to determine the procedures, methodologies, and technologies appropriate for producing its own ESI." *Allergan*, 2025 WL 1013987, at *3 (cleaned up, citing cases, and quoting The Sedona Principles, 19 Sedona Conf. J. 1, Principle 6 ("Sedona Principle 6"), 118-124 (3d ed. 2018)). "In effect, then, a presumption exists in favor of the producing party's selected search terms and custodians, which the requesting party can overcome only by proving that those selections are manifestly unreasonable or the resulting production is deficient." *Id.* (cleaned up and citing cases).

**b.    Plaintiffs Have Not Identified Specific Deficiencies Justifying the Addition of Their 16 Custodians.**

To show that Defendants should be required to designate any one of the 16 additional custodians, Plaintiffs must "demonstrate that any marginal relevance of the additional requests outweighs the substantial burden to produce." *Radio Music License Comm.*, 2020 WL 7636280, at *5; *LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 162 (N.D. Ill. 2023) ("[T]he burden is on the requesting party to prove 'a specific discovery deficiency in the responding party's production.'") (cleaned up, quoting Sedona Principle 6 at 123-24). To carry their burden of demonstrating that the benefit of additional custodians outweighs the burden, plaintiffs must specifically explain "why [they] seek discovery from these specific custodians, given the discovery they have already obtained in the case." *Handloser v. HCL Am., Inc.*, 2020

- 60 -

4934-6279-9994.v1

WL 7405686, at *3 (N.D. Cal. Dec. 17, 2020). Courts deny motions to compel where defendants considered proposed additional custodians but ultimately selected the custodians "most likely to possess information responsive to Plaintiff[s'] requests for production." *See Wadeea v. Mercedes-Nez USA, LLC*, 2025 WL 2309025, at *2 (S.D. Cal. July 21, 2025).

As explained below, Plaintiffs' proposed additional custodians are marginally relevant, with information that will be captured by the existing set of custodians. Plaintiffs' custodians include (i) seven lower-level Disney employees whose marginal relevance is outweighed by the burden and duplication of collection given that Defendants are already agreeing to produce multiple other custodians in the same business functions and reporting lines; (ii) two chiefs of staff whose marginal relevance is outweighed by the burden and duplication of collection of the senior executives they support; (iii) three additional Board Members who are duplicative of the current custodial Board Member and other Board documents; and (iv) four members of Disney senior leadership who have little-to-no involvement in the issues at the heart of Plaintiffs' allegations. Notably, Defendants are still reviewing and will be producing voluminous documents. Plaintiffs cannot and do not demonstrate why 16 additional custodians are necessary to fill any perceived "gap" in Defendants' production.   Plaintiffs have failed to demonstrate "a significant need" for these custodians, and certainly not one sufficient to justify the "extremely burdensome" additional collection on top of the 38 more relevant custodians Defendants have designated. *Rusoff v. Happy Grp., Inc*., 2023 WL 114224, at *5 (N.D. Cal. Jan. 5, 2023); *Radio Music License Comm.*, 2020 WL 7636280, at *4 (denying request for 22 additional custodians).

- 61 -

4934-6279-9994.v1

**(i)      Defendants Are Not Required to Designate Low-Relevance, Duplicative Lower-Level Employees.**

Plaintiffs propose adding seven lower-level employees as custodians. At the outset, Plaintiffs contend that "relevant information is not limited to written documents in the files of senior executives," J.S. at 13, and that Defendants should have designated lower-level employees as custodians. *See* J.S. at 11-14. But Defendants *did* designate lower-level employees in the business functions at issue. For example, existing custodian Nathan Harris was a Senior Financial Reporting Analyst and was a junior member of his department responsible for financial reporting. Existing custodian Denise Morgan was a director-level financial analyst during the relevant period involved in financial projections and long-range planning.

Plaintiffs nonetheless contend that seven custodians they deem "critical"—Eduardo Bezerra, Matthew Kambic, Michael Chin, Nick Lewerke, Jon Pang, Jack Reiman, David Chodniewicz—should be designated, offering three reasons to support collecting and reviewing their files. J.S. at 15-19. None holds water.

