# EXHIBIT D

ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIEL S. DROSMAN (200643)
RYAN A. LLORENS (225196)
JESSICA T. SHINNEFIELD (234432)
JEFFREY J. STEIN (265268)
NICOLE Q. GILLILAND (335132)
JESSICA E. ROBERTSON (352207)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
ryanl@rgrdlaw.com
jshinnefield@rgrdlaw.com
jstein@rgrdlaw.com
ngilliland@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, on Behalf of Itself and All Others Similarly Situated, | Case No. 2:23-cv-03661-CBM (ASx) |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ALL DEFENDANTS |
| THE WALT DISNEY COMPANY, et al., | |
| Defendants. | |

4928-3271-3030.v1

Pursuant to Federal Rules of Civil Procedure 26 and 34 and the Local Civil Rules of the Central District of California, Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund, Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987, and Central Pennsylvania Teamsters Health and Welfare Fund, and plaintiffs Local 272 Labor-Management Pension Fund and John Patrick Talbot (collectively, "Plaintiffs") request that Defendants (defined below), each individually and separately, respond to and produce for inspection and copying the documents designated under the heading "Documents Requested" within 30 days of the date of service hereof to the offices of Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, California 92101, or at such other time and place as the parties mutually agree.

## I.    DEFINITIONS

1.    "Action" means *Local 272 Labor-Management Pension Fund v. The Walt Disney Company*, *et al.*, No. 2:23-cv-03661 (C.D. Cal.).

2.    "All," "any," and "each" shall each be construed as encompassing any and all.

3.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4.    "Answer" means Defendants' Answer to the Corrected Consolidated Complaint for Violations of the Federal Securities Laws (ECF 113) filed in this Action on March 5, 2025.

5.    "Class Period" means the currently alleged class period of December 10, 2020 through May 10, 2023, inclusive.

6.    "Complaint" means the Corrected Consolidated Complaint for Violations of the Federal Securities Laws (ECF 68) filed in this Action on December 18, 2023.

- 1 -

4928-3271-3030.v1

7.      "Communication(s)" means emails, text messages, iMessages, short-messages, letters, or any other transmittal of information (in the form of facts, ideas, inquiries, or otherwise), including all attachments thereto.

8.      "Concerning" means relating to, referring to, describing, evidencing, or constituting.

9.      "Defendant(s)" means individually or collectively Disney (defined below), Robert Chapek ("Chapek"), Kareem Daniel ("Daniel"), and Christine M. McCarthy ("McCarthy").

10.      "Disney" means The Walt Disney Company, any of its direct or indirect subsidiaries, divisions, or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, accountants, and advisors, and all other persons (defined below) acting or purporting to act on its behalf.

11.      "DMED" means Disney Media and Entertainment Distribution.

12.      "DMED Reorganization" means the October 2020 reorganization of Disney's media and entertainment operations into a single group that is responsible for distributing all of Disney's media and entertainment content across all platforms globally.

13.      "Document(s)" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.  "Document(s)" includes data from servers, local computers, cloud accounts, personal devices, and any other locations where responsive data might reside.

14.      "DTC" means Disney's direct-to-consumer business, including Disney+, Disney+ Hotstar, ESPN+, Hulu, and Star+ video streaming services.

15.      "Electronically stored information" or "ESI" means all items covered by Federal Rule of Civil Procedure 34(a)(1)(A) and includes all information or data that is generated, received, processed, transmitted, or stored electronically, including

- 2 -

4928-3271-3030.v1

metadata (*e.g.*, author, recipient, file creation date, file modification date, file name, file path, etc.), regardless of the media or whether it is in the original format in which it was created.

16.    "Entitled Subscribers" means individuals that were entitled to a Disney+ subscription through a Third-Party Partnership (defined below), but who did not activate their Disney+ subscription.

17.    "Executive Officer(s)" means individually or collectively Chapek, Daniel, McCarthy, and Robert Iger ("Iger").

18.    "Five-Year Plan" means the plan that, *inter alia*, projected specific dates Disney+ would become cash-flow positive, the subscriber numbers required to become cash-flow positive, and content costs (*see, e.g.*, Complaint, ¶35).

19.    "Identify," with respect to persons, means to give, to the extent known, the person's full name, present or last known address, present or last known email address, and when referring to a natural person, additionally, the present or last known place of employment.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the information of that person.

20.    "Identify," with respect to documents, means to give, to the extent known, the: (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s), and recipient(s).

21.    "Intersegment Transfer Pricing" means the cost accounting procedure in place prior to the DMED Reorganization by which Disney's film and general entertainment studio divisions produced content and then sold the content to other segments, including Disney+, at external fair market value, including actual production costs plus an industry profit markup.

22.    "Meetings" means the contemporaneous presence of any natural person (including by telephone or electronic connection) for any purpose, whether or not such presence was prearranged or by chance and whether or not the meeting was formal or

- 3 -

informal or occurred in connection with some other activity.  The term "meeting" also includes presentations.

23.    "Paid Subscriber" means the Disney+ paid subscriber metric that Disney reported in its quarterly SEC (defined below) filings, which was defined as Disney+ "subscribers for which [Disney] recognized subscription revenue."

24.    "Person(s)" means any natural person or legal entity, including, without limitation, any business or governmental entity or association.

25.    "Third-Party Partnership(s)" means a partnership between Disney and another entity (such as Verizon, Amazon Music, and American Express), through which the other entity offered a Disney+ subscription as an incentive to use its products or services.

26.    "SEC" means the United States Securities and Exchange Commission.

27.    "You" or "your" means each person or entity responding to these requests.

28.    "2024 Disney+ Profitability Target" means the target Disney set on December 10, 2020, that Disney+ would become profitable by 2024.

