UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, | ) ) | CASE NO: 2:23-cv-03661-CBM-ASx |
| | ) | CIVIL |
| Plaintiff, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Tuesday, January 6, 2026 |
| THE WALT DISNEY COMPANY, ET AL, | ) ) | (9:58 a.m. to 11:47 a.m.) |
| | ) | |
| Defendants. | ) | |

HEARING RE:

JOINT STIPULATION TO MOTION TO COMPEL CUSTODIANS
AND SEARCH TERMS [DKT.NOS.188,189]

BEFORE THE HONORABLE ALKA SAGAR,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:              SEE PAGE 2

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Alma Felix

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

**APPEARANCES:**

| | |
|---|---|
| For Plaintiff: | DANIEL S. DROSMAN, ESQ. |
| | DARRYL J. ALVARADO, ESQ. |
| | JESSICA T. SHINNEFIELD, ESQ. |
| | Robbins Geller Rudman & Dowd |
| | 655 West Broadway |
| | Suite 1900 |
| | San Diego, CA 92101 |
| | 619-231-1058 |
| | |
| For Defendants: | STACY NETTLETON, ESQ. |
| | WYATT R. SMITH, ESQ. |
| | White & Case |
| | 1221 Avenue of the Americas |
| | New York, NY 10020 |
| | 212-819-8301 |

3

**Los Angeles, California; Tuesday, January 6, 2026; 9:58 a.m.**

**--oOo--**

THE CLERK:  Calling Case No. cv-23-3661-CBM-ASX, Local 272 Labor Management Pension Fund versus the Walt Disney Company, et al.  Beginning with plaintiff's counsel, please state your appearance for the record.

MR. DROSMAN:  Good morning, Your Honor, Daniel Drosman on behalf of plaintiffs from Robbins Geller Rudman and Dowd, here with my colleagues, Darryl Alvarado and Jessica Shinnefield.

THE COURT:  Good morning.

MS. NETTLETON:  Good morning, Your Honor, it's Stacy Nettleton from White & Case on behalf of the defendants.  With me is Wyatt Smith also of White & Case.  Just to note, we'll be filing a notice of appearance for Mr. Smith after this hearing.

THE COURT:  All right.  Good morning, you may be seated.

Okay.  This is the hearing on the plaintiff's motion to compel custodians and search terms.  The parties joint stipulation was filed on December 1st at Dockets 188 and 189. And the following day on December 2nd at Docket 192 the Court granted the request for under seal filing.  And on December 3rd at Docket 194 defendants filed a notice of errata and corrected Exhibits 2 and 3 at Dockets 195 and 196.  And then on December 23rd at Dockets 198 and 199 the parties filed their respective

4

supplemental memorandums in support of and in opposition to the motion.

Was anything else filed in addition to what I've just stated?  Okay.  All right.  So what I'd like to do is start with -- it seems like there was some negotiation after the motion was filed and the parties seem to have narrowed some of the disputes and I don't know if there's been further agreement since that time.  But what I would like to do is start with the dispute regarding the custodians and then we can move on to the search terms.

So the first issue was that defendant's -- plaintiff complained that the defendants were not -- were excluding the individual defendants as custodians and I understand that defendants have now agreed to run the individual defendants as custodians for the search terms; is that right?

**MS. NETTLETON:**  That's correct.

**THE COURT:**  So that's not the -- that's no longer at issue.  And the second category was plaintiffs wanted managers and senior employees, they've -- in key departments.  They've identified seven custodians that they wanted to include. Defendants claim that they have designated custodians that are in the same sort of departments, but perform the same functions as these seven custodians.  And in addition, they've also -- defendants have also agreed to produce management audit files and complaint files and they argue that adding these additional

5

seven custodians would impose a considerable burden that would outweigh any marginal relevance that these custodians, you know, would reveal.

And I think that argument is well taken.  And I know that the discovery cut off isn't until what, is it August of this year?

MR. DROSMAN:  Yes, Your Honor, it's August.

THE COURT:  It also -- defendants also argue that the communications that you have identified in your motion to support your argument that you need these seven custodians, these sort of managers, the senior employees, that on many of these communications other custodians that defendants have designated already on those, and so that sort of reinforces their position regarding the -- it would be largely duplicative.

I think that argument is well taken and I propose to deny without prejudice your request to add those, I don't know, I don't want to call them lower level person, managers, but they appear to be managers in senior level and employees that are sort of at a lower level than the executives that really are at the heart of the allegations in the complaint.

Do you want to be heard further on that argument?

MR. DROSMAN:  I do, Your Honor.

THE COURT:  Yeah, go ahead.

MR. DROSMAN:  Would you prefer that I take the podium

6

or --

THE COURT:  As long as you speak into the microphone, fine.

MR. DROSMAN:  Okay.  Great.

So I think that there's -- the two points that you addressed the defendants made are flawed and I'll explain why. First, we can only look at the documents that have been produced to date.  And the fact that some of these custodians happen to be on other communications I think underscores rather than undermines the importance of these custodians.  They're right at the heart of this fraud for the reasons that we explained in our motion.

And I would also note that to the extent there's duplication, Your Honor, that's going to be eliminated through global de-duplication.  Defendants will never look at those documents.  They'll never bear the burden of reviewing them.

So -- and, you know, let me just highlight a couple of specific instances where I think it's really important that we get some of these custodians.  Like, you know, we've got the VP of data science and analytics and I'll probably slaughter his name, but I think it's Chodnowitz (phonetic).  And defendants designated Laura Evans (phonetic).  She was the VP of data science for about a month at the beginning of the class period.  So as you said, that role is relevant, right.

She left that role and then Mr. Chodnowitz took it

over and he was in that role for about two years during the class period.  We don't have anybody from data science and analytics during that period if Mr. Chodnowitz is not added.

So we know the role is relevant.  Defendants have conceded that, we just don't have an individual who served in that role during the appropriate period.

THE COURT:  What is the period for the class?

MR. DROSMAN:  It is December 2019 to November or no, I'm sorry, May 2022.

THE COURT:  Okay.

MR. DROSMAN:  And he -- Mr. Chodnowitz left that role I believe at the beginning of 2022, so somebody took it over for him for like that sub period, that five month sub period, we don't know who that person is.  Defendants haven't disclosed that, somebody else took it over, I just couldn't tell you who that person is.  But that's an example of somebody who's really important and who we just don't have at all.

There's another person that I wanted to mention and he's the head of content and analysis.  And his name is Nick Lewerke, L-E-W-E-R-K-E, he's a VP in that function.  And we don't have -- he ran the window'ing strategy.

So he ran saturation of content scenarios.  His work included strategic analysis related to window'ing and moving content around, which as you know is one of the artifices of our scheme to defraud.  So it's right at the heart of our

8

complaint and we don't have anybody, nobody from that role at all.  So if we don't get Nick Lewerke, we just won't have any insight into that particular role.

You know so --

THE COURT:  What is it about Mr. Lewerke's duties that relate specifically to the allegations?

MR. DROSMAN:  Sure.  So he was in charge of window'ing.  So what we allege, Your Honor, is that defendants would move content, movies, shows, et cetera from -- immediately from either Pay Per View or their TV service or the movies right onto Disney Plus so they could increase subscribers artificially.

What we say is that that actually was unprofitable in the long run, because they sacrificed the Pay Per View profit by moving it straight on to Disney Plus.  Mr. Lewerke was in charge of all of the window'ing that took place, window'ing meaning moving, you know, content from one platform to another. So that is one of the artifices that we allege that they used to prop up their subscriber numbers in the short term at the expense of long term profitability.

THE COURT:  All right.

MR. DROSMAN:  And so, you know, when a whole function like Mr. Lewerke's content and analysis is missing, obviously duplication is not an issue.  There's nobody duplicated in that role.

9

You know, there's a few others that I just wanted to mention as well.  You know, we've got, you know, this guy Edward -- Eduardo Bizera (phonetic) and he's the director of subscriber and engagement finance.  And, you know, he was the in house advisor to Disney streaming services, the executive leadership.  So this goes straight to the executives.

He was charged with ensuring, and this is a quote, ensuring that Disney streaming services met its subscriber and profitability goals.  You can't have anybody more relevant than that.  And this is his description of his role.

Quote, ensuring the Disney streaming services met its subscriber and profitability goals.  His name is Eduardo Bizera.  And again, defendants object that he's lower level, but you know, I'd mention two things, Your Honor.

First, we have to prove both scienter, in other words, the intent to defraud on behalf of the individual defendants, but we also have to prove falsity.  And, you know, I've been doing unfortunately more than 25 years and in my experience, the documents that go to the heart of falsity are not found with these upper level executives.  They're found in the files of the lower level people who are doing the actual, you know, ground level work.

And so I think these people are really important for falsity.  There's also, Your Honor, the issue of proving liability as to not just the individual defendants but we've

named Disney the corporation as a defendant.

Now clearly some of these people, VP level people their knowledge is going to be imputable to the corporation itself.  So we're not just looking at the three individual defendants.  We're looking at more than that.  We're looking at imputing knowledge and falsity to Disney itself, so.

**THE COURT:**  What about what the defendant's argument that these people, in particular, Mr. Bizera, for example, whatever he does, he is reporting what he's doing up the chain.  So up the chain you're getting those communications.  So you definitely will capture whatever it is he's being directed to do, whatever it is he's done in his reporting.

You know, I don't know if at this point you really need someone like Bizera, I mean, I understand your argument on Lewerke and the other person whose name I also --

**MR. DROSMAN:**  Chodnowitz?

**THE COURT:**  Chodnowitz, yeah.  But with respect to the others, I -- what do you say to that argument?

**MR. DROSMAN:**  Sure.  So I wish it were true that whatever he generated just went up automatically up the chain of command.  What actually happens is there's some different version that ultimately filters its way up because these lower level people do the analysis and they obtain the data and then they know what the executives would like to see and it's not always what they've generated.

