ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (200643)
RYAN A. LLORENS (225196)
JESSICA T. SHINNEFIELD (234432)
DARRYL J. ALVARADO (253213)
JEFFREY J. STEIN (265268)
NICOLE Q. GILLILAND (335132)
JESSICA E. ROBERTSON (352207)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
ryanl@rgrdlaw.com
jshinnefield@rgrdlaw.com
dalvarado@rgrdlaw.com
jstein@rgrdlaw.com
ngilliland@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> THE WALT DISNEY COMPANY, et al., <br><br> Defendants. | Case No. 2:23-cv-03661-CBM (ASx) <br><br> CLASS ACTION <br><br> MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION **[REDACTED]** <br><br> Date:  July 14, 2026 <br> Time:  10:00 a.m. <br> Ctrm:  8D <br> Judge:  Hon. Consuelo B. Marshall |

4939-1674-0503.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................. 2

    A.    Summary of the Allegations ................................................................... 2

    B.    The Proposed Class Representatives ...................................................... 7

III.  THE PROPOSED CLASS SATISFIES RULE 23 ........................................... 8

    A.    The Proposed Class Satisfies Rule 23(a) ............................................... 8

        1.    The Proposed Class Is Sufficiently Numerous ........................... 8

        2.    Questions of Law and Fact Are Common to the Class .............. 9

        3.    The Proposed Class Representatives' Claims Are Typical ...... 10

        4.    The Proposed Class Representatives Will Fairly and Adequately Represent the Interests of the Class ...................... 11

    B.    The Proposed Class Also Satisfies Rule 23(b)(3) ............................... 13

        1.    Common Questions of Law and Fact Predominate ................. 13

            a.    Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance ................................................. 14

            b.    Damages Can Be Calculated on a Classwide Basis ....... 20

        2.    Class Treatment Is Superior to Other Methods of Adjudication ........................................................................... 21

    C.    The Proposed Class Is Ascertainable ................................................... 22

    D.    Robbins Geller Should Be Appointed Class Counsel ......................... 22

IV.   CONCLUSION ............................................................................................... 23

- i -

4939-1674-0503.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................................. 13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ................................................................ 8, 13, 14, 15

*Angley v. UTi Worldwide Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018) .............................................. 15, 16, 19, 20

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................... 2, 14, 15

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) .................................................................................. 9

*Brown v. China Integrated Energy Inc.*,
2015 WL 12720322 (C.D. Cal. 2015) ............................................................ 17, 18

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ................................................................... 16, 18

*City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
2018 WL 4931543 (N.D. Cal. 2018) ................................................................... 20

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2022 WL 1459567 (N.D. Cal. 2022) .............................................. 10, 11, 20, 22

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
660 F.3d 1170 (9th Cir. 2011),
*aff'd*, 568 U.S. 455 (2013) .................................................................................... 8

*Crews v. Rivian Auto., Inc.*,
2024 WL 3447988 (C.D. Cal. 2024) .................................................................. 19

*Epstein v. MCA, Inc.*,
50 F.3d 644 (9th Cir. 1995), *rev'd on other grounds sub nom.*
*Matsushita Elec. Indus. Co., Ltd. v. Epstein*,
516 U.S. 367 (1996) ................................................................................................. 1

- ii -

**Page**

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ................................................................................. 14, 15

*In re Banc of Cal. Sec. Litig.*,
    326 F.R.D. 640 (C.D. Cal. 2018) ....................................................... *passim*

*In re Cooper Cos. Inc. Sec. Litig.*,
    254 F.R.D. 628 (C.D. Cal. 2009) ..................................................... 1, 9, 14, 21

*In re Diamond Foods, Inc., Sec. Litig.*,
    295 F.R.D. 240 (N.D. Cal. 2013) ..................................................... 8, 13, 17, 18

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................. 15

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 4704578 (C.D. Cal. 2021) ............................................................... 8

*In re Myriad Genetics, Inc. Sec. Litig.*,
    2021 WL 5882259 (D. Utah 2021) ............................................................... 11

*In re Twitter Inc. Sec. Litig.*,
    326 F.R.D. 619 (N.D. Cal. 2018) ............................................................. 11, 21

*In re Twitter Inc. Securities Litigation*,
    No. 4:16-cv-05314 (N.D. Cal. Nov. 21, 2022) ............................................. 12

*Johnson v. Aljian*,
    490 F.3d 778 (9th Cir. 2007) ....................................................................... 13

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ............................................................ 18, 19

*Lamartina v. VMware, Inc.*,
    2024 WL 3286059 (N.D. Cal. 2024) ......................................................... 11, 12

*Malriat v. QuantumScape Corp.*,
    2022 WL 17974629 (N.D. Cal. 2022) ........................................................... 19

- iii -

**Page**

*Milbeck v. TrueCar, Inc.*,
2019 WL 2353010 (C.D. Cal. 2019) ....................................................... 9, 10, 14

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ............................................................................. 9

*Petrie v. Elec. Game Card, Inc.*,
308 F.R.D. 336 (C.D. Cal. 2015) ............................................................... 18, 19

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
2021 WL 229310 (N.D. Cal. 2021) ................................................................. 16

*Purple Mountain Tr. v. Wells Fargo & Co.*,
2022 WL 3357835 (N.D. Cal. 2022) ............................................... 10, 12, 15, 20

