JONATHAN D. POLKES (admitted *pro hac vice)*
jonathan.polkes@whitecase.com
STACY NETTLETON (admitted *pro hac vice*)
stacy.nettleton@whitecase.com
ADAM B. BANKS (admitted *pro hac vice*)
adam.banks@whitecase.com
LADAN F. STEWART (admitted *pro hac vice*)
ladan.stewart@whitecase.com
TANIA C. MATSUOKA (admitted *pro hac vice*)
tania.matsuoka@whitecase.com
ZACH WILLIAMS (*pro hac vice* pending)
zach.williams@whitecase.com
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200

JOHN W. SPIEGEL (SB 78935)
john.spiegel@mto.com
JOHN M. GILDERSLEEVE (SB 284618)
john.gildersleeve@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOCAL 272 LABOR-MANAGEMENT PENSION FUND, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> THE WALT DISNEY COMPANY, *et al.*, <br><br> Defendants. | Case No. 2:23-cv-03661 <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> **[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]** <br><br> Date:  July 14, 2026 <br> Time:  10:00 A.M. <br> Ctrm:  8D <br> Judge:  Hon. Consuelo B. Marshall |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 4

    I.      THE LAUNCH OF DISNEY+ ................................................................ 4

    II.    INVESTOR DAY AND SUBSEQUENT DISCLOSURES ................. 4

    III.   THE INDUSTRY SHIFT AND LEADERSHIP
          TRANSITION—CULMINATING IN DISNEY+ ACHIEVING
          PROFITABILITY IN 2024 ................................................................... 6

    IV.   PLAINTIFFS' ALLEGATIONS ........................................................... 8

    V.    PLAINTIFFS' CLASS CERTIFICATION MOTION ........................ 10

ARGUMENT ......................................................................................................... 13

    VI.   THE SINGLE DAMAGES METHODOLOGY PLAINTIFFS
          SET FORTH FOR THEIR SECTION 10(B) CLAIMS FAILS
          *COMCAST* ......................................................................................... 13

          A.     Plaintiffs Do Not Offer a Methodology Capable of
                Calculating Damages Based on Their Scheme Theory of
                Liability ..................................................................................... 14

          B.     Plaintiffs Do Not Offer a Methodology Capable of
                Calculating Damages Based on Their Misstatement
                Theory of Liability .................................................................... 20

          C.     Dr. Cain Has Not Proposed a Methodology that Can
                Bridge the Differences Between the Misstatement and
                Scheme Theories of Liability ..................................................... 21

    VII.  THE SECTION 20A CLAIM CANNOT BE CERTIFIED AS
          PART OF A SINGLE UNDIFFERENTIATED CLASS .................... 24

CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Angley v. UTi Worldwide Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018).................................................................3

*Basic v. Levinson*,
485 U.S. 224 (1988) .............................................................................................10

*In re Bofi Holdings, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...............................................................................14

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ..................................................3, 23

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .........................................................................................*passim*

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014).........................................................................24

*DeLuca v. Farmers Ins. Exch.*,
2019 WL 4307940 (N.D. Cal. Sept. 11, 2019)....................................................13

*Leyva v. Medline Indus., Inc.*,
716 F.3d 510 (9th Cir. 2013) ...............................................................................13

*Loritz v. Exide Techs.*,
2015 WL 6790247 (C.D. Cal. July 21, 2015) ......................................................23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022)................................................................................23

*In re The Boeing Company Aircraft Sec. Litig.*,
2026 WL 734721 (N.D. Ill. Mar. 16, 2026) ........................................................19

*Vaccarino v. Midland Nat. Life Ins. Co.*,
2014 WL 572365 (C.D. Cal. Feb. 3, 2014) ..............................................20, 21, 22

*In re Vale S.A. Sec. Litig.*,
2026 WL 1002335 (E.D.N.Y. Apr. 13, 2026)......................................................18

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*In re Vaxart, Inc. Sec. Litig.*,
    813 F. Supp. 3d 970 (N.D. Cal. Dec. 18, 2025) ................................................24, 25

*Ward v. Apple Inc.*,
    784 F. App'x 539 (9th Cir. 2019) ................................................................. 13, 24

*White v. Symetra Assigned Benefits Serv. Co.*,
    104 F.4th 1182 (9th Cir. 2024) ........................................................................ 13

**FEDERAL STATUTES**

15 U.S.C. § 78t-1(a) ...............................................................................................24

15 U.S.C. § 78t-1(b)(1) ...........................................................................................25

**FEDERAL RULES OF CIVIL PROCEDURE**

Rule 10b-5(b) .......................................................................... 1, 9, 14, 15

Rule 23 ...........................................................................................*passim*

Rule 23(a) ............................................................................................. 13

Rule 23(b)(3) ................................................................................ 1, 10, 13, 23

Rule 23(b) ............................................................................................. 13

Rules 10b-5(a) and 10b-5(c) ............................................................1, 9, 14, 25

# **INTRODUCTION**

Plaintiffs ask the Court to certify a broad class to pursue claims under two distinct Section 10(b) theories of liability based on a single, generic damages methodology offered by their expert. This type of bare, perfunctory methodology does not satisfy the Supreme Court's holding in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). As that seminal decision makes clear, Plaintiffs have the burden under Rule 23(b)(3) to demonstrate—at the class certification stage—that damages are capable of being measured and isolated in a manner that is *consistent with each alleged theory of liability*, and that could be appropriately adapted if only a subset of those theories or allegations ultimately proceeds to trial. Plaintiffs have failed to meet that burden and class certification should be denied.

Unlike a typical misstatement-only case, Plaintiffs here plead: (1) a "scheme" claim under Rules 10b-5(a) and (c) based on a nine-part, evolving scheme that allegedly concealed conduct over more than three years; and (2) a "misstatement" claim under Rule 10b-5(b) based on seven categories of alleged misstatements consisting of a series of discrete statements made by different speakers at different times. Any viable damages model must be tailored to each theory *and* be capable of disentangling the damages attributable to each.

Plaintiffs have not offered such a model, and their proposed methodology is inadequate under *Comcast*. They do not even attempt to explain how damages are capable of being measured on a class-wide basis for each distinct theory of liability—which is particularly critical where, as here, the claims are based on intertwined and at times conflicting allegations. Nor do Plaintiffs explain how their methodology could isolate damages for one theory, or portions of one theory, if Plaintiffs' claims are narrowed or rejected before trial.