*First*, Plaintiffs contend that these individuals' emails may contain criticism and other chatter regarding Disney's "culture," "tone-at-the-top," and Chapek's management style. J.S. at 14, 31. But such potential "chatter" (not uncommon in a large organization) is irrelevant to the core issue of whether Defendants schemed to mislead investors about Disney+ performance. Defendants already agreed to produce management audit files and formal complaint files that will allow Plaintiffs to probe any concerns employees registered about management. The burden of additional collections would greatly outweigh the marginal relevance of this information.

*Second*, Plaintiffs argue these seven individuals should be designated because they "directly participated in the events at issue" and that their "departments sit at the core of Plaintiffs' allegations." J.S. at 10. But Plaintiffs ignore that Defendants' custodians already include members of those same departments, including managers

- 62 -

who received and distributed key information and metrics and senior leadership whose statements are the subject of Plaintiffs' allegations. The chart below shows that *each of Plaintiffs' custodians were in the reporting chains of multiple of Defendants' custodians*:

| Plaintiffs' Proposed Custodians | Current Custodians |
|---|---|
| **Eduardo Bezerra**<br><br>*Director of Subscriber & Engagement Financing*<br><br><br><br>*Note: Subscriber & Engagement Financing is a unit within DMED-Hulu.* | **Kareem Daniel** (*Vice President of DMED*)<br><br>**Justin Warbrooke** (*Executive Vice President DTC/International Operations*)<br><br><br>**Lukas Wickart** (*Senior Vice President, Finance – DTC*)<br><br><br>**Daniel Wiegand** (*Vice President, Subscription Finance*) |
| **Matthew Kambic**<br><br>*Vice President of Marketing Finance*<br><br><br><br>*Note: Marketing Finance is a unit within Disney Finance.* | **Kareem Daniel** (*Vice President of DMED*)<br><br><br>**Justin Warbrooke** (*Executive Vice President DTC/International Operations*)<br><br><br>**Lukas Wickart** (*Senior Vice President, Finance – DTC*) |
| **Michael Chin**<br><br>*Director of Tactical Opportunities*<br><br><br><br>*Note: Tactical Opportunities is a unit within both Hulu Advertising and DTC Subscription Finance.* | **Justin Warbrooke** (*Executive Vice President DTC/International Operations*)<br><br><br><br>**Lukas Wickart** (*Senior Vice President, Finance – DTC*) |

- 63 -

4934-6279-9994.v1

| Plaintiffs' Proposed Custodians | Current Custodians |
|---|---|
| **Nick Lewerke**<br><br>*Vice President of Content Planning & Analysis*<br><br><br>*Note: Content Planning and Analysis is a unit within DMED Strategic Planning.* | **Kareem Daniel** (*Vice President of DMED*)<br><br>**Justin Warbrooke** (*Executive Vice President DTC/International Operations*) |
| **Jon Pang**<br><br>*Vice President of DTC/Strategy* | **Kareem Daniel** (*Vice President of DMED*)<br><br>**Justin Warbrooke** (*Executive Vice President DTC/International Operations*)<br><br>**Bryan Castellani** (*Executive Vice President Finance*)<br><br>**Cindy Wang** (*Senior Vice President, Disney Streaming*) |
| **Jack Reiman**<br><br>*Senior Data Analyst*<br><br><br>*Data Analytics is a unit within DMED: Product Management.* | **Rebecca Campbell** (*Chair, International Content & Operations*)<br><br>**Michael Paull** (*President, DTC*)<br><br>**Justin Warbrooke** (*Executive Vice President DTC/International Operations*)<br><br>**Lukas Wickart** (*Senior Vice President, Finance – DTC*) |

- 64 -

| Plaintiffs' Proposed Custodians | Current Custodians |
|---|---|
| **David Chodniewicz**<br><br>*Vice President, Data Science & Analytics*<br><br><br>*Data Science & Analytics is a unit within Data Analytics.* | **Rebecca Campbell** (*Chair, International Content & Operations*)<br><br><br>**Michael Paull** (*President, DTC*)<br><br><br>**Laura Evans** (*Senior Vice President, Data*) |

In short, Defendants need not add lower-level custodians when, as here, Plaintiffs will "already obtain[] [discovery] from . . . [the additional] custodians' direct supervisors." *Handloser*, 2020 WL 7405686, at *2 (rejecting plaintiffs' request for five additional custodians because "the Court cannot discern why plaintiffs expect to discover information from these custodians that differs from discovery they already obtained from the others, including the U.S. heads of the relevant departments"). Courts have declined to require the defendant designate a lower employee as a document custodian when the defendant already designated "the most knowledgeable and comprehensive source of information." *Affinity Credit Union v. Apple, Inc.*, 2024 WL 3859802, at *3 (N.D. Cal. Aug. 16, 2024).