29.    "2024 Disney+ Subscriber Target" means the original target Disney set on December 10, 2020, that Disney+ would reach 230-260 million subscribers by 2024, and incorporates the one-time adjustment in August 2022 to revise the target to 215-245 million.

30.    The use of the singular form of any word includes the plural and vice versa.

## II.    INSTRUCTIONS

1.    In responding to these requests, you shall produce all responsive documents that are in your possession, custody, or control, or in the possession, custody, or control of your predecessors, successors, parents, subsidiaries, divisions, or affiliates, or any of your respective directors, executives, officers, partners, managing agents, agents, employees, accountants, or any other representative.  A

- 4 -

4928-3271-3030.v1

document shall be deemed to be within your control if you have the ability or right to secure the document or a copy of the document from another person having possession or custody of the document.  You shall produce said documents as they are kept in the usual course of business and shall organize and label them to correspond with the categories in the request.

2.    In responding to these requests, you shall produce all responsive documents available at the time of production, and you shall supplement your responses as required by Federal Rule of Civil Procedure 26(e).

3.    If any responsive document was, but no longer is, in your possession or subject to your control, state whether the document is:

(a)    missing or lost;

(b)    destroyed;

(c)    transferred voluntarily or involuntarily to others; or

(d)    otherwise disposed of, and in each instance identify the name and address of its current or last known custodian, and the circumstances surrounding such disposition.

4.    If you claim any form of privilege or any other objection, whether based on statute, common law, or otherwise, as a ground for not producing any requested document, please furnish a privilege log identifying each document for which the privilege or other objection is claimed, together with the following information:

(a)    the privilege being asserted;

(b)    the person on whose behalf the privilege is asserted; and

(c)    a precise statement of the facts upon which the claim of privilege is based; and

(d)    identify each document for which the privilege is claimed, including:

(i)    the document's nature, *e.g.*, letter, memorandum, email, etc.;

(ii)    the date the document was prepared;

- 5 -

(iii)   the date the document bears;

(iv)   the date the document was sent;

(v)   the date the document was received;

(vi)   the name of the person who prepared the document;

(vii)   the name(s) of the person(s) who received the document; and

(viii)  the name of each person to whom the document was sent or was intended to be sent, including all addressees and all recipients of copies.

5.   If a portion of any document responsive to these requests is withheld under a claim of privilege pursuant to Instruction 4, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

6.   You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instructions 4 and 5 above), regardless of whether you consider the entire document to be relevant or responsive to the requests.

**III.    PRODUCTION OF HARD-COPY DOCUMENTS: FORMAT**

Hard-copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat).  The database load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME," and "CUSTODIAN."  The documents should be logically unitized (*i.e.*, distinct documents shall not be merged into a single record, and single documents shall not be split into multiple records) and be produced in the order in which they are kept in the usual course of business.  If an original document contains color, and the color is necessary to understand the meaning or content of the document, the document shall be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image. Multi-page OCR text for each document should also be provided.  The OCR software

- 6 -

4928-3271-3030.v1

shall maximize text quality. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

## IV.    PRODUCTION OF ESI

1.    Format: Except where otherwise noted in this section, ESI should be produced in single-page, black and white, TIFF Group IV, 300 DPI TIFF images. Spreadsheet and presentation type files, audio and video files, photo or graphic images, and documents with tracked changes reflected in the metadata should be produced in native format. Short message communications (*e.g.*, text messages, WhatsApp, Slack, iMessage, Teams, G-Chat, Bloomberg, etc.) shall be produced in RSMF with all available metadata and attachments. Chat logs, texts, and messages should be produced in a reasonably usable form (for instance, exported to PDF with timestamps, or in a message consolidation with metadata of sender/receiver and time). Except for messages that contain privileged content, the complete communication shall be produced, separated into 24-hour increments. To the extent RSMF cannot be provided, the parties shall meet and confer on the appropriate metadata fields and format of production. If an original document being produced in image format contains color, the document should be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image. TIFFs/JPGs should show any and all text, hidden content, and images that would be visible to the reader using the native software that created the document. For example, TIFFs/JPGs of email messages should include the BCC line, and documents should display comments and hidden content.

2.    Format – Native Files: If a document is produced in RSMF or in native format, a single-page, Bates stamped image slip sheet stating the document has been produced in native format should also be provided, with the exception of PowerPoint presentations. PowerPoint documents should be produced in native format along with single-page, 300 DPI TIFF/JPG images which display both the slide and speaker's notes. Each native file should be named according to the Bates number it has been

- 7 -

assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field.

3.    De-Duplication: You shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level.  Attachments should not be eliminated as duplicates for purposes of production, unless the parent email and all attachments are also duplicates.  An email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in those fields, even if all remaining content in the email is identical.  Removal of near-duplicate documents and email thread suppression is not acceptable.  De-duplication should be done across the entire collection (global de-duplication) and the CUSTODIAN-ALL field should list each custodian, separated by a semicolon, who was a source of that document and the FILEPATH-DUP field will list each file path, separated by a semicolon, that was a source of that document.  Should the CUSTODIAN-ALL or FILEPATH-DUP metadata fields produced become outdated due to rolling productions, an overlay file providing all the custodians and file paths for the affected documents should be produced prior to substantial completion of the document production.

4.    Technology-Assisted Review: Predictive coding/technology-assisted review or artificial intelligence shall not be used for the purpose of culling the documents to be reviewed or produced without notifying the requesting party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

5.    Metadata: All ESI shall be produced in a manner that preserves metadata, including at minimum fields evidencing the document's creator, date of creation, last modified date, custodian, and recipients (for communications).  Emails should include full header information, and electronic documents should be in native format (or other format preserving formulas, tracked changes, and other dynamic content, where applicable).  All ESI shall be produced with a delimited, database load file that

- 8 -

contains the metadata fields listed in Table 1, attached hereto. The metadata produced should have the correct encoding to enable preservation of the documents' original language. For ESI other than email and e-docs that do not conform to the metadata listed in Table 1, such as text messages, Instant Bloomberg, iMessage, Google Chat, MS Teams, Slack, Google Docs, etc., the parties should meet and confer as to the appropriate metadata fields to be produced.