11

And often what you find is communications with these lower level people, they'll say well Bob Chapek really doesn't want to see churn numbers increasing.  So even though these churn numbers are up, we're going to give him some watered down version.

You see that all the time.  I mean, that's very common.  It's not just -- it's not an autonomous process where information is automatically filtered up and I'd say that that concern is even, you know, aggravated in this case, because as you know from our complaint, Bob Chapek would disparage individuals by calling them Eeyore or mean girls, et cetera or when they sort of went against the narrative.  When their story didn't conform.

So I do think that the communications that these lower level people are having, the actual data that they're generating, it doesn't always filter up and that's the problem.  If it did, Your Honor, I'd be perfectly satisfied to say well we don't need these people.  I just know from experience that that's not the case.

THE COURT:  All right.  Let me hear from defendant's counsel.  Can you just address this issue with some of the internal communications by these lower level managers and I don't mean lower level, I mean lower than the highest level and then particularly with this individual Chodnowitz, the fact that he alone was head of data science for a big chunk of the

12

class period.

MS. NETTLETON:  Your Honor, just to level set just on the bigger picture because we have 38 custodians.  And it does include lower level members --

THE COURT:  Right, I know.

MS. NETTLETON:  -- of the strategy and --

THE COURT:  I know, but I just mean with respect --

MS. NETTLETON:  -- finance --

THE COURT:  -- to these --

MS. NETTLETON:  I know you --

THE COURT:  -- specific.

MS. NETTLETON:  I'm just saying like we're dealing with a case where a lot of these people seem to have been selected based on a title that was listed on their LinkedIn page.  And there are other people from the same group, maybe with a different title that were also involved in data analytics.

And do want to just note from the defendant's perspective, you know, Disney obviously knows the groups, the people, what they were responsible for and there's deference that should paid to that, versus research that I guess has been done on a LinkedIn page for people's different titles.  So I'm just saying that we have a robust set of custodians, which includes --

THE COURT:  Right.  I've read the joint stip.

**MS. NETTLETON:**  I know.

**THE COURT:**  I understand your argument.  I just want you --

**MS. NETTLETON:**  So with --

**THE COURT:**  -- to address, because I heard this for the first time --

**MS. NETTLETON:**  Yes.

**THE COURT:**  -- that this Chodnowitz sort of took over as head of data science and nobody else was in that role for a big chunk of the period.  And so why shouldn't he be added as a custodian?

**MS. NETTLETON:**  Yeah.  So with respect to Mr. Chodnowitz, he did -- he reported to Laura Evans who was our custodian who left.  Nobody specifically replaced that role.  David Chodnowitz continued in his data sciences role, but he reported to Michael Paul and Rebecca Campbell in connection with his work and both of those two individuals are custodians.

And what we've also discussed with plaintiff with respect to their request to add these iterative individuals, to the extent we are talking about the analyses and the work that is being done, we are collecting from two caches of shared files that all of the individuals that worked on the strategy and finance group put their analyses into.  And that includes the key metrics of the Disney Plus subscriber growth and

14

profitability targets that are at issue in this case, assumptions, costs, the financial planning, they're getting that material.

THE COURT:  Right.

MS. NETTLETON:  So then it comes --

THE COURT:  But I think what they really are looking for are the communications where they're just speaking amongst themselves about what it is they're doing or not doing or how they're sort of massaging the work, which would not work its way into a final report.

MS. NETTLETON:  Right.  Well, if you take the example that counsel gave with respect to pressure to change the numbers or meet a particular target, presumably this is in the communications that are being made about the targets and forecasts and analyses that are being done.  And we have again a ton of people from that group that are designated custodians.

So just identifying another couple of people who are within the mix of the group that could have, again this is almost like a quintessential we're looking for a needle in a haystack, what if one analyst on the team sent one e-mail that, you know, may have mentioned like, you know, I don't like this analysis, I'm going to change it this way, that's -- you know, we can't operate like that because then it will just be an unending burden to fish for documents and potential relevant evidence.  We've obviously done a robust search because we have

15

1 million documents that we're currently reviewing to produce to plaintiffs.

THE COURT:  All right.  What about the document plaintiff's counsel made about Nick Lewerke?

MS. NETTLETON:  Yeah, so again I think it seems that we're getting information from sporadic pieces of perhaps LinkedIn data, but Mr. Lewerke his -- first of all, the content selection is somewhat of a tangential aspect of this -- of their allegations.  Certainly they say that content was being selected to be premiered on different channels in order to boost the Disney Plus subscriber numbers, but you're going to see that on the data that they're getting, as far as where was content being selected to be -- to broadcast.

Nike Lewerke's position was actually very, as I understand it, title focus, so the e-mail that they cite, for example, it's him talking about whether or not the Wonder Years should be released on one platform as another.  And he was primarily focused on the Hulu Disney platform which is different than the Disney Plus platform that is the subject of plaintiff's allegations.

So you're talking about a low level person who is just talking about should we consider whether or not Wonder Years should be broadcast on Hulu.  And in my view, again, adding just another custodian to the 38 that we have just in case he happens to mention something about where a content is

going to be shown it's going to be reflected in other documents.

THE COURT: Okay. I am going to then grant in part the request to add these seven custodians. I'll deny it as to five and grant it as to Chodnowitz and Lewerke.

Then the next group is plaintiffs want to add three directors on Disney's compensation committee and plaintiffs have agreed to add Susan Arnold and documents from Boardvantage and they argue that in light of that concession, it is not necessary to add these three board members because their communications will be duplicative of current custodial and other board members.

Is -- do I have that right, is that your claim?

MS. NETTLETON: Yes, Your Honor.

THE COURT: With respect to those three?

MS. NETTLETON: Certainly based on the reasoning that they've given to us as to why they need outside directors, which obviously will be burdensome to collect and produce from.

THE COURT: Right. And I think that argument is well taken and I'm inclined to deny the request to add Barra, Lagomasino, and Parker because of the arguments that defendant makes and their agreement that their communications will be duplicative of whatever they'll get from Susan Arnold, the Board share. Do you want to be heard further on that?

MR. DROSMAN: I do, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. DROSMAN:  So what I would propose, Your Honor, is -- well, let me back up.  Susan Arnold was not on the compensation committee.  And Chapek's compensation is a big part of this case, in fact, his motive, one of his major motives was to obtain a contract renewal and that's what we allege led to his -- one of the things that led to his scienter.

So -- and there was all sorts of -- if you remember from the complaint, all sorts of machinations about whether to renew his contract and whether the renewal was unanimous and all sorts of Board debate relating to that, a big part of our complaint centers on that.

So what I would ask Your Honor is that we get one, one member of the compensation committee, one of these three to run because I do think you're going to find documents in the compensation committee's possession that you're not going to find in a non-committee member.

And I'd also note that these people don't have day to day responsibilities, you know, they show up once every quarter to meet and so you're not talking about a vast quantity of documents.  You're talking about a really small subset and I think it's very reasonable to at least have one person from the comp committee.

THE COURT:  Okay.  All right.  Let me hear.

18

MS. NETTLETON: Your Honor, I think --

THE COURT: First of all, what was Susan Arnold's position?

MS. NETTLETON: She was chair of the board.

THE COURT: So she was not on the compensation committee.

MS. NETTLETON: No, Your Honor. And I think going back to the points that plaintiffs just raised, to the extent that they believe these individuals are relevant because they had roles on the comp committee, one, Chapek's contract renewal, his ultimate separate from the company, those are Board level conversations and decisions.

So why do you need a compensation committee member specifically with respect to that, when you have Ms. Arnold and you have all of the other Board materials, which includes the Boardvantage communications which go to the Board, as well as communications from the corporate secretary, Jolene McGree (phonetic), who is one of our custodians.

Why would we separately need comp committee members and I think counsel mentioned that his compensation was also something that may have incentivized him in connection with the allegations in this case. Well, they're getting the compensation committee minutes' material, his employment file, his employment agreement, e-mails from him concerning his employment.

So adding -- again, it's an outside director.  I know the volume may not seem to be a lot when you're talking about an outside director, but the efforts of collecting from these individuals who have day jobs at other places, where they may have had communications relating to Disney, I mean that would be extremely burdensome on top of -- for the reasons that they've given that they need a particular compensation committee member.

**THE COURT:**  Okay.  All right.  I'm persuaded by the defendant's argument.  I'm going to deny the request to add the directors on the compensation committee as custodians.

All right.  Then the next group is co-chairs of Disney Entertainment.  Plaintiffs argue that these individuals, Alan Bergman and Dana Walden oversaw streaming, the streaming business and were critical of Chapek's leadership.  Defendants claim that notwithstanding that they might have been critical of Chapek, they weren't involved in any of the -- sort of in the substantive allegations regarding subscriber profitability, projections and investor communications.

I think that argument makes sense.  What are your thoughts, do you want to be heard on that?  I'm inclined to deny that request.

**MR. DROSMAN:**  So I think there's maybe a misunderstanding that there are -- you know, defendants made the point that these aren't foundational issues.  Well, they

20

don't have to be foundational to be relevant, right.  I mean, we alleged this stuff in our complaint and this is a quote relating to who these people Alan Bergman and Dana Walden are.  They oversee -- quote, oversee Disney's streaming business and manage all content decisions for those services, including Disney Plus.

I mean that is -- it's facially relevant.  There's no way around that.  You know, I'd also say that, you know, that the fact that they were vocally critical of Chapek's leadership and central figures in his removal as the CEO is a huge part of our case.  I mean, that is -- and the fact that defendants concede that they're vocally critical of him, you know, I frankly don't see how these people are not likely to possess relevant documents, such that we search their information.