*Sayce v. Forescout Techs., Inc.*,
754 F. Supp. 3d 878 (N.D. Cal. 2024) .................................................. 8, 9, 20, 22

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020) ...................................................................... 9

*Todd v. STAAR Surgical Co.*,
2017 WL 821662 (C.D. Cal. 2017) ............................................................ 16, 17

*Turocy v. El Pollo Loco Holdings, Inc.*,
2018 WL 3343493 (C.D. Cal. 2018) ................................................................ 20

*Vinh Nguyen v. Radient Pharms. Corp.*,
287 F.R.D. 563 (C.D. Cal. 2012) ........................................................... 16, 17, 19

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b) .................................................................................................. *passim*
§78t(a) .......................................................................................... 11, 13, 14, 10
§78t-1 ................................................................................................... *passim*

4939-1674-0503.v1

**Page**

Federal Rules of Civil Procedure
Rule 23..................................................................................................................1, 8, 21
Rule 23(a) ............................................................................................................1, 8, 11
Rule 23(a)(1)..................................................................................................................8
Rule 23(a)(2)..................................................................................................................9
Rule 23(a)(3)................................................................................................................10
Rule 23(a)(4)................................................................................................................11
Rule 23(b) ......................................................................................................................8
Rule 23(b)(3) ................................................................................................1, 2, 13, 21
Rule 23(b)(3)(A)..........................................................................................................21
Rule 23(b)(3)(B) ..........................................................................................................21
Rule 23(b)(3)(C) ..........................................................................................................21
Rule 23(b)(3)(D)..........................................................................................................21
Rule 23(g)(1) ...............................................................................................................22

17 C.F.R.
§240.10b-5....................................................................................................................15
§240.10b-5(a) ...............................................................................................................13
§240.10b-5(b) ...............................................................................................................13
§240.10b-5(c) ...............................................................................................................13

4939-1674-0503.v1

Plaintiffs[1] respectfully submit this memorandum of law in support of their motion for an order: (1) certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; (2) appointing the Teamsters Funds and Local 272 (collectively, the "Funds") as Class Representatives; and (3) appointing Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

## I.    INTRODUCTION

Pursuant to Rule 23(a) and (b)(3), Plaintiffs move for certification of a class consisting of:

All persons and entities that purchased or otherwise acquired The Walt Disney Company ("Disney" or the "Company") common stock between December 10, 2020 and May 10, 2023, inclusive (the "Class Period"), and were damaged thereby (the "Class").[2]

"As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'" *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 632 (C.D. Cal. 2009) (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996)). This securities fraud case is no exception. First, it easily satisfies each of Rule 23(a)'s requirements:

---

[1]    "Plaintiffs" are Lead Plaintiffs Central Pennsylvania Teamsters Pension Fund, Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987, and Central Pennsylvania Teamsters Health and Welfare Fund (collectively, the "Teamsters Funds"), and plaintiffs Local 272 Labor-Management Pension Fund ("Local 272") and John Patrick Talbot.

[2]    Excluded from the proposed Class are: (i) defendants Disney, Robert Chapek ("Chapek"), Kareem Daniel ("Daniel"), Robert Iger ("Iger"), and Christine M. McCarthy ("McCarthy") (collectively, "Defendants"); (ii) any person who was an officer or director of Disney during the Class Period; (iii) members of the immediate families and the legal representatives, heirs, successors or assigns of the individuals identified in (i) and (ii); and (iv) any entity in which any of the Defendants has or had a controlling interest.

- 1 -

- *Numerosity*: An average of 57.3 million shares of Disney common stock traded on a weekly basis, meaning there are likely thousands of proposed Class members who were harmed by Defendants' misconduct.

- ***Commonality and Typicality***: Defendants made the same misleading public statements and engaged in the same scheme to defraud all proposed Class members.  The Funds, like all proposed Class members, were injured by Defendants' misconduct.

- *Adequacy*: The Funds have retained qualified counsel, supervised this action, participated in discovery, and are committed to maximizing the recovery for the proposed Class.

This action also satisfies Rule 23(b)(3)'s predominance and superiority requirements.  Predominance is met because key questions – including whether Defendants made misleading statements and/or engaged in a scheme to defraud – will be answered on a classwide basis.  Plaintiffs are also entitled to a presumption of classwide reliance under the fraud-on-the-market theory set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  Common issues regarding damages also predominate because damages can be measured using a common methodology consistent with Plaintiffs' theory.  Further, a class action is the superior method for adjudicating this case and promoting judicial economy, as the alleged misconduct damaged thousands of geographically dispersed investors, many of whom have claims too small to economically pursue on an individual basis.

## II.    FACTUAL BACKGROUND

### A.    Summary of the Allegations

This is a securities-fraud action against Disney and certain of its highest-ranking former executives: Chapek (former CEO), McCarthy (former CFO), Iger (former CEO and Executive Chairman), and Daniel (former head of Disney Media and Entertainment Distribution ("DMED")). Plaintiffs allege that Defendants engaged

- 2 -

4939-1674-0503.v1

in a scheme to defraud and made material misrepresentations to create the illusion of rapid and profitable Disney+ growth when, in reality, Disney was spending profligately to drive low-quality subscriber growth at the expense of profitability.