Instead, Plaintiffs' expert offers an off-the-shelf methodology that cannot be squared with the case Plaintiffs have opted to pursue. Indeed, he has offered the same four-page damages opinion, *nearly word for word*, in numerous other Section 10(b)

cases, without accounting for specific claims or facts. All he has done in this case is insert the word "Disney" into his stock opinion.

The very structure of Plaintiffs' claims underscores why such a generic damages opinion does not suffice here. Plaintiffs are not proceeding on a straightforward misstatement theory that may be amenable to the sort of simple damages methodology their expert has offered. Instead, though they opted to allege two legally and economically distinct Section 10(b) claims, they make no attempt to disentangle how the conduct they have charged under each theory of liability (and often under both theories of liability) harmed them. Given the pleading structure Plaintiffs have created, it is critical that Plaintiffs' expert address—at the class certification stage—how their tangled mass of alleged misconduct can be parsed and unwound such that any damages analysis can be performed on a class-wide basis. The methodology Plaintiffs' expert offers fails to accomplish this.

For example, the scheme claim is based both on allegedly concealed conduct and public disclosures—including statements at the start of the Class Period that Plaintiffs do not allege to be misstatements but somehow try to frame as deceptive. The scheme is also alleged to have evolved in various ways, with certain alleged deceptive conduct occurring long after the start of the Class Period. In connection with the other claim, different misstatements are alleged to have been made at different points in time, and there are portions of the Class Period where there are no alleged misstatements and others where there are multiple.

The damages methodology put forth by Plaintiffs' expert starts with the premise that Defendants' allegedly wrongful conduct caused the price of Disney's stock to be artificially inflated, and that the alleged corrective disclosures, by revealing the so-called "truth," caused that artificial inflation to dissipate. Damages can be measured, Plaintiffs' expert says, by calculating the artificial inflation in the stock price at the time a purported class member bought and sold the stock.

The critical problem is that Plaintiffs' expert goes no further. He makes no

-2-
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

effort to consider how his proposed methodology could be applied to the theories of liability and alleged facts of *this* case. This is simply not enough under *Comcast. C.f. Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1128-29 (C.D. Cal. 2018) (Marshall, J.) (certifying class where model was "tied to Plaintiff's theory of liability" and not "tied to multiple theories of liability, some of which are no longer at issue").

A *Comcast*-compliant damages methodology would need to address, among other things, when and how each component of the scheme allegedly introduced inflation, how that inflation evolved and dissipated, how misstatement-based inflation differed in timing and magnitude, and how to separate any scheme-based inflation from misstatement-based inflation so that damages remain "responsive to the jury's specific findings of liability." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *16-17 (S.D. Tex. Dec. 6, 2013). Plaintiffs' expert does not even attempt that exercise.

This failing is especially stark with respect to Plaintiffs' "scheme" liability claim. The methodology put forth by Plaintiffs' expert relies on (1) *publicly made misstatements* that allegedly inflated the stock price, and (2) *publicly made* corrective disclosures that allegedly *corrected prior misstatements* and thus caused the inflation to be removed from the stock price. Plaintiffs' expert has not shown, among other things, how this model can incorporate inflation from *concealed conduct* separate and apart from a misstatement, or how a corrective disclosure can "correct" something that was concealed and never publicly disclosed.

Plaintiffs have thus failed to meet their burden of establishing that class-wide damages can be established in connection with either of their Section 10(b) claims. Class certification therefore should be denied as to the Section 10(b) claim in its entirety. And, even if the Court were to accept that Plaintiffs' proposed damages methodology can establish class-wide damages with respect to the misstatement claims, it should at a minimum decline to certify the class as to the scheme claims.

Separately, class certification should be denied as to Plaintiffs' Section 20A insider trading claim against former CFO Christine McCarthy. As with their Section

-3-

10(b) claim, Plaintiffs have not carried their burden to show that common questions predominate because Section 20A relief is unavailable to wide swaths of the proposed class who did not trade contemporaneously with Ms. McCarthy, and because Plaintiffs' expert fails to put forth a viable model to measure damages under *Comcast*.

**BACKGROUND[1]**

## I.    THE LAUNCH OF DISNEY+

In April 2019, Disney held an investor day at which it announced plans to launch Disney+ in November 2019 and set a target of 60 to 90 million subscribers globally by the end of fiscal year 2024, with profitability to be achieved in the same year. Ex. A at 60-61. Disney+'s launch immediately blew those projections out of the water. Analysts had projected Disney+ would add 8 million subscribers by the end of 2020; instead, 10 million customers subscribed on the first day. By November 2020—four years ahead of schedule—Disney+ had 73 million subscribers, already within the range of its original FY24 target. Ex. B at 3.

Against this backdrop, Disney announced in October 2020 a strategic reorganization of its media and entertainment businesses, consolidating distribution and commercialization activities into a single global Media and Entertainment Distribution organization ("DMED") rooted in the philosophy that content creators should focus on making content while managers focus on selling it. Ex. C at 2. Disney's then-CEO, Robert Chapek, explained: "Managing content creation distinct from distribution will allow us to be more effective and nimble in making the content consumers want most, delivered in the way they prefer to consume it." *Id*.

## II.   INVESTOR DAY AND SUBSEQUENT DISCLOSURES

Throughout 2020 and into subsequent years, Disney integrated Disney+ subscriber and profitability projections into its long-range planning, formulating targets based on data-driven projections rooted in industry-wide consumer trends—

---

[1] The facts presented in this Background section are provided solely to provide context for the Rule 23 analysis and are not offered as a recitation of facts the Court must resolve at this stage.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

specifically, the accelerating shift in consumer preference for streaming video on demand over linear television and theatrical release. *See, e.g.*, Ex. D at 11; Ex. E at 13. Disney held a second investor day on December 10, 2020 ("Investor Day"), at which Mr. Chapek announced a revised Disney+ subscriber target of 230 to 260 million by FY24 and re-affirmed the FY24 profitability target. Ex. D at 79.

Disney disclosed its subscriber methodology, subscriber counts, and DTC financial results throughout the proposed Class Period. For instance, Disney repeatedly disclosed how it calculated paid subscribers: As early as May 2020—months before Investor Day—Disney told investors that "[a] subscription bundle is considered a paid subscriber for each service included in the bundle," and repeated that disclosure in its Q3 and Q4 FY20 earnings releases and its FY20 Form 10-K. Ex. F at 6. Disney also told investors that it would use promotions, discounts, and bundles to attract subscribers, that it would roll out Disney+ in international markets, and that some subscribers (including certain bundled or discounted offerings), would be less profitable. *See e.g.*, Ex. G at 5-6. These disclosures were consistent with Disney's stated DTC strategy—mirroring the broader streaming market at the time—of investing heavily in content to drive subscriber growth even at the cost of significant DTC losses in the near term. *See* Ex. C.