*Third*, Plaintiffs cite emails *Defendants already searched for and produced* to argue that these seven custodians possessed relevant information. The mere fact that an individual appears on a relevant email cannot be enough to justify including that person as a custodian—were it otherwise, the list of custodians would be never-ending. But more significantly, the emails demonstrate why the additional custodians are unnecessary because multiple of Defendants custodians are on these email chains—indeed, that is why Plaintiffs have them. ██████████

████████████████████████████

████████████████████████████

- 65 -

4934-6279-9994.v1

██████████████████████ Likewise, Plaintiffs' Exhibit II, which they cite to support their request to add Nancy Lee, also includes Bowen and Paull. The fact that more than one of Defendants' selected custodians are on these chains demonstrates that relevant emails are, in fact, captured by Defendants' search protocol, and collection from additional custodians is unnecessary. "[J]ust because a proposed custodian exchanged a large number of emails with a current custodian does not mean that the proposed custodians will have a significant number of important, *non-cumulative* information." *Kleen Prods. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *14 (N.D. Ill. Sept. 28, 2012) (emphasis in original).

*Finally*, Plaintiffs fault Defendants for declining their offer to "swap" some of their proposed custodians for some of those designated by Defendants. *See* J.S. at 14. Plaintiffs never explained which custodians they wanted to swap or why they wanted to trade custodians. And the standard for identifying custodians is not whomever Plaintiffs choose. The standard is whomever is "most likely to possess information responsive to Plaintiff[s'] requests for production," *Wadeea*, 2025 WL 2309025, at *1-2, and Defendants, who are "in the best position to know and identify those individuals within [their] organization likely to have information relevant to the case," concluded that their custodians should not be swapped out. *Servicios Funerarios GG, S.A. de C.V. v. Advent Int'l Corp.*, 2023 WL 7332836, at *2 (D. Mass. Nov. 7, 2023) (internal citation and quotations omitted).

          **(ii)**        **The High Burden and Duplication of Plaintiffs' Chief of Staff Custodians Outweigh Their Marginal Relevance.**

The same logic applies to the chief-of-staff custodians Plaintiffs request, Claire Lee (Chapek's Chief of Staff) and Nancy Lee (Iger's Chief of Staff). Plaintiffs contend that Lee and Lee should be designated because they played "critical gatekeeping roles, they controlled the flow of information into and out of the CEO and Executive Chairman offices, coordinated cross-functional briefings, and tracked

- 66 -

4934-6279-9994.v1

follow-ups." J.S. at 26. But Plaintiffs' argument fails on its own terms. Any information going "into and out" of the CEO and Executive Chairman offices is, to the extent any of it is relevant to Plaintiffs' allegations, captured by Chapek and Iger's documents. Any facilitation of meetings and briefings is likewise redundant, as the actual participants in those meetings have been produced as custodians. *Cf. Mullenix v. Univ. of Tex. at Austin*, 2021 WL 3474008, at *3 (W.D. Tex. Aug. 6, 2021) (finding that plaintiff had failed to demonstrate the necessity of deposing an administrative assistant because plaintiff had failed to show that testimony in her role as an assistant would not be duplicative of her superior's testimony).

      (iii)      **Plaintiffs' Burdensome Board of Director Custodian Requests Duplicate Board Materials Defendants Will Produce.**

Plaintiffs' request for three additional Board custodians—Mary Barra (Chair and CEO of General Motors), Mark Parker (Executive Chairman of Nike, Inc.), and Maria Elena Lagomasino (Chief Executive Officer and Managing Partner of WE Family Offices)—similarly ignores the substantial information Plaintiffs will receive from other sources. *See* J.S. at 20. Defendants have already agreed to produce documents from Susan Arnold, who was the Chairman of Disney's Board of Directors for most of the class period. Defendants will also produce relevant Board documents such as meeting minutes and presentations (including Compensation Committee meeting minutes and presentations), and documents from a specialized communications platform for boards of directors called BoardVantage. In light of these productions, Plaintiffs cannot show any necessary or proportional need for creating a collection and review burden for additional Board members employed by other companies.