6. Embedded Objects: Embedded files shall be produced as attachments to the document that contained the embedded file, with the parent/child relationship preserved. The embedded files should be marked with a "YES" in the load file under the "Is Embedded" metadata field. Logos need not be extracted as separate documents as long as they are displayed in the parent document.

7. Attachments: Each document shall be produced with any attachments, exhibits, enclosures, or linked documents intact. If a document contains a hyperlink to a file stored in Disney's systems, that file must be retrieved and produced as if it were an attachment. If any part of a communication or its attachments is responsive, the entire communication and attachments should be produced, except any attachments that must be withheld or redacted on the basis of privilege. The attachments should be produced sequentially after the parent communication. You shall collect and produce point-in-time documents that are links in documents and communications, including Google G Suite, Microsoft 365, etc. and treat as family documents. Documents extracted from links shall be populated with the BEGATTACH and ENDATTACH metadata fields to show the family relationship. If documents cannot be extracted from links at the time of collection, or the documents that can be extracted are not likely to be the same version that existed the time the communication was sent (*i.e.*, point-in-time or contemporaneous version), you must promptly discuss alternative methods of collection and production.

8. Compressed File Types: Compressed file types (*e.g.*, .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

- 9 -

4928-3271-3030.v1

9.    Structured Data: To the extent a response to discovery requires production of electronic information stored in a database, the parties should meet and confer regarding methods of production.  You shall consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.

10.    Exception Report: You shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type, and the file location.

11.    Encryption: To maximize the security of information in transit, any media on which documents are produced may be encrypted.  In such cases, you shall transmit the encryption key or password to the receiving party, under separate cover, contemporaneously with sending the encrypted media.

12.    Redactions: If documents to be produced in native format need to be redacted, you shall implement redactions while ensuring that proper formatting and usability are maintained.  Spreadsheets requiring redaction should be redacted using native redaction software and produced in native format.

## V.    RELEVANT TIME PERIOD

Unless otherwise specifically indicated, the requests herein refer to the period from January 1, 2020 through August 31, 2023 (the "Relevant Period"), and shall include documents and information that relate to such period, even if dated, prepared, generated, used, published, or received outside of the Relevant Period.  If a document prepared before this period is necessary for a correct or complete understanding of any document covered by a request, you must produce the earlier document as well.  If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the request.

## VI.    DOCUMENTS REQUESTED

REQUEST FOR PRODUCTION NO. 1:

All documents and communications concerning the 2024 Disney+ Subscriber Target, including, but not limited to:

- 10 -

4928-3271-3030.v1

(a)      All documents and communications concerning persons, methods, and considerations involved in setting the 2024 Disney+ Subscriber Target, including, but not limited to, all underlying data, financial models, assumptions, and sensitivity analyses used or considered;

(b)      All documents and communications concerning internal assessments, analyses, forecasts, or discussions regarding Disney's projected ability, or lack thereof, to achieve the 2024 Disney+ Subscriber Target, including any risk assessments or expressions of concern;

(c)      All documents and communications concerning plans or methods for achieving the 2024 Disney+ Subscriber Target;

(d)      All documents and communications concerning Disney's forecasts or projections concerning the 2024 Disney+ Subscriber Target;

(e)      All documents and communications concerning Disney's progress toward the 2024 Disney+ Subscriber Target; and

(f)      All documents and communications concerning Disney's February 8, 2023 announcement to no longer provide 2024 Disney+ Subscriber Target guidance, including documents and communications related to that decision.

REQUEST FOR PRODUCTION NO. 2:

All documents and communications concerning the 2024 Disney+ Profitability Target, including, but not limited to:

(a)      All documents and communications concerning persons, methods, and considerations involved in setting the 2024 Disney+ Profitability Target;

(b)      All documents and communications concerning Disney's ability or inability to achieve the 2024 Disney+ Profitability Target;

(c)      All documents and communications concerning plans or methods for achieving the 2024 Disney+ Profitability Target;

(d)      All documents and communications concerning Disney's forecasts or projections concerning the 2024 Disney+ Profitability Target;

- 11 -

4928-3271-3030.v1

(e)    All documents and communications concerning Disney's progress toward the 2024 Disney+ Profitability Target; and

(f)    All documents and communications concerning Disney's decisions to reaffirm the 2024 Disney+ Profitability Target on its quarterly earnings calls.

REQUEST FOR PRODUCTION NO. 3:

All documents and communications concerning Disney+ subscriber numbers or growth, including, but not limited to:

(a)    All documents and communications concerning the reasons for or drivers of Disney+ subscriber numbers or growth;

(b)    All documents and communications concerning the monitoring, tracking, estimating, or forecasting of Disney+ subscriber numbers or growth;

(c)    All documents and communications concerning investors' or financial analysts' expectations regarding or reactions to Disney+ subscriber numbers or growth;

(d)    All documents and communications concerning Disney's internal short-term (*e.g.*, monthly or quarterly) or long-term (*e.g.*, annual or multi-year) Disney+ subscriber goals, targets, and projections, including, but not limited to, internal dashboards, tracking reports, or scorecards provided to or reviewed by any Executive Officer and any such goals, targets, or projections that differed from those publicly disclosed;

(e)    All documents and communications concerning plans for achieving external expectations or Disney's internal short-term (*e.g.*, monthly or quarterly) or long-term (*e.g.*, annual or multi-year) goals, targets, or projections regarding Disney+ subscriber numbers or growth; and

(f)    All documents and communications concerning the sustainability or quality of Disney+ subscriber numbers or growth.