THE COURT:  Well, I don't think the fact that they're really conceding it, because they're vocally critical, that their communications are directly relevant, because I'm sure there were a lot of people at Disney that were vocally critical of the leadership, but that doesn't mean that, you know, their communications, because of the role that they played, that that factors into or is probative of the allegations.

I mean, the fact that there was like, you know, unrest at Disney regarding what was going on with the leadership doesn't mean -- doesn't play into, you know, the allegation that they were deliberately, you know, turning

content from one platform to another, to make it appear as if the numbers were greater than they were. That's really what you want. You want those level of communications, people that were actually doing that and, you know, so that you can show that they were doing that at the behest of the -- you know, the leadership --

MR. DROSMAN: Well --

THE COURT: -- or for the purpose of being able to, you know, communicate to investors that this was going to be a profitable, you know, investment.

I don't know that -- so I -- so just to your point, I don't think that just the fact that employees are amongst themselves critical of what's happening in leadership, I don't think that their communications are necessarily relevant. I think it depends on who those people are, what their roles are, and specifically, you know, what they were doing and why and who at whose behest.

MR. DROSMAN: And I agree with Your Honor, I think it does depend who these people are and what their roles are. If we were asking for the head of parks or the head of Disney Cruises and we were saying well these people are vocally critical, I would agree that, you know, that may be tangential and probably not relevant.

This is different, though, because these people were at the very epicenter of this fraud. They oversaw Disney's

streaming businesses and they managed all content decisions for those services including Disney Plus.

So when they're vocally critical of Chapek, these are people who have just this nexus to the fraud that cannot be denied and then they're critical of Chapek's leadership with respect to that. So that's why these people are particularly important.

**THE COURT:** Right. But, you know, defendants argue that these people were really involved in, you know, figuring out content, they were more sort on the creative side and I think that doesn't really play into, you know, the allegations.

What you're trying to get at is whether they were, you know, moving content from one platform to another for the purpose of making it appear that this was generating, you know, profitability. I don't know that these people and the roles that they were in, you know, were involved in those decisions.

I think that, you know, if they were doing it and it was at the direction of someone above them, those people are the ones whose, you know, communications are going to be more pertinent to it.

**MR. DROSMAN:** You're right, that window'ing is important, the moving of one content to another, but our -- another artifice that we allege is that these people at Disney was producing content and very expensive content, in an effort to get short term subscriber growth over long term

profitability.

So it's actually the production of new content, which you may remember Iger cut dramatically when he took over as CEO, just took a huge write off and took all that content off and said, we're going to start over, we're going to strip this to the bones.

So it's not just the window-ing, and these people weren't just creatives. I saw that argument. I didn't understand it, because the way in which they're described is overseeing Disney's streaming businesses. It's not making creative decisions. These people are not there, you know, directing movies and talking about what might be funded. You know, these people are business people. They're deciding what to make and where to put it and, you know, that goes to the heart of our fraud.

THE COURT: Right. But their decisions on what to make and how to make it and where to stream it, are those decisions being made for the purpose of making it appear that, you know, there are more subscribers out there than there really are. Like I think that's where I kind of -- I'm struggling to find that causal connection.

MR. DROSMAN: Uh-huh. Well, look, these are our allegations. We have to explore that. We can't know in advance. They haven't searched these people.

So here's what's going to happen, we're going to go

24

to trial and they're going to bring, you know, these people on and they're going to put them on the stand and they're going to say, did you make any decisions based on, you know, the desire to conflate subscriber growth. Absolutely not, we didn't do that. That was not part -- we haven't been given an opportunity.

So this is what happens when we're denied these important custodians is we don't have visibility into that. Now, we've also -- remember, we're not just sort of searching these people's files wholesale, we're running targeted search terms, which we'll get to in a moment.

THE COURT: Right.

MR. DROSMAN: But we're only getting documents that are presumably responsive, right. So if they don't have responsive documents, we're not going to get them and there's not going to be a burden but they're just not going to get a lot of hits. We don't know how many hits these people would get.

THE COURT: Okay. All right. Thank you. Do you want to respond to that?

MS. NETTLETON: Yes, Your Honor. I just wanted to correct that I appreciated all the points you made, obviously those were the points that we had raised. But I wanted to correct the record because I think there was several things that have been misstated.

Ms. Walden and Mr. Bergman did not oversee the streaming business or make decisions as to content distribution during the class period.  They both, after Mr. Chapek left, both Mr. Bergman and Ms. Walden became co-chairs of the overall Disney media business.  So that is at the end of the class period and not during the class period, that's why.

So what we said, which I guess has been questioned is that during the relevant period, their roles were on the creative side.  Mr. Bergman was the chairman of Disney Studios and Ms. Walden was the chairman of general entertainment content.

And one of the allegations that's in the complaint is that they created this DMED organization that was run by defendant Kareem Daniel and overseen obviously by the CEO Mr. Chapek.  And that took away the decision-making from the creative side of the content creation of the business and related to costs and they were making all the decisions about where to distribute and it was in part to boost the subscriber numbers in Disney Plus.

So their own allegations is that the content creative people were pushed out of the decision-making related to Disney Plus, because they wanted to boost these subscribers.  So I would just say that I don't think any of the points that plaintiffs just made, counsel just made, actually supports the argument that these two individuals needs to be added.

And as Your Honor noted, it just appears that they're looking for the chatter and the gossip of like potentially critical comments and e-mail from these two individuals, which certainly I don't think justifies an onerous search of their materials for this case.

THE COURT:  All right.

MR. DROSMAN:  Your Honor, if I could just be heard really quickly.  So they became co-chairs of Disney Entertainment in February of 2023.  And our class period ends in May.  So we're talking about --

THE COURT:  '22?

MR. DROSMAN:  20 -- I'm sorry, I misspoke earlier. It's May 2023.

THE COURT:  Okay.

MR. DROSMAN:  So this is overlap between the --

THE COURT:  And the class period goes to May 2023?

MR. DROSMAN:  Correct, Your Honor.  And so what I would ask is for that period, when they were co-chairs of Disney Media Entertainment, it's a very short period, we run those particular custodians.

THE COURT:  What would that period be?

MR. DROSMAN:  It would be February of 2023 to the end of the class period, which I think is May 10th, 2023.

THE COURT:  Okay.

MS. NETTLETON:  Your Honor, I mean I don't see how

that's remotely relevant.  So they're -- at that point, Mr. Chapek had resigned at the end of 2022.  Mr. Iger had taken over.  The only reason their class period ends in May is because then that was when there was an impairment charge that was taken in connection with certain content costs.

So that little stub period, that's post the fraud that they're alleging, which is that we were -- Disney was misleading investors about Disney Plus subscriber growth and profitability.

So the fact that Mr. Chapek resigned, Mr. Iger took over, changed the business strategy, impairment charge taken, for that three month period I don't see how Ms. Waldman (sic) or Mr. Bergman's materials are remotely relevant to the fraud they've alleged.

THE COURT:  All right.

MS. NETTLETON:  That's our case.

THE COURT:  All right.  I'm going to deny the request to add Bergman and Walden as custodians.

The next group is executives involved in Disney's leadership crisis and plaintiff seek to Horacio Gutierrez and Paul Richardson, limited to a short time frame of September 2022 to the end of November 2022.

Do defendants argue that these individuals really have no involvement in the issues relating to plaintiff's allegations, but I think plaintiffs make a valid point that,

28

you know, their role in dealing with the leadership crisis during this critical time period is relevant to the allegations that plaintiffs have in this case.  And I am inclined to grant that request.  Do you want to be heard on that, Ms. Nettleton?

**MS. NETTLETON:**  Yes, Your Honor.  So this would be another circumstance and I'll take each of them in turn because they're different situated, where we already have again coming back all of these custodians.  And the custodians that were directly involved, it appears that the argument that plaintiff has made with respect to Mr. Richardson the head of HR and Mr. Gutierrez, the chief legal officer is that they were involved at the end of the class period with the ultimate resignation for Mr. Chapek.

And, you know, we already have -- we have the chairman of the board, we have Chapek, we have Iger, we have all the board materials, the corporate secretary who was in these meetings, materials related to that time period when Mr. Chapek ultimately stepped down.  And Mr. Iger was asked to come back in.

So these two individuals, to the extent they were in the room, you know, when it happened, they're not adding anything.  And in particular, Mr. Gutierrez, he's the chief legal officer.  So there are going to be privilege issues related to collecting and reviewing his documents that obviously will be burdensome and doesn't outweigh -- isn't

29

outweighed by what their articulated need, when they have all of these other custodians that are -- who were in the meetings and in the conversations relating to the decision-making.

And Mr. Richardson in particular, I think they -- he's the chief of human resources. But as Your Honor knows in a company like Disney, he's not making decision-making with respect to Mr. Chapek's employment. He's not -- that's a board decision. And, you know, I guess they speculate that he was a confidante of Mr. Chapek, well they're getting Mr. Chapek and again all of the board materials related to that. So he's not a decision-maker.

And to the extent he may have been involved in a conversation, again I don't think -- apologies. Again, I don't think it outweighs the burden of adding them unnecessarily as to additional custodians on duplicative issues.

**THE COURT:** Right. So to the extent that, you know, the documents that pop up for these two custodians are duplicative of the records, it'll come up for the other custodians he's designated, I don't know how that's really unduly burdensome. Because you just -- those -- I'm assuming that the software is designed to not even have those records pop up, they'll just be deleted -- they won't be included in what's found during the search because they will be duplicates, right?