During the Class Period, Disney+ was critical to Disney's success and Chapek's future as its new CEO. By the start of the Class Period, the COVID-19 shutdown had ravaged the Company's traditional revenue sources, and Disney+ was the only business segment positioned to succeed during the pandemic. Further, as the world shifted from traditional media distribution to streaming, Disney+ was integral to proving that Disney could successfully evolve and remain relevant. Chapek, to whom Disney's Board of Directors had recently granted an unusually short CEO contract, knew that the only way to keep Disney's stock price elevated and secure renewal of his lucrative contract was to go all in on Disney+. ████████████

████████████████████████████████████████████████████████████

██████████████████████████         Ex. 5 at -129.[3]

Accordingly, Chapek, together with Daniel and McCarthy (the "Executive Defendants"), devised and executed a scheme designed to convince investors that Disney+ was growing more rapidly and sustainably than it actually was, and that it was on track to meet the Company's lofty 2024 subscriber and profitability targets. The scheme involved several coordinated artifices.

First, during Disney's December 10, 2020 Investor Day, the Executive Defendants announced an unattainable subscriber target that *quadrupled* the target Iger had set just one year prior. McCarthy announced that Disney+ would have 230-260 million subscribers and achieve profitability by fiscal year 2024, and Chapek confirmed "we're incredibly confident that we will achieve the long-term guidance

---

[3] Unless otherwise noted, all exhibits referenced herein are attached to the Declaration of Daniel S. Drosman in Support of Plaintiffs' Motion for Class Certification, filed concurrently herewith, "¶_" or "¶¶_" references are to the Corrected Consolidated Complaint for Violations of the Federal Securities Laws (ECF 68), emphasis is added, and citations and footnotes are omitted.

- 3 -

4939-1674-0503.v1

that Christine outlined," declaring that it would "fundamentally transform The Walt Disney Company." ¶150.  Analysts were "blown away" and predicted that "Disney [wa]s almost certain to be a clear winner in streaming along with Netflix."  ¶¶151, 230.  Internally, however, Disney executives recognized that the subscriber target was "***batshit crazy***."  ¶153.

Second, the Executive Defendants reorganized Disney by creating DMED and appointing Daniel as its president, thereby giving Chapek and Daniel complete control over Disney+ and Disney's content distribution decisions.

Third, the Executive Defendants then used DMED to steer content directly to Disney+, bypassing lucrative theatrical and pay-per-view distribution windows. *See* Ex. 6 at -050, -058 (

).  This artifice created a short-term bump in subscribers when the content became available on Disney+ but sacrificed profits from other distribution windows.

Fourth, the Executive Defendants embarked on a massive and unsustainable content-spending spree at the expense of Disney+'s profitability.

Ex. 7 at -884.

Ex. 8 at -399.

Ex. 9 at -295.

Fifth, the Executive Defendants used steep discounts and promotions that drove low-revenue subscribers that were likely to churn off the service when their promotion period ended, creating                          Ex. 10.  Defendants even went so far as to provide every Hulu+ Live TV subscriber with a free Disney+ subscription and to count those subscribers as paid Disney+ subscribers.  Disney often

- 4 -

4939-1674-0503.v1

increased promotional activity in order to "fill the gap" to "hit subscriber numbers and revenue targets." ¶135; Ex. 11 at -497-98 (████████████████████████████████████████████████████████████████████████████████████████████).

Sixth, the Executive Defendants launched Disney+ in dozens of unprofitable international markets to generate subscribers at the expense of profitability. While Disney+'s international rollout was initially planned to be complete by the end of 2021, subscriber growth slowed, and the Executive Defendants announced in November 2021 that they planned to *double* the number of countries in which Disney+ operated. The cost to launch and operate in many of these countries greatly exceeded their potential revenue, and by the third quarter of 2022, international subscribers were responsible for over *99%* of new Disney+ subscriptions.

Seventh, the Executive Defendants engaged in accounting manipulations to conceal Disney's massive and uncontrolled content spending. For example, while Defendants spent prolifically on Disney+ content, they failed to allocate those content costs to Disney+, often by briefly airing content on other distribution platforms such as the Disney channel, and allocating costs there instead. ██████████████████████████████████████████████████████████████████████████████████ Ex. 12 at -504. Defendants also amortized content costs, meaning they did not account for full content costs upfront. Instead, they spread the costs over multiple quarters, which provided Defendants visibility into Disney's rising content costs but kept investors in the dark.

Eighth, the Executive Defendants repeatedly reassured investors Disney+ was on track to achieve the 2024 subscriber and profitability targets, ████████████████████████████████████████████████████████████ Ex. 13 at -914. ██████████

- 5 -

4939-1674-0503.v1

 Ex. 14 at -305.

Ex. 15.

(Ex. 16 at -792),

Ex. 17 at -128; ¶205. Nonetheless, Chapek and McCarthy consistently and unequivocally reaffirmed both the subscriber and profitability targets throughout the Class Period. ¶¶205-210, 223, 227.

Finally, the Executive Defendants concealed Disney+'s churn problem. Disney executives reported that churn was a "constant problem" and so severe that employees called it "the leaky bucket" because "[n]o matter how much water you put in, some leaks out." ¶226. Nonetheless, the Executive Defendants concealed Disney+ churn, publicly assuring investors that "our churn is low" and "we're extraordinarily pleased with the low churn that we see." ¶227.

Consistent with their scheme, the Executive Defendants also issued materially false and misleading statements to reinforce the illusion of robust and profitable Disney+ growth. For example, the Executive Defendants repeatedly touted subscriber gains while failing to disclose they were driven by unsustainable tactics that sacrificed profitability. ¶¶268-275. The Executive Defendants also lauded Disney+'s new content and assured investors it was driving new subscribers ¶¶277, 279, 282-286. (Ex. 18 at -377), Ex. 8 at -399.