In September 2021, at the Goldman Sachs Communacopia conference, Mr. Chapek announced that Disney+ subscriber additions would be in the "low single-digit millions" in Q3, attributing the slowdown to headwinds including the timing of Indian Premier League cricket subscription expirations, slow growth after the Star+ launch in South America, and COVID-induced production delays. Ex. H at 11.

Consistent with that guidance, Disney announced in November 2021 that Disney+ had grown by just over two million subscribers during Q3. Disney's then-CFO, Christine McCarthy, also disclosed that Disney+ likely would reach its peak year of losses in FY22 rather than FY21, explaining that "better than expected revenue and lower content expenses due to production delays contributed to lower than

expected losses in 2021." Disney also reaffirmed the FY24 subscriber and profitability targets. Ex. I at 17.

On August 10, 2022, Ms. McCarthy reiterated that FY22 remained the peak year of losses "consistent with what we've previously said" and reaffirmed the Disney+ FY24 profitability target. Ex. E at 28. That same day, Disney revised its subscriber growth guidance downward, separating the projections for Disney+ and its Indian streaming service, Hotstar—a revision driven directly by Disney's publicly disclosed decision not to pursue Indian Premier League cricket digital streaming rights. *Id*. An investment adviser to plaintiff Local 272 ███████████████ ████████████████████. Ex. J ("Ruland Tr.") 167:23-169:14. Disney also announced it would raise Disney+ pricing and reduce content spending, which the adviser ████████████████████████████████████████████████ ████████████████████████████████. Ex. E at 13; Ruland Tr. 170:2-15. Local 272 ██████████████████████████. Ruland Tr. 168:2-169:14.

Tellingly, Plaintiffs disregard Disney's public August 2022 statement reducing its subscriber target and fail to identify the August 2022 revision as a corrective disclosure. Instead, in contravention of the undisputed public record, they allege that "[a]s late as August 10, 2022, Disney assured investors that Disney+ would achieve profitability and reach over 200 million subscribers by 2024," Compl. ¶ 335, and that Defendants "unequivocally reaffirm[ed] the 230-260 million subscriber target" each quarter through Q4 2022. *Id*. ¶ 233. Plaintiffs do acknowledge that Disney withdrew its subscriber target in Q1 2023—before the last corrective disclosure in May 2023, *id*. n.22—but still do not identify that withdrawal as a corrective disclosure.

## III. THE INDUSTRY SHIFT AND LEADERSHIP TRANSITION—CULMINATING IN DISNEY+ ACHIEVING PROFITABILITY IN 2024

In April 2022, Netflix—the dominant streaming platform—announced a loss of 200,000 subscribers for the first quarter of 2022, its first subscriber decline in over a decade. *See* Ex. K. Netflix also announced a major strategic pivot away from

subscriber growth and a plan to increase profitability through an ad-supported subscription plan and restricting account sharing. *Id*. Netflix's stock price declined 35% in response to that news. *See* Ex. L. Netflix's April 2022 announcement was widely understood (even by Plaintiffs' investment advisers) as an inflection point for the streaming industry, which had hit maturity earlier than expected. Ex. M ("Willis Tr.") 139:8–11 ("Netflix was really the biggie going on right then, and [subscriber growth] was the most important thing on their [earnings] calls."); Ruland Tr. 169:15–170:2 (███████████████████████████████████████ ████████████████████████████████████████████). Plaintiffs' advisers understood that "[i]f [Netflix is] suffering, Disney probably is too." Willis Tr. 162:14–17. Disney followed the same strategic trajectory as Netflix, and indeed the streaming industry as a whole. In August 2022, Disney announced its own Disney+ ad-supported tier was slated to be launched in December 2022. Ex. E at 26. That move—introducing an ad-supported tier while the industry was pivoting from a focus on raw subscriber counts to different paths to profitability—was the beginning of Disney's own shift in how it sought to enhance Disney+ profitability.

In November 2022, Disney announced that Mr. Chapek would depart as CEO and that prior CEO Robert Iger would return. One of Mr. Iger's mandates was to shift the DTC business away from the raw subscriber-growth-focused model and toward other strategic goals to grow profitability. At a November 2022 town hall, Mr. Iger stated that Disney+ had been "chasing [subscribers] with . . . aggressive spend on content" and would "have to start chasing profitability." Compl. ¶¶ 252, 336.

Further, during Disney's Q1 2023 earnings call, Mr. Iger announced that Disney would cease providing long-term subscriber guidance. He also announced that the company would "aggressively curate" its general entertainment offerings, "reassess all markets we have launched in," and "determine the right balance between global and local content."  Ms. McCarthy announced an annualized content savings target of approximately $3 billion in future spending. Ex. N at 11.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

At least one of Local 272's investment advisers  ███████████. Ruland Tr. 192:8-193:16. This adviser ███████████ ███████████ ███████████ *Id*. 194:21-195:25. Another of Local 272's advisers similarly testified that Mr. Iger's return was a positive development because "during his time period, Disney had flourished." Willis Tr. 190:8-17.

In May 2023, consistent with what it had previewed the prior quarter, Disney announced an expected impairment charge of $1.5 to $1.8 billion for content removed from Disney+. Compl. ¶ 287. In the words of one analyst, this disclosure provided "a very clear heads-up that DIS will soon book a large charge for restructuring and impairment." Ex. O at 9.

Disney+ achieved profitability in fiscal year 2024—as Disney had targeted on Investor Day.[2] The Complaint omits this important fact. Indeed, Plaintiffs assert a Class Period ending in May 2023, long before they could have known whether Disney would meet its long-projected timeframe for Disney+ to achieve profitability.

## IV.    PLAINTIFFS' ALLEGATIONS

***Purported Scheme***. Plaintiffs allege that, following the onset of the COVID-19 pandemic in 2020 that disrupted many of Disney's operations, Defendants "planned and executed a scheme to keep Wall Street's sole focus on Disney+ and keep Disney's stock price elevated" through nine distinct "artifices," including that Defendants: (i) "launched the scheme by intentionally setting an unattainably high Disney+ subscriber target"; (ii) "reorganized the Company, creating DMED and appointing Daniel as President, to consolidate complete control over Disney+"; (iii) "utilized DMED to steer feature films to Disney+, bypassing the lucrative theatrical

---

[2] Ex. P at 1, 22; Ex. Q at 36 ████████████████████████; Ex. R at 26 ████████████████████.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

release and pay-per-view windows"; (iv) "embarked on a massive and unsustainable content spending spree"; (v) "ramped up the use of steep discounts and promotions to chase 'low quality' subscriber growth"; (vi) "launched Disney+ in unprofitable international markets to chase subscriber growth"; (vii) "falsely assured investors [Chapek's] Disney+ growth plan was on track"; (viii) "employed accounting manipulations to conceal runaway Disney+ content costs"; and (ix) "concealed Disney+'s problem with [subscriber] churn." Compl. ¶¶ 5, 122-43.