- 67 -

4934-6279-9994.v1

Still, Plaintiffs contend that Board's Compensation Committee members are relevant for four reasons. J.S. at 21. One purported reason—to obtain information conveyed to the Board regarding "Disney+ shortfalls" and "DMED losses"—is adequately covered by Arnold's designation and Defendants' production of other Board materials; Plaintiffs have not explained why Compensation Committee members would have any uniquely relevant documents on this issue. Two more of those reasons—assessing whether the Board unanimously renewed Chapek's contracts as disclosed, and why the Board reversed course after the renewal—are also Board-wide topics captured by Arnold's designation and the general Board materials. There is no reason why, by dint of their membership on the Compensation Committee, Plaintiffs' three additional Board custodians would have any unique information on these topics. Plaintiffs' fourth reason, the only justification specific to the Compensation Committee, concerns how facts shaped the Compensation Committee's assessment of Chapek's credibility and strategy. That topic is likely to be addressed by the Compensation Committee meeting minutes and presentations Defendants will produce. In light of all the materials Plaintiffs will be receiving (which they have not yet reviewed), there appears to be no real explanation for Plaintiffs' inclusion of these independent Board members now other than the burden it would create.

**(iv)    The High Burden of Plaintiffs' Disney Senior Leadership Custodians Outweigh Their Minimal Relevance.**

As noted above, Defendants' custodians already include several members of Disney senior leadership. Plaintiffs seek the addition of three more, none of whom are likely to possess relevant information such that the burden is justified.

Alan Bergman and Dana Walden both worked in content-creation divisions at Disney. *See* J.S. at 22-23. They were not responsible for the management of DMED, streaming, forecasting, or disclosures to the public. Plaintiffs claim that it is necessary to include Bergman and Walden as custodians because they may have been "vocally

- 68 -

critical of Chapek's leadership and were central figures in his removal as CEO." J.S. at 22. But whether two executives out of many at Disney were critical of Chapek is not relevant to Plaintiffs' allegations about Disney+ subscriber and profitability projections, DMED accounting, content spend, or communications with investors.

Plaintiffs argue that as Disney's Chief Human Resources Officer, Paul Richardson had a "unique vantage point for complaints regarding Disney's 'toxic culture' and Chapek's and Daniel's problematic leadership." J.S. at 25. But "culture" and "tone-at-the-top" do not bear on Plaintiffs' securities fraud allegations. *See supra* § II.D.1.b.i. Further, Defendants have already agreed to produce all complaints from Disney's formal complaint system, as well as employment files for the Individual Defendants and Board documents and communications. *See supra id.*

Horacio Gutierrez was and remains the Chief Legal and Compliance Officer for Disney whose documents are overwhelmingly likely to be privileged. *See* J.S. at 24-25. The instances Plaintiffs cite Gutierrez's alleged involvement in Chapek's resignation—that Gutierrez attended a Board meeting where McCarthy previewed Disney's financial results and that he had a meeting with McCarthy, Daniel and other members of leadership to address the issue, *see* J.S. at 24—are both events where multiple other current custodians were also in attendance. Collecting and reviewing Gutierrez's documents for those purposes is duplicative. Additionally, subjecting Defendants to an onerous privilege review for the sole purpose of demonstrating an individual's knowledge of dissatisfaction with then-CEO Chapek is a clear instance of burden outweighing marginal relevance.

### 3. Plaintiffs Search Protocol Is Disproportionate to the Needs of the Case and Contrary to the PSLRA.

As discussed above, *see supra* § II.D.1-2, the massive additional discovery that Plaintiffs are demanding would necessarily result in significant additional time and expense to Defendants, while yielding little, if any, additional relevant materials. Without once explaining the need for all these searches or addressing the total volume

- 69 -

4934-6279-9994.v1

of documents their searches produce, Plaintiffs summarily argue that their proposal is proportionate to the needs of this case because "courts routinely oversee productions measured in millions" in "fact-intensive securities class actions," J.S. at 34, and Disney is "a corporation with a market capitalization exceeding $200 billion," and therefore "has the resources to collect and produce it." J.S. at 3. However, neither rationale shows their proposal is proportionate.