- 12 -

4928-3271-3030.v1

REQUEST FOR PRODUCTION NO. 4:

All documents and communications concerning any iteration of the Five-Year Plan.

REQUEST FOR PRODUCTION NO. 5:

All documents and communications concerning the DMED Reorganization, including, but not limited to:

(a)    All documents and communications concerning the decision to implement the DMED Reorganization;

(b)    All documents and communications concerning the organizational and reporting structure changes associated with the DMED Reorganization;

(c)    All documents and communications concerning the decision to change the financial reporting structure, including eliminating  intersegment transfer pricing, as part of the DMED Reorganization;

(d)    All documents analyzing or quantifying the impact of the change of the financial reporting structure on reported segment profitability, comparability with prior period financial results, and on Disney+ specific financial metrics;

(e)    All documents and communications concerning Disney executives' and employees' reactions to and opinions of the DMED Reorganization; and

(f)    All documents and communications concerning the purpose(s) and effect(s) of the DMED Reorganization.

REQUEST FOR PRODUCTION NO. 6:

All documents and communications concerning the appointment of Daniel as Chairman of DMED, including, but not limited to:

(a)    All documents and communications concerning the reasons for the appointment;

(b)    All documents and communications concerning any disagreement, dissent, resistance, argument, dispute, or opposition from Disney personnel about the appointment, either before it happened or afterward;

- 13 -

4928-3271-3030.v1

(c)    All documents and communications concerning the terms and conditions of the appointment; and

(d)    All documents and communications concerning the decision-making process for the appointment.

REQUEST FOR PRODUCTION NO. 7:

All documents and communications concerning Disney+ subscriber churn, including, but not limited to:

(a)    All documents and communications concerning the causes of or reasons for changes in Disney+ subscriber churn rates;

(b)    All documents and communications concerning analyses of churn rates broken down by subscriber cohort, including, but not limited to, subscribers acquired via promotional offers, specific Third-Party Partnerships, various international markets, and specific content-driven sign-ups;

(c)    All documents and communications concerning the causes of or reasons for Disney+ subscriber churn;

(d)    All documents and communications concerning plans or attempts to reduce Disney+ subscriber churn rates;

(e)    All documents and communications concerning internal dashboards, regular reports, and presentations concerning churn that were provided to, reviewed by, or discussed by any Executive Officer, including any documents referring to Disney+ churn as a "leaky bucket" or similar terminology indicating concern;

(f)    All documents and communications monitoring, tracking, estimating, or forecasting Disney+ subscriber churn rates; and

(g)    All documents and communications concerning the impact of Third-Party Partnerships on Disney+ subscriber churn rates.

- 14 -

4928-3271-3030.v1

REQUEST FOR PRODUCTION NO. 8:

All documents and communications concerning the distribution of Disney+ content on other distribution platforms, including linear cable networks, movie theaters, and pay-per-view platforms, including, but not limited to:

(a)    All documents and communications concerning the decision to release feature films on Disney+ before or in lieu of other distribution platforms (such as theaters or pay-per-view platforms);

(b)    All documents and communications concerning the financial effect(s) and impacts on subscriber counts of releasing feature films on Disney+ before or in lieu of other distribution platforms (such as theaters or pay-per-view platforms);

(c)    All documents and communications concerning the decision to debut Disney+ content on other distribution platforms (such as linear cable networks) immediately prior to releasing the content on Disney+.  These documents include, but are not limited to, internal policies, guidelines, or communications discussing this specific cost allocation strategy, and any documents reflecting McCarthy's alleged concerns or criticisms of this practice; and

(d)    All documents and communications concerning the financial impacts of debuting Disney+ content on other distribution platforms (such as linear cable networks) immediately prior to releasing the content on Disney+, including the impact on the allocation of content and marketing costs across the various distribution platforms.  These documents include, but are not limited to, internal policies, guidelines, or communications discussing this specific cost allocation strategy, and any documents reflecting McCarthy's concerns or criticisms of this practice.

REQUEST FOR PRODUCTION NO. 9:

All documents and communications concerning Disney+ content costs or content budgets, including, but not limited to:

- 15 -

4928-3271-3030.v1

(a)    All documents and communications concerning persons, methods, and considerations involved in setting, approving, or adjusting budgets for Disney+ content costs; and

(b)    All documents and communications concerning monitoring, tracking, accounting for, estimating, or forecasting Disney+ content costs or spending related to DTC or Disney+.

REQUEST FOR PRODUCTION NO. 10:

All documents and communications concerning Disney's policies, practices, and procedures related to accounting for Disney+ content costs, including, but not limited to:

(a)    All documents and communications concerning the amortization of Disney+ content costs; and

(b)    All documents and communications concerning the allocation of costs across different distribution platforms and lines of business.

REQUEST FOR PRODUCTION NO. 11:

All documents and communications concerning Disney+ and DTC operating losses, including, but not limited to:

(a)    All documents and communications concerning monitoring, tracking, accounting for, estimating, or forecasting Disney+ and DTC operating losses;

(b)    All documents and communications concerning underlying data, financial models, assumptions, and sensitivity analyses provided to or reviewed by any Executive Officer quantifying, estimating, or forecasting Disney+ and DTC operating losses;

(c)    All documents and communications concerning efforts to reduce or minimize Disney+ and DTC operating losses;

(d)    All documents and communications concerning the causes or drivers of Disney+ and DTC operating losses; and

- 16 -

4928-3271-3030.v1

(e)     All documents and communications concerning the effect of eliminating Intersegment Transfer Pricing on Disney+ and DTC operating losses.