But I do think that, you know, notwithstanding the

fact that, you know, they didn't make the ultimate decision and it was really a board decision, communications that they were involved in may be relevant. And I think the time frame is really narrowed to a very small period of time. So I don't -- I think in this situation, I don't think any burden on the defendants would be, you know, would outweigh the potential relevance.

So I'm going to grant that request to add those two as custodians.

**MS. NETTLETON:** Your Honor, if I could just on that one point, appreciating the point that you made with respect to the duplication, but there is this concern with respect to Mr. Gutierrez's role as a legal advisor, if we were going to consider adding a custodian for that particular, you know, it's the same purpose, it's that period of time of his resignation, if I could ask that we would then limit it to Mr. Richardson, so that we could avoid the burden of having to deal with a privilege review and logging all of those documents. I think that would be a compromise just from a burden perspective.

**THE COURT:** Well, but I don't have anything before me that sort of gives me the ability to weigh what that burden would be, you know, I don't know what the universe of records is, so I don't know exactly you're looking at.

What I will do is I will grant the request, but then have the parties meet and confer on how best to minimize the

burden with respect to reviewing Mr. Gutierrez's communications, so that you don't have to log, you know, like a vast number of privileged documents. And maybe you can work on that through targeted searches.

All right. Then the last category is the plaintiffs are requesting that Mr. Chapek and Mr. Iger's chief of staff, their communications be included and defendants argue that the marginal relevance is really outweighed by the burden and the duplication of collecting information from these individuals, whose relevant communications will be captured by the senior executives that they report to.

What are your comments on that? I mean, I think that makes sense. I don't see where you'd really -- you know, if you're going to argue that well these individuals may have been critical of, you know, who they were reporting to, I don't think that really advances your argument.

They don't appear to be in decision-making roles and it would appear that whatever communications they had with respect to information, conveying information to their respective bosses, that's going to get captured in the communications that -- because Chapek and Iger are going to be -- their records are going to be searched.

So what would be -- what are you hoping to get by adding the chief of staff as custodians?

**MR. DROSMAN:** So in my view, the two chiefs of staff,

32

I think it's Nancy Lee and Clearly (phonetic) are the most important custodians that we're asking for and I'll explain why.

Defendants in their brief, you may recall, in their joint submission said, well we've given plaintiffs all of these senior level people, you don't need the custodians that plaintiffs are after.  And I'd refer the Court, and this is very important, to page 58 and defendants have a heading that are called senior leadership and it's in their -- page 58 of their -- of the joint stipulation regarding plaintiff's motion to compel custodians and terms.

And there they -- this is just their justification for not running our custodians, remember that.  So they say senior leadership, and if you look at the very end they say, Arthur Bochner, Chapek's chief of staff.  They say these custodians -- and this is a quote from the defendants, these custodians may potentially possess communications relevant to, among other allegations, plaintiff's allegations regarding publicly announced subscriber targets, a DMED reorganization, subscriber growth strategy, public disclosures, and Chapek's renewal as a CEO.

Okay.  That's how they describe the chief of staff position.  So it is absolutely mind boggling to me that they now come back and say, well Iger's chief of staff and Chapek's chief of staff are just mere administrative assistants.  I

33

mean, they're anything but administrative -- they're not administrative assistants. And the sole case that they quote deals with an admin assistant.

These people are chiefs of staff. And as you'll recall, Your Honor, it was Chapek's chief of staff who went to a meeting, an important meeting on Chapek's behalf. That's the sort of thing they do.

So she's taking notes, she's, you know, sending communications to others who are not necessarily Chapek. I think that there's this misnomer that because she's Chapek's chief of staff, all her communications are going to be solely with Chapek. That's not the way it works. She's going to communicate with many other people.

You've got Iger's chief of staff --

THE COURT: Yeah, but who is she going to communicate with that is not already a custodian, right? I mean, if she's going to communicate to -- she's going to communicate to senior management --

MR. DROSMAN: Correct.

THE COURT: -- about whatever it is, you know, that transpired in these meetings that she went to. Even if she doesn't communicate to Chapek, she'll be communicating to others, those communications will be captured by those others.

MR. DROSMAN: I don't think that's true, Your Honor, because defendants don't represent that they have all the

senior staff.  They have a smattering of senior level people, right.  This is a huge company, it's Disney.  That's not, you know, they basically run the individual defendants and then their senior leadership consists of what looks like six or seven people.

So these are not all the senior staff at Disney. She's communicating -- this is a high level person who is acting as his alter ego.  Chapek's alter ego.  And then, of course, you've got Nancy Lee acting as Iger's alter ego taking notes at meetings, I don't know whether those notes got communicated to Iger, but to the extent that they didn't, we won't get them.

So, you know, these people are extremely important. The defendants concede that in their own submission when they talk about Arthur Bochner.  I don't know how we get around that.  They say he's senior leadership.  This is a chief of staff.

**THE COURT:**  Okay.  Ms. Nettleton, how is it that you concede that Chapek's former chief of staff is a relevant custodian but current or the one that plaintiffs want Clearly is not?

**MS. NETTLETON:**  Yes, Your Honor.  So I guess going back to the company knows its employees and their roles and what they did in selecting the relevant and we did so in good faith.

EXCEPTIONAL REPORTING SERVICES, INC

35

So Arthur Bochner, who was identified as Chapek's chief of staff, his other role was Vice-President of Strategic Communications, I know we didn't list that title, when we listed him as part of the senior management, but it was because he had an actual other substantive role that we felt he had potential responsive relevant material to plaintiff's requests. And that is why we included him again in good faith as a custodian, not to just open the door to anybody's assistant to be added as a relevant custodian.

THE COURT:  Well, I mean, I don't consider a chief of staff role as an administrative assistant.  I think that's two different --

MS. NETTLETON:  I agree.  But in terms of having a substantive role in the issues that we are in discovery for, he had a different title, which is why we included him on the list.  I also just want to clarify obviously there were certain things that we said that the senior leadership, this is just a list of people with different things.  We weren't making a representation that Arthur Bochner was responsible for all of those areas.  There was -- there's --

THE COURT:  Right.

MS. NETTLETON:  -- several people mentioned there, I just wanted to clarify that for the record.

So for purposes of Nancy and Clearly, you know, again our view is given the number of custodians that we have that

36

were involved in the actual substantive issues, in fact, they identify Ms. Lee as the notetaker at the meeting, because she circulated all of the notes to the people who were in the meeting who were all custodians.

So again, just adding, because there might be some piece of paper that didn't make it to one of our existing custodians or Mr. Chapek or Mr. Iger, seems again like an unnecessary burden for a minimal potential relevance.

On top of that, you know, this is a securities fraud case. So what really matters is what the people who are making the decisions and are making the disclosures know or have access to.

So again, just for the sake of potentially finding some piece of information that didn't make its way to Mr. Chapek or Mr. Iger, it doesn't to me justify the burden of having to collect two additional people and search all their documents just for that potential irrelevant piece of information.

THE COURT: All right. I want to think about this one a little bit more, so I will take that under submission, the chief of staff.

Okay. Now, we get to the search terms and there were all these appendices that were sort of sent back and forth. It's not clear to me really what's -- whether all of these are at issue, or whether it's just the broad categories.

One of the issues appears to be the use of the term Disney and Disney Plus or DTC and the term churn. And defendant -- plaintiffs argue that that is too restrictive and they want defendants to run the term churn as a standalone term and defendants resisting that because they're saying that would just create large swaths of non-responsive material.

So what I'm wondering is whether -- I mean, arguably it is relevant to run the term Disney, Disney Plus or DTC and churn, but with respect to plaintiff's request that defendants also use the term churn as a standalone term, is it possible to agree that you would run that term churn as a standalone for just certain custodians who would be more likely to use the term in the manner that plaintiffs allege it has been used in furtherance of their allegations?

I understand your point that, you know, that's a term that can be, you know, used in many, many different ways and if you just run it as a standalone term you're going to get a lot of hits that have nothing to do with this case and that would be burdensome. But what if we just restricted it to those people that are more likely to have used it to convey what plaintiff claim was conveyed? Do you want to be heard on that?

**MR. DROSMAN:** I do because I think that there's an important point. This particular search for churn yields 2,000 hits, 2,000 that's it.

**THE COURT:** You mean like as a standalone?

**MR. DROSMAN:**  As a standalone.

**THE COURT:**  So defendants did run it because I wasn't clear whether I think at one point you argued they refused to run any of your terms.

**MR. DROSMAN:**  Yes, so they ran it because in our December 8th proposal we said, run this and you know what, we're going to do exactly what Your Honor suggested, we're going to limit it to just the Disney Plus custodians.  And so we limited it to Disney Plus custodians only and we had the standalone term run and it came back with 2,000 hits, which is de minimis.

So -- and we limited it to the custodial files for the individual defendants.  So, I mean, this is as limited as you can get.

**THE COURT:**  And so let me hear from you.  Was that --

**MS. NETTLETON:**  Your Honor, yes, and I think just to level set on how we got to this point, just for this proposal and I agree, you know, when you look at it in just that one isolation of that churn search on those individuals, it has the 2,000 unique hits, and again that was their last ditch proposal that came in after they filed their motion that we responded to.

So in isolation that doesn't add a lot.  Cumulatively what they are still asking for, again in this last proposal that they put in right before we had our final submissions in

39

this matter, it still results in a million more documents on top of what we have -- the million we're already reviewing.

THE COURT: For this term churn?

MS. NETTLETON: No, but it's the cumulative effect of all of their searches. And the reason why we've had a issue I think with a lot of the searches is because they fall under this umbrella is plaintiff's search -- the proposed searches always seem to ignore that Disney is a very large company and doesn't just run a Disney Plus business, which is the core business that's at issue. And a lot of our custodians, their responsibilities are broader than Disney Plus.