While the fraud inflated Disney's stock price to record highs, Defendants capitalized. Chapek secured a renewed CEO contract and *$27 million* in performance-based compensation. McCarthy dumped *$17 million* of her Disney

- 6 -

4939-1674-0503.v1

stock on unknowing investors, in violation of §20A. And rather than stop the scheme, Iger instead profited from it by selling an incredible ***$375 million*** of his Disney stock.

The scheme inevitably collapsed, and the relevant truth was revealed through a series of partial disclosures. ██████████████████████████████████████████████████ Ex. 19 at -672. First, on November 10, 2021, Disney disclosed a significant slowdown in Disney+ subscriber growth and warned that Disney+ losses would peak one year later than expected. Then, on November 8, 2022, Disney announced a massive and unexpected $1.47 billion loss for DTC. Within days, Disney fired Chapek and Daniel and reinstalled Iger, who began unwinding the scheme after internally criticizing, but failing to stop it, while Chapek was CEO. Finally, on May 10, 2023, Disney announced, among other things, a $1.5-$1.8 billion impairment charge related to removing content from Disney+ and revealed that DTC losses were expected to continue. These disclosures sent the price of Disney's common stock into a tailspin.

**B.    The Proposed Class Representatives**

The Funds have actively participated in and supervised this action and now seek appointment as Class Representatives. Exs. 1-2. The Teamsters Funds are multi-employer funds with over $2 billion in collective assets under management for the benefit of over 35,000 participants and their beneficiaries. ¶18. They were appointed as Lead Plaintiffs on August 8, 2023. ECF 58. Local 272 is a multi-employer pension fund that manages the retirement benefits of thousands of employees in New York City and has over $372 million in assets under management. ¶19. During the Class Period, the Funds purchased Disney common stock at artificially inflated prices and were damaged thereby. Exs. 1-2; ECF 68 at 192-99.

- 7 -

4939-1674-0503.v1

### III.   THE PROPOSED CLASS SATISFIES RULE 23

Class certification is appropriate if a proposed class satisfies the requirements of Rule 23(a) and one category of Rule 23(b). *See Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013). "'[T]he law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws.'" *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *3 (C.D. Cal. 2021). At class certification, "'the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather, whether the requirements of Rule 23 are met.'" *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 245 (N.D. Cal. 2013); *see also In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 646 (C.D. Cal. 2018) ("'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.'") (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

#### A.   The Proposed Class Satisfies Rule 23(a)

Rule 23(a) sets forth four requirements for class certification: (1) the class must be so numerous that joinder of all members is impractical; (2) there must be questions of law or fact that are common to the proposed class; (3) the proposed class representatives' claims must be typical of the proposed class' claims; and (4) the proposed class representatives must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). This action satisfies each requirement.

#### 1.   The Proposed Class Is Sufficiently Numerous

Under Rule 23(a)(1), a proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no fixed numerical threshold, but generally courts have found the [numerosity] requirement satisfied when the class contains forty or more members." *Sayce v. Forescout Techs., Inc.*, 754 F. Supp. 3d 878, 900 (N.D. Cal. 2024). Courts "certainly may infer that, when a

4939-1674-0503.v1

corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year." *Cooper*, 254 F.R.D. at 634; *see also Forescout*, 754 F. Supp. 3d at 900 ("'In cases involving securities traded on national stock exchanges, numerosity is practically a given.'").

During the Class Period, Disney common stock traded on the New York Stock Exchange ("NYSE"), an average of 57.3 million shares of Disney common stock traded weekly, and Disney had 1.8 billion shares of its common stock outstanding. Ex. 3 ("Cain Rpt."), ¶¶16, 41, 94. These facts easily establish numerosity. *See Milbeck v. TrueCar, Inc.*, 2019 WL 2353010, at \*2 (C.D. Cal. 2019) (numerosity satisfied where "there were between 85.5 million and 98.5 million shares of TrueCar common stock outstanding"); *Banc of Cal.*, 326 F.R.D. at 646 (numerosity satisfied where there were "between 43.9 and 49.6 million Banc shares issued and outstanding, with an average trading volume of about five million a week").

### 2.    Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "To show commonality, a plaintiff 'need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2).'" *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 283 (N.D. Cal. 2020) (quoting *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014)). "Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest . . . which is not defeated by slight differences in class members' positions . . . ." *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).

Like most securities cases, this action is replete with common questions, including:

- 9 -

(1) whether Defendants violated the Exchange Act . . .; (2) whether Defendants' statements misrepresented or omitted facts; (3) whether the misrepresented and omitted facts were material; (4) whether . . . Defendants knowingly or recklessly disregarded that their statements were materially false and misleading; (5) whether the price of [Disney] common stock was artificially inflated; (6) the extent of damage sustained by the Class members, and the appropriate measure of damages; and (7) whether the Individual Defendants had control over [Disney]. These questions are sufficient to satisfy the commonality requirement.

*TrueCar*, 2019 WL 2353010, at \*2 (cleaned up); *see also Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at \*3 (N.D. Cal. 2022) ("'[T]he questions common to all investors will be relatively substantial' because [plaintiff] 'alleges a common course of conduct over the entire period directed against all investors, generally relied upon, and violating common statutory provisions.'").