***Purported Misstatements***. In addition to the scheme claim, Plaintiffs allege Disney made materially false and misleading statements about Disney+. Compl. ¶ 266. The Court's order denying Defendants' motion to dismiss left seven surviving "categories" of alleged misstatements as pled by Plaintiffs, relating to: (i) Disney+ paid subscribers and subscriber growth; (ii) Disney+ content; (iii) Disney's DTC operating losses; (iv) Disney+ international growth; (v) Disney's DMED reorganization; (vi) Disney+ subscriber churn; and (vii) Disney+ profitability. *Id*.; *see also* ECF 111 at 1-2.

These two theories of liability—the nine-artifice scheme and the seven-category misstatement theory—are pleaded as running "[a]t the same time" in parallel, as distinct but overlapping causes of action. Compl. ¶ 8. Plaintiffs' scheme claim is brought under Rules 10b-5(a) and 10b-5(c), while their misstatement claim is brought under Rule 10b-5(b). *Id*. ¶¶ 14-19.

***Corrective Disclosures***. Plaintiffs allege three corrective disclosures: the November 10, 2021 earnings announcement at which Disney disclosed slower subscriber growth and a revised peak-loss timeline; the November 8, 2022 earnings announcement at which Disney reported a $1.47 billion DTC operating loss; and the May 10, 2023 earnings announcement at which Disney disclosed the $1.5 to $1.8 billion content impairment charge. Compl.¶¶ 383-97.

What Plaintiffs do not allege and what the Class Period does not cover, as noted above, is that Disney+ achieved profitability in 2024—in line with the targets

disclosed during Investor Day and throughout the Class Period—targets that, according to Plaintiffs, mark the start of the alleged scheme and form the basis for the opening of the proposed Class Period.

## V.    PLAINTIFFS' CLASS CERTIFICATION MOTION

Plaintiffs move to certify a class of investors who purchased or acquired Disney common stock between December 10, 2020 and May 10, 2023. ECF 246 at 1. Plaintiffs rely on the expert report of Matthew D. Cain. *See* ECF 247-3 ("Cain Report"). Dr. Cain has submitted, by his own account, approximately 70 expert reports in securities fraud class actions in the past decade—all but one in support of plaintiffs, including between 15 to 20 on behalf of Plaintiffs' counsel in this case. Ex. S ("Cain Tr.") 42:5-23; 43:24-45:10; 45:17-22.

To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs seek to establish class-wide reliance under the fraud-on-the-market presumption recognized in *Basic v. Levinson*, 485 U.S. 224 (1988). ECF 246 at 8-15. In support, Dr. Cain presents an event study analyzing price movements on ten trading days—all earnings release dates between February 12, 2021 and May 11, 2023—as the basis for his opinion that Disney stock traded in an efficient market. Defendants do not challenge that Disney stock traded in an efficient market.

Dr. Cain offers a separate opinion that "damages in this matter can be calculated on a class-wide basis using a standard, common methodology that is consistent with Plaintiffs' theory of liability." Cain Report ¶ 3(c). His sole basis for this opinion is that it is possible to calculate class-wide damages for all claims using a single "out-of-pocket" methodology that "calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale." Cain Report ¶ 100. But Dr. Cain has offered no methodology to calculate inflation, consistent with either theory of liability, let alone two distinct legal theories that rely on a tangle of intertwined allegations. Cain Tr. 52:4-8.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Dr. Cain asserts that artificial inflation can be estimated using event studies that "measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged fraudulent schemes and misrepresentations"; or valuation models, such as discounted-cash-flow analysis, that estimate "changes to firm value based on changes in future expected cash flows." Cain Report ¶¶ 102-04. But he has not explained how an event study or a valuation analysis could estimate artificial inflation given the specific claims in this case.

Dr. Cain proposes in theory to calculate artificial inflation using a technique called "back-casting"—working backwards from the stock price drops on the three alleged corrective disclosure dates to infer how much inflation existed throughout the Class Period before those disclosures. *Id.* ¶ 102. But he admits he has not "calculated the input, which is artificial inflation." Cain Tr. 52:4-8. Most importantly, Dr. Cain has not done any work to confirm that artificial inflation is in fact capable of being calculated consistent with Plaintiffs' theories of liability. For example:

- He has not attempted to determine whether and how any alleged misstatement or alleged scheme component caused Disney's stock price to be artificially inflated. *Id.* 91:5-14.

- He has not attempted to determine whether and how any artificial inflation in Disney's stock price was "maintained by specific misstatements or specific artifices of the scheme." *Id.* 118:23-25; 120:25-121:8.

- He has not analyzed whether and how the scheme artifices introduced artificial inflation independently of the alleged misstatements, even though he acknowledges "there could be a wide variety of facts and circumstances that would be necessary to analyze and assess before forming a specific opinion about inflation creation" in this case. *Id.* 120:2-15.

- He has not formed any opinion on "the precise amount or timing of artificial inflation; whether that started on Day 1 [of the proposed Class Period] or was introduced on subsequent days." *Id.* 77:17-79:3.

-11-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

- He has not attempted an event study, a discounted cash flow analysis, or any other technique he might one day deploy to quantify artificial inflation—and has not even decided which technique he would use. *Id*. 139:16-23; 146:3-11.

- He has not read a single analyst report concerning Disney during the relevant period. *Id*. 65:15-23.

All that Dr. Cain offers this Court is a vague, generic, unsupported assurance that inflation is "capable [of] being calculated" at some unspecified future point. *Id*. 145:16-146:11. When pressed on why he had not performed key analyses, Dr. Cain testified that he was engaged only to opine on whether "methodologies exist" to calculate class-wide damages. *Id*. 159:6-17. That, alone, is wholly insufficient to satisfy *Comcast* and its progeny.

Indeed, the methodology that Dr. Cain describes is, on its face, not the result of any case-specific analysis. Substantial portions of his report—including his description of the out-of-pocket methodology and his discussion of the tools available to calculate artificial inflation—are lifted nearly verbatim from reports he submitted in other, unrelated Section 10(b) cases. *See, e.g.*, Ex. T; *see also* Cain Tr. 34:10-23 ("I would expect to have a lot of language in this report that is the same or similar to a lot of language in my prior reports when talking about those types of concepts that are repeated across reports").