Proportionality "is a common-sense concept, that should be applied to establish reasonable limits on discovery." *Ashcraft v. Experian Info. Sols., Inc.*, 2018 WL 6171772, at *1 (D. Nev. Nov. 26, 2018) (cleaned up). The proportionality analysis focuses on the "marginal utility of the discovery being sought." *Vaigasi v. Solo Mgmt. Corp.*, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016). Plaintiffs cite six securities cases to support their proposition that seeking millions of pages of discovery is appropriate. Each of these cases considered "millions of pages," proportionate, an amount already commensurate with Defendants' proposal. *See* Johnston Decl. ¶ 18 ("Defendants are likely to review approximately 28,558,239 pages."). Plaintiffs' proposal would burden Defendants with a review burden near the top of the range of Plaintiffs' cited cases.

Disney's resources do not give Plaintiffs *carte blanche* for demanding unreasonable and overbroad discovery. Consideration of the parties' resources "does not . . . justify unlimited discovery requests addressed to a wealthy party." Fed. R. Civ. P. 26(b) Advisory Committee's Notes to 2015 Amendment; *see also Goes Int'l, AB v. Dodur Ltd.*, 2016 WL 427369, at *4 (N.D. Cal. Feb. 4, 2016) ("Discovery and its costs are neither shield to ward off nor hammer to throttle the opposing party.").

Plaintiffs' Motion is a textbook example of the abusive tactics Congress enacted the PSLRA to stamp out. As the Supreme Court has made clear, the PSLRA was intended to prevent "vexatious discovery requests . . . result[ing] in extortionate settlements." *Merrill Lynch*, 547 U.S. at 81. Consistent with that objective, courts in

- 70 -

4934-6279-9994.v1

the Ninth Circuit have warned against attempts to abuse the discovery process, emphasizing that the PSLRA was adopted to prohibit "the targeting of 'deep pocket' defendants" and "the abuse of the discovery process to coerce settlement." *SG Cowen Sec. Corp.*, 189 F.3d at 911 (quotations omitted).

What Plaintiffs are doing here—demanding Defendants wade through tens of millions of pages based on facially overbroad and duplicative requests—is a blatant attempt to weaponize discovery to drive up Defendants' costs for no legitimate reason tied to the litigation. The Court should not indulge Plaintiffs' transparent attempt to leverage the discovery process as a cudgel against a corporate defendant. The Motion should be denied.

### E.    Conclusion

Because the discovery Plaintiffs seek is irrelevant, disproportional and unduly burdensome under Rule 26(b)(1), the Court should deny Plaintiffs' Motion to Compel.

DATED:  December 1, 2025

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN
RYAN A. LLORENS
JESSICA T. SHINNEFIELD
JEFFREY J. STEIN
NICOLE Q. GILLILAND
JESSICA E. ROBERTSON

                    s/ Jessica T. Shinnefield
                    JESSICA T. SHINNEFIELD

- 71 -

4934-6279-9994.v1

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
ryanl@rgrdlaw.com
jshinnefield@rgrdlaw.com
jstein@rgrdlaw.com
ngilliland@rgrdlaw.com
jrobertson@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JONATHAN ZWEIG (*pro hac vice*)
CRISTELLE R. RABBAN (*pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
jzweig@rgrdlaw.com
crabban@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 72 -

4934-6279-9994.v1

Dated: December 1. 2025

WHITE & CASE LLP

s/ Stacy Nettleton

JONATHAN D. POLKES
STACY NETTLETON
ADAM B. BANKS
SUSAN L. GRACE
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
jonathan.polkes@whitecase.com
stacy.nettleton@whitecase.com
adam.banks@whitecase.com
susan.grace@whitecase.com

MUNGER, TOLLES & OLSON LLP
JOHN W. SPIEGEL
JOHN M. GILDERSLEEVE
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: 213/683-9100
john.spiegel@mto.com
john.gildersleeve@mto.com

Attorneys for Defendants
The Walt Disney Company, Robert Iger, Robert Chapek, Christine M. McCarthy and Kareem Daniel

- 73 -

4934-6279-9994.v1

**ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4**

Pursuant to L.R. 5-4.3.4, I hereby attest that all signatories listed above concurred in this filing.

DATED: December 1. 2025        s/ Jessica T. Shinnefield

                                        JESSICA T. SHINNEFIELD