REQUEST FOR PRODUCTION NO. 12:

All documents and communications concerning Third-Party Partnerships, including, but not limited to:

(a)     All documents and communications concerning the decision to categorize all Entitled Subscribers as Paid Subscribers.  These documents include, but are not limited to, policy documents, accounting memos, or internal communications that formalized or approved this definition and counting methodology;

(b)     All contracts or agreements with companies with which Disney entered into Third-Party Partnerships;

(c)     All documents and communications concerning the impact of Third-Party Partnerships on Disney+ subscriber numbers;

(d)     All documents and communications concerning the effects of Third-Party Partnerships on Disney+ or DTC profitability or financial results; and

(e)     All documents and communications concerning the number or rate of Disney+ subscribers that subscribed to Disney+ after their subscription or eligibility obtained through any Third-Party Partnership ended.

REQUEST FOR PRODUCTION NO. 13:

All documents and communications concerning the decision to provide each Hulu+ Live TV subscriber with a free Disney+ subscription, including, but not limited to:

(a)     All documents and communications concerning the impact of the decision on Disney+ subscriber numbers;

(b)     All documents and communications concerning the internal rationale, financial modeling, and accounting treatment for this initiative;

(c)     All documents and communications concerning the impact of the decision on Disney+ or DTC profitability or financial results; and

- 17 -

4928-3271-3030.v1

(d)    All documents and communications concerning the decision to categorize each individual that received a free subscription as a Paid Subscriber.

REQUEST FOR PRODUCTION NO. 14:

All documents and communications concerning the profitability (or lack thereof) of each international market in which Disney+ launched, including, but not limited to:

(a)    All documents and communications concerning analyses, assessments, calculations, projections, or estimates of the profitability (or lack thereof) of each international market;

(b)    All documents and communications concerning the average revenue per user for each international market;

(c)    All documents and communications concerning the costs (including, but not limited to, costs associated with local content production, acquisition, and marketing) to launch and operate in each international market; and

(d)    All documents and communications concerning the effect of international market launches on Disney+ or DTC profitability or financial results.

REQUEST FOR PRODUCTION NO. 15:

All documents and communications concerning the decisions to launch Disney+ in various international markets, including, but not limited to, analyses, assessments, calculations, projections, or estimates of the impact on Disney+ subscriber counts associated with launching in each international market.

REQUEST FOR PRODUCTION NO. 16:

All documents and communications concerning monitoring or tracking of Disney+ content performance, including, but not limited to:

(a)    All documents and communications concerning data related to Disney+ content performance (including as discussed in Complaint, ¶32);

(b)    All documents and communications tracking, monitoring, or estimating content performance;

- 18 -

4928-3271-3030.v1

(c)     All documents and communications concerning decisions to remove content from Disney+, including underperforming content; and

(d)     All documents and communications concerning decisions not to remove or to delay the removal of underperforming content during the Class Period, or any internal analyses that suggested that such underperforming content was not driving subscriber acquisition or retention.

REQUEST FOR PRODUCTION NO. 17:

All documents and communications concerning any report, brief, summary or compilation related to the 2024 Disney+ Subscriber Target, the 2024 Disney+ Profitability Target, Disney+ subscribers, Disney+ profitability, Disney+ churn, Disney+ or DTC content costs or spending, DTC operating losses, Third-Party Partnerships, Disney+ international markets, or Disney+ content performance.

REQUEST FOR PRODUCTION NO. 18:

All documents and communications concerning any formal or informal meeting attended by any Executive Officer concerning the 2024 Disney+ Subscriber Target, the 2024 Disney+ Profitability Target, Disney+ subscribers, Disney+ profitability, Disney+ churn, Disney+ or DTC content costs or spending, DTC operating losses, Third-Party Partnerships, Disney+ international markets, or Disney+ content performance.

REQUEST FOR PRODUCTION NO. 19:

All documents, including all drafts, and all communications concerning the preparation, content, review process, and submission of Disney's SEC filings, including, but not limited to, all drafts, internal communications, and preparatory materials.

REQUEST FOR PRODUCTION NO. 20:

All documents and communications concerning any communications, conference calls, presentations, or meetings with any Disney shareholders, financial analysts, institutional investors, financial publications, news reporters, journalists, or

- 19 -

investment bankers, including, but not limited to, any scripts, drafts, transcripts, notes, edits, comments, preparatory materials, talking points, and anticipated questions and answers.

REQUEST FOR PRODUCTION NO. 21:

All documents and communications concerning Disney's quarterly earnings conference calls, including, but not limited to, any scripts, transcripts, notes, comments, preparatory materials, talking points, anticipated questions and answers, and communications with analysts before or after the conference call.

REQUEST FOR PRODUCTION NO. 22:

All documents and communications concerning any meeting of Disney's Board of Directors (whether informal or formal and including meetings of any committee or subcommittee thereof) during which the subject matter of any allegation in the Complaint was discussed, including board packages, financial closing packages, meeting minutes, exhibits, agendas, memoranda, resolutions (whether adopted or discussed), notes, reports, and presentations, as well as all documents and communications concerning any action of Disney's Board of Directors by written consent.  This request includes, but is not limited to, all deliberations and information provided to Disney's Board of Directors concerning Disney+ strategy, subscriber targets, financial performance, content spending, churn, international expansion risks, and executive oversight of these areas.  This request also includes, but is not limited to, all materials, reports, and presentations provided to Disney's Board of Directors or any of its committees by, or at the direction of, any Executive Officer concerning any of the topics listed in Request for Production No. 17 of these requests.