So when you take out Disney Plus from -- and this is just an issue that permeates a lot of their searches, which includes this churn search, when you take out that modifier, the results are just exponential and it's this cumulative -- they've never offered to take some of these proposed searches off the table and if we could agree on some of these smaller searches that are more isolated that doesn't result in a million documents, you know, we would be willing to reach that compromise.

But the fact of just taking Disney Plus and having an investor relations search for earnings and presentation it's just blows the review population in a way that it's unprecedented. I've never seen -- I've been doing this for 25 years too and I've never seen anything of this magnitude that's

being requested to double our review population and three months before the substantial completion deadline.

We've been trying to resolve this since August and we just keep getting these millions and millions and millions of -- and we keep pages -- documents, I'm sorry, additional proposals and every time we say this is what's overbroad, like it's not limited to Disney Plus.  It doesn't -- it's not targeted, it's just the word DMED which was a whole business division, it never narrows.

So I agree.  In their most recent proposal, which again we got lobbed on us like at the last minute, they did narrow some of these searches, but the cumulative effect is still a million documents.

So what we've agreed to do and it's -- I think it's -- I'll find the exact citation, we have proposed that we would make certain of their modifications in their most recent proposals, which results in 60,000 additional documents. That's on top of 150,000 modifications that we made in response to prior proposals that they made.  So that's an added 2,000 documents that we've agreed to over the last four months.

We've agreed to do an additional potential 60,000 based on their modifications.  I think we described that it's Exhibit C to our supplemental disclosure at page 198-3.

THE COURT:  All right.  So --

MS. NETTLETON:  And that's -- yeah, we agreed to add

Disney Plus as a synonym. We accepted plaintiff's revision to 43 of defendant searches, which I won't list. And we've agreed to run defendant searches over the additional custodians that plaintiffs requested who are among the defendant 38 custodians. So that's something that we put on the table for them when we got the most recent proposal.

THE COURT: Okay. Do you have anything to add to this argument about the churn being used as a standalone search?

MS. NETTLETON: No. So in response to that particular search, the 2,000 on the three custodians I think we could agree to run that particular search. But again I think it's the global issue is that that --

THE COURT: Right.

MS. NETTLETON: -- permeation amongst all the searches that excludes Disney Plus just has this snowball effect of potential irrelevant hits.

THE COURT: Okay. The next issue is the plaintiff's claim that you've arbitrarily excluded SUB and SUBS, but I think defendants have agreed to add those as synonymous in lieu of subscriber or sub-scre (phonetic). Is there any other -- is there any dispute as to that request?

MS. NETTLETON: I don't believe so. We agreed to that?

MR. DROSMAN: Not that I'm aware.

42

THE COURT:  Okay.

MR. DROSMAN:  Your Honor, is there any way that I could -- I -- when I was preparing for this argument I definitely felt sympathetic to Your Honor, because I'm like this would be very difficult for somebody who's not immersed in the facts of this case to wade through.  There are a lot of searches, there are a lot of justifications and arguments back and forth.  I have a proposal that I just wanted to give you that may cut through a lot of this.

THE COURT:  Okay.

MR. DROSMAN:  So here's my proposal.  Defendants have already said and we told them we appreciated their willingness to accept 43 of our edits to the 51 search terms that they have, okay.  So that issue is resolved.  In fact, 43 of 51.  So that leaves eight edits that they say they won't run and then our search terms.

And here are my proposals.  I'd like to talk about the eight edits that they won't run, because I think they're justified.  With respect to our search terms, we've got several that are under 5,000 unique hits.  So my proposal would be for those searches, and I can list them for Your Honor, those are de minimis.  They should be run by defendants because they're a de minimis, there's no real burden, no genuine legitimate burden argument with respect to those particular terms.

And then we've got just a few of our searches that I

43

went through and I sort of said, if we have to accept less than all, what are the most important ones.  And so I went through and I sort of looked at the five most important, one of which was churn, which you have discussed.  I'd like to talk about the four others, if Your Honor's okay with that and then maybe we can cut through this, and maybe that's a proposal that works for everybody.  And we're not talking about massive numbers then, we're talking about four additional point of searches, we're talking about searches under 5,000 unique hits, and we're talking about edits to eight of plaintiff's -- in eight of defendant searches that they refuse to run.  They said they've run 43 of 51, that leaves a delta of eight that they say they won't run.  Does that make sense to Your Honor?

THE COURT:  The 51 are their searches?

MR. DROSMAN:  Correct.  They have 51 searches.  I think we have 37 -- 36, I apologize.  So we have 36 searches, they have 51.  We went through their searches and edited them and said, look, you've got to put in synonyms, expand the connectors, they said for 43, we'll run them.  That leaves a delta of eight that they said we can talk about those eight, that at least reduces the population significantly.

THE COURT:  So these are the eight they're willing to run but not according to the modifications that you want.

MR. DROSMAN:  Exactly.

THE COURT:  Got it.  Okay.  So let's deal with those

44

first.

MR. DROSMAN: So, yeah, let's just talk about those eight and what we have is we have search term number one, and that is -- that's their search term number one. That's -- and 2024.

So you'll remember that we have projections in this case, it's really the way that the class period begins, it's the heart of our case, which is they issued projections of 230 to 260 new subscribers by 2024. Okay.

That was the sole projection at issue in this case. The projection never changed until it did at the end of the class period and they dropped the projection entirely. But during the class period it never changed, it was always 230 to 260, it was always 2024.

They want to include a modifier and 2024, every time they talk about these projections. And the reason that that is unworkable is because, like I said, it was the only projection and employees would not retype the word 2024 every time they discussed projections.

Requiring 2024 is like requiring California in every e-mail about Los Angeles. It's not -- it's just not the way people write, our 2024 projections. It's the only projection. It would be completely superfluous to add that term.

And so also, you know, you've got projections for each quarter. And those aren't the 2024 projections. Those

**EXCEPTIONAL REPORTING SERVICES, INC**

are the Q-4 projections that we're going to announce to investors, which they did every quarter and you'll recall they said every quarter, hey, we're on track with our projections. Even in their announcement, they don't say 2024, their public announcement, okay.

They say we're on track to meet our targets. We're on track to meet our projections. That's what the defendant states. This happened every quarter and as you recall, that -- those words on track are one of the artifices, I think we have nine. It's one of the nine artifices.

The way in which they perpetuated this scheme is by reassuring investors every single quarter that they were going to meet the projections.

THE COURT: Right. So the dispute is that they want to add 2024 to the search term and you're saying that that makes it too restrictive and you want the search to be conducted without the 2024?

MR. DROSMAN: Correct, that's exactly right, Your Honor.

THE COURT: So do we know how many additional documents are generated when 2024 is not included, do we know that?

MS. NETTLETON: Your Honor, if I could address because -- so this particular modification that they made generates an additional 323,000, a little bit over that,

documents.  And the reason why is because they took out 2024, but there's no Disney Plus modifier.  So any -- this goes back to that recurrent issue that we keep having with their proposed searches.

So any time there's a document that just happens to mention subscriber and projection or target would be picked up by this revised search that they propose.  And what they ignore is the fact that we -- the only reason that particular search that fits 51 of our searches had the 2024 modifier is because their entire complaint claims that the 2024 projections were false and misleading.

So, yes, there were projections, but that's picked up by numerous other searches that we have.  So we have a search that generates nearly 400,000 documents, number 3, which is Disney Plus with subscriber and growth and metrics, goal, hit, we have another search for Disney Plus and direct to consumer that generates 200,000 documents.  Our search number 2, Disney Plus or direct to consumer and projection and projecting or target or forecast or goal or hit or number or guidance or objective.

So we have searches that are picking up hundreds of thousands of documents --

**THE COURT:**  Without the 2024?

**MS. NETTLETON:**  Without the 2024.  That was just one search we created because they had an allegation that was

specific to the 2024.  Then they strip out Disney Plus, they strip out 2024 and suddenly there's additional 300,000 documents that's just subscriber and target, which could generate a ton of false hits.  So they're just layering on to our 1 million, over 1 million documents that we're already reviewing.

You know, we didn't play games, because we were on an expedited schedule heading into this case, that we now have a little bit more time, but we're almost at the end.  We're actually almost complete with our review of the million documents.  We would have to restart discovery again for these requests that are not seeking targeted relevant material to fill a gap.  It's just layering hundreds of thousands of irrelevant documents on us to review.

THE COURT:  Okay.

MR. DROSMAN:  So I think counsel may have misspoke. Because if you look at our edits, it's in Appendix B, it's the first search in Appendix B to our December 8th letter, we say row number 1, here's the proposed search, Disney Plus subscriber in quotes or DPLUS or Disney Plus are all search terms in that particular search, okay.

So Disney -- it is circumscribed by Disney Plus.  We did not take out Disney Plus.  The only thing, and you can see the little redline, the only thing we removed is and 2024. Which is unduly restrictive for the reasons I just explained.

When defendants spoke out publicly they didn't use the 2024 modifier.

THE COURT: Right, but what about the argument that there are so many other searches that don't have 2024 that, you know, have these same terms and you'll capture what you need with those other searches?

MR. DROSMAN: They don't, Your Honor. If you look at our particular search terms, projection or projected or projecting or target, or forecast or goal or hit or number or guidance or objective, you're not going to find those. Okay.

These are -- this is the primary search for that particular issue, for the projections that defendants gave throughout the class period that is one part, one important component part of our scheme.

I mean I -- you know, there's 50 -- defendants have 51 searches. There is no search that goes to projections like this.