### 3. The Proposed Class Representatives' Claims Are Typical

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality "'requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at \*4 (N.D. Cal. 2022). "'The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Banc of Cal.*, 326 F.R.D. at 647.

Here, the Funds' and the proposed Class' claims are founded on the same facts and legal theories – *i.e.*, that Defendants' scheme and misrepresentations artificially

- 10 -

4939-1674-0503.v1

inflated Disney's stock price, which caused injury to investors when the relevant truth was revealed and Disney's stock price dropped. Accordingly, proving the Funds' claims will prove the proposed Class' claims, and typicality is satisfied. *See Oracle*, 2022 WL 1459567, at *4 ("[Plaintiff] claims that it bought Oracle common stock at a price inflated by the same omissions as all other Class members. And [plaintiff] claims that it was damaged based on the same corrective disclosures as the rest of the Class. Accordingly, [plaintiff] has shown that its claims are typical of the Class."); *Lamartina v. VMware, Inc.*, 2024 WL 3286059, at *3 (N.D. Cal. 2024) (typicality established where "Defendants' alleged scheme was divulged to the market through a series of corrective disclosures, [and] VMware common stock price allegedly plummeted, injuring Lead Plaintiff and Class Members alike").[4]

### 4. The Proposed Class Representatives Will Fairly and Adequately Represent the Interests of the Class

Rule 23(a)'s final requirement is that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "'To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"'" *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 626 (N.D. Cal. 2018).

No conflicts exist here. Rather, the Funds' and the proposed Class' interests are directly aligned. Like all proposed Class members, the Funds purchased Disney

---

[4]  Typicality is also satisfied for Plaintiffs' §20(a) control person and §20A insider trading claims because they arise from the same false and misleading statements and misconduct. *See In re Myriad Genetics, Inc. Sec. Litig.*, 2021 WL 5882259, at *3 (D. Utah 2021) ("[Plaintiff] makes three claims: securities fraud, controlling persons liability, and insider trading. These claims arise from the Defendants' alleged materially misleading statements, as well as trading securities while in possession of material non-public information. Any proposed class claims would also rely on these theories and would arise from the same allegedly materially misleading statements and securities trading facts. . . . Thus, [Plaintiff] has satisfied the typicality requirement.").

- 11 -

4939-1674-0503.v1

common stock at inflated prices during the Class Period and were injured by Defendants' misconduct.  Thus, the Funds are incentivized to establish Defendants' liability and maximize their and the proposed Class' recovery.  *See Wells Fargo*, 2022 WL 3357835, at \*2 (adequacy satisfied where plaintiff's "interest 'in establishing Defendants' liability and obtaining the maximum possible recovery' is aligned with the interests of the putative class because it was injured by the same alleged misstatements").

The Funds have also demonstrated their willingness and ability to prosecute this action by consulting with Robbins Geller regarding case events, reviewing court filings and other key documents, and complying with their discovery obligations. Exs. 1-2.  The Funds also understand the requirements and responsibilities of serving as a class representative, and will continue to monitor this litigation and work with counsel to maximize the Class' recovery.  *Id.*

The Funds have also demonstrated their adequacy by retaining capable attorneys with considerable experience litigating securities class actions.  Ex. 4; *Lamartina*, 2024 WL 3286059, at \*5 ("Robbins Geller is an established firm experienced in securities litigation and complex class action lawsuits who has successfully prosecuted a wide range of fraud cases on behalf of injured investors . . . ."); *In re Twitter Inc. Securities Litigation*, No. 4:16-cv-05314, ECF 671 (N.D. Cal. Nov. 21, 2022) (final order in securities class action where Robbins Geller achieved a $809.5 million recovery for the class); *Banc of Cal.*, 326 F.R.D. at 651-52 ("[T]he work of Robbins Geller lawyers in this case so far indicates that the Court can again expect that Robbins Geller lawyers will effectively help the class representative vigorously prosecute this case.").  In short, the Funds and Robbins Geller will fairly and adequately represent the proposed Class.

- 12 -

4939-1674-0503.v1

## B.    The Proposed Class Also Satisfies Rule 23(b)(3)

The proposed Class also satisfies Rule 23(b)(3) because: (1) common questions of law or fact predominate over individual questions; and (2) a class action is superior to alternative methods of resolving the dispute.  Fed. R. Civ. P. 23(b)(3).

### 1.    Common Questions of Law and Fact Predominate

"Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . ."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "Class certification under Rule 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication."  *Diamond Foods*, 295 F.R.D. at 246; *see also Banc of Cal.*, 326 F.R.D. at 647 ("'The predominance inquiry of Rule 23(b)(3) asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."'"). Predominance "does ***not*** require a plaintiff seeking class certification to prove that each 'element of her claim is susceptible to classwide proof,'" only "that common questions '***predominate*** over any questions affecting only individual class members.'" *Amgen*, 568 U.S. at 469 (emphasis in original and alterations omitted).  Nor does predominance require that "questions common to the class . . . will be answered, on the merits, in favor of the class."  *Id.* at 459 (original emphasis omitted).