And Dr. Cain offers the same opinion in all Section 10(b) cases he is hired to opine upon regardless of the actual theory of liability or facts of those cases. Whether a case involves scheme-based liability, misstatement-based liability, or both, Dr. Cain presents an identical damages methodology, using nearly identical words, concluding in each and every case that damages can be calculated on a class-wide basis. Cain Tr. 34:6-23; 35:16-37:22. Here too, Dr. Cain has failed to perform any case-specific analysis and instead simply recycles a generic damages framework without any tailoring to Plaintiffs' theories of liability. That is not enough, particularly where, as

-12-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

here, where Plaintiffs allege complex, overlapping scheme and misstatement theories.

## ARGUMENT

To certify a class, plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). "Courts may only certify a class if they conclude, after a rigorous analysis, that the prerequisites of Rule 23 have been met." *Id*. Plaintiffs have not demonstrated predominance as to any of their claims and certification therefore should be denied.[3]

## VI.    THE SINGLE DAMAGES METHODOLOGY PLAINTIFFS SET FORTH FOR THEIR SECTION 10(B) CLAIMS FAILS *COMCAST*

In *Comcast*, the Supreme Court made clear that Rule 23(b)(3) requires a "rigorous analysis" of whether "plaintiff's damages case [is] consistent with its liability case." 569 U.S. at 35. Plaintiffs' expert must "translat[e] the legal theory of the harmful event into an analysis of the economic impact of that event." *Id*. at 38; *see Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (damages must "stem[] from the defendant's actions that created the legal liability"). This "[r]igorous analysis entails 'considerations . . . enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *DeLuca v. Farmers Ins. Exch.*, 2019 WL 4307940, at *2 (N.D. Cal. Sept. 11, 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). Plaintiffs must make this showing at the class certification stage and not punt these questions to some later stage of the case. *Ward v. Apple Inc.*, 784 F. App'x 539, 541 (9th Cir. 2019).

Here, Plaintiffs offer two legally and economically distinct theories of liability

---

[3] Defendants do not challenge Plaintiffs' position that the proposed class satisfies the requirements of Rule 23(a). Defendants' opposition is limited to Plaintiffs' claim that they have satisfied Rule 23(b)'s predominance requirement.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

under Section 10(b)—a nine-artifice scheme under Rules 10b-5(a) and (c), and a seven-category misstatement claim under Rule 10b-5(b). Plaintiffs' expert has not offered a viable damages methodology for either theory. And, importantly, he has not offered a damages methodology that disentangles the overlapping, tangled allegations underlying the two theories of liability under Section 10(b). Each failure is independently fatal to certification.

### A. **Plaintiffs Do Not Offer a Methodology Capable of Calculating Damages Based on Their Scheme Theory of Liability**

#### i. *Dr. Cain Cannot Establish How Scheme-Based Inflation Was Introduced into Disney's Stock Price*

Plaintiffs' proposed damages methodology suffers from a fundamental structural flaw that their expert does not even attempt to address: It is a misstatement-based methodology that cannot measure damages attributable to Plaintiffs' scheme claim. It is premised on Defendants' alleged conduct causing Disney's stock price to be artificially inflated, and the alleged corrective disclosures removing the artificial inflation from the stock price by "reveal[ing] the relevant truth." Cain Report ¶ 102. Dr. Cain would then calculate damages as the difference between the artificial inflation at the times a class member purchased and sold the stock. *Id.* ¶ 100.

But inflation can be introduced into the price of a given stock in a number of different ways depending on the specific facts and circumstances. Misstatement-based inflation is discrete and statement-specific; it enters the stock price on the date of a specific false statement and is removed when a corrective disclosure reveals that specific statement's falsity. *See, e.g.*, *In re Bofi Holdings, Inc. Sec. Litig.*, 977 F.3d 781, 789-90 (9th Cir. 2020) (noting that corrective disclosures are commonly used to show that the revelation of truth caused the "fraud-induced inflation in the stock's price to be reduced or eliminated"); *see also* Ex. U ("Marietta-Westberg Report") ¶¶ 16, 47-50. Scheme-based inflation is different. Where an alleged scheme sweeps in deceptive conduct *beyond* the four corners of any specific public statement— including concealed practices, accounting manipulation, and artifices deployed at

-14-

different points in time—the damages methodology must be capable of explaining how that conduct introduced inflation into the stock price, and how it was removed. Marietta-Westberg Report ¶¶ 19-20, 26, 28-29.

Here, Plaintiffs allege exactly such a scheme, premised on concealed conduct involving alleged accounting manipulation, artificial subscriber growth, and undisclosed content costs—which purportedly evolved in magnitude and character as different alleged artifices were deployed at different times. *See* ECF 80 at 3 ("Scheme claims are distinct from claims under Rule 10b-5(b) because they are based on deceptive conduct rather than deceptive statements."). As such, a scheme-based damages methodology must be capable of measuring how that conduct introduced artificial inflation into the stock price independently of any misstatement, tracing when each component of the alleged fraud (*i.e.*, each of the nine alleged artifices) was deployed, quantifying the incremental inflation each introduced, and identifying when the inflation relating to each dissipated. Dr. Cain has not proposed any such methodology. Marietta-Westberg Report ¶¶ 19-20, 26, 28-29, 30-37, 43-45.

In the first instance, Dr. Cain cannot even articulate the economic mechanism by which Plaintiffs' scheme theory generates inflation. When asked how concealed scheme conduct can create artificial inflation in an efficient market without a public-facing statement, Dr. Cain testified that he "typically . . . would point to a public-facing statement," and conceded that while he could "envision scenarios" from "a pure economics standpoint" in which scheme conduct might operate independently of statements, he had "not analyzed such a scenario here." Cain Tr. 95:10-96:6. Nor has Dr. Cain "attempted to quantify the exact timing of which day inflation was introduced into the stock price." *Id*. 97:10-14. And whether scheme conduct, independent of any misstatement, introduced inflation is "not a question [he has] attempted to assess." *Id*. 100:17-24.