REQUEST FOR PRODUCTION NO. 23:

All documents and communications concerning Chapek's June 2022 contract renewal, including, but not limited to:

- 20 -

4928-3271-3030.v1

(a)     All documents and communications concerning assessments, evaluations, reviews, analyses, or considerations related to the decision to renew Chapek's contract;

(b)     All Board of Directors materials, minutes, and communications (including, but not limited to, any informal discussions among directors) related to the evaluation process and the decision to renew Chapek's contract;

(c)     All documents and communications concerning any meeting (formal or informal) concerning Chapek's employment performance or the decision to renew his contract;

(d)     All documents and communications concerning the terms of Chapek's renewed contract; and

(e)     All documents and communications regarding any disagreement, dissention, resistance, argument, dispute, or opposition related to Chapek's contract renewal.

REQUEST FOR PRODUCTION NO. 24:

All documents and communications concerning Chapek's or Daniel's management or leadership style or tone, including, but not limited to, any formal or informal complaints related to Chapek's or Daniel's management or leadership style or tone.

REQUEST FOR PRODUCTION NO. 25:

All documents and communications concerning any assessments, evaluations, reviews, or analyses of Chapek's, McCarthy's, or Daniel's employment performance.

REQUEST FOR PRODUCTION NO. 26:

All documents and communications concerning any Executive Officer's impressions of or opinions about Chapek's or Daniel's performance, management style, or decision-making.

- 21 -

4928-3271-3030.v1

REQUEST FOR PRODUCTION NO. 27:

All documents and communications concerning all compensation that each Executive Officer received or was eligible to receive from Disney, including, but not limited to:

(a)    All documents and communications concerning all components of the Executive Officers' compensation, including salaries, bonuses, and equity-based incentive compensation;

(b)    All documents and communications detailing how performance metrics, including Disney+ subscriber growth, were tied to annual bonuses and equity awards for the Executive Officers;

(c)    All documents and communications concerning any changes in compensation;

(d)    All documents and communications concerning compensation policies, terms, and agreements;

(e)    All documents and communications concerning reviews, analyses, and considerations involved in determining variable compensation payout levels for each Executive Officer;

(f)    All documents and communications concerning benchmarking compensation against peer groups;

(g)    All documents and communications concerning attempts to reduce or claw back any of the Executive Officers' compensation; and

(h)    All documents and communications concerning any of the Executive Officers' severance packages, termination agreements, parachute payments, or any other negotiation or agreement regarding post-termination or post-resignation compensation.

REQUEST FOR PRODUCTION NO. 28:

All documents and communications concerning transactions in Disney securities by any Executive Officer, including, but not limited to:

- 22 -

4928-3271-3030.v1

(a)    All documents and communications concerning any awards, exercises, purchases, or sales of Disney securities by any Executive Officer;

(b)    All documents and communications concerning the adoption, modification, or termination of Rule 10b5-1 trading plans by the Executive Officers, along with all documents and communications concerning the establishment or execution of sales under such plans; and

(c)    All documents and communications concerning any of the Executive Officers' Rule 10b5-1 trading plans, including any modification, adoption, or cancellation of any plan.

REQUEST FOR PRODUCTION NO. 29:

All documents and communications concerning the departure, resignation, or termination, of Chapek, McCarthy, Daniel, or Arthur Bochner, including, but not limited to, documents or communications detailing the reasons for these departures, including any separation agreements or internal announcements.

REQUEST FOR PRODUCTION NO. 30:

All documents and communications concerning the decision to rehire Iger as Disney CEO in November 2022.

REQUEST FOR PRODUCTION NO. 31:

All documents and communications concerning the accessibility of internal data regarding Disney+ or DTC, including, but not limited to:

(a)    All documents and communications concerning limited or restricted access to internal data;

(b)    All documents and communications demonstrating who had or did not have access to internal data;

(c)    All documents and communications concerning any requests for access to Disney+ or DTC operational or financial data by Disney employees or executives that were denied, restricted, or delayed, including the reasons provided for such denial, restriction, or delay; and

- 23 -

(d)      All documents and communications concerning policies, practices, and procedures regarding access to internal data.

REQUEST FOR PRODUCTION NO. 32:

All documents and communications concerning meetings (formal or informal) with the Executive Officers regarding Disney's fourth quarter of 2022 ("4Q22") financial results, including, but not limited to:

(a)      The September 2022 meeting during which Chapek and McCarthy discussed Disney's 4Q22 financial results with Disney's Board of Directors (*see* Complaint, ¶364);

(b)      The meeting in Orlando, Florida during which Kristina Schake and Alexia Quadrani discussed Disney's 4Q22 financial results with Chapek (*see* Complaint, ¶365); and

(c)      The November 2022 meeting at Disney's New York offices during which Disney executives discussed Disney's 4Q22 results with Chapek (*see* Complaint, ¶365).

REQUEST FOR PRODUCTION NO. 33:

All documents and communications concerning the decision to unwind DMED that Iger announced during Disney's February 8, 2023 earnings call, including, but not limited to:

(a)      All documents and communications concerning all information considered when deciding to unwind DMED;

(b)      All documents and communications concerning any criticism of DMED or the need to unwind DMED; and

(c)      All documents and communications concerning the purpose, reason(s), or effect of unwinding DMED.  These documents include, but are not limited to, explicit or implicit admissions about the flaws, inefficiencies, or detrimental effects of the original DMED reorganization and any documents reflecting

- 24 -

Iger's statements that the DMED reorganization "was a mistake" or "created a huge divide."

REQUEST FOR PRODUCTION NO. 34:

All documents and communications concerning the $5.5 billion cost-cutting initiative that Iger announced during Disney's February 8, 2023 earnings call, including, but not limited to:

(a)    All documents and communications concerning all information considered when deciding to implement the $5.5 billion cost-cutting initiative;

(b)    All documents and communications concerning any criticism or concern about Disney's costs; and

(c)    All documents and communications concerning the purpose(s) and effect(s) of the $5.5 billion cost-cutting initiative.