MS. NETTLETON: Your Honor, if I could -- I guess I don't know if we're confused by your edits, but there's an or, so it's subs or, all those other words. Like I didn't speak incorrectly, this is the search that they've proposed and that's why it's generating a ton of potentially irrelevant materials and it doesn't address -- we have all these other searches that are the same -- it's the same search that he's describing Disney Plus, plus subscribers, plus targets, growth,

49

that's our search number 2.  So I guess I'm not --

THE COURT:  Uh-huh.

MS. NETTLETON:  -- seeing what his --

MR. DROSMAN:  Your Honor, I'm referring to our redline of their search terms, which is attached.  It's -- the Docket No. is -- it was filed as Exhibit 3 to our supplemental brief.  And it's page 35 of 40 on that 12/23/25 filing.  And this is where we took their searches and we modified them in redline form.

And I'm looking at search number one.  And I see search number one shows Disney Plus subscriber, Disney Plus, and then it has projection and it eliminates -- the only thing we eliminated was and 2024.  That's it.

MS. NETTLETON:  Sorry.  It says, Disney Plus subscriber or DPLUS or Disney Plus or sub or subs or subscriber and then it says and projections.  So one of the searches that is being run is sub and projection with no Disney Plus.  That's what they've modified.

MR. DROSMAN:  Your Honor, we didn't modify that.  That was --

THE COURT:  So why --

MR. DROSMAN:  -- part of their search.

THE COURT:  So why not just add Disney Plus to that?

MR. DROSMAN:  It is, Disney Plus is there.  They had sub or subscriber and projection.  We didn't modify that.  We

50

didn't touch it.  If you look at our --

THE COURT:  You just want that search run without the -- and 2024?

MR. DROSMAN:  Exactly.

THE COURT:  Yeah, I think their argument is well taken that you are going to get that -- you're going to get a lot of, you know, extraneous non-relevant documents if you don't have the and 2024.  And to the extent you want searches that don't have and 2024 in them, there are other searches that'll capture what you want.

So I'm going to deny the request or -- to require them to use that edit.  Which -- what search term is that, what number was that?

MS. NETTLETON:  It was plaintiff's proposed modification to defendant's search number 1.

THE COURT:  Okay.

MR. DROSMAN:  Your Honor, can I just be heard on this for one moment, because I think that may be a mistake in premise.  There is no search that encompasses this.  I'm looking at search number 2 right now.  And it's sub or subs or subscriber within five of trajectory or on track or off track or behind or gap or variance or trend.  There's no words like guidance or projection in there.  We're not going to get those documents if we don't run that search.  There's no forecast, there's no projection, there's no guidance.  That is the

51

guidance search.

MS. NETTLETON: I'm sorry, forecast is part of the search.

THE COURT: All right. Let's move on to the next one. What's the next proposed --

MR. DROSMAN: The next one, Your Honor, is -- it's search terms numbers 20 and 21. And it's the over-restricted international markets term that yield zero unique hits. So the way defendants have it right now, they insist on overly formal phrasing for international expansion and let me just back up for one moment to give Your Honor some context.

One of the artifices was defendants expanded in international markets, we're not talking about, you know, France or Germany, we're talking about far flung locations in Asia and Africa, expanded in these markets in order to artificially prop up their subscriber numbers, while realizing that those markets were unprofitable and, in fact, they were and they led to long term problems, right. But this was a short term bump in their subscribers. So that's the international markets, the context behind that.

They insist on this overly form of phrasing for the international expansion searches, such as requiring international within 25 words of market and requiring a subscriber limiter.

The hit data shows the result, Your Honor.

Defendant's proposed version generates zero, zero unique hits, underscoring that the search is overly restrictive. And if the term yields zero unique hits, burden cannot plausibly be the rationale for refusing reasonable fixes suggested by plaintiffs to those searches.

THE COURT: And what's the fix that you propose?

MR. DROSMAN: Sure.

THE COURT: Just to take out and marks, markets?

MR. DROSMAN: So like I said, these are 20 and 21. And what we've done there is we've added and instead of -- we've taken out and market, and suber-subs for subscriber from 20. And we've taken out and sub or sub or subscriber from 21 essentially, that's what we've done.

So we just tried to open it up a little bit so we get some documents that are responsive to our fraud.

THE COURT: Well, I don't understand why those terms would not -- why they have to be taken out?

MR. DROSMAN: Because they yield zero unique hits with those terms in there.

THE COURT: And we don't know how many hits you'll get without those terms?

MS. NETTLETON: Your Honor --

THE COURT: This is like defendant's search, you haven't -- you've done it with those terms, you get zero hits, if you do it without those terms, you don't know how many hits

you're going to get.

MS. NETTLETON:  So just to clarify, zero hits just means unique hits.  That doesn't mean that those terms aren't hitting on documents, it just means our searches so broad that we have other searches that are likely capturing these documents that also mention these terms.  It doesn't mean that there's no relevant documents that we identified, it just means that maybe also hitting on another search, from a hit report.

Plaintiff's proposed modifications would result in an additional 50,000 documents.  And the reason why is because based on what they've done, we would be running a search that has, you know, direct to consumer and profit, direct -- and market, direct to consumer, and country.

So the way they have modified this is not targeted to get specific communications about launching in international markets, further to their allegations that that generated low quality subscribers to boost subscriber numbers.  So that was why our search was targeted to subscribers because that is the crux of their allegations with respect to launching in the international markets.

MR. DROSMAN:  So I would just say these are their two international market expansion searches.  So to the extent that there may be documents that overlap, this is not -- I mean, this is it.  So I don't know if there are extraneous documents that overlap it.  There's no way to know.  I mean, frankly

54

we're looking at two searches that cover one of the artifices to our scheme, we only have nine of them.  And it's getting zero unique hits.

THE COURT:  All right.  What's the next one?

MR. DROSMAN:  So the next one, Your Honor, is the content distribution windowing, it's search term number 9. Defendant's proposed string there requires the literal word content, even though employees talk about movies and series without using that word.

And so these artificial limiters are designed to miss documents.  People don't talk about, hey, should we shift content to one -- should we shift, you know, movies, should we shift series.  All we're asking for is some synonyms.  If you look at what we've done we've taken out and content and, you know, you've got and linear or cable or network or window or feeder or pay per view window.

It's just -- it's a common sense edit to that particular one, because people just don't talk about content that way.

THE COURT:  But it's or content, right?

MR. DROSMAN:  We want or content.  They had and content.

THE COURT:  Okay.

MS. NETTLETON:  So, Your Honor, their modification to this would add 50,000 documents and I'll explain why.  One, the

55

reason we had and content is because that is how Disney employees internally refer to what's being put on air and what service, content is a very frequently invoked word.

Their allegations are with respect to where content was being decided to be released. When you take that out and make it an or, now you have a search which is literally Disney Plus, release, cable. And I mean, there's probably a gazillion documents where somebody is just mentioning, okay, we've got Disney Plus and cable.

So not -- removing some of these terms just for the sake of I guess adding documents is not identifying responsive materials. Their allegations concern decision-making as to where to distribute and release content whether it be Disney Plus, Linear, cable or a theatre. And that's what this search was constructed to do.

THE COURT: Okay.

MS. NETTLETON: Oh, and also that particular search, the way we constructed it hit on 400,000 documents.

THE COURT: All right. What's the next one?

MR. DROSMAN: You know, Your Honor, I'm not sure whether it makes sense to march through the remainder. Those were the three priority searches that I identified.

THE COURT: Okay.

MR. DROSMAN: So I think we could live without the edits to the remainder if we had those, and that was why I

identified them to make things -- sort of streamline the process today.

THE COURT: All right. Let's now talk about the five, I guess, it's four terms now, that could be dealt with, churn, right?

MR. DROSMAN: Yes.

THE COURT: The four search terms that you wanted.

MR. DROSMAN: Sure. So in addition to the under 5,000 the de minimis, which is important, we would ask for -- it's row 2 and row 5 of Appendix A to our December 8th letter. And it's on track and off track. And let me just discuss this.

Defendant's protocol UMBIX (phonetic), on track or off track and close synonyms. And the relevance there is self-evident. Plaintiffs allege defendants publicly assured the market that Disney Plus was on track, okay, while internal reality diverged and the defendants maintained the scheme, as I talked about by reassuring the public quarter after quarter after quarter that their projections were on track and their subscriber targets were on track.

A protocol that doesn't search on track is likely to miss the exact internal e-mails that would refute those assurances, okay. Plaintiff's targeted trajectory returns 14,825 unique documents and not captured by defendant's protocol.

And a Disney Plus constrained version of that same

57

search, Your Honor, returns 5,631 unique documents, okay.  And defendant's protocol searches for projections, but it completely ignores the qualitative descriptors, right, executives use to discuss the projections.

If Bob Chapek e-mails Kareem Daniel, one of the individual defendants and says we're off track for Q-4, defendant's search will miss it unless they happen to use the word projection in the same sentence.  And that's why their search is designed to fail, this is so important.  This is one of our top four.

THE COURT:  Is this your Appendix B?

MR. DROSMAN:  It's our Appendix A.  The Appendix B was our redlines to their searches.

THE COURT:  Okay.

MR. DROSMAN:  And our Appendix A is our own searches.  And so this would be row 2 and row 5 of Appendix A.

THE COURT:  And where is this because I'm looking at -- you say it's attached to your December 8th letter?

MR. DROSMAN:  Yes, to our December 8th letter, it's Exhibit 3 which is December 8th letter.  And then Appendix A is the third page in, you'll see it begins on the third page.

And if it's easier, I can hand Your Honor up a copy of that.

THE COURT:  Okay.  I have plaintiff's -- it's actually attached to your December 16th letter.

MR. DROSMAN:  Did I misspeak?