Plaintiffs allege Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 by making false and misleading statements in violation of Rule 10b-5(b) and by engaging in a scheme to defraud in violation of Rule 10b-5(a) and (c). Accordingly, Plaintiffs must establish: (1) Defendants made material misrepresentations and/or engaged in a scheme to defraud; (2) a connection with the purchase or sale of a security; (3) scienter; (4) reliance; (5) economic loss; and (6) loss causation. *See id.* at 460-61.  Plaintiffs also allege McCarthy violated §20A by selling her Disney common stock while in possession of material, nonpublic information. *See Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007).

- 13 -

"'[M]ost of these elements are clearly susceptible to classwide proof, particularly the alleged misrepresentations made by the defendants, scienter, and loss.' Furthermore, a plaintiff is not required to prove materiality or loss causation at the class certification stage." *TrueCar*, 2019 WL 2353010, at \*4; *Amgen*, 568 U.S. at 467-70, 474-76 ("[T]his Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."); *Cooper*, 254 F.R.D. at 639 ("District courts in the Ninth Circuit have held that when plaintiffs plead a fraud-on-the-market theory, questions of whether misleading conduct occurred, and whether that conduct occurred with fraudulent intent, predominate over other questions.").

Finally, individual issues regarding reliance will not predominate because Plaintiffs are entitled to a presumption of classwide reliance under the fraud-on-the-market theory established in *Basic*, and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014).[5]

### a. Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance

The fraud-on-the-market theory premises that, "'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.'" *Basic*, 485 U.S. at 241-42; *see also Halliburton*, 573 U.S. at 270 ("'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material

---

[5] Common questions regarding Plaintiffs' §§20(a) and 20A claims also predominate because they are derivative of Plaintiffs' §10(b) claims, and questions regarding individual control and whether McCarthy sold Disney common stock while in possession of material, nonpublic information are susceptible to common proof.

- 14 -

4939-1674-0503.v1

misrepresentations'"). Accordingly, "'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton*, 573 U.S. at 268.

The fraud-on-the-market presumption applies where, as here: "(1) the alleged misrepresentations were publicly known; (2) the alleged misrepresentations were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1120 (C.D. Cal. 2018) (Marshall, J.). These requirements are satisfied here. First, Plaintiffs allege that Defendants made materially misleading statements in public earnings calls and U.S. Securities and Exchange Commission ("SEC") filings. *See, e.g.*, ¶¶267-317. Second, although materiality must be proved at trial to invoke the *Basic* presumption, it "is not a prerequisite to class certification." *Amgen*, 568 U.S. at 459. Third, Plaintiffs purchased Disney common stock between the time the misrepresentations were made and the end of the Class Period. *See* ECF 68 at 192-201. Fourth, as detailed below and in Dr. Matthew D. Cain's report, Disney's common stock traded in an efficient market, and the presumption of reliance is "supported by common sense and probability." *Basic*, 485 U.S. at 246; Cain Rpt., ¶¶25-97, 123.

Finally, because Defendants made misstatements as part of their scheme, the fraud-on-the-market presumption also applies to Plaintiffs' scheme allegations. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192-93 (D. Or. 2015) (applying the fraud-on-the-market presumption to scheme allegations).

### (1) Disney's NYSE Listing Is Strong Evidence of Market Efficiency

Throughout the Class Period, Disney's common stock traded on one of the world's largest and most efficient forums for stock trading, the NYSE. Cain Rpt., ¶¶16, 29. This fact alone "strongly indicates" that Disney's stock traded in an efficient market during the Class Period. *See Wells Fargo*, 2022 WL 3357835, at *5

- 15 -

4939-1674-0503.v1

("the fact that Wells Fargo stock is listed on the NYSE, a highly regarded and well-regulated exchange, strongly indicates that it trades in an efficient market"); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *6 (N.D. Cal. 2021) ("Granite stock traded on the NYSE, a quintessentially efficient market."); *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *6 (C.D. Cal. 2017) ("'federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency'").

### (2)    The *Cammer* Factors

In evaluating market efficiency, courts also consider the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See Angley*, 311 F. Supp. 3d at 1121 n.1 ("The Ninth Circuit has recognized that '*Cammer* sets out five well-recognized factors designed to help make the central determination of efficiency in a particular market.'"); *Banc of Cal.*, 326 F.R.D. at 649 (same). The five *Cammer* factors are:

> (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S-3. . . ; and (5) whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."

*Angley*, 311 F. Supp. 3d at 1120-21. These "'factors "are an analytical tool, not a checklist" of requirements.'" *Id.* at 1121. Each *Cammer* factor demonstrates that Disney common stock traded in an efficient market.

***Weekly Trading Volume***. "A high average trading volume supports a finding of market efficiency, because it 'implies significant investor interest in the company,' and that interest 'implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.'" *Vinh Nguyen v.*

- 16 -

*Radient Pharms. Corp.*, 287 F.R.D. 563, 571 (C.D. Cal. 2012).  "'[A]verage weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.'"  *Id.*  Disney's average weekly trading volume was 3.1% during the Class Period, which exceeds both the 1% and 2% thresholds and gives rise to a strong presumption of market efficiency.  Cain Rpt., ¶¶40-41.

*Analyst Coverage*.  Analyst coverage supports market efficiency because it indicates "'that the market would rapidly and fully incorporate information into the stock price because analyst reports would likely be "closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."'"  *Brown v. China Integrated Energy Inc.*, 2015 WL 12720322, at *17 (C.D. Cal. 2015).  During the Class Period, 57 analysts followed Disney and collectively published over 780 reports about the Company.  Cain Rpt., ¶44.  This significant coverage supports market efficiency.  *See Diamond Foods*, 295 F.R.D. at 248 (coverage by 13 analysts supported efficiency); *Todd*, 2017 WL 821662, at *7 (coverage by "[a]t least six different securities analysts" supported efficiency).