The problem is compounded by the fact that several of the nine alleged artifices were not concealed at all—they were publicly known. The creation and structure of

-15-

DMED, Disney's content investments, its DTC operating losses, and its average revenue per user (ARPU) were all publicly disclosed and widely discussed by analysts throughout the proposed Class Period. *See infra* n.5; *see also* Marietta-Westberg Report ¶¶ 32-35. In an efficient market, publicly disclosed information is quickly and fully incorporated into stock price. Cain Report ¶ 28. A damages methodology that cannot distinguish between price movements attributable to concealed conduct as opposed to publicly known information simply cannot measure scheme-based inflation. *See* Marietta-Westberg Report ¶¶ 32-37.

The DMED reorganization is illustrative. Plaintiffs allege that Mr. Chapek used DMED to steer films to Disney+ in order to boost subscriber growth at the expense of profits. But Disney's distribution windows were publicly known and extensively discussed by analysts. *Id*. ¶ 33 & n.53. Dr. Cain does not articulate how his methodology could reliably estimate inflation from the alleged "concealment" of a scheme to steer films to Disney+ when it was publicly known that Disney was doing exactly that. Moreover, the DMED reorganization was undisputedly announced in October 2020, before the start of the proposed Class Period. *Supra* at 4. Dr. Cain has "not attempted to assess" whether the alleged inflation from the DMED reorganization would have been introduced into the stock price before the Class Period, at its start, or at some later point. Cain Tr. 98:20-99:2.

Likewise, Dr. Cain claims that scheme-based inflation entered Disney's stock price on December 10, 2020—the first day of the proposed Class Period—when Defendants purportedly "launched the scheme by intentionally setting an unattainably high Disney+ subscriber target" as part of their Investor Day disclosures. Cain Tr. 22:2-8; Compl. ¶ 122. At the same time, Dr. Cain concedes that the first actionable misstatement in the case was made, not at Investor Day, but months later in February 2021. Cain Tr. 87:17-24.

This exposes a threshold problem that Plaintiffs cannot resolve: how can statements that are *not* alleged to be false or misleading form the basis for the start of

-16-

a fraudulent scheme? Equally important, how can an alleged scheme that was concealed—as Plaintiffs' expert claims here—introduce artificial inflation into an efficient market as of December 10, 2020, or at any time?

### ii.    Dr. Cain Cannot Establish How Scheme-Based Inflation Evolved Throughout the Class Period

The failing in Dr. Cain's methodology is not limited to how inflation entered the stock price—it extends to how inflation allegedly evolved throughout the course of the alleged scheme. The nine alleged artifices underlying Plaintiffs' scheme claim were not all deployed at once. Compl. ¶¶ 122-43. For example, certain artifices are alleged to have begun after the start of the Class Period, meaning any incremental inflation they introduced could not have existed from the beginning of the Class Period. Compl. ¶¶ 205-09; 227. A proper damages methodology would have to be capable of accounting for when each artifice was deployed, what inflation, if any, each incrementally introduced, and how that inflation dissipated—questions Dr. Cain does not attempt to address. *Supra* § VI.A.i; Marietta-Westberg Report ¶¶ 28-29, 30-37, 38-42, 43-45.

Moreover, information related to specific artifices changed materially over the course of the proposed Class Period in ways that would affect any inflation calculation. For example, Disney's content spend—central to the alleged scheme—increased from approximately $20 billion in FY 2020 to approximately $30 billion in FY 2022, and Disney's quarterly DTC operating losses more than tripled from $466 million in Q1 2021 to $1.474 billion in Q4 2022.[4] To the extent the value implications of any alleged concealment about content spend or DTC losses would change as the underlying figures changed, inflation would not be constant across the Class Period. Marietta-Westberg Report ¶¶ 40-42.

Likewise, as discussed above with respect to the DMED reorganization, many

---

[4] Ex. D at 82-83; Ex. E at 12; Ex. G at 3; Ex. V at 4.

-17-

of the supposed "artifices" were themselves publicly disclosed throughout the Class Period.[5] In an efficient market, each such disclosure would be incorporated into Disney's stock price when it occurred. *See* Cain Report ¶ 28. Accordingly, any inflation attributable to concealment of a particular artifice would have dissipated upon these disclosures—which, importantly, occurred on different dates than Plaintiffs' three alleged corrective disclosures. Dr. Cain does not explain how scheme-related inflation could persist, much less remain constant, in an efficient market that incorporated this information into the stock price over time, or how his model could account for that. Nor does he explain how to disentangle any inflation that might have persisted from the inflation that was removed by those disclosures. Marietta-Westberg Report ¶¶ 32-37, 38-42, 43-45.

Dr. Cain acknowledges that "artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements," Cain Report ¶ 108, but offers no methodology capable of measuring that evolution. Asserting that his methodology is "flexible," *id.*, is not a substitute for necessary modeling and analysis. *See In re Vale S.A. Sec. Litig.*, 2026 WL 1002335, at *7 (E.D.N.Y. Apr. 13, 2026) (excluding damages opinion that assumed full amount of artificial inflation began from start of class period but "conducted no analysis" to determine if inflation remained constant throughout).

### iii.  *Dr. Cain Cannot Establish How Scheme-Based Inflation Was Removed from Disney's Stock Price*

Dr. Cain also fails to demonstrate that his methodology is capable of addressing a significant inconsistency in Plaintiffs' own scheme theory. Plaintiffs allege that "the artifices were exposed and the scheme began to unravel in late 2022," pointing to the

---

[5] For instance, Disney repeatedly disclosed: the direct-to-Disney+ film premieres and shortened theatrical windows, *e.g.*, Ex. G at 6, Ex. I at 22-23; promotional subscriber partnerships, *e.g.*, Ex. G at 6 n.2, ECF 71-14 at 422; the international launches and associated lower-ARPU markets, *e.g.*, Ex. G at 6 n.3; and elimination of intersegment pricing markups, ECF 72-7 at 1126. *See* Compl. ¶¶ 164-68, 181-90, 191-203, 214-15 (alleging the foregoing as scheme "artifices").

-18-

November 8, 2022 earnings announcement, Mr. Chapek's subsequent firing, and the return of Mr. Iger as CEO. Compl. ¶¶ 245-52. But if the scheme began to unravel in late 2022, Dr. Cain does not explain how the alleged corrective disclosure on November 10, 2021—a full year earlier—corrected any scheme-related inflation. Marietta-Westberg Report ¶ 44. Nor does he articulate how his methodology would address that disconnect, or what portion, if any, of the November 2021 price decline reflected the revelation of the alleged scheme versus other information.