REQUEST FOR PRODUCTION NO. 35:

All documents and communications concerning Disney's share price, market capitalization, number of shareholders, volume of shares traded, and stock price movements.

REQUEST FOR PRODUCTION NO. 36:

All documents and communications concerning the possible or actual factors or reasons that led to any change in the price of Disney common stock.

REQUEST FOR PRODUCTION NO. 37:

All documents and communications concerning Disney's public disclosures on November 10, 2021, November 8, 2022, and May 10, 2023, including, but not limited to, the impact of these disclosures on Disney's stock price.

REQUEST FOR PRODUCTION NO. 38:

All documents and communications concerning the lower-than-expected Disney+ subscriber growth Disney reported on November 10, 2021, including, but not limited to, the reasons for or drivers of the lower-than-expected Disney+ subscriber growth and all documents concerning internal discussions and analyses prior to this

- 25 -

4928-3271-3030.v1

public disclosure that indicated a potential shortfall or a slowdown in subscriber growth.

REQUEST FOR PRODUCTION NO. 39:

All documents and communications concerning McCarthy's November 10, 2021 statement that "we now expect that Disney+ will reach its peak year of losses in fiscal 2022 instead of fiscal 2021" including the reasons that the expected peak year of losses for Disney+ moved from fiscal 2021 to fiscal 2022, including, but not limited to, all documents underlying and supporting this specific revised forecast.  This includes, but is not limited to, the analyses, data, and internal communications that led to this change in expectation.

REQUEST FOR PRODUCTION NO. 40:

All documents and communications regarding the $1.47 billion in DTC operating losses reported on November 8, 2022, including all documents and communications concerning the reasons for or drivers of the DTC operating losses and all documents tracking, estimating, or demonstrating the impact of different business results or variables on DTC operating losses.

REQUEST FOR PRODUCTION NO. 41:

All documents and communications concerning the $1.5 billion impairment and removal of content from Disney+ announced in May 2023 and June 2023, including, but not limited to:

(a)    All documents and communications concerning all information considered when deciding to remove content from Disney+, including for each program listed in Appendix A to the Complaint; and

(b)    All documents and communications concerning the purpose(s) and effect(s) of the $1.5 billion impairment and content removal.

REQUEST FOR PRODUCTION NO. 42:

All documents and communications concerning any media, insider trading, code of conduct, or corporate disclosure policies or procedures, including all

- 26 -

4928-3271-3030.v1

documents and communications concerning actual or potential violations of any of these policies or procedures.

REQUEST FOR PRODUCTION NO. 43:

Calendars, date books, telephone logs, telephone bills (local, long distance, and cellular), timesheets, expense reports, visitor logs, and/or appointment books reflecting Disney-related activities, maintained by each of the Executive Officers and each current or former Disney employee identified in Disney's forthcoming disclosures made pursuant to Federal Rule of Civil Procedure 26(a)(1).

REQUEST FOR PRODUCTION NO. 44:

Documents sufficient to identify all personal and business phone numbers, email addresses, secretaries, and/or personal assistants for the Executive Officers and each current or former Disney employee identified in Disney's forthcoming disclosures made pursuant to Federal Rule of Civil Procedure 26(a)(1).

REQUEST FOR PRODUCTION NO. 45:

All documents and communications concerning each Executive Officer's employment agreement(s) with Disney.

REQUEST FOR PRODUCTION NO. 46:

Directories, organizational charts, or other documents sufficient to identify Disney's organizational structure, officers, and employees.

REQUEST FOR PRODUCTION NO. 47:

All documents identified in your forthcoming Federal Rule of Civil Procedure 26(a)(1) disclosures.

REQUEST FOR PRODUCTION NO. 48:

All documents and communications concerning all insurance policies, indemnification agreements, hold harmless agreements, and/or by-laws that may provide coverage for you for all or part of any potential liability arising from the claims alleged in the Complaint.

- 27 -

4928-3271-3030.v1

REQUEST FOR PRODUCTION NO. 49:

All documents and communications concerning Disney's document retention policies and the preservation, search for, collection, maintenance, destruction, or alteration of documents or ESI.

REQUEST FOR PRODUCTION NO. 50:

All documents and communications concerning any of the affirmative and other defenses set forth in the Answer.

REQUEST FOR PRODUCTION NO. 51:

All documents and communications reflecting any internal complaints, concerns, or objections raised by Disney employees or contractors regarding Disney+ subscriber metrics, subscriber growth sustainability, the accuracy of Disney+ financial reporting, or the allocation of costs to Disney+.  This request includes, but is not limited to, any reports of such concerns made to Disney's management, Disney's Board of Directors, internal audit, compliance hotlines, or regulators.

REQUEST FOR PRODUCTION NO. 52:

All communications (including emails, text messages, or memos) sent or received by any of the Executive Officers that express concern, disagreement, or skepticism regarding: (a) Disney+ subscriber growth rates or projections; (b) the ability of Disney+ to meet its 2024 subscriber or profitability targets; or (c) the practice of debuting content on other platforms to shift costs away from Disney+.

REQUEST FOR PRODUCTION NO. 53:

All documents sufficient to show the metrics and data displayed by Disney's internal dashboards or analytics systems used to monitor Disney+ performance during the Class Period.  This includes, without limitation, reports, data exports, slide decks, or screenshots from any business intelligence tools or platforms (*e.g.*, Tableau reports, Workday dashboards, or similar internal databases) that tracked: (a) Disney+ subscriber counts (total and by region, including Disney+ Hotstar); (b) subscriber

- 28 -

growth or churn rates; (c) average revenue per user; (d) content costs or expenses allocated to Disney+; and/or (e) Disney+ segment profitability or forecasts.