THE COURT:  Okay.  It's --

MR. DROSMAN:  You're right.  It's the December -- I'm sorry, no wonder you're --

THE COURT:  -- December 22nd letter, right?

MR. DROSMAN:  Yes, I'm really sorry.

THE COURT:  Okay.  I'm on the right page.  So it's row 2 and --

MR. DROSMAN:  It's row 2 and row 5 and that's the off track, on track.  There's nothing like that that defendants have.

THE COURT:  Okay.

MS. NETTLETON:  So, Your Honor, the row 2 --

THE COURT:  Uh-huh.

MS. NETTLETON:  -- suffers from that similar problem that I keep describing that it's not tied to Disney Plus.  It's just subscriber and trajectory and off track.  Row 5 has the Disney Plus modifier, you know, so the returns are less.

I will just say and this is because there are so many searches and they're proposing so many additional searches, we already have searches that are hitting on over 600,000 documents that cover everything having to do with this are you hitting targets, are you meeting your goals.

For example our search number 3 is Disney Plus, subscriber, growth, metric, goal, hit, number.  Our search

59

number 4 is Disney Plus, subscriber, quality, leak, hold, bucket, which are things that plaintiff proposed.  Our search number 5 is Disney Plus and long range plan and all of their planning.

So -- and I could go on and on, there's a bunch of different searches that I'll touch upon this, your targets, your goals, your metrics, your long range plan.  So again now we're just quibbling with, okay, but we want the word on track.  So --

THE COURT:  So what's wrong with the --

MS. NETTLETON:  5 --

THE COURT:  -- number 5?

MS. NETTLETON:  -- I guess I would put in the category that we could throw that in, but again I'm just trying to avoid this cumulative effect where they want to add a word here or there to every search just for the sake of adding a word.

THE COURT:  Okay.  I see the argument with respect to both sides.  What's the next one that you -- you said there were four?

MR. DROSMAN:  Yes, Your Honor.  So the next one is cost shifting and plaintiffs -- so this is row 16 of Appendix A.  And plaintiff's targeted cost shifting search returns and that returns 17,301 unique documents.  And this language maps directly onto the alleged mechanics of shifting costs across

platforms.

We have another artifice where they shifted cost, not just content, but cost across the platforms and distribution windows in order to appear profitable and conceal the scheme. And the deficiency here, Your Honor, is defendant's protocol looks for the word allocation, but it refuses to look for the verbs of fraud, like shift, move, reclass.

So if a finance VP e-mails, let's move these marketing costs to ESPN, which is what we allege they did, defendant's search misses it.  If they say, can we shift this spend, defendant's search misses it.  We're asking for the active verbs that describe the alleged misconduct.  17,000 documents are sitting in the dark because of defendant's refusal to run this action word shift.

**THE COURT:**  How do you know that they're missing 17,000 documents if they haven't run the search?

**MR. DROSMAN:**  Because they have run the search and they've told us it yields 17,301.

**THE COURT:**  Got it.  All right.  Let me hear from you, Ms. Nettleton.  The form does include and Disney, so it will capture, you know, it'll capture I think relevant information.  What's the problem with that?

**MS. NETTLETON:**  Well, it's overbroad even with the Disney Plus modifier.  You have, based on the construction, and he only mentioned a couple of the terms listed here, you

literally would get any document where it mentions -- because it's and, Disney Plus and expense.  Disney Plus and budget.  You know, there's -- and within, and maybe you have these words of like move or cost or allocation.

Any time that somebody is talking about we're making budget allocations related to Disney Plus has been picked up by this search.  And again, we have searches that relate to costs that aren't as broad as this, so that you're not getting a whole host of irrelevant material like obviously when you're running a business, people talk about their budget and talk about their expenses.

So just running a search to search for any mention of any kind of allocation relating to budget is overbroad.

MR. DROSMAN:  Your Honor, if I could just say one thing on this.  I would argue that any time somebody talks about budget allocation for Disney Plus, that is going to be relevant to our case.  That is the heart of our case.  I mean, we -- this is not an overbroad search.  We're seeking those documents.  And by the way, we're only running the search term on people they said are the most senior level managers.

THE COURT:  Right, okay.  What's the next one?

MR. DROSMAN:  Okay.  The last one, Your Honor, is at the tone at the top and management style, it's row 37 of Appendix A.  And there we allege that Chapek and Daniel created a toxic culture to suppress dissent using specific epithets to

62

marginalize critics.  And plaintiffs targeted tone at the top, search terms returns 30,627 unique documents.

Plaintiffs are not seeking innuendo.  We're seeking evidence relevant to scienter, an internal environment around decision-making, especially where the complaint itself ties leadership style to strategy decisions and internal warnings where the complaint alleges these exact words were used.

Mean girls, Eeyore, et cetera.  Chapek's use of these specific terms was reported by reputable news sources like the New York Times, Wall Street Journal and CNBC.  These are not speculative terms selected by plaintiffs.  And the deficiency here, Your Honor, is defendants argue that these terms are generic.

Eeyore and Mean Girl are not generic corporate terms. They're specific insults Chapek allegedly used to silence CFO Christine McCarthy.  Dictator.  It's how witnesses themselves, confidential witnesses describe the DMED structure, a search return in 30,000 hits suggest this quote, toxic culture was heavily discussed in e-mails.  And defendants want to limit it to formal HR complaints.  But the evidence of scienter doesn't reside in those formal complaints, it resides in informal peer-to-peer communications that use this specific nomenclature.

THE COURT:  Right.  Okay.  Let me hear from --

MS. NETTLETON:  Your Honor, just to correct a few things.  One, I do question whether or not people just being

EXCEPTIONAL REPORTING SERVICES, INC

63

critical, saying Mean Girls, Eeyore or whatever some of these terms are is relevant to their alleged fraud --

THE COURT: Uh-huh.

MS. NETTLETON: -- because that happens a lot in the workplace and what we are also already searching if as I think some of their arguments in the briefing allege, that people felt pressured to change their Disney Plus subscriber numbers. We have a thousand hits of searches that are constructed to get anything having to do with the subscriber numbers. So -- and we've agreed to produce documents responsive to their tone at the top type request.

So that's one. Two, when we say generic terms, we're talking about their proposal is Daniel within 20 aggressive, Daniel within 20 disregard, Daniel within 20 ignore, Daniel within 20 quit. It's not even specific to Kareem Daniel who's the individual defendant. This could be any Daniel that they mention. It's random words.

Like any time you said like oh, I had an aggressive workout this weekend, this is a completely overbroad search. And I know counsel just pooh-pooh'd what we've done, but as I've said, we will produce documents relating to this tone at the top type allegation. If it comes up in all of the million documents that we're reviewing, that all are concerning Disney Plus and its business and that type of terminology.

We've also agreed to --

64

THE COURT:  Yeah, you're -- with respect to this, your argument is that you're going to be turning over reports and records that are in a database.

MS. NETTLETON:  Well, we're reviewing a million documents.

THE COURT:  Right.

MS. NETTLETON:  So if there's a document that hit upon one of our other searches that Disney Plus and subscriber then targets and it's talking about I hate Daniel, he's forcing me to do stuff that I don't agree with and he's an Eeyore or whatever the terminology is --

THE COURT:  Right.

MS. NETTLETON:  -- and it's discussing Disney Plus and subscribers, they will get that document.

THE COURT:  If it's there.

MS. NETTLETON:  If it's there.

THE COURT:  Right.

MS. NETTLETON:  And also we're searching the files for complaints and we have other searches that are more directed to -- that are also directed to this tone at the top type allegations, including our searches No. 30, which has 20,000 documents relating to the individual defendants and their separation, their compensation, their salary, their performance.

So in any event, the point being is that we have

65

plenty of searches that are likely or could capture this type of information.

THE COURT:  Okay.  All right.  I'm inclined to grant plaintiff's request for post search terms in rows 5, 16 and 37, deny the request for row 2.  You've already come to an agreement on the use of the term churn with respect to certain custodians.  And then plaintiffs say that there are search terms that are de minimis and yield less than 5,000 hits should also be run by the defendants.  I don't know what the volume of that is.  Do you know what we're talking about?

MR. DROSMAN:  I mean, some are tiny, some are hundreds, so it's not like 5,000 times 16.  I don't have the exact number, but there are plenty that are in the hundreds, less than a thousand.

THE COURT:  Okay.

MR. DROSMAN:  It's going to be fewer for sure than, you know, 60,000 hits.

THE COURT:  Okay.  All right.  Do you want to be heard on that?

MS. NETTLETON:  Yes, Your Honor, I mean I --

THE COURT:  On the de minimis ones.

MS. NETTLETON:  Right.  I guess this goes back to the refrain I keep making.  Their total search protocol is resulting in a million documents.

THE COURT:  Yeah, but that doesn't take into account

66

what is going to be taken out as duplicative, right?

MS. NETTLETON:  Well, so I guess the fig is that if -- there's two points there.  One is they proposed, what did it end up being, 37 searches or so?  And then modifications to 40 some odd of ours, or I guess I'm sorry, we're only talking about their universe.  So 37 searches.

I don't know how many of them result in 5,000 or less documents, but obviously that adds up quickly and this is the first we're hearing of the proposal so we'd have to look at it. So we could do that tally because I question whether or not all of those searches are, in fact, targeting responsive information.

THE COURT:  Okay.  So why don't we put a cap on those.  What would be a reasonable cap?  I don't know what it all adds up to, but I think that's a valid point.

MR. DROSMAN:  Yeah, that's --

THE COURT:  We don't want 16,000 times -- 16 times 5,000 but.

MR. DROSMAN:  Sure.  Why don't -- Your Honor, why don't we put a 100,000 document cap on it and what we can do is we'll go through and we'll select the searches that will not yield more than about 100,000 documents.