*Market Makers*.  "'A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices.'"  *Nguyen*, 287 F.R.D. at 572.  Market makers support efficiency because they "'"react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."'"  *Brown*, 2015 WL 12720322, at *17.  During the Class Period, Disney had 163 market makers, which further supports market efficiency.  Cain Rpt., ¶¶49-55; *see also Todd*, 2017 WL 821662, at *7 (91 market makers supported efficiency); *Brown*, 2015 WL 12720322, at *17 (21 market makers supported efficiency).

*Form S-3*.  A company's ability to file a Form S-3 supports market efficiency because it is associated with other characteristics that correlate with efficiency,

- 17 -

4939-1674-0503.v1

including size, number of shares traded, and availability of information. *See Cammer*, 711 F. Supp. at 1287; *Brown*, 2015 WL 12720322, at *17 ("the S-3 form is 'predicated on the Commission's belief that the market operates efficiently for these companies'"). Disney was able to (and did) file Forms S-3 with the SEC during the Class Period, which further establishes market efficiency. Cain Rpt., ¶¶56-60.

*Cause-and-Effect*. The final *Cammer* factor focuses on whether a company's stock price reacts quickly to new company-specific information. *See Cammer*, 711 F. Supp. at 1287. To test Disney's responsiveness to new Company-specific information, Plaintiffs' expert, Dr. Cain, who holds a Ph.D. in finance and teaches at UC Berkeley Law School and is a Senior Fellow at the New York University School of Law, conducted an event study analyzing Disney's stock price movements on days that Company-specific news was publicly released and comparing those movements to other days in the Class Period. Cain Rpt., ¶¶5, 61-72. Event studies "calculate the effect of an event on the value of the stock of a company" and are "[t]he most common empirical test for a causal connection." *Diamond Foods*, 295 F.R.D. at 248; *see also Banc of Cal.*, 326 F.R.D. at 649 ("Event studies are 'regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events.'"). As detailed in his report, Dr. Cain's event study identified – at a 95% confidence level – a cause-and-effect relationship between the release of new, Disney-specific information and movement in Disney stock price, which is strong evidence of an efficient market. Cain Rpt., ¶¶63-82; *see Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 352 (C.D. Cal. 2015) ("a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in stock price . . . is the 'essence of an efficient market'").

### (3) The *Krogman* Factors

When assessing market efficiency, "'[c]ourts in this Circuit also consider the three factors from *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001): (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the

- 18 -

4939-1674-0503.v1

percentage of stock not held by insiders, [also known as the float].'" *Crews v. Rivian Auto., Inc.*, 2024 WL 3447988, at *8 n.4 (C.D. Cal. 2024); *see also Angley*, 311 F. Supp. 3d at 1121.  The *Krogman* factors further support market efficiency here.

***Market Capitalization***.    A large market capitalization indicates market efficiency "because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478.  Disney – one of the world's largest corporations – had an average market capitalization of $253.5 billion over the Class Period, which strongly indicates market efficiency.  Cain Rpt., ¶¶83-86; *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *13 (N.D. Cal. 2022) (market capitalization of $11.8 billion supported market efficiency).

***Bid-Ask Spread***.  The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares; a low bid-ask spread indicates a more efficient market.  *See Krogman*, 202 F.R.D. at 478.  Disney's bid-ask spread was low, averaging 0.02% over the Class Period, which further supports market efficiency.  *See Nguyen*, 287 F.R.D. at 574 (spread of 0.58% supported efficiency); *QuantumScape*, 2022 WL 17974629, at *13 (spread between 0.02% and 0.06% supported efficiency).

***Public Float***.  A stock's "float" is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities.  *See Krogman*, 202 F.R.D. at 478.  A large public float indicates market efficiency because "'insiders may have information that is not yet reflected in stock prices, [so] the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information.'" *Petrie*, 308 F.R.D. at 357.  During the Class Period, Disney's public float was greater than 99%, which further confirms that its stock traded in an efficient market.  Cain Rpt., ¶¶92-95; *Petrie*, 308 F.R.D. at 357 (public float of roughly 87% supported efficiency).

4939-1674-0503.v1

**b.      Damages Can Be Calculated on a Classwide Basis**

"[T]he Ninth Circuit has made clear . . . that '"damage calculations alone cannot defeat certification."'"  *Oracle*, 2022 WL 1459567, at \*7; *Wells Fargo*, 2022 WL 3357835, at \*5 ("The Ninth Circuit has determined . . . that 'a district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial.'").  "The purpose of analyzing plaintiffs' damages model at the class certification stage 'is to determine whether individualized damages questions predominate over other common issues' and does not permit defendants 'a preemptive strike on the merits.'" *Forescout*, 754 F. Supp. 3d at 899.  To establish predominance, Plaintiffs need only show that "damages are capable of measurement on a classwide basis." *Wells Fargo*, 2022 WL 3357835, at \*5.  Plaintiffs have done just that.