The problem is equally pronounced with respect to the last alleged corrective disclosure on May 10, 2023—approximately six months after Mr. Iger returned as CEO. By that point, as Plaintiffs admit, the "scheme" had *already* unraveled: Mr. Iger had publicly announced $5.5 billion in cost savings, dissolved DMED, and reoriented Disney's streaming profitability strategy away from a focus on raw subscriber growth—all well before May 2023.[6] *Supra* at 6-7. Given that public statements revealing the alleged scheme's core premises were being openly discussed by new management, the May 2023 price decline cannot be attributed to the revelation of the alleged scheme.[7] Moreover, Dr. Cain does not explain how his methodology could distinguish between price reactions as corrections of the alleged scheme, as opposed to new strategic choices by a new CEO. Marietta-Westberg Report ¶ 45. A price decline driven by a new CEO's policy choices, of course, is not a corrective disclosure removing fraud-induced inflation; it is a market reaction to new information. *Id*.

The only tool Dr. Cain discusses with any specificity is a theoretical event study analyzing price reactions on the alleged corrective disclosure dates. Cain Report ¶ 102. But an event study on its own does not permit one to assess the separate price

---

[6] For example, according to the Complaint: at a November 28, 2022 company townhall that was widely reported in the press, Mr. Iger stated that Disney+ had been chasing subscribers through aggressive content spend; and at a March 9, 2023 industry conference, Mr. Iger acknowledged that content exclusivity was not as valuable as Disney had thought. Compl. ¶ 262.

[7] *See In re The Boeing Company Aircraft Sec. Litig.*, 2026 WL 734721, at *20-21 (N.D. Ill. Mar. 16, 2026) (trimming Class Period where alleged corrective information was previously disclosed).

-19-

impact of nine different artifices when information related to multiple artifices is revealed concurrently. Marietta-Westberg Report ¶ 28. Likewise, Dr. Cain cannot explain how his damages methodology would be capable of disentangling the price impact of individual artifices if only some are found to be actionable, whether by a jury or at summary judgment. *Id*. If, for example, only three of the nine alleged artifices were found to give rise to liability, or if only the misstatement claims proceeded to trial, Dr. Cain's generic "out-of-pocket" methodology would still produce a single aggregate damages figure with no capacity to isolate what any particular finding of liability actually caused. *Id*. That is precisely the failure *Comcast* was designed to prevent. *See Vaccarino v. Midland Nat. Life Ins. Co.*, 2014 WL 572365, at \*7 (C.D. Cal. Feb. 3, 2014) (noting *Comcast* model failed Rule 23 "because it conflated all four theories of antitrust violation without differentiating between the harms caused by each theory").

### B. Plaintiffs Do Not Offer a Methodology Capable of Calculating Damages Based on Their Misstatement Theory of Liability

Plaintiffs allege seven categories of surviving misstatements made by different speakers, on different dates, on different subjects, spanning more than two and a half years. *Supra* at 9. The first alleged misstatement in the Disney+ profitability category, for example, was not made until November 8, 2022—nearly two years into the proposed Class Period, one year after the first alleged corrective disclosure, and on the same date as the second alleged corrective disclosure. *See* Compl. ¶ 316. But Dr. Cain does not articulate a methodology to calculate the incremental inflation introduced by any given misstatement. Marietta-Westberg Report ¶¶ 47, 51-52. And he cannot articulate how his methodology would determine the separate impact of different alleged misstatements when those misstatements overlap in a given period.

In addition, Dr. Cain's methodology does not account for how inflation evolved throughout the proposed Class Period. Plaintiffs' allegations relate to statements about Disney+ subscriber targets, content spend, and DTC operating losses—all of

which changed materially over the proposed Class Period. For example, after Netflix reported its first subscriber decline in 2022, the streaming market overall shifted focus from raw subscriber growth metrics to a profitability lens that more heavily focused on unit economics. *Supra* at 6-7; Marietta-Westberg Report ¶¶ 52-54. A disclosure regarding DTC operating losses would be expected to have a different impact on Disney's stock price early in the proposed Class Period when the market (and Disney) was focused on subscriber growth, than in late 2022 or 2023 when the market was scrutinizing profitability through other, additional factors. Marietta-Westberg Report ¶¶ 53-54. But Dr. Cain does not explain how his methodology would account for any evolution in the value implications of the alleged misstatements, nor the corresponding change in the inflation. *Id.* ¶ 51.

### C. Dr. Cain Has Not Proposed a Methodology that Can Bridge the Differences Between the Misstatement and Scheme Theories of Liability

Even assuming Dr. Cain could build a viable misstatement-based damages model and a separate scheme-based model, *Comcast* requires a third showing: that his methodology can disentangle the two. It cannot.

In *Comcast*, the expert "expressly admitted that the model calculated damages resulting from 'the alleged anticompetitive conduct *as a whole*' and did not attribute damages to any one particular theory of anticompetitive impact"; the model therefore could not "bridge the differences" between plaintiffs' particular theory of harm and a general theory of antitrust harm, and certification was denied. 569 U.S. at 36-38.

Dr. Cain commits the same error in applying the same methodology, without distinction, to both the scheme and misstatement theories Plaintiffs chose to plead. Cain Tr. 79:7-16. Dr. Cain admits that he has not considered whether artificial inflation from the scheme-related conduct would differ from misstatement-related inflation. *Id.* 97:10-14. A model that aggregates damages across multiple theories of liability, without attributing any portion to any particular one, cannot establish that damages are measurable on a class-wide basis consistent with each theory. *Vaccarino*,

2014 WL 572365, at *7 (*Comcast* model failed Rule 23 where it "did not segregate out harm caused by each of the four theories [] proffered by the plaintiffs.")

This disentanglement problem—critical to the pending class certification request—manifests in various ways because the components of the alleged misstatements and scheme are largely interrelated. For example, Plaintiffs allege that setting unattainably high subscriber targets at Investor Day was an artifice of the scheme, but according to their interrogatory responses and their expert's testimony, this was not a false or misleading misstatement. Compl. ¶¶ 150-52; ECF 136 at 13 n.8; Ex. W at 22-32; Cain Tr. 87:17-24. Plaintiffs further allege that Disney's reaffirmation of those same targets on November 10, 2021 was both a scheme act *and* an actionable misstatement. Compl. ¶¶ 271, 276(a). Under this theory, scheme-based inflation entered the stock price on December 10, 2020, and misstatement-based inflation related to the allegedly unattainably high subscriber targets entered—if at all—a year later on November 10, 2021. But, by no stretch can Dr. Cain show how his damages methodology can disentangle the portion of the resulting inflation that relates to the alleged misstatements in 2021 from the portion that relates to the alleged scheme in 2020. Marietta-Westberg Report ¶¶ 60-66.