REQUEST FOR PRODUCTION NO. 54:

For the Executive Officers and each person who, during the Class Period, served as a Disney officer or director with responsibilities relating to Disney+, all documents and communications about Disney+'s subscribers, financial performance, or strategic decisions that are stored on or were transmitted via any personal device, personal email account, or non-Disney messaging application. This includes relevant communications made via text message/SMS, iMessage, Signal, WhatsApp, Telegram, personal Gmail or other email, or similar platforms, to the extent such communications exist.

REQUEST FOR PRODUCTION NO. 55:

All documents and communications, from January 1, 2020 to May 10, 2023, concerning strategies, plans, or internal discussions regarding public communications or messaging to investors, analysts, or the media relating to Disney+ subscriber numbers, Disney+ subscriber growth, Disney+ subscriber targets, the Disney+ content slate or content spending, Disney+ international expansion, or Disney+ financial performance (including profitability and operating losses), including, but not limited to, internal talking points, Q&A preparation documents not specifically tied to earnings calls, media engagement strategies, crisis communication plans (if any related to these topics), and internal deliberations or guidance on how to frame or present such information.

REQUEST FOR PRODUCTION NO. 56:

All documents and communications reflecting any Executive Officer's awareness of, or response to, internal concerns, criticisms, or warnings raised by any Disney employee, executive, or consultant regarding: (a) the achievability or sustainability of the 2024 Disney+ Subscriber Target or the 2024 Disney+ Profitability Target; (b) the accuracy or methodology of Disney+ subscriber counting, including

- 29 -

4928-3271-3030.v1

the treatment of Entitled Subscribers; (c) the actual or projected rates of Disney+ subscriber churn; (d) the financial viability or profitability of Disney+ international market expansions; (e) the effectiveness or return on investment of Disney+ content spending in driving quality subscriber growth; or (f) the operational or financial impacts of the DMED Reorganization.

REQUEST FOR PRODUCTION NO. 57:

All documents and communications that analyze, model, calculate, quantify, or report the specific dollar impact on: (a) Disney+ segment content costs; (b) Disney+ segment operating income or loss; and (c) DTC segment operating income or loss, resulting from the elimination of Intersegment Transfer Pricing for content sales to Disney+ following the DMED Reorganization, for each fiscal quarter from the first quarter of 2021 through the fourth quarter of 2021.  This request includes any analyses comparing these reported figures to what they would have been under the prior accounting methodology using Intersegment Transfer Pricing.

REQUEST FOR PRODUCTION NO. 58:

All documents and communications, from February 25, 2020 to December 31, 2021, that were provided to, created by, sent by, or reflect the participation of Iger in his capacity as Executive Chairman of Disney, concerning: (a) Disney+ subscriber targets, projections, or actual performance; (b) the financial viability or profitability of the Disney+ subscriber growth strategy; (c) the DMED Reorganization and its operational or financial impacts; (d) Disney+ content spending levels or strategy; (e) Disney+ subscriber churn rates or analyses; or (f) the profitability of Disney+ international market operations.  This request includes, but is not limited to, reports, memoranda, presentations, emails, and notes of meetings.

- 30 -

4928-3271-3030.v1

DATED:  June 4, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN
RYAN A. LLORENS
JESSICA T. SHINNEFIELD
JEFFREY J. STEIN
NICOLE Q. GILLILAND
JESSICA E. ROBERTSON

DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
ryanl@rgrdlaw.com
jshinnefield@rgrdlaw.com
jstein@rgrdlaw.com
ngilliland@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 31 -

4928-3271-3030.v1

## DECLARATION OF SERVICE BY EMAIL

I, Kirsten McCormack, not a party to the within action, hereby declare that on June 4, 2025, I served the attached Plaintiffs' First Set of Requests for Production of Documents to All Defendants on the parties in the within action by email addressed as follows:

**COUNSEL FOR PLAINTIFFS**:

| NAME | FIRM | EMAIL |
| --- | --- | --- |
| Daniel S. Drosman | Robbins Geller Rudman & Dowd LLP | dand@rgrdlaw.com |
| Ryan A. Llorens | 655 West Broadway, Suite 1900 | ryanl@rgrdlaw.com |
| Jessica T. Shinnefield | San Diego, CA 92101 | jshinnefield@rgrdlaw.com |
| Jeffrey J. Stein | Telephone: 619/231-1058 | jstein@rgrdlaw.com |
| Nicole Q. Gilliland | 619/231-7423 (fax) | ngilliland@rgrdlaw.com |
| Jessica E. Robertson | | jrobertson@rgrdlaw.com |

**COUNSEL FOR DEFENDANTS**:

| NAME | FIRM | EMAIL |
| --- | --- | --- |
| Jonathan D. Polkes | White & Case LLP | jonathan.polkes@whitecase.com |
| Stacy Nettleton | 1221 Avenue of the Americas | stacy.nettleton@whitecase.com |
| Susan L. Grace | New York, NY 10020 | susan.grace@whitecase.com |
| Adam B. Banks | Telephone: 212/819-8338 | adam.banks@whitecase.com |
| | 212/354-8113 (fax) | |
| John W. Spiegel | Munger, Tolles & Olson LLP | john.spiegel@mto.com |
| John M. Gildersleeve | 350 South Grand Avenue, 50th Floor | john.gildersleeve@mto.com |
| Lauren C. Barnett | Los Angeles, CA 90071 | lauren.barnett@mto.com |
| | Telephone: 213/683-9100 | |
| | 213/687-3702 (fax) | |

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 4, 2025, at San Diego, California.

KIRSTEN McCORMACK

4928-3271-3030.v1