THE COURT:  Well, no, no, no.

MR. DROSMAN:  I mean --

THE COURT:  With respect to --

MR. DROSMAN: I mean, we'll search the de minimis. The de minimis.

THE COURT: -- your -- yeah, with respect to your de minimis searches which are defined as those searches --

MR. DROSMAN: Correct.

THE COURT: -- which will yield 5,000 or less documents, you will -- I think having 100,000 is a lot. Let's cap it at 60,000.

MR. DROSMAN: Okay. And we'll go through and make sure that the de minimis searches that we select --

THE COURT: Right.

MR. DROSMAN: -- do not exceed that number. And it may be the case that all the de minimis searches do not exceed that number.

THE COURT: Could be.

MR. DROSMAN: But we'll make sure.

THE COURT: And then you'll get, in addition to that, row 5, row 16 and row 37.

MR. DROSMAN: And then I just wanted to ask Your Honor what about row 4, which is our 230 to 216 numeric number which is pretty important for us. It's the actual numerical targets at the heart of the scheme.

MS. NETTLETON: If Your Honor -- before we get to this new added on, going back to the de minimis searches that are now tallying up to a ton of documents, again we preagreed

to an additional 60,000 documents.  Now based on your Court's order and the searches that they identified, that's another 40,000 documents.  So now that's an additional 100,000 documents to our review.

THE COURT:  Right.

MS. NETTLETON:  Now they're saying, and then give us the rest of the stuff under 5,000 documents, without even saying this is a core to us, that we really need this, because there's a deficiency.  And now it's quickly adding up to, you know, potentially whatever we were, two 50,000 additional documents, which frankly based on this offer of just throw in all the searches and our 37 searches under 5,000 documents sounds pretty arbitrary and like they're just trying to make us review more documents for the sake of reviewing more documents.

THE COURT:  No, but we're capping it at 60, and I guess the argument is that, you know, they are really -- they are de minimis.  They're not all 5,000, some are in the hundreds.

MS. NETTLETON:  But it's 60,000 documents on top of nearly 100 and some odd thousand documents that we're already agreeing to do.

THE COURT:  Well, on -- just with respect to their search terms --

MS. NETTLETON:  Or 105.

THE COURT:  -- on top of the 5,600 in row 5 and what

69

was 30 -- row 16.

MR. DROSMAN:  It's 17,000 in row 16.

THE COURT:  Right.  And then row 37 was what, 30,000?

MR. DROSMAN:  30,000, correct.

MS. NETTLETON:  Was 30.  So 6 -- you know, that's like a hundred and some odd thousand.

THE COURT:  Right.  And then there will be fewer than that because of the duplication.  So I don't --

MS. NETTLETON:  No, this is de-duplicated.

THE COURT:  Oh, these are -- after they've been de-duplicated?

MS. NETTLETON:  And actually when we limit, when we isolate these searches they may capture more documents because of being de-duplicated against all of the searches.  So once we eliminate some of the other searches that are captured in large documents, these document searches may actually result in more documents.

MR. DROSMAN:  Your Honor, let me just make the point that we started with -- this is the fourth round of reductions from plaintiffs.  We've been negotiating this ourselves essentially.  We came out with a large number of searches, we reduced it again --

THE COURT:  Right, I know the history.  I've read the papers.

MR. DROSMAN:  I mean, the point is we've gotten down

EXCEPTIONAL REPORTING SERVICES, INC

70

to so few now --

THE COURT: Yeah.

MR. DROSMAN: -- and we're talking about 16 de minimis searches --

THE COURT: Right.

MR. DROSMAN: -- we're going to cap that.

MS. NETTLETON: Your Honor, just -- I know you know the history, but I feel the need to clarify. They're talking about reducing proposals they made that kept adding, doubling or tripling the million, over a million documents we're reviewing.

THE COURT: Right.

MS. NETTLETON: So that to me is not a concession. That's like walking back from -- you set the bar at like a gazillion documents that would be unheard of in a security litigation and then you walked it back a little bit.

MR. DROSMAN: So, Your Honor, this most recent round, which is attached to our December 22nd --

THE COURT: Uh-huh.

MR. DROSMAN: -- the subject of our December 8th letter, we went from 1.6 million if you ran everyone of plaintiff's terms, to 650,000, okay. Now we're dialing it back further and I just want to make the point that we're talking about massive securities fraud litigation where the damages are in the billions.

THE COURT:  Right.

MR. DROSMAN:  This is a company with $200 million of market cap, okay.  You purport -- the proportionality analysis has to take that into consideration.

THE COURT:  Well, the way I look at it is what they're asking for in addition to what you've already agreed to is just a little over 100,000 additional documents.  This is their de minimis which is capped at 60,000, row 5 which is 5,600, row 16 which is 17,000 and row 37 which is 30,000 so it's a little over 100,000.  And I think that they have articulated the necessity for having those searches conducted.

So I think they've met their burden.  And I don't find that defendants have been able to show that this will, you know, all production is burdensome, it's whether it's unduly burdensome.  And I -- and that showing hasn't been made.

So I'm going to grant their request as to those searches, search terms that they want.  And then with respect to the edits to the defendant's searches that plaintiffs have requested, I think it's numbers 9, 20 and 21 and 1.

MR. DROSMAN:  Correct.

THE COURT:  And I think that they've been able to, you know, articulate why they need those.  So -- and then they're not going to -- and then we're going to -- you're going to withdraw your request for the other just four out of eight so -- four out of seven, so you're going to withdraw your

72

request for the other three or I'll just deny those.

MR. DROSMAN:  Yeah, that's fine.  I gave you the high priority items.  And I'll just say as to row 4 of our letter, that yields fewer than 10,000.  And it is extremely important and it's not going to give false positives, Your Honor. Because the only time they talked about the 230 to 260 was when they're talking about the subscriber numbers at the heart of our case, that launched this case, that permeated this case all the way through.  You're not getting false positives on that one.

MS. NETTLETON:  Your Honor, if I can just because I think when we were talking about their revisions to row 1, this is the one where it would pick up -- it doesn't include the Disney Plus modifier.

THE COURT:  Oh, for the 2024?  Yes.

MS. NETTLETON:  Yeah.

THE COURT:  Yes, I misspoke earlier.  I actually denied that one.

MS. NETTLETON:  Okay.  Thank you.

THE COURT:  Yeah, yeah, sorry.

MS. NETTLETON:  Thank you.  And just with this numerical thing, if you look at the actual search it's not just 230 to 260, it's also -- and that's just --

THE COURT:  You're talking about their row 4?

MS. NETTLETON:  Yeah.  Their row 4 is -- it's just a

73

bunch of random numbers that like, you know, any time somebody had a budget that had 215M listed in it is going to get picked up.  I don't -- again, we have all of these searches that are directed to the subscriber targets at issue.  Wanting the random numbers is not adding anything.

THE COURT:  I agree.  I'm going to deny the request for plaintiff's proposed search number 4.

Okay.  Is there anything --

MR. DROSMAN:  Your Honor, I'd just ask, could those denials be without prejudice to renew?

THE COURT:  Yes, they're all without prejudice.

MR. DROSMAN:  Okay.  Thank you.

THE COURT:  Do we need to set dates for compliance or can you meet and confer regarding that?

MS. NETTLETON:  I would hope we can meet and confer.  I think one thing, obviously we'll have to collect from the new custodians, which obviously is going to add.  The substantial completion deadline is I guess March 31st, which I said we're on track to meet currently.

I don't think necessarily adding this is going to create much of a problem on that front, although we've talked before about if there's some slippage for this additional stuff.  And then the one caveat being the collection issue is that I don't -- if that drags, that material may be later in time.

74

**THE COURT:** Okay. You're okay with meeting and conferring?

**MR. DROSMAN:** Yeah, I mean, that sounds fine, Your Honor. I remember when we were modifying this schedule, I worked with defense counsel and I said, look, just assume for the purposes of this modification that we prevail on everything, would we be able to meet this 3/31 deadline and she said yes. I would ask that Your Honor just ask that the production be rolling, so that we're not just given a document dump on 3/31, because at the end of the day we have to analyze these documents and then start depositions. And so if we get them all on the 31st, that's really difficult to do in a timely way.

**THE COURT:** And what is the 3/31 deadline?

**MR. DROSMAN:** It's the substantial completion deadline. So they had to substantially complete their production of documents with respect to I believe it's just the first set of -- first request for production of documents, which all these searches relate to.

**THE COURT:** And is that something that you both agreed to or something that's court ordered?

**MR. DROSMAN:** We did. We proposed it to the Court and agreed to it.

**THE COURT:** Okay.

**MR. DROSMAN:** And we modified the prior schedule to

75

put in this -- because I said, look, if that's going to pose a challenge, we can ask for four -- you know, we can ask for the end of April instead and I was told that should be fine.

THE COURT:  Okay.  All right.  I will issue a brief order that just sort of summarizes what I have ruled on here and order the parties to meet and confer regarding, you know, the compliance.  I encourage you to do a rolling production so there isn't a document dump at the end of March.

And if there are any further issues that arise with respect to compliance with the order that I'm going to issue with respect to this motion, please use the informal discovery dispute resolution process to bring them to the Court's attention?

MR. DROSMAN:  Thank you for your time, Your Honor.

MS. NETTLETON:  Thank you.

THE COURT:  All right.  Everybody have a good rest of the day.

MR. DROSMAN:  You too.

THE CLERK:  Court is adjourned.

(Proceedings concluded at 11:47 a.m.)

* * * * *

EXCEPTIONAL REPORTING SERVICES, INC

76

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    January 10, 2026

            **Signed**                                  **Dated**


                    *TONI HUDSON, TRANSCRIBER*