As described in Dr. Cain's report, §10(b) damages can be calculated on a classwide basis using the same methodology – the out-of-pocket measure – for all proposed Class members.  Cain Rpt., ¶¶98-109.  Many "courts have recognized the event study/out of pocket method . . . is an accepted method for calculating damages in securities fraud class actions.  Therefore, Plaintiff[s] meet[] [their] burden of demonstrating damages are calculable on a classwide basis." *Angley*, 311 F. Supp. 3d at 1128-29; *see also City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at \*3 (N.D. Cal. 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action.").

As Dr. Cain explains, §20A damages are also consistent with Plaintiffs' theory and can be measured using a common methodology.  *See* Cain Rpt., ¶¶110-116; *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at \*18 (C.D. Cal. 2018) ("[B]ecause the process of computing individual damages for Section 20A class action claims is relatively straightforward and guided by the statute and case law, the Court

- 20 -

4939-1674-0503.v1

is satisfied, as required by Rule 23, that there are common questions of law and fact as to classwide damages and that individual damages issues do not predominate.").

### 2. Class Treatment Is Superior to Other Methods of Adjudication

Rule 23(b)(3) also requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "'[C]ourts have consistently embraced the class action device as a superior method of adjudicating federal securities fraud claims.'" *Cooper*, 254 F.R.D. at 642; *Twitter*, 326 F.R.D. at 631 ("Courts in this district have recognized the utility of the class action device in securities cases."). When assessing superiority, courts consider: (1) class members' interests in individually controlling separate actions; (2) whether other litigation has already commenced; (3) the desirability of concentrating claims in one forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Each consideration demonstrates that a class action is the superior method for adjudicating this case. First, interest in individually prosecuting separate actions is minimal, as the expense of doing so would be prohibitive when weighed against potential recoveries. Second, Plaintiffs are unaware of other §10(b) cases based on similar facts being actively litigated against Defendants.[6] Third, a class action in this District ensures efficient resource expenditure and consistent rulings. This District is also a desirable forum, as Disney is headquartered in this District and individual proposed Class members are geographically dispersed. Fourth, Plaintiffs do not foresee any management difficulties in proceeding as a class action. Indeed, Plaintiffs have already undertaken extensive discovery and motion practice in this Court. A

---

[6] Plaintiffs are aware of only one other §10(b) case based on similar facts pending against Defendants. That case involves only two plaintiffs and is currently stayed pending the resolution of this action. *See* Joint Stipulation, *Union Asset Management Holding AG, et al. v. The Walt Disney Company, et al.*, No. 2:25-cv-11668 (C.D. Cal. Jan. 2, 2026), ECF 24.

- 21 -

class action is the superior method for litigating the proposed Class' claims. *See Banc of Cal.*, 326 F.R.D at 651 ("A stock price drop for one company doesn't have a large economic impact on an investor who only owns a small number of shares. So all the small investors in the class . . . will substantially benefit from having an institutional investor like the Fund, with its considerable monetary interest, in charge of prosecuting this case.").

### C.    The Proposed Class Is Ascertainable

"'[A] class is ascertainable if the class is defined with objective criteria and if it is administratively feasible to determine whether a particular individual is a member of the class.'" *Oracle*, 2022 WL 1459567, at *5. "[T]he proposed class is ascertainable because plaintiffs clearly identify who the class members are: any person or entity that purchased [Disney] common stock during the proposed class period." *Forescout*, 754 F. Supp. 3d at 889; *Oracle*, 2022 WL 1459567, at *5 (same).

### D.    Robbins Geller Should Be Appointed Class Counsel

A "court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, courts consider: (i) counsel's work in "identifying or investigating potential claims"; (ii) "experience in handling class actions"; (iii) "knowledge of the applicable law"; and (iv) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Plaintiffs' chosen counsel, Robbins Geller, satisfies these requirements and has successfully prosecuted numerous securities fraud class actions on behalf of injured investors, including in this District. *See* Ex. 4; *see also supra*, §III.A.4. Robbins Geller has also already vigorously prosecuted this action, including by filing a comprehensive complaint (ECF 68), defeating Defendants' motion to dismiss (ECF 111), defeating Defendants' motion for judgment on the pleadings (ECF 150), prevailing on a motion for reconsideration that reinstated Iger as a defendant (ECF 175), obtaining discovery

- 22 -

from Defendants and third-parties, and pursuing class certification. Plaintiffs respectfully request that the Court appoint Robbins Geller as Class Counsel.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court: (1) certify this action as a class action; (2) appoint the Funds as Class Representatives; and (3) appoint Robbins Geller as Class Counsel.

DATED:  March 19, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN
RYAN A. LLORENS
JESSICA T. SHINNEFIELD
DARRYL J. ALVARADO
JEFFREY J. STEIN
NICOLE Q. GILLILAND
JESSICA E. ROBERTSON


             s/ Daniel S. Drosman
          DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dand@rgrdlaw.com
ryanl@rgrdlaw.com
jshinnefield@rgrdlaw.com
dalvarado@rgrdlaw.com
jstein@rgrdlaw.com
ngilliland@rgrdlaw.com
jrobertson@rgrdlaw.com

- 23 -

4939-1674-0503.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
CRISTELLE R. RABBAN (*pro hac vice*)
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
crabban@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SCOTT I. DION (*pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdion@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 24 -

4939-1674-0503.v1

**L.R. 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 23 pages, which complies with the page limit set by the Court's Standing Order (ECF 18), dated May 19, 2023.

DATED:  March 19, 2026

          s/ Daniel S. Drosman
          DANIEL S. DROSMAN

- 25 -

4939-1674-0503.v1