*Comcast* warns against this very scenario. As the Supreme Court observed, "[f]or all we know," one group of purchasers "may have been overcharged because of" one alleged harmful practice while another group "may have paid elevated prices" for a different reason. 569 U.S. at 37. "The permutations" were "nearly endless." *Id.* at 38. So too here. Class members who purchased across a two-and-a-half-year Class Period would have been exposed to  different combinations of alleged scheme-based and misstatement-based inflation in proportions that cannot be determined without theory-specific analysis that Dr. Cain concedes he has not performed and cannot perform with a single undifferentiated methodology like the one he offers the Court.

To the contrary, Dr. Cain has not proposed a methodology to adjust for which alleged misstatement or scheme artifice caused inflation or when, nor one that

-22-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

attributes any particular plaintiff's loss to any particular aspect of the alleged fraudulent conduct. It thus renders damages "unresponsive to specific liability findings." *BP*, 2013 WL 6388408, at *17; *see also Loritz v. Exide Techs.*, 2015 WL 6790247, at *24 (C.D. Cal. July 21, 2015) (*Comcast* concerns heightened when alleged misrepresentations "changed and grew throughout the class period" and "information was disclosed at different times in multiple alleged corrective disclosures").

\*     \*     \*

At the class certification stage, a district court "is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022). Thus, the question is not whether Dr. Cain will ultimately prove that Plaintiffs were damaged—it is whether he has proposed a methodology *capable* of measuring the damages attributable to each theory of liability. That is a Rule 23 question, not a merits question, and Dr. Cain has failed to offer the Court such a methodology.

Rule 23(b)(3) squarely requires a rigorously supported damages methodology anchored to the facts of a particular case and the specific theories of liability. Plaintiffs' broad and intertwining theories and allegations cannot be crammed into Dr. Cain's generic, one-size-fits-all damages methodology. The nature of the scheme Plaintiffs opted to allege—weaved into Plaintiffs' misstatement theory and creating a convoluted and confusing web of facts that must be parsed as part of any damages analysis—sets this case apart. This is not a case where experts like Dr. Cain can convince a court to grant certification based on little more than dusting off a generic Section 10(b) damages methodology. *Comcast* requires more on these facts.

Dr. Cain's only refrain is that his methodology is flexible and can adapt to incorporate the issues that will need to be evaluated as part of the damages calculation in this case. That is not a damages methodology capable of demonstrating class-wide

-23-

resolution under *Comcast*; it is a promise to devise one later. The Court is left with no assurance that this hypothetical, future methodology could in fact account for the issues that Dr. Cain admits he has not considered, analyzed, or opined upon. That is precisely what *Comcast* forbids. *See Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019) (plaintiff's expert cannot "merely assert[] that he [will] be able to develop a model at some point in the future"); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) (plaintiffs cannot rely on expert's "assurance that he can build a model to calculate damages").

Plaintiffs fail to meet their burden to show that common issues predominate with respect to damages, and certification should be denied as to their Section 10(b) claims. At a minimum, certification should be denied as to the scheme claim.

## VII. THE SECTION 20A CLAIM CANNOT BE CERTIFIED AS PART OF A SINGLE UNDIFFERENTIATED CLASS

The proposed class likewise fails Rule 23's predominance requirement for Plaintiffs' Section 20A insider trading claim. Plaintiffs seek to certify the *exact same class* for the Section 20A claim as for Section 10(b), but this fails for two reasons.

*First*, large swaths of the Proposed Class likely have no cognizable Section 20A claim. A Section 20A plaintiff must have purchased stock "contemporaneously" with a defendant (here, Ms. McCarthy) who sold while in possession of material, nonpublic information. 15 U.S.C. § 78t-1(a). Whatever "contemporaneity" window this Court adopts, only investors who purchased Disney stock within that window can seek Section 20A relief. Of the four proposed class representatives, only one, Local 272, alleges purchases contemporaneous with Ms. McCarthy's sales. Compl. ¶ 423 (alleging purchases within two to four days of two of Ms. McCarthy's sales). Plaintiffs offer no class-wide method to identify eligible investors and no subclass structure to segregate the contemporaneous traders from the broader class. This alone defeats predominance. *See, e.g., In re Vaxart, Inc. Sec. Litig.*, 813 F. Supp. 3d 970, 973 (N.D. Cal. Dec. 18, 2025) ("A court cannot certify a class that consists of some people who

-24-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

traded contemporaneously with the insiders and others who likely didn't.").

*Second*, Plaintiffs have not demonstrated that Section 20A damages are capable of class-wide calculation. Section 20A has its own damages framework and caps "[t]he total amount of damages imposed" at "the profit gained or loss avoided" by the insider on the trades at issue. 15 U.S.C. § 78t-1(b)(1). Dr. Cain does not actually propose a damages model; he simply notes that the court "may" measure "losses avoided" by comparing Ms. McCarthy's sale price to post-disclosure prices, or "profits gained" from the alleged fraud, labeling those approaches as "relatively straightforward" and "applicable class-wide." Cain Report ¶¶ 113–15. As with his Section 10(b) damages methodology, this is not a damages model but a vague promise of one to come. This is insufficient under *Comcast*.

Compounding the problem, whatever Section 20A calculation Dr. Cain might eventually perform will depend on his flawed Section 10(b) damages methodology. *See* Cain Report ¶ 116 n.115 (stating that the "losses avoided" calculation "simply requires substituting the daily inflation measures for the prices in the mathematical formula"). Without a viable methodology for calculating and tracking inflation for the Section 10(b) claim—which Plaintiffs have not offered, *see supra* Part VI—there is no foundation for any Section 20A damages calculation.

Accordingly, because Plaintiffs have failed to show that common issues predominate, certification should be denied as to their Section 20A claim too.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification as to both Section 10(b) claims or, in the alternative, as to the scheme liability claim under Rules 10b-5(a) and (c). The Court should further deny certification as to the Section 20A claim.

Dated:  April 30, 2026

Respectfully submitted,

WHITE & CASE LLP
MUNGER, TOLLES & OLSON LLP

By:     s/ John W. Spiegel
        JOHN W. SPIEGEL

Attorneys for Defendants The Walt Disney Company, Robert Iger, Robert Chapek, Christine M. McCarthy, and Kareem Daniel

-26-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## L.R. 11-6.2 Certificate of Compliance

The undersigned, counsel of record for Defendants, certifies that this brief contains 25 pages, which complies with the page limit set by the Court's Individual Practice Rule 7(c).

Dated: April 30, 2026                    /s/ *John W. Spiegel*
                                         JOHN W. SPIEGEL

-27